No. 23-2366

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

K.C., ET AL.,

*Plaintiffs-Appellees*,

v.

INDIVIDUAL MEMBERS OF THE MEDICAL LICENS-
ING BOARD OF INDIANA, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Southern District of Indiana, No. 1:23-cv-00595-JPH-KMB,
The Honorable James P. Hanlon, Judge

**OPENING BRIEF FOR DEFENDANTS-APPELLANTS**

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-6255
Tom.Fisher@atg.in.gov

THEODORE E. ROKITA
Attorney General of Indiana

THOMAS M. FISHER
Solicitor General

JAMES A. BARTA
Deputy Solicitor General

MELINDA R. HOLMES
Deputy Attorney General

*Counsel for Defendants-Appellants*

## TABLE OF CONTENTS

INTRODUCTION ................................................................... 1

JURISDICTIONAL STATEMENT ............................................ 3

STATEMENT OF THE ISSUES .............................................. 3

STATEMENT OF THE CASE.................................................. 4

I.     Sex, Gender Identity, and Gender Discordance................... 4

II.    Gender Dysphoria .......................................................... 6

       A.     Diagnosis of gender dysphoria ............................... 6

       B.     The recent spike in gender dysphoria ...................... 7

       C.     Persistence of gender dysphoria into adulthood ......... 9

III.   Interventions for Gender Dysphoria ................................ 10

       A.     Psychosocial interventions.................................... 10

       B.     Medical interventions........................................... 11

IV.    The Push for Medical Interventions................................. 13

       A.     The "Dutch protocol" .......................................... 13

       B.     WPATH & Endocrine Society ............................... 15

V.     The Increasing Evidence of Regret.................................. 18

VI.    International Reevaluations of the Evidence ...................... 20

VII.   Indiana's S.E.A. 480 Restricts Experimental Interventions
       for Minors ................................................................... 24

VIII.  District Court Proceedings ............................................. 25

SUMMARY OF THE ARGUMENT .......................................... 27

STANDARD OF REVIEW...................................................... 30

ARGUMENT ........................................................................................ 30

I.    The Equal Protection Clause Permits Indiana To Protect Minors from Harmful and Unproven Gender-Transition Procedures ................................. 30

      A.    S.E.A. 480 classifies by age, procedure, and medical condition—not sex—rendering it subject to rational-basis review.............................. 31

            1.    S.E.A. 480 applies equally to both sexes .................................... 32

            2.    Supreme Court precedent precludes heightened scrutiny ................................................................... 33

            3.    *Whitaker* does not require heightened scrutiny.......................... 36

            4.    The Sixth Circuit's recent ruling confirms rational-basis review applies ...................................................... 39

      B.    Alleged disparate impacts on transgender persons do not warrant heightened scrutiny....................................................... 40

      C.    S.E.A. 480's ban on subjecting minors to unproven, harmful procedures satisfies any level of scrutiny............................................ 42

            1.    S.E.A. 480 serves important state interests.............................. 42

            2.    S.E.A. 480 is substantially related to its objectives .................. 45

II.   Indiana May, Consistent with the First Amendment, Prohibit Medical Providers from Aiding or Abetting Unlawful Procedures .............................. 48

III.  Equitable Considerations Militate Against Injunctive Relief........................ 49

IV.   The District Court Erred in Enjoining Enforcement of S.E.A. 480 Against Everyone and in All Circumstances .................................................. 51

CONCLUSION................................................................................... 53

# TABLE OF AUTHORITIES

## CASES

*A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville*,
    --- F.4th ---, 2023 WL 4881915 (7th Cir. Aug. 1, 2023) ........................................ 37

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
    57 F.4th 791 (11th Cir. 2022) ................................................................................... 40

*Bowen v. Gilliard*,
    483 U.S. 587 (1987) .................................................................................................. 40

*Brandt ex rel. Brandt v. Rutledge*,
    47 F.4th 661 (8th Cir. 2022) ..................................................................................... 39

*Brandt ex rel. Brandt v. Rutledge*,
    No. 21-2875, 2022 WL 16957734 (8th Cir. Nov. 16, 2022) ..................................... 39

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) .................................................................................................. 41

*Craig v. Boren*,
    429 U.S. 190 (1976) .................................................................................................. 40

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022) ....................................................................................*passim*

*Doe v. Rokita*,
    54 F.4th 518 (7th Cir. 2022) .................................................................... 51, 52, 53

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) ............................................................................................ 31, 41

*Geduldig v. Aiello*,
    417 U.S. 484 (1974) ........................................................................................*passim*

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490, 502 (1949) ..................................................................................... 48, 49

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) ............................................................................................ 43, 46

*Heller v. Doe*,
    509 U.S. 312, 319 (1993) ......................................................................................... 31

Cases [cont'd]

*John Doe No. 1. v. Reed,*
  561 U.S. 186, 194 (2010) ....................................................................... 52

*Kane v. De Blasio,*
  19 F.4th 152 (2d Cir. 2021) ............................................................... 52

*L.W. ex rel. Williams v. Skrmetti,*
  73 F.4th 408 (6th Cir. 2023) ......................................................... *passim*

*Lyng v. Castillo,*
  477 U.S. 635 (1986) ............................................................................ 40

*Marshall v. United States,*
  414 U.S. 417, 427 (1974) ................................................................ 1, 45

*Mass. Bd. of Retirement v. Murgia,*
  427 U.S. 307 (1976) ............................................................................ 41

*Mathews v. Lucas,*
  427 U.S. 495 (1976) ............................................................................ 40

*Michael M. v. Superior Ct. of Sonoma Cnty.,*
  450 U.S. 464 (1981) ............................................................................ 34

*Mulholland v. Marion Cnty. Election Bd.,*
  746 F.3d 811 (7th Cir. 2014) ............................................................. 52

*New York v. Ferber,*
  458 U.S. 747 (1982) ............................................................................ 42

*Nguyen v. INS,*
  533 U.S. 53 (2001) ................................................................... 34, 37, 42

*Reed v. Reed,*
  404 U.S. 71 (1971) ........................................................................ 31, 33

*Rice v. Paladin Enters., Inc.,*
  128 F.3d 233 (4th Cir. 1997) ............................................................. 49

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
  547 U.S. 47 (2006) .............................................................................. 49

*Smith v. Bayer Corp.,*
  564 U.S. 299 (2011) ............................................................................ 51

CASES [CONT'D]

*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,*
    563 F.3d 257 (7th Cir. 2009) ................................................ 30

*United States v. Hansen,*
    143 S. Ct. 1932 (2023) ........................................ 48, 49, 52

*United States v. Salerno,*
    481 U.S. 739 (1987) .................................................. 50, 52

*United States v. Virginia,*
    518 U.S. 515 (1996) ............................................ 31, 34, 37

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) .......................................................... 40

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of*
    *Educ.,*
    858 F.3d 1034 (7th Cir. 2017) .......................... 28, 36, 37, 38

*Winter v. Nat. Res. Defense Council, Inc.,*
    555 U.S. 7 (2008) .............................................................. 30

STATUTES

28 U.S.C. § 1292(a)(1) ...................................................... 3

28 U.S.C. § 1331 ................................................................ 3

42 U.S.C. § 1396d(a)(10)(A) ............................................ 3

42 U.S.C. § 1396d(a)(10)(B)(i) ........................................ 3

42 U.S.C. § 18116 ............................................................ 3

Ind. Code § 25-1-22-4 ...................................................... 24

Ind. Code § 25-1-22-5(a) .................................................. 24

Ind. Code § 25-1-22-5(a)(1)–(2) ................................ 32, 40

Ind. Code § 25-1-22-5(b) ............................................ 32, 40

Ind. Code § 25-1-22-6 ...................................................... 24

Ind. Code § 25-1-22-8 ...................................................... 24

STATUTES [CONT'D]

Ind. Code § 25-1-22-12 ........................................................... 24

Ind. Code § 25-1-22-13(a)-(b) ................................................... 24

Ind. Code § 25-1-22-13(b) ........................................................ 48

Ind. Code §  25-1-22-1, et seq. ................................................... 3

Ind Code. § 25-1-22-5(b) ......................................................... 24

Ind Code. § 25-1-22-13(c) ........................................................ 24

Ind Code. § 25-1-22-13(d) ........................................................ 24

OTHER AUTHORITIES

Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021) ...................... 42

Exec. Order No. 14,020, 86 Fed. Reg. 13,797 (Mar. 8, 2021) ..................... 42

Exec. Order No. 14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021) ..................... 42

Laura Edwards-Leeper & Erica Anderson, *The Mental Health
Establishment Is Failing Trans Kids*, Wash. Post (Nov. 24, 2021) ..................... 18

*Transgender Resources*, ABA,
https://www.americanbar.org/groups/diversity/sexual_orientation/re
sources/transgenderrights/ ....................................................... 42

**INTRODUCTION**

Across the developed world, the number of minors claiming to experience gender dysphoria has climbed exponentially over the past decade—including by 4,000% in the United Kingdom and 1,500% in Sweden. By one count, U.S. cases tripled between 2017 and 2021 alone. Rates are especially high among teenage girls.

Some physicians have responded by prescribing puberty blockers to interrupt normal puberty and massive doses of hormones to change permanently the physical appearance of still-developing minors. As new systematic reviews of scientific literature reveal, however, those interventions lack reliable support. The "evidence" for them consists of small, biased studies unable to distinguish between the impact of medical interventions and non-invasive psychological support. In fact, as the reviews reflect, the only thing known for sure about puberty blockers and hormones is that they carry significant risks. Blockers stunt growth, weaken bones, and affect brain development; hormones increase cancer and stroke risk and cause sterility.

Given the known harms and unproven benefits of these medical interventions for gender dysphoria in minors, Indiana may constitutionally prohibit them. The "normal rule" is that States have broad discretion over how to regulate new medical procedures, particularly "'in areas fraught with medical and scientific uncertainties.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2268 (2022) (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)). As the Sixth Circuit recently observed in permitting another state law protecting minors against gender-transition procedures to take effect, States may "rationally take the side of caution before

permitting irreversible medical treatments of [their] children." *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023). States are under no constitutional imperative to authorize experimental treatments for gender dysphoria.

Notwithstanding States' traditional power over health and safety measures, the district court held that the Equal Protection Clause gives minors with gender dysphoria a right to puberty blockers and hormones. The court thought that Indiana's prohibition on using puberty blockers and hormones for child gender transitions, known as Senate Enrolled Act (S.E.A.) 480, should be subject to heightened scrutiny for classifying based on sex. As the court itself conceded, however, "S.E.A. 480 prohibits both male and female minors from using puberty blockers and cross-sex hormone[s]." SA20. It cannot be that a statute discriminates based on sex when it applies equally to both sexes. Embracing the district court's expansive view of sex discrimination would require discarding decades of Supreme Court precedent.

S.E.A. 480 withstands heightened scrutiny regardless. By the district court's own account, "more research is needed to explore the[] risks" of gender-transition procedures, and "important reasons" underlie S.E.A. 480's ban on them. SA1, SA23. The court thus did not dispute that S.E.A. 480 advances important state interests in protecting children from risky, experimental procedures. Instead, the court quibbled with Indiana's decision to ban gender-transition procedures rather than follow the path of countries that have limited their use to "'formal research.'" SA26. But Indiana need not let its children become research subjects merely because others have made

2

a different policy choice. The Constitution entrusts democratically accountable representatives with balancing the risks and benefits of unproven medical interventions.

## JURISDICTIONAL STATEMENT

This appeal arises from a putative class action in which plaintiffs alleged that Indiana's S.E.A. 480, Ind. Code § 25-1-22-1 *et seq.*—which regulates the provision of gender-transition procedures to minors—violates the Fourteenth Amendment's Equal Protection and Due Process Clauses; the First Amendment; Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116; and Medicaid requirements, 42 U.S.C. § 1396d(a)(10)(A) and (a)(10)(B)(i). Dkt. 1. The district court had jurisdiction under 28 U.S.C. § 1331. On June 16, 2023, the district court issued an order granting in part plaintiffs' motion for a preliminary injunction, Dkt. 67, and a separate preliminary injunction, Dkt. 68. On July 11, 2023, defendants timely appealed. Dkt. 77. This Court has jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.     Whether, consistent with the Equal Protection Clause, Indiana may prohibit physicians from providing minors with GnRH analogues (puberty blockers) and hormones for purposes of gender transitions.

2.     Whether, consistent with the First Amendment, Indiana may prohibit medical providers from aiding or abetting gender-transition procedures.

3.     Whether the equities and public interest preclude a preliminary injunction against a democratically adopted measure that protects minors from unproven, dangerous, and potentially irreversible medical interventions.

3

4.     Whether the district court erred in enjoining application of S.E.A. 480 to anyone in all circumstances without first certifying a class or finding there is no set of circumstances in which S.E.A. 480 can be constitutionally applied.

## STATEMENT OF THE CASE

### I.     Sex, Gender Identity, and Gender Discordance

All humans have a sex—male or female. *See* Dkt. 48-4 at 5 (Weiss Decl. ¶ 18); Dkt. 48-2 at 10 (Hruz Decl. ¶ 16). "Sex is an objective biological trait . . . permanently determined . . . at conception" and genetically encoded into every human cell. Dkt. 48-2 at 9 (Hruz Decl. ¶ 14); *see* Dkt. 48-4 at 5–6 (Weiss Decl. ¶¶ 18–20); Dkt. 48-1 at 52–54 (Cantor Decl. ¶¶ 104–06). "Males have XY chromosomes in their cells"; "females have XX chromosomes." Dkt. 48-4 at 5 (Weiss Decl. ¶ 19); *see* Dkt. 48-2 at 9, 32, 41 (Hruz Decl. ¶¶ 14, 57, 71). That encoding affects humans through "over 6,500" sex-differentially expressed genes. Dkt. 48-2 at 27, 41 (Hruz Decl. ¶¶ 48, 71).

One of sex's most significant impacts is on human reproductive roles. Dkt. 48-2 at 9, 41 (Hruz Decl. ¶¶ 14, 71). Human males produce sperm in testes and deliver it to females; human females receive the sperm and join it with maternal genetic information contained in an ovum produced by ovaries. *Id.* (¶ 14); *see* Dkt. 48-4 at 5 (Weiss Decl. ¶ 20). "[N]o procedure can enable an individual to perform the reproductive role of the opposite sex." Dkt. 48-4 at 5 (Weiss Decl. (¶ 21); *see* Dkt. 48-2 at 32–33 (Hruz Decl. ¶ 57). Although rare disorders can affect external genitalia's appearance, sex can be correctly identified from genitalia in "nearly 99.98% of cases." Dkt. 48-2 at 9–12 (Hruz Decl. ¶¶ 15–19).

Gender and gender identity are distinct from sex. Traditionally, "gender" referred to a grammatical concept, but nowadays often refers to "psychological and cultural characteristics." Dkt. 48-2 at 12–13 (Hruz Decl. ¶ 20). As even plaintiffs' Dr. Turban admits, whereas sex refers to an *objective*, *biological* concept, gender identity refers to a *subjective*, *psychological* sense. Dkt. 48-11 at 7 (Turban Dep. 19: 3–12); *see* Dkt. 48-1 at 52 (Cantor Decl. ¶ 104); Dkt. 48-2 at 9, 11–12 (Hruz Decl. ¶¶ 14, 20). Plaintiffs' experts describe gender identity as an "internal sense of belonging," Dkt. 26-2 at 6 (Shumer Decl. ¶ 27), which can be male, female, a blend, or something else, Dkt. 26-1 at 7 (Karasic Decl. ¶ 28). A person whose sex and gender identity do not align may be called "transgender." Dkt. 26-2 at 6 (Shumer Decl. ¶ 27).

As plaintiffs' witnesses concede, no test for gender identity exists. Dkt. 48-10 at 9, 11 (Shumer Dep. 27:1–5, 33:14–15); Dkt. 48-11 at 8 (Turban Dep. 24:1–6); Dkt. 48-8 at 15 (Mosaic Dep. 51:5–6); Dkt. 48-1 at 52 (Cantor Decl. ¶ 104). To know a person's gender identity, plaintiffs' witnesses explain, they must ask the person to "tell [them]." Dkt. 48-8 at 15 (Mosaic Dep. 51:3–4); *see* Dkt. 48-10 at 9 (Shumer Dep. 28:13–16); Dkt. 48-9 at 8 (Karasic Dep. 24:15–21); Dkt. 48-11 at 7–8 (Turban Dep. 19:13–21, 21:6–22:20). According to plaintiffs' witnesses, "gender identity may evolve over time." Dkt. 26-2 at 6–7 (Shumer Decl. ¶ 28); *see* Dkt. 48-8 at 13–14 (Mosaic Dep. 44:13–15, 46:14–25) (agreeing that "gender identity change[s] over time").

## II.     Gender Dysphoria

### A.     Diagnosis of gender dysphoria

Gender dysphoria is a psychiatric (not medical) diagnosis defined by the American Psychiatric Association's DSM-5. *See* Dkt. 48-1 at 55 (Cantor Decl. ¶ 108). The prior manual, DSM-4, called the diagnosis "gender identity disorder." *Id.* at 119–20 (¶ 266). A diagnosis of gender dysphoria requires (among other things) "clinically significant distress" with one's sex. *Id.* at 55 (¶ 108); *see* Dkt. 48-3 at 99–100 (Kenny Decl. ¶¶ 188–89). Not all transgender youth experience dysphoria. Dkt. 48-10 at 13 (Shumer Dep. 42:5–8); Dkt. 48-11 at 10 (Turban Dep. 31:4–10).

Gender dysphoria in children (prepubertal minors) is marked by a "strong desire" or "insistence" that "one is the other gender" and at least five other criteria, all lasting at least six months, such as "a strong preference for wearing only typical" clothing of the other gender, "for the toys, games or activities stereotypically used or engaged in by the other gender," and "for playmates of the other gender." Dkt. 49-4 at 7–8 (DSM-5 TR 3–4). Gender dysphoria in adolescents (minors who have reached puberty) is marked by two criteria lasting at least six months, such as a "strong desire to be rid of one's primary and/or secondary sex characteristics" or "a strong conviction that one has the typical feelings and reactions of the other gender." *Id.*

As plaintiffs' experts concede, no other test exists to verify a diagnosis or to calculate an error rate. *See* Dkt. 48-11 at 10 (Turban Dep. 31:11–19); Dkt. 48-10 at 13 (Shumer Dep. 41:15–16). A diagnosis depends on self-reported feelings. Other conditions and experiences, such as post-traumatic stress disorder, schizophrenia,

autism, borderline personality disorder, and incipient homosexuality, can cloud the diagnostic process. Dkt. 48-5 at 62–69 (Kaliebe Decl. ¶¶ 171–89); Dkt. 48-3 at 121–26 (Kenny Decl. ¶¶ 237–46); Dkt. 48-11 at 15 (Turban Dep. 49:1–5).

### B.    The recent spike in gender dysphoria

Historically, gender dysphoria in minors was "rare." Dkt. 48-5 at 10, 12–13 (Kaliebe Decl. ¶¶ 19, 28). Most cases were reported in prepubertal children born male, with ratios of boys to girls being as high as 33 to 1. Dkt. 48-3 at 43–45 (Kenny Decl. ¶¶ 87, 89); *see* Dkt. 48-1 at 57 (Cantor Decl. ¶ 112).

In recent years, however, numbers have skyrocketed. "The UK has reported a 4,000 percent increase . . . over the past 10 years," resulting in a 50-fold increase in referrals to its leading gender clinic, and "Sweden . . . a 1,500 percent increase." Dkt. 48-3 at 35 (Kenny Decl. ¶ 71); *see* Dkt. 48-5 at 12 (Kaliebe Decl. ¶ 28).



Dkt. 48-5 at 11–12 (Kaliebe Decl. ¶¶ 28–30). "Similar increases have been reported across much of the economically advanced countries in the world, many showing an

7

over 1000% rise in gender dysphoria over the last decade." Dkt. 48-5 at 12 (Kaliebe Decl. ¶ 29); *see* Dkt. 48-3 at 43–51 (Kenny Decl. ¶¶ 87–101). "Never before have there been large cohorts of individuals seeking . . . to alter their secondary sex characteristics." Dkt. 48-5 at 12 (Kaliebe Decl. ¶ 30).

With skyrocketing numbers has come an equally dramatic shift in presentation. Whereas formerly most minors with gender dysphoria were young boys, most minors today are adolescent girls with no history of cross-gender behavior. Dkt. 48-1 at 66–67 (Cantor Decl. ¶ 135); Dkt. 48-5 at 11–12 (Kaliebe Decl. ¶¶ 28–30); Dkt. 48-3 at 43–45 (Kenny Decl. ¶¶ 87–89).

The upsurge in gender dysphoria among teen girls is largely unstudied, Dkt. 48-1 at 66–67 (Cantor Decl. ¶ 135)—as a U.K. review observed, "[a]t present we have the least information for the largest group of patients," Dkt. 49-7 at 59 (Cass Report 58). But "[c]ases commonly appear to occur within clusters of peers in association with increased social media use, and among people with autism or other mental health issues." Dkt. 48-1 at 66–67 (Cantor Decl. ¶ 135). Approximately "70% of children with gender dysphoria have had recent trauma, history of abuse, autism spectrum disorder, homosexual orientation, depression, anxiety, or bullying." Dkt. 48-4 at 14 (Weiss Decl. ¶ 58).

Social and online contagion could be "major contributors" to the "remarkable rise in gender dysphoria in adolescents." Dkt. 48-5 at 13 (Kaliebe Decl. ¶ 33). A 2018 paper showed 86.7% of parents reporting "that, along with the sudden or rapid onset of gender dysphoria, their child either had an increase in their social media/internet

8

use, belonged to a friend group in which one or multiple friends" identified as transgender "during a similar time-frame, or both." *Id.* at 16 (¶ 42) (citation omitted). A 2023 paper showed similar results. Dkt. 48-1 at 66–67 (Cantor Decl. ¶ 135).

Those findings are consistent with broader research showing that peers exert "powerful" influence on minors, especially adolescent girls. Dkt. 48-3 at 17–18, 39 (Kenny Decl. ¶¶ 32–33, 78). Minors who do not fit within peers' perception of a binary gender role are frequently ostracized and, to gain acceptance, may "declar[e] themselves transgender," an identity "valorized by a politically powerful transactivist lobby." *Id.* at 37–38 (¶ 76); *see id.* at 41–42 (¶ 84).

The findings are also consistent with research showing the internet and social media powerfully affect minors, as illustrated by their role in spreading suicide contagion, self-harm contagion, anorexia, tic disorders, and psychosomatic illnesses. Dkt. 48-5 at 15 (Kaliebe ¶¶ 39–41); *see* Dkt. 48-3 at 40–41 (Kenny Decl. ¶¶ 82–83). When polled, 82% of respondents at a national conference of psychiatrists reported that social media "somewhat often" or "very often" influences teens regarding "their sexual and/or gender identity." Dkt. 48-5 at 21 (Kaliebe Decl. ¶ 53).

## C.    Persistence of gender dysphoria into adulthood

Although long-term data on the recent rise of adolescent teen girls identifying as transgender is lacking, existing research indicates that gender dysphoria can resolve on its own, *i.e.*, without social or medical intervention. All studies of children found that a "majority cease to want to be the other gender over the course of puberty—ranging from 61–88% desistance." Dkt. 48-1 at 59 (Cantor Decl. ¶ 115).

Currently, however, there is no "reliable procedure for discerning which children who present with gender dysphoria will persist." *Id.* at 61–62 (¶ 122) (citation omitted).

## III. Interventions for Gender Dysphoria

There is ongoing debate over whether gender dysphoria in minors should be treated using psychosocial interventions, medical interventions, or both.

### A. Psychosocial interventions

Psychosocial interventions for gender dysphoria include "psychosocial support[] and psychotherapy." Dkt. 48-5 at 57–58 (Kaliebe Decl. ¶ 150); *see* Dkt. 48-8 at 22, 25 (Mosaic Dep. 77:1–8, 90:7–14) (admitting to using social support as a "treatment"). "Quality psychotherapy includes the process of exploring patient life history, emotions, coping style, and thought patterns. This includes validating how patients feel, but it also includes teaching patients to not be guided solely by their feelings." Dkt. 48-5 at 58 (Kaliebe Decl. ¶ 151). "Psychiatrists," for example, "do not 'affirm' hopelessness in depression, delusions in schizophrenia, or distorted body image in anorexia or body dysmorphic disorder." *Id.* (¶ 152).

"Time-tested and widely effective psychotherapy approaches include supportive therapy or cognitive behavioral therapy." Dkt. 48-5 at 61–62 (Kaliebe Decl. ¶ 167). "Cognitive behavioral therapy has proven effective for virtually every mental health condition it has been researched for, including the full range of anxiety disorders, depressive and mood disorders, disturbed anger, sleep disturbance and trauma reactions"—conditions present at "high levels" in patients with gender dysphoria. *Id.* (¶ 167). Psychotherapy's goal is "to help individuals gain a deeper understanding of

themselves, develop coping skills, and provide a neutral, unbiased process." *Id.* (¶ 168). Both sides' experts agree "psychotherapy" is "very valuable for a lot of people" with gender dysphoria. Dkt. 48-9 at 22 (Karasic Dep. 76:18–24); *see* Dkt. 48-11 at 59–60 (Turban Dep. 228:16–229:1) (admitting psychotherapy "helped" patients).

## B.    Medical interventions

Medical interventions for gender dysphoria are riskier and more invasive. They include GnRH analogues (puberty blockers), cross-sex hormones, and gender-transition surgeries. This appeal focuses on GnRH analogues and hormones.

1.    GnRH analogues are drugs that the FDA approved to treat central precocious puberty, a rare disorder in which children undergo puberty too early. Dkt. 48-2 at 20–22, 24 (Hruz Decl. ¶¶ 36–37, 39, 43); *see* Dkt. 48-4 at 19 (Weiss Decl. ¶ 86). When used for treating that disorder, the goal is to allow a child to enter puberty at a normal age, lest early puberty stunt their ultimate bone growth. Dkt. 48-2 at 21, 25 (Hruz Decl. ¶¶ 37, 45). Puberty, however, is not further delayed due to the risk of "adverse effects, including reduced bone marrow density." *Id.* (¶ 45); *see* Dkt. 48-4 at 20 (Weiss Decl. ¶ 92).

GnRH analogues are not FDA approved for treating gender dysphoria. Dkt. 48-4 at 19 (Weiss Decl. ¶ 86); *see* Dkt. 48-2 at 33 (Hruz Decl. ¶ 58). When GnRH analogues are used to treat gender dysphoria in minors, the objective is to delay natural puberty and to prevent the development of secondary sex characteristics (*e.g.*, facial hair in natal males and breasts in natal females). Dkt. 48-2 at 14–15, 33–34 (Hruz Decl. ¶¶ 25, 59); *see* Dkt. 26-2 at 13–15 (Shumer Decl. ¶¶ 54, 57–58) (similar). Various

11

medical and psychiatric conditions can render patients with gender dysphoria ineligible for GnRH analogues. Dkt. 48-11 at 18 (Turban Dep. 62:14–63:6).

2.     Cross-sex hormones are another medical intervention. Males and females naturally have different primary sex hormones: The principal sex hormone for males is testosterone while the principal female sex hormone is estrogen. Dkt. 48-2 at 27–30, 42 (Hruz Decl. ¶¶ 49, 53, 73); Dkt. 48-4 at 23 (Weiss Decl. ¶¶ 107–08). "There are major and highly significant differences between male and female responses to sex hormones." Dkt. 48-2 at 27 (Hruz Decl. ¶ 48). For example, testosterone can be used to restore health in males by raising low testosterone due to damaged testes or by treating delayed male puberty with "low doses of testosterone for 3–4 months." *Id.* at 27–28 (¶¶ 49–50). By contrast, testosterone is "not an indicated treatment" for disorders affecting "a female child or adolescent." *Id.* at 29 (¶ 52). Giving testosterone to a female would yield "serious adverse effects," including "impaired fertility, alopecia (hair loss), disfiguring acne, and metabolic changes that increase risk of heart disease and diabetes." *Id.* (¶ 52). Instead, females are given estrogen to "to treat the same conditions testosterone treats in males." *Id.* at 28–29 (¶ 53).

Cross-sex hormone treatment for gender dysphoria involves giving females doses of testosterone 20–40 times higher than their normal levels to induce typical male characteristics, such as lower voice and facial hair, and giving males doses estrogen about 5 times higher than their normal levels to induce typical female characteristics, such as breasts, female fat distribution, and softer skin. Dkt. 48-2 at 39–40 (Hruz Decl. ¶ 68); Dkt. 48-4 at 23 (Weiss Decl. ¶¶ 107–08). Gender dysphoria patients

12

may take hormones for "the rest of their lives." Dkt. 48-8 at 20 (Mosaic Dep. 69:22–23). This use of hormones is not FDA approved. Certain conditions, including suicidality, can render patients better suited for psychotherapy than hormones. Dkt. 48-9 at 22 (Karasic Dep. 77:25–79:16); Dkt. 48-11 at 12 (Turban Dep. 37:24–39:9).

3.    Surgeries are the most invasive intervention. Surgeries considered for natal females include "masculinizing chest surgery" (or "top surgery") and "phalloplasty" (or "bottom surgery"). Dkt. 48-11 at 47 (Turban Dep. 180:10–16). Chest surgery means removing both breasts and recontouring the chest. *See* Dkt. 48-11 at 48 (Turban Dep. 182:4–18). A phalloplasty involves "taking a piece of tissue from somewhere else in the body and fashioning a phallus from that," attaching it, and repositioning and extending the urethra. Dkt. 48-11 at 48 (Turban Dep. 181:21–182:3).

Surgeries for natal males include vaginoplasties. Dkt. 48-11 at 47 (Turban Dep. 180:10–16). That surgery involves "removal of the testes" and penis, creating a "space between the rectum and the bladder," creating a vaginal-like structure with skin from the penis, and "reposition[ing] the urethra where the urine flows." Dkt. 48-9 at 26 (Karasic Dep. 96:7–23); Dkt. 48-11 at 48 (Turban Dep. 181:9–16). Genital surgeries are "fairly big invasive surgeries that carry substantial medical involvement and are difficult to reverse." Dkt. 48-11 at 47 (Turban Dep. 180:19–21).

## IV.    The Push for Medical Interventions

### A.    The "Dutch protocol"

The history of medical interventions for gender dysphoria is a short one, beginning at a clinic in the Netherlands during the 1990s. Dkt. 48-1 at 110 (Cantor Decl.

¶¶ 238–39); Dkt. 48-2 at 33 (Hruz Decl. ¶ 58). The protocol that clinic developed, known as the "Dutch protocol," is more conservative than what many practitioners use today but still quickly proceeds to medical interventions. Dkt. 48-1 at 83, 110 (Cantor Decl. ¶¶ 170, 238–39).

Under the Dutch protocol, "no social transition"—*i.e.*, "social affirmation" of a child in the opposite gender—is permitted before age 12. Dkt. 48-1 at 110–11 (Cantor Decl. ¶¶ 240, 244). Rather, "watchful waiting" is prescribed. *Id.* "Watchful waiting does not mean do nothing." *Id.* (¶ 244). It instead involves "actively treating" other "issues which may be exacerbating psychological stress or dysphoria" through therapy and mental-health interventions. *Id.* The Dutch insistence on watchful waiting reflects "the long-established and repeated observation" that gender dysphoria will resolve in most children without intervention and that social transition "contribute[s] to the likelihood of persistence." *Id.* at 61, 110 (¶¶ 121, 239) (citation omitted).

After age 12, the Dutch protocol permits social transition and treatment with GnRH analogues, but only after mental-health issues are resolved and only with ongoing mental-health support. Dkt. 48-1 at 110–11 (Cantor Decl. ¶¶ 240, 243). It "emphasize[s] the need for extensive mental health assessment, including clinical interviews, formal psychological testing with validated psychometric instruments, and multiple sessions with the child and the child's parents." *Id.* at 111 (¶ 243). After age 16, the Dutch protocol permits cross-sex hormones, but again only if mental-health issues have been resolved and only with ongoing mental-health support. *Id.* at 110–11 (¶¶ 240, 243).

In selecting age thresholds, the Dutch did not identify "any research" showing them to be more appropriate than alternatives. Dkt. 48-1 at 111 (Cantor Decl. ¶ 242); *see id.* at 111–12 (¶ 245). The clinic selected them because they corresponded to the age of informed consent under Dutch law. *Id.* at 111 (¶ 242).

### B.     WPATH & Endocrine Society

More recently, many practitioners have departed from the Dutch protocol to take an even riskier approach—which plaintiffs here prefer. Plaintiffs point to guidelines developed by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society as describing this approach. *See* Dkt. 27 at 16. Some practitioners and clinics take even more lax approaches, however. Dkt. 49-17 at 6–7, 10–11 (Reed Decl. ¶¶ 10–11, 21).

WPATH released version 8 of its guidelines in 2022 (SOC-8). Dkt. 48-5 at 42 (Kaliebe Decl. ¶ 113). Under SOC-8, social transition is permitted *at any age*. Dkt. 48-1 at 52, 112–13 (Cantor Decl. ¶¶ 101, 248). Plaintiffs' expert considers three-year-olds able to declare themselves transgender and to begin social transition. Dkt. 48-11 at 12 (Turban Dep. 40:17–21). And while the SOC-8 initially had age recommendations for medical interventions, WPATH abruptly dropped those recommendations soon after initial publication without citing any research. Dkt. 48-1 at 52, 112–13 (Cantor Decl. ¶¶ 101, 248). The current guidelines permit treatment with GnRH analogues and cross-sex hormones whenever puberty first manifests (Tanner Stage 2). Dkt. 49-3 at 115–16, 117–18 (WPATH SOC-8 at S12.1, S12.5). Under SOC-8, there is no requirement for psychotherapy before transitioning. *Id.* at 178 (S18.9).

15

In creating SOC-8, WPATH did not conduct a "systematic review" of the evidence "for children." Dkt. 48-9 at 23 (Karasic Dep. 81:4–6). It commissioned a general review on *efficacy* of GnRH analogues and cross-sex hormones but not their safety. Dkt. 48-1 at 48–49 (Cantor Decl. ¶¶ 92–93). The review did not separately evaluate adolescents. *Id.* at 50 (¶ 97). It considered only three studies on adolescents, excluding three others due to "high risks of bias," and then lumped the selected studies together with adult studies. *Id.* at 49–50 (¶¶ 94, 97). Even so, the review found only "low" quality evidence that hormones improved quality of life, depression, and anxiety, and "insufficient" evidence that hormone therapy reduced suicide. *Id.* at 50 (¶ 97). No studies "follow[ed] youth into adulthood." *Id.* at 51–52 (¶ 100). Despite research gaps, SOC-8 recommended medical interventions using "consensus-based expert opinion." *Id.* at 50–51, 85–86 (¶¶ 98, 175) (citation omitted); *see* Dkt. 48-5 at 43–45 (Kaliebe Decl. ¶¶ 115–21) (observing SOC-8 used a process like the prior version, which "scored poorly on editorial independence, applicability, and rigor of development").

Like WPATH, the Endocrine Society recommends "temporary suppression of pubertal development of children with GnRH agonists followed by hormonal treatments." Dkt. 48-2 at 48–49 (Hruz Decl. ¶¶ 82–83). Those recommendations were created by a committee of ten members—nine of whom are "also WPATH leaders or authors"—and were never submitted to the full membership for approval or for external review. Dkt. 48-5 at 47–48 (Kaliebe Decl. ¶ 128); *see* Dkt. 48-2 at 50–51 (Hruz Decl. ¶ 86). According to the guidelines themselves, evidence quality for the recommendations is "low" or "very low" under the GRADE system, the leading method for

evaluating medical-evidence quality. Dkt. 48-2 at 48–49 (Hruz Decl. ¶ 83). Under GRADE, "low recommendations indicate that '[f]urther research is very likely to have an important impact on our confidence in the estimate of effect and is likely to change the estimate.' Very low recommendations mean that 'any estimate of effect is very uncertain.'" *Id.* at 48 (¶ 82). The guidelines nevertheless made "strong recommendations" based on "weak evidence"—a "discouraged" practice. *Id.* at 49 (¶ 84).

In creating the guidelines, the Endocrine Society commissioned a review on how sex-steroid use affects "lipids and cardiovascular outcomes" and "bone health." Dkt. 48-1 at 47–48 (Cantor Decl. ¶ 88) (citation omitted). It did not "look at the effect of the interventions on gender dysphoria itself, arguably 'the most important outcome.'" Dkt. 48-2 at 49 (Hruz Decl. ¶ 84) (citation omitted). Despite the narrow scope, the reviews did not identify "any study of adolescents" on lipids and cardiovascular outcomes, and identified "only one small," short-term study on bone health. Dkt. 48-1 at 47–48 (Cantor Decl. ¶ 88). "[T]he Endocrine Society does not claim to have conducted or consulted any systematic review of the efficacy of puberty blockers or cross-sex hormones to reduce gender dysphoria or increase mental health or well-being." *Id.* at 48 (¶ 89). "Nor does it claim to have conducted or consulted any systematic review of safety" with respect to "brain development, future fertility, [or] actual reversibility." *Id.*

Many medical advocacy organizations have nonetheless issued supporting statements. Dkt. 48-3 at 76 (Kenny Decl. ¶ 144). Some statements, such as the American Academy of Pediatrics', are the work of "a single author" who never did a

systematic review. Dkt. 48-1 at 52 (Cantor Decl. ¶ 103). Others were developed by committees staffed with advocates of medical interventions for transgender youth. Dkt. 48-5 at 32–33 (Kaliebe Decl. ¶¶ 85–87). The organizations' leadership have suppressed efforts to discuss evidence quality and alternative treatments. *Id.* at 33–58 (¶¶ 89–150); Dkt. 48-3 at 74–75, 81–85 (Kenny Decl. ¶¶ 142–43, 155–60). WPATH's U.S. affiliate even censured WPATH's first transgender president, Dkt. 48-5 at 47 (Kaliebe Decl. ¶ 125), who criticized physicians for "rush[ing]" youth into transitions without adequate research to support "quick medical treatment," Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment Is Failing Trans Kids*, Wash. Post (Nov. 24, 2021), https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/.

## V.    The Increasing Evidence of Regret

Heartbreaking stories of how hormones and surgeries have destroyed lives accompany aggressive medical interventions. Corinna Cohn tells how hormones and surgeries pursued at a young age left him depressed, alienated, and "sexually dysfunctional." Dkt. 49-13 at 2, 5 (Cohn Decl. ¶¶ 2, 13). He now faces a lifetime of regret. *Id.* at 6–7 (¶¶ 21–22). Xandra Robertson, a detransitioned woman, attempted suicide because "[t]he pursuit of transition had pushed away [her] family, destroyed [her] marriage, and made meaningful relationships nearly impossible." Dkt. 49-14 at 6–7 (Robertson Decl. ¶¶ 14–15). As Robertson learned, she could never "truly transition and become the other gender" but was a medical patient for life. *Id.* at 5 (¶ 12).

Chloe Cole began testosterone at age 13 and received a double mastectomy at age 15, and now at age 18 "griev[es for her] breasts and [her] girlhood that was cut short." Dkt. 49-12 at 2, 4 (Cole Decl. ¶¶ 2, 13). Zoe Hawes started testosterone at 16 and desperately wanted a hysterectomy and mastectomy—only insufficient finances preserved her ability to become a mother able to breastfeed her son. Dkt. 49-16 at 4–5 (Hawes Decl. ¶¶ 15–16). Yaacov Sheinfeld's daughter experienced so much depression and pain from ten years of cross-sex hormones that she took fentanyl, fatally overdosing. Dkt. 49-15 at 3 (Sheinfeld Decl. ¶¶ 11–13).

These tragic stories do not stand alone. Evidence of detransition and regret among those who undergo gender-transition procedures as minors is "increasing." Dkt. 48-4 at 27 (Weiss Decl. ¶ 137); *see* Dkt. 48-1 at 20–21 (Cantor Decl. ¶ 29); Dkt. 48-3 at 69–70 (Kenny Decl. ¶ 132). Detransition rates among youth have not been exhaustively studied. But an evaluation of 952 adolescents observed that 26% of those who started hormonal interventions before age 18 discontinued them, including 36% of natal females. Dkt. 48-4 at 27–28 (Weiss Decl. ¶ 139). And that paper almost certainly undercounts. Years may elapse between receipt of hormones and detransition, and a high proportion—by one estimate, 76%—"d[o] not inform their physicians about their detransition." *Id.* (¶¶ 138–39). Dr. Weiss estimates about 70% of the roughly 100 gender dysphoria patients he treated discontinued hormones. *Id.* at 28 (¶ 140).

## VI.     International Reevaluations of the Evidence

Although WPATH and the Endocrine Society are fulfilling the wishes of adolescents clamoring for medical interventions despite increasing evidence of regret, international medical bodies are studying the evidence and charting a different path.

1.      In 2020, the U.K.'s National Health Service commissioned an independent report by prominent pediatrician Dr. Hilary Cass on the use of puberty blockers and cross-sex hormones. Dkt. 48-1 at 12–13, 15–16 (Cantor Decl. ¶¶ 12, 19). To aid with the report, U.K.'s National Institute for Health Care Excellence (NICE) surveyed the literature on efficacy and safety. *Id.* at 42 (¶ 77). It reported that the literature was "very low" quality, commenting that it either reported changes of "questionable clinical value" or was "not reliable." Dkt. 49-5 at 41–42, 46 (NICE GnRH Review 40–41, 45); *see* Dkt. 49-6 at 15, 48, 51 (NICE Hormone Review 14, 47, 50) (similar). Any purported benefits, NICE stated, "could be due to confounding, bias or chance." Dkt. 49-5 at 46 (NICE GnRH Review 45). The "long-term safety profile" of hormones is "largely unknown." Dkt. 49-6 at 51 (NICE Hormone Review 50).

Dr. Cass, in turn, reported that the evidence was "not strong enough" to recommend a policy. Dkt. 49-7 at 36 (Cass Report 35). She observed that decisions to undergo "irreversible" medical interventions that come with various risks—from sterility to cancer to osteoporosis—"need to be informed by long-term data" but that existing data was of "poor quality." *Id.* at 37 (36); *see id.* at 38 (37). Dr. Cass further emphasized the lack of "any data" on the new population of teenage girls that only recently began presenting with gender dysphoria, observing that many of them "may

20

not reach a settled gender expression until their mid-20s." *Id.* at 37 (36). Following Dr. Cass's report, the U.K.'s National Health Service reversed its policy of routinely providing puberty blockers and hormones to minors. Dkt. 48-1 at 16, 44 (Cantor Decl. ¶¶ 20, 82). "Little," it commented, "is known about the long-term side effects of hormone or puberty blockers." *Id.* (citation omitted).

2.    In 2019, Finland "commissioned a systematic review of the effectiveness and safety of medicalized transition" as well. Dkt. 48-1 at 16–17 (Cantor Decl. ¶ 22). It observed that "the youth who were functioning well after transition were those who were already functioning well before transition, and those who were functioning poorly before transition continued to function poorly after transition." *Id.* at 17 (¶ 22). "Medical gender reassignment is not enough to improve functioning and relieve psychiatric comorbidities among adolescents with gender dysphoria." *Id.*

In 2020, Finland "ended the surgical transition of minors" and sharply restricted other medical interventions. Dkt. 48-1 at 17 (Cantor Decl. ¶ 24). Its governing policy body concluded that, due to scant evidence, puberty blockers and cross-sex hormones are "experimental." Dkt. 49-9 at 9 (COHERE Recommendation 8). It stated that medical interventions must be done "with a great deal of caution, and no irreversible treatment should be initiated." *Id.* Medical interventions for minors accordingly may be considered "only if" a minor's transgender identity is "of a permanent nature," it "causes severe dysphoria," "other psychiatric symptoms have ceased," and "adolescent development is progressing normally." *Id.* at 10–11 (at 9–10). The "first-

line intervention" should be "psychosocial support and, as necessary, gender-explor-ative therapy and treatment for comorbid psychiatric disorders." *Id.* at 9 (at 8).

3.     In 2019, Sweden—the first country in the world to authorize legal gen-der transitions—initiated its own systematic review. Dkt. 48-1 at 18–19 (Cantor Decl. ¶ 26). Released as a peer-reviewed article in 2023, the review concluded that "long-term effects of hormone therapy on psychosocial and somatic health are unknown, except that GnRHa treatment seems to delay bone maturation and gain in bone min-eral density." Dkt. 49-10 at 13 (Swedish Review 12). The review observed that there were "[n]o randomised controlled trials" regarding safety and efficacy, and that exist-ing observational studies were "limited by methodological weaknesses." *Id.* at 10–11 (at 9–10). As the review explained, the "absence of long-term studies is worrying be-cause many individuals start treatment as minors (<18 years) and [cross-sex hormone therapy] is lifelong." *Id.* at 11 (at 10).

After the review, Sweden's "leading . . . pediatric gender clinic" discontinued hormonal interventions for patients under the age of 16 and limited hormonal inter-ventions for minors over age 16 to closely supervised "clinical trials." Dkt. 48-1 at 19 (Cantor Decl. ¶ 27). It cited a "lack of evidence for both the long-term consequences of the treatments, and the reasons for the large influx of patients in recent years," adding that hormonal "treatments are potentially fraught with extensive and irre-versible adverse consequences." *Id.* (citation omitted). Sweden's Board of Health and Welfare issued a policy document reaching a similar conclusion. *Id.* at 20 (¶ 28). It emphasized the "lack of reliable scientific evidence concerning the efficacy and

safety," observing that the evidence to support claimed benefits is "insufficient and inconclusive for all reported outcomes." *Id.* (citation omitted). The "risks" of medical interventions, the board concluded, "outweigh the possible benefits." *Id.*

4.      In 2022, in response to the Swedish review, the French Académie Nationale de Médecine changed its own stance on medical interventions, saying the "greatest reserve is required." Dkt. 49-11 at 2 (Académie 1). "[G]reat medical caution," the Académie observed, "must be taken in children and adolescents, given the vulnerability, particularly psychological, of this population and the many undesirable effects, and even serious complications, that some of the available therapies can cause." *Id.* The Académie attributed a "very important part" of the growing numbers of minors with gender dysphoria to the "addictive character of excessive consultation of social networks," *i.e.*, social media and peers. *Id.* at 3 (at 2). It advised providers "to extend as much as possible the psychological support phase" of treatment. *Id.*

5.      In 2022, Norway undertook a review as well and concluded medical interventions for minors are "experimental." Dkt. 48-1 at 21 (Cantor Decl. ¶ 30) (citation omitted). The review noted an eightfold increase in the number of minors seeking treatment for gender dysphoria, particularly among young natal females. *Id.* at 22 (¶ 33). And it observed that the "knowledge base, especially research-based knowledge for gender-affirming treatment (hormonal and surgical), is insufficient and the long-term effects are little known." *Id.* at 21 (¶ 31) (citation omitted). "This applies particularly to the teenage population, which accounts for a large part of the

increase in referrals to the specialist health service in the last decade." *Id.* (citation omitted).

## VII.  Indiana's S.E.A. 480 Restricts Experimental Interventions for Minors

Amid growing calls for caution, Indiana enacted S.E.A 480 in April 2023. S.E.A. 480 generally prohibits licensed medical practitioners from "knowingly provid[ing]," or aiding or abetting another practitioner in providing, "gender transition procedures to a minor." Ind. Code § 25-1-22-13(a)–(b). "[G]ender transition procedures" are procedures that seek to "(1) alter or remove physical or anatomical characteristics or features that are typical for the individual's sex" or "(2) instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex," including "puberty blocking drugs, gender transition hormone therapy," and gender-reassignment surgeries. *Id.* § 25-1-22-5(a); *see id.* §§ 25-1-22-4, 25-1-22-6, 25-1-22-8 (detailing which hormones and surgeries are covered). In S.E.A. 480, "sex" refers to "the biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." *Id.* § 25-1-22-12.

Under S.E.A. 480, medical practitioners may still provide (1) services for "a disorder or condition of sexual development," (2) services for a "physical disorder, physical injury, or physical illness," (3) services for "any infection, injury, disease, or disorder" attributable to gender-transition procedures, and (4) "[m]ental health or social services." Ind Code. §§ 25-1-22-5(b), 25-1-22-13(c). S.E.A. 480 also permitted practitioners to continue prescribing gender transition hormones for up to 6 months after its effective date to permit them to titrate down hormones. *Id.* § 25-1-22-13(d).

## VIII.  District Court Proceedings

Within hours of S.E.A. 480's signing, plaintiffs filed this lawsuit. Dkt. 1. Plaintiffs include four transgender minors—all suffering from "multiple serious psychiatric comorbidities," Dkt. 48-4 at 8 (Weiss Decl. ¶ 28); *see* Dkt. 48-3 at 101–120 (Kenny Decl. ¶¶ 192–234) (detailing comorbidities and trauma)—and their parents; Catherine Bast, a physician who provides puberty blockers and cross-sex hormones to minors; and her medical practice, Mosaic Health and Healing Arts. Dkt. 1 at 3–4 (¶¶ 7–16). Plaintiffs alleged that S.E.A. 480 violates the Equal Protection Clause, substantive due process, the First Amendment, Medicaid requirements, and the Affordable Care Act. Dkt. 1 at 42–45 (¶¶ 212–23).

Plaintiffs moved for a preliminary injunction and class certification. Dkt. 9; Dkt. 10. When defendants moved to postpone class-certification briefing due to voluminous discovery for the preliminary-injunction motion and resource constraints, Dkt. 29, the district court *sua sponte* proposed that it could issue a preliminary injunction extending "beyond the named plaintiffs" without certifying a class. SA38. The court directed "Plaintiffs" to show cause "why briefing on their motion for class certification should not be stayed." SA40. The court did not give defendants an opportunity to respond. Instead, the court emphasized that it was "not address[ing] the appropriate scope of preliminary injunctive relief," which was the "subject of the parties' ongoing briefing." SA39. Plaintiffs responded by acceding to a postponement of class-certification briefing, even though (they conceded) defendants had not "agree[d] to apply any injunction to all members of the putative classes." Dkt. 42 at 1–2.

The court granted the motion for a preliminary injunction in part, enjoining defendants from enforcing S.E.A. 480's prohibitions on providing puberty blockers and hormones and on "speech that would aid or abet gender transition procedures for minors." SA2. It did not enjoin S.E.A. 480's application to surgeries. SA15.

The court stated plaintiffs had "some likelihood of success" on their equal-protection claim. SA2. "While S.E.A. 480 prohibits both male and female minors from using puberty blockers and cross-sex hormone therapy for gender transitions," the court applied heightened scrutiny. SA20. It reasoned that the statute rests upon a "sex-based classification" because a "medical provider can't know whether a gender *transition* is involved without knowing the patient's sex and the gender associated with the goal of the treatment." SA18–SA19.

In applying heightened scrutiny, the court conceded Indiana has "legitimate" interests in protecting children and regulating the medical profession. SA21–SA22. It also conceded that "there are important reasons underlying the State's regulation of gender transition procedures for minors," observing that medical interventions for gender dysphoria carry risks, that "high-quality medical research" on the interventions is "exceptionally limited," and that the interventions' "long term effects" are "currently unknown." SA1–SA2, SA22–SA23 (cleaned up).

Even so, the court held that S.E.A. 480 failed heightened scrutiny because it "categorically bans the use of puberty blockers and hormone therapy for gender transition for minors" and "Plaintiffs have designated evidence of risks" from a ban. SA24-SA25. The court rejected the arguments that legislatures—not courts—get to decide

how to make cost-benefit decisions when faced with conflicting evidence. SA25. The court cited European decisions to permit "limited" use of puberty blockers and hormones in "formal research" and "clinical trials" as evidence Indiana had more tailored alternatives. SA26–SA27 (citations omitted). The court, however, did not specify what limitations on gender-transition procedures it deemed sufficiently tailored.

The court further held that plaintiffs had "some likelihood of success on their First Amendment challenge to S.E.A. 480's aiding and abetting provision, as applied to speech." SA29. The court concluded that the State lacked a compelling justification for prohibiting speech about "gender transition procedures" by medical providers. *Id.* The court rejected arguments that S.E.A. 480 prohibits only speech "incidental to separate, prohibited conduct," explaining that "Plaintiffs have some likelihood of success on challenges to other portions of S.E.A. 480 as well." SA28–SA29.

The court concluded that the remaining factors relevant to injunctive relief favored plaintiffs for the same reasons it thought they had some likelihood of succeeding on the merits. SA30–SA32. Although no class had been certified, the court prohibited defendants "from enforcing the enjoined portions of S.E.A. 480 against any provider, as to any minor." SA33. The court theorized that the "pending" class-certification motion gave it "equitable power" to issue class-wide relief. *Id.*

## SUMMARY OF THE ARGUMENT

I. The Equal Protection Clause permits States to protect all children from unproven, risky, and often permanent gender-transition procedures that threaten children's health and wellbeing. Indiana's S.E.A. 480 bans gender-transition

procedures for children of both sexes, so rational-basis review applies. The statute determines permissible uses of GnRH analogues and hormones based on age, procedure, and medical condition—not sex. It mentions sex only for the purpose of distinguishing one medical procedure from another.

Although gender transition means instilling different characteristics in males and females, that is merely a reflection of distinct biological starting points and the meaning of *transition*. S.E.A. 480's ban on transition procedures for youth is broad and sex-neutral, taking no account of *which* characteristics are being instilled. It is the *transition* that matters. And regardless how one conceptualizes the procedures affected, under Supreme Court precedent, regulations affecting a medical procedure biologically exclusive to one sex do not trigger heightened scrutiny. Whether in the doctor's office or in the law, different standards of care based on differences in male and female biology do not amount to "discrimination."

*Whitaker ex rel. Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), does not say otherwise. As this Court recently confirmed, that decision applies to school bathroom policies only. Its sex-stereotyping rationale cannot be extended to medical standards reflecting innate biological differences between males and females without running afoul of Supreme Court precedent. As a recent Sixth Circuit decision staying an injunction against a similar law attests, S.E.A. 480 falls within States' broad power over health.

Allegations that S.E.A. 480 discriminates based on transgender status do not warrant heightened scrutiny—transgender status is not a protected characteristic,

and the statute reflects no facial discrimination or invidious intent. It merely regulates procedures that are unproven and dangerous.

Ultimately, S.E.A. 480 survives any level of scrutiny. Using GnRH analogues and hormones to alter minors' development risks substantial and permanent negative health outcomes and offers no proven benefits. Even the district court recognized significant uncertainty surrounds gender-transition procedures. That uncertainty justifies regulatory intervention to protect affected children. Indiana need not permit indiscriminate use of experimental procedures on children—or even permit children to be the subject of controlled experiments—merely because other jurisdictions do.

II.     S.E.A. 480's prohibition on aiding and abetting gender-transition procedures mirrors traditional aiding-and-abetting prohibitions and is therefore valid. S.E.A. 480 regulates conduct—not speech. The district court erred in treating S.E.A. 480's prohibition as a speech regulation merely because it doubted whether the underlying conduct could be constitutionally prohibited. Regardless, if Indiana can in fact prohibit gender-transition procedures for minors, it plainly can also prohibit anyone from aiding and abetting those procedures.

III.     The equities and public interest cut against an injunction. Upholding the injunction would irreparably harm Indiana's interest in enforcing democratically enacted statutes and expose minors to harmful, irreversible procedures. No reliable evidence supports the suggestion that "some minors" benefit from procedures, and even if *some* might, that does not justify enjoining S.E.A. 480 as to *all* minors. Less-intrusive treatments for gender dysphoria remain available.

IV.   At a minimum, S.E.A. 480's enforcement cannot be enjoined as to everyone in all circumstances. Class-wide relief cannot be issued absent a properly certified class. And S.E.A. 480 can be applied constitutionally in some circumstances—as shown by plaintiffs' admission that Indiana may constitutionally hold physicians to standards from WPATH and the Endocrine Society.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Underlying legal conclusions are reviewed de novo, factual findings for clear error, and the balancing of equities for abuse of discretion. *See United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 269 (7th Cir. 2009).

## ARGUMENT

### I.   The Equal Protection Clause Permits Indiana To Protect Minors from Harmful and Unproven Gender-Transition Procedures

As the district court recognized, "important reasons" underlie S.E.A. 480's prohibition on gender-transition procedures for minors. SA1. Those procedures cause potentially irreversible changes to still-developing minors and carry lifelong health risks, dramatically increasing risks for cancer, stroke, and other serious conditions. Yet no reliable research supports their use. As a matter of the Constitution's "original fixed meaning," it is implausible that "the people of this country ever agreed" to

remove decisions about whether to permit unproven procedures from the "conventional place" for dealing with them: "the democratic process." *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 415 (6th Cir. 2023). "The State plainly has authority, in truth a responsibility, to look after the health and safety of its children." *Id.* at 419. The district court's theory that S.E.A. 480 unjustifiably discriminates based on sex ignores that S.E.A. 480 prohibits both sexes from accessing gender-transition procedures. And the significant uncertainties the court identified surrounding gender-transition procedures for minors justifies S.E.A. 480's ban on them regardless.

## A. S.E.A. 480 classifies by age, procedure, and medical condition—not sex—rendering it subject to rational-basis review

Generally, state laws regulating health and welfare are entitled to a "strong presumption of validity" and "must be sustained if there is any rational basis on which the legislature could have thought that it would serve legitimate state interests." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022) (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). Sex-based classifications are subject to heightened scrutiny. *See Reed v. Reed*, 404 U.S. 71, 75–76 (1971). A statutory classification is sex-based if the statute provides for "different treatment . . . on the basis of sex," preferring "members of either sex over members of the other." *Id.*; *see United States v. Virginia*, 518 U.S. 515, 532–33 (1996) (directing courts to "[f]ocus[] on the differential treatment"); *Frontiero v. Richardson*, 411 U.S. 677, 682–83 (1973) (similar). A classification is not sex based, however, if there is a "lack of identity" between the groups created and sex such that one of the groups contains "members of both sexes." *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974).

31

### 1.     S.E.A. 480 applies equally to both sexes

S.E.A. 480 does not prefer one sex to the other sex or in any way treat the two sexes differently. Under S.E.A. 480, a physician cannot perform "any medical or surgical service" on a minor that "seeks to" "alter or remove physical or anatomical characteristics or features that are typical for the individual's sex" or "instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex." Ind. Code § 25-1-22-5(a)(1)–(2). That directive does not provide different rules for males and females or for transgender and cisgender patients. And while S.E.A. 480 affords some exemptions, those are based on age, procedure, and condition (*e.g.*, "disorder of sex development," "physical injury," etc.). *Id.* § 25-1-22-5(b). Both the rule and the exceptions apply equally to both sexes and all gender identities.

S.E.A. 480 mentions the word "sex" only to distinguish gender-transition procedures from other medical procedures that use GnRH analogues and hormones to achieve different, legitimate goals. Put another way, S.E.A. 480 uses sex to identify a distinct type of procedure—not to determine its permissibility. Knowing a minor's sex is not enough to know whether S.E.A. 480 bans a particular use of GnRH analogues and hormones. As the district court observed, the provider must know both "the patient's sex *and the gender associated with the goal of treatment*." SA18–SA19 (emphasis added). A provider must know the medical goal because that goal, along with age and medical condition, determines permissibility.

With S.E.A. 480, Indiana has chosen among competing standards of care for minors with gender dysphoria, preferring more conservative psychological

interventions over invasive medical interventions that lack supporting evidence. But it has not allowed males to access medical interventions for gender dysphoria while prohibiting females from accessing them. As the district court conceded, "S.E.A. 480 prohibits *both male and female minors*" from undergoing medicalized "gender transition[s]." SA20 (emphasis added). Sex does not determine access to gender-transition procedures. Accordingly, S.E.A. 480 fits comfortably within Indiana's broad authority to enact "health and welfare laws." *Dobbs*, 142 S. Ct. at 2284.

### 2.    Supreme Court precedent precludes heightened scrutiny

The district court objected that S.E.A. 480 "allows physicians . . . to 'instill or create' characteristics 'resembl[ing]' female anatomical characteristics for females but not for males, and male anatomical characteristics for males but not females." SA18. First, however, that outcome is incidental to the sex-neutral prohibition on invasive, often-irreversible gender-transition procedures. Second, under Supreme Court precedent, the relevant question is whether a statute prefers one sex to another. *See Reed*, 404 U.S. at 75–76. Simply recognizing that physicians address male and female biology differently does not trigger heighted scrutiny. No one would think that a statute prohibiting physicians from administering pregnancy tests to males constitutes sex discrimination. As the Supreme Court has explained, "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245–46 (quoting *Geduldig*, 417 U.S. at 496).

That rule makes sense. Heightened scrutiny's purpose is to ensure that classifications do not rest on "overbroad generalizations" that are "entirely unrelated to any differences between men and women." *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 469 (1981) (citation omitted); *see Virginia*, 518 U.S. at 533. The Equal Protection Clause, however, does not require "things which are different in fact . . . to be treated in law as though they were the same." *Michael M.*, 450 U.S. at 464 (citation omitted). Indeed, it would "disserv[e]" equal protection to ignore "basic biological differences" between men and women when it comes to medical procedures intertwined with sex. *Nguyen v. INS*, 533 U.S. 53, 73 (2001). For physicians to blind themselves to sex in treating patients for testicular or ovarian cancer, male or female infertility, or sex disorders would be malpractice, not a cause for celebration.

As a result, the Supreme Court has refused to apply heightened scrutiny to statutes dealing with biologically rooted distinctions. In *Geduldig*, for example, the Court held that excluding "pregnancy"—a condition that affects "only women"—from a "list of compensable disabilities" did not trigger heightened scrutiny. 417 U.S. at 496 n.20. Similarly, in *Dobbs*, the Supreme Court refused to apply heightened scrutiny to abortion regulations despite the fact they affect only women. *See Dobbs*, 142 S. Ct. at 2245–46. "The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny." *Id.*

*Dobbs* and *Geduldig* dispose of the district court's objection here. As plaintiffs see the world, physicians cannot treat gender dysphoria in young females by permitting the natural development of female or anatomical characteristics. They must

prevent female characteristics and instill male ones. Dkt. 26-2 at 12–16 (Shumer Decl. ¶¶ 51–54, 58, 61–62). So physicians cannot use estrogen to treat gender dysphoria in girls; only testosterone will do. *See* Dkt. 48-2 at 39–40 (Hruz Decl. ¶ 68); Dkt. 48-4 at 23 (Weiss Decl. ¶¶ 107–08); Dkt. 26-1 at 11 (Karasic Decl. ¶ 43). Thus, by definition, gender-transition procedures to make a female look like a male (or a male look like a female) are ones that "only one sex can undergo." *Dobbs*, 142 S. Ct. at 2245; *see L.W.*, 73 F.4th at 419. Banning them therefore raises no constitutional hackles.

S.E.A. 480 need not prohibit GnRH analogues and hormones "in all circumstances," for *Dobbs* and *Geduldig* to apply. SA18–SA19. As *Dobbs* and *Geduldig* establish, the mere fact that physicians know a patient's sex (which informs what services they provide to a given patient) does not mean a statute distinguishing among procedures is sex-based. Nor are two medical procedures the same merely because they happen to use the same drugs. Obviously giving males abnormally high doses of testosterone to boost performance during the Tour de France is a different medical use of the drug than prescribing it in small doses to treat delayed male puberty, an objectively verifiable sex disorder. The medical "goal," drug regimen, etc. matter.

Indeed, significant differences between the medical procedures permitted and those banned justify the distinction. When physicians prescribe GnRH analogues for central precocious puberty, another objectively verifiable disorder, they attempt to ensure that puberty happens at the normal age. Dkt. 48-2 at 20–24, 34–36 (Hruz Decl. ¶¶ 37–45, 61–63). By contrast, when physicians prescribe GnRH analogues for gender dysphoria, they seek to disrupt a properly functioning endocrine system to

prevent normal puberty. *Id.* Similarly, when physicians prescribe testosterone to males for the objectively verifiable disorder of delayed puberty, they give low doses for a few months to induce normal puberty. *Id.* at 27–29, 38–42 (¶¶ 50–53, 68–75). By contrast, when physicians prescribe testosterone to females for gender dysphoria, they give high doses indefinitely to suppress a properly functioning system. *Id.* The condition treated—and the intent, effects, and method of treatment—differ.

In short, *Dobbs* and *Geduldig* preclude heightened scrutiny absent proof that S.E.A. 480's procedure-based classification is "mere pretex[t]" for "invidious discrimination against the members of one sex." *Dobbs*, 142 S. Ct. at 2246 (quoting *Geduldig*, 417 U.S. at 496 n.20). But the district court never suggested that S.E.A. 480 secretly prefers one sex to the other; the court admitted that S.E.A. 480 treats "both male and female minors" the same, adding that "legitimate," "important" reasons underlie its restrictions. SA1, SA20–SA21. Rational-basis review thus applies. "If a law restricting a medical procedure that applies only to women does not trigger heightened scrutiny, as in *Dobbs*, a law equally applicable to all minors, no matter their sex at birth, does not require such scrutiny either." *L.W.*, 73 F.4th at 419.

### 3. *Whitaker* does not require heightened scrutiny

*Whitaker ex rel. Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), does not require a different conclusion. *Contra* SA20. First, that decision addressed Title IX and the Equal Protection Clause's application to a school bathroom policy that classified "based upon the sex listed on the student's birth certificate." *Id.* at 1051. It did not address medical

regulations classifying by medical goal (even if discerning the goal requires reference to sex). And this Court has since clarified that *Whitaker* does not preordain answers to questions about "how Title IX and the Equal Protection Clause regulate" other matters, including "sex-segregated living facilities, educational programs, or sports teams." *A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville*, --- F.4th ---, 2023 WL 4881915, at *9 (7th Cir. Aug. 1, 2023).

Second, *Whitaker*'s sex-stereotyping rationale cannot be extended to this case without running headlong into Supreme Court precedent. In *Whitaker*, this Court stated that the bathroom policy treated "transgender students . . . differently" for "fail[ing] to conform to the sex-based stereotypes associated with their assigned sex at birth." 858 F.3d at 1051. It criticized the policy for resting on "conjecture" about culturally appropriate privacy levels, observing that the policy did not distinguish based on "biological sex" but the "marker on a birth certificate." *Id.* at 1052–53.

Whatever the validity of *Whitaker*'s reasoning, it cannot control here. S.E.A. 480 classifies by medical procedure. Its classification reflects that, as a biological matter, males and females have different chromosomes, genitalia, and healthy hormone levels. But the Supreme Court has warned against deriding such "basic biological differences" as "stereotypes." *Nguyen*, 533 U.S. at 73; *see Virginia*, 518 U.S. at 533 ("[t]he two sexes are not fungible" (citation omitted)). And since *Whitaker*, the Supreme Court has held that heightened scrutiny cannot be applied to medical regulations that simply account for biological differences. *See Dobbs*, 142 S. Ct. at 2245–46.

As the Sixth Circuit recently observed, *"Dobbs* prevents [courts] from extending" sex-stereotyping rationales to statutes like S.E.A. 480. *L.W.*, 73 F.4th at 421.

Third, *Whitaker*'s rejection of sex stereotyping is equally damaging to plaintiffs' position. According to plaintiffs' experts, gender identity is an unverifiable, subjective, "deeply felt sense of being male, female, or another gender." Dkt. 48-9 at 9 (Karasic Dep. 25:6–9). Such feelings are developed through "interact[ions]" with "other person[s]" and "society." Dkt. 48-10 at 19 (Shumer Dep. 65:13–66:5). In other words, gender identity is both a response to one set of stereotypes and an embrace of other stereotypes.

Stereotypes permeate gender *dysphoria* as well. Diagnostic questions include whether a child prefers "typical masculine clothing," "games or activities stereotypically used or engaged in by the other gender," and "playmates of the other gender." Dkt. 49-4 at 7 (DSM-5 TR 3). The premise of plaintiffs' approach is that a male who does not feel like other males must be the wrong sex, which denies that males can have a wider variety of feelings and experiences than is stereotypical.

Thus, if anything, S.E.A. 480 stops medical practitioners from foisting irreversible procedures on minors who do not conform to sex stereotypes. As Cohn observes, he would never have transitioned if he had realized that his "stereotypically feminine attitudes and behaviors did not . . . make [him] a woman, but rather a feminine man." Dkt. 49-13 at 6 (Cohn Decl. ¶ 14). Surely, heightened scrutiny should not apply to a prohibition on an extreme and pernicious form of sex stereotyping.

38

### 4. The Sixth Circuit's recent ruling confirms rational-basis review applies

The Sixth Circuit's recent ruling in favor of Tennessee's prohibition on gender-transition procedures for minors confirms rational-basis review should apply here. *L.W.*, 73 F.4th at 419. In *L.W.*, the Sixth Circuit explained that a sex-based classification must "prefer one sex to the detriment of the other." *Id.* Tennessee's sex-neutral ban—which "applies to all minors, regardless of their biological birth with male or female sex organs"—did not meet that criterion. *Id.* The Sixth Circuit also dismissed concerns that Tennessee prohibited "procedures that administer cross-sex hormones but not those that administer naturally occurring hormones." *Id.* Under *Dobbs*, the court explained, heightened scrutiny does not apply to medical procedures that "only one sex can undergo." *Id.* (quoting *Dobbs*, 142 S. Ct. 2245–46).

As *L.W.* and the district court noted, the Eighth Circuit applied heightened scrutiny to an Arkansas statute prohibiting gender-transition procedures. *See Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022). But it did not consider Supreme Court precedent holding that a sex-based classification must provide for "different treatment" and prefer "members of either sex over members of the other." *Reed*, 404 U.S. at 75–76. Nor did it consider Supreme Court precedent holding that a procedure "only one sex can undergo" merits rational-basis review. *Dobbs*, 142 S. Ct. 2245–46. As five different judges of the Eighth Circuit observed, there is "reason to be skeptical" of the panel decision. *Brandt ex rel. Brandt v. Rutledge*, No. 21-2875, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissenting from denial of rehearing en banc). This Court should not take the wrong end of a circuit split.

39

**B.    Alleged disparate impacts on transgender persons do not warrant heightened scrutiny**

Plaintiffs alternatively have argued that heightened scrutiny applies because S.E.A. 480 discriminates against transgender persons who should be treated as a quasi-suspect class. Dkt. 27 at 20. The district court did not reach that argument, SA21 n.3, and this Court should not adopt it either.

First, as plaintiffs have admitted, S.E.A. 480 does not facially discriminate against transgender persons. Dkt. 27 at 20. It prohibits gender-transition procedures, making exceptions based on age, condition, and procedure. *See* Ind. Code §§ 25-1-22-5(a)(1)–(2), 25-1-22-5(b). Both transgender and cisgender persons are subject to the law and eligible for its exceptions, so no facial discrimination based on transgender status occurs. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022) (en banc) (citing *Geduldig*, 417 U.S. at 497 n.20). Nor can plaintiffs credibly claim disparate impact and invidious intent. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). As the district court recognized, S.E.A. 480 was enacted for "legitimate," "important reasons." SA1, SA21.

Second, transgender persons are not a quasi-suspect class. *See L.W.*, 73 F.4th at 419–21; *cf. Adams*, 57 F.4th at 803 n.5 (expressing "grave doubt"). The Supreme Court has recognized only sex, *Craig v. Boren*, 429 U.S. 190, 197 (1976), and illegitimacy, *Mathews v. Lucas*, 427 U.S. 495, 505–06 (1976), as quasi-suspect classes. It has repeatedly declined to recognize others. *See, e.g.*, *Bowen v. Gilliard*, 483 U.S. 587, 601–2 (1987) (family units); *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (close relatives);

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441–42 (1985) (mental disability); *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312–3 (1976) (age).

Transgender status does not meet the criteria for a new protected class. It is not an obvious, "immutable characteristic determined solely by the accident of birth." *Frontiero*, 411 U.S. at 686. According to plaintiffs' experts, transgender status depends on a "person's internal sense of belonging." Dkt. 26-02 at 6 (Shumer Decl. ¶ 27). That sense of belonging cannot be objectively measured. Dkt. 48-1 at 52 (Cantor Decl. ¶ 104); Dkt. 48-10 at 9, 11 (Shumer Dep. 27:1–5, 33:14–15); Dkt. 48-11 at 8 (Turban Dep. 24:1–6). Gender identity, moreover, can—and frequently does—"evolve." Dkt. 26-02 at 6–7 (Shumer Decl. ¶ 28). Up to 88% of children with gender dysphoria grow out of it. Dkt. 48-1 at 59 (Cantor Decl. ¶ 115).

Transgender minors have not been "historical[ly]" subjected to medical discrimination for no legitimate reason. *Bowen*, 483 U.S. at 602; *see City of Cleburne*, 473 U.S. at 440–41. Many medical organizations support transgender persons—and have since at least 1979. Dkt. 26-01 at 9, 17–18 (Karasic Decl. ¶¶ 34, 60). And while Indiana now restricts unproven gender-transition procedures for minors, that measure reflects genuine concern for their wellbeing. *See* SA1, SA21. Progressive European countries share that same conviction. Indiana permits transgender minors to access less risky, more beneficial interventions, such as psychotherapy.

Relatedly, transgender persons are not a politically powerless minority with "no ability to attract the attention of lawmakers." *City of Cleburne*, 473 U.S. at 445. President Biden has issued various executive orders intended to advance transgender

rights. *See, e.g.*, Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021); Exec. Order No. 14,020, 86 Fed. Reg. 13,797 (Mar. 8, 2021); Exec. Order No. 14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021). An abundance of advocacy groups support transgender persons as well. *See, e.g.*, *Transgender Resources*, ABA, https://www.americanbar.org/groups/diversity/sexual_orientation/resources/transgenderrights/.

In any event, the absence of binding precedent recognizing transgender status as a protected characteristic is a sufficient reason to hold plaintiffs are not likely to succeed on the merits. "The bar for recognizing a new quasi-suspect class"—something the Supreme Court has not done for more than four decades—"is a high one." *L.W.*, 73 F.4th at 420. And excellent reasons justify "hesitat[ing]" before recognizing transgender status as a protected characteristic, especially since doing so would pose "vexing line-drawing dilemmas" for sports and medicine. *Id.*

### C.    S.E.A. 480's ban on subjecting minors to unproven, harmful procedures satisfies any level of scrutiny

Even under heightened scrutiny, S.E.A. 480 survives. Its classification "serves important governmental objectives" and is "substantially related to the achievement of those objectives," *Nguyen*, 533 U.S. at 70 (cleaned up)—namely, it protects children from unproven, often irreversible medical interventions that can have long-term negative consequences for their health and well-being.

### 1.    S.E.A. 480 serves important state interests

The district court did not dispute that S.E.A. 480 serves important state interests in "safeguarding the physical and psychological well-being of a minor," *New York v. Ferber*, 458 U.S. 747, 756–57 (1982), and "regulating the medical profession,"

*Gonzales v. Carhart*, 550 U.S. 124, 157 (2007). The court recognized evidence demonstrating "the safety and effectiveness of puberty blockers and hormone therapy is uncertain and unsettled." SA23. Using blockers and hormones carries significant "risks," and many long-term consequences are "unknown." SA22–SA23. "Indeed," the court observed, "the consensus from all sides is that more research is needed to explore these risks." SA23.

Using GnRH analogues off-label to prevent normal puberty is undeniably risky. Even when properly administered to prevent premature puberty, GnRH analogues "may cause hot flashes, weight gain, fatigue," "mood alterations," and increased brain pressure capable of causing "headache[s] and loss of eyesight." Dkt. 48-4 at 20 (Weiss Decl. ¶¶ 90-93); *see* Dkt. 48-2 at 25, 36 (Hruz Decl. ¶¶ 43, 61). Psychiatric effects, including suicidality, are also possible. Dkt. 48-1 at 103 (Cantor Decl. ¶ 220). When physicians attempt to prevent normal puberty, the risks multiply. To date, "no controlled trials . . . prove the safety" of using GnRH analogues to prevent endogenous puberty in minors. Dkt. 48-4 at 20 (Weiss Decl. ¶ 89). That procedure creates risks for stature, bone density, the ability to orgasm, cardiovascular health, and brain maturation. Dkt. 48-2 at 35–38 (Hruz Decl. ¶¶ 61–66); Dkt. 48-1 at 99–104 (Cantor Decl. ¶¶ 207–13, 215–21).

Exposing minors to cross-sex hormones increases the chance of harm. Continued exposure causes "permanent" changes, such as lowered voices in natal females. Dkt. 48-11 at 18 (Turban Dep. 61:6–15). That sets the stage for profound regret among minors who later detransition. *See* pp. 18–19, *supra*.

43

Moreover, no one knows whether exposing "immature gonads" to cross-sex hormones will cause permanent infertility. Dkt. 48-2 at 44 (Hruz Decl. ¶ 77); *see id.* at 38–39, 44–45 (¶¶ 67, 78). Even "advocates of transgender hormone therapy" recognize "that hormonal treatment impairs fertility, which may be irreversible." *Id.* at 44 (¶ 77). "Other potential adverse effects" of cross-sex hormones "include disfiguring acne, high blood pressure, weight gain, abnormal glucose tolerance, breast cancer, liver disease, thrombosis," "cardiovascular disease," "lower bone density," and "thrombo-embolic stroke." Dkt. 48-2 at 45–46 (Hruz Decl. ¶ 79); *see* Dkt. 48-4 at 23–25 (Weiss Decl. ¶¶ 109–25). When natal females take testosterone, "breast cancer onset is 20 years earlier than expected," the risk of heart attacks is 3.5 times greater, and the stroke risk doubles. Dkt. 48-4 at 24 (Weiss Decl. ¶¶ 115, 117–18). Natal males taking estrogen experience a "22-fold increase in the rate of breast cancer" and a "36-fold higher risk of strokes." *Id.* at 24–25 (¶¶ 119, 123).

Meanwhile, no reliable evidence shows that prescribing GnRH analogues or cross-sex hormones to minors for gender dysphoria produces offsetting benefits. No randomized controlled trials—the "gold standard" for medical research—have examined the procedures. Dkt. 48-1 at 28, 30 (Cantor Decl. ¶¶ 44, 52). And as a chorus of new systematic reviews observe, what little research exists is beset by severe "methodological weaknesses." Dkt. 49-10 at 10–11 (Swedish Review 9–10); *see* Dkt. 49-5 at 41–42, 45 (NICE GnRH Review 40–41, 44); Dkt. 49-6 at 15, 48, 51 (NICE Hormone Review 14, 47, 50). Any purported benefits "could be due to confounding, bias or chance." Dkt. 49-5 at 46 (NICE GnRH Review 45). As a Swedish systematic review

recently summarized, the "long-term effects of hormone therapy on psychosocial and somatic health are unknown, except that GnRHa treatment seems to delay bone maturation and gain in bone mineral density." Dkt. 49-10 at 13 (Swedish Review 12). Unquestionably, S.E.A. 480 serves compelling state interests.

### 2.    S.E.A. 480 is substantially related to its objectives

According to the district court, the problem with S.E.A. 480 is that it "categorically bans the use of puberty blockers and hormone therapy for gender transition for minors." SA24. The court cited European decisions to limit hormone therapy to "'formal research'" or "'monitored clinical trials'" as evidence that "more tailored alternatives to S.E.A. 480" are available. SA26–SA27 (citation omitted). But the mere fact that some bodies have chosen to permit research does not mean Indiana must do the same—much less permit the indiscriminate use of puberty blockers and hormones *outside the research context*. Indiana need not make its children test subjects.

Under our Constitution, policy decisions about whether to permit limited research or to ban unproven procedures altogether are for legislatures—not courts—to make. The "normal rule" is that courts must "defer to the judgments of legislatures "'in areas fraught with medical and scientific uncertainties.'" *Dobbs*, 142 S. Ct. at 2268 (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)). That remains true in the context of heightened scrutiny. *Contra* SA25–SA26. Even when the Supreme Court applied the undue-burden standard to abortion regulations, it held that "[m]edical uncertainty does not foreclose the exercise of legislative power in the

abortion context any more than it does in other contexts." *Carhart*, 550 U.S. at 164. "[M]edical uncertainty . . . provides a sufficient basis" to uphold a law. *Id.*

Adopting the district court's contrary view would threaten harm. Under its view, legislatures would be forced to permit potentially harmful procedures so long as some conflicting evidence remains. It would give "parents and a doctor exclusive authority to decide whether to permit a potentially irreversible new drug treatment," even in the absence of "satisfactory long-term testing." *L.W.*, 73 F.4th at 417. Surely, however, the Constitution does not require States to refrain from legislating on controversial subjects "where there is medical and scientific uncertainty." *Carhart*, 550 U.S. at 163. Such a rule would impair the legislative power where it is most needed to resolve competing opinions about acceptable medical risks and benefits.

In deeming S.E.A. 480 overbroad, the district court cited the "experience" of plaintiffs' expert, Dan Karasic, for the proposition that gender-transition procedures benefit "some minors." SA24–SA25 n.4, SA30. As an initial matter, a single practitioner's "experience" is a poor basis for concluding that the procedures benefit any minor. Individual experience is the "*least* reliable source of medical knowledge" because it is "subject to bias" and cannot control for confounding variables. Dkt. 48-1 at 30 (Cantor Decl. ¶ 53). By contrast, systematic reviews provide the most reliable evidence of what is "actually known or not known." *Id.* at 25 (¶ 39). So "foundational principles of evidence-based medicine" demand that Karasic's personal experience yield to recent systematic reviews concluding that gender-transition procedures provide no proven benefit. *Id.* at 24–25, 26 (Cantor Decl. ¶¶ 38, 41).

Even if one credits Karasic's personal "experience," however, it still does not follow that S.E.A. 480 reaches too far. Heightened scrutiny does not "require[] that the statute under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70 (cleaned up). It thus does not matter whether Karasic (or other practitioners) believe that gender-transition procedures benefit "some minors" based on "experience" with a limited number of minors or that some countries deem controlled trials on small groups acceptable. Under heightened scrutiny, it suffices that systematic reviews find no reliable evidence that the benefits of puberty blockers and cross-sex hormones *generally* outweigh their dangers.

The difficulty with determining ex ante *which* minors might benefit reinforces that no more tailored alternative is available. "No means of either falsifying or verifying" gender identity exists. Dkt. 48-1 at 52 (Cantor Decl. ¶ 104); *see* Dkt. 48-10 at 9, 11 (Shumer Dep. 27:1–5, 33:14–15); Dkt. 48-11 at 8 (Turban Dep. 24:1–6); Dkt. 48-8 at 15 (Mosaic Dep. 51:5–6). And plaintiffs' own witnesses admit that "gender identity may evolve over time," Dkt. 26-2 at 6-7 (Shumer Decl. ¶ 28); *see* Dkt. 48-8 at 13 (Mosaic Dep. 44:13–15, 46:14–25) (agreeing that "gender identity change[s] over time"). Indeed, while no studies examine adolescent onset gender dysphoria, research consistently finds that up to 88% of gender dysphoric children will desist. Dkt. 48-1 at 59 (Cantor Decl. ¶ 115). There is, however, no "reliable procedure for discerning which children . . . will persist." *Id.* at 61 (¶ 122); *see id.* at 62–63, 118–22 (¶¶ 123–24, 265–71). As the Endocrine Society admits, "we cannot predict the psychosexual outcome for any specific child." Dkt. 49-1 at 9 (Hembree 3876).

In short, physicians cannot know which minors being given puberty blockers and pumped with hormones will later detransition or regret having their bodies permanently altered. It is thus entirely appropriate to prohibit physicians from inducing irreversible changes that carry health risks in minors who do not have the legal capacity or mental maturity to consent—and whose gender identities may change.

## II.     Indiana May, Consistent with the First Amendment, Prohibit Medical Providers from Aiding or Abetting Unlawful Procedures

Under S.E.A. 480, a "physician or other practitioner may not aid or abet another physician or practitioner in the provision of gender transition procedures to a minor." Ind. Code § 25-1-22-13(b). No case, however, has ever declared "an abridgement of freedom of speech or press" merely because a law forbids conduct "in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *United States v. Hansen*, 143 S. Ct. 1932, 1947 (2023) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). That principle controls here. S.E.A. 480 prohibits *any action* that aids or abets a gender-transition procedure as part of a broader scheme of regulating the procedures themselves. It is a regulation of conduct that affects speech only incidentally.

The district court suggested that S.E.A. 480 "burden[s] speech 'on its face,'" rather than regulates it as "incidental to separate, prohibited conduct." SA28–SA29. But S.E.A. 480 is written no differently from traditional aiding-and-abetting prohibitions. For centuries, governments have prohibited "aiding or abetting" conduct. *See Hansen*, 143 S. Ct. at 1940–45. Traditional aiding-and-abetting restrictions encompass "lending physical aid" or using "words" to further a prohibited enterprise. *Id.* at

48

1940. But traditional aiding-and-abetting prohibitions have "never been deemed an abridgement of freedom of speech." *Id.* at 1947 (quoting *Giboney*, 336 U.S. at 502); *see Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 244 (4th Cir. 1997). So S.E.A 480's prohibition cannot be held to constitute an unlawful speech restriction either.

In many ways, the district court's First Amendment analysis appears to depend on its ruling that Indiana cannot constitutionally prohibit gender-transition procedures. SA29 n.7. But it is hard to see why that matters for determining whether the aiding-and-abetting provision's impact on speech is "incidental" to S.E.A. 480's "regulation of conduct." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006). And if S.E.A. 480's regulation of conduct is constitutional, then the district court's rationale falls apart. Thus, at a minimum, the court should not have enjoined S.E.A. 480's aiding-and-abetting provision as applied to surgeries because the court declined to address them. SA16, SA35.

Finally, even under strict scrutiny, S.E.A. 480 survives. Its aiding-and-abetting prohibition is necessary to advance compelling state interests in preventing harm to minors and regulating the medical profession. *See* pp. 42–48, *supra*.

## III. Equitable Considerations Militate Against Injunctive Relief

Considerations of equity and the public interest foreclose the injunction too. Under the injunction, Indiana "suffer[s] irreparable harm from its inability to enforce the will of its legislature, to further the public-health considerations undergirding the law, and to avoid irreversible health risks to its children." *L.W.*, 73 F.4th at 421.

49

The district court cited mental-health risks as cutting in the opposite direction, asserting that "there's evidence that puberty blockers and cross-sex hormone therapy reduces distress for *some* minors diagnosed with gender dysphoria." SA30 (emphasis added). But it is for "elected representatives" to make "cost-benefit decisions" about medical treatments. *L.W.*, 73 F.4th at 421. So even if there is some evidence of benefit, the district court overstepped by enjoining S.E.A. 480's enforcement in the face of evidence that gender-transition procedures carry significant risks that cannot be undone and will cause irreversible changes to minors. *See id.*

That is particularly true given the injunction's sweeping scope. The court enjoined S.E.A. 480's enforcement against "any provider" treating "any minor." SA33. To conclude that the equities favor that relief, the district court needed evidence that gender-transition procedures will provide more benefit than harm for *all* affected minors. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). It, however, merely cited evidence that "some minors" could benefit. SA30.

Ultimately, saying the evidence shows even "some minors" will benefit overstates matters. Whatever Karasic's experience or the individual plaintiffs', no reliable evidence shows that gender-transition procedures provide any long-term benefit. *See* pp. 42–45, *supra*. No one can predict with confidence that the individual plaintiffs here will persist rather than regret their life-altering decisions later. *See* pp. 47–48, *supra*. Meanwhile, psychosocial support and psychotherapy have been used in treating gender-dysphoric patients for years with beneficial results. Dkt. 48-1 at 87–88, 90–94 (Cantor Decl. ¶¶ 178–79, 188–96); *see* Dkt. 48-4 at 7 (Weiss Decl. ¶ 26); Dkt.

48-5 at 57–58, 70 (Kaliebe Decl. ¶¶ 150, 195). Several European authorities "now endorse psychotherapy as the treatment of choice for minors." Dkt. 48-1 at 14 (Cantor Decl. ¶ 16). These less risky, more beneficial alternatives further undermine any suggestion an injunction is necessary to prevent irreparable harm.

## IV.  The District Court Erred in Enjoining Enforcement of S.E.A. 480 Against Everyone and in All Circumstances

Regardless of S.E.A. 480's constitutionality, the preliminary injunction cannot stand as written. As this Court recently held in *Doe v. Rokita*, 54 F.4th 518 (7th Cir. 2022), "relief should be no greater than necessary to protect the rights of the prevailing litigants," *id.* at 519. The district court violated that principle twice over.

First, the district court erred in awarding relief to nonparties. In *Doe*, this Court held that a district court may not grant relief to persons other than the named plaintiffs where a "case has not been certified as a class action." 54 F.4th at 519. Granting broader relief, the Court explained, would "offend[] the principle that relief should be no greater than necessary to protect the rights of the prevailing litigants." *Id.*; *accord L.W.*, 73 F.4th at 415 (ruling that, "absent a properly certified class," a statewide prohibition on enforcing Tennessee's prohibition on gender-transition procedures for minors likely "exceed[ed] the norms of judicial power"). Here, however, the district court did what *Doe* forbids. It forbade S.E.A. 480's enforcement against "any provider, as to any minor," without certifying a class. SA33.

The district court deemed *Doe* inapplicable on the ground that plaintiffs' "motion for class certification remains pending." SA33. But a "nonnamed class member" is not "a party to the class-action litigation *before the class is certified*." *Smith v. Bayer*

*Corp.*, 564 U.S. 299, 313 (2011) (citation omitted). So a not-yet-decided motion for class certification does not allow courts to treat putative class members as "prevailing litigants." *Doe*, 54 F.4th at 519. *Mulholland v. Marion County Election Board*, 746 F.3d 811 (7th Cir. 2014), does not suggest otherwise. *Contra* SA39. *Mulholland* did not address courts' authority to issue class-wide relief. It addressed the scope of a prior consent judgment declaring a statute "facially unconstitutional" under the First Amendment—a context in which precedent relaxes many of the usual requirements for prospective relief. 746 F.3d at 819. Merely "styling" claims as "'facial' challenges" does not authorize "class wide relief without . . . class certification." *Kane v. De Blasio*, 19 F.4th 152, 173 (2d Cir. 2021).

Second, whatever courts' authority to grant class-wide relief before class certification, the district court erred in enjoining application of S.E.A. 480 in all circumstances. *See L.W.*, 73 F.4th at 414–15. Even *Mulholland* recognizes that, to obtain a declaration of facial unconstitutionality, plaintiffs "must 'satisfy [the] standards for a facial challenge.'" 746 F.3d at 819 (quoting *John Doe No. 1. v. Reed*, 561 U.S. 186, 194 (2010)). Satisfying that standard here would require plaintiffs to "'establish that *no set of circumstances* exists under which [S.E.A. 480] would be valid.'" *Hansen*, 143 S. Ct. at 1939 (quoting *Salerno*, 481 U.S. at 745).

But plaintiffs' own concessions establish *some circumstances* in which S.E.A. 480 passes constitutional muster. Plaintiffs admitted that Indiana may require medical providers to follow "WPATH's guidelines or the guidelines that Riley [hospital] follows." Dkt. 73 at 19:2–9. And plaintiffs' experts admitted that, under WPATH

guidelines, puberty blockers and cross-sex hormones are not always appropriate. Dkt. 48-9 at 22 (Karasic Dep. 77:25–79:16); Dkt. 48-11 at 12, 18, 48 (Turban Dep. 37:24–39:9, 62:21–63:6, 183:1–25). Under the district court's injunction, however, Indiana cannot enforce S.E.A. 480 against providers who fall below standards to which plaintiffs have no constitutional objection. That overreach "offends the principle that relief should be no greater than necessary." *Doe*, 54 F.4th at 519.

## CONCLUSION

The preliminary injunction should be vacated.

<div style="margin-left:40%">

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana

/s/ Thomas M. Fisher
THOMAS M. FISHER
Solicitor General

JAMES A. BARTA
Deputy Solicitor General

MELINDA R. HOLMES
Deputy Attorney General

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-6255
Tom.Fisher@atg.in.gov

</div>

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limitation of Circuit Rule 32(c) because this document contains 13,954 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.     This document complies with the typeface requirements of Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 12-point font.

August 21, 2023                    /s/ Thomas M. Fisher
                                       THOMAS M. FISHER
                                       Solicitor General

## REQUIRED SHORT APPENDIX

Pursuant to Circuit Rule 30, Appellants submit the following as their Required Short Appendix. Appellants' Required Short Appendix contains all of the materials required under Circuit Rule 30(a) and 30(b).

By:    <u>s/ *Thomas M. Fisher*    </u>
Thomas M. Fisher
Solicitor General

No. 23-2366

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

K.C., ET AL.,

*Plaintiffs-Appellees*,

v.

INDIVIDUAL MEMBERS OF THE MEDICAL LICENS-
ING BOARD OF INDIANA, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Southern District of Indiana, No. 1:23-cv-00595-JPH-KMB,
The Honorable James P. Hanlon, Judge

**REQUIRED SHORT APPENDIX OF DEFENDANTS-APPELLANTS**

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-6255
Tom.Fisher@atg.in.gov

THEODORE E. ROKITA
Attorney General of Indiana

THOMAS M. FISHER
Solicitor General

JAMES A. BARTA
Deputy Solicitor General

MELINDA R. HOLMES
Deputy Attorney General

*Counsel for Defendants-Appellants*

**TABLE OF CONTENTS**

Dkt. 67, Order Granting in Part Plaintiffs' Motion for a
      Preliminary Injunction............................................................................... SA1

Dkt. 68, Preliminary Injunction............................................................. SA35

Dkt. 41, Order Regarding Stay of Class Certification Briefing ........................... SA37

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| K. C., *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00595-JPH-KMB |
| | ) | |
| THE INDIVIDUAL MEMBERS OF THE | ) | |
| MEDICAL LICENSING BOARD OF | ) | |
| INDIANA in their official capacities, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

Recently enacted by the Indiana General Assembly, Senate Enrolled Act
480 is scheduled to become effective July 1, 2023.  If it takes effect, S.E.A. 480
will prohibit physicians and other practitioners from knowingly providing
gender transition procedures to a minor, and from aiding or abetting another
physician or practitioner in the provision of gender transition procedures to a
minor.  Gender transition procedures banned by S.E.A. 480 include the use of
puberty-blocking drugs, cross-sex hormone therapy, and gender reassignment
surgery.  Plaintiffs are four minor children, many of their parents, and a doctor
and her family medical practice.  Alleging that S.E.A. 480 violates the United
States Constitution and other federal laws, Plaintiffs ask the Court to enter a
preliminary injunction that would prohibit Defendants—who are various State
officials—from enforcing S.E.A. 480.

The State has a strong interest in enforcing democratically enacted laws.
And Defendants have shown that there are important reasons underlying the

State's regulation of gender transition procedures for minors.  Still, Plaintiffs have carried their burden of showing some likelihood of success on their claims that S.E.A. 480 would violate their equal protection rights under the Fourteenth Amendment and free speech rights under the First Amendment. Under the evidence available at this preliminary stage, there is not a "close means–end fit" between the State's important reasons for regulating the provision of gender transition procedures to minors and S.E.A. 480's broad ban of those procedures.  So, when the State's interests are weighed against the likelihood that Plaintiffs will be able to show that S.E.A. 480 would violate their constitutional rights and the risk of irreparable harm, Plaintiffs are entitled to a preliminary injunction.

Plaintiffs' motion for a preliminary injunction is therefore **GRANTED in part** to the extent that, while this case is pending, Defendants may not enforce S.E.A. 480's prohibitions on (1) providing gender transition procedures for minors except gender reassignment surgery and (2) speech that would aid or abet gender transition procedures for minors.  Dkt. [9].  Plaintiffs motion is **DENIED in part** as to the ban on gender reassignment surgeries.  Plaintiffs lack standing to challenge that ban because gender reassignment surgeries are not provided to minors in Indiana.

## I.
## Facts & Background

The parties have submitted joint stipulated facts, dkt. 51, and more than 3,000 pages of evidence.  Dkt. 26; dkt. 48; dkt. 49; dkt. 58.  They also jointly recommended to the Court that there was no need for an evidentiary hearing,

*see* dkt. 22 at 3; dkt. 56, so the Court's recitation of the relevant facts is based on the written materials submitted with the parties' briefing.

### A. Sex, gender, and gender dysphoria

A person's sex is generally identified at birth based on external genitalia. Dkt. 51 at 1 (parties' stipulated facts).  Gender or gender identity, by contrast, commonly refer to a person's psychological and/or cultural sense of their sex or gender.  Dkt. 26-1 at 7 (Karasic decl.); dkt. 48-2 at 12–13 (Hruz report). Most people's sex and gender identity match, but "[f]or transgender people, their assigned sex does not align with their gender identity."  Dkt. 26-1 at 7 (Karasic decl.).

Gender dysphoria is a mental-health diagnosis recognized in the Fifth Edition of the American Psychological Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), and can be diagnosed in pre-pubertal children, adolescents, or adults.  Dkt. 51 at 2–3.  The DSM-5 defines gender dysphoria as "[a] marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by" certain diagnostic criteria.  *Id.*  Gender dysphoria in adolescents or adults "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."  *Id.* at 3.

"There is no medical or surgical treatment indicated for children with gender dysphoria pre-puberty."  *Id.* at 4.  However, once puberty begins, "[a]dolescents diagnosed with gender dysphoria . . . may be prescribed puberty-delaying medications."  Dkt. 26-2 at 13 (Shumer decl.).  Then, in mid-

adolescence, patients may be prescribed hormones—testosterone, or estrogen with a testosterone suppressant.  *Id.* at 16.  Gender-transition surgeries may also be considered, *see* dkt. 26-3 at 7 n.11 (Turban decl.), but in Indiana no "provider performs gender-transition surgery on persons under the age of 18." Dkt. 51 at 4.

### B. Senate Enrolled Act 480

In early 2023, the Indiana General Assembly passed S.E.A. 480 and Governor Holcomb signed it into law.  S.E.A. 480 (to be codified at Ind. Code §§ 25-1-22-1 *et seq.* (eff. July 1, 2023)).

S.E.A. 480 would prohibit physicians and other medical practitioners from "knowingly provid[ing] gender transition procedures to a minor."  S.E.A. 480 § 13(a).  The statute defines "gender transition" as "the process in which an individual shifts from identifying with and living as a gender that corresponds to his or her sex to identifying with and living as a gender different from his or her sex."  *Id.* § 3.  It defines "sex" as "the biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles."  *Id.* § 12.  And "gender" as "the psychological, behavioral, social, and cultural aspects of being male or female."  *Id.* § 1.

Under S.E.A. 480, the prohibited "gender transition procedures" include "any medical or surgical service . . . that seeks to:

> (1) alter or remove physical or anatomical characteristics or features that are typical for the individual's sex; or

> (2) instill or create physiological or anatomical characteristics that are different from the individual's sex."

*Id.* § 5(a). The statute then excludes:

> (1) Medical or surgical services to an individual born with a medically verifiable disorder of sex development, including an individual with:
>> (A) external sex characteristics that are irresolvably ambiguous;
>> (B) forty-six (46) XX chromosomes with virilization;
>> (C) forty-six (46) XY chromosomes with undervirilization; or
>> (D) both ovarian and testicular tissue.
>
> (2) Medical or surgical services provided when a physician or practitioner has diagnosed a disorder or condition of sexual development that the physician or practitioner has determined through genetic or biochemical testing that the individual does not have normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action.
>
> (3) The treatment of any infection, injury, disease, or disorder that has been caused by or exacerbated by the performance of gender transition procedures.
>
> (4) Any medical or surgical service undertaken because the individual suffers from a physical disorder, physical injury, or physical illness that would, as certified by the physician or practitioner, place the individual in imminent danger of death or impairment of major bodily function unless the medical or surgical service is performed.
>
> (5) Mental health or social services other than gender transition procedures as defined in subsection (a).
>
> (6) Services for a disorder or condition of sexual development that is unrelated to a diagnosis of gender dysphoria or gender identity disorder.

*Id.* § 5(b), *see* § 13(c).

Medical services prohibited under S.E.A. 480 can thus include "medical services that provide puberty blocking drugs, gender transition hormone therapy, or genital . . . or nongenital gender reassignment surgery." *Id.* § 5(a)(2).[1]  Physicians and other medical practitioners are further prohibited from "aid[ing] or abet[ting] another physician or practitioner in the provision of" prohibited gender transition procedures to a minor.  *Id.* § 13(b).

Physicians or medical practitioners who violate S.E.A. 480 are subject to discipline by their regulating licensing boards.  *Id.* § 15; Ind. Code § 25-1-9-4(a)(3) (providing for discipline for licensed medical providers who "knowingly violate[ ] any state statute . . . regulating the profession in question").  Private individuals may also bring lawsuits alleging violations of S.E.A. 480.  S.E.A. 480 § 17.

### C. Plaintiffs

K.C. is the ten-year-old child of Nathaniel and Beth Clawson.  *See* dkt. 51 at 5.  "K.C. was identified male at birth," but before the age of 4 "grabbed a pair of scissors, and asked to cut off K.C.'s penis, asserting that it should not be there."  *Id.*  An IU Health pediatrician diagnosed K.C. with gender dysphoria.  *Id.*  K.C. "socially transitioned [to female] before K.C. was 4 years old and uses female pronouns."  *Id.*  In 2017, K.C. first visited the Riley Gender

---

[1] S.E.A. 480 provides a limited extension to its July 1, 2023 effective date: physicians or medical practitioners may "continue to prescribe . . . until December 31, 2023," gender transition hormone therapy to individuals who were taking that therapy "on June 30, 2023, as part of a gender transition procedure."  S.E.A. 480 § 13(d).

Health Clinic, which "again diagnosed [K.C.] with gender dysphoria." *Id.* at 6. K.C. began taking a puberty blocker in 2023. *Id.*

M.W. is the 16-year-old child of Ryan and Lisa Welch. *Id.* "M.W. was identified female at birth" and "was diagnosed with gender dysphoria in adolescence." *Id.* at 6–7. At the age of 12, M.W. "declared that M.W. is a transgender male" and now "uses a stereotypically male first name and male pronouns." *Id.* at 7. "M.W. was prescribed testosterone" in July 2022, and continues to receive testosterone. *Id.* at 7.

A.M. is the 11-year-old child of Emily Morris. *Id.* at 8. "At birth, A.M. was identified as male," but "[b]efore A.M. was 4 years of age, A.M. stated to family members that A.M. was a girl and was thinking about trying to cut off A.M.'s penis." *Id.* "A.M. socially transitioned before the age of 4" and since then "has used a stereotypically female first name and female pronouns." *Id.* A.M. has been diagnosed with gender dysphoria and receives a puberty blocker. *Id.* at 9-10.

M.R. is the 15-year-old child of Maria Rivera. *Id.* at 10. "M.R. was identified as female at birth" and in December 2021 "declared . . . that M.R. is a transgender male." *Id.* "M.R. now consistently uses a stereotypically male first name and male pronouns." *Id.* M.R. has been diagnosed with gender dysphoria and receives testosterone under a prescription from Dr. Catherine Bast at Mosaic Health and Healing Arts ("Mosaic"). *Id.* at 11.

Dr. Bast is a board-certified family-practice physician at Mosaic in Goshen, Indiana. *Id.* at 11–12. Mosaic currently treats 72 minor patients who

are diagnosed with gender dysphoria and are prescribed either puberty

blockers or hormones.  *Id.* at 12.

### D. Defendants

The individual members of the Medical Licensing Board of Indiana serve

as members of the board that is responsible for the licensing and discipline of

medical providers, and that grants and revokes licenses to Indiana medical

practitioners.  *See* dkt. 1 at 5; Ind. Code §§ 25-1-9-1 *et seq.*

The Executive Director of the Indiana Professional Licensing Agency

oversees the Medical Licensing Board.  Ind. Code §§ 25-0.5-3-1 *et seq*; 25-1-6-

3.

The Attorney General of Indiana investigates complaints against licensed

medical providers and can pursue discipline from the Medical Licensing

Board.  Ind. Code § 25-1-7-2.

The Secretary of Indiana Family and Social Services Administration is the

director of the FSSA, which administers Medicaid in Indiana.  Ind. Code § 12-

15-1-1.

### E. Procedural history and preliminary-injunction evidence

Plaintiffs brought this action in April 2023, alleging that S.E.A. 480's

restrictions violate (1) the minor plaintiffs' Fourteenth Amendment equal

protection rights; (2) the parent plaintiffs' "fundamental rights protected by due

process" under the Fourteenth Amendment, (3) the medical-provider plaintiffs'

First Amendment speech rights; and (4) Medicaid provisions in 42 U.S.C. §§

18116 and 1396d(a).  Dkt. 1 at 42–45.  Plaintiffs have filed a motion for a

preliminary injunction under Federal Rule of Civil Procedure 65, requesting that the Court "prohibit[ ] the enforcement of" S.E.A. 480.  Dkt. 9.

The parties have agreed that there should not be an evidentiary hearing. *See* dkt. 22 at 3; dkt. 56.  To develop the preliminary-injunction record, the parties have conducted substantial discovery, filed a statement of stipulated facts, and designated extensive evidence.  *See* dkt. 26; dkt. 48; dkt. 49; dkt. 51. In total, excluding citations and supporting exhibits, Plaintiffs have designated more than 100 pages of expert opinions, dkt. 26; dkt. 58, and Defendants have designated more than more than 300 pages of expert opinions, dkt. 48.  The parties' complete evidentiary filings span more than 3,000 pages.  Dkt. 26; dkt. 48; dkt. 49; dkt. 58.

Despite the volume of designated evidence and the contradicting expert opinions, the parties have designated only a small portion of the evidentiary filings in their briefs, generally relying on summaries of evidence in their experts' reports.  *See* dkt. 54; dkt. 59.

### 1. Plaintiffs' experts

Plaintiffs have designated three experts, who have provided reports of their opinions.

Dr. Dan Karasic, a Professor Emeritus of Psychiatry at the University of California, San Francisco School of Medicine, has "provided care for thousands of transgender patients" over thirty years.  Dkt. 26-1 at 3.  He's worked with the World Professional Association for Transgender Health ("WPATH") and co-authored the *WPATH Standards of Care for the Health of Transsexual,*

*Transgender, and Gender Nonconforming People. Id.* at 4. Dr. Karasic's expert report details his opinions on gender identity, gender dysphoria, appropriate medical treatments, and harms of denying gender-affirming care. *Id.* at 6–18.

Dr. Daniel Shumer is a pediatric endocrinologist, an Associated Professor of Pediatrics at Mott Children's Hospital at Michigan Medicine, and the Medical Director of the Comprehensive Gender Services Program at Michigan Medicine, University of Michigan. Dkt. 26-2 at 1. He has extensively researched "gender identity in pediatrics and the treatment of gender dysphoria" and has "been treating patients with gender dysphoria as a pediatric endocrinologist since 2015." *Id.* at 2. Dr. Shumer's expert report addresses evidence-based treatments for gender dysphoria in minors, including their safety and efficacy. *Id.* at 6–23.

Dr. Jack Turban is an Assistant Professor of Child & Adolescent Psychiatry at the University of California, San Francisco School of Medicine and the director of the Gender Psychiatry Program in the Division of Child & Adolescent Psychiatry. Dkt. 26-3 at 2. His expert report includes opinions about the effects of gender-dysphoria treatment on mental health. *Id.* at 4–18.

Plaintiffs' experts have each filed supplemental reports addressing the opinions of Defendants' experts. Dkt. 58. Defendants have filed a motion to exclude many of the opinions from Plaintiffs' experts, arguing that they are unreliable. *See* dkt. 62; dkt. 63.[2]

---

[2] Plaintiffs have orally moved to strike that motion because it violates the parties' stipulation regarding the admissibility of evidence discussed at the June 5, 2023 status conference, *see* dkt. 56, and was filed too late in the preliminary-injunction

### 2. Defendants' experts

Defendants have designated five experts, who have provided reports detailing their opinions.

Dr. James Cantor is the Director of the Toronto Sexuality Centre.  Dkt. 48-1 at 9.  He is trained as a clinical psychologist and neuroscientist and has researched "the development of sexual orientation, gender identity, hypersexuality, and atypical sexualities."  *Id.* at 8.  His expert report opines on the strength of the medical evidence regarding gender-dysphoria treatments as well as the safety and effectiveness of those treatments.  *Id.* at 11–131.

Dr. Paul Hruz, an Associate Professor of Pediatrics in the Division of Pediatric Endocrinology and Diabetes at Washington University School of Medicine, has "participated in the care of hundreds of infants and children, including adolescents, with disorders of sexual development."  Dkt. 48-2 at 2. Dr. Hruz's opinions address the use of puberty blockers and hormone therapy to treat endocrine disorders and gender dysphoria.  *Id.* at 9–52.

Dr. Dianna Kenny was a Professor of Psychology at the University of Sydney for thirteen years and is now "a psychodynamic psychotherapist" and "child, marriage, and family therapist."  Dkt. 48-3 at 3-4.  For the past five years, she has "engaged in exploratory psychotherapy with children,

proceedings.  Many of the points raised in support of Defendants' motion to exclude could and should have been made in their response brief.  Dkt. 54.  This case's preliminary-injunction proceedings have been carefully scheduled to ensure thorough and fair review before S.E.A. 480's July 1, 2023 effective date, and none of those orders anticipated a motion to exclude filed after preliminary-injunction briefing was complete.  *See* dkt. 21; dkt. 25; dkt. 56.  However, for the reasons below, it's unnecessary to strike Defendants' motion to exclude.

adolescents, and their families who are struggling with gender dysphoria." *Id.* at 4.  Dr. Kenney's report addresses social aspects of gender dysphoria.  *Id.* at 10–126.

Dr. Daniel Weiss, a practicing endocrinologist, has provided care for adults and children, and has completed extensive medical research.  Dkt. 48-4 at 3.  He opines on the history and safety of treatments for gender dysphoria. *Id.* at 5–30.

Dr. Kristopher Kaliebe is an Associate Professor in the University of South Florida Medical School's Department of Psychiatry.  Dkt. 48-5 at 3.  He supervises a child and adolescent psychiatry clinic and treats pediatric patients with gender dysphoria.  *Id.* at 7.  His expert report opines on the history of gender dysphoria diagnoses and the strength of the evidence regarding gender-dysphoria treatments.  *Id.* at 10–71.

The Court held oral argument on June 14, 2023.  Dkt. 66.

## II.
## Preliminary Injunction Standard

Injunctive relief under Federal Rule of Civil Procedure 65 is "an exercise of very far-reaching power, never to be indulged in except in a case clearly demanding it."  *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021).  To obtain such extraordinary relief, the party seeking the preliminary injunction carries the burden of persuasion by a clear showing.  *See id.*; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Determining whether a plaintiff "is entitled to a preliminary injunction involves a multi-step inquiry."  *Int'l Ass'n of Fire Fighters, Local 365 v. City of E.*

*Chi.*, 56 F.4th 437, 446 (7th Cir. 2022). "As a threshold matter, a party seeking

a preliminary injunction must demonstrate (1) some likelihood of succeeding

on the merits, and (2) that it has no adequate remedy at law and will suffer

irreparable harm if preliminary relief is denied." *Id.* "If these threshold factors

are met, the court proceeds to a balancing phase, where it must then consider:

(3) the irreparable harm the non-moving party will suffer if preliminary relief is

granted, balancing that harm against the irreparable harm to the moving party

if relief is denied; and (4) the public interest, meaning the consequences of

granting or denying the injunction to non-parties." *Cassell*, 990 F.3d at 545.

This "involves a 'sliding scale' approach: the more likely the plaintiff is to win

on the merits, the less the balance of harms needs to weigh in his favor, and

vice versa." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). "In the final

analysis, the district court equitably weighs these factors together, seeking at

all times to minimize the costs of being mistaken." *Cassell*, 990 F.3d at 545.

### III.
### Analysis

#### A. Standing to challenge S.E.A. 480's prohibition on gender reassignment surgery

Gender reassignment surgery is one of the "gender transition procedures"

that S.E.A. 480 prohibits for minors. S.E.A. 480 §§ 5(a); 13(a). The statute

defines "gender reassignment surgery" as "any medical or surgical service that

seeks to surgically alter or remove healthy physical or anatomical

characteristics or features that are typical for the individual's sex, in order to

instill or create physiological or anatomical characteristics that resemble a sex

different from the individual's sex . . . knowingly performed for the purpose of assisting an individual with a gender transition."  *Id.* § 2.

The parties have stipulated that "[n]o Indiana provider performs gender-transition surgery on persons under the age of 18."  Dkt. 51 at 4.  Defendants therefore argue that Plaintiffs lack standing to seek a preliminary injunction against S.E.A. 480's prohibition on gender-transition surgery.  Dkt. 54 at 30.  Plaintiffs contend that they have standing because they are challenging the prohibition on "'gender transition procedures' generally."  Dkt. 59 at 22.

Standing is a constitutional doctrine "rooted in the traditional understanding of a case or controversy" and "ensure[s] that federal courts do not exceed their authority as it has been traditionally understood."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–38 (2016); U.S. CONST. Art. III, § 2.  To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo*, 578 U.S. at 338.  Here, Plaintiffs must have standing as to each piece of their claim.  *See Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 661 (7th Cir. 2015) ("The fact that a plaintiff has suffered an injury that is traceable to one kind of conduct does not grant that plaintiff standing to challenge other, even related, conduct; standing is not dispensed in gross."); *Mueller v. Raemisch*, 740 F.3d 1128, 1132–33 (7th Cir. 2014) (holding that the plaintiffs had standing to challenge the requirement to continually update sex-offender registry information, but not to challenge the prohibition on changing their names, since they had no intention

of doing so). "To have standing for prospective injunctive relief, a plaintiff must face a 'real and immediate' threat of future injury as opposed to a threat that is merely 'conjectural or hypothetical.'" *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017); *see Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (recognizing a plaintiff's "burden to demonstrate standing in the context of a preliminary injunction motion"). Put simply, a preliminary injunction can be appropriate only if there are "continuing, present adverse effects." *Simic*, 851 F.3d at 738.

Here, the stipulated facts show that no minor could receive gender-transition surgery from a physician or other practitioner in Indiana, regardless of S.E.A. 480. Dkt. 51 at 4. Plaintiffs therefore cannot show that S.E.A. 480's prohibition on gender-transition surgery would cause any minor in Indiana an injury that is likely to be redressed by a favorable judicial decision. Plaintiffs therefore lack standing to seek a preliminary injunction against S.E.A. 480's prohibition on gender-transition surgery for minors. *See Speech First*, 968 F.3d at 644.

### B. Fourteenth Amendment equal protection claims

"The Fourteenth Amendment's Equal Protection Clause guarantees that 'No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.'" *Hope v. Comm'r of Ind. Dep't of Corr.*, 9 F.4th 513, 528–29 (7th Cir. 2021) (quoting U.S. Const. amend. XIV, § 1). This "is essentially a direction that all persons similarly situated should be treated alike." *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F.3d 1034, 1050 (7th Cir. 2017).

Plaintiffs argue that S.E.A. 480 "violates the equal protection rights of the plaintiff youth" because it impermissibly "discriminates on the basis of both sex and transgender status." Dkt. 27 at 26–27. Defendants respond that S.E.A. 480 instead makes reasonable classifications "based on age, procedure, and condition—not sex or transgender status." Dkt. 54 at 40.

### 1. Sex-based classifications and heightened scrutiny

"Generally, state action is presumed to be lawful [under the Equal Protection Clause] and will be upheld if the classification drawn by the statute is rationally related to a legitimate state interest." *Whitaker*, 858 F.3d at 1050. That "rational basis test, however, does not apply when a classification is based upon sex." *Id.* Sex-based classifications are instead "subject to heightened scrutiny," requiring "the state to demonstrate that its proffered justification is 'exceedingly persuasive.'" *Id.*; *accord Sessions v. Morales–Santana*, 582 U.S. 47, 59 (2017) (recognizing "the heightened scrutiny that now attends 'all gender-based classifications'"). "This requires the state to show that the 'classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Whitaker*, 858 F.3d at 1050 (quoting *United States v. Virginia*, 518 U.S. 515, 524 (1996)).

Plaintiffs argue that heightened scrutiny applies here because, under S.E.A. 480, sex is the determining factor as to whether a treatment is prohibited. Dkt. 27 at 27–30. Defendants respond that S.E.A. 480 draws

distinctions based on other factors, such as medical condition and procedure, rather than based on sex.  Dkt. 54 at 40.

S.E.A. 480 defines "sex" as "the biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles."  S.E.A. 480 § 12.  And it prohibits "a physician or other practitioner" from "knowingly provid[ing] gender transition procedures to a minor."  *Id.* § 13(a).  "[G]ender transition" is defined as "the process in which an individual shifts from identifying with and living as a gender that corresponds to his or her sex to identifying with and living as a gender different from his or her sex."  *Id.* § 3.  And a "gender transition procedure" is defined as:

> any medical or surgical service . . . that seeks to:
> (1)  alter or remove physical or anatomical characteristics or features that are typical for the individual's sex; or
> (2)  instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex, including medical services that provide puberty blocking drugs, gender transition hormone therapy, or genital gender reassignment surgery or nongenital gender reassignment surgery knowingly performed for the purpose of assisting an individual with a gender transition.

*Id.* § 5(a).

Sex-based classifications are therefore central to S.E.A. 480's prohibitions.  Section 5(a)(1), for example, prohibits procedures seeking to "alter or remove physical or anatomical characteristics or features that are typical for the individual's sex."  But it does not prohibit a person from seeking to "alter or remove" a characteristic or feature typical of the opposite sex, under

S.E.A. 480's definition of sex.  Similarly, section 5(a)(2) prohibits the creation of physiological or anatomical characteristics or features "that resemble a sex different from the individual's sex."  But it does not prohibit a medical provider from creating physiological or anatomical characteristics or features that resemble that individual's sex.  In other words, the statute allows physicians and other practitioners to "instill or create" characteristics "resembl[ing]" female anatomical characteristics for females but not for males, and male anatomical characteristics for males but not for females.  It's therefore impossible for a medical provider to know whether a treatment is prohibited without knowing the patient's sex.  S.E.A. 480's prohibitions therefore "cannot be stated without referencing sex."  *Whitaker*, 858 F.3d at 1051.

Despite that statutory language, Defendants argue that S.E.A. 480's classifications are instead "based on age, procedure, and medical condition" and "encompass both sexes and all gender identities."  Dkt. 54 at 40.  Defendants therefore contend that because S.E.A. 480 prohibits all gender-transition procedures, for both males and females, there's no sex-based classification.  *See id.* at 40–41 (relying on *Geduldig v. Aiello*, 417 U.S. 484 (1974)).  But *Geduldig* was about pregnancy, which doesn't always trigger heightened scrutiny since it's an "objectively identifiable physical condition" and not necessarily a proxy for sex, even though "only women can become pregnant."  417 U.S. at 496 n.20.  S.E.A. 480's prohibitions, by contrast, do not prohibit certain medical procedures in all circumstances, but only when used for gender transition, which in turn requires sex-based classifications.

Indeed, under S.E.A. 480's plain language, a medical provider can't know whether a gender *transition* is involved without knowing the patient's sex and the gender associated with the goal of the treatment.  S.E.A. 480 §§ 3, 5(a).

In short, without sex-based classifications, it would be impossible for S.E.A. 480 to define whether a puberty-blocking or hormone treatment involved transition from one's sex (prohibited) or was in accordance with one's sex (permitted).  That's certainly why S.E.A. 480's plain text defines "sex," *id.* § 12; defines "gender transition" in sex-based terms, *id.* § 3; and then phrases its prohibitions in terms that repeatedly rely on those definitions, *id.* §§ 5(a), 13(a) (prohibitions centering on what is "typical for the individual's sex" and "characteristics that resemble a sex different from the individual's sex").  At bottom, sex-based classifications are not just present in S.E.A. 480's prohibitions; they're determinative.

Defendants further argue that the rationale for heightened scrutiny doesn't apply to S.E.A. 480.  Dkt. 54 at 31–33 (arguing that when "medical procedures take account of basic, immutable biological differences" between males and females, that does not trigger heightened scrutiny and does not rely on "stereotypes").  The Supreme Court has indeed applied heightened scrutiny while recognizing that "[p]hysical differences between men and women are enduring" and that "[t]he two sexes are not fungible."  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  It has therefore explained that the purpose of heightened scrutiny is not to "make sex a proscribed classification" but to ensure that sex-based classifications do not "create or perpetuate the legal,

social, and economic inferiority of women" or men.  *Id.*; *Sessions*, 582 U.S. at 72.

While S.E.A. 480 prohibits both male and female minors from using puberty blockers and cross-sex hormone therapy for gender transition, it nonetheless draws sex-based classifications under current Seventh Circuit precedent.  *See Whitaker*, 858 F.3d at 1050.  For the reasons argued by Defendants, perhaps the Seventh Circuit or the Supreme Court will hold that a legislative sex-based classification like that made in S.E.A. 480 is presumed lawful and subject to only rational basis review.  But *Whitaker* holds that rational basis review "does not apply when a classification is based upon sex." 858 F.3d at 1050.  Instead, a sex-based classification triggers heightened scrutiny that requires the state to show that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *Id.*

The Eighth Circuit reached the same conclusion in a case involving a substantially similar statute.  *Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022). There, the court held that heightened scrutiny applied to the challenged Arkansas statute because "[t]he biological sex of the minor patient is the basis on which the law distinguishes between those who may receive certain types of medical care and those who may not."  *Id.* at 670.  The same is true here.

Because S.E.A. 480's prohibitions are "inherently based upon" sex
classifications, "heightened review applies."  *Whitaker*, 858 F.3d at 1051.[3]

### 2. Heightened scrutiny applied to S.E.A. 480

"Successful defense of legislation that differentiates on the basis of
gender . . . requires an 'exceedingly persuasive justification.'"  *Sessions v.
Morales–Santana*, 582 U.S. 47, 58 (2017).  "For a gender-based classification to
withstand such scrutiny, it must 'serve important governmental objectives,'
and 'the discriminatory means employed must be substantially related to the
achievement of those objectives."  *Nevada Dep't of Human Res. v. Hibbs*, 538
U.S. 721, 728–29 (2003) (quoting *Virginia*, 518 U.S. at 533).  In other words,
there must be a "close means–end fit."  *Sessions*, 582 U.S. at 68.

Plaintiffs argue that S.E.A. 480 does not survive heightened scrutiny
because there's no important government interest to justify prohibiting "safe,
effective, and medically necessary treatment for the health and well-being of
adolescents suffering from gender dysphoria."  Dkt. 27 at 30.  Defendants
contend that the prohibited treatments are unsafe and their effectiveness is
unproven, so S.E.A. 480 is justified by the State's interests in protecting the
wellbeing of minors and regulating the medical profession.  Dkt. 54 at 33–40.

Certainly, the proffered state interests are legitimate.  "[I]t is clear that a
legislature may pass valid laws to protect children."  *Packingham v. North
Carolina*, 582 U.S. 98, 106 (2017).  And it's similarly "clear [that] the State has

---

[3] Because S.E.A. 480's sex-based classification triggers heightened scrutiny, the Court
does not address what level of scrutiny a transgender-based classification alone might
warrant.

a significant role to play in regulating the medical profession." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007). But heightened scrutiny requires a "close means–end fit," so it's not enough for the State's interests to justify *some* regulation of gender transition procedures for minors. Instead, the State's interests must justify S.E.A. 480's *prohibition* of gender transition procedures for minors. *Sessions*, 582 U.S. at 68; *cf. Packingham*, 582 U.S. at 106 (explaining, in the First Amendment context, that "the assertion of a valid governmental interest cannot, in every context, be insulated from all constitutional protections").

S.E.A. 480's scope is broad. As Defendants acknowledge, the statute "generally prohibits licensed medical providers from knowingly providing, or aiding and abetting another practitioner in providing, gender transition procedures to a minor." Dkt. 54 at 27–28. Indiana thus opted to ban—rather than otherwise regulate—gender transition procedures for minors. Defendants argue that this ban is justified because gender transition procedures "subject vulnerable minors to unproven, harmful, and irreversible procedures." Dkt. 54 at 33. In support, they have designated medical evidence supported by expert reports. *See generally* dkt. 48.

There is thus designated evidence in the record that puberty blockers carry risks of increased brain pressure and reductions in bone density and "may cause hot flashes, weight gain, fatigue and mood alterations." Dkt. 48-4 at 20 (Weiss decl.); dkt. 48-2 at 25 (Hruz decl.). And while puberty blockers are prescribed when puberty starts far too soon, high-quality medical research on

their use to delay puberty past a typical age is exceptionally limited.  *See* dkt. 48-2 at 46 (Hruz decl.); dkt. 48-4 at 21–22 (Weiss decl.).  Indeed, the consensus from all sides is that more research is needed to explore these risks. *See* dkt. 48-4 at 21–23 (Weiss decl.) (identifying statements from healthcare organizations including The Endocrine Society); dkt. 48-1 (Cantor decl.) (summarizing WPATH's calls for further research).

There's also evidence that the cross-sex hormone therapies prohibited by S.E.A. 480 have risks as well.  Those include fertility impairment, lower bone density, disfiguring acne, high blood pressure, weight gain, abnormal glucose tolerance, breast cancer, liver disease, thrombosis (blood clots in veins or arteries), and cardiovascular disease.  Dkt. 48-2 at 44–46 (Hruz decl.). Hormone therapy is used to treat medical conditions other than gender dysphoria, but—similar to puberty blockers used for gender transition—the "long term effect[s]" of using of cross-sex hormones for gender transition are "currently unknown."  *Id.* at 44.

This designated evidence thus provides support for Defendants' view that the safety and effectiveness of puberty blockers and hormone therapy is uncertain and unsettled.  It also supports Defendants' position that the State has good reasons for regulating gender transition procedures for minors. Nevertheless, Plaintiffs argue that these "concerns are based on mischaracterizations and distortions about the diagnosis and treatment of gender dysphoria."  Dkt. 59 at 2.  Maybe Plaintiffs will be able to prove that's true at a trial where Defendants' experts are subject to cross-examination on

the strength of their opinions.  *See Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (explaining that admissible expert evidence "is to be tested . . . with the familiar tools of 'vigorous cross-examination [and] presentation of contrary evidence'").  But based on the paper record available here, the Court finds that Defendants have designated some evidence in support of their position.

Even so, heightened scrutiny requires more—the regulation must have an "exceedingly persuasive justification" and a "close means–end fit." *Sessions*, 582 U.S. at 59, 68.  In other words, the State's specific "means" (S.E.A. 480's broad ban) must fit its "ends" (protecting minors and regulating the medical profession).  *Sessions*, 582 U.S. at 68; *Virginia*, 518 U.S. at 531 ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' *for that action.*" (emphasis added)).

So, for example, when the Supreme Court considered the male-only education offered at the Virginia Military Institute, it recognized that sex-based classifications can serve legitimate interests yet not survive heightened scrutiny.  *Virginia*, 518 U.S. at 535–36.  Therefore, in that case, while "[s]ingle-sex education affords pedagogical benefits to at least some students," and "diversity among public educational institutions can serve the public good," those "benign justifications" were not enough to justify VMI's "categorical exclusions." *Id.*

Here, S.E.A. 480 categorically bans the use of puberty blockers and hormone therapy for gender transition for minors.  And Plaintiffs have designated evidence of risks to minors' health and wellbeing from gender

dysphoria if those treatments can no longer be provided to minors—prolonging

of their dysphoria, and causing additional distress and health risks, such as

depression, posttraumatic stress disorder, and suicidality. *See* dkt. 26-1 at

16–17 (Karasic decl.).[4]  Those treatments could no longer be used if S.E.A. 480

goes into effect.  So, while the State has identified legitimate reasons for

regulation in this area, the designated evidence does not demonstrate, at least

at this stage, that the extent of its regulation was closely tailored to uphold

those interests.  Plaintiffs therefore have shown some likelihood of success on

the merits of their equal protection claim. *See Mays v. Dart*, 974 F.3d 810, 818

(7th Cir. 2020).

Nor does "the normal rule that courts defer to the judgments of

legislatures in areas fraught with medical and scientific uncertainties" settle

the issue here. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2268

(2022).  Defendants argue that S.E.A. 480 fits comfortably within this vast zone

of legislative discretion, but they have not cited any authority making that

---

[4] In their motion to exclude expert testimony, Defendants argue that Dr. Karasic's
opinion is unreliable and therefore inadmissible. Dkt. 62; dkt. 63 at 26–27.  But Dr.
Karasic bases his opinion on his experience "provid[ing] care for thousands of
transgender patients," including "patients over the years who were unable to access
gender-affirming care when it was clinically indicated." Dkt. 26-1 at 3, 17.  That
includes minors, "many" of whom then had "increased depression, anxiety, suicidal
ideation and self-harm, increased substance use, and a deterioration in school
performance." *Id.* at 17.  Defendants argue that this experience is "unspecified" and
unsupported, dkt. 63 at 26–27, but it is enough to pass *Daubert* gatekeeping. *See
Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586–87 (7th Cir. 2000) (explaining that
"experience in treating patients" can qualify a medical expert and "[m]edical
professionals reasonably may be expected to rely on self-reported patient histories").
Other than this ruling, Defendant's motion to exclude expert testimony is **DENIED
without prejudice** as unnecessary at this stage because this order does not rely on
the challenged opinions in concluding that Plaintiffs have carried their preliminary-
injunction burden.  Dkt. [62].

principle controlling here, when heightened scrutiny applies to an equal protection claim.  *See id.* at 2245–46 (*Dobbs* explaining that it did not involve "heightened constitutional scrutiny" but instead "the same standard of review" that applied to "other health and safety measures").

Nevertheless, Defendants argue that "the State has no less restrictive means" than S.E.A. 480 "to advance its interests."  Dkt. 54 at 36.  They reason that there's "no test for gender dysphoria and no reliable way to know whether it will resolve without lifechanging medical interventions."  *Id.*

Defendants don't explain, however, why uncertainty about a gender-dysphoria diagnosis or about how long gender dysphoria may persist leaves the State without more tailored alternatives to S.E.A. 480.  At the hearing on Plaintiffs' motion, Defendants emphasized that regardless of any expert testimony, the risks and uncertainties identified in systematic reviews conducted by certain European countries justified S.E.A. 480's ban on gender transition procedures for minors.  But reliance on those reviews also does not achieve the "close means–end fit" required.

Most detrimental to Defendants' position is that no European country that has conducted a systematic review responded with a ban on the use of puberty blockers and cross-sex hormone therapy as S.E.A. 480 would.  Instead, Defendants' designated evidence is that (1) the English National Health Service has proposed that puberty blockers be used only "in the context of a formal research protocol," (2) Finland's health service has restricted puberty blockers and cross-sex hormone therapies to when gender dysphoria is

severe and other psychiatric symptoms have ceased, (3) the "leading Swedish pediatric gender clinic" has limited puberty blockers and cross-sex hormones to those sixteen and older in monitored clinical trials[5], (4) the Académie Nationale de Médecine of France has advised providers "to extend as much as possible the psychological support stage" before turning to hormone treatments, and (5) the "Dutch Protocol" developed in the Netherlands involves age restrictions on certain treatments and requires "resolution of mental health issues before any transition." Dkt. 48-1 at 16–21, 110–11 (Cantor decl.).

In short, these European countries all chose less-restrictive means of regulation. In Defendants' view, however, the data from the systematic reviews gives the State unfettered discretion to choose how to regulate gender transition procedures for minors—up to and including a broad prohibition. But that does not take into account the "close means–end fit" that heightened scrutiny requires of sex-based classifications. *Sessions*, 582 U.S. at 59, 68.

Plaintiffs therefore have shown some likelihood of success on their claim that S.E.A. 480's prohibitions on puberty blockers and hormone therapy for minors violate the Equal Protection Clause. *See id.* at 68.

### C. First Amendment speech claims

In addition to its treatment prohibitions, S.E.A. 480 prohibits physicians and other medical practitioners from "aid[ing] or abet[ting] another physician or practitioner in the provision of" prohibited gender transition procedures to a

---

[5] The Swedish National Board of Health, however, has not imposed those restrictions but "recommends restraint." Dkt. 48-1 at 20.

minor.  S.E.A. 480 § 13(b).  It's uncontested that § 13(b) would prohibit any action that aids or abets a gender transition procedure.  *See* dkt. 54 at 52.  It therefore sweeps up both speech—such as medical referrals and discussing a shared patient's care—and conduct—such as driving a minor to receive prohibited care or assisting a surgery.  *See id.*

Plaintiffs Dr. Bast and Mosaic therefore challenge this provision as applied to its regulation of speech, arguing that it violates medical providers' First Amendment free speech rights because it prohibits making referrals for or providing information about gender transition procedures.  Dkt. 27 at 49; dkt. 59 at 35.  Defendants respond that § 13(b) regulates speech only incidentally and is valid as part of a broader regulatory statute.  Dkt. 54 at 52–53.

It is "true that the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  But burdens on speech are "incidental" only when they flow indirectly from the core purpose of the regulation—like an employment anti-discrimination ordinance requiring the removal of a "White Applicants Only" sign, or an ordinance against outdoor fires preventing flag burning.  *Id.*; *see also Morgan v. White*, 964 F.3d 649, 652 (7th Cir. 2020) (holding that it's an incidental burden on speech when a COVID-related social distancing order makes it harder for a campaign to "round up signatures").  Here, the speech that section 13(b) would prohibit would itself be "aiding and abetting," rather than being incidental to separate, prohibited conduct.  *See Expressions Hair Design v. Schneiderman*, 581 U.S.

37, 47 (2017) (holding that a ban on surcharges for using a credit card regulated speech directly rather than incidentally because it dictated how stores communicated prices); *Hurley v. Irish–American Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557 (1995) (holding that a ban on discrimination based on sexual orientation violated the First Amendment as applied to a parade).[6]

S.E.A. 480 § 13(b) therefore appears to burden speech "on its face and in its practical operation" because "aiding and abetting" directly prohibits referrals and collaboration among medical providers. *Sorrell*, 564 U.S. at 567. Moreover, the regulation triggers heightened scrutiny because it's "directed at certain content and is aimed at particular speakers." *Id.* at 567, 571. Section 13(b) singles out medical providers and only one category of medical treatment—gender transition procedures.

Plaintiffs therefore have some likelihood of success on their First Amendment challenge to S.E.A. 480's aiding and abetting provision, as applied to the speech they have shown to be regulated by that provision. *Cf. Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021) (finding likelihood of success on a First Amendment challenge to a ban on referrals as part of a similar statute), *aff'd*, 471 F.4th 661, 671–72 (8th Cir. 2022).[7]

---

[6] Defendants also argue that S.E.A. 480 § 13(b) is permissible as "an integral part . . . of a valid . . . statute." Dkt. 54 at 52. But for the reasons explained above, Plaintiffs have some likelihood of success on challenges to other portions of S.E.A. 480 as well.

[7] Because Plaintiffs have shown some likelihood of success for these reasons as to the portions of S.E.A. 480 that they have standing to challenge, the Court does not address Plaintiffs' arguments that S.E.A. 480 (1) denies parents the fundamental right

### D. Remaining preliminary injunction factors

#### 1. Irreparable harm

Plaintiffs must also show that they would suffer irreparable harm

without an injunction.  *See Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir.

2021).  "Harm is irreparable if legal remedies are inadequate to cure it."  *Life

Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021).  "Inadequate

'does not mean wholly ineffectual; rather, the remedy must be seriously

deficient as compared to the harm suffered.'"  *Id.*

Minor Plaintiffs argue that they would suffer irreparable harm if S.E.A.

480 took effect because they would have to stop receiving puberty blockers or

hormone therapy to treat the severe condition of gender dysphoria.  Dkt. 27 at

52–53.  Defendants respond that psychotherapy is available as an alternative

treatment.  Dkt. 54 at 54–55.

Medical harms, including to mental health, can constitute irreparable

harm, *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F.3d 1034, 1044–46

(7th Cir. 2017), and Defendants do not contest that gender dysphoria is a

psychiatric diagnosis that requires "clinically significant distress" to diagnose,

dkt. 54 at 14.  *Accord Brandt*, 551 F. Supp. 3d at 892 (finding irreparable harm

on a similar record), *aff'd*, 471 F.4th at 671–72.  And—again—there's evidence

that puberty blockers and cross-sex hormone therapy reduces distress for

some minors diagnosed with gender dysphoria.  *See* dkt. 26-1 at 3, 16–17

to dictate their children's medical care, (2) violates federal Medicaid law, and (3)
violates the Affordable Care Act.  Dkt. 27 at 33–49.

(Karasic decl.); dkt. 48-12 at 18, 20 (B. Clawson Dep.) (explaining the effects of treatment on K.C.); dkt. 48-14 at 13–14 (Morris Dep.) (same for A.M.); dkt. 48-15 at 19 (R. Welch Dep.) (same for M.W.); dkt. 48-17 at 20 (Rivera Dep.) (same for M.R.).  The risk of irreparable harm therefore supports a preliminary injunction.  *See Whitaker*, 858 F.3d at 1045 (The irreparable harm requirement does not "require that the harm be certain to occur before a court may grant relief on the merits.  Rather, harm is considered irreparable if it cannot be prevented or fully rectified by the final judgment after trial.").

Plaintiffs have also satisfied the irreparable-harm requirement on their First Amendment speech claim.  *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) ("[V]iolations of First Amendment rights are presumed to constitute irreparable injuries.").

## 2. Balancing

Because Plaintiffs have some likelihood of success on the merits of constitutional claims, a preliminary injunction is in the public interest.  *See Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019) ("Enforcing a constitutional right is in the public interest.").  While the State has a strong interest in enforcing democratically enacted laws, that interest decreases as Plaintiffs' likelihood of success on the merits of their constitutional claims increases.  *See Higher Soc'y of Ind. v. Tippecanoe Cty.*, 858 F.3d 1113, 1116 (7th Cir. 2017).  And for the reasons above, Plaintiffs risk suffering irreparable harm absent an injunction.  As a result, the balance of harms favors granting a preliminary injunction against the portions of S.E.A. 480 that Plaintiffs have

some likelihood of success in challenging.  *See Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).

### 3. Bond Requirement

Federal Rule of Civil Procedure 65(c)'s bond requirement is waived.  *See BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, 912 F.3d 1054, 1058 (7th Cir. 2019).  "There is no reason to require a bond" in a case in which "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction."  *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010).  Here, Defendants have not argued a likelihood of money damages or requested a bond.  Any party may request an injunction bond while this case remains pending.

### E. Scope of the injunction

Plaintiffs are therefore entitled to a partial injunction preventing the enforcement of S.E.A. 480's prohibitions on:

(1) gender transition procedures, except gender reassignment surgery, S.E.A. 480 § 13(a); and

(2) "aid[ing] or abet[ting] another physician or practitioner in the provision of" prohibited gender transition procedures to a minor, as applied to speech, *id.* § 13(b).  The injunction will run against the regulated speech Plaintiffs have identified—providing patients with information, making referrals to other medical providers, and providing medical records or other information to other medical providers.

Defendants briefly argue that any injunction must be limited to the named plaintiffs. Dkt. 54 at 55–56. They rely on *Doe v. Rokita*, which identified "a problem with the remedy" when a court provides final relief enjoining a statute's application to non-parties without certifying a class action. *Id.* (citing 54 F.4th 518, 519 (7th Cir. 2022)). *Doe*, however, does not apply here because Plaintiffs seek a preliminary injunction while their motion for class certification remains pending. *See* dkt. 10; *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 886 (7th Cir. 2011). Therefore, for the reasons in the Court's order regarding a stay of class-certification briefing, the Court can use its equitable power to issue an injunction prohibiting Defendants from enforcing the enjoined portions of S.E.A. 480 against any provider, as to any minor. *See* dkt. 41 ("[A] court may issue a classwide preliminary injunction in a putative class action suit prior to a ruling on the class certification motion . . . .").[8]

---

[8] Indeed, briefing on class-certification was stayed at Defendants' request. And Defendants' submissions in support of that request did not mention their view that a stay would later preclude preliminary relief beyond the named plaintiffs. Dkt. 29. Defendants' counsel do not explain why it's appropriate to file such a motion to stay and then raise their view of the scope of available relief for the first time more than a month later in their preliminary-injunction response brief. *See* dkt. 54.

**IV.**
**Conclusion**

Plaintiffs' motion for a preliminary injunction is **GRANTED in part**.  Dkt. [9].[9]  A separate injunction shall issue contemporaneously with this order.  *See* Fed. R. Civ. P. 65(d).

The assigned magistrate judge is asked to enter a case management plan for resolving this case.  The Court will then set a trial date.

**SO ORDERED.**

Date: 6/16/2023

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel

---

[9] The motion for leave to file brief as *amici curiae* of Arkansas, Alabama, and 14 other states is **GRANTED**.  Dkt. [53].

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| K. C., *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00595-JPH-KMB |
| | ) | |
| THE INDIVIDUAL MEMBERS OF THE | ) | |
| MEDICAL LICENSING BOARD OF | ) | |
| INDIANA in their official capacities, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## PRELIMINARY INJUNCTION

Defendants, their officers, agents, employees, servants, attorneys, and all persons in active concert or participation with them, **ARE HEREBY ENJOINED AND RESTRAINED**, pending further order of the Court, from enforcing, against any physician or practitioner and relating to any patient:

(1) S.E.A. 480's prohibitions on gender transition procedures, except the prohibition on gender reassignment surgery.  S.E.A. 480 § 13(a) (to be codified at Ind. Code § 25-1-22-13(a)).

(2) S.E.A. 480's prohibition on "aid[ing] or abet[ting] another physician or practitioner in the provision of gender transition procedures to a minor" as applied to providing patients with information, making referrals to other medical providers, and providing medical records or other information to medical providers.  S.E.A. 480 § 13(b) (to be codified at Ind. Code § 25-1-22-13(b)).

**SO ORDERED.**

SA35

Date: 6/16/2023

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| K. C. *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00595-JPH-KMB |
| | ) | |
| THE INDIVIDUAL MEMBERS OF THE | ) | |
| MEDICAL LICENSING BOARD OF | ) | |
| INDIANA in their official capacities, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER REGARDING STAY OF CLASS CERTIFICATION BRIEFING**

In conjunction with their motion for a preliminary injunction, Plaintiffs have filed a motion to certify three classes and two subclasses under Federal Rule of Civil Procedure 23(b)(2).  Dkt. 10; dkt. 28.  Defendants have filed a motion to stay briefing on that motion until the Court rules on Plaintiffs' motion for a preliminary injunction.  Dkt. 29.  Plaintiffs oppose the motion. Dkt. 32.

Neither side addresses whether class certification under Federal Rule of Civil Procedure 23(b)(2) is the appropriate procedure for Plaintiffs to obtain the scope of preliminary injunctive relief they request.  *See Kartman v. State Farm Mut. Auto Ins. Co.*, 634 F.3d 883 886 (7th Cir. 2011) ("[C]ertification of a class under Rule 23(b)(2) is permissible only when class plaintiffs seek 'final injunctive relief.'").  Put differently, the parties don't address why the Court would not be able to use its equitable power to issue appropriately tailored preliminary injunctive relief, should the Court conclude that Plaintiffs have

shown they are entitled to preliminary injunctive relief. Relatedly, Plaintiffs have not identified any Seventh Circuit authority explaining why Federal Rule of Civil Procedure 23(b)(2) provides the appropriate procedure for applying a preliminary injunction to nonparties. *See* dkt. 28; dkt. 30; *but see Meyer v. Portfolio Recovery Assocs.*, 707 F.3d 1036, 1043 (9th Cir. 2012).

Indeed, in cases challenging similar laws in other states, plaintiffs have not sought class certification. *See Brandt v. Griffin*, No. 4:21-cv-450-JM, dkt. 12 at 61–62 (E.D. Ark.); *Eknes–Tucker v. Ivey*, No. 2:22-cv-184-LCB-CWB, dkt. 8 at 50 (M.D. Ala.); *L.W. v. Skrmetti*, No. 3:23-cv-376, dkt. 33 at 25 (M.D. Tenn); *Poe v. Drummond*, No. 4:23-cv-177, dkt. 6 at 25 (N.D. Okla.). In those cases, two district courts have issued preliminary injunctions that applied beyond the named plaintiffs, without addressing class certification. *Brandt*, No. 4:21-cv-450-JM, 551 F.Supp. 3d 882, 894 (E.D. Ark. Aug. 2, 2021); *Eknes–Tucker*, No. 2:22-cv-184-LCB-CWB, 603 F.Supp.3d 1131, 1151 (M.D. Ala. May 13, 2022) (appeal pending). The Eight Circuit affirmed the preliminary injunction in *Brandt*, holding that the "district court did not abuse its discretion by granting a facial injunction" because Arkansas "failed to offer a more narrowly tailored injunction that would remedy Plaintiffs' injuries." *Brandt v. Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022). Plaintiffs have not explained why a different procedure—Rule 23 class certification—would be appropriate here, should the Court conclude that Plaintiffs have shown they are entitled to preliminary injunctive relief. *See* dkt. 28; dkt. 30.

Indeed, the Seventh Circuit has indicated that a district court's equitable

powers can extend beyond the named parties, in an appropriate case. *See*

*Mulholland v. Marion Cnty. Elec. Bd.*, 746 F.3d 811, 819 (7th Cir. 2014) ("Facial

unconstitutionality as to one means facial unconstitutionality as to all,

regardless of the fact that the injunctive portion of the judgment directly

adjudicated the dispute of only the parties before it."). Several courts,

including district courts in the Seventh Circuit, have issued that type of broad

preliminary injunctive relief without certifying a class under Rule 23. *See*

Newberg on Class Actions § 4:30 (collecting cases) ("[A] court may issue a

classwide preliminary injunction in a putative class action suit prior to a ruling

on the class certification motion . . . ."); *O.B. v. Norwood*, 170 F.Supp.3d 1186,

1200 (N.D. Ill. Mar. 21, 2016) (district court did not issue a class ruling but

"use[d] its general equity powers to order preliminary injunctive relief for the

proposed class of plaintiffs"); *Lee v. Orr*, No. 13-cv-8719, 2013 WL 6490577 at

*2 (N.D. Ill. Dec. 10, 2013).

To be clear, none of this addresses the merits of Plaintiffs' motion for a

preliminary injunction. Whether Plaintiffs are entitled to any preliminary

injunctive relief remains to be determined. Similarly, this order does not

address the appropriate scope of preliminary injunctive relief, should the Court

find any relief warranted. Those issues are the subject of the parties' ongoing

briefing. Dkt. 22; dkt. 25. This order addresses only the proper procedure that

may be used to implement any preliminary injunctive relief that the Court may

award upon full consideration of the parties' briefs, evidentiary materials, and the parties' presentations at the June 14, 2023, hearing.  *See* dkt. 38.

For these reasons, Plaintiffs **SHALL SHOW CAUSE by May 12, 2023**, why briefing on their motion for class certification should not be stayed because the Court's equitable power would provide the more appropriate procedure for the relief they seek.

**SO ORDERED.**

Date: 5/5/2023

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Thomas M. Fisher

THOMAS M. FISHER
Solicitor General


Office of the Indiana Attorney General
Indiana Government Center South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 232-6255
Facsimile: (317) 232-7979
Tom.Fisher@atg.in.gov