No. 23-2366

# United States Court of Appeals for the Seventh Circuit

_____

K.C., ET AL.,
PLAINTIFFS-APPELLEES,

*v.*

INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD, ET AL.,
DEFENDANTS-APPELLANTS,

_____

*APPEAL FROM THE U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA,
NO. 23-CV-595, HON. JAMES PATRICK HANLON, PRESIDING*

_____

## BRIEF OF FAMILY RESEARCH COUNCIL AS *AMICUS CURIAE* SUPPORTING APPELLANTS AND REVERSAL

_____

CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay St. #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

*Counsel for* Amicus Curiae

Save As     Clear Form

### APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2366

Short Caption: K.C. et al. v. Individual Members of the Medical Licensing Board, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Family Research Council

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Spero Law LLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: s/ Christopher Mills    Date: 8/25/23

Attorney's Printed Name:   Christopher Mills

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑  **No** ☐

Address:  Spero Law LLC, 557 East Bay St. #22251

Charleston, SC 29413

Phone Number: 843-606-0640    Fax Number:

E-Mail Address: cmills@spero.law

rev. 12/19 AK

## TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................ ii

Interest of *Amicus Curiae* ...................................................................... 1

Introduction ............................................................................................. 2

Argument ................................................................................................. 5

    I.   The Plaintiffs' favored medical groups are driven by ideology. ..................... 6

        A. WPATH…………………………………………………………………….8

        B. AAP……………………………………………………………………..19

        C. Endocrine Society ...................................................................... 24

    II.  No high-quality evidence supports sterilizing interventions in children ....... 27

Conclusion ............................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) ...................................................6

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ...........................7

*Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019).......................................................8

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ...............................................................6

*Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) .......................................................8

*Wilk v. AMA*, 895 F.2d 352 (7th Cir. 1990) ...............................................................8

OTHER AUTHORITIES

A. L. Nos et al., *Association of Gonadotropin-Releasing Hormone Analogue Use With Subsequent Use of Gender-Affirming Hormones Among Transgender Adolescents*, 5 JAMA Netw. Open e2239758 (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2798002 ..........19

Aaron Sibarium, *The Hijacking of Pediatric Medicine*, The Free Press (Dec. 7, 2022), https://www.thefp.com/p/the-hijacking-of-pediatric-medicine ...............20

Abigail Shrier, *Top Trans Doctors Blow the Whistle on 'Sloppy' Care*, The Free Press (Oct. 4, 2021), https://www.thefp.com/p/top-trans-doctors-blow-the-whistle...................................................................................................................9

Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* (2016) .......................................................................7

Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014), https://doi.org/10.1542/peds.2013-2958.............................................................32

Annelou L.C. de Vries, *Challenges in Timing Puberty Suppression for Gender-Nonconforming Adolescents*, 146 Pediatrics 1 (2020), https://doi.org/10.1542/peds.2020-010611 .......................................................32

Azeen Ghorayshi, *How a Small Gender Clinic Landed in a Political Storm*, N.Y. Times (Aug. 23, 2023), https://tinyurl.com/y2m3mrda .......................................18

Azeen Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls for Research Review*, New York Times (Aug. 3, 2023),

ii

https://www.nytimes.com/2023/08/03/health/aap-gender-affirming-care-
evidence-review.html ................................................................................ 21, 22

Azeen Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery,'* N.Y. Times
(Sept. 26, 2022), https://www.nytimes.com/2022/09/26/health/top-surgery-
transgender-teenagers.html .......................................................................... 13, 14

*Boe v. Marshall*, No. 2:22-cv-184-LCB (M.D. Ala. Dec. 27, 2022),
ECF No. 208 ....................................................................................................16

Brief for AAP et al. as *Amici Curiae* in Support of Plaintiffs-Appellees, *L.W. v.
Skrmetti*, No. 23-5600 (6th Cir. Aug. 10, 2023),
ECF No. 102 ................... 3, 8, 9, 13, 14, 16, 17, 18, 21, 23, 24, 26, 27, 28, 30, 31

Brief for Am. Acad. of Pediatrics et al. as *Amici Curiae* Supporting Plaintiffs,
*Brandt v. Griffin*, No. 4:21-cv-00450 (E.D. Ark. June 24, 2021),
ECF No. 30 ........................................................................................... 2, 13, 27

Brief for Family Research Council as *Amicus Curiae* Supporting Appellants,
*Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) (No. 21-2875) ..........................2

Christal Achille et al., *Longitudinal impact of gender-affirming endocrine
intervention on the mental health and well-being of transgender youths:
preliminary results*, 8 Int'l J. Pediatric Endocrinology (Apr. 30, 2020),
https://ijpeonline.biomedcentral.com/articles/10.1186/s13633-020-00078-2 .....29

Christine Milrod & Dan H. Karasic, *Age is Just a Number: WPATH-Affiliated
Surgeons' Experiences and Attitudes Toward Vaginoplasty in Transgender
Females Under 18 Years of Age in the United States*, 14 J. Sexual Med. 624
(2017), https://doi.org/10.1016/j.jsxm.2017.02.007 ...........................................17

*Correction*, 23 Int'l J. of Transgender Health S259 (2022),
https://tinyurl.com/48e6rcfb .................................................................................13

Cory Turner & Anya Kamenetz, *What Your Teen Wishes You Knew About Sex
Education*, NPR (Feb. 11, 2020),
https://www.npr.org/transcripts/804508548?ft=nprml&f=804508548 ...............22

David Oliver, *Can My Doctor Out Me to My Parents?*, U.S. News & World
Reports (Mar. 22, 2017), https://health.usnews.com/wellness/articles/2017-03-
22/can-my-doctor-out-me-as-gay-to-my-parents ................................................23

Diane Chen et al., *Psychosocial Functioning in Transgender Youth After 2 Years of
Hormones*, 388 New Eng. J. Med. 240 (2023).....................................................31

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender
Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1

(2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ...................................................................................................... 4, 12, 15

Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. Times Magazine (June 15, 2022), https://www.nytimes.com/2022/06/15/magazine/gender-therapy.html ........ 10, 11

Endocrine Soc'y, *AMA strengthens its policy on protecting access to gender-affirming care*, https://tinyurl.com/5n6wpexw (June 12, 2023) ................... 26, 30

Endocrine Soc'y, *Transgender Health: An Endocrine Society Position Statement* (Dec. 16, 2020), https://www.endocrine.org/advocacy/position-statements/transgender-health ................................................................. 29

Erica Ciszek et al., *Discursive Stickiness: Affective Institutional Texts and Activist Resistance*, 10 Pub. Rel. Inquiry 295 (2021) ................................................. 10, 11

Federalist No. 10 ....................................................................................................... 6

Frank C. Woodside & Michael J. Gray, *Researchers' Privilege: Full Disclosure*, 32 W. Mich. U.T.M. Cooley L. Rev. 1, 33 (2015) ................................................ 16

Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, Reduxx (May 17, 2022), https://tinyurl.com/bddr6hhf ............................................................................. 15

Jack L. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145 Pediatrics 1 (Feb. 2020), https://doi.org/10.1542/peds.2019-1725 .......................................................... 30

James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46 J. Sex & Marital Therapy 307 (2019), https://doi.org/10.1080/0092623X.2019.1698481 ............................................. 20

Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics 1 (2018), https://doi.org/10.1542/peds.2018-2162 ............................................... 19, 20, 23

Jennifer Block, *Gender dysphoria in young people is rising — and so is professional disagreement*, 380 BMJ 382 (2023), https://www.bmj.com/content/380/bmj.p382.long ........................... 20, 24, 25, 26

Jenny Jarvie, *This Abortion Doctor is Not Ready to Leave Alabama*, L.A. Times (Apr. 28, 2023), https://tinyurl.com/2tf2hrnn ...................................................... 17

Jesse Singal, *The New, Highly Touted Study on Hormones for Transgender Teens Doesn't Really Tell Us Much of Anything*, Singal-Minded (Feb. 7, 2023), https://jessesingal.substack.com/p/the-new-highly-touted-study-on-hormones ..31

Joint Letter from USPATH and WPATH (Oct. 12, 2021), https://www.wpath.org/media/cms/Documents/Public%20Policies/2021/Joint%20WPATH%20USPATH%20Letter%20Dated%20Oct%2012%202021.pdf .......10

Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, Wall Street Journal (Aug. 17, 2022), https://on.wsj.com/3BzOuTZ ..........................................................................................21

Kaylee White, *Follow the money*, Washington Examiner (Sept. 20, 2022), https://tinyurl.com/3jkmvn9r .................................................................................14

Kellan E. Baker et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc'y 1 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7894249 ....................31

Lisa Selin Davis, *Kid Gender Guidelines Not Driven by Science*, N.Y. Post (Sept. 29, 2022), https://nypost.com/2022/09/29/kid-gender-guidelines-not-driven-by-science/ ................................................................................................................13

Luke R. Allen et al., *Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones*, 7 Clinical Prac. Pediatric Psychol. 302 (2019)....31

Michael Biggs, *Puberty Blockers and Suicidality in Adolescents Suffering from Gender Dysphoria*, 49 Archives of Sexual Behav. 2227 (2020), https://link.springer.com/article/10.1007/s10508-020-01743-6...........................30

Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals*, 49 J. Sex & Marital Therapy 348 (2023), https://bit.ly/3DIUNY3 ......................................................32

Nat'l Inst. for Health & Care Excellence, *Evidence Review: Gender-Affirming Hormones for Children and Adolescents with Gender Dysphoria* (2021), https://tinyurl.com/4fsz2krm .................................................................................3

Open Letter re: Archives of Sexual Behavior, https://asbopenletter.com/ (May 5, 2023)...................................................................................................................12

Robin Resput & Chad Terhune, *Putting Numbers on the Rise in Children Seeking Gender Care*, Reuters (Oct. 6, 2022) ...................................................................14

Sarah Maslin Nir & Kristi Berner, *A 10-Year-Old Got a Tattoo. His Mother Was Arrested.*, N.Y. Times (Nov. 13, 2022), https://www.nytimes.com/2022/11/13/nyregion/tattoos-children.html ...............22

Simona Martin et al., *Criminalization of Gender-Affirming Care—Interfering with Essential Treatment for Transgender Children and Adolescents*, 385 New Eng. J. Med. (2021), https://bit.ly/3qTCwRm....................................................................28

State of the Art, YouTube (Feb. 15, 2019), https://www.youtube.com/watch ?v=m7Xg9gZS_hg#t=5m25s ...............................................................26

Statement of Removal, 23 Int'l J. of Transgender Health S259 (2022), https://tinyurl.com/2wv6mxhf...............................................................16

Stephen Levine et al., *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, 48 J. Sex & Marital Therapy 706 (2022), https://tinyurl.com/2s4x67ks ..........................................................4

Usha Lee McFarling, *Transgender Clinics See Surge in Demand From Youth Seeking Early Treatment*, KQED (Apr. 11, 2017), https://www.kqed.org/futureofyou/370142/transgender-clinics-see-surge-in-demand-from-youth-seeking-early-treatment ......................................23

*USPATH Demand Meeting Feb. 2017,* YouTube (Feb. 6, 2017), https://www.youtube.com/watch?v=rfgG5TaCzsk ..............................................10

*USPATH Gala Part 2*, YouTube (Feb. 6, 2017), https://www.youtube.com/watch?v=wxbsOX4hX0M#t=2m45s.........................11

Videorecording of Dr. Tishelman's WPATH presentation, Twitter (Sep. 19, 2022, 7:06 PM), https://twitter.com/SwipeWright/status/1571999221401948161 .......13

Vinay Prasad & Adam Cifu, *Medical Reversal*, 84 Yale J. Biology & Med. 471 (2011)......................................................................................................8

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017)............................ 24, 25

## INTEREST OF *AMICUS CURIAE*

Family Research Council (FRC) is a nonprofit research and educational organization that seeks to advance faith, family, and freedom in public policy from a biblical worldview. FRC recognizes and respects the dignity of every human life, which entails protection of the vulnerable. It thus has a significant interest in this case, which challenges Indiana's efforts to protect children from unproven, sterilizing interventions. All parties consented to this brief.[1]

---

[1] No party's counsel authored, and no one other than *amicus* and its counsel contributed money for, this brief.

**INTRODUCTION**

The World Professional Association for Transgender Health, the American Academy of Pediatrics, the Endocrine Society, the American Medical Association, and other medical interest groups (collectively, "WPATH") file an *amicus* brief in most cases challenging the public's efforts to protect children from sterilizing medical interventions. But the original version of that brief looks much different from the one WPATH now files, including recently in a similar Sixth Circuit case. The original brief asserted that "[a] robust body of scientific evidence supports the efficacy of" gender transition medical interventions for "young people."[2] WPATH repeatedly touted a "robust consensus" and a "robust body of empirical evidence."[3]

But WPATH's claim of robust evidence has always been false. How do we know? Because after the Family Research Council filed a brief in that early case showing that nearly everyone—except ideologically-captured American medical interest groups—recognizes the paucity of reliable long-term evidence about sterilizing interventions in minors,[4] WPATH quietly deleted *every claim* about a "robust body of empirical evidence" from its brief on that appeal—and all its future briefs. Then WPATH refused repeated invitations to explain its about-face, instead

---

[2] Brief for AAP et al. as *Amici Curiae* Supporting Plaintiffs, *Brandt v. Griffin*, No. 4:21-cv-00450 (E.D. Ark. June 24, 2021), ECF No. 30, at 12 ("*Brandt* Brief").

[3] *Id.* at 3, 13; *see id.* at 4, 8, 9, 20.

[4] Brief for Family Research Council as *Amicus Curiae* Supporting Appellants, *Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) (No. 21-2875).

retreating to meaningless and still-incorrect claims that "evidence indicates the effectiveness of treating gender dysphoria according to the guidelines."[5] WPATH's "indicatory" evidence is a handful of slipshod studies that failed to control for relevant variables or to reach statistically or clinically significant results.

The medical groups' reliance on such studies to claim a "robust" scientific "consensus" exposes them for what they are on this issue: policy advocates rather than honest brokers of medical evidence. The one common ground in the literature—even the medical groups' policy statements—is that, as an England National Health Service review recently concluded, there is "limited evidence for the effectiveness and safety of gender-affirming hormones in children and adolescents with gender dysphoria," and the "long-term safety profile of these treatments" is "largely unknown."[6] WPATH's new Standards of Care, which nonetheless approve chest and genital *surgeries* for children regardless of age, say that because "the number of studies" about adolescent treatment "is still low," "a systematic review regarding outcomes of treatment in adolescents is not possible" and "the long-term effects of

---

[5] Brief for AAP et al. as *Amici Curiae* in Support of Plaintiffs-Appellees, *L.W. v. Skrmetti*, No. 23-5600 (6th Cir. Aug. 10, 2023), ECF No. 102, at 17 (capitalization omitted) ("Br.").

[6] Nat'l Inst. for Health & Care Excellence, *Evidence Review: Gender-Affirming Hormones for Children and Adolescents with Gender Dysphoria* 50 (2021), https://tinyurl.com/4fsz2krm.

gender-affirming treatments initiated in adolescence are not fully known."[7]

Even this statement misstates the scientific process: systematic reviews here *are* possible. Just ask much of Europe, where health authorities have repeatedly determined that minor transitioning interventions flunk systematic reviews precisely because of the lack of evidence. Regardless, WPATH continues to withhold all this information from the courts, suggesting no evidentiary doubt about giving cross-sex hormones to an 11-year-old. As these repeated episodes show, there is no reason to trust WPATH and the other medical interest groups on this politicized issue. If the medical groups tell lies about "robust" "evidence-based" treatments in federal court, they will push physicians to tell the same lies to children who could face a lifetime of personal devastation. Indeed, as one recent article explained, "the implications of administering a treatment with irreversible, life-changing consequences based on evidence that has an official designation of 'very low certainty'" are "rarely discussed with the patients," much less the "risks to fertility, bone, and cardiovascular health."[8]

The reason to wait for medical interventions—and the reason this law passes any level of scrutiny—is that the consequences of "gender-affirming care" for a

---

[7] Coleman, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S46, S65 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ("SOC 8").
[8] Levine, *Reconsidering Informed Consent*, 48 J. Sex & Marital Therapy 706, 709 (2022), https://tinyurl.com/2s4x67ks.

minor are drastic. Gender dysphoria in most children does not persist into adulthood. But children who take puberty blockers then cross-sex hormones—the near-universal transitioning pathway—are expected to become sterile and potentially suffer many other negative repercussions.[9]

The Plaintiffs would substitute the standards of ideologically and financially interested medical groups for the default rule that the People may govern themselves when it comes to protecting health and welfare. Constitutional law should not be outsourced to medical interest groups. On this issue, many of these groups' positions appear to derive from ideology, not science. The Court should reverse.

## ARGUMENT

The Plaintiffs put the views of "leading mental health and medical organizations in the United States" front and center, claiming they provide "widely accepted and evidence-based standards of care" for transitioning interventions in children. Compl., ECF No. 1 ¶ 67. The Plaintiffs' substantive due process claims are premised on a parental right to "obtain[] medically necessary medical care for their children." *Id.* ¶ 215. Their equal protection claims are likewise premised on their alleged inability to obtain "medically necessary health care." *Id.* ¶ 213. Why do the Plaintiffs say their desired treatments are "medically necessary"? Because "the WPATH Standards of Care" and "other leading medical organizations, such as the American

---

[9] *Id.* at 711, 713.

5

Academy of Pediatrics" say so. *Id.* ¶ 68; *see also, e.g.*, *id.* ¶¶ 83, 202; Plaintiffs'

Memorandum in Support of Motion for Preliminary Injunction, ECF No. 27, at 25

("S.EA. 480 deprives the minor Plaintiffs and their parents of the right to seek what

every major medical association has recognized is safe, effective, and necessary

care").

But "[t]he law need not give [physicians] unfettered choice in the course of

their medical practice." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). To be sure,

no business likes to be regulated, and medical advocacy groups like WPATH, the

AAP, and the Endocrine Society have financial incentives and ideological commit-

ments at play. But no honest broker of scientific evidence could have claimed that a

"robust consensus" exists about the experimental treatments here. These groups have

put ideology above patients and scientific evidence. This Court should discount their

views. Constitutional law should not be outsourced to medical interest groups.

## I.     The Plaintiffs' favored medical groups are driven by ideology.

In most areas of the law, courts properly recognize that interest groups with

ideological or financial stakes may push a self-interested legal view. *Cf.* The Feder-

alist No. 10 (Madison). Such groups can advocate for their positions, but courts are

"not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of*

*Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019). Yet some courts treat (certain)

medical groups differently, letting them drive constitutional interpretation despite ideological and self-interested motivations.

The Supreme Court recently revoked the permission slip for select medical interest groups to preempt the People when it comes to self-government. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2267 (2022) ("[T]he position of the American Medical Association" does not "shed light on the meaning of the Constitution." (cleaned up)). Yet the Plaintiffs' case would substitute the standards of certain ideological, financially-interested medical interest groups for the default rule that the People may govern themselves in protecting health and welfare. The Court should not elevate the view of self-interested medical interest groups to law.

Historically, medical interest groups are hardly paragons of truth or virtue. Not long ago, "[t]he most important elite advocating eugenic sterilization was the medical establishment"; "every article on the subject of eugenic sterilization published in a medical journal between 1899 and 1912 endorsed the practice."[10] Other examples abound: racist medical experimentation, lobotomies, opioids, thalidomide, and smoking. As this Court has explained, the American Medical Association's "systematic, long-term wrongdoing" has led courts to "doubt[] the AMA's genuineness regarding its concern for scientific method in patient care." *Wilk v. AMA*, 895

---

[10] Adam Cohen, *Imbeciles* 66 (2016).

F.2d 352, 363, 366 (7th Cir. 1990). Even apart from nefarious motives, science changes; certainty on an issue risks future contradiction.[11]

Skepticism is even more appropriate here. The interest groups claim that their "treatment protocols" are "evidence-based." Brief, *supra* note 5, at 9. But a careful examination reveals that these groups are more committed to achieving policy ends than accurately presenting scientific evidence.

## A.    WPATH

WPATH's vaunted Standards of Care—which just substantially changed—"reflect not consensus, but merely one side in a sharply contested medical debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019). Look no further than WPATH's leaders. Dr. Stephen Levine, who helped author an early version of WPATH's guidelines, "expressed concerns that later versions of WPATH were driven by political considerations rather than medical judgment." *Id.* at 222. Levine said that WPATH's status as "an advocacy group for the transgendered" "sometimes conflict[s]" with its aspirations to be a "scientific organization." *Id.* According to Levine, "[s]kepticism and strong alternative views are not well tolerated" and have been "greeted with antipathy from the large numbers of nonprofessional adults" in WPATH. *Kosilek v. Spencer*, 774 F.3d 63, 78 (1st Cir. 2014) (alteration omitted).

---

[11] Prasad & Cifu, *Medical Reversal*, 84 Yale J. Biology & Med. 471, 472–73 (2011) (collecting examples).

WPATH's president, Dr. Marci Bowers, agrees there are those in WPATH "trying to keep out anyone who doesn't absolutely buy the party line," leaving "no room for dissent."[12] Bowers—who has conducted more than 2,000 gender transition surgeries—and another former WPATH board member, psychologist Erica Anderson, are two of the "most prominent" and "respected" "providers in the field of transgender medicine."[13] About WPATH's guidelines, Bowers said, "I think maybe we zigged a little too far to the left," because "there was naiveté on the part of pediatric endocrinologists who were proponents of early [puberty] blockade thinking that just this magic can happen" without harm.[14] Bowers lamented that many clinics start giving adolescents cross-sex hormones after just "one visit."[15] (Of course, WPATH's brief implicitly concedes that its standards require nothing more. Brief, *supra* note 5, at 10 ("a thorough evaluation").) Anderson expressed similar concerns: "It is my considered opinion that due to some of the . . . sloppy healthcare work, that we're going to have more young adults who will regret having gone through this process."[16]

---

[12] Shrier, *Top Trans Doctors Blow the Whistle on 'Sloppy' Care*, The Free Press (Oct. 4, 2021), https://www.thefp.com/p/top-trans-doctors-blow-the-whistle.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

WPATH's response? Censuring Anderson and banning board members from speaking to the press.[17] This response is par for the course. Take WPATH's annual conferences. For real medical groups, conferences are a time to present research and debate medical issues. For WPATH, conferences are group struggle sessions intended to terrorize into submission those not fully on board with WPATH's agenda.

For instance, at WPATH's U.S. affiliate's (USPATH) inaugural conference in 2017, one respected researcher presented findings not to the liking of the activists in attendance. When his panel discussion began, "protesters interrupted and picketed."[18] "That evening, at a meeting with the conference leaders, a group of advocates led by transgender women of color read aloud a statement in which they said the 'entire institution of WPATH' was 'violently exclusionary' because it 'remains grounded in cis-normativity and trans exclusion.'"[19] According to one professor who attended (and admired) the meeting, the session "was not a forum for dialog; it was a space" for activists "to vocalize their demands to the USPATH executive board."[20]

[17] Bazelon, *The Battle Over Gender Therapy*, N.Y. Times Magazine (June 15, 2022), https://www.nytimes.com/2022/06/15/magazine/gender-therapy.html; Joint Letter (Oct. 12, 2021), https://www.wpath.org/media/cms/Documents/Public%20Policies/2021/Joint%20WPATH%20USPATH%20Letter%20Dated%20Oct%2012%202021.pdf.
[18] Bazelon, *supra* note 17; Ciszek, *Discursive Stickiness*, 10 Pub. Rel. Inquiry 295, 302 (2021).
[19] Bazelon, *supra* note 17.
[20] Ciszek, *supra* note 18, at 302; *see also USPATH Demand Meeting,* YouTube (Feb. 6, 2017), https://www.youtube.com/watch?v=rfgG5TaCzsk.

WPATH caved to all the activists' demands. The speaker's panels were cancelled, and "[c]onference organizers and board members publicly" apologized for the speaker's "presence at the conference and their part in perpetuating the mistreatment of and violence against transgender women of color" by allowing the speaker to attend.[21] They also "promised to incorporate transgender women of color into each level of WPATH's organization"—including, presumably, "the scientific committees that decide which academic papers are accepted for conferences."[22] The former president of WPATH told the activists—not the speaker—"We are very, very sorry."[23] The public apology ended with the protesters chanting "Trans Power!":[24]



Just recently, WPATH's activists took a similar approach when the *Archives of Sexual Behavior* dared publish a study on rapid onset gender dysphoria—the

---

[21] Ciszek, *supra* note 18, at 304.

[22] *Id.* at 302, 304.

[23] Bazelon, *supra* note 17.

[24] *USPATH Gala Part 2*, YouTube (Feb. 6, 2017), https://www.youtube.com/watch?v=wxbsOX4hX0M#t=2m45s; Ciszek, *supra* note 18, at 304.

phenomenon of gender dysphoria arising in peer circles. Because this phenomenon suggests a social element of gender dysphoria, WPATH cannot tolerate it. Thus, WPATH's president and other activists demanded that the article be retracted and the journal's editor—the speaker just discussed—be fired and replaced by someone with "a demonstrated record of integrity on LGBTQ+ matters and especially trans issues."[25] Though the journal's publisher acknowledged that WPATH gave no valid basis for retraction, the publisher seized on a participant consent technicality. Though thousands of its other papers used a similar consent method—including papers relying on the 2015 U.S. Transgender Survey used by the medical groups' favored studies—the publisher retracted the article and promised to hunt down the other papers.[26] Better to delete all the science than let an article that asks the "wrong" questions be published.

With that background, turn to WPATH's updated 8th edition of its Standards of Care (SOC 8). Those standards admit that they are based on not just "the published literature" "but also" "consensus-based expert opinion"[27]—a consensus obtained by hounding out dissenting views and banning contrary science. SOC 8 initially

---

[25] Open Letter, https://asbopenletter.com/ (May 5, 2023).

[26] SEGM, *Springer to Retract a Key Paper in Response to Activist Demands*, https://tinyurl.com/w4p8xcyn (June 10, 2023).

[27] SOC 8, *supra* note 7, at S8.

retained age requirements for transitioning minors.[28] This displeased WPATH's activists. So a mere nine days after WPATH published the latest iteration of its standards—years in the making—it issued a "correction" eliminating minimum ages for transition surgeries.[29] "[L]imited research" on adolescent issues is a "challenge[]," an author admitted, but the "[un]correct[ed]" SOC 8 would "make it more likely that practitioners would be sued" for malpractice by devastated children.[30] Plus, according to WPATH's president, to "propose" surgeries at defined "younger age[s]" would require "a better political climate."[31] *Contra* Brief, *supra* note 5, at 9, 15 (WPATH's Standards are "evidence-based" and "the product of careful and robust deliberation"). Just two years ago, WPATH's standard *amicus* brief assured that "genital surgeries on youth under 18 are not recommended and are not performed in [the state]."[32] Even this claim was highly questionable—in a two-year partial

---

[28] Davis, *Kid Gender Guidelines Not Driven by Science*, N.Y. Post (Sept. 29, 2022), https://nypost.com/2022/09/29/kid-gender-guidelines-not-driven-by-science/.

[29] *Correction*, 23 Int'l J. of Transgender Health S259 (2022), https://tinyurl.com/48e6rcfb.

[30] Videorecording of Dr. Tishelman's WPATH presentation, Twitter (Sep. 19, 2022, 7:06 PM), https://twitter.com/SwipeWright/status/1571999221401948161.

[31] Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery,'* N.Y. Times (Sept. 26, 2022), https://www.nytimes.com/2022/09/26/health/top-surgery-transgender-teenagers.html.

[32] *Brandt* Brief, *supra* note 4, at 12 n.44.

analysis of insurance claims, Reuters found hundreds of child surgeries[33]—and now WPATH flees from the surgery issue. *See* Brief, *supra* note 5, at 3 n.3.

Of course, ideology and lawsuits are not the only explanations for WPATH's child genital surgery backtracking. As a doctor in Vanderbilt's transition clinic bragged, the hospital started the clinic after being convinced that it would be a "big money maker": hormone interventions "bring[] in several thousand dollars," while "top" surgeries "bring in" $40,000, and "female to male bottom surgeries are *huge* money makers" ($100,000) because they are so "labor-intensive" and "require a lot of follow-up."[34] Why bother with the difficult work of addressing underlying mental health issues through psychosocial support—which many countries mandate but WPATH's brief ignores—when profitable genital surgeries on vulnerable children without threat of lawsuits await?

Indeed, one surgeon profiled by the *New York Times* "has built a thriving top surgery specialty" by advertising to children on social media.[35] Dr. Sidhbh Gallagher's social media "feeds often fill with photos tagged #NipRevealFriday, highlighting patients . . . whose bandages were just removed."[36] Dr. Gallagher regularly

---

[33] *See* Resput & Terhune, *Putting Numbers on the Rise in Children Seeking Gender Care*, Reuters (Oct. 6, 2022), https://www.reuters.com/investigates/special-report/usa-transyouth-data/.

[34] White, *Follow the money*, Washington Examiner (Sept. 20, 2022), https://tinyurl.com/3jkmvn9r (video).

[35] *More Trans Teens*, *supra* note 31.

[36] *Id.*

provides surgeries to minors as young as 13.[37] Echoing Plaintiffs' experts, Dr. Gallagher claimed that "I don't know of a single case of regret" and assumed that reports of her patients detransitioning were "a hoax."[38] Dr. Gallagher "amended her stance" after the *New York Times* asked her about a patient who detransitioned sixteen months after surgery, saying: "I slowly came to terms with the fact that it had been a mistake born out of a mental health crisis": "I realized I lost something about myself that I could have loved."[39]

Also included in SOC 8 was a new chapter about eunuchs—"those assigned male at birth" who "wish to eliminate masculine physical features, masculine genitals, or genital functioning."[40] This chapter relies on "the large online peer-support community that congregates on sites such as the Eunuch Archive,"[41] and one of the "most prominent participants" at the Eunuch Archive headed the chapter.[42] The SOC 8 draft "directly acknowledged" "the Eunuch Archive's 'Fiction Archive.'"[43] But the standards did *not* mention that Archive's "primar[y] focus on the eroticization of child castration": "violent sexualized depictions of children with stunted puberty

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *See* Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, Reduxx (May 17, 2022), https://tinyurl.com/bddr6hhf; SOC 8, *supra* note 7, at S88.

[41] SOC 8, *supra* note 7, at S88.

[42] Gluck, *supra* note 40.

[43] *Id.*

being raped by doctors," "Nazi doctors castrating children, baby boys being fed milk with estrogen in order to be violently sex trafficked as adolescents, and pedophilic fantasies of children who have been castrated."[44]

Despite all this, WPATH claims that its standards "were developed through a robust and transparent process" with "scientific rigor." Brief, *supra* note 5, at 15 (capitalization omitted). This is a bold claim for an organization that yanked from the internet even evidence of SOC 8's surgery age correction.[45] If SOC 8's formulation was—all evidence to the contrary—"robust and transparent," surely WPATH would be willing to provide details. Yet when another state subpoenaed WPATH, WPATH proclaimed itself an "advocacy organization[]" shielded from public disclosure.[46] WPATH went so far as to (unsuccessfully) demand mandamus from the Eleventh Circuit after the district court held WPATH failed to make a *prima facie* case of First Amendment harm.[47] "[P]revent[ing] research data from ever seeing the light of day does not foster quality research, scientific progress, or public health."[48] But it is unsurprising coming from a self-described "advocacy organization."

---

[44] *Id.*

[45] *See* Statement of Removal, 23 Int'l J. of Transgender Health S259 (2022), https://tinyurl.com/2wv6mxhf.

[46] *Boe v. Marshall*, No. 2:22-cv-184-LCB (M.D. Ala. Dec. 27, 2022), ECF No. 208, at 3.

[47] *See In re World Prof'l Ass'n for Transgender Health*, No. 23-11753, ECF No. 31-2 (11th Cir. June 30, 2023).

[48] Woodside & Gray, *Researchers' Privilege*, 32 W. Mich. U.T.M. Cooley L. Rev. 1, 33 (2015).

Finally, WPATH's guidelines are not true standards of care. No physician must adhere to them. One survey found that 55% of WPATH surgeons did *not* follow its (since-abandoned) age recommendations for gender surgeries.[49] As for cross-sex hormones, WPATH assures courts that "[h]ormone therapy is only prescribed when a qualified mental health professional has confirmed the persistence of the patient's gender dysphoria, the patient's mental capacity to consent to the treatment, and that any coexisting problems have been addressed," and "[a] pediatric endocrinologist or other clinician experienced in pubertal induction must also agree with the indication." Brief, *supra* note 5, at 14. An unsuspecting reader might think that describes the real world. It does not.

A recent *Los Angeles Times* article tells the story of an OB-GYN physician at the West Alabama Women's Center, whose abortion business practically disappeared after *Dobbs*. Needing new sources of revenue, the center made "[a] key prong of its new work" "bringing in LGBTQ+ patients," including minors for gender transition hormone therapy.[50] The OB-GYN—who admitted that "this area of medicine is pretty new to me"—said that she "does not believe adolescents seeking hormones require mental health evaluations": "'No, I don't need a psychologist or psychiatrist

---

[49] *See* Milrod & Karasic, *Age is Just a Number*, 14 J. Sexual Med. 624 (2017), https://doi.org/10.1016/j.jsxm.2017.02.007.

[50] Jarvie, *This Abortion Doctor is Not Ready to Leave Alabama*, L.A. Times (Apr. 28, 2023), https://tinyurl.com/2tf2hrnn.

to evaluate someone who's telling me, "This is how I felt for years.""" "'I know that how they felt for years is not pathological.'"[51] Even though the OB-GYN recognized "that this is a relatively experimental area of medicine without a lot of data," the article described her first visit with a minor girl: she informed the patient "early in their first conversation" via telehealth that she would prescribe testosterone.[52] "[T]he teen's pediatrician and staff at a psychiatric hospital," by contrast, had declined to prescribe testosterone.[53]

The same story is told at the academic clinics that supposedly provide the gold standard of care. The endocrinologist head of Washington University's gender clinic said he has "no idea how to meet" "intensive interpretations" of SOC 8.[54] Instead, as one patient related, he prescribed testosterone "after one appointment": "There was no actual speaking to a psychiatrist or another therapist or even a case worker."[55] So much for only providing "gender-affirming medical interventions" "to carefully evaluated patients who meet diagnostic criteria." Brief, *supra* note 5, at 4–5.

In short, neither WPATH's scientific claims nor its *amicus* briefs should be taken at face value.

---

[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] Ghorayshi, *How a Small Gender Clinic Landed in a Political Storm*, N.Y. Times (Aug. 23, 2023), https://tinyurl.com/y2m3mrda.
[55] *Id.*

**B.    AAP**

The American Academy of Pediatrics also places ideology above scientific evidence. AAP's argument in its standard brief is especially deceptive because it fails to reflect its own policy statement. For instance, AAP's brief asserts that puberty blockers are "reversible" and have "well-known efficacy and side-effect profiles," and that "any potential risks" can be "mitigate[d]." *Id.* at 13–15. But AAP's policy statement contradicts these claims:

> Pubertal suppression is not without risks. Delaying puberty beyond one's peers can also be stressful and can lead to lower self-esteem and increased risk taking. Some experts believe that genital underdevelopment may limit some potential reconstructive options. Research on long-term risks, particularly in terms of bone metabolism and fertility, is currently limited and provides varied results.[56]

Making arguments that contradict its own policy statement disqualifies AAP. If AAP does not know what the risks are, it cannot know they can be mitigated. And if AAP does not believe its own arguments, no one else should either. Worse, neither AAP's brief nor its policy statement accounts for the fact that over 95% of children who start on puberty blockers will go on to cross-sex hormones.[57] Thus, all the risks of

---

[56] Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics 1, 5 (2018), https://doi.org/10.1542/peds.2018-2162.

[57] *E.g.*, Nos, *Association of Gonadotropin-Releasing Hormone Analogue Use With Subsequent Use of Gender-Affirming Hormones Among Transgender Adolescents*, 5 JAMA Netw. Open e2239758 (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2798002.

those hormones—including permanent sterility—are *also* risks of starting puberty blockers. Again, AAP tells neither the courts nor families that information.

Of course, AAP's policy statement is itself ideological. As one researcher meticulously explained, the few "references that AAP cited as the basis of their policy instead outright contradicted that policy," and AAP "left out" "the actual outcomes [of] research on [gender dysphoric] children"—disregarding 10 of the 11 studies on this cohort.[58] "[A]ny assertion that their policy is based on evidence is demonstrably false"; instead, "AAP's statement is a systematic exclusion and misrepresentation" of the literature.[59] That is unsurprising: according to the statement, it was written by one doctor.[60] That doctor admitted that the AAP's process "doesn't quite fit the definition of systematic review" so its "policy statement is not meant to be" "a protocol."[61]

AAP has never responded to published critiques. "By 2019," the policy statement "was eliciting quiet concern among rank-and-file doctors affiliated with the AAP."[62] Rather than address these concerns, AAP's tactic has been to silence

---

[58] Cantor, *Transgender and Gender Diverse Children and Adolescents*, 46 J. Sex & Marital Therapy 307, 307–313 (2019), https://doi.org/10.1080/0092623X.2019.1698481.

[59] *Id.*

[60] Rafferty, *supra* note 56, at 1.

[61] Block, *Gender dysphoria in young people is rising*, 380 BMJ 382, at *2, 3 (2023), https://www.bmj.com/content/380/bmj.p382.long.

[62] Sibarium, *The Hijacking of Pediatric Medicine*, The Free Press (Dec. 7, 2022), https://www.thefp.com/p/the-hijacking-of-pediatric-medicine.

dissenting voices. AAP recently refused to allow the Society for Evidence-Based Gender Medicine to present contrary evidence at its annual conference and suppressed resolutions calling for more discussion of alternatives to hormone therapies.[63] Meanwhile, AAP continues to publish flawed studies in its flagship journal.[64]

Just a couple of weeks ago, the AAP finally "commission[ed] a systematic review of medical research on the treatments, following similar efforts in Europe that found uncertain evidence for their effectiveness in adolescents."[65] Yet even as the AAP implicitly acknowledged that it has never done any "systematic review" of the evidence, it chose to "reaffirm[] its position from 2018."[66] The AAP justified sticking to its position while awaiting the evidence because its board had "confidence" in the interventions, while WPATH's president said the position was appropriate because "[t]hey know the stories" "[a]necdoctally."[67] Considering that the groups repeatedly rely on Dr. Gordan Guyatt, father of evidence-based medicine, to support their "evidence-based" guidelines,[68] it is thus damning that Guyatt himself recognizes that AAP is "'very clearly putting the cart before the horse'" by

---

[63] *Id.*; Mason & Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, Wall Street Journal (Aug. 17, 2022), https://on.wsj.com/3BzOuTZ.
[64] Mason & Sapir, *supra* note 63.
[65] Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls for Research Review*, New York Times (Aug. 3, 2023), https://www.ny-times.com/2023/08/03/health/aap-gender-affirming-care-evidence-review.html.
[66] *Id.*
[67] *Id.*
[68] Brief, *supra* note 5, at 15.

"recommend[ing] the treatments for young people before completing a rigorous review."[69] "Based on previous systematic reviews, Dr. Guyatt said, the [AAP's] report will most likely find low-quality evidence for pediatric gender care."[70] He concluded: "'The policies of the Europeans are much more aligned with the evidence than are the Americans.'"[71]

Did WPATH and the AAP put any of this information into the *amicus* brief they dutifully filed in the Sixth Circuit a few days later? Of course not. This is their "robust and transparent process" in action. Brief, *supra* note 5, at 15.

The past chair of AAP's Committee on Adolescence, Dr. Cora Breuner, recently gave an interview supporting state laws prohibiting children from obtaining tattoos. "It is a permanent mark," "and I don't think kids under 18 have that kind of agency to make a decision."[72] Breuner has explained that during adolescence, "kids' decision-making ability [is] going a little haywire": "the part of their brain that's supposed to say, stop doing that, isn't really working."[73] Yet Breuner—one of the AAP's transitioning policy signatories—says that she wants to make sterilizing

---

[69] *Medical Group Backs*, *supra* note 65.

[70] *Id.*

[71] *Id.*

[72] Nir & Berner, *A 10-Year-Old Got a Tattoo*, N.Y. Times (Nov. 13, 2022), https://www.nytimes.com/2022/11/13/nyregion/tattoos-children.html.

[73] Turner & Kamenetz, *What Your Teen Wishes You Knew About Sex Education*, NPR (Feb. 11, 2020), https://www.npr.org/transcripts/804508548?ft=nprml&f=804508548.

gender transition interventions for adolescents "absolutely mainstream."[74] Neither she nor the AAP has explained why an 11-year-old boy can provide informed consent to undergoing drugs and surgeries that will sterilize him but not to getting a tattoo.

AAP's claim that gender transition drugs are "only prescribed" after "parents or guardians" "give their informed consent" (Brief, *supra* note 5, at 14) is particularly egregious given Breuner's suggestion that doctors should withhold information about a child's care from his parents.[75] Breuner's own transgender clinic emphasizes that "some treatments are available to patients without formal parental consent," including "medications used to suppress menstrual cycles" and "some testosterone blockers."[76] That accords with the AAP's policy statement, which suggests that "legal" authorities be called on families that "take issue with providers" who "offer gender-affirming care" and that "deny access to [that] care" for endangering their child's "welfare and safety."[77] The AAP also calls for its ideological views to be adopted in physician "certifying examinations" and "maintenance of certification

---

[74] McFarling, *Transgender Clinics See Surge in Demand From Youth Seeking Early Treatment*, KQED (Apr. 11, 2017), https://www.kqed.org/futureofyou/370142/transgender-clinics-see-surge-in-demand-from-youth-seeking-early-treatment.

[75] *See* Oliver, *Can My Doctor Out Me to My Parents?*, U.S. News & World Reports (Mar. 22, 2017), https://health.usnews.com/wellness/articles/2017-03-22/can-my-doctor-out-me-as-gay-to-my-parents.

[76] *Caring for Transgender Youth*, Seattle Children's Hospital (Apr. 3, 2019), https://providernews.seattlechildrens.org/caring-for-transgender-youth/.

[77] Rafferty, *supra* note 56, at 8.

activities."[78] Uncooperative physicians may see challenges to their board certification for supposed "disinformation."[79]

The AAP has a policy view that subordinates both children and families to AAP's ideological values. The AAP is entitled to those values, as harmful to children as they are. But no one should pretend that they are based on scientific evidence.

### C.     Endocrine Society

Many of the concerns raised about WPATH's standards apply also to the Endocrine Society's transitioning recommendations and practice guidelines—which expressly disclaim "establish[ing] a standard of care."[80] The Society's *amicus* brief trumpets that its guidelines are graded "based on the internationally recognized Grading of Recommendations Assessment, Development and Evaluation (GRADE) system." Brief, *supra* note 5, at 15. This system measures the quality of evidence after "an unbiased, thorough, critical systematic review of all the relevant evidence."[81] The natural follow-up questions would be (1) what evidence the Society considered and (2) what grades the evidence received.

---

[78] *Id.* at 10.

[79] Wyckoff, *Board-Certified Physicians Who Spread COVID Vaccine Misinformation Risk Certification*, Am. Acad. of Pediatrics (Sept. 10, 2021), https://publications.aap.org/aapnews/news/15622.

[80] Hembree, *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102 J. Clinical Endocrinology & Metabolism 3869, 3895 (Nov. 2017).

[81] Block, *supra* note 61, at *2.

Neither Plaintiffs nor the interest groups dare answer those questions. That is because the Endocrine Society commissioned only "two systematic reviews for its clinical practice guideline": "one on the effects of sex steroids on lipids and cardio-vascular outcomes" and "the other on their effects on bone health."[82] That's it. As Dr. Guyatt—who helped develop GRADE and is cited multiple times by the interest groups' standard brief—noted, "the systematic reviews didn't look at the effect of the interventions on gender dysphoria itself"—seemingly "the most important out-come."[83] Nor did the Society's systematic reviews consider *any* other risks or poten-tial benefits of these treatments. Guyatt described this as a "serious problem[]," as making a recommendation without a systematic review "violat[es] standards of trust-worthy guidelines."[84]

Turning to the second question about what grades the Endocrine Society's guidelines received, all recommendations about "affirming" treatment of adoles-cents are supported only by low or very low-quality evidence.[85] To justify strong recommendations based on weak evidence, the guidelines rely on the Society's own "values and preferences."[86] One of the guidelines' authors, Dr. Joshua Safer, admit-ted that the "new recommendation" to give cross-sex hormones to children younger

---

[82] *Id.* at *3.
[83] *Id.*
[84] *Id.*
[85] *Id.*; *see* Hembree, *supra* note 80, at 3869–3903.
[86] Block, *supra* note 61, at *3; *see* Hembree, *supra* note 80, at 3879–89.

25

than 16 did not come from even a "little data"—"we had none"—but was an "expert opinion" to give "cover" to clinics already doing so.[87] *Contra* Brief, *supra* note 5, at 15 ("The Endocrine Society imposes strict evidentiary requirements").

But as Mark Helfand, professor of medical informatics and clinical epidemiology, explained, "[w]eak evidence 'doesn't just mean something esoteric about study design, it means there's uncertainty about whether the long term benefits outweigh the harms.'"[88] In a recent interview, Guyatt said:

> "Everybody now has to claim to be evidence based" in order to be taken seriously . . . . But people "don't particularly adhere to the standard of what is evidence based medicine . . . ." When there's been a rigorous systematic review of the evidence and the bottom line is that "we don't know,'" he says, then "anybody who then claims they do know is not being evidence based."[89]

Confirming its ideological bent, the Endocrine Society just sponsored—and the AMA passed—a wildly distorted resolution complaining about laws like these. The resolution claims that "[m]edical intervention is reserved for older adolescents and adults."[90] *False*. The groups' own brief says that puberty blockers are "offered beginning at the onset of puberty"—*i.e.*, ages 9 to 11—with cross-sex hormones shortly thereafter. Brief, *supra* note 5, at 12. The resolution also asserts that "[m]ajor

---

[87] State of the Art, YouTube (Feb. 15, 2019), https://www.youtube.com/watch?v=m7Xg9gZS_hg#t=5m25s.
[88] Block*, supra* note 61, at *3.
[89] *Id.* at *5.
[90] Endocrine Soc'y, *AMA strengthens its policy on protecting access to gender-affirming care*, https://tinyurl.com/5n6wpexw (June 12, 2023).

medical organizations" "agree on waiting until an individual has turned 18 . . . to undergo gender-affirming genital surgery."[91] But surgery age limits are exactly what WPATH—the only organization that purports to offer standards of care—*rejected*.

In sum, public information about WPATH, AAP, and the Endocrine Society raises serious concerns about their motivations. Ideology, not evidence, appears to be their north star.

## II.  No high-quality evidence supports sterilizing interventions in children.

The medical interest groups' standard brief touts their "important expertise" and claims to "provide the [courts] with an accurate" summary of the "widely accepted" "scientific evidence supporting [gender transition medical] interventions" in minors. Brief, *supra* note 5, at 2–3. But WPATH and AAP provided *in*accurate information to other courts, so why should their promise of accuracy be trusted? The few studies the groups discuss suggest that it should not.

In place of their prior claim that a "robust body of scientific evidence" "shows that young people suffering from gender dysphoria who receive the gender-affirming standard of care experience improvements in their overall well-being,"[92] WPATH and AAP now say that "[e]mpirical evidence *indicates* that . . . gender-affirming medical interventions provided to *carefully evaluated* patients *who meet*

---

[91] *Id.*
[92] *Brandt* Brief, *supra* note 2, at 12.

*diagnostic criteria*[] *can* alleviate clinically significant distress." Brief, *supra* note 5, at 4–5 (emphases added). This new claim borders on meaningless, thanks to all the italicized weasel words. And the only source cited for this claim is the same one they cited for the previous claim, which looks like a scientific article published in the *New England Journal of Medicine* but is actually an opinion piece written by a recent college graduate. *Id.* at 5 n.7 (citing Simona Martin et al., *Criminalization of Gender-Affirming Care—Interfering with Essential Treatment for Transgender Children and Adolescents*, 385 New Eng. J. Med. (2021), https://bit.ly/3qTCwRm). Yet the medical interest groups cite the op-ed repeatedly—*passim* in their Table of Authorities—presenting its ideological claims as scientific fact each time.

The medical interest groups next claim that "gender-affirming medical interventions" "greatly reduce[] the negative physical and mental health consequences that result when gender dysphoria is untreated." *Id.* at 8–9. Their only citation? A dated "position statement" of the Endocrine Society, filed in the "Advocacy" section of its website. This claim is founded on a false dichotomy: the choice is not whether to leave gender dysphoria "untreated," but whether to use proven, low-risk interventions like psychotherapy instead of permanently sterilizing cross-sex hormones—at least until the minor becomes an adult and can fully comprehend the decisions she is asked to make. None of the studies cited appears to separate psychotherapy from medical interventions. In many, both treatments are provided, but the groups

proclaim that any improvement is due to medical interventions. That unscientific approach is implicitly contrary even to the Endocrine Society's "position statement," which says that "the degree of improvement as a result of the intervention" is "not yet known."[93] The position statement also says that "further studies are needed to determine strategies for fertility preservation and *to investigate long-term outcomes of early medical intervention*."[94] That is because, contrary to what one would assume reading the interest groups' standard brief, no one knows those outcomes.

Meanwhile, the studies the groups cite are deeply flawed. Take the lead study in their string-cites of studies about puberty blockers *and* studies about cross-sex hormones. The study is a joke. Of 116 participants who entered the study, less than 50% completed it. 47 participants were given drugs, and 3 participants were not. Many participants were older than age 18—as old as 25.[95] A non-randomized control group of three participants is deficient, and the study makes no attempt to compare outcomes between the groups. And because the study makes little effort to control for other relevant variables, the study could not show any causal relationship

---

[93] Endocrine Soc'y, *Transgender Health: An Endocrine Society Position Statement* (Dec. 16, 2020), https://www.endocrine.org/advocacy/position-statements/transgender-health.

[94] *Id.* (emphasis added).

[95] *See* Achille, *Longitudinal impact of gender-affirming endocrine intervention*, 8 Int'l J. Pediatric Endocrinology, at 1, tbl. 1 (Apr. 30, 2020), https://ijpeonline.biomedcentral.com/articles/10.1186/s13633-020-00078-2; *id.* tbl. 2 (showing that apparently 24 participants were only given cross-sex hormones).

between gender transition interventions and outcomes. Finally, according to the study itself, "most predictors did not reach statistical significance."[96] No entity concerned with evidence-based medicine would *lead* with this study.

Next, the interest groups wave around a study that "analyzed survey data from 89 transgender adults." Brief, *supra* note 5, at 19. (This is also the only study cited by the Endocrine Society's recent "resolution."[97]) The study's "data" were responses from an online survey drawn from trans-affirming websites. It "excluded those who underwent medical intervention and then subsequently stopped identifying as transgender," and "[o]bviously, those who actually committed suicide."[98] "73% of respondents who reported having taken puberty blockers" "said they started on them *after* the age of 18 years"—which is not even when puberty blockers are prescribed.[99] And the study concedes that it "does not allow for determination of causation."[100]

The groups' reliance on other studies is just as embarrassing. The study they cite as finding "that suicidality was decreased" (Brief, *supra* note 5, at 19) involved

---

[96] *Id.* at 3.

[97] *AMA*, *supra* note 90.

[98] Biggs, *Puberty Blockers and Suicidality in Adolescents Suffering from Gender Dysphoria*, 49 Archives of Sexual Behav. 2227, 2227 (2020), https://link.springer.com/article/10.1007/s10508-020-01743-6.

[99] *Id.*

[100] Turban, *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145 Pediatrics 1, 1, 7 (Feb. 2020), https://doi.org/10.1542/peds.2019-1725.

only 47 participants, considered a treatment period of as little as three months, "lacked a control group" so one "cannot infer that [medical interventions] are causally responsible," and did not control for confounding variables like "whether a patient is actively receiving psychotherapy."[101] WPATH's own reviewers said "[i]t was impossible to draw conclusions about the effects of hormone therapy on death by suicide" based on the available evidence.[102]

The 2023 study the medical groups cite as finding that interventions were "associated with decreased symptoms of depression and anxiety" (Brief, *supra* note 5, at 19) also did not include a control group, did not separate psychiatric interventions, saw 2 (of 307) patients commit suicide (a 0.6% mortality rate within two years), and suspiciously omitted data about *most* of the outcomes that the study set out to examine.[103]

Last, the study the medical groups cite as finding "a statistically significant decrease in depression and anxiety" (Brief, *supra* note 5, at 20) looked at a mere 55

---

[101] Allen, *Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones*, 7 Clinical Prac. Pediatric Psychol. 302, 303–04, 308–09 (2019).
[102] Baker, *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People*, 5 J. Endocrine Soc'y 1, 1, 12 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7894249.
[103] Chen, *Psychosocial Functioning in Transgender Youth After 2 Years of Hormones*, 388 New Eng. J. Med. 240, 243, 245–48 (2023); *see generally* Singal, *The New, Highly Touted Study on Hormones for Transgender Teens Doesn't Really Tell Us Much of Anything*, Singal-Minded (Feb. 7, 2023), https://jessesingal.substack.com/p/the-new-highly-touted-study-on-hormones.

people, drawn with self-selection problems from an initial group of 200 that was conceededly "different from the transgender youth in community samples" and omitted one patient who died after genital surgery.[104] The study found that gender dysphoria was *worse* after puberty blockers.[105] And the study's lead author said its protocol may not be relevant to the more recent wave of girls who present as adolescents with gender dysphoria, a "new developmental pathway."[106]

If the open ideological bias of the medical interest groups were not enough to warrant skepticism, their repeated reliance on facially deficient studies confirms that interests other than evidence-based medicine are driving their views on this issue. The Court should not defer to those self-interested, ideological views.

## CONCLUSION

Given the mounting evidence that these sterilizing interventions harm children and the absence of any long-term studies demonstrating their safety and effectiveness, Indiana's law is necessary to protect children. Absent reversal, some number of Indiana children will be permanently prevented from engaging in intimate

---

[104] Vries, *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696, 697, 702 (2014), https://doi.org/10.1542/peds.2013-2958; *see* Biggs, *The Dutch Protocol for Juvenile Transsexuals*, 49 J. Sex & Marital Therapy 348, 354–55 (2023), https://bit.ly/3DIUNY3.

[105] Vries, *supra* note 104, at 699, tbl. 2.

[106] Vries, *Challenges in Timing Puberty Suppression for Gender-Nonconforming Adolescents*, 146 Pediatrics 1, 1 (2020), https://doi.org/10.1542/peds.2020-010611.

relationships, having children of their own, and being able to care for their children.

The Court should reverse.

Respectfully submitted,

s/ Christopher Mills
CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay St. #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amicus Curiae*

AUGUST 25, 2023

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 6,993 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3. This document has been scanned for viruses and is virus-free.

Dated:  August 25, 2023

/s Christopher Mills
Christopher Mills

## CERTIFICATE OF SERVICE

I, Christopher Mills, an attorney, certify that on this day the foregoing Brief was served electronically on all parties via CM/ECF.

Dated:  August 25, 2023

s/ Christopher Mills
Christopher Mills
