No. 23-2366

## UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

◆

K.C., et al.,

*Plaintiffs-Appellees*,

v.

THE INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD OF INDIANA, in their official capacities, et al.,

*Defendants/Appellants.*

◆

On Appeal from the U.S. District Court for the
Southern District of Indiana, No. 1:23-cv-00595-JPH-KMB

### BRIEF OF ALABAMA, ARKANSAS, TENNESSEE, AND 18 OTHER STATES AS *AMICI CURIAE* SUPPORTING APPELLANTS AND REVERSAL

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Jonathan Skrmetti
  *Attorney General & Reporter*
Clark L. Hildabrand
  *Deputy Chief of Staff & Senior Counsel*
Steven J. Griffin
  *Assistant Attorney General*
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 253-5642
clark.hildabrand@ag.tn.gov

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*
OFFICE OF THE ARKANSAS ATTORNEY
GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Dylan.Jacobs@ArkansasAG.gov

*Additional Counsel Listed on
Signature Page*

## CORPORATE DISCLOSURE STATEMENT

As governmental parties, amici are not required to file a certificate of interested persons. Fed. R. App. P. 26.1(a).

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION AND INTERESTS OF AMICI CURIAE ....................... 1

ARGUMENT ............................................................................................ 4

    I.    Laws Prohibiting Pediatric Gender-Transition Procedures Do Not
Trigger Heightened Scrutiny ................................................... 5

        A.    Laws Prohibiting Pediatric Gender-Transition
Procedures Do Not Discriminate Based on Sex ......................... 5

        B.    *Bostock* Does Not Control ............................................. 11

        C.    Transgender Individuals Are Not a Suspect Class ................... 13

    II.    Indiana's Law Survives Any Level Of Review ..................... 17

        A.    Laws Prohibiting Pediatric Gender-Transition
Procedures Are Based in Biology, Not Stereotype ................... 17

        B.    Gender-Transition Procedures Are Experimental ................... 19

        C.    Plaintiffs Erroneously Rely on American Medical
Interest Groups that are Biased Advocates, Not Neutral
Experts ..................................................................... 23

CONCLUSION ....................................................................................... 27

CERTIFICATE OF COMPLIANCE ........................................................ 30

CERTIFICATE OF SERVICE ................................................................ 31

## TABLE OF AUTHORITIES

**CASES**

*Abigail All. For Better Access to Developmental Drugs v. von Eschenbach,*
   495 F.3d 695 (D.C. Cir. 2007) .................................................................................. 1

*Adams v. Sch. Bd. of St. Johns Cnty.,*
   57 F.4th 791 (11th Cir. 2022) .................................................................. 14, 17, 18

*B.P.J. v. W.V. State Bd. of Educ.,*
   2023 WL 111875 (S.D.W.V. Jan. 5, 2023) *enjoined pending appeal,*
   WL 28703113 (4th Cir. 2023) ................................................................................ 17

*Ballard v. United States,*
   329 U.S. 187 (1946) ................................................................................................ 17

*Boe v. Marshall,*
   No. 2:22-cv-184-LCB (N.D. Ala.) ........................................................................ 25

*Botock v. Clayton County,*
   140 S. Ct. 1731 (2020) ................................................................................ 11, 12, 13

*Brandt v. Rutledge,*
   47 F.4th 661 (8th Cir. 2022) ............................................................................ 6, 12

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985) ................................................................ 12, 14, 15, 16, 17

*Craig v. Boren,*
   429 U.S. 190 (1976) ................................................................................................ 18

*Dent v. West Virginia,*
   129 U.S. 114 (1889) .................................................................................................. 1

*Dobbs v. Jackson Women's Health Org.,*
   142 S. Ct. 2228 (2022) ...................................................................................*passim*

*Doe 1 v. Thornbury,*
   No. 23-5609, -- F.4th --, 2023 WL 4861984 (6th Cir. July 31, 2023) ...................... 4

*Eknes-Tucker v. Gov. of Ala.,*
   No. 22-11707, -- F. 4th --, 2023 WL 5344981 (11th Cir. Aug. 21, 2023) ....... *passim*

*Frontiero v. Richardson,*
   411 U.S. 677 (1973) ................................................................. 15

*Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974) ........................... 6

*Gibson v. Collier,*
   920 F.3d 212 (5th Cir. 2019) ................................................ 27

*Gonzales v. Carhart,*
   550 U.S. 124 (2007) .................................................................. 1

*Kirchberg v. Feenstra,*
   450 U.S. 455 (1981) ................................................................ 18

*Kosilek v. Spencer,*
   774 F.3d 63 (1st Cir. 2014) ................................................... 27

*L.W. v. Skrmetti,*
   73 F.4th 408 (6th Cir. 2023) ........................................ *passim*

*Lyng v. Castillo,*
   477 U.S. 635 (1986) ................................................................ 15

*Mass. Bd. of Retirement v. Murgia,*
   427 U.S. 307 (1976) ................................................... 14, 15, 16

*McMain v. Peters,*
   2018 WL 3732660 (D. Or. Aug. 2, 2018) ................................ 9

*Michael M. v. Superior Court,*
   450 U.S. 464 (1981) ................................................................ 18

*Nguyen v. INS,*
   533 U.S. 53 (2001) ............................................................ 17, 19

*Pelcha v. MW Bancorp, Inc.,*
   988 F.3d 318 (6th Cir. 2021) ........................................... 11, 12

*Reed v. Reed,*
   404 U.S. 71 (1971) .................................................................. 18

*San Antonio Ind. Sch. Dist. v. Rodriguez,*
   411 U.S. 1 (1973) ................................................................... 14

*Stanton v. Stanton,*
    421 U.S. 74 (1975) ................................................................ 18

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.,*
    143 S. Ct. 2141 (2023) ............................................................ 12

*United States v. Virginia,*
    518 U.S. 515 (1996) ................................................................ 18

*Vacco v. Quill,*
    521 U.S. 793 (1997) ................................................................ 14

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ............................................................. 2, 4

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
    858 F.3d 1034 (7th Cir. 2017) ........................................ 17, 19

## STATUTES

Ind. Code §25-1-22-1 *et seq* ..................................................... 4

Miss. Code Ann. § 41-41-191 ..................................................... 7

## OTHER AUTHORITIES

Andrew Gelman & Eric Loken, *The Statistical Crisis in Science,*
    102 AMERICAN SCIENTIST (2014) ............................................ 24

Anna Smith Haghighi, *What To Know About Estrogen in Men,*
    MEDICAL NEWS TODAY (Nov. 9, 2020), https://perma.cc/B358-S7UW ................... 11

Azeen Ghorayshi, *Britain Limits Use of Puberty-Blocking Drugs to Research Only,*
    N.Y. TIMES (June 9, 2023), https://perma.cc/Z74M-ED6R .................... 21

Azeen Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls for
    Research Review,* N.Y. TIMES (Aug. 3, 2023), https://perma.cc/N3BJ-TB9J ..... 4, 23

Azeen Ghorayshi, *More Trans Teens Are Choosing "Top Surgery,"*
    N.Y. TIMES (Sept. 26, 2022), https://perma.cc/2K79-A7S8 ..................... 7

Claire Sissions, *Typical Testosterone Levels in Males and Females,* Medical News
    Today (Jan. 6, 2023), https://perma.cc/M98N-4WG4 ............................. 10

E. Coleman et al., *WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH (Sept. 15, 2022) ........................................................................... 2, 3, 26

Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE (June 15, 2022), https://perma.cc/ZMT2-W6DX .................................... 26

Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, REDUXX (May 17, 2022), https://perma.cc/5DWF-MLRU .................................................................. 3

Hembree et al., *Endocrine Treatment of Gender-Dysphoric / Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLIN. ENDOCRINOL. METAB. (2017) ..................................................................... 25

Hilary Cass, Letter to Director of Specialized Commissioning (Jul. 19, 2022), https://perma.cc/KS4N-V2GX ................................................................... 20

Hilary Cass, *The Cass Review: Interim Report* 37 (Feb. 2022), https://perma.cc/RJU2-VLHT ................................................................... 20

Jayne Leonard, *What Causes High Testosterone in Women?*, MEDICAL NEWS TODAY (Jan. 12, 2023), https://perma.cc/BT38-L79X ...................................... 11

Jennifer Block, *Gender dysphoria in young people is rising—and so is professional disagreement*, The BMJ (Feb. 23, 2023), https://perma.cc/QKB6-5QCR............... 25

Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, THE BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9 .......... 22, 23

Joshua Safer, *State of the Art: Transgender Hormone Care* (Feb. 15, 2019), https://www.youtube.com/watch?v=m7Xg9gZS_hg (at 5:38-6:18) ........................ 25

Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, Wall St. Journal (Apr. 17, 2022) ......................................... 24

Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. PEDIATRIC & ADOLSCENT GYNECOLOGY (2019), https://perma.cc/WU36-5889 .................................................................. 11

Leor Sapir & Colin Wright, *Medical Journal's False Consensus on "Gender-Affirming Care,"* WALL ST. JOURNAL (June 9, 2023), https://perma.cc/SJK7-SGS8 .................................................................. 26

vi

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR (2021) ............................ 14, 16

Maria Vogiatzi et al., *Testosterone Use in Adolescent Males*, 5 J. ENDOCRINE SOC'Y 1, 2 (2021), https://perma.cc/E3ZQ-4PZV .......................... 11

Nat'l Inst. for Health & Care Excellence *Gender-affirming hormones for children and adolescents with gender dysphoria*, (Mar. 11, 2021), https://perma.cc/M8J5-MXVG ................................................................................................ 20

Nat'l Inst. for Health & Care Excellence *Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria*, (Mar. 11, 2021), https://perma.cc/93NB-BGAN ................................................................. 20

NHS England, *Interim Service Specification* (June 9, 2023), https://perma.cc/YE3E-AE3H ................................................................... 21

NIH, *How Do Healthcare Providers Diagnose Precocious Puberty & Delayed Puberty?*, https://perma.cc/3LGJ-TSV4 (last visited May 12, 2023) ...................... 10

Palveluvalikoima, Recommendation of the Council for Choices in Health Care in Finland (2020), https://perma.cc/VN38-67WT                                       22

Riitakerttu Kaltiala et al., *Youth Gender Transition Is Pushed Without Evidence*, WALL ST. JOURNAL (Jul. 14, 2023) ........................................................ 27

Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, Wall St. Journal (June 28, 2023) .................................... 25

Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* (2022), https://perma.cc/FDS5-BDF3 .............................................................. 21

Victoria Pelham, *Puberty Blockers: What You Should Know*, Cedars Sinai (Jan. 16, 2023), https://perma.cc/H83F-4ZR7; Mayo Clinic, *Precocious Puberty*, https://perma.cc/58SA-ESRV (last visited May 12, 2023)................................. 8, 10

Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X ................................................................................................ 26

Yuval Levin, *A Time to Build: From Family and Community to Congress and the Campus, How Recommitting to our Institutions Can Revive the American Dream* (2020) ................................................................................................ 24

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

Amici curiae are the States of Alabama, Arkansas, Tennessee, Alaska, Florida, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, Texas, Utah, and West Virginia.

"[F]rom time immemorial," amici have exercised their authority to enact health and safety measures—regulating the medical profession, restricting access to potentially dangerous medicines, banning treatments that are unsafe or unproven. *Dent v. West Virginia*, 129 U.S. 114, 121-24 (1889); *see Abigail All. For Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703-05 (D.C. Cir. 2007) (en banc).

State legislatures have particularly "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). And "State[s] plainly ha[ve] authority, in truth a responsibility, to look after the health and safety of [their] children." *L.W. v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023). So when it comes to experimental gender-transition procedures, States like Indiana can "rationally take the side of caution before permitting irreversible medical treatments of [their] children." *Id.* (granting stay pending appeal of preliminary injunction enjoining enforcement of similar Tennessee law). "Absent a constitutional mandate to the contrary, these types of issues are quintessentially the sort that our system of government reserves to legislative, not judicial, action." *Eknes-Tucker v. Gov. of Ala.*, No. 22-11707, -- F. 4th --, 2023 WL 5344981, at *18 (11th Cir.

Aug. 21, 2023) (vacating preliminary injunction enjoining enforcement of similar Alabama law).

Yet rather than accord Indiana's "health and welfare laws" a "strong presumption of validity," *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022) (citation omitted), Plaintiffs asked the district court to treat certain medical interest groups as the *real* regulators, authoring standards that no mere State could contradict. According to Plaintiffs, the "major medical associations in the United States" endorse the Standards of Care promulgated by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society, so it is *those* standards the Constitution purportedly mandates. Pls' PI Br., Dkt.27 at 6, 8.

Nonsense. One could scarcely dream up a more radical organization to outsource the regulation of medicine to than WPATH (whose members are also almost entirely responsible for the Endocrine Society Guidelines). While "Americans are engaged in an earnest and profound debate about" how best to help children suffering from gender dysphoria, *cf. Washington v. Glucksberg*, 521 U.S. 702, 735 (1997), WPATH has taken its gender ideology to the extreme and included in its latest Standards an entire chapter on self-identified "eunuchs"—individuals "assigned male at birth" who "wish to eliminate masculine physical features, masculine genitals, or genital functioning."[1] Because eunuchs "wish for a body that is compatible with their eunuch identity," the Standards say, some will need "castration to better align their

---

[1] E. Coleman et al., *WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH (Sept. 15, 2022), S88 ("SOC 8").

bodies with their gender identity."[2] WPATH thus deems castration "medically necessary gender-affirming care" for eunuchs to "gain comfort with their gendered self."[3]

And how did WPATH learn that castration constitutes "medically necessary gender-affirming care"? From the Internet of course—specifically from a "large online peer-support community" called the "Eunuch Archive," which WPATH reports hosts "the greatest wealth of information about contemporary eunuch-identified people."[4] WPATH did *not* report that the Archive also hosts thousands of stories that "focus on the eroticization of child castration" and "involve the sadistic sexual abuse of children."[5] Just as with eunuchs, though, WPATH's Standards consider sterilizing gender-transition procedures to be medically necessary "gender-affirming care" for *minors* suffering from gender dysphoria.[6] This is the stuff of nightmares, not constitutional law.

Even the American Academy of Pediatrics (AAP)—which has aggressively lobbied against laws such as Indiana's—acknowledged earlier this month that there are no systematic reviews supporting the treatments Indiana has prohibited. It thus promised to conduct an initial review. (Tellingly, the group will continue to recommend the treatments while awaiting evidence of their safety and efficacy—a move Dr. Gordon Guyatt, the father of evidence-based medicine, noted "puts the cart before

---

[2] *Id.* at S88-89.
[3] *Id.*
[4] *Id.* at S88.
[5] Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, Reduxx (May 17, 2022), https://perma.cc/5DWF-MLRU.
[6] *See* SOC 8, *supra*, at S43-S66.

the horse").[7] Several European countries, meanwhile, have already conducted systematic reviews and, based on their findings, severely curtailed the availability of these treatments outside controlled research settings.[8]

Plaintiffs would substitute WPATH's year-old Standards, rejected abroad and in numerous States, for the judgment of Indiana's legislature. Thankfully, the Constitution does not put WPATH in charge of regulating medicine. The government regulates the medical profession, not the other way around. *See Glucksberg*, 521 U.S. at 731. The most recent federal appellate courts to consider similar laws rejected those plaintiffs' requests to substitute WPATH's judgment for that of Tennessee, Kentucky, and Alabama. *L.W.*, 73 F.4th at 413; *Doe 1 v. Thornbury*, No. 23-5609, -- F.4th --, 2023 WL 4861984, at *1 (6th Cir. July 31, 2023); *Eknes-Tucker*, 2023 WL 5344981, at *18. This Court should do likewise.

## ARGUMENT

Indiana's Senate Enrolled Act 480 is a valid exercise of the State's police power. Like many States, Indiana became concerned that healthcare providers were risking the long-term health and well-being of gender dysphoric children by prescribing unproven hormonal and surgical treatments. The Indiana legislature responded by prohibiting the administration of gender-transition procedures for minors. *See* Ind. Code §25-1-22-1 *et seq.*

---

[7] Azeen Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls for Research Review*, N.Y. TIMES (Aug. 3, 2023), https://perma.cc/N3BJ-TB9J.
[8] *E.g.*, Cantor Decl., Dkt.48-1, ¶¶16-35.

The district court erred by granting Plaintiffs' request for a preliminary injunction. First, the court erroneously assumed that heightened scrutiny applies whenever a medical provider must know a patient's sex to determine what care to provide. SA18. Second, Plaintiffs insisted, and the court seemed to accept, that any healthcare regulation that conflicts with WPATH's 2022 Standards of Care and the position of American medical interest groups cannot survive heightened scrutiny. *Id.* at 24. But the Constitution does not cast such a skeptical eye on health and welfare laws, even if they regulate gender-transition treatments. And States do not need to seek approval from WPATH before banning experimental procedures that leave children sterilized. The Court should reverse.

## I. Laws Prohibiting Pediatric Gender-Transition Procedures Do Not Trigger Heightened Scrutiny.

The fundamental goal of S.E.A. 480 is the same as laws many of the amici States have enacted: to prohibit healthcare providers from performing surgeries on and administering hormones to minors in the name of WPATH-encouraged gender transition. The district court erred by subjecting this law to heightened scrutiny. As with "other health and welfare laws," rational-basis review applies. *Dobbs*, 142 S. Ct. at 2284.

### A. Laws Prohibiting Pediatric Gender-Transition Procedures Do Not Discriminate Based on Sex.

Following the erroneous reasoning of an Eighth Circuit preliminary injunction panel, the district court held that S.E.A. 480 triggers heightened scrutiny because "[t]he biological sex of the minor patient is the basis on which the law distinguishes

5

between those who may receive certain types of medical care and those who may not." SA20 (quoting *Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022)). Both the Sixth and Eleventh Circuits have since disagreed with that faulty reasoning, *see L.W.*, 73 F.4th at 419; *Eknes-Tucker*, 2023 WL 5344981, at *16-17, and five Eighth Circuit judges—half of all participating judges—wanted to rehear the case en banc immediately, with another three judges wanting to reconsider it after the then-impending trial was finished. *Brandt*, 2022 WL 16957734, at *1 (Colloton, J., joined by Smith, C.J., and Benton, J., concurring); *id.* (Stras, J., joined by Gruender, Erickson, Grasz, Kobes, JJ., dissental).

But put that aside. Consider what it would mean if any law, regulation, or policy that uses the words sex, gender, male, female, man, woman, boy, or girl automatically triggers heightened review. In that world, the Constitution would look askance at any public hospital offering testicular exams only to men or c-sections only to women. It would also mean that a law restricting abortions would face heightened scrutiny. The Supreme Court squarely rejected this reasoning, explaining that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretext designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245-46 (cleaned up) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)).

Plaintiffs' attempt to turn the Equal Protection Clause into a prohibition on explicitly gendered terms thus runs headlong into *Dobbs*. Virtually every abortion

regulation, including the one at issue in *Dobbs*, uses gendered terms or references the unique characteristics of the female reproductive system. *See* Miss. Code Ann. §41-41-191 (calculating gestational age "from the first day of the last menstrual period of the pregnant woman"). Or say that plastic surgeons started using TikTok to market to minors an experimental surgery that uses skin grafts to change one's racial appearance. (Disturbingly, not a far cry from current trends like #NipRevealFriday and "Yeet the Teet" that some surgeons use to sell transitioning mastectomies to children.[9]) If Indiana enacted a law prohibiting doctors from providing skin grafts to minors for the purpose of changing their racial appearance, would strict scrutiny apply simply because the statute uses "racial terms"? Of course not. Such a law would not impose a race-based classification under the Equal Protection Clause. So here.

So it simply does not matter that the Act mentions the words "gender" and "sex." "[H]ow could it not? That is the point of the existing hormone treatments—to help a minor transition from one gender to another." *L.W.*, 73 F.4th at 419. In other words, S.E.A. 480 "refers to sex only because the medical procedures that it regulates—puberty blockers and cross-sex hormones as a treatment for gender dysphoria—are themselves sex-based." *Eknes-Tucker*, 2023 WL 5344981, at *16. And "[i]f a law restricting a medical procedure that applies only to women does not trigger heightened scrutiny, as in *Dobbs*, a law equally applicable to all minors, no matter their sex at birth, does not require such scrutiny either." *L.W.*, 73 F.4th at 419.

---

[9] *See* Azeen Ghorayshi, *More Trans Teens Are Choosing "Top Surgery,"* N.Y. TIMES (Sept. 26, 2022), https://perma.cc/2K79-A7S8.

The district court tried to get around this truth by finding that the Act's prohibitions "do not prohibit certain medical procedures in all circumstances, but only when used for gender transition, which in turn requires sex-based classifications." SA18. Males can get testosterone, in other words, but females can't.

This pathway doesn't evade *Dobbs*, either. For healthy development, males naturally need higher levels of testosterone than females, and females need higher levels of estrogen than males. The lower court's reasoning is akin to subjecting an abortion regulation to heightened scrutiny because men can access "reproductive healthcare," while only women's access to abortion is restricted. It defines the procedure at too high a level of generality (though there would be no asymmetry here because neither boys *nor* girls can be prescribed gender-transition procedures). What matters are the individual procedures at issue.

Here, there are three. The first is puberty blocker transitioning treatment. Puberty blockers work the same way in males and females. Sex has no bearing on their prescription or dosage, whether for treating precocious puberty or for transitioning.[10] So banning their use in gender-transition procedures does not draw any line based on sex. Girls and boys are treated identically: both may receive puberty blockers to treat precocious puberty, but not to transition.

The second treatment is testosterone transitioning treatment. Unlike puberty blockers, testosterone transitioning treatments can be used *only* in females. That is,

---

[10] *See* Victoria Pelham, *Puberty Blockers: What You Should Know*, Cedars Sinai (Jan. 16, 2023), https://perma.cc/H83F-4ZR7; Mayo Clinic, *Precocious Puberty*, https://perma.cc/58SA-ESRV (last visited May 12, 2023).

8

giving testosterone to a female can be a transitioning treatment because it will lead to male characteristics, while giving testosterone to a male *cannot* be a transitioning treatment because it will *not* lead to female characteristics. While the same drug may be used in *other* treatments for males (like treating a testosterone deficiency), no amount of testosterone can cause a male to develop female characteristics.

The third treatment is estrogen transitioning treatment, which works the inverse as testosterone transitioning treatment. It can be given only to males to transition. Giving estrogen to a female won't lead to transitioning; testosterone is needed to do that.

Because biology dictates that only males can take estrogen *to transition*, and only females can take testosterone *to transition*, testosterone transitioning treatments and estrogen transitioning treatments are "medical procedure[s] that only one sex can undergo." *Dobbs*, 142 S. Ct. at 2245-46. Rational-basis review thus applies to laws regulating the procedures. *Id.*; *see Eknes-Tucker*, 2023 WL 5344981, at *16.

It does not matter that Indiana allows these same drugs—puberty blockers, testosterone, and estrogen—to be used for some purposes but not for transitioning. The distinctions the State drew make sense because the different uses of the drugs have different diagnoses, different goals, and different risks. That makes them different treatments. This distinction is normal. States routinely allow drugs to be used for some treatments (morphine to treat a patient's pain) but not others (morphine to assist a patient's suicide). *E.g.*, *McMain v. Peters*, 2018 WL 3732660, at *4 (D. Or. Aug. 2, 2018) (prisoner seeking testosterone for PTSD not similarly situated to

9

prisoner with Klinefelter Syndrome); Indeed, distinguishing between treatments that use the same drug is not just rational, but necessary. To the diabetic patient, injecting insulin is lifesaving. To the hypoglycemic patient, it can be life ending. Same drug, different treatments.

Consider puberty blockers again. Puberty blockers are ordinarily prescribed to treat precocious puberty, in which a child begins puberty at an unusually early age.[11] Unlike gender dysphoria, precocious puberty is a physical abnormality that can be diagnosed through medical tests.[12] And the goal of using puberty blockers to treat precocious puberty is to ensure children develop at "the normal age of puberty"[13]—the exact opposite goal as when doctors use them to treat gender dysphoria by *halting* normal puberty. This distinction alters the risk calculus as well: because doctors prescribe blockers to dysphoric children well beyond the normal age, using puberty blockers to treat gender dysphoria may risk diminished bone growth and social development.[14]

The same distinctions hold for the hormones barred by Indiana. Males and females normally have very different amounts of naturally occurring testosterone and estrogen.[15] And these hormones serve very different purposes in the different sexes.

---

[11] Mayo Clinic, *Precocious Puberty*, *supra*.

[12] *See* NIH, *How Do Healthcare Providers Diagnose Precocious Puberty & Delayed Puberty?*, https://perma.cc/3LGJ-TSV4 (last visited May 12, 2023).

[13] Mayo Clinic, *Precocious Puberty*, *supra*.

[14] *See* Nat'l Inst. for Health & Care Excellence (NICE), *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria*, (Mar. 11, 2021), https://perma.cc/93NB-BGAN, at 26-32 ("NICE Puberty Blocker Evidence Review").

[15] *E.g.*, Claire Sissions, *Typical Testosterone Levels in Males and Females*, MEDICAL NEWS TODAY (Jan. 6, 2023), https://perma.cc/M98N-4WG4.

In females, excess testosterone can *cause* infertility[16]; in males, testosterone is prescribed to *alleviate* fertility problems.[17] The inverse is true of estrogen. When prescribed at an excess level to males, estrogen can *cause* infertility and sexual dysfunction[18]; for females, estrogen is usually prescribed to *treat* problems with sexual development.[19] This makes the use of the same hormones in the different sexes different treatments. Accordingly, "the right question under the Equal Protection Clause" is whether the two groups seeking the different treatments—"those who want to use these drugs to treat a discordance between their sex and gender identity and those who want to use these drugs to treat other conditions"—are "similarly situated." *Eknes-Tucker*, 2023 WL 5344981, at *20 (Brasher, J., concurring). The question answers itself. The Equal Protection Clause does not look askance on regulations that treat different procedures differently.

### B.     *Bostock* Does Not Control.

Nor does *Bostock* say otherwise, as Plaintiffs contend. Dkt.27 at 18-19. First, *Bostock v. Clayton County* concerned only Title VII's prohibition on sex-based employment discrimination. 140 S. Ct. 1731, 1737 (2020). The Supreme Court expressly cabined *Bostock*'s reasoning to that context. *See id.* at 1753; *see also Pelcha v. MW*

---

[16] Jayne Leonard, *What Causes High Testosterone in Women?*, MEDICAL NEWS TODAY (Jan. 12, 2023), https://perma.cc/BT38-L79X.

[17] Maria Vogiatzi et al., *Testosterone Use in Adolescent Males*, 5 J. ENDOCRINE SOC'Y 1, 2 (2021), https://perma.cc/E3ZQ-4PZV.

[18] Anna Smith Haghighi, *What To Know About Estrogen in Men*, MEDICAL NEWS TODAY (Nov. 9, 2020), https://perma.cc/B358-S7UW.

[19] Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. PEDIATRIC & ADOLESCENT GYNECOLOGY 460 (2019), https://perma.cc/WU36-5889.

*Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). That is particularly true when it comes to the Equal Protection Clause, which "predates Title VII by nearly a century, so there is reason to be skeptical that [their] protections" are coextensive. *Brandt*, 2022 WL 16957734, at *1 n.1 (Stras, J., dissental). Justice Gorsuch, the author of *Bostock*, recently agreed, explaining why interpretations of Title VII, "enacted at the same time by the same Congress" as Title VI, go "beyond the Equal Protection Clause." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2220 (2023) (Gorsuch, J., concurring).

Second, even if *Bostock*'s reasoning applied to the Equal Protection Clause, Plaintiffs' claims still would fail. In *Bostock*, the Supreme Court held that an employer that "penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth" discriminates based on sex under Title VII. 140 S. Ct. at 1741. At the core of the Court's reasoning was a "simple test": "if changing the employee's sex would have yielded a different choice by the employer," the employer has treated the employee differently "because of sex." *Id.*

*Bostock* applied this test to workplace hiring and firing decisions based on gender stereotypes. Those decisions should be sex blind. It makes no sense to apply the same test to medicine, where males and females are *not* similarly situated and where decisions should *not* be sex blind. *See Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) ("The Equal Protection Clause … is essentially a direction that all persons similarly situated should be treated alike."). A fertility clinic would not discriminate on the basis of sex by deciding to implant fertilized eggs only in females, even though

"changing the [patient's] sex would have yielded a different choice by the [clinic]." *Bostock*, 140 S. Ct. at 1741. There is no equal protection problem because there is no stereotype or inequality in the clinic's policy; implanting the egg in a male would be a different procedure altogether.

The same is true for gender-transition procedures, which also depend on biology, not stereotype. Administering testosterone to bring a boy's levels into a normal range is not the same treatment as ramping up a young girl's testosterone levels to that of a healthy boy—or, for that matter, as providing the hormone to a Tour de France cyclist seeking a yellow jersey. The laws at issue use sex only to determine who would benefit from certain drugs and who would not. And States may regulate testosterone wherever it is administered, be it a pediatrician's office, a gender clinic, or a cyclist training center. To put it in *Bostock*'s terms, it is *not* true that but for a child's sex he could be given gender-transitioning hormones to transition, because *no one* is allowed to receive the drug that transitions *them*. More particularly, because puberty blockers work the same for boys and girls, changing the child's sex changes nothing. Testosterone transitioning treatments and estrogen transitioning treatments, on the other hand, are "medical procedure[s] that only one sex can undergo," *Dobbs*, 142 S. Ct. at 2245-46—unlike Aimee Stephens's desire to wear a dress, which anyone of either sex can do, *see Bostock*, 140 S. Ct. at 1738. *Bostock* does not apply.

## C.    Transgender Individuals Are Not a Suspect Class.

Plaintiffs insist that S.E.A. 480 "facially prohibits" medical care that "only transgender people undergo," thereby unlawfully discriminating based on

transgender status. Pls' PI Br., Dkt.27 at 16-17, 20-22. This notion is refuted by the growing ranks of detransitioners—individuals who identify as transgender, receive gender-transition procedures, and later re-identify with their sex and seek to "detransition."[20] If detransitioners were not transgender, then Plaintiffs are wrong that only transgender people seek such procedures. And if detransitioners *were* transgender but no longer are, then being transgender is not an immutable characteristic.

Regardless, heightened scrutiny doesn't apply simply because people seeking a procedure are disproportionately (or even uniformly) members of a suspect class. *Vacco v. Quill*, 521 U.S. 793, 800 (1997). Classifications based on sex receive intermediate scrutiny, but a classification of "people seeking abortions" does not, even though only women seek abortions. *Dobbs*, 142 S. Ct. at 2245-46.

And in any event, individuals who identify as transgender do not constitute a suspect class to begin with. Aside from the obvious—race, sex, national origin, religion, etc.—the Supreme Court rarely designates suspect or quasi-suspect classes. *See, e.g.*, *Cleburne*, 473 U.S. at 442-46. Indeed, the Court has rejected suspect classification for disability, age, and poverty. *Id.*; *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976); *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). The fact that so few classifications rise to the level of "suspect" itself casts "grave doubt" on the assertion that transgender identity does. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.5 (11th Cir. 2022) (en banc). Until the Supreme Court says

---

[20] *E.g.*, Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR 3353 (2021).

otherwise, "rational basis review applies to transgender-based classifications." *L.W.*, 73 F.4th at 419.

Precedent explains why. Classifications are suspect when they single out "distinguishing characteristics" that have historically been divorced from "the interests the State has the authority to implement." *Cleburne*, 473 U.S. at 441. Sex classifications, for example, are suspect because they often "reflect outmoded notions of the relative capabilities of men and women," rather than real differences. *Id.* Same for racial classifications. *Murgia*, 427 U.S. at 313-14. Thus, to be "suspect," a classification must single out a so-called "immutable" characteristic that has historically been the basis for deep discrimination. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (looking for (1) immutable characteristics that define (2) a discrete group, (3) historical discrimination, and (4) political powerlessness).

Transgender status does not check these boxes. For one, it is not "an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). To the contrary, according to Plaintiffs, individuals identify as transgender when their internal perception of who they are departs from the immutable characteristic of their biological sex, a characteristic known since birth. Pls' PI Br., Dkt.27 at 4-5. Transgender identification necessarily takes place sometime *after* birth. And many individuals who identify as transgender alternate between gender identifications, be it non-binary, gender fluid, third gender, or their natal

15

gender.[21] If a child can hop in and out of the category based on her "fluid" identity, it makes no sense to use the category for equal protection purposes.

Transgender identity falls short on the other suspect-classification factors too. Individuals identifying as transgender as a class look quite "unlike" those individuals who were long denied equal protection because of their race, national origin, or gender. *Murgia*, 427 U.S. at 313-14 (rejecting age as a suspect class because the elderly have not faced discrimination "akin to [suspect] classifications"). States enshrined purposeful race and sex discrimination into their laws for decades; conversely, transgender individuals have been protected by a "major piece of federal civil rights legislation" for nearly a half-century. *Bostock*, 140 S. Ct. at 1753.

And the laws (wrongly) described as discriminating against transgender individuals are recent enactments grappling with tough policy questions about how to protect children from significant harms arising from the recent spike in transgender identification. To the extent that regulating to prevent those harms requires zeroing in on gender dysphoric individuals most likely to be at risk from them, such a classification is a "sensible ground for differential treatment," not the sort of irrelevant grouping that warrants heightened review. *Cleburne*, 473 U.S. at 440. These issues are difficult, and States are understandably taking different approaches to them. *L.W.*, 73 F.4th at 416 (collecting examples). "To permit legislatures on one side of the debate to have their say while silencing legislatures on the other side" does not further the goals of equal protection. *Id.* Rational-basis review applies here.

---

[21] *See* Littman, *Individuals Treated for Gender Dysphoria*, *supra*.

## II.     Indiana's Law Survives Any Level Of Review.

Even if the district court was right to apply heightened scrutiny, it was wrong to find that Indiana's law fails such review. First, the law is based in biology, not stereotype. Second, pediatric gender-transition procedures are experimental, and States have every reason to wait for the results of the experiments to come in before allowing children to be sterilized. Third, the medical interest groups Plaintiffs rely on are biased participants, not neutral arbiters of science.

### A.     Laws Prohibiting Pediatric Gender-Transition Procedures Are Based in Biology, Not Stereotype.

The Equal Protection Clause commands that "all persons *similarly situated* … be treated alike." *Cleburne*, 473 U.S. at 439 (emphasis added). But males and females are not similarly situated with respect to receiving sex hormones or obtaining certain surgeries. So a law targeting the unique problems inherent in providing cross-sex hormones can't ignore those biological realities. *Dobbs*, 142 S. Ct. at 2245-46. Nor does the Constitution require it to. On the contrary, "fail[ing] to acknowledge ... basic biological differences ... risks making the guarantee of equal protection superficial, and so disserving it." *Nguyen v. INS*, 533 U.S. 53, 73 (2001); *see Ballard v. United States*, 329 U.S. 187, 193 (1946). And a transgender identity doesn't obviate sex-based harms. *Accord Adams*, 57 F.4th at 809-10 (upholding single-sex bathroom policy); *B.P.J. v. W.V. State Bd. of Educ.*, 2023 WL 111875, at *7 (S.D.W.V. Jan. 5, 2023) (upholding single-sex sports policy), *enjoined pending appeal*, 2023 WL 2803113 (4th Cir. 2023); *cf. Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050-53 (7th Cir. 2017) (finding that single-sex bathroom policy

violated the Equal Protection Clause where the justifications offered for the policy rested on "stereotypes," not biology).

Biological differences are "the driving force behind the Supreme Court's sex-discrimination jurisprudence." *Adams*, 57 F.4th at 803 n.6. Indeed, "the biological differences between males and females are the reasons intermediate scrutiny," not strict, "applies in sex-discrimination cases in the first place." *Id.* at 809. Intermediate scrutiny prevents States from legislating based on "overbroad generalizations about the different talents, capacities, or preferences of males or females"—generalizations that have no basis in biology. *United States v. Virginia*, 518 U.S. 515, 553 (1996); *see Whitaker*, 858 F.3d at 1050 (noting that heightened scrutiny protects against sex-based stereotypes that "frequently bear[] no relation to the ability to perform or contribute to society" (citation omitted)). States cannot presume that women don't like competition, that they have less skill in managing or distributing property, or that they mature faster. *See, e.g.*, *Virginia*, 518 U.S. at 541; *Kirchberg v. Feenstra*, 450 U.S. 455, 459-60 (1981); *Reed v. Reed*, 404 U.S. 71, 74 (1971); *Craig v. Boren*, 429 U.S. 190, 192 (1976); *Stanton v. Stanton*, 421 U.S. 7, 14 (1975).

But applying intermediate scrutiny, rather than strict, ensures that distinctions based on "enduring" and "[i]nherent differences" between the sexes survive. *Virginia*, 518 U.S. at 533 (internal quotation marks omitted). Such distinctions are, by their nature, substantially related to the relevant governmental interest and thus have been upheld time and again. *E.g.*, *Michael M. v. Superior Court*, 450 U.S. 464, 466 (1981) (upholding statutory-rape statute prohibiting sex with a minor female

because "[o]nly women may become pregnant"); *accord Nguyen*, 533 U.S. at 58. Because biology matters, legislatures can and should take sexual differences into account when creating a classification that prevents harms unique to one sex. *See Eknes-Tucker*, 2023 WL 5344981, at *18 (Brasher, J., concurring) ("Assuming the classification in this law is subject to intermediate scrutiny, I believe the state probably has an 'exceedingly persuasive justification' for regulating these drugs differently when they are used to treat a discordance between an individual's sex and sense of gender identity than when they are used for other purposes.").

This Court's decision in *Whitaker* is in accord.[22] First, in determining that a school's single-sex bathroom policy likely violated the Equal Protection Clause, the Court rested its decision on record evidence showing that (1) the school district sought to justify its policy based on "sex-based stereotypes" rather than biological reality, (2) the school district's privacy concerns were "based upon sheer conjecture and abstraction," and (3) the school district had implemented its policy in inconsistent and arbitrary ways. 858 F.3d at 1051-53. Second, and in any event, *Whitaker* does *not* stand for the proposition that laws that are legitimately based in biology rather than gender stereotype are constitutionally suspect. Just the opposite. Under *Whitaker*, States can legislate based on sex to prevent sex-based harms.

## B.  Gender-Transition Procedures Are Experimental.

While Plaintiffs and their preferred medical interest groups repeat again and again that pediatric gender-modification procedures are well-supported by the

---

[22] Amici do not take a position here on the correctness of *Whitaker*. Nevertheless, *Whitaker* does not preclude this Court from ruling in favor of Indiana.

evidence, that is far from the case. In recent years, medical authorities in the United Kingdom, Finland, Sweden, and Norway have looked at the evidence and determined that such procedures are in fact experimental.

*1. United Kingdom.* In 2020, Britain's National Health Service (NHS) commissioned Dr. Hilary Cass, the former president of the Royal College of Paediatrics and Child Health, to chair an independent commission examining the use of puberty blockers and cross-sex hormones to treat gender dysphoria in minors. As part of the review, the National Institute for Care and Excellence (NICE) conducted two systematic reviews of the published scientific literature concerning the safety and efficacy of using gender-modification procedures to treat children and adolescents with gender dysphoria.[23] The results are striking. The literature reviews concluded that there are no "reliable comparative studies" on the "effectiveness and safety of [puberty blockers],"[24] and that the safety of testosterone and estrogen transitioning treatments was similarly unknown.[25] Dr. Cass determined that "the available evidence was not strong enough to form the basis of a policy position,"[26] and thus called for experiments to *start* being conducted.[27]

---

[23] *See* Nat'l Inst. for Health & Care Excellence (NICE), *Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria*, (Mar. 11, 2021), https://perma.cc/M8J5-MXVG ("NICE Cross-Sex Hormone Evidence Review"); NICE Puberty Blocker Evidence Review, *supra*.

[24] NICE Puberty Blocker Evidence Review at 12.

[25] NICE Cross-Sex Hormone Evidence Review 14.

[26] Hilary Cass, *The Cass Review: Interim Report* 37 (Feb. 2022), https://perma.cc/RJU2-VLHT.

[27] Hilary Cass, Letter to Director of Specialized Commissioning (Jul. 19, 2022), https://perma.cc/KS4N-V2GX.

On June 9, 2023, NHS published an interim service specification officially adopting many of Dr. Cass's recommendations. Unlike American medical interest groups, NHS now prioritizes psychological—not hormonal or surgical—care for the treatment of gender dysphoria in youth and will consider prescribing puberty blockers to minors *only* as part of a formal research protocol. Recruitment for that research study is expected to *begin* in 2024. Until then, puberty blockers will ordinarily not be prescribed by NHS physicians as a treatment for gender dysphoria.[28]

*2. Sweden.* In February 2022, following an extensive literature review, Sweden's National Board of Health and Welfare concluded that "the risk of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits."[29] Concerned that there is no "reliable scientific evidence concerning the efficacy and the safety of both treatments," that "detransition occurs among young adults," and that there has been an "unexplained increase" in minors identifying as transgender, the National Board restricted the use of puberty blockers and cross-sex hormones to strictly controlled research settings or "exceptional cases."[30]

---

[28] *See* Azeen Ghorayshi, *Britain Limits Use of Puberty-Blocking Drugs to Research Only*, N.Y. TIMES (June 9, 2023), https://perma.cc/Z74M-ED6R; NHS England, *Interim Service Specification* (June 9, 2023), https://perma.cc/YE3E-AE3H.

[29] Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3.

[30] *Id.* at 3-4.

*3. Finland.* In June 2020, Finland's Council for Choices in Healthcare in Finland also suggested changes to its treatment protocols.[31] Though allowing for some hormonal interventions under certain conditions, the Council lamented the lack of evidence and urged caution in light of severe risks associated with medical intervention. "As far as minors are concerned," the Council found, "there are no medical treatment[s] [for gender dysphoria] that can be considered evidence-based," and "it is critical to obtain information on the benefits and risks of these treatments in rigorous research settings."[32] The Council concluded: "[N]o decisions should be made that can permanently alter a still-maturing minor's mental and physical development."

*4. Norway.* In March 2023, the Norwegian Healthcare Investigation Board (Ukom) released a report finding that its national guidelines for treating gender dysphoria were inadequate.[33] The existing 2020 guidelines had not been based on a literature review, and the new report found "insufficient evidence for the use of puberty blockers and cross sex hormone treatments in young people, especially for teenagers who are increasingly seeking health services."[34] Ukom "recommended that updated guidelines should be based on a new commissioned review or existing international up-to-date systematic reviews, such as those conducted in 2021 by the UK's National

---

[31] *See* Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland* (2020), https://perma.cc/VN38-67WT.
[32] *Id.*
[33] Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, THE BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9.
[34] *Id.*

Institute for Health and Care Excellence."[35] Ukom thus "defines such treatments as utprøvende behandling, or 'treatments under trial,'"[36]—that is, experimental.

### C. Plaintiffs Erroneously Rely on American Medical Interest Groups that are Biased Advocates, Not Neutral Experts.

The district court discounted the European experience because "no European country that has conducted a systematic review responded with a ban on the use of puberty blockers and cross-sex hormone therapy as S.E.A. 480 would." SA26. But if the treatments are experimental, what does it matter if England chooses to conduct the experiments? The Constitution does not require Indiana to offer its children as guinea pigs rather than waiting on results of the ongoing experiments.

Plaintiffs' answer is that Indiana cannot await the results because the American medical organizations haven't done so. Pls' PI Br., Dkt.27 at 6, 8. Indeed they haven't. While healthcare authorities in Europe have curbed access to pediatric gender-transition procedures, American medical organizations have run in the opposite direction, advocating unfettered access to transitioning treatments even as they admit that more research is needed.[37]

In some ways, it is unsurprising that, until recent decisions by the Sixth and Eleventh Circuits, courts repeatedly deferred to these organizations. One would think that medical societies like the AAP, the Endocrine Society, and WPATH would be honest brokers, reviewing the evidence as Europe has done and responding accordingly. And one would hope that organizations like the American Medical

---

[35] *Id.*

[36] *Id.*

[37] *E.g.*, Ghorayshi, *Medical Group Backs Youth Gender Treatments*, *supra.*

Association—which has not published guidelines on this topic but supports the WPATH Standards of Care—would use their institutional goodwill, built up over time, to be the voice of reason and put the safety of children first.

Sadly, this has not happened. As with other institutions, American medical organizations have become increasingly "performative," treated by their leaders as platforms for advancing the current moment's cause célèbre.[38] Add to this a replication crisis in scientific literature and the ability of researchers to use statistics to make findings appear significant when they are not,[39] and it is no wonder that medical organizations find it easier to just go with the zeitgeist. (Not to mention that the American interest groups that endorse gender-transition procedures are just that— interest groups, with a strong financial interest in the procedures their members make a living by providing.) Science is *hard*, and there is no reward in the current climate for any organization that questions the safety and efficacy of using sterilizing gender-transition procedures on children.

Take AAP, for instance, which has "decried" "as transphobic" a resolution by its members discussing "the growing international skepticism of pediatric gender transition" and calling for a literature review.[40] As AAP member Dr. Julia Mason

---

[38] *See generally* Yuval Levin, *A Time to Build: From Family and Community to Congress and the Campus, How Recommitting to our Institutions Can Revive the American Dream* (2020).
[39] *E.g.*, Andrew Gelman & Eric Loken, *The Statistical Crisis in Science*, 102 AMERICAN SCIENTIST 460, 460-65 (2014) (noting "statistical significance" can "be obtained even from pure noise" by various tricks of the trade).
[40] Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, WALL ST. JOURNAL (Apr. 17, 2022).

concluded, "AAP has stifled debate" and "put its thumb on the scale … in favor of a shoddy but politically correct research agenda."[41]

Similar concerns have been raised about the Endocrine Society,[42] whose guidelines for treating gender dysphoria the *British Medical Journal* recently exposed as having "serious problems" because—remarkably—the "systematic reviews" the guidelines were based on "didn't look at the effect of the interventions on gender dysphoria itself."[43] The Endocrine Society knows that plaintiffs in cases like this one bandy about its Guidelines to justify the procedures its members profit from. But the fine print at the end of these Guidelines shows how unauthoritative they are: "The Endocrine Society makes no warranty, express or implied, regarding the guidelines," "nor do they establish a standard of care."[44] One member of the Guidelines authoring committee acknowledged, when not testifying in court against the States, that the Endocrine Society did not even have "some little data"—they "had none"—to justify the language allowing prescription of cross-sex hormones prior to age 16, a change that gave "cover" to doctors to do so.[45]

Then there is WPATH, which at least confesses to being "an advocacy organization[]." *Boe v. Marshall*, No. 2:22-cv-184-LCB (N.D. Ala.), ECF 208. Ample evidence

---

[41] *Id.*

[42] *E.g.*, Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, WALL ST. JOURNAL (June 28, 2023).

[43] Jennifer Block, *Gender dysphoria in young people is rising—and so is professional disagreement*, THE BMJ (Feb. 23, 2023), https://perma.cc/QKB6-5QCR.

[44] Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLIN. ENDOCRINOL. METAB. 3869, 3895 (2017).

[45] Joshua Safer, *State of the Art: Transgender Hormone Care* (Feb. 15, 2019), https://www.youtube.com/watch?v=m7Xg9gZS_hg (at 5:38-6:18).

shows just how true that is. In addition to advocating castration as "medically necessary gender-affirming care" for males whose "gender identity" is "eunuch," WPATH recently removed most minimum-age requirements for gender-modification procedures from its Standards of Care.[46] According to the lead author of the chapter on children, WPATH dropped the age requirements to "bridge th[e] considerations" regarding the need for insurance coverage with the desire to ensure that doctors would not be held liable for malpractice if they deviated from the standards.[47]

WPATH has also suppressed dissent, including canceling the presentation of a prominent researcher who dared to question the safety of transitioning young children and censuring a board member who went public with concerns that medical providers in America are transitioning minors without proper safeguards.[48]

And just recently, WPATH's leaders were successful in having a major scientific publishing house, Springer, retract a published paper that dared to examine the growing phenomenon of groups of adolescents suddenly "declar[ing] a transgender identity after extensive exposure to social media and peer influence."[49] Indeed, WPATH has tried to cancel nearly every researcher that has looked at "Rapid Onset Gender Dysphoria," for the simple reason that, "[e]ven mentioning the possibility that trans identity is socially influenced or a phase threatens [its] claims that children can know early in life they have a permanent transgender identity and therefore that

---

[46] *See* SOC 8, *supra*, at S43-79.

[47] Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X.

[48] Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE (June 15, 2022), https://perma.cc/ZMT2-W6DX.

[49] Leor Sapir & Colin Wright, *Medical Journal's False Consensus on "Gender-Affirming Care,"* WALL ST. JOURNAL (June 9, 2023), https://perma.cc/SJK7-SGS8.

they should have broad access to permanent body-modifying and sterilizing procedures."[50] More examples abound. *E.g.*, Amicus Br. of Family Research Council at 7-26.

There is thus good reason for the Supreme Court's observation that medical interest groups' position statements do not "shed light on the meaning of the Constitution." *Dobbs*, 142 S. Ct. at 2267. The First and Fifth Circuits had it right when they found that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014). While medical organizations are certainly capable of establishing true, evidence-based standards of care, they have utterly failed to act responsibly when it comes to pediatric gender-transition procedures. As a group of respected gender clinicians and researchers from Finland, the UK, Sweden, Norway, Belgium, France, Switzerland, and South Africa recently opined, "medical societies" in the United States should "align their recommendations with the best available evidence—rather than exaggerating the benefits and minimizing the risks."[51] Until they do so, States like Indiana are forced to step in to protect children.

## CONCLUSION

The Court should reverse.

---

[50] *Id.*

[51] Riitakerttu Kaltiala et al., *Youth Gender Transition Is Pushed Without Evidence*, WALL ST. JOURNAL (Jul. 14, 2023).

Dated: August 28, 2023

Respectfully submitted,

Steve Marshall
  *Attorney General*

<u>s/ Edmund G. LaCour Jr.</u>
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*
OFFICE OF THE ARKANSAS ATTORNEY
GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Dylan.Jacobs@ArkansasAG.gov

Jonathan Skrmetti
  *Attorney General & Reporter*
Clark L. Hildabrand
  *Deputy Chief of Staff & Senior Counsel*
Steven J. Griffin
  *Assistant Attorney General*
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 253-5642
clark.hildabrand@ag.tn.gov

*Counsel for Amici Curiae*

## ADDITIONAL COUNSEL

<table>
<tr>
<td>

TREG TAYLOR
Attorney General
State of Alaska

</td>
<td>

ANDREW BAILEY
Attorney General
State of Missouri

</td>
</tr>
<tr>
<td>

ASHLEY MOODY
Attorney General
State of Florida

</td>
<td>

AUSTIN KNUDSEN
Attorney General
State of Montana

</td>
</tr>
<tr>
<td>

CHRIS CARR
Attorney General
State of Georgia

</td>
<td>

MICHAEL T. HILGERS
Attorney General
State of Nebraska

</td>
</tr>
<tr>
<td>

RAUL R. LABRADOR
Attorney General
State of Idaho

</td>
<td>

DREW H. WRIGLEY
Attorney General
State of North Dakota

</td>
</tr>
<tr>
<td>

BRENNA BIRD
Attorney General
State of Iowa

</td>
<td>

GENTNER DRUMMOND
Attorney General
State of Oklahoma

</td>
</tr>
<tr>
<td>

KRIS KOBACH
Attorney General
State of Kansas

</td>
<td>

ALAN WILSON
Attorney General
State of South Carolina

</td>
</tr>
<tr>
<td>

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

</td>
<td>

ANGELA COLMENERO
Provisional Attorney General
State of Texas

</td>
</tr>
<tr>
<td>

JEFF LANDRY
Attorney General
State of Louisiana

</td>
<td>

SEAN REYES
Attorney General
State of Utah

</td>
</tr>
<tr>
<td>

LYNN FITCH
Attorney General
State of Mississippi

</td>
<td>

PATRICK MORRISEY
Attorney General
State of West Virginia

</td>
</tr>
</table>

**CERTIFICATE OF COMPLIANCE**

1. I certify that this brief complies with the type-volume limitations set forth in Circuit Rule 29 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,980 words.

2. In addition, pursuant to Federal Rule of Appellate Procedure 32(g)(1), this brief complies with the typeface and type style requirements of Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 12-point Century Schoolbook font.

Dated: August 28, 2023

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on August 28, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to any CM/ECF participants.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amici Curiae*
