IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

No. 23-2366

K.C., *et al.*,

Plaintiffs/Appellees,

v.

INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING
BOARD OF INDIANA, *et al.*

Defendants/Appellants

_____

On Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:23-cv-00595-JPH-KMB,
The Honorable James P. Hanlon, Judge

_____

**BRIEF OF APPELLEES**

_____

Kenneth J. Falk                          Chase Strangio
*Counsel of Record*                      Harper Seldin
Gavin M. Rose                            American Civil Liberties Union
Stevie J. Pactor                         125 Broad Street
ACLU of Indiana                          New York, N.Y. 10004
1031 E. Washington St.                   212/549-2500
Indianapolis, IN 46202                   cstrangio@aclu.org
317/635-4059                             hseldin@aclu.org
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

*Counsel for Appellees*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2366

Short Caption: K.C. et al.. v. Individual Members of the Medical Licensing Board, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

K.C., Nathaniel & Beth Clawson; M.W., Ryan & Lisa Welch; A.M, Emily Morris; M.R., Maria Rivera, Catherine Bast,MD

Mosaic Health & Healing Arts, Inc. (Unredacted disclosure statement filed and sealed pursuant to July 17, 2023 Order)

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana, American Civil Liberties Union

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

None

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Kenneth J. Falk          Date: September 18, 2023

Attorney's Printed Name:  Kenneth J. Falk

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** [✓]     **No** [ ]

Address:  ACLU of Indiana, 1031 E. Washington St., Indianapolis, IN 46202

Phone Number: 317/635-4059          Fax Number:  317/635-4105

E-Mail Address: kfalk@aclu-in.org

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

K.C., Nathaniel & Beth Clawson, M.W., Ryan &Lisa Welch, A.M., Emily Morris, M.R., Maria Rivera, Catherine Bast, M.D.

and Mosaic Health & Healing Arts, Inc. Full names of minors included in sealed disclosure statement of Kenneth J. Fal

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana, American Civil Liberties Union

(3)   If the party, amicus or intervenor is a corporation:

i)   Identify all its parent corporations, if any; and

None

ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Gavin M. Rose                Date: July 14, 2023

Attorney's Printed Name: Gavin M. Rose

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]   No [✔]

Address: 1031 E. Washington St.

Indianapolis, IN 46202

Phone Number: 317/635-4059                Fax Number: 317/635-4105

E-Mail Address: grose@aclu-in.org

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

K.C., Nathaniel & Beth Clawson, M.W., Ryan &Lisa Welch, A.M., Emily Morris, M.R., Maria Rivera, Catherine Bast, M.D.

and Mosaic Health & Healing Arts, Inc. Full names of minors included in sealed disclosure statement of Kenneth J. Fa

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana, American Civil Liberties Union

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

None

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Stevie J. Pactor     Date: July 19, 2023

Attorney's Printed Name: Stevie J. Pactor

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ☑

Address: 1031 E. Washington St.

Indianapolis, IN 46202

Phone Number: 317/635-4059     Fax Number: 317/635-4105

E-Mail Address: spactor@aclu-in.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-2366</u>

Short Caption: <u>K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

<div style="margin-left:2em;">☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**</div>

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>K.C., Nathaniel & Beth Clawson, M.W., Ryan & Lisa Welch, A.M., Emily Morris, M.R., Maria Rivera, Catherine Bast, &</u>

<u>Mosaic Health & Healing Arts, Inc. Full names of minors included in sealed disclosure statement of Kenneth J. Falk.</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>ACLU of Indiana; American Civil Liberties Union</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)      Identify all its parent corporations, if any; and

          <u>None</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          <u>None</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Chase Strangio</u>        Date: <u>August 23, 2023</u>

Attorney's Printed Name: <u>Chase Strangio</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: <u>125 Broad Street, New York, NY 10004</u>

Phone Number: <u>212-549-2500</u>        Fax Number: <u>        </u>

E-Mail Address: <u>cstrangio@aclu.org</u>

<div style="text-align:right;">rev. 12/19 AK</div>

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   K.C., Nathani & Beth Clawson, M.W., Ryan & Lisa Welch, A.M., Emily Morris, M.R., Maria Rivera, Catherine Bast, &

   Mosaic Health & Healing Arts, Inc. Full names of minors included in sealed disclosure statement of Kenneth J. Falk.

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   ACLU of Indiana; American Civil Liberties Union.

(3)      If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and

         None

   ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         None

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ Harper Seldin          Date: August 29, 2023

Attorney's Printed Name:  Harper Seldin

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]   No [✓]

Address:  125 Broad Street, New York, NY 10004

Phone Number: 267-615-4686          Fax Number:

E-Mail Address: hseldin@aclu.org

rev. 12/19 AK

**Table of Contents**

Table of Authorities ......................................................................... iv

Introduction ...................................................................................... 1

Jurisdictional Statement ................................................................... 2

Statement of the Issues .................................................................... 2

Statement of the Case ....................................................................... 3

     I.     The challenged statute............................................................ 4

     II.    Gender identity and gender dysphoria ............................... 5

     III.   The diagnosis and treatment of gender dysphoria in adolescents ..... 6

          A.    The diagnosis and treatment of gender dysphoria in adolescents are governed by rigorous and stringent criteria ... 6

          B.    Gender-affirming medical interventions.................................... 6

          C.    The banned care benefits patients and there are no alternative treatments......................................................... 8

          D.    Gender-affirming medical care is not an outlier in pediatric medicine ......................................................... 10

     IV.   The parties' experts.................................................................... 11

     V.    Appellees and the harms imposed by the ban........................ 14

     VI.   Procedural history........................................................................ 19

Summary of the Argument........................................................... 20

Argument .......................................................................................... 21

     I.     Standard of review..................................................................... 23

II.    The district court properly held that appellees were likely to prevail
       on their equal protection claim .................................................................    23

       A.    The district court correctly concluded that heightened scrutiny
             applies because the law classifies based on sex..........................    23

             1.    Under *Whitaker* and *Bostock* discrimination against
                   transgender persons is sex discrimination subject to
                   heightened scrutiny ............................................................    23

             2.    The district court correctly held that S.E.A. 480 classifies
                   on the basis of transgender status and sex ......................    25

       B.    The district court correctly concluded that S.E.A. 480 was not
             likely to survive heightened scrutiny..........................................    33

             1.    The State inappropriately ignores the governing standard
                   for the grant of a preliminary injunction, and the
                   uncontested facts and facts found by the district court
                   support its holding................................................................    33

             2.    The record supports the district court's conclusion that
                   the State cannot show the required "exceedingly
                   persuasive" justification for its sweeping, categorical
                   ban ..........................................................................................    35

             3.    The district court properly concluded that the prohibition
                   on gender-affirming care lacks the requisite "close means-
                   end fit" ..................................................................................    38

       C.    S.E.A. 480 fails any level of review ...............................................    40

III.   Appellees are likely to prevail on their due process claim ...................    41

IV.    The district court correctly held that appellees were likely to prevail
       on their First Amendment claim as the statute's "aid-or-abet" provision
       prohibits speech ..........................................................................................    44

V.     The district court did not abuse its discretion in holding that the other

requirements for the grant of a preliminary injunction were met ....... 47

VI.   The scope of the preliminary injunction entered by the district court was not an abuse of discretion ................................................................ 48

Conclusion ............................................................................................................ 51

Certificate of Compliance ................................................................................. 52

# Table of Authorities

Cases:

*A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) ... 20, 24, 26, 32

*Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015)........................33

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985) ................................. 23

*Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356 (2001) ........... 41

*Bigelow v. Virginia*, 421 U.S. 809 (1975) ....................................................... 22, 45, 47

*Bostock v. Clayton County*, 590 U.S.__, 140 S. Ct. 1731 (2020) .................... 24, 25, 29

*Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018) ......................................... 29

*Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) ................................................ 30, 32

*Brandt v. Rutledge,* __F. Supp. 3d __, 2023 WL 4073727 (June 20, 2023) *appeal pending*, No. 23-2681 (8th Cir) ........................................................................ 12, 43

*Buchmeier v. United States*, 581 F.3d 561 (7th Cir. 2009) (en banc)........................ 32

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020) ......................................... 22, 49

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985).............................. 41

*Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019) ............................ 23

*Dekker v. Weida,* __F. Supp. 3d __, 2023 WL 4102243, at *8 (N.D. Fla. June 21, 2023), *appeal pending,* No. 23-12155 (11th Cir) ............................................................... 12

*Dobbs v. Jackson Women's Health Organization*, 597 U.S.__, 142 S. Ct. 2228 (2022)............................................................................................... 28, 30, 39, 41

*Doe v. City of Lafayette, Indiana*, 377 F.3d 757 (7th Cir. 2004) (en banc) ............... 42

*Doe v. Ladapo*, __F. Supp. 3d__, 2023 WL 3833848 (N.D. Fla. June 6, 2023), *appeal pending*, No. 23-12159 (11th Cir.) ........................................................................ 12

*Doe v. Rokita*, 54 F.4th 518 (7th Cir. 2022)........................................................49

*Doe v. University of Southern Indiana*, 43 F.3d 784 (7th Cir. 2022) ........................ 23

*Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002) ...................................................................................................................... 14

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) .................................................................... 41

*Eknes-Tucker v. Governor of Alabama*, __F.4th__,  2023 WL 5344981 (11th Cir. Aug. 21, 2023) ............................................................................... 31, 32, 33, 42

*Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022), *rev'd* __F.4th__, 2023 WL 5344981 (11th Cir. Aug. 21, 2023)...................................................14

*Evancho v. Pine-Richland School Dist.*, 237 F. Supp. 3d 267 (W.D. Pa. 2017)......... 33

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)........................................ 48, 51

*F.V. v. Barron*, 286 F. Supp. 3d 1131 (D. Idaho 2018 ................................................ 33

*Geduldig v. Aiello,* 417 U.S. 484 (1974) .......................................................... 20, 28, 29

*Grimm v. Gloucester School Board*, 972 F.3d 586 (4th Cir. 2020)...........................33

*Hecox v. Little*, __F.4th__, 2023 WL 5283127 (9th Cir. Aug. 17, 2023) ..................... 28

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......................................... 45

*Huston v. Hearst Communications, Inc.*, 53 F.4th 1097 (7th Cir. 2022) ................... 41

*Illinois Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) ................... 20, 34

*J.E.B. v. Alabama,* 511 U.S. 127 (1994)..................................................................... 31

*Kadel v. Folwell*, 620 F. Supp. 3d 339 (M.D.N.C. 2022)...................................... 14, 29

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) .................................................... 33

*L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408 (6th Cir. 2023).................... 31, 32, 43

*Loving v. Virginia*, 388 U.S. 1 (1967)......................................................................... 31

*M.A.B. v. Board of Education of Talbot County,* 286 F. Supp. 3d 704 (D. Md. 2018)...........................................................................33

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ..................................................... 42

*Michael M. v. Superior Ct. of Sonoma County*, 450 U.S. 464 (1981) ........................ 27

*Nguyen v. INS*, 533 U.S. 53 (2001)........................................................... 27

*Parham v. J.R.*, 442 U.S. 584 (1979)..................................................... 21, 42, 43, 44

*Pavatt v. Jones*, 627 F.3d 1336 (10th Cir. 2010)............................................ 11

*Ray v. McCloud,* 507 F. Supp. 3d 925 (S.D. Ohio 2020)................................... 33

*Reed v. Town of Gilbert, Ariz*, 576 U.S. 155 (2015) ............................................ 43, 45

*Reno v. Flores*, 507 U.S. 292 (1993)........................................................... 43

*Romer v. Evans*, 517 U.S. 620 (1996)....................................................... 41

*Sessions v. Morales-Santana*, 582 U.S. 47 (2017)......................................... 20, 25, 38

*Spar v. Cha*, 907 N.E.2d 974 (Ind. 2009) .................................................... 38

*Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676 (7th Cir. 2012) ........... 4

*Troxel v. Granville*, 530 U.S. 57 (2000)................................................... 42, 44

*Trump v. International Refugee Assistance Project*, 582 U.S. 571 (2017) ................ 49

*Turnell v. CentiMark Corp.*, 796 F.3d 656 (7th Cir. 2015).................................. 23

*Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622 (1994) ........................... 39

*United States v. Hansen*, 599 U.S. 762,143 S. Ct. 1932 (2023)........................... 45, 46

*United States v. O'Brien*, 391 U.S. 367 (1968)............................................. 47

*United States v. Salerno*, 481 U.S. 739 (1987)............................................. 51

*United States v. Virginia*, 518 U.S. 515 (1996)................................................. *passim*

*Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000) ......................................... 43

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Ed.,* 858 F.3d 1034 (7th Cir. 2017) ........................................................................ *passim*

**Statutes**

*Indiana*

Indiana Code § 25-1-9-4(a)(3) ................................................................ 5

Indiana Code § 25-1-22-5(a) .................................................................. 4

Indiana Code § 25-1-22-5(b). ................................................................ 4

Indiana Code § 25-1-22-5(b)(1). .......................................................... 36

Indiana Code § 25-1-22-12 ..................................................................... 4

Indiana Code § 25-1-22-13(a) ................................................................ 4

Indiana Code § 25-1-22-13(b) .................................................. 3, 5, 22, 44

Indiana Code § 25-1-22-13(d) ................................................................ 5

Indiana Code § 25-1-22-15 ..................................................................... 5

Indiana Code § 25-1-22-16 ..................................................................... 5

Indiana Code § 25-1-22-17 ..................................................................... 5

Indiana Code § 25-1-22-18 ..................................................................... 5

*Other*

W. Va. Code Ann. § 30-3-20(c)(5)(A) ................................................. 38

**Introduction**

Appellees include four transgender adolescents and the parents who love them, whose lives have been positively transformed by the availability of gender-affirming medical care in Indiana. No party disputes that these parents only want what is best for their children, that they have watched their adolescent children suffer and then seen them benefit tremendously from the treatment banned by Senate Enrolled Act 480 ["S.E.A. 480" or the "Act"]). And no party disputes that the banned treatment represents the standard of care for adolescent gender dysphoria recognized by all major medical organizations in the United States. The appellants ("State") have no answer to the evidence presented by appellees that without the to-be-banned treatment these adolescents will suffer "additional distress and health risks, such as depression, posttraumatic stress disorder, and suicidality." (Appellants' Short Appendix ["S.A." 25]). And the State has proposed no evidence-based alternative treatment for these adolescents who are suffering from the profound and debilitating effects of gender dysphoria.

 Seeking to reverse the preliminary injunction issued by the district court, the State ignores binding precedent from this Court and largely bases its argument on a version of the facts that not only is hotly contested, but was not credited by the district court. Although the State recites these "facts" at length in its brief, the overwhelming majority of them are not reflected in factual findings by the district court. And that makes sense given that the sources for these "facts" are doctors and psychologists

who claim no expertise in adolescent gender dysphoria or its treatment, and who have conducted no peer-reviewed research in the field.

Faced with the certainty of the severe harm that the statute would cause, clear law from this Court and the Supreme Court, and the inadequacy of the State's justification for banning medical interventions for transgender adolescents that non-transgender minors may receive for any purpose, the district court properly found that appellees demonstrated both irreparable harm and a likelihood of success on the merits of their equal protection claim. The district court also correctly held that S.E.A. 480, which prohibits the provision of truthful, non-misleading information, likely violates the First Amendment.

Given its conclusion that appellees were likely to succeed on the merits of at least two claims, and its finding that the other factors were met, the district court properly issued its preliminary injunction. It did not abuse its discretion in enjoining the State from enforcing S.E.A. 480 against any provider, as to any minor, and the injunction should be affirmed.

## Jurisdictional Statement

The jurisdictional statement is complete and correct.

## Statement of the Issues

1.      Did the district court properly conclude that appellees were likely to prevail on the merits of their claims that:

   a.      S.E.A. 480 violates equal protection inasmuch as under this Court's precedent, the Act classifies based on sex, demanding elevated scrutiny,

and the evidence demonstrates that the State cannot meet its burden
under this standard?

b.  the "aiding and abetting" provision of S.E.A. 480, Ind. Code § 25-1-22-
13(b), which prohibits the provision of truthful and non-misleading
information, violates the First Amendment?

2.  Although not decided by the district court, are appellees likely to prevail on
their claim that S.E.A. 480 violates the fundamental due process rights of parents to
make medical decisions for their children in consultation with physicians?

3.  Did the district court abuse its discretion in holding that the other
requirements for the grant of a preliminary injunction were met?

4.  Did the trial court abuse its discretion in enjoining enforcement statewide of
the portions of S.E.A. 480 it found to be likely unconstitutional?

## Statement of the Case

The State's one-sided portrayal of gender-affirming medical care ignores the
reality that virtually none of its contested "facts" made their way into any factual
findings by the district court. It also ignores the substantial evidence provided by
appellees demonstrating that the care provided to the appellee-youth represents the
studied, cautious approach governed by widely accepted clinical guidelines and
supported by major United States medical associations. Contrary to the State's
claims, this well-established care is provided with substantial safeguards; is
evidence-based, supported by clinical experience and scientific study; does not pose
unique risks to warrant categorical prohibition; and its safety and efficacy are well-

documented. Although the district court also did not adopt much of appellees' evidence into factual findings, this Court can consider the entire record that was before the district court. *See Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (citing cases).

## I.    The challenged statute

S.E.A. 480 prohibits a physician or other practitioner from "knowingly provid[ing] gender transition procedures to a minor." Ind. Code § 25-1-22-13(a). "[G]ender transition procedures" are defined as medical or surgical services, including drugs, designed to "alter or remove physical or anatomical characteristics or features that are typical for the individual's sex"[1] or that are designed to "instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex." Ind. Code § 25-1-22-5(a). These include "puberty blocking drugs, gender transition hormone therapy, or genital gender reassignment surgery or nongenital gender reassignment surgery knowingly performed for the purpose of assisting an individual with a gender transition." *Id.* Under the Act, adolescents may receive the otherwise banned medical interventions, as long as they are not for "gender transition." Ind. Code § 25-1-22-5(b).

S.E.A. 480 not only prohibits physicians or other practitioners from knowingly providing gender transition procedures to a minor, but also prohibits them from

---

[1]    "Sex" is defined as "the biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." Ind. Code § 25-1-22-12.

"aid[ing] or abet[ting] another physician or practitioner in the provision of gender transition procedures to a minor." Ind. Code § 25-1-22-13(b). Doing so subjects the physician or practitioner to discipline by boards that regulate them and to potential damages actions. Ind. Code §§ 25-1-22-15; 25-1-22-16-18; 25-1-9-4(a)(3) (allowing professional discipline for violating Indiana law).

The Act provides that if an individual is prescribed "gender transition hormone therapy" as part of a "gender transition procedure" prior to July 1, 2023, the statute's effective date, the hormone therapy may continue until December 31, 2023. Ind. Code § 25-1-22-13(d). There is no similar exception for those receiving puberty-delaying treatment or other gender-affirming care as of July 1, 2023.

II.     Gender identity and gender dysphoria

As recognized by the district court, persons who have a gender identity that does not align with their birth-assigned sex are transgender. (S.A. 3). Being transgender is not itself a medical condition to be treated or cured. (District Court Docket ["Dkt."] 26-1 ¶ 33). A person's gender identity, which has biological roots, cannot be changed or altered through medical intervention. (Dkts. 26-1 ¶ 28; 26-2 ¶¶ 27-29; 26-3 ¶ 20; 58-4 ¶ 29).

The incongruence that transgender people experience between their birth-assigned sex and gender identity can give rise to "gender dysphoria," a mental health diagnosis recognized by the American Psychological Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"). (S.A. 3). Gender dysphoria "is associated with clinically significant distress or impairment in social, occupational,

[5]

or other areas of functioning." (S.A. 3 [quoting the DSM-5]). Untreated, it can lead to depression, posttraumatic stress disorder, eating disorders, substance abuse, self-harm, and suicidality. (S.A. 24-25; Dkts. 26-1 ¶ 57; 26-2 ¶ 35; 26-3 ¶ 22).

III.   The diagnosis and treatment of gender dysphoria in adolescents

  A.   The diagnosis and treatment of gender dysphoria in adolescents are governed by rigorous and stringent criteria

Treatment of adolescents with gender dysphoria is governed by widely accepted guidelines published by the Endocrine Society and the World Professional Association for Transgender Health ("WPATH"). (Dkts. 26-1 ¶¶ 34-37; 26-2 ¶¶ 32, 40-48). Both the Endocrine Society Guidelines and the WPATH Standards of Care are evidence-based and require rigorous assessments before the initiation of gender-affirming medical interventions in adolescents. (Dkts. 26-1 ¶¶ 35, 37, 41-45, 61; 26-2 ¶¶ 32, 40, 43, 45; 58-2 ¶¶ 15, 54; 58-3 ¶¶ 12-14). Prior to providing medical treatments to adolescents, clinicians are guided by mental health assessments and/or work in close consultation with qualified providers who are experienced in diagnosing and treating gender dysphoria. (Dkts. 26-1 ¶¶ 7, 43, 45, 50; 26-2 ¶ 37). For adolescents, parental informed consent is required before the initiation of any medical interventions. (Dkts. 26-1 ¶ 42; 26-2 ¶¶ 57, 63; 58-2 ¶ 15).

  B.   Gender-affirming medical interventions

Gender-affirming care does not mean steering adolescents in any particular direction or providing care "on demand" without appropriate assessment, but rather, involves support for patients as they explore their gender identity and consideration of gender-affirming medical care where medically indicated. (Dkts. 26-1 ¶ 44; 58-2 ¶

15; 58-3 ¶ 15; 58-4 ¶ 6). Treatment is not provided without appropriate evaluation and an informed consent process that includes parents, adolescents, and clinicians. (Dkts. 26-2 ¶ 57; 58-3 ¶ 15).

No medical or surgical treatment is indicated for children with gender dysphoria prior to the onset of puberty. (S.A. 3) Once puberty begins, adolescents diagnosed with gender dysphoria may be prescribed puberty-delaying medications (*i.e.* "puberty blockers"), and in mid-adolescence, patients may be prescribed hormone therapy. (S.A. 3-4). For many transgender adolescents, going through puberty in accordance with their sex assigned at birth can cause significant distress. (Dkts. 26-1 ¶¶ 40, 59; 26-2 ¶¶ 57-58, 73). To relieve this distress and pause the development of the potentially permanent physical changes that come with puberty, healthcare providers may prescribe puberty-delaying medication. (Dkts. 26-1 ¶¶ 40-41; 26-2 ¶¶ 50-58). Puberty blockers are reversible; if an adolescent discontinues the treatment, endogenous puberty will resume. (Dkt. 26-2 ¶¶ 55-56). For some adolescents, their healthcare provider may determine it is medically necessary and appropriate to treat them with gender-affirming hormone therapy (*i.e.*, testosterone for transgender boys and testosterone suppression and estrogen for transgender girls). (Dkts. 26-1 ¶¶ 8, 43, 60; 26-2 ¶¶ 61-63, 76; 26-3 ¶ 32). Medical treatment for gender dysphoria seeks to eliminate or avoid clinically significant distress by helping a transgender person live in alignment with their gender identity. (Dkts. 26-1 ¶¶ 33, 57; 26-2 ¶ 34).

Such medical treatment for gender dysphoria in adolescents is evidence based. (Dkts. 26-1 ¶¶ 35, 61; 26-2 ¶¶ 34-47; 26-3 ¶¶ 19, 31). It is widely recognized in the

medical community as safe and effective for adolescents with gender dysphoria and is supported by the major United States professional medical and mental health organizations including the American Medical Association, the American Psychiatric Association, and the American Academy of Pediatrics. (Dkts. 26-1 ¶¶ 36, 56, 60; 26-2 ¶¶ 46-47; 26-3 ¶¶ 13, 32). Indiana's Medicaid program, administered by the Family and Social Services Administration, which only pays for medically necessary services, paid for this treatment for transgender adolescents prior to the Act. (Dkts. 26-6 ¶ 19; 26-8 ¶ 14; 51 ¶¶ 96-99).

> C.   The banned care benefits patients and there are no alternative treatments

The best available evidence developed through decades of clinical experience and a substantial body of research has demonstrated the safety and efficacy of these treatments for adolescents with gender dysphoria. (Dkts. 26-1¶¶ 41-56; 26-2 ¶¶ 35-45, 76, 78-79; 26-3 ¶¶ 12, 14-17, 21). The banned care not only reduces distress at the time of treatment, but also minimizes dysphoria later in life and reduces or eliminates the need for later surgical interventions. (Dkts. 26-1 ¶¶40, 57; 26-2 ¶¶ 57-58; 26-3 ¶¶ 53, 57). Cross-sectional and longitudinal studies have shown that both puberty-delaying treatment and gender-affirming hormone therapy prevent the worsening of severe symptoms of gender dysphoria in adolescents and improve overall health. (Dkt. 26-3 ¶¶ 14-15, 32).[2]

---

[2]     The State notes that there are no randomized controlled trials supporting gender-affirming care. (Appellants' Br. 44). Although randomized controlled trials provide certain kinds of information that other studies do not, it is not ethical to conduct randomized controlled trials in this area of medicine, and the existing literature supports the safety and efficacy of care. (Dkt. 58-4 ¶ 7).

Other than the gender-affirming medical care banned by S.E.A. 480, there are no evidence-based or other effective alternatives. (Dkts. 26-1 ¶¶ 10, 58; 26-3 ¶ 19). There is no evidence that psychotherapy alone addresses gender dysphoria when medical interventions are clinically indicated, although therapy may be part of the treatment to support the person's general mental health. (Dkts. 58-2 ¶¶ 22-25, 38; 58-4 ¶¶ 11, 39). During oral argument, the State's attorney conceded that there are no studies showing that psychotherapy is an effective alternative to the treatment banned by S.E.A. 480. (Prelim. Inj. Tr. at 35:13-14).

Adolescents with gender dysphoria who receive gender-affirming care demonstrate improved health and well-being, while lack of access to gender-affirming care directly contributes to poorer mental health outcomes. (Dkts. 26-1 ¶¶ 47-50, 57-61; 26-2 ¶¶ 73, 76, 80, 82; 26-3 ¶¶ 14-15, 32). Delayed or denied care frequently results in increased depression, anxiety, suicidal ideation and self-harm, increased substance use, and a deterioration in school performance. (Dkts. 26-1 ¶ 59; 26-2 ¶ 80-81; 26-3 ¶ 32). Discontinuing puberty-delaying treatment causes the onset of puberty, a significant source of distress for patients with gender dysphoria. (Dkt. 26-2 ¶ 81). Discontinuing gender-affirming hormone therapy causes adolescents to experience physiological changes inconsistent with their gender identity, regardless of whether that therapy is withdrawn abruptly or titrated down. (*Id*.).

D.    Gender-affirming medical care is not an outlier in pediatric medicine

The endocrine treatments prohibited by S.E.A. 480—puberty-delaying treatment, testosterone, estrogen, and testosterone suppression—are used to treat

[9]

other conditions such as precocious puberty, delayed puberty, hypogonadism, Turner Syndrome, Klinefelter Syndrome, agonism, premature ovarian failure, and disorders of sex development, and they carry comparable risks and side effects regardless of the indication for which they are prescribed. (Dkt. 26-2 ¶¶ 55, 59-60, 66-68, 74-75, 77). Further, the endocrine treatments used to treat gender dysphoria in adolescents do not create a unique risk to fertility: puberty-delaying treatment on its own does not affect fertility, and many patients treated with hormone therapy are able to biologically conceive children. (Dkt. 26-2 ¶¶ 56, 59, 70). Moreover, gender-affirming care is not the only type of medical care that can affect fertility, but it is the only care banned by S.E.A. 480. (Dkt. 26-2 ¶ 71). The evidence supporting the safety and efficacy of the care prohibited by S.E.A. 480 is comparable to the evidence supporting treatment of other conditions. (Dkts. 26-1 ¶ 35; 26-2 ¶ 40).

Regret is not unique to gender-affirming medical care, except that it is far *less* common than for other medical interventions. (Dkt. 26-1 ¶¶ 51-52). Detransition and regret are extraordinarily rare: between 1-2%. (Dkts. 26-3 ¶ 29; 58-2 ¶ 51). Given that the vast majority of those with gender dysphoria in adolescence will continue to experience gender dysphoria, "watchful waiting" is not an accepted approach used with adolescents. (Dkt. 58-2 ¶ 26). Such an approach would cause severe distress for pubertal patients with gender dysphoria for whom medical treatment is indicated because, absent medical intervention, they would undergo physiological changes that can be difficult, if not impossible, to reverse. (Dkt. 58-3 ¶ 16). Nor is there any evidence that providing gender-affirming medical care causes youth with gender

dysphoria who would otherwise desist to, instead, persist. (Dkts. 58-2 ¶ 27; 58-4 ¶ 18).

Indiana's total ban is inconsistent with international practices. Indeed, the district court correctly found that "no European country that has conducted a systematic review responded with a ban on the use of puberty-delaying treatment and cross-sex hormones as S.E.A. 480 would," and thus that those "European countries all chose less-restrictive means of regulation." (S.A. 26-27). And none of those countries have done what Indiana has done: ban gender-affirming care for minors entirely. (*Id.*; Dkt. 58-4 ¶5).

## IV. The parties' experts

Appellees' experts in the district court were Drs. Karasic, Shumer, and Turban. Dr. Karasic, a psychiatrist and Professor Emeritus at UCSF School of Medicine, has treated thousands of patients with gender dysphoria, chairs the American Psychiatric Association's Workgroup on Gender Dysphoria, and has published extensively, among other accomplishments. (Dkt. 26-1 ¶¶ 12-20).[3] Dr. Shumer is a pediatric endocrinologist, associate professor, and medical director of the Comprehensive Gender Services Program at the University of Michigan at Ann Arbor. (Dkt. 26-2 ¶ 3). He has extensive experience treating youth with gender dysphoria, established

---

[3]     The district court recognized Dr. Karasic's experience. (S.A. 25). The State seeks to undermine its significance (Appellants' Br. at 46), which is perhaps understandable given the lack of experience of its experts. (*See infra* at 11-14). But an expert can testify based on his clinical experience (although Dr. Karasic also testified based on his extensive knowledge of the relevant literature, some of which he created). *See, e.g., Pavatt v. Jones*, 627 F.3d 1336, 1340 (10th Cir. 2010) (crediting the testimony of the expert who had "substantially more clinical experience" than the opposing expert).

the Child and Adolescent Gender Services Clinic in Ann Arbor, and has authored numerous peer-reviewed articles concerning the treatment of transgender youth. (*Id.* ¶¶ 6-15). Dr. Turban is an Assistant Professor of Child & Adolescent Psychiatry at the UCSF School of Medicine, where he is also the director of the Gender Psychiatry Program in the Division of Child & Adolescent Psychiatry. (Dkt. 26-3 ¶ 4). He is a leading researcher in the field and publishes extensively in peer-reviewed journals on the topic of transgender youth, and has served as lead author for multiple textbook chapters on the mental health of transgender youth. (Dkt. 26-3 ¶¶ 4, 7-8). All three of the experts have been credited by federal courts. *See, e.g., Dekker v. Weida*, __F. Supp. 3d __, 2023 WL 4102243, at *8 (N.D. Fla. June 21, 2023) (Drs. Karasic and Shumer), *appeal pending,* No. 23-12155 (11th Cir); *Brandt v. Rutledge,* __F. Supp. 3d __, 2023 WL 4073727, at *26-*27 (June 20, 2023) (Drs. Karasic and Turban)*, appeal pending*, No. 23-2681 (8th Cir); *Doe v. Ladapo*, __F. Supp. 3d__, 2023 WL 3833848, at *5 (N.D. Fla. June 6, 2023) (Drs. Karasic and Shumer), *appeal pending*, No. 23-12159 (11th Cir.).

By contrast, neither of the State's endocrinology experts (Drs. Paul Hruz and Daniel Weiss) have ever treated a minor patient for gender dysphoria. (Dkts. 58-5 at 8 [27:20-29:16]; 58-6 at 11-13 [41:19-47:9], 33 [126:16-127:8]). Indeed, Dr. Hruz has never treated *any* patient for gender dysphoria, nor has he even been present for conversations with physicians and gender-dysphoric patients concerning their treatment options. (Dkt. 58-5 at 9 [32:12-33:10]). Dr. Kaliebe, the State's expert psychiatrist, has only treated approximately 13 minors with gender dysphoria. (Dkt.

58-7 at 10 [35:7-36:11]). The State's expert psychologists have résumés just as thin: in 25 years of seeing patients, Dr. James Cantor has treated only 8 minors with gender dysphoria and has not treated a single person, *for any condition*, younger than 16. (Dkt. 58-8 at 16 [59:12-60:8]). Dr. Dianna Kenny—who, in general, receives referrals of parents "convinced that the diagnosis of gender dysphoria is inaccurate and inappropriate for their child"—contends that only a single minor patient of hers may have been properly diagnosed with the condition. (Dkt. 58-9 at 8-9 [28:22-23, 30:24-33:17]).

None of these experts' credentials are meaningfully bolstered by their research or academic experiences. Both Dr. Weiss and Dr. Kaliebe admit to not having conducted or supervised any research, or published any articles, pertaining to gender dysphoria. (Dkts. 58-6 at 9-10 [33:7-34:6]; 58-7 at 13-14 [49:24-50:11]). Dr. Kenny's sole peer-reviewed publication pertaining to gender dysphoria (on which she was the fifth-listed author) did not consist of original research but merely responded to an article published by Dr. Turban. (Dkt. 58-9 at 15 [55:8-56:1]). Dr. Cantor, who specializes in atypical sexual attractions such as pedophilia, has not performed or published any original research on the mental-health outcomes of persons with gender dysphoria. (Dkt. 58-8 at 12-13 [44:12-21, 48:1-4]). Other than a single "letter to the editor," Dr. Hruz's limited writings on the subject have all appeared in religiously affiliated publications. (Dkt. 58-5 at 13-15 [46.6-55:5]).

Therefore, the primary expertise that the State's witnesses bring to bear on this case is their ability to read self-selected scientific literature authored by others.

This is not enough. *See, e.g.*, *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science."). Not surprisingly, federal courts have either rejected the opinions of some of the State's witnesses, or have given them little weight. *See Ladapo*, 2023 WL 3833848, at *2 n.8 (describing Dr. Hruz as "a deeply biased advocate, not as an expert sharing relevant evidence-based information and opinions," and refusing to credit his testimony); *Kadel v. Folwell*, 620 F. Supp. 3d 339, 364 (M.D.N.C. 2022) (sharply criticizing Dr. Hruz's motivations and finding him unqualified to render opinions "on the diagnosis of gender dysphoria, the DSM, gender dysphoria's potential causes, the likelihood that a patient will 'desist,' or the efficacy of mental health treatments"), *appeal pending*, No. 22-1721 (4th Cir.); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1142-43 (M.D. Ala. 2022) (assigning Dr. Cantor's testimony "very little weight" in light of his lack of experience treating transgender minors), *rev'd on other grounds*, __F. 4th __, 2023 WL 5344981 (11th Cir. Aug. 21, 2023).

V.     Appellees and the harms imposed by the ban

K.C. is a 10-year-old transgender girl. (Dkt. 26-4 ¶ 3). Although her birth-assigned sex was male, she has lived as a girl since before she was four years old, using a typical girl's name and wearing girls' clothing. (*Id.* ¶¶ 4, 7). Before she was four, she showed distress about her physical body not aligning with her gender identity. (*Id.* ¶ 5). She was diagnosed with gender dysphoria shortly after she turned

[14]

four and has been in therapy intermittently since that time. (*Id.* ¶¶ 6, 9). K.C.'s dysphoria has triggered severe anxiety and depression. (*Id.* ¶ 9). She is a patient at the Riley Gender Health Program ("Riley") in Indianapolis. (*Id.* ¶ 10). K.C. has recently entered the first stages of puberty and her doctor has prescribed a puberty blocker to prevent her from undergoing the permanent physical changes of typical male puberty. (*Id.* ¶ 11). If medically indicated, she hopes to receive gender-affirming hormone therapy in the future. (*Id.* ¶ 19). The thought of developing physical characteristics typical of boys causes her dysphoria, including anxiety and depression, to increase. (*Id.* ¶ 14).

M.W. is a 16-year-old transgender boy who socially transitioned at 14 and consistently uses a typical boy's first name and dresses and appears as a boy. (Dkt. 26-5 ¶¶ 3-4). He has been diagnosed with gender dysphoria and suffers from anxiety and depression because of the incongruence between his gender identity and sex assigned at birth. (*Id.* ¶¶ 5-6). He has received care at Riley since 2022. (*Id.* ¶ 5). For approximately a year his gender dysphoria has been treated with testosterone by clinicians at Riley. (*Id.* ¶ 8). He also separately receives mental health therapy. (*Id.* ¶ 10). The testosterone has allowed M.W.'s body to come into alignment with his gender identity, which has greatly ameliorated the symptoms of his gender dysphoria. (*Id.* ¶¶ 12-14). His depression and anxiety have decreased, and he now has made friends who treat him as the boy that he is. (*Id.* ¶ 13).

A.M. is an 11-year-old transgender girl who informed her family before she was four that she is a girl. (Dkt. 26-6 ¶ 3). Since that time, she has lived as a girl,

consistently using a female first name and dressing and appearing as a girl; she is known to the world only as a girl. (*Id.* ¶ 4). She has been diagnosed with gender dysphoria, which causes her anxiety and depression, and has been in mental health counseling since she was six. (*Id.* ¶¶ 7-8). She has been prescribed a puberty blocker and has been taking it by injection at Riley since August of 2021. (*Id.* ¶ 10). As a result, she is not experiencing any of the physiological changes that increased testosterone levels would cause in a pubescent boy. (*Id.* ¶ 16). This has caused the symptoms of A.M.'s gender dysphoria to markedly decrease. (*Id.*). Terminating A.M.'s puberty blockers, causing her to develop male characteristics, would be devastating. (*Id.* ¶¶ 16-17). In the future she will be prescribed estrogen and testosterone suppression if medically appropriate. (*Id.* ¶ 23).

M.R. is a 15-year-old transgender boy. (Dkt. 26-7 ¶¶ 3-4). He suffers from gender dysphoria, causing depression, anxiety, and self-harming behavior, resulting in hospitalization. (*Id.* ¶ 6). Approximately 18 months ago, he publicly came out as a boy and was diagnosed with gender dysphoria. (*Id.* ¶ 8). At that time, he began to receive mental health care for the distress caused by his gender dysphoria. (*Id.*). He began to receive testosterone early in 2023. (*Id.* ¶ 9). As soon as he began to receive the testosterone, his mental health greatly improved; his depression and anxiety substantially decreased. (*Id.* ¶ 11). Before receiving testosterone, he did not want to leave the house and had an enormous amount of anxiety that he would be misgendered, which lead to self-harming behavior. (*Id.* ¶ 12). Since starting hormone therapy, he has become more outgoing and comfortable with his peers. (*Id.* ¶ 14). He

is now developing male physical characteristics and is recognized by others as male. (*Id.* ¶ 13). His mother believes that the terrible symptoms of his gender dysphoria will continue to decrease as he continues receiving testosterone as part of his gender-affirming treatment. (*Id.* ¶ 15).

All the appellee-youth were prescribed gender-affirming care only after the risks and benefits were fully explained to them and to their parents who provided informed consent. (Dkts. 26-4 ¶ 13; 26-5 ¶ 9; 26-6 ¶ 14; 26-7 ¶ 10). The appellee-parents have all watched their children suffer greatly from gender dysphoria and have made the informed choice to provide their children with the gender-affirming care that they believe, and their healthcare providers confirm, is medically necessary. (Dkts. 26-4 ¶ 20; 26-5 ¶¶ 16-17; 26-6 ¶¶ 20-22; 26-7 ¶ 5-6, 12, 17). They recognize that denying this care would be extremely harmful and devastating to their children as it would have a cascade of negative consequences: it would undo the physical progress their children have already made; cause the development of the physiological characteristics inconsistent with their children's gender identities, thereby causing severe symptoms of gender dysphoria to return; and, injure their mental health with potentially extremely serious consequences. (Dkts. 26-4 ¶¶ 16-18; 26-5 ¶¶ 15-16; 26-6 ¶¶ 17-18; 26-7 ¶ 16).

Mosaic Health and Healing Arts, Inc. ("Mosaic") is a family medicine practice in Goshen, Indiana, which, in addition to plaintiff Dr. Catherine Bast, employs other licensed healthcare practitioners: two family nurse practitioners and a mental health

counselor. (Dkt. 26-8 ¶ 9). It desires to continue to provide this necessary care for its patients. (*Id.* ¶ 26).

Dr. Bast is a board-certified family care physician and is one of the co-founders of Mosaic, where she provides an array of medical services to her patients, including treatment for youth with gender dysphoria. (Dkt. 26-9 ¶¶ 2-4, 10-12). In providing services to her patients, including puberty blockers and hormone therapy, Dr. Bast utilizes and relies upon the WPATH Standards of Care. (*Id.* ¶ 14). Dr. Bast and Mosaic provide referrals of their patients to other physicians and clinics where they can receive care for various matters, including gender-affirming hormones and puberty blockers, if, for instance, those practitioners are more conveniently located for the patients. (Dkts. 26-9 ¶ 22; 26-8 ¶ 18). If S.E.A. 480 takes effect, Dr. Bast will want—and indeed considers it part of her ethical obligation as a physician—to provide referrals for her patients to out-of-state practitioners so that her patients can continue to receive these treatments; and Mosaic will also wish to make these referrals. (Dkts. 26-9 ¶ 23; 26-8 ¶ 19). And Dr. Bast will want, and is ethically obligated, to cooperate with those out-of-state practitioners by talking to them about her former patients at their request, so that her patients receive continuity of care, and Mosaic will want to similarly cooperate. (Dkts. 26-9 ¶ 24; 26-8 ¶ 20). However, if S.E.A. 480 takes effect Dr. Bast and Mosaic understand that making these referrals, or cooperating with physicians who contact Dr. Bast or Mosaic's other practitioners concerning the patients, is prohibited by the "aiding or abetting" provisions of the statute. (Dkts. 26-9 ¶ 25; 26-8 ¶ 21).

VI.     Procedural history

Appellees filed their Complaint on April 5, 2023, and the next day moved to preliminarily enjoin the law from going into effect. The parties agreed to move forward without an evidentiary hearing, relying instead on their evidentiary submissions. (S.A. 2-3). On June 14, 2023, the district court heard oral argument on the motion.

On June 16, 2023, the district court granted in part the preliminary injunction motion and enjoined S.E.A. 480's prohibitions on gender transition procedures, except the prohibition on gender reassignment surgery,[4] and further enjoined the prohibition on "aid[ing] or abet[ting] another physician or practitioner in the provision of gender transition procedures to a minor" as applied to providing patients with information, making referrals to other medical providers, and providing medical records or other information to medical providers. (S.A. 35).

In doing so, the district court held that heightened scrutiny applied to S.E.A. 480 because sex-based classifications were "central" to and "determinative" of the prohibitions contained therein (*id*. 17, 19), and rejected the State's argument that S.E.A. 480's classifications were based on "age, procedure, and medical condition" (*Id*. 18). Although the court found that the State's proffered interests in protecting children and regulating the medical profession were legitimate, the court held that

---

[4]     In declining to enjoin S.E.A. 480's prohibition on surgery, the court concluded that "no minor could receive gender-transition surgery from a physician or other practitioner in Indiana, regardless of S.E.A. 480," and therefore plaintiffs lacked standing to seek a preliminary injunction as to that prohibition. (S.A. 15). Appellees do not challenge this portion of the order.

S.E.A. 480 lacked the requisite "close means-end fit": "it's not enough for the State's interests to justify *some* regulation of gender transition procedures for minors. Instead, the State's interests must justify S.E.A. 480's *prohibition* of gender transition procedures for minors." (*Id.* 22) (emphasis in original). Defendants filed their notice of appeal on July 11, 2023.

## Summary of the Argument

1.     This Court has held that discrimination based on transgender status is sex discrimination. *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772 (7th Cir. 2023); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Ed.,* 858 F.3d 1034, 1051 (7th Cir. 2017), *abrogation on other grounds recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020). Under established Supreme Court precedent, all sex discrimination is subject to heightened scrutiny, *United States v. Virginia* ("*VMI*"), 518 U.S. 515, 524 (1996), and the burden is on the government to show a "close means-end fit" between the challenged law and important governmental interests. *Sessions v. Morales-Santana*, 582 U.S. 47, 68 (2017).

The district court correctly found that S.E.A. 480 discriminates on the basis of sex as the ability to obtain the otherwise-banned treatment depends entirely on an adolescent's sex designated at birth. As recognized by *Whitaker*, this is a sex-based classification. 858 F.3d at 1051. Unlike the pregnancy exclusion in *Geduldig v. Aiello,* 417 U.S. 484 (1974), S.E.A. 480 is not a neutral listing of excluded physical conditions, but targets those who do not conform to the statute's definition of sex. The statute

does not merely regulate a physical condition that only one sex can experience; instead, it targets certain medical care, "but only when used for gender transition, which in turn requires sex-based classifications." (S.A. 18). On its face, the law targets transgender youth "who fail to conform to the sex-based stereotypes associated with their assigned sex at birth." *Whitaker,* 858 F.3d at 1051.

The district court's well-supported factual findings and the uncontested facts demonstrate that the State is unlikely to meet the requisite heightened scrutiny. The State claims certain opinions of its witnesses as "facts," even though not found as such by the district court. These "facts" are refuted in the record and come nowhere close to establishing that S.E.A. 480 meets the required "exceedingly persuasive justification." *VMI*, 518 U.S. at 531. The district court properly concluded that S.E.A. 480 lacks the requisite "close means-end fit" as it bans widely accepted care that effectively treats adolescents with gender dysphoria, and there are no evidence-based alternatives to this treatment. Indiana made no attempt to tailor its statute, instead opting for a total ban despite evidence, as the district court recognized, of grave consequences for transgender adolescents if the care is banned.

2.     Although not reached by the district court, appellees are also likely to prevail on their due process claim. Due process protects the ability of parents to seek medical care for their children, subject to the professional judgment of physicians. *Parham v. J.R.*, 442 U.S. 584 (1979). S.E.A. 480 impinges upon that fundamental right and there is no justification, let alone a compelling one, for exposing the appellee-youth to the

certainty of harm that will occur if the statute goes into effect and their well-accepted and evidence-based treatment is banned.

3.       The district court also properly held that appellees were likely to succeed in demonstrating that S.E.A. 480's "aiding or abetting" provision, Ind. Code § 25-1-22-13(b), violates the First Amendment. It prohibits practitioners from referring patients for care or discussing that care with other practitioners. This is pure speech, not conduct, and as the district court noted, a state cannot prohibit the dissemination of truthful information about lawful out-of-state alternatives without running afoul of the First Amendment. *See, e.g.*, *Bigelow v. Virginia*, 421 U.S. 809, 829 (1975).

4.       The other requirements for the grant of a preliminary injunction are met. The district court properly noted the evidence of irreparable harm that would occur to the appellee-youth if S.E.A. 480 went into effect and appropriately balanced the preliminary injunction factors.

5.       A statewide injunction is necessary so that the appellee-youth can continue to receive needed medical care, and this Court has recognized that it is not improper to extend an injunction to non-parties, when necessary, both to provide complete relief and to avoid "the chaos and confusion that comes from a patchwork of injunctions." *City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020). This is such a case. Further, the law is facially unconstitutional, and the district court did not abuse its discretion by enjoining its application statewide.

## Argument

I.     Standard of review

"When reviewing the grant of a preliminary injunction, [this Court] review[s] the district court's findings of fact for clear error and its legal conclusions *de novo*." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 957 (7th Cir. 2019) (further citation omitted). The clear error standard applies to factual findings "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). "[This Court] give[s] substantial deference to the court's weighing of evidence and balancing of the various equitable factors." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015) (citations omitted). The balancing of the preliminary injunction factors is reviewed for an abuse of discretion. *Doe v. Univ. of So. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (citation omitted).

II.     The district court properly held that appellees were likely to prevail on their equal protection claim

    A.     The district court correctly concluded that heightened scrutiny applies because the law classifies based on sex

        1.     Under *Whitaker* and *Bostock* discrimination against transgender persons is sex discrimination subject to heightened scrutiny

Both this Court and the Supreme Court have recognized that discrimination based on transgender status is sex discrimination. In *Whitaker*, this Court, in the context of affirming a preliminary injunction, held that a school policy denying a transgender boy the use of boys' restrooms violated equal protection as unlawful sex

discrimination. 858 F.3d at 1051. While cisgender boys were able to use the boys' restrooms, the plaintiff, a transgender boy, was not. This differential treatment represented sex discrimination because "transgender individual[s] do not conform to the sex-based stereotypes of the sex . . . assigned at birth." *Whitaker*, 858 F.3d at 1048. In other words, forcing a transgender person to follow rules inconsistent with their gender identity "punishes that individual for his or her gender non-conformance." *Id.* at 1049. In *Bostock v. Clayton County*, 590 U.S.__, 140 S. Ct. 1731 (2020), a Title VII case, the Supreme Court reasoned that when "a person identified as male at birth" is penalized "for traits or actions that [are] tolerate[d] in [a person] identified as female at birth," the person's "sex plays an unmistakable" role. *Id.* at 1741-42. Because of that, the Court held, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 1741.

This Court recently reaffirmed *Whitaker* in *A.C.,* holding that the plaintiff-students had established a strong likelihood of success on their claim that being barred from the restrooms consistent with their gender identities violated equal protection. 75 F.4th at 773. "Per *Whitaker*'s guidance, [the school's] access policy relies on sex-based classifications and is therefore subject to heightened scrutiny." *Id.* at 773 (citing *Whitaker*, 858 F.3d at 1051). In *A.C.* this Court rejected the argument that *Bostock*'s reasoning was limited to Title VII cases. *Id.* at 769. All the *Bostock* Court said was that it would not "prejudge" future cases, 140 S. Ct. at 1753, but this did not prevent this Court from recognizing that *Bostock'*s reasoning could and should

be applied outside of Title VII. *A.C.*, 75 F.4th at 769. *Bostock*'s reasoning applies beyond the context of Title VII and both *Whitaker* and *Bostock* make clear that Indiana's medical ban classifies based on sex.

All sex-based classifications are subject to heightened scrutiny, requiring the State to demonstrate "an exceedingly persuasive justification" for its differential treatment. *VMI*, 518 U.S. at 533. The State bears the burden of demonstrating that the classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 524 (quotation and citation omitted). As the district court noted, in order to survive this elevated scrutiny there must be a "'close means-end fit.'" (S.A. 24 [quoting *Morales-Santana*, 582 U.S. at 68)]).

### 2. The district court correctly held that S.E.A. 480 classifies on the basis of transgender status and sex

S.E.A. 480 draws lines solely based on a person's transgender status and sex. It allows all medically indicated treatments for cisgender youth, *e.g.*, puberty suppressors to treat precocious puberty or testosterone to treat disorders of sexual development (*supra* at 10), but prohibits the identical pharmacological treatments for gender dysphoria in transgender youth. Under *Bostock* and *Whitaker*, by prohibiting medical treatment only when that treatment is deemed inconsistent with a minor's birth sex, S.E.A. 480 classifies on the basis of sex. The law "unavoidably discriminates against persons with one sex identified at birth and another today." *Bostock*, 140 S. Ct. at 1746. Because the law's prohibition "cannot be stated without referencing sex," the policy creates a sex-based classification for purposes of equal protection.

*Whitaker*, 853 F. 3d at 1051. As the district court correctly concluded, "[i]t's therefore impossible for a medical provider to know whether a treatment is prohibited without knowing a patient's sex. S.E.A. 480's prohibitions therefore 'cannot be stated without referencing sex.'" (S.A. 18 [citing *Whitaker*, 858 F.3d at 1051]). This reliance on "sex-based classifications . . . is therefore subject to heightened scrutiny." *A.C.*, 75 F.4th at 772 (citing *Whitaker*).

Nevertheless, the State argues that the discrimination imposed by S.E.A. 480 is based on age, procedure, and medical condition, not sex. The State's arguments are foreclosed by *Whitaker* and are without merit for a number of reasons.

1. As an initial matter, the State argues that *Whitaker* is not controlling because *Whitaker* did not concern medical regulations. (Appellants' Br. 37). The fact that *Whitaker* did not concern medical regulations does not change its conclusion that when the government draws a line "based upon the sex listed on [a person's] . . . birth certificate," such line-drawing "is inherently based upon a sex-classification and heightened review applies." 858 F.3d at 1051. S.E.A. 480 determines who can obtain certain medical care solely based on the sex listed on their birth certificate. While there may be different justifications for a sex-based classification in the context of medical care, the medical context does not turn a facial sex classification into a facially neutral one. The State confuses the application of heightened scrutiny with the question of whether it is triggered in the first instance.

2. The State further contends that medical regulations based on biological differences do not support a claim of sex discrimination. (Appellants' Br. 37-38). The

State erroneously implies that sex classifications involving physical differences do not trigger heightened scrutiny. (*Id.* at 34). But in support of this claim, the State cites *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464 (1981) and *Nguyen v. INS*, 533 U.S. 53 (2001). In both cases the Supreme Court *applied* heightened scrutiny to sex-based rules involving physical differences. *Michael M.*, 450 U.S. at 468-69; *Nguyen,* 533 U.S. at 60-61. Those applications undermine the State's suggestion that classifications purportedly based on physical differences are exceptions to *VMI*'s command that all sex classifications warrant heightened scrutiny. No such exception exists.

The State argues that heightened scrutiny does not apply here because S.E.A. 480 does not rest on "overbroad generalizations" about men and women. (Appellants' Br. 34). That is wrong for two reasons. First, heightened scrutiny applies whenever there is a sex classification to guard against the possibility that the law rests on overbroad generalizations; again, the State mistakes the triggering of heightened scrutiny with its application. Second, even under the State's mistaken logic, S.E.A. 480 does rest on overbroad generalizations about sex: namely, that all persons will or should have a gender identity that is congruent with their sex assigned at birth.

 While the Supreme Court recognized in *VMI* that "physical differences between men and women . . . are enduring," it went on to hold that heightened scrutiny was appropriate to ensure that such differences not be used to impose "artificial constraints on an individual's opportunity." *VMI*, 518 U.S. at 533. Just as most women did not aspire to attend the Virginia Military Institute, most people have

a gender identity that aligns with their sex assigned at birth. But "estimates of what is appropriate for most [people]" cannot be used to discriminate against those who fall "outside the average description." *Id.* at 550.

Given the unambiguous and unwavering command from the Supreme Court that heightened scrutiny applies to sex classifications, the State turns to *Geduldig v. Aiello*, 417 U.S. 484 (1974) and *Dobbs v. Jackson Women's Health Organization*, 597 U.S.__, 142 S. Ct. 2228 (2022), arguing that medical regulations involving sex are exempt from heightened scrutiny. (Appellants' Br. 34, 37). The district court properly rejected this argument. (S.A. 18). Nothing in *Geduldig* or *Dobbs* changes the general rule that facial sex classifications warrant heightened scrutiny.

The Supreme Court in *Geduldig* held that a state disability insurance program that denied benefits for work loss due to a normal pregnancy, described as "merely . . . one physical condition," did not violate equal protection. 417 U.S. at 496 n.20. The Court stressed that equal protection problems would arise if the classifications based on pregnancy "were mere pretexts designed to effect an invidious discrimination." *Id. Dobbs* ploughs no new ground in this regard, merely reciting that *Geduldig* establishes that absent pretext, "regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny." 142 S. Ct. at 2245-46.

S.E.A. 480 is not a neutral listing of excluded physical conditions, but rather, expressly and exclusively targets only treatment related to gender transition. Ind. Code § 25-2-22-12. *See, e.g., Hecox v. Little*, __F.4th__, 2023 WL 5283127, *11 (9th

Cir. Aug. 17, 2023) (*Geduldig* did not prevent heightened scrutiny being applied to a statute prohibiting transgender women and girls from participating in women's student athletics as "the [statute's] definition of 'biological sex' was designed precisely as a pretext to exclude transgender women from women's athletics—a classification that *Geduldig* prohibits"). The ban on treatment related to gender transition does not "relate[] to sex in some vague sense" or just have a "disparate impact on one sex or another," but rather, "to discriminate on th[is] ground[] requires … intentionally treat[ing] individual[s]…differently because of their sex." *Bostock*, 140 S. Ct. at 1742. Because of this, S.E.A. 480 is not subject to rational basis under *Geduldig*'s logic.

Moreover, S.E.A. 480 is not a simple regulation of a physical condition that only one sex may experience. As noted by the district court, *Geduldig* is inapposite as the statute does "not prohibit certain medical procedures in all circumstances, but only when used for gender transition, which in turn requires sex-based classifications." (S.A. 18). *See also, e.g., Kadel v. Folwell*, 620 F. Supp. 3d 339, 379 (M.D.N.C. 2022), *appeal pending*, No. 22-1721 (4th Cir.) (same); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 999 (W.D. Wis. 2018) (same). Transgender and cisgender youth can both have medical needs to receive the medications used for gender-affirming treatments but the prohibition on access to treatment turns only on an adolescent's sex. A special burden is placed upon those whose gender identity and sex assigned at birth do not align. This is not simply a "regulation of a medical procedure that only

one sex can undergo" but rather a prohibition that facially requires treating adolescents differently because of their sex. *Dobbs*, 142 S. Ct. at 2246.[5]

3.      The State argues that S.E.A. 480 applies equally to both sexes and therefore cannot constitute sex discrimination. (Appellants' Br. 32-33). This, of course, is the precise argument that this Court rejected in *Whitaker*. The school district argued that the challenged policy requiring students to use restrooms consistent with their sex assigned at birth was not violative of equal protection "since it treats all boys and girls the same." 858 F.3d at 1051. This Court flatly rejected this contention, as the policy only treated transgender students "who fail to conform to the sex-based stereotypes associated with their assigned sex at birth differently." *Id.*

The Equal Protection Clause extends its guarantee to "any person," not to groups, and for each individual to know whether treatment is prohibited under S.E.A. 480, one must know a person's sex at birth. As the Eighth Circuit noted in affirming a preliminary injunction against an Arkansas statute that would have prohibited "gender transition procedures" for minors, "[t]he biological sex of the minor patient is the basis on which the law distinguishes between those who may receive certain types of medical care and those who may not." *Brandt v. Rutledge*, 47 F.4th 661, 668, 670 (8th Cir. 2022). If S.E.A. 480 went into effect, any doctor evaluating an adolescent would have to first determine the prospective patient's sex assigned at birth before

---

[5]      The State notes that the *Whitaker* decision is based on a rejection of sex stereotyping, but claims that a gender dysphoria diagnosis is based on a "pernicious form of sex stereotyping." (Appellants' Br. at 38). It is not entirely clear what legal argument the State intends to advance with this claim, but it demonstrates the extreme nature of the State's position and a profound misunderstanding of a recognized and serious diagnosis.

determining whether treatment was prohibited or permitted. The law therefore determines who can and cannot receive treatment based on their sex.

In any event, a statute that contains classifications subject to elevated scrutiny raises equal protection concerns, even if applied even-handedly to both sexes. In *J.E.B. v. Alabama,* 511 U.S. 127 (1994), the Court stressed that the equal protection right to a jury selection process free of sex discrimination "extends to both men and women." *Id.* at 141. *See also, e.g., Loving v. Virginia*, 388 U.S. 1, 9 (1967) ("the fact of equal application does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required"). Relatedly, the State contends that there can be no sex discrimination here because sex discrimination requires that all members of one sex be preferred over another. (Appellants' Br. at 33). Of course, here all cisgender youth are preferred over transgender youth, and this is precisely the discrimination that *Whitaker* concluded was sex discrimination.

4.      The recent decisions from the Sixth and Eleventh Circuits applying rational basis review to similar laws are neither binding on this Court nor persuasive. *See Eknes-Tucker v. Governor of Alabama*, __F.4th__, 2023 WL 5344981, *15-16 (11th Cir. Aug. 21, 2023) (applying rational basis review to similar law in Alabama); *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023) (divided panel decision applying rational basis review to similar law in Tennessee in an emergency stay application). Much more persuasive is the Eighth Circuit's application of heightened scrutiny to a similar Arkansas statute:

> Arkansas's characterization of the Act as creating a distinction on the basis of medical procedure rather than sex is unpersuasive. Arkansas argues that administering testosterone to a male should be considered a different procedure than administering it to a female because the "procedure allows a boy to develop normally" whereas for a girl it has the effect of "disrupting normal development." But this conflates the classifications drawn by the law with the state's justification for it.

*Brandt*, 47 F. 4th at 669-70. The law was subject to heightened scrutiny as sex discrimination because an adolescent's sex determined whether the medical care could be received. *Id.* at 670.

The Eighth Circuit cited *Whitaker*'s holding that when a decision is based on the sex listed on a youth's birth certificate, it "'is inherently based upon a sex-classification and heightened review applies.'" *Id.* at 670 (quoting *Whitaker*, 47 F. 4th at 670). Neither *Eknes-Tucker* nor *Skrmetti* mentions *Whitaker*, which is not surprising as the cases cannot be reconciled with each other. In *A.C.* this Court recognized that there was a circuit split on the question of school restroom access for transgender students with this Circuit and the Fourth Circuit on one side and the Eleventh Circuit on the other. 75 F.4th at 771. The Court adhered to *Whitaker*, noting that none of the factors that would justify overruling circuit precedent applied, and therefore "[i]t makes little sense for us to jump from one side of the circuit split to another." *Id.* (citing *Buchmeier v. United States*, 581 F.3d 561, 566 (7th Cir. 2009) (en banc)). Nothing has changed and *Whitaker* continues to compel the conclusion that S.E.A. 480 discriminates based on sex.[6]

---

[6] The district court did not see the need to address appellees' alternative argument that S.E.A. 480 is subject to heightened scrutiny because it represents discrimination against transgender persons who must be deemed to be members of a quasi-suspect class. (Dkts. 27 at 20-22; 59 at 18 n.10). Given the above, there is no need for this Court to address this issue.

[32]

B.    The district court correctly concluded that S.E.A. 480 was not likely to
      survive heightened scrutiny

    1.    The State inappropriately ignores the governing standard for the
      grant of a preliminary injunction, and the uncontested facts and
      facts found by the district court support its holding

Having properly held that S.E.A. 480 classifies based on sex, the district court

correctly concluded that the State had not carried its burden of demonstrating that

the total prohibition on gender-affirming care for minors "serves important

governmental objectives and that the discriminatory means employed are

substantially related to the achievement of these objectives." *VMI,* 518 U.S. at 533.

(S.A. 21-27). The State argues that it carried the heavy burden of demonstrating an

"exceedingly persuasive justification" but does so by relying not on the district court's

factual findings but on its own one-sided recitation of contested facts. As noted above

(*supra* at 11-14) and below (*infra* at 34-37), the State's presentation of "facts" is made

through proffered experts who have no or little relevant expertise and hold opinions

far out of the mainstream, which are contradicted by research and clinical experience.

However, there is no need to wade through the State's factual assertions. As

the district court recognized, a preliminary-injunction movant need demonstrate only

a likelihood of success on the merits, which requires not that the movant prove its

---

However, as noted by numerous courts, discrimination against transgender persons is subject
to heightened scrutiny as discrimination against a quasi-suspect classification. *See, e.g.,
Grimm v. Gloucester Sch. Bd.,* 972 F.3d 586, 613 (4th Cir. 2020); *Karnoski v. Trump,* 926 F.3d
1180, 1201 (9th Cir. 2019); *Ray v. McCloud,* 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020); *M.A.B.
v. Bd. of Ed. of Talbot Co.,* 286 F. Supp. 3d 704, 719-21 (D. Md. 2018); *F.V. v. Barron,* 286 F.
Supp. 3d 1131, 1145 (D. Idaho 2018); *Evancho v. Pine-Richland School Dist.,* 237 F. Supp. 3d
267, 289 (W.D. Pa. 2017); *Adkins v. City of New York,* 143 F. Supp. 3d 134, 139 (S.D.N.Y.
2015). *Contra, Eknes-Tucker,* 2023 WL 5344981, at *17.

claims by a preponderance, but rather provide a demonstration of how "it proposes to prove the key elements of its case." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). Appellees plainly adduced sufficient evidence to meet this standard. In addition to their experts' well-supported opinions regarding the safety and efficacy of the gender-affirming care banned by S.E.A. 480, appellees demonstrated without dispute that (a) the prohibited care is the treatment recognized and supported by numerous medical and mental health organizations in the United States (*supra* at 8; Appellants' Br. at 17), (b) gender-affirming care is well-studied and there is no alternative treatment for gender dysphoria (*supra* at 8-9), (c) "there's evidence that puberty blockers and cross-sex hormone therapy reduces distress for some minors diagnosed with gender dysphoria" (S.A. 30), (d) the care continues to be legal in the European countries upon which the State places so much emphasis (*supra* at 11), (e) the care is provided in Indiana only after parents are fully informed of the potential risks of the treatment and provide their consent (*supra* at 7, 17), (f) there is "evidence of risks to minors' health and wellbeing from gender dysphoria if those treatments can no longer be provided to minors—prolonging of their dysphoria, and causing additional stress and health risks, such as depression, posttraumatic stress disorder, and suicidality" (S.A. 24-25), and (f) the care has certainly benefitted the appellee-youth (*supra* at 14-17).

Rather than proceeding directly to trial and asking the district court to resolve any factual disputes necessary to reach a final determination on the merits, the State instead chose to appeal the preliminary injunction. Having made that litigation

decision, it may not now urge reversal by pretending that no facts exist except the opinions they present as "fact." Given the abundant record the district court properly held that appellees are likely to succeed on the merits of their claim. (S.A. 25).

> 2. The record supports the district court's conclusion that the State cannot show the required "exceedingly persuasive" justification for its sweeping, categorical ban on care

The State argues the Act is justified by the need to protect children. However, heightened scrutiny requires more than articulating an interest. The State must establish that the statute is substantially related to achieving that interest. *VMI*, 518 U.S. at 524. Although, as noted above, there is no need to delve into the State's "facts," its claims are rebutted by ample evidence in the record and come nowhere close to meeting the required demanding burden.

<u>Side effects.</u>     The State attempts to justify the ban by claiming that gender-affirming medical care has harmful side effects. (Appellants' Br. 43-44). The record makes clear that the risks and side effects—including those related to cardiovascular health and bone density—are rare or easily managed when treatment is provided under a clinician's supervision. (Dkt. 26-2 ¶¶ 67-68, 74-75). Indeed, all medicine carries risk of potential side effects and there is nothing uniquely risky about the care provided to transgender minors to treat gender dysphoria when compared to any other types of healthcare. All of the endocrine treatments prohibited by S.E.A. 480 are used to treat other conditions in adolescents and carry comparable risks and side effects, regardless of why they are prescribed. (Dkts. 26-2 ¶¶ 55, 59-60, 66-68, 74-75, 77; 26-3 ¶¶ 18, 30; 58-2 ¶ 43).

The State claims that the law is justified because of the banned treatment's potential impact on fertility. However, S.E.A. 480 is both over- and under-inclusive with respect to concerns about fertility: it bans puberty delaying treatment, even though it does not affect fertility, but explicitly permits surgical treatment for "medically verifiable disorder[s] of sex development," Ind. Code § 25-1-22-5(b)(1), even though the treatment may have fertility consequences, and says nothing about numerous other medical interventions with known or potential effects on future fertility. (Dkts. 26-2 ¶¶ 56, 69-71; 58-3 ¶¶ 31-33).

Evidence base.     The State attempts to justify the ban by claiming that the efficacy of gender-affirming medical care is unsupported by randomized clinical trials. (Appellants' Br. at 43-44). Such studies are not ethical in this area and would not be approved. (Dkt. 58-4 ¶ 7). Numerous other studies have demonstrated the effectiveness of gender-affirming hormones and puberty-delaying treatment to treat gender dysphoria. (*Supra* at 8). And this is the only evidence-based and effective treatment available. (*Supra* at 9).

The State fails to explain why gender-affirming medical care alone should be singled out for a uniquely high evidentiary standard of efficacy. The evidence supporting the safety and efficacy of the banned care is comparable to the evidence supporting treatment of other conditions, but only treatment for gender dysphoria in adolescents is banned. (*Supra* at 10).

Regret.     The State attempts to justify the ban by claiming that hormone therapy causes "permanent" changes and "sets the stage for profound regret among

[36]

minors who later detransition." (Appellants' Br. 43-44, 48). But not all of the banned treatments are irreversible: puberty blockers are fully reversible. (*Supra* at 7). Moreover, this is not a principled basis to single out gender-affirming medical care: most surgeries and many other medical interventions are also irreversible, but they are not banned. The State's purported concern with irreversibility relates to its argument that it has an interest in preventing regret, but detransition and regret are extraordinarily rare and far less common than for other medical interventions. (*Supra* at 10). Nor is there any evidence that providing gender-affirming medical care causes youth with gender dysphoria who would otherwise desist to, instead, persist. (*Supra* at 11).

The State claims that all care must be banned because of the "difficulty with determining ex ante *which* minors might benefit" or which minors will persist or desist in their gender dysphoria. (Appellants' Br. 47). But the State still has no explanation for "why uncertainty about a gender-dysphoria diagnosis or about how long gender dysphoria may persist leaves the State without more tailored alternatives" than the ban. (S.A. 26). All that the State can suggest is a denial of care and "watchful waiting" that will inevitably cause severe distress and harm. (*Supra at* 9).[7]

---

[7]    The State's purported concern with determining which minors "really" require care long-term presumes a lack of rigorous assessments for gender dysphoria (totally unsupported by the record) and the imagined problem of "social contagion," (Dkt. 58-4 ¶¶ 21-26), for which there is no evidence. Moreover, the "rapid onset gender dysphoria" (that the State claims may confound which minors really have gender dysphoria) is another invented phenomenon and not a recognized mental health condition: it was a term popularized in 2018 in a (since corrected) article based on an anonymous survey of parents of transgender youth, recruited from websites promoting the "social contagion" theory. (*Id.* ¶¶ 22-24). To the extent that the

> 3. The district court properly concluded that the prohibition on gender-affirming care lacks the requisite "close means-end fit"

Appellees do not disagree with the general proposition that a state has a legitimate interest in protecting children through regulation of the medical profession. But the State fell far short of establishing that the total ban on care satisfies the "close means-end fit" with this interest as is "required to survive heightened scrutiny." *Morales-Santana,* 582 U.S. at 68.

There is not an "exceedingly persuasive" justification for the "differential treatment" meted out by S.E.A. 480. *VMI,* 518 U.S. at 532-33. The statute bans effective care that is recognized by major medical organizations, while leaving no evidence-based alternatives for the appellees. Even accepting the State's "facts," all they establish is that there may be some degree of risk attendant to gender-affirming care—the degree and precise nature of which the State is unsure of and appellees dispute. But all treatments carry risk, which is why informed consent is necessary. *See, e.g.*, *Spar v. Cha*, 907 N.E.2d 974, 984 (Ind. 2009) (discussing physicians' obligation to provide informed consent). The State does not explain how the informed consent process that is undisputedly engaged in by the appellee-youth's physicians fails to address the potential for risks and fails to safeguard the youth. Given this, the mere possibility of uncertain risk does not satisfy the "close means-end fit"

---

State's actual concern is inappropriate diagnosis, there are more tailored ways to address that concern than a categorical ban. For example, West Virginia requires two independent gender dysphoria diagnoses before providing gender-affirming medical care to adolescents. *See* W. Va. Code Ann. § 30-3-20(c)(5)(A).

.

requirement inasmuch as the State must demonstrate that ban is substantially related to its asserted goal of protecting children. *VMI,* 518 U.S. at 533. This is particularly true given that the banned interventions provided as part of gender-affirming care have been found to be safe when provided to cisgender youth for other reasons. Moreover, focusing solely on the risk of possible harm ignores the district court's findings as to the much more immediate risks to the appellee-youth attendant to the prohibition of gender-affirming care. (S.A. 24-25).

Nevertheless, the State argues, citing *Dobbs,* that it can erect a categorical ban to further its interest in protecting children and that courts must defer to legislative judgment on the matter. (Appellants' Br. 45 ). To the extent that any deference is owed in the absence of legislative findings, deference does not mean that the legislative judgments "are insulated from meaningful judicial review altogether." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994). The State must satisfy the requisite elevated scrutiny. To demonstrate the "close means-end fit," the State must do more than simply say it has the right to deny care—particularly where the banned intervention is the standard of care for the treatment of gender dysphoria for minors and where the State does not dispute that this care is greatly benefitting the appellee-youth.

In the district court, and again here, the State points to its characterization of the "European" response to gender-affirming care. (S.A. 26-27; Appellants' Br. 20-24). But as the district court highlighted, while is true that the European countries selectively chosen by the State have identified certain requirements for obtaining

treatment, and some are conducting reviews, "no European country that conducted a systematic review responded with a ban on the use of puberty blockers and cross-sex hormone therapy as S.E.A. 480 would." (S.A. 26). In the meantime, all of these countries are continuing to allow necessary treatment. "In short, these European countries all chose less-restrictive means of regulation." (S.A. 27). The State eschewed this more tailored approach. But, as the district court concluded, the State cannot do so and satisfy heightened scrutiny.

The district court acknowledged that appellees have presented evidence of the grave consequences that may arise if the appellee-youth are not allowed to receive gender-affirming care—depression, posttraumatic stress disorder, and suicidality—and that there is evidence that the banned treatment is effective. (S.A. at 24-25, 30). It is clear that the appellee-youth suffer from a serious medical condition, gender dysphoria, which by definition "is associated with clinically significant distress or impairment." (*Id.* at 3). The State does not explain how prohibiting medical care with no evidence-based medical alternative is a close means-end fit to the avowed purpose of protecting children.

The district court correctly concluded that appellees had established some likelihood of success on the merits of their equal protection claim.

C.    S.E.A. 480 fails any level of review.

Although the ban is subject to heightened scrutiny, it ultimately fails any level of review. There is no rational basis to conclude that allowing adolescents with gender dysphoria to receive gender-affirming medical care that they, their parents, and their

doctors agree is medically necessary "would threaten legitimate interests of [Indiana] in a way that" allowing other types of care "would not." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *see also Eisenstadt v. Baird*, 405 U.S. 438, 450-51 (1972) (health risks of birth control pills not a rational basis for banning access for unmarried people versus married people). Even under rational basis review, the justifications for the ban "ma[k]e no sense in light of how the [statute] treat[s] other [procedures] similarly situated in relevant respects." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001). The prohibition on all types of gender-affirming medical care is "so far removed from [the asserted] justifications that . . . it [is] impossible to credit" those interests as the true motivation for the law. *Romer v. Evans*, 517 U.S. 620, 635 (1996).

III.    Appellees are likely to prevail on their due process claim

This Court may affirm the district court "on any ground that the record supports and that the appellee has not waived." *Huston v. Hearst Comms., Inc.*, 53 F.4th 1097, 1100 (7th Cir. 2022) (quotation and citation omitted). Although the district court did not find it necessary to rule on appellee-parents' due process claim, this Court may do so now if necessary.

The Due Process Clause of the Fourteenth Amendment not only protects rights that are explicit in the Constitution but also those that are "deeply rooted in [our] history and tradition" and that are "essential to our Nation's scheme of ordered liberty." *Dobbs*, 142 S. Ct. at 2246 (quotation and citation omitted) (alteration by the Court). For the past century, the Supreme Court has recognized that the "liberty"

protected by due process includes the right to "establish a home and bring up children." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). Since *Meyer*, the Court has decided an unbroken chain of cases recognizing that "the interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (citing cases).

In *Parham v. J.R.*, 442 U.S. 584 (1979), the Court held that parents, in the context of seeking voluntary psychiatric commitment of their children, have the "plenary authority to seek such care for their children, subject to a physician's independent medical examination and medical judgment." *Id.* at 604. It is true that a substantive due process right must be defined in a manner "that is specific and concrete [and] avoids sweeping abstractions and generalities." *Doe v. City of Lafayette, Ind.*, 377 F.3d 757, 769 (7th Cir. 2004) (en banc). However, the Supreme Court's recognition in *Parham* that the "plenary authority" of a parent to seek medical care for their child includes the ability to make decisions concerning obtaining "a tonsillectomy, appendectomy, or other medical procedure," 442 U.S. at 603, firmly ensconces the right to obtain medical care, subject to a physician's independent judgment, as a right guaranteed to a parent by due process.

S.E.A. 480 impinges upon this fundamental right. In rejecting this argument the Eleventh Circuit in *Eknes-Tucker* determined that there is no Supreme Court case recognizing a specific due process right of parents to treat their children with "transitioning medications." 2023 WL 5344981, at *12-*13. The Sixth Circuit in

*Skrmetti* concluded that there is no due process right for the parents to obtain "new medical or experimental drug treatments" for their children. 73 F.4th at 417.

But the Supreme Court need not have individually recognized the particular medical treatment at issue for the fundamental right to be impinged upon. Such microscopic specificity is not warranted and would render the right meaningless. The question is not whether due process protects a right to a specific medical procedure, but simply whether it protects the fundamental right of parents, rather than the State, to make medical decisions for their children. *Parham* supplies the answer. *See also, e.g., Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (noting that due process "includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state"); *Brandt v. Rutledge*, __F. Supp. 3d __, 2023 WL 4073727, at *36 (E.D. Ark. June 30, 2023) (same, but specifically concerning gender-affirming care), *appeal pending*, No. 23-2681 (11th Cir.).

As a fundamental right, the ability of the parent to consent to medical care for their child cannot be infringed "unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (citations omitted). Under that "strict scrutiny," the State bears the heavy burden to establish both narrow tailoring and a compelling state interest. *See, e.g., Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015). The State has come nowhere near establishing that any of the treatments at issue are so unacceptably dangerous that the State has a compelling interest in categorical prohibition, or that a complete ban

furthers a compelling interest in protecting children. At most the State's evidence points to the possibility of risks, but the existence of "risk does not automatically transfer the power to make [the healthcare] decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. And as the district court recognized, appellees presented evidence demonstrating that, far from protecting the appellee-youth, denying this treatment will expose them to serious "additional distress and health risks." (S.A. 25). There is no compelling state interest that justifies exposing the youth to these harms. And given that the statute does not satisfy the "intermediate" tailoring required of sex-based classifications, it certainly does not satisfy the narrow tailoring required by strict scrutiny.

"[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel,* 530 U.S. at 68-69. Yet this is precisely what S.E.A. 480 does, and it violates the parents' fundamental rights to dictate "the care, custody, and control of their children." *Id*. at 65.

IV.    The district court correctly held that appellees were likely to prevail on their First Amendment claim as the statute's "aid-or-abet" provision prohibits speech

S.E.A. 480 prohibits physicians or practitioners from "aid[ing] or abet[ting] another physicians or practitioner in the provision" of gender-affirming care. Ind. Code § 25-1-22-13(b). The State does not dispute that this aid-or-abet provision prohibits Dr. Bast and Mosaic from referring patients to other qualified practitioners

or even from cooperating with other providers by producing patient records or taking other steps to ensure continuity of care. (Dkts. 26-8 at 4-5, 26-9 at 4-5). This is pure speech and the Act is a content-based regulation of speech, and as such, it is subject to strict scrutiny, *see, e.g.*, *Reed*, 576 U.S. at 163-64, and the State's cursory argument that a prohibition on the dissemination of truthful information can meet this exacting standard does not carry the day. *See, e.g.*, *Bigelow v. Virginia*, 421 U.S. 809, 829 (1975) (holding that a Virginia law prohibiting encouraging the procuring of an abortion violated the First Amendment when applied to a Virginia newspaper advertising the availability of abortions in New York).[8] The district court properly held that appellees were likely to prevail on their claim that the provision is unconstitutional.

Relying almost exclusively on *United States v. Hansen*, 599 U.S 762, 143 S. Ct. 1932 (2023), the State's primary response is to say that the aid-or-abet provision is a regulation of conduct with only an incidental impact on speech. (Appellants' Br. 48-

---

[8]     The importance of gender-affirming care to minors' physical and mental health, and the flaws in the State's contention that a ban on this care is necessary to protect Hoosier children, has been detailed above. Almost as importantly, the Supreme Court in *Bigelow* held a state's interest in shielding its citizens from information about legal out-of-state medical services that is not "deceptive or fraudulent" and that does not "further[] a criminal scheme in the state" to be "entitled to little, if any, weight." 421 U.S. at 828. As there, Indiana is impermissibly "advancing an interest in shielding its citizens from information about activities outside [its] borders, activities that [its] police powers do not reach." *Id.* at 827-28.

On top of this, the aid-or-abet provision is not narrowly tailored. Information about minors' options for obtaining gender-affirming care is available from a wide variety of sources, but Indiana has prohibited the dissemination of this information from only the persons most qualified to do so. And it has gone so far as to prohibit doctors from sharing vital information such as patient medical histories with out-of-state providers treating children. It is not enough under strict scrutiny for the State to say that it wants to protect minors when the statute prohibits the provision of medical information that will safeguard the treatment of the minors.

49). This argument cannot be reconciled with *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), which addressed a federal prohibition on the provision of "material support or resources to a foreign terrorist organization." Given that the prohibited activity "most often does not take the form of speech at all," the government in *Holder*, like the State here, contended that "the only thing truly at issue [was] conduct" and that any burden on speech was merely incidental to the statute's regulation of conduct. *Id.* at 26. The Supreme Court unequivocally rejected this argument: "The law here may be described as directed at conduct . . . but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." *Id.* at 28. So too here. Indeed, it would be shocking if a state could ban speech activity simply by also banning non-speech activity. That, however, is the crux of the State's argument.

*Hansen* is not to the contrary. The Supreme Court there first concluded that the terms "encouraging" and "inducing," as used in a federal statute prohibiting a person from "encourag[ing] or induc[ing]" unlawful immigration, were used "in [their] specialized, criminal-law sense—that is, as incorporating common-law liability for solicitation and facilitation." 143 S. Ct. at 1942. Given this, "[t]o the extent that [they] reache[d] *any* speech," they reached only "speech integral to unlawful conduct." *Id.* at 1947 (emphasis in original). The same cannot be said here. A transgender minor who receives gender-affirming care in Illinois or Michigan is violating no law, and so Mosaic's referral to a provider in one of these states, while certainly integral to the minor's health and well-being, is not "integral to unlawful conduct." The State ignores

[46]

this distinction.[9]

It is not clear why the State believes that the district court's First Amendment holding depends on its conclusion that Indiana cannot prohibit gender-affirming care. (Appellants Br. 49). It does not: as the Supreme Court made clear in *Bigelow*, 421 U.S. at 827-29, the right to share information about legal options for obtaining medical care does not rise and fall on whether a state can prohibit that care within its borders. The State has no answer for this case.

V.    The district court did not abuse its discretion in holding that the other requirements for the grant of a preliminary injunction were met

The district court correctly held that that the other requirements for a preliminary injunction were met: that (1) appellees would suffer irreparable harm without an injunction; (2) the issuance of an injunction was in the public interest; and (3) the balance of harms favored the plaintiffs. (S.A. 30-32).

The State erroneously claims that "[c]onsiderations of equity and the public interest foreclose the injunction." (Appellants' Br. 49). The State cannot demonstrate clear error merely by rehashing its contentions regarding the risks of gender-affirming medical treatment: the district court found "there's evidence that puberty blockers and cross-sex hormone therapy reduces distress for some minors diagnosed with gender dysphoria," which requires "clinically significant distress" to diagnose.

---

[9]    Although the State does not acknowledge as much, its conduct-versus-speech distinction only affects the level of scrutiny that this Court must employ. Under *United States v. O'Brien*, 391 U.S. 367 (1968), a regulation of conduct that incidentally burdens expression still must satisfy intermediate scrutiny. *See Holder*, 561 U.S. at 26-27. A prohibition on the dissemination of truthful information about legal options for obtaining medical care cannot satisfy any test. As noted, the *Bigelow* Court held any asserted state interest in such a prohibition to be "entitled to little, if any, weight." 421 U.S. at 828.

(S.A. 30). Nor was there any clear error in the district court's finding that there was evidence that withholding treatment to adolescents would "prolong[] . . . their dysphoria, and caus[e] additional distress and health risks, such as depression, posttraumatic stress disorder, and suicidality." (S.A. 25). These severe harms are irreparable and are amply supported by the record. Moreover, the violation of a constitutional right is itself an irreparable harm. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).

The district court explicitly concluded that the State's interest in enforcing this law was diminished when weighed against the strength of the plaintiffs' likelihood of success on the merits. (S.A. 31). This is the balancing required, and the court did not abuse its discretion in any of those findings.

VI. **The scope of the preliminary injunction entered by the district court was not an abuse of discretion**

The district court did not abuse its discretion by enjoining statewide enforcement of the law. A statewide injunction is necessary to provide complete relief to the appellees. S.E.A. 480 bars providers from treating patients, pharmacists from filling prescriptions, and providers from making referrals. Without a facial injunction, three of the adolescent appellees—those not receiving care at Mosaic— would immediately not be able to receive care and all of the youth might not be able to receive the medications that they need.

Additionally, this Court has recognized not only the long history of awarding equitable relief that extends beyond the parties, but also that the Supreme Court's pronouncements on the subject have "put to rest any argument that the courts lack

[48]

the *authority* to provide injunctive relief that extends to non-parties." *City of Chicago v. Barr*, 961 F.3d 882, 915-16 (7th Cir. 2020) (citing *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017)) (emphasis in original).

Rather than contend with *City of Chicago*, the State mischaracterizes this Court's vacatur of a permanent injunction in *Doe v. Rokita*, 54 F.4th 518, 519 (7th Cir. 2022) as establishing that "a district court may not grant relief to persons other than the named plaintiffs where a case has not been certified as a class action." (Appellants' Br. at 51). Of course, such a holding would have necessitated overruling *City of Chicago,* which this Court did not do. The Court merely articulated that a permanent injunction "should be no greater than necessary to protect the rights of the prevailing litigants." *Doe*, 54 F.4th at 519. The same is true in the context of a preliminary injunction—is the scope of the injunction appropriate under the circumstances?

Whether an injunction is sufficiently tailored must be determined in an individual case. *City of Chicago,* 961 F.3d at 916. An injunction that applies beyond the parties "can be necessary to provide complete relief to plaintiffs, to protect similarly-situated nonparties, and to avoid the chaos and confusion that comes from a patchwork of injunctions." *Id.* at 916-17 (citation and quotation omitted). This is clearly such a case: Indiana has enacted a statute that applies identically to all covered practitioners and all minors with gender dysphoria, the existence of whom the State does not appear to dispute. The failure to issue a statewide injunction would surely cause Indiana's federal courts to become inundated with similar suits,

[49]

resulting in precisely the "patchwork of injunctions" this Court cautioned against. *Id.* at 916-17.

The administrative concerns about a patchwork of injunctions and the pending class certification bolster the propriety of the scope of relief below. As set forth in appellees' briefing seeking class certification, there are hundreds, if not thousands, of persons who could bring identical suits. (Dkt. 28 at 4-5). Indeed, Mosaic—a small community healthcare provider—alone treats 72 minor patients receiving care banned by S.E.A. 480. (S.A. 7-8). There was nothing erroneous about the district court's determination that its injunction was necessary under such circumstances. (S.A. 32-33).

Further, the State cannot argue that appellees' pending motion for class certification detracts from the district court's authority to provide statewide relief when the State itself requested that the district court hold the motion until after the preliminary injunction proceeding. Although appellees moved to certify this matter as a class action on the same day that they moved for a preliminary injunction and timely filed their memorandum in support, the State responded by moving to stay any consideration of the class-certification issue. (*Compare* Dkts. 9, 10, and 28 *with* Dkt. 29). As the district court emphasized in its injunction order, in seeking that stay (based on the workload of State's counsel [Dkt. 29 at 3-4]), the State never disclosed that it would then oppose any preliminary injunctive relief extending beyond the named plaintiffs, nor explained "why it [is] appropriate to file such a motion to stay and then raise [its] view of the scope of available relief for the first time more than a

month later in [its] preliminary-injunction response brief." (S.A. 33, fn. 8 [citing Dkt. 29]). The State cannot have it both ways: it cannot impede class certification and then argue that the lack of progress forecloses broader relief.

Finally, there is no merit to the State's separate argument that a facial injunction is improper because there are "some circumstances" in which the statute "passes constitutional muster," or because medical interventions are not clinically indicated for every minor diagnosed with gender dysphoria. (Appellants' Br. 52-53 [citing, *inter alia*, *United States v. Salerno*, 481 U.S. 739 (1987)]). Because S.E.A. 480 fails heightened scrutiny—*i.e.*, there is no close means-end fit between its sex classification and the State's purported interests—there is "no set of circumstances" where the ban is valid. *Salerno*, 481 U.S. at 745. "In a facial challenge like this one, the claimed constitutional violation inheres in the terms of the statute, not its application." *Ezell,* 651 F.3d at 698. That is, the means employed by the legislature—categorically banning care—are not more closely tailored to their purported interests depending on the factual circumstances. A facial injunction is warranted and the district court did not abuse its discretion.

## Conclusion

For all of the above reasons, the preliminary injunction should be affirmed.

Kenneth J. Falk
*Counsel of Record*
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202

317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Chase Strangio
Harper Seldin
American Civil Liberties Union
125 Broad Street
New York, NY 10004
212/549-2500
cstrangio@aclu.org
hseldin@aclu.org

Attorneys for Appellees

## Certificate of Compliance

1.    This document complies with the type-volume limitation of Circuit Rule 32(c) because this document contains 13,976 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.    This document complies with the type-face requirements of Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has prepared using Microsoft Word in Century Schoolbook font with the text in 12-point font and the footnotes in 11-point font.

Kenneth J. Falk
Attorney at Law