No. 23-2366

## UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

K.C., ET AL.,
*Plaintiffs-Appellees*,

v.

INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD OF INDIANA, ET AL.,
*Defendants-Appellants.*

On Appeal from the U.S. District Court for the Southern District of Indiana
No. 1:23-cv-00595-JPH-KMB,
The Honorable James P. Hanlon, Judge

## BRIEF OF AMICI CURIAE STATE OF CALIFORNIA AND 19 OTHER STATES SUPPORTING PLAINTIFFS-APPELLEES AND AFFIRMANCE

ROB BONTA
Attorney General of California
RENU R. GEORGE
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
STEPHANIE T. YU
NIMROD PITSKER ELIAS
LILY G. WEAVER
NATALIE TORRES
Deputy Attorneys General
STATE OF CALIFORNIA
OFFICE OF THE ATTORNEY GENERAL
1515 Clay Street, Oakland CA 94612
(510) 879-0011
Kathleen.Boergers@doj.ca.gov

September 27, 2023

*Attorneys for Amici Curiae State of California*

## TABLE OF CONTENTS

INTERESTS OF AMICI CURIAE ............................................................. 1

ARGUMENT ........................................................................................... 2

    I.    Restricting Access to Gender-Affirming Medical Care Significantly Harms Transgender Minors ........... 2

    II.   Amici States' Laws and Policies Promote Access to Gender-Affirming Medical Care Based on Established Medical Standards .................................... 7

    III.  The Ban Violates the Equal Protection Clause .......... 10

        A.    Heightened Scrutiny Applies............................ 11

        B.    The Ban Does Not Satisfy Heightened Scrutiny............................................................ 21

        C.    Alabama's Arguments are Flawed .................... 28

CONCLUSION..................................................................................... 33

# TABLE OF AUTHORITIES

Cases

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*
    75 F.4th 760 (7th Cir. 2023) ........................................................ 11, 13

*Bostock v. Clayton Cnty., Georgia*
    140 S.Ct. 1731 (2020) .................................................................. 13, 16

*Brandt ex. rel. Brandt v. Rutledge*
    47 F.4th 661 (8th Cir. 2022) ........................................................ 11, 31

*Brandt v. Rutledge*
    551 F.Supp.3d 882 (E.D. Ark. 2021) .................................................. 27

*Brandt v. Rutledge*
    No. 4:21-CV-00450 JM, 2023 WL 4073727 (E.D. Ark. June
    20, 2023) ............................................................................................ 31

*Bray v. Alexandria Women's Health Clinic*
    506 U.S. 263 (1993) ........................................................................... 18

*Davis v. Guam*
    932 F.3d 822 (9th Cir. 2019) ............................................................. 20

*Dekker v. Weida*
    No. 4:22-CV-325-RH-MAF, 2023 WL 4102243 (N.D. Fla.
    June 21, 2023) ................................................................................... 31

*Dobbs v. Jackson Women's Health Org.,*
    142 S.Ct. 2228, 2268, 213 L. Ed. 2d 545 (2022)) ........................... 25, 26

*Doe 1 v. Thornbury*
    No. 3:23-CV-230-DJH, 2023 WL 4230481 (W.D. Ky. June
    28, 2023) ............................................................................... *passim*

*Doe v. Ladapo*
    No. 4:23-cv-114-RH-MAF, 2023 WL 3833848 (N.D. Fla.
    June 6, 2023) ......................................................................... *passim*

*Eknes-Tucker v. Governor of Alabama*
    No. 22-11707, 2023 WL 5344981 (11th Cir. Aug. 21, 2023) ............... 11

*Eknes-Tucker v. Marshall*
    603 F.Supp.3d 1131 (M.D. Ala. 2022) ................................................. 17

*Gonzales v. Carhart*
    550 U.S. 124 (2007) .......................................................................... 26

*Griffin v. Sisters of Saint Francis, Inc.*
    489 F.3d 838 (7th Cir. 2007)............................................................. 20

*Grimm v. Gloucester Cnty. Sch. Bd.*
    972 F.3d 586 (4th Cir. 2020)........................................................ 11, 17

*Gustovich v. AT&T Comms., Inc.*
    972 F.2d 845 (7th Cir. 1992)............................................................. 20

*Hecox v. Little*
    No. 20-35813, 2023 WL 5283127 (9th Cir. Aug. 17, 2023) ......... *passim*

*Ill. Republican Party v. Pritzker*
    973 F.3d 760 (7th Cir. 2020)............................................................. 13

*K.C. v. Individual Members of the Medical Licensing Board*
    *of Indiana*
    No. 1:23-cv-00595-JPH-KMB, 2023 WL 4054086 (S.D.
    Ind. June 16, 2023)....................................................................... *passim*

*L.W. ex rel. Williams v. Skrmetti*
    73 F.4th 408 (6th Cir. 2023) ............................................................. 11

*L.W. ex rel. Williams v. Skrmetti*
    No. 3:23-CV-00376, 2023 WL 4232308 (M.D. Tenn. June
    28, 2023)....................................................................................... *passim*

*McMain v. Peters*
    No. 2:13-CV-01632-AA, 2018 WL 3732660 (D. Or. Aug. 2,
    2018) ................................................................................................. 29

*McWright v. Alexander*
    982 F.2d 222 (7th Cir. 1992)..........................................................18, 19

*Smith v. City of Salem*
    378 F.3d 566 (6th Cir. 2004).................................................................17

*Titus v. Aranas*
    No. 3:18-CV-00146-MMD-CLB, 2020 WL 4248678 (D.
    Nev. June 29, 2020)...............................................................................29

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1
    Bd. of Educ.*
    858 F.3d 1034 (7th Cir. 2017).................................................13, 15, 17

STATUTES & REGULATIONS

63 Pa. Cons. Stat. § 422.1 et seq. ............................................................22

63 Pa. Cons. Stat. § 422.41........................................................................22

Cal. Bus. & Prof. Code § 2000 et seq. .....................................................22

Cal. Bus. & Prof. Code § 2220 et seq .......................................................22

D.C. Code § 3–1205.14...............................................................................22

Ind. Code Ann. § 25-1-9-4 .........................................................................22

Ind. Code Ann. § 25-1-9-9 .........................................................................22

Mass. Gen. Laws Chapter 112, § 5 ...........................................................22

Md. Code Ann., Health Occ. § 14-101 et seq. ..........................................22

Md. Code Ann., Health Occ. § 14-404 ......................................................22

N.Y. Comp. Codes R. & Regs. Title 18 § 505.2(*l*)(2)(i)–(ii) ........................8

N.Y. Educ. Law § 6530 ...............................................................................22

N.Y. Pub. Health Law § 230-a ...................................................................22

Nev. Rev. Stat. §§ 630.301, 630.306, 630.230 .........................................22

iv

Nev. Rev. Stat. § 630.352(4) ....................................................... 22

Wash. Admin. Code §§ 182-531-1675(b)(ii), (f) ........................... 8

Wash. Rev. Code § 18.71.002 et seq............................................. 22

Wash. Rev. Code § 18.130.050 et seq........................................... 22

Wash. Rev. Code § 48.43.0128(3) ................................................. 9

Wash. Rev. Code § 48.43.0128(3)(a) ........................................... 24

## OTHER AUTHORITIES

Ali Zaker-Shahrak et al., Cal. Dep't of Ins., Economic Impact
    Assessment: Gender Nondiscrimination in Health
    Insurance 10 (2012), https://transgenderlawcenter.org/wp-
    content/uploads/2013/04/Economic-Impact-Assessment-
    Gender-Nondiscrimination-In-Health-Insurance.pdf ........................... 4

American Psychiatric Association, *Gender Dysphoria*,
    https://www.psychiatry.org/patients-families/gender-
    dysphoria/what-is-gender-dysphoria (last visited Aug. 1,
    2023) ...................................................................................... 3

Amy E. Green et al., *Association of Gender-Affirming
    Hormone Therapy with Depression, Thoughts of Suicide,
    and Attempted Suicide Among Transgender and
    Nonbinary Youth*, 70 J. Adolescent Health 643, 647–48
    (2022), https://doi.org/10.1016/j.jadohealth.2021.10.036 ..................... 5

Ann P. Haas et al., Am. Found. For Suicide Prevention &
    The Williams Inst., Suicide Attempts Among Transgender
    and Gender Non-Conforming Adults: Findings of the
    National Transgender Discrimination Survey 2 (2014),
    https://williamsinstitute.law.ucla.edu/wp-
    content/uploads/Trans-GNC-Suicide-Attempts-Jan-
    2014.pdf.................................................................................. 4

Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696, 702 (2014), https://doi.org/10.1542/peds.20132958 ............................................... 6

Ashley Austin et al., *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, 37 J. of Interpersonal Violence 2696 (2022), https://journals.sagepub.com/doi/10.1177/08862605209155 54 ............................................................................................................. 4

Chester A. McPherson, D.C. Dep't of Ins., Bulletin 13-IB-01-30/15, Prohibition of Discrimination in Health Insurance Based on Gender Identity or Expression 4 (2014), https://disb.dc.gov/sites/default/files/dc/sites/disb/publicati on/attachments/Bulletin-ProhibitionDiscriminationBasedonGenderIdentityorExpre ssionv022714.pdf ............................................................... 9, 27

Diana M. Tordoff, et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 J. Am. Med. Ass'n Network Open 1, 6 (2022), https://jamanetwork.com/journals/jamanetworkopen/fullar ticle/2789423 .......................................................................... 5

E. Coleman et al., Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, 23 Int'l J. Transgender Health S1 (2022), https://doi.org/10.1080/26895269.2022.2100644 ................................. 24

*Equality Maps: Healthcare Law and Policies*, Movement Advancement Project, https://www.lgbtmap.org/equality-maps/healthcare_laws_and_policies (last visited Jul. 29, 2023) ........................................................................................ 8

Emily Newfield et al., *Female-to-Male Transgender Quality of Life*, 15(9) Quality of Life Research 1447 (2006), https://www.ncbi.nlm.nih.gov/pubmed/16758113 ................................. 3

Jack L Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145 Pediatrics 1, 5 (2020), https://doi.org/10.1542/peds.2019-1725 .................................... 5

Julia C. Sorbara et al., *Mental Health and Timing of Gender-Affirming Care*, 146 Pediatrics 1, 5 (2020), https://publications.aap.org/pediatrics/article/146/4/e2019 3600/79683/Mental-Health-and-Timing-of-Gender-Affirming-Care ....................................................... 7

Marijn Arnoldussen et al., *Self-Perception of Transgender Adolescents After Gender-Affirming Treatment: A Follow-Up Study Into Young Adulthood*, 9 LGBT Health 238 (2022), https://www.liebertpub.com/doi/epdf/10.1089/lgbt.2020.04 94 .................................................................................... 6

Mass. Comm'r of Ins., Bulletin 2021-11, Continuing Applicability of Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Gender Affirming Care and Related Services at 2 (2021), https://www.mass.gov/doc/bulletin-2021-11-prohibited-discrimination-on-the-basis-of-gender-identity-or-gender-dysphoria-including-medically-necessary-gender-affirming-care-and-related-services-issued-september-9-2021/download ................................................... 24

Nat'l Conf. of State Legislatures, Prescribing Policies: States Confront Opioid Overdose Epidemic (June 30, 2019), https://web.archive.org/web/20220426122124/https://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx ............................... 25

N.Y. Dep't of Fin. Servs., Ins. Circular Letter No. 7 (2014), https://www.dfs.ny.gov/insurance/circltr/2014/cl2014_07.h tm ...................................................................................... 23

Or. Health Auth., Prioritized List: Guideline for Gender
    Dysphoria 1 (2019),
    https://www.oregon.gov/oha/HPA/DSI-
    HERC/FactSheets/Gender-dysphoria.pdf ....................................... 8, 23

*Patient-Physician Relationships*, AMA Code of Medical
    Ethics, https://code-medical-ethics.ama-assn.org/ethics-
    opinions/patient-physician-relationships (last visited
    Sept. 22, 2023) ..................................................................... 26

Press Release, Cal. Dep't of Ins., Commissioner Lara Takes
    Proactive Step to Ensure Transgender Youth Have Access
    to Gender-Affirming Medical Care for Gender Dysphoria
    (Dec. 30, 2020), https://www.insurance.ca.gov/0400-
    news/0100-press-releases/2020/release140-2020.cfm .................. 10, 27

R.I. Health Ins. Comm'r, Health Ins. Bulletin 2015-3,
    Guidance Regarding Prohibited Discrimination on the
    Basis of Gender Identity or Expression 1 (2015),
    http://www.ohic.ri.gov/documents/Bulletin-2015-3-
    Guidance-Regarding-Prohibited-Discrimination.pdf ........................ 23

Wylie C. Hembree et al., *Endocrine Treatment of Gender-
    Dysphoric/Gender Incongruent-Persons: An Endocrine
    Society Clinical Practice Guideline*, 102 J. Clinical
    Endocrinology & Metabolism 3869 (2017),
    https://doi.org/10.1210/jc.2017-01658 ................................................ 24

Ximena Lopez et al.
    *Statement on Gender-Affirmative Approach to Care from
    the Pediatric Endocrine Society Special Interest Group on
    Transgender Health*, 29 Current Op. Pediatrics 475, 480
    (2017), https://pubmed.ncbi.nlm.nih.gov/28562420 ............................ 7

## INTERESTS OF AMICI CURIAE

Amici Curiae States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and the District of Columbia strongly support transgender people's right to live with dignity, be free from discrimination, and have equal access to healthcare.[1] Discrimination and exclusion on the basis of transgender status cause direct economic, physical, and emotional harms to transgender people, including an increased risk of depression, anxiety, substance abuse, and suicide. To prevent these injuries, amici States have adopted laws and policies to combat discrimination against transgender people who seek gender-affirming medical care. These laws and policies adhere to medically accepted standards of care and avoid interfering with the doctor-patient relationship. Amici States' laws and policies result in better health outcomes for our transgender teens, safeguard their

---

[1] Amici States submit this amicus brief pursuant to Federal Rule of Appellate Procedure 29(a) in support of Plaintiffs-Appellees and affirmance of the preliminary injunction.

physical, emotional, and financial well-being, protect their autonomy, and preserve the integrity and ethics of the medical profession.

Amici States also share a strong interest in the proper application of the Equal Protection Clause to protect transgender individuals throughout our nation from unconstitutional discrimination. Indiana's ban violates equal protection. The challenged law treats cisgender minors differently from transgender minors, allowing cisgender minors to access certain medications while banning transgender minors from accessing the same. The ban thus singles out transgender minors for discriminatory treatment *because of* their gender nonconformity. As the district court properly concluded, such treatment is discrimination based on sex. The lower court properly reviewed the ban under heightened scrutiny and correctly concluded that it did not satisfy that standard of review. Transgender minors deserve, and are guaranteed, the equal protection of the law, as are all other persons under the Constitution. This Court should affirm the preliminary injunction.

## ARGUMENT

## I.  RESTRICTING ACCESS TO GENDER-AFFIRMING MEDICAL CARE SIGNIFICANTLY HARMS TRANSGENDER MINORS

Denying medically necessary care to transgender teens harms

their physical, emotional, and psychological health.[2] Many transgender teens suffer from gender dysphoria: the often debilitating distress and anxiety that can result from incongruence between a person's gender identity and sex at birth.[3] If unaddressed or untreated, gender dysphoria can affect quality of life, trigger decreased social functioning, and prompt self-medication through drugs and alcohol.[4] The symptoms of gender dysphoria, and the compounding effects of societal discrimination, can also be fatal. Among transgender people, suicide

---

[2] The Indiana ban not only harms its own residents, but also threatens amici States' residents who travel to Indiana for school, vacation, and work. Indiana's law, for example, could compel transgender teenagers who receive gender-affirming healthcare in amici States to discontinue their prescribed medications while in Indiana. Teens traveling to Indiana, even on a temporary basis, may lack access to gender-affirming medical care if they are hospitalized for an injury or need to refill a prescription. And amici States' residents working, visiting, and studying in Indiana, like college students and tourists, could be forced to forgo necessary medical care to avoid the bans' effects.

[3] American Psychiatric Association, *Gender Dysphoria*, in Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2022), https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria (last visited Aug. 1, 2023).

[4] *See* Emily Newfield et al., *Female-to-Male Transgender Quality of Life*, 15(9) Quality of Life Research 1447 (2006), https://www.ncbi.nlm.nih.gov/pubmed/16758113 (observing that transgender men who received transition-related care reported having a higher health-related quality of life than those who had not).

attempts are nine times more common than in the overall U.S. population (41% versus 4.6%).[5] The risks are especially high among transgender minors.[6] One study found that 56% of transgender minors reported a previous suicide attempt and 86% reported suicidal thoughts.[7]

Access to gender-affirming healthcare and other medical interventions that improve mental health are thus especially important to transgender teenagers. A 2021 analysis found that, for teens under

---

[5] Ann P. Haas et al., Am. Found. For Suicide Prevention & The Williams Inst., Suicide Attempts Among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey 2 (2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-GNC-Suicide-Attempts-Jan-2014.pdf.

[6] *See, e.g.*, Ali Zaker-Shahrak et al., Cal. Dep't of Ins., Economic Impact Assessment: Gender Nondiscrimination in Health Insurance 10 (2012), https://transgenderlawcenter.org/wp-content/uploads/2013/04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf ("A recent systematic review of largely American samples gives a suicide attempt rate of approximately one in every three individuals with higher rates found among adolescents and young adults.").

[7] Ashley Austin et al., *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, 37 J. of Interpersonal Violence 2696 (2022), https://journals.sagepub.com/doi/10.1177/0886260520915554.

the age of eighteen, use of gender-affirming hormone therapy was associated with lower odds of recent depression and lower odds of attempting suicide compared to adolescents who wanted, but did not receive, such therapy.[8] Another study reflected that, for teenagers and young adults ages thirteen to twenty, receiving gender-affirming care, including puberty blockers and gender-affirming hormones, was associated with 60% lower odds of moderate or severe depression and 73% lower odds of having suicidal thoughts over a twelve-month follow-up.[9] A survey of over 3,500 transgender adults revealed that individuals who received pubertal suppression during adolescence had nearly 20 percent lower odds of lifetime suicidal thoughts compared to individuals who wanted this treatment but did not receive it.[10] A longitudinal study

---

[8] Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643, 647–48 (2022), https://doi.org/10.1016/j.jadohealth.2021.10.036.

[9] Diana M. Tordoff, et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 J. Am. Med. Ass'n Network Open 1, 6 (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789423.

[10] Jack L Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145 Pediatrics 1, 5 (2020),

that followed transgender adolescents from their intake at a gender clinic into young adulthood reported that gender-affirming treatment resulted in significant improvement in global functioning and psychological wellbeing and the participants' life satisfaction, quality of life, and subjective happiness were comparable to their cisgender peers.[11] Another study found significant improvement in teens' sense of self-worth after starting hormone therapy.[12] In short, removing discriminatory barriers to healthcare improves health outcomes for our transgender residents, especially teenagers.

Conversely, studies reflect that withholding gender-affirming treatment can have significant negative effects on teens' psychological wellbeing, psychosocial development, and quality of life. For transgender adolescents, being forced to endure puberty that does not

---

https://doi.org/10.1542/peds.2019-1725 (percentage calculated from odds ratio).

[11] Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696, 702 (2014), https://doi.org/10.1542/peds.20132958.

[12] Marijn Arnoldussen et al., *Self-Perception of Transgender Adolescents After Gender-Affirming Treatment: A Follow-Up Study Into Young Adulthood*, 9 LGBT Health 238 (2022), https://www.liebertpub.com/doi/epdf/10.1089/lgbt.2020.0494.

align with their gender identity is "often a source of significant distress."[13] Delaying treatment also imposes harms. A 2020 study reflected that adolescents who begin gender-affirming treatment at later stages of puberty are five times more likely to be diagnosed with depression and four times more likely to have anxiety disorders than adolescents who seek treatment in early puberty.[14]

## II. AMICI STATES' LAWS AND POLICIES PROMOTE ACCESS TO GENDER-AFFIRMING MEDICAL CARE BASED ON ESTABLISHED MEDICAL STANDARDS

In light of the adverse consequences that arise when transgender individuals are deprived of access to medically necessary healthcare, many amici States have enacted laws and regulations to ensure that their residents, including transgender teenagers, have access to gender-

---

[13] Ximena Lopez et al., *Statement on Gender-Affirmative Approach to Care from the Pediatric Endocrine Society Special Interest Group on Transgender Health*, 29 Current Op. Pediatrics 475, 480 (2017), https://pubmed.ncbi.nlm.nih.gov/28562420.

[14] *See* Julia C. Sorbara et al., *Mental Health and Timing of Gender-Affirming Care*, 146 Pediatrics 1, 5 (2020), https://publications.aap.org/pediatrics/article/146/4/e20193600/79683/Mental-Health-and-Timing-of-Gender-Affirming-Care (reporting odds ratios).

affirming healthcare.[15] These laws promote sound medical practices and increase equity in healthcare. Beyond these general protections, some amici States have issued explicit guidance prohibiting insurers from denying minors treatment for gender dysphoria solely based on age, in recognition of the importance of gender-affirming interventions for this vulnerable population. For instance, in 2013, Oregon approved puberty suppression coverage for minors.[16] Washington explicitly allows coverage for puberty suppression and gender-affirming care for those under age twenty. Wash. Admin. Code §§ 182-531-1675(b)(ii), (f). Similarly, New York's Medicaid regulations require coverage for medically necessary puberty suppression for patients who meet eligibility criteria and medically necessary hormone therapy for individuals who are sixteen years of age and older. N.Y. Comp. Codes R. & Regs. tit. 18 § 505.2(*l*)(2)(i)–(ii).

---

[15] *See generally Equality Maps: Healthcare Law and Policies*, Movement Advancement Project, https://www.lgbtmap.org/equality-maps/healthcare_laws_and_policies (last visited Jul. 29, 2023).

[16] *See* Or. Health Auth., Prioritized List: Guideline for Gender Dysphoria 1 (2019), https://www.oregon.gov/oha/HPA/DSI-HERC/FactSheets/Gender-dysphoria.pdf.

In contrast to Indiana's categorical ban on gender-affirming care for minors, amici States' policies also recognize that best medical practices require an *individualized* assessment to determine whether—and to what extent—gender-affirming care is medically necessary for an individual patient. For example, the District of Columbia has instructed that determinations of "medical necessity" for insurance coverage purposes "must also be guided by providers in communication with individual patients."[17] Washington forbids insurers from "deny[ing] or limit[ing] coverage for gender affirming treatment" when it is "medically necessary" and "prescribed in accordance with accepted standards of care."[18] And California encourages health insurance companies to evaluate coverage criteria for gender-affirming care in

---

[17] Chester A. McPherson, D.C. Dep't of Ins., Bulletin 13-IB-01-30/15, Prohibition of Discrimination in Health Insurance Based on Gender Identity or Expression 4 (2014), https://disb.dc.gov/sites/default/files/dc/sites/disb/publication/attachments/Bulletin-ProhibitionDiscriminationBasedonGenderIdentityorExpressionv022714.pdf.

[18] Wash. Rev. Code § 48.43.0128(3).

order "to avoid needlessly delaying and interfering with medical care recommended by a patient's doctor."[19]

Taken together, these laws and policies reflect amici States' core commitment to preserving the integrity of the medical profession, protecting the equality of all people, regardless of their gender identity, and ensuring that people with gender dysphoria are not denied medically necessary healthcare.

## III. THE BAN VIOLATES THE EQUAL PROTECTION CLAUSE

S.E.A. 480 prohibits transgender teenagers from obtaining medically necessary care that cisgender teenagers are permitted to receive. Accordingly, the statute is subject to heightened scrutiny because it expressly classifies on the basis of sex and it discriminates against transgender individuals because of their gender nonconformity. The lower court's conclusion that S.E.A. 480 imposes a sex-based classification that warrants heightened scrutiny is consistent with the

---

[19] Press Release, Cal. Dep't of Ins., Commissioner Lara Takes Proactive Step to Ensure Transgender Youth Have Access to Gender-Affirming Medical Care for Gender Dysphoria (Dec. 30, 2020), https://www.insurance.ca.gov/0400-news/0100-press-releases/2020/release140-2020.cfm.

weight of federal authority holding that discrimination against

transgender individuals is discrimination based on sex.[20]

## A.   Heightened Scrutiny Applies

The district court correctly determined that "sex-based

classifications are . . . central to S.E.A. 480's prohibitions." *K.C. v.*

*Individual Members of the Medical Licensing Board of Indiana*, No.

1:23-cv-00595-JPH-KMB, 2023 WL 4054086, at *8 (S.D. Ind. June 16,

2023). S.E.A. 480 prohibits procedures only when they alter

characteristics that are "typical for the individual's sex" or create

characteristics that "resemble a sex different from an individual's sex."

*Id.* Because the statute bans procedures "only when used for gender

---

[20] *See, e.g., A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020); *Brandt ex. rel. Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022); *Hecox v. Little*, No. 20-35813, 2023 WL 5283127, at *12 (9th Cir. Aug. 17, 2023); *Doe v. Ladapo*, No. 4:23-cv-114-RH-MAF, 2023 WL 3833848 at *8 (N.D. Fla. June 6, 2023); *Doe 1 v. Thornbury*, No. 3:23-CV-230-DJH, 2023 WL 4230481, at *3 (W.D. Ky. June 28, 2023); *L.W. ex rel. Williams v. Skrmetti*, No. 3:23-CV-00376, 2023 WL 4232308, at *16-17 (M.D. Tenn. June 28, 2023). Some courts, however, have recently taken a different approach. *See Eknes-Tucker v. Governor of Alabama*, No. 22-11707, 2023 WL 5344981, at *1 (11th Cir. Aug. 21, 2023) (vacating preliminary injunction and holding that rational basis review applies); *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 422 (6th Cir. 2023) (staying the Tennessee district court's preliminary injunction pending expedited appeal).

transition," medical providers must know the patient's sex and the gender associated with the goal of the treatment to know whether the treatment is lawful. *Id.* In other words, "without sex-based classifications, it would be impossible for S.E.A. 480 to define whether a puberty-blocking or hormone treatment involved transition from one's sex (prohibited) or was in accordance with one's sex (permitted)." *Id.* The plain language of the challenged statute expressly classifies based on sex, triggering application of heightened scrutiny. *Id.* at *8–9.

Indiana disagrees. It asserts that "S.E.A. 480 classifies by age, procedure, and medical condition—not sex—rendering it subject to rational basis review." Opening Br. for Defendants-Appellants at 31, K.C. v. Individual Members of the Medical Licensing Board of Indiana, No. 23-2366 (7th Cir. Aug. 21, 2023). According to Indiana, the statute "does not provide different rules for males or females or for transgender and cisgender patients." *Id.* at 32. Although Indiana concedes that the statute repeatedly references "sex," it claims that the ban does not classify based on sex because knowing the patient's sex is not enough; the medical provider must also know the "*gender associated with the goal of the treatment.*" *Id.* (emphasis original). In Indiana's view,

rational basis review applies because the "medical goal" of the procedure, not the patient's "sex," determines whether or not a procedure is lawful. *Id.*

But, as Indiana acknowledges, even under its theory that S.E.A. 480 classifies "by medical goal," "discerning the goal *requires reference to sex.*" *Id.* at 37 (emphasis added). And such policies requiring reference to sex are subjected to heightened scrutiny. *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (applying heightened scrutiny to equal protection claim because "the School District's policy cannot be stated without referencing sex, as the School District decides which bathroom a student may use based upon the sex listed on the student's birth certificate."), abrogated on other grounds as recognized by *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *accord A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023) ("*Bostock* strengthens *Whitaker*'s conclusion that discrimination based on transgender status is a form of sex discrimination"). When a procedure's legality turns on whether it "alter[s] or remove[s]" characteristics that are "typical for the

individual's sex," the law necessarily classifies on the basis of sex. *K.C.*, 2023 WL 4054086, at *8. Indiana's insistence that S.E.A. 480 classifies based on the "medical goal" of the procedure is misplaced because—as Indiana admits—the statute's definition of that "medical goal" is directly tied, in explicit statutory terms, to the patient's sex. *See* Opening Br. for Defendants-Appellants at 37 ("discerning the goal requires reference to sex").

Indiana's ban, therefore, cannot be understood as a neutral regulation of medical procedures. It prohibits certain procedures only when the treatment is sought by a teenager whose gender identity does not conform to the teenager's sex at birth. These bans are therefore *not* equally applicable to all minors. Rather, they treat cisgender and transgender teenagers differently by permitting certain medications for the former while categorically banning the same medications for the latter. Although Indiana claims that its ban "does not provide different rules . . . for transgender and cisgender patients" (*id.* at 32), this simply cannot be squared with the text of the statute. It is beyond dispute that one group—and only one group—pursues the "medical goal" that Indiana has criminalized: transgender individuals. Indiana has

14

targeted transgender people with precision, even if the ban does not expressly use the word "transgender." *See, e.g., Ladapo*, 2023 WL 3833848, at *9 (N.D. Fl. June 6, 2023) (explaining that to know whether prescribing puberty blockers is legal or illegal, "one must know whether the child is cisgender or transgender. The treatment is legal if the child is cisgender but illegal if the child is transgender because the statute prohibits [puberty blockers] only for transgender children, not for anyone else."); *Skrmetti*, 2023 WL 4232308, at *11 n.18 (SB 1's prohibitions "are directly and exclusively targeted at minors who are transgender").

Banning medical care that only transgender individuals seek is discriminatory. And "discrimination on the basis of transgender status is a form of sex-based discrimination." *Hecox*, 2023 WL 5283127, at *12; *see also Whitaker By Whitaker*, 858 F.3d at 1051 (applying heightened scrutiny where a school district "treats transgender students . . . who fail to conform to the sex-based stereotypes associated with their assigned sex at birth, differently" because transgender students are disciplined if they use a bathroom that conforms with their gender identity).

These principles are also consistent with the Supreme Court's decision in *Bostock v. Clayton County*, which explained that, in the context of a Title VII claim, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty., Georgia*, 140 S.Ct. 1731, 1741 (2020). In other words, "if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Id.* Here, a similar analysis reveals that the challenged law also imposes differential treatment on the basis of sex: changing the minor's sex at birth yields a different result as to whether a medication is authorized, *e.g.*, a cisgender young man can receive testosterone to initiate male puberty but a transgender young man cannot.

In addition to expressly classifying based on sex, S.E.A. 480 discriminates against transgender individuals because of their gender nonconformity. Forbidding individuals from creating characteristics "that resemble a sex different from the individual's sex," S.E.A. 480, section 5(a)(2), is a textbook example of enforcing gender conformity— which itself constitutes discrimination on the basis of sex. In the context

16

of a Title IX claim, this Court has recognized that "sex discrimination
includes discrimination against a transgender person for gender
nonconformity." *Whitaker By Whitaker*, 858 F.3d at 1048 (internal
citation omitted). Indeed, "[m]any courts . . . have held that various
forms of discrimination against transgender individuals constitute sex-
based discrimination for purposes of the Equal Protection Clause
because such policies punish transgender persons for gender non-
conformity, thereby relying on sex stereotypes." *Hecox*, 2023 WL
5283127, at \*12 (internal citations omitted); *see also Grimm*, 972 F.3d
at 608 (Plaintiff "was subjected to sex discrimination because he was
viewed as failing to conform to the sex stereotype propagated by the
Policy"); *Smith v. City of Salem*, 378 F.3d 566, 573–75, 577–78 (6th Cir.
2004) (applying a sex-stereotyping theory, without mentioning a level of
scrutiny, and holding that the transgender plaintiff stated a sex
discrimination claim in violation of equal protection).[21]

---

[21] Lower courts evaluating bans on gender-affirming care agree.
*See, e.g.*, *L.W. ex rel. Williams v. Skrmetti*, No. 3:23-CV-00376, 2023
WL 4232308, at \*10 (M.D. Tenn. June 28, 2023) (the law "prohibits
transgender minors—and only transgender minors—from taking
transitioning medications due to their gender nonconformity") (quoting
*Eknes-Tucker v. Marshall*, 603 F.Supp.3d 1131, 1138 (M.D. Ala. 2022),

Indiana also argues that heightened scrutiny is not warranted because "S.E.A. 480 does not facially discriminate against transgender persons." Opening Br. for Defendants-Appellants at 40, K.C. v. Individual Members of the Medical Licensing Board of Indiana, No. 23-2366 (7th Cir. Aug. 21, 2023). Indiana claims that "[b]oth transgender and cisgender persons are subject to the law and eligible for its exceptions, so no facial discrimination based on transgender status occurs." *Id.* But facial discrimination against transgender individuals does not require the word "transgender" to appear in the text of the statute. Courts have long recognized that actors can engage in "proxy discrimination" despite using facially neutral criteria. *See, e.g., Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."); *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992) (excluding service dogs or wheelchairs is a proxy for disability).

---

*vacated*, 2023 WL 5344981 (11th Cir. 2023)); *Thornbury*, 2023 WL 4230481, at *4 ("Regardless of its stated purpose, then, SB 150 would have the effect of enforcing gender conformity.").

The Ninth Circuit's recent analysis of a law banning the participation of transgender women and girls in women's student athletics reflects how classifications can be "carefully drawn to target" transgender individuals, even if the challenged law "does not use the word 'transgender' in the definition." *Hecox*, 2023 WL 5283127, at *10. The court further explained in a concurring opinion that "[p]roxy discrimination is a form of facial discrimination. It arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Id.* at *26 (Christen, J, concurring in part and dissenting in part) (quoting *Pac. Shores Properties, LLC*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) ("In a case of proxy discrimination, the defendant discriminates against individuals on the basis of criteria that are almost exclusively indicators of membership in the disfavored group.")).[22]

---

[22] *See also McWright*, 982 F.2d at 228 (providing the example of "using gray hair as a proxy for age: there are young people with gray

It is thus no answer for Indiana to assert that its law does not facially discriminate on the basis of sex or transgender status because it "restrict[s] a medical procedure" through a law that is "equally applicable to all minors, no matter their sex at birth." Opening Br. for Defendants-Appellants at 36. There is complete overlap between the banned "medical goal" (gender transition) and the targeted group (transgender individuals). By definition, cisgender individuals do not seek to transition their gender, and therefore no cisgender person will be subject to the ban, even if they receive the same medical intervention that is banned for their transgender peers. By banning certain treatments for a medical purpose that only transgender individuals would pursue, Indiana facially (and by proxy) discriminates against transgender individuals on the basis of sex. *Hecox*, 2023 WL 5283127,

---

hair (a few), but the 'fit' between age and gray hair is sufficiently close that they would form the same basis for invidious classification"); *Davis v. Guam*, 932 F.3d 822, 839 (9th Cir. 2019) (statute limiting voting to "Native Inhabitants of Guam" served as a proxy for race); *Gustovich v. AT&T Comms., Inc.*, 972 F.2d 845, 851 (7th Cir. 1992) (recognizing that "wage discrimination can be a proxy for age discrimination"); *Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 843 (7th Cir. 2007) (under the Pregnancy Discrimination Act, pregnancy is a proxy for gender and "discrimination against pregnancy is discrimination against women").

at *10; *see also id.* at *26 (Christen, J., concurring in part and dissenting in part) ("[T]he Act can only be understood as a transgender-based classification").

## B.  The Ban Does Not Satisfy Heightened Scrutiny

The district court also correctly concluded that the law does not satisfy heightened scrutiny because it is not closely tailored to advance Indiana's asserted interests. Indiana argued that the ban was substantially related to regulating the medical profession and guarding the health of transgender youth from experimental medical procedures. The district court rejected those assertions based on the extensive record developed below. The court found, after evaluating the 3000-page record, that "the designated evidence does not demonstrate, at least at this stage, that the extent of its regulation was closely tailored to uphold" the State's asserted interests because Indiana enacted a complete ban on gender transition procedures for minors when less-restrictive means exist. *K.C. v. Individual Members of the Medical Licensing Board of Indiana*, 2023 WL 4054086, at *11.

Amici States' experience supports the district court's conclusion. Safeguarding access to gender-affirming care is compatible with amici

States' interest in regulating the medical profession. Our preexisting state-level safeguards have proven adequate and effective in guarding against improper medical practices. Like Indiana, amici States regulate the right to practice medicine through laws and regulations that prohibit abusive, unethical, or medically improper conduct. *See, e.g.*, Ind. Code Ann. § 25-1-9-4 (establishing the medical board's power to regulate the practice of medicine, including when a provider has engaged in fraud, deception, and lewd or immoral conduct).[23] Violation of the code of conduct set forth in a medical practice act can result in a State's medical board suspending or revoking a provider's medical license. *See, e.g.*, Ind. Code Ann. § 25-1-9-9.[24] Given the authority these medical boards already possess, a categorical ban on accepted medical

---

[23] *See also, e.g.*, Cal. Bus. & Prof. Code § 2000 et seq.; D.C. Code § 3–1205.14; 225 Il. Comp. Stat. 60/22(A); Mass. Gen. Laws ch. 112, § 5; Md. Code Ann., Health Occ. § 14-101 et seq.; Nev. Rev. Stat. §§ 630.301, 630.306, 630.230; N.Y. Educ. Law § 6530; 63 Pa. Cons. Stat. § 422.1 et seq.; Wash. Rev. Code § 18.71.002 et seq.

[24] *See also, e.g.*, Cal. Bus. & Prof. Code § 2220 et seq; D.C. Code § 3–1205.14; 225 Il. Comp. Stat. 60/22(A); Mass. Gen. Laws ch. 112, § 5; Md. Code Ann., Health Occ. § 14-404; Nev. Rev. Stat. § 630.352(4); N.Y. Pub. Health Law § 230-a; 63 Pa. Cons. Stat. § 422.41; Wash. Rev. Code § 18.130.050 et seq.

treatment is not substantially related to Indiana's purported goal of regulating the medical profession.

Amici States' experience also confirms that a categorical ban on gender-affirming care is not substantially related to any concern about the medical risks of receiving such care. As our laws and guidance reflect, gender-affirming care is well-established, evidence-based medical treatment.[25] The World Professional Association for

---

[25] For example, New York, Oregon, and Rhode Island's insurance guidelines explicitly identify the importance of scientific evidence and professional standards. N.Y. Dep't of Fin. Servs., Ins. Circular Letter No. 7 (2014), https://www.dfs.ny.gov/insurance/circltr/2014/cl2014_07.htm (citing the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders' recognition of gender dysphoria); Or. Health Auth., Prioritized List: Guideline for Gender Dysphoria 1 (2019), https://www.oregon.gov/oha/HPA/DSIHERC/FactSheets/Gender-dysphoria.pdf (approving youth puberty suppression coverage based on extensive testimony "from experts at various public meetings," "reviewing relevant evidence and literature," and citing WPATH standards); R.I. Health Ins. Comm'r, Health Ins. Bulletin 2015-3, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Expression 1 (2015), http://www.ohic.ri.gov/documents/Bulletin-2015-3-Guidance-Regarding-Prohibited-Discrimination.pdf ("[A] growing body of scientific and clinical evidence regarding the potential harm to consumers arising from the denial or exclusion of services on the basis of gender identity" prompted reexamination of exclusions). Many other States have relied on prevailing professional standards of care set forth by nationally recognized medical experts in crafting laws and guidance on coverage of

Transgender Health (WPATH), the Endocrine Society, and other recognized and reputable professional associations endorse evidence-based standards of care for transgender people.[26] And while gender-affirming medical care—like all medical treatments—carries both risks and benefits, those are appropriately evaluated in consultation between treating providers, patients, and their families. A flat ban on gender-

---

gender-affirming medical care to treat gender dysphoria. *See, e.g.*, Mass. Comm'r of Ins., Bulletin 2021-11, Continuing Applicability of Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Gender Affirming Care and Related Services at 2 (2021), https://www.mass.gov/doc/bulletin-2021-11-prohibited-discrimination-on-the-basis-of-gender-identity-or-gender-dysphoria-including-medically-necessary-gender-affirming-care-and-related-services-issued-september-9-2021/download (recommending insurance carriers "consult the most up-to-date medical standards set forth by nationally recognized medical experts in the transgender health field, including but not limited to those issued by the [WPATH]"); Wash. Rev. Code § 48.43.0128(3)(a) (forbidding insurers from "deny[ing] or limit[ing] coverage for gender-affirming treatment" when it is medically necessary and "prescribed in accordance with accepted standards of care").

[26] *See* E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022), https://doi.org/10.1080/26895269.2022.2100644; *see also* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender Incongruent-Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (2017), https://doi.org/10.1210/jc.2017-01658.

affirming care for teenagers—even when doctors deem the care to be medically necessary—is inconsistent with these medical standards.[27]

Moreover, any legitimate concerns over some forms of gender-affirming care can be addressed through ordinary regulatory methods. For example, States did not react to the opioid crisis by completely banning the use of opioids and depriving all patients of medications to manage their pain. Instead, States adopted legislation or regulations to curb the amount of opioids that physicians could prescribe and disciplined providers who engaged in improper prescribing practices.[28] Indiana provides no sound basis for enacting a blanket ban on well-established medical care. Instead, it argues that courts "must defer to the judgments of legislatures 'in areas fraught with medical and scientific uncertainties.'" Opening Br. for Defendants-Appellants at 45 (citing *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228, 2268,

---

[27] *See id.*

[28] Nat'l Conf. of State Legislatures, Prescribing Policies: States Confront Opioid Overdose Epidemic (June 30, 2019), https://web.archive.org/web/20220426122124/https://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx ("State lawmakers are crafting innovative policies . . . to address this public health crisis while also ensuring appropriate access to pain management.").

213 L. Ed. 2d 545 (2022)). But, as the district court observes, Defendants "have not cited any authority making that principle controlling here, when heightened scrutiny applies to an equal protection claim."[29] *K.C. v. Individual Members of the Medical Licensing Board of Indiana*, 2023 WL 4054086, at *11.

Finally, Indiana's ban oversteps by unnecessarily interfering with the doctor-patient relationship. According to the American Medical Association's Code of Medical Ethics, the relationship between a patient and a physician is based on trust, "which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others, to use sound medical judgment on patients' behalf, and to advocate for their patients' welfare."[30] Courts have recognized the significance of this

---

[29] Defendants cite to *Gonzalez v. Carhart*. Opening Br. for Defendants-Appellants, Case No. 23-2366, at 45–46. But in *Gonzalez*, unlike here, alternatives were available. *See Gonzales v. Carhart*, 550 U.S. 124, 164 (2007).

[30] *Patient-Physician Relationships*, AMA Code of Medical Ethics, https://code-medical-ethics.ama-assn.org/ethics-opinions/patient-physician-relationships (last visited Sept. 22, 2023).

relationship.[31] And amici States' policies explicitly avoid interfering with the doctor-patient relationship and disrupting decisions rooted in well-accepted medical standards.[32] In short, Indiana's ban undermines, rather than promotes, the practice of medicine, the doctor-patient relationship, and the integrity of the medical profession.[33]

---

[31] *See, e.g.*, *Thornbury*, 2023 WL 4230481, at *5 (W.D. Ky. June 28, 2023); *Doe v. Ladapo*, No. 4:23-cv-114-RH-MAF, 2023 WL 3833848, at *13 (N.D. Fla. June 6, 2023) ("Ordinarily it is the patient, in consultation with the doctor, who weighs the risks and benefits and chooses a course of treatment. What is remarkable about the challenged statute and rules is not that they address medical treatments with both risks and benefits but that they arrogate to the state the right to make the decision.").

[32] *See, e.g.*, McPherson, *supra* note 17, at 3–4 (determinations of "medical necessity" for insurance coverage purposes "must also be guided by providers in communication with individual patients."); Press Release, Cal. Dep't of Ins., *supra* note 19 (the State encourages health insurance companies to evaluate coverage criteria for gender-affirming care in order "to avoid needlessly delaying and interfering with medical care recommended by a patient's doctor.").

[33] *See Brandt v. Rutledge*, 551 F.Supp.3d 882, 891 (E.D. Ark. 2021) ("[T]he State's goal of ensuring the ethics of Arkansas healthcare providers is not attained by interfering with the patient-physician relationship, unnecessarily regulating the evidence-based practice of medicine[,] and subjecting physicians who deliver safe, legal, and medically necessary care to civil liability and loss of licensing.").

### C.   Alabama's Arguments are Flawed

Alabama's amicus brief raises three principal arguments in support of Indiana's law. None of them are persuasive.

First, Alabama asserts that S.E.A. 480 classifies based on medical procedure, not sex. Br. of Amici Curiae Alabama et al. at 7–11, K.C. v. Individual Members of the Medical Licensing Board of Indiana, No. 23-2366 (7th Cir. Aug. 28, 2023). As explained above, this view cannot be reconciled with the way that S.E.A. 480 operates to deny treatment to transgender individuals, and no one else. *Supra* at Section III.A. Nor can this view be squared with Indiana's concession that "discerning the [medical] goal *requires reference to sex.*" Opening Br. for Defendants-Appellants at 37 (emphasis added). S.E.A. 480 expressly, and by its operation necessarily, draws sex-based classifications.

Second, Alabama contends that "[i]t does not matter that Indiana allows these same drugs—puberty blockers, testosterone, and estrogen—for some purposes but not for transitioning" because the permitted uses are really "different treatments."[34] Br. of Amici Curiae

---

[34] Alabama's contention that these are different treatments is undermined by its concession that puberty blockers work the same way

Alabama at 9–10 (citing circumstances in which certain States authorize the use of morphine for pain but not assisted suicide, or allow the use of testosterone for Klinefelter Syndrome but not for PTSD). But those examples do not categorically bar medical care based on the sex of the patient and thus say nothing at all about whether *this* ban imposes a sex-based classification.[35] Nor did they involve medically necessary care.[36] Here, in contrast, Indiana has banned medical treatment based on gender nonconformity and transgender status, and the treatment denied is medically necessary and consistent with the standards of care for treating gender dysphoria. *Supra* at Section III.A–B.

Third, Alabama asserts that even if heightened scrutiny applies,

---

regardless of the purpose for which they are being taken. *See* Br. of Amici Curiae Alabama at 8 ("Puberty blockers work the same way in males and females. Sex has no bearing on their prescription or dosage, whether for treating precocious puberty or for transitioning.").

[35] *See McMain v. Peters*, No. 2:13-CV-01632-AA, 2018 WL 3732660, at *3–4 (D. Or. Aug. 2, 2018) (Plaintiff did not receive testosterone because his levels were only slightly below normal and other medications were more appropriate for treating his mental health issues); *Titus v. Aranas*, No. 3:18-CV-00146-MMD-CLB, 2020 WL 4248678, at *5–6 (D. Nev. June 29, 2020) (Plaintiff did not receive testosterone because his levels were normal so there was no medical need for it).

[36] *Id.*

the district court erred by crediting medical expert testimony that gender-affirming treatment is consistent with well-established standards of care. Br. of Amici Curiae Alabama at 23–27. Alabama dismisses the overwhelming medical consensus that both supports gender-affirming care as a treatment option for gender dysphoria when clinically indicated, and opposes categorical bans on medical care like Indiana's. *Id.* Instead, Alabama argues that every major medical association in the United States, and WPATH, has political motivations and should be discredited. *Id.*[37] But Alabama cannot point to *any* American medical association that has endorsed its position.[38] In fact,

---

[37] The courts have largely rejected such claims. *See, e.g., Thornbury*, 2023 WL 4230481, at *5 n.6 (dismissing the purported "ideological takeover of the major medical organizations" as "baseless"); *see also Ladapo*, 2023 WL 3833848, at *14 ("[I]t is fanciful to believe that all the many medical associations who have endorsed gender-affirming care, or who have spoken out or joined an amicus brief supporting the plaintiffs in this litigation, have so readily sold their patients down the river. The great weight of medical authority supports these treatments.").

[38] Other courts have made similar findings. *See Ladapo*, 2023 WL 3833848 at *4 ("At least as shown by this record, not a single reputable medical association has taken a contrary position."); *see also Skrmetti*, 2023 WL 4232308, at *29 ("It is undisputed that every major medical organization to take a position on the issue . . . agrees that puberty blockers and cross-sex hormone therapy are appropriate and medically necessary treatments for adolescents when clinically indicated.").

mainstream medical consensus, and the great weight of federal

authority, agree that gender dysphoria is a real, diagnosable, and

treatable medical condition—one that harms the physical and mental

health of transgender minors and adults alike when left untreated.[39]

Alabama also points to four European countries, some of which

have recently limited the availability of gender-affirming care. Br. of

Amici Curiae Alabama at 20–23. But, as the district court explained,

"no European country that has conducted a systematic review

responded with a ban on the use of puberty blockers and cross-sex

hormone therapy as S.E.A. 480 would." *K.C. v. Individual Members of

the Medical Licensing Board of Indiana*, 2023 WL 4054086, at *11; *see*

---

[39] *See, e.g.*, *Brandt v. Rutledge*, 47 F.4th 661, 671 (8th Cir. 2022)
("According to . . . the British National Institute for Health & Care
Excellence, several studies have shown statistically significant positive
effects of hormone treatment on the mental health, suicidality, and
quality of life of adolescents with gender dysphoria. None has shown
negative effects."); *Brandt v. Rutledge*, No. 4:21-CV-00450 JM, 2023 WL
4073727, at *24 (E.D. Ark. June 20, 2023) ("Delaying gender-affirming
medical care when indicated puts patients at risk of worsening anxiety,
depression, hospitalization, and suicidality."); *Dekker v. Weida*, No.
4:22-CV-325-RH-MAF, 2023 WL 4102243, at *7 (N.D. Fla. June 21,
2023). ("The overwhelming weight of medical authority supports
treatment of transgender patients with GnRH agonists [puberty
blockers] and cross-sex hormones in appropriate circumstances.").

*also id.* at *12 ("these European countries all chose less-restrictive means of regulation.")[40] Alabama cites no article, study, or recommendation to support its view that gender-affirming healthcare for teenagers is *never* appropriate and does not come close to establishing that the district court clearly erred in concluding that "[u]nder the evidence available at this preliminary stage, there is not a 'close means-end fit' between the State's asserted reasons for regulating the provision of gender transition procedures to minors and S.E.A. 480's broad ban of those procedures." *Id.* at *1.

---

[40] *See also Skrmetti*, 2023 WL 4232308, at *27 n.53 ("Defendants' reliance on the practices of European nations is not an apt analogy where none of these countries have gone so far as to ban hormone therapy entirely."); *see also K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, No. 1:23-cv-00595-JPH-KMB, 2023 WL 4054086, at *11 (S.D. Ind. June 16, 2023) ("Most detrimental to Defendants' position is that no European country that has conducted a systematic review responded with a ban on the use of puberty blockers and cross-sex hormone therapy."); *Ladapo*, 2023 WL 3833848, at *14 ("[T]he treatments are available in appropriate circumstances in all the countries cited by the defendants, including Finland, Sweden, Norway, Great Britain, France, Australia, and New Zealand.").

## CONCLUSION

The preliminary injunction should be affirmed.


Dated: September 27, 2023    Respectfully submitted,

ROB BONTA
Attorney General of California
RENU R. GEORGE
Senior Assistant Attorney General

*s/ KATHLEEN BOERGERS*

KATHLEEN BOERGERS
Supervising Deputy Attorney General
STEPHANIE T. YU
NIMROD PITSKER ELIAS
LILY WEAVER
NATALIE TORRES
Deputy Attorneys General
*Attorneys for Amicus Curiae State of California*


[*additional counsel listed on subsequent page*]

## ADDITIONAL COUNSEL

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 North French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
100 West Randolph Street
Chicago, IL 60601

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol 75 Rev. Dr. Martin
Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street N.E.
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

MICHELLE A. HENRY
*Attorney General*
*Commonwealth of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

## CORPORATE DISCLOSURE STATEMENT

As governmental parties, amici are not required to file a certificate of interested persons. Fed. R. App. P. 26.1(a).

## CERTIFICATE OF COMPLIANCE

1.     I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6377 words.

2.     I certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century font. Fed. R. App. P. 32(g)(1).

Respectfully submitted,

/s/ KATHLEEN BOERGERS

KATHLEEN BOERGERS
Supervising Deputy Attorney General
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on September 27, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to any CM/ECF participants.

/s/ KATHLEEN BOERGERS

KATHLEEN BOERGRES
Supervising Deputy Attorney General
*Counsel for Amici Curiae*