No. 23-2366

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

K.C., et al.,

Plaintiffs-Appellees,

v.

INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD OF
INDIANA in their official capacities, et al.,

Defendants-Appellants,

On Appeal from the United States District Court for the Southern District of
Indiana, No. 1:23-cv-00595-JPH-KMB, The Honorable James P. Hanlon, Judge

**BRIEF OF *AMICI CURIAE* 81 LOCAL GOVERNMENTS
AND LOCAL GOVERNMENT OFFICIALS**

Jonathan B. Miller
Aadika Singh
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
jon@publicrightsproject.org
(646) 831-6113

Eli Savit
Victoria Burton-Harris
Washtenaw County Prosecuting
 Attorney's Office
P.O. Box 8645
Ann Arbor, MI 48107

Save As          Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    See attached.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    N/A

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: _/s/ Jonathan B. Miller_    Date: 09/27/2023

Attorney's Printed Name: Jonathan B. Miller

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ✓    No ☐

Address: 490 43rd Street, Unit #115

    Oakland, CA 94609

Phone Number: (646) 831-6113    Fax Number:

E-Mail Address: jon@publicrightsproject.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**
**ATTACHED SHEET**

Appellate Court No: <u>23-2366</u>

Short Caption: <u>K.C., et al. v. Individual Members of the Medical Licensing Board</u>
<u>of Indiana, et al.</u>

(1)     The full name of every party that the attorney represents in the case (if
the party is a corporation, you must provide the corporate disclosure
information required by Fed. R. App. P. 26.1 by completing item #3)

Attorney is serving as counsel for an amicus brief on behalf of Local
Governments and Local Government Officials. Several of the *amici*
are governmental entities. The government entities have additional
counsel listed on the brief and are not subject to the disclosure
requirement. They are as follows:

City of Ann Arbor, Michigan; City of Baltimore, Maryland; City of
Boston, Massachusetts; City of Chicago, Illinois; City of Cincinnati,
Ohio; City of Columbus, Ohio; City of Madison, Wisconsin; City of
Minneapolis, Minnesota; County of Monterey, California; City of
New York, New York; City of Oakland, California; City of Pittsburgh,
Pennsylvania; City of Portland, Oregon; City of Sacramento,
California; City of Saint Paul, Minnesota; Travis County, Texas; and
City of West Hollywood, California.

Attorney is serving as counsel for the following Local Government
Officials in connection with the amicus brief:

Ylenia Aguilar, Elizabeth Alcantar, Soli Alpert, Susan AnderBois,
Valarie Bachelor, Natalie Beyer, Buta Biberaj, Daniel Biss, Xouhoa
Bowen, Teri Castillo, Peter Ceglarek, Michael Chameides, John Clark,
Jerry L. Clayton, Paula Cole, Laura Conover, Kara Davis, Satana
Deberry, Jorge DeFendini, Rosalba Dominguez, John Donegan, Parisa

Dehghani-Tafti, Matthew Ellis, Scott Esserman, Carrie Evans, Ramin Fatehi, Vanessa Fuentes, George Gascon, Megan Green, Leanne Greenberg, Marion Greene, Sarah George, Deborah Gonzalez, Beau Harbin, Michele Hirsch, Andrea Jenkins, Jillian Johnson, Tarece Johnson-Morgan, Nick Komives, Larry Krasner, Jaguanana Lathan, Stephanie Loredo, Mary Lupien, Ryan Mello, Rachel Miller, Omar Narvaez, Marcelia Nicholson, Isabel Piedmont-Smith, Veronica Pillar, Delishia Porterfield, Kim Roney, Minita Sanghvi, Alana Sanders, Gabriela Santiago-Romero, Mike Schmidt, Karen Stegman, Kimberly Wilburn, Stephanie Willoughby, Robin Wilt, Cynthia Wirth, Nelsie Yang, Gregory Young, Estevan Zarate, and Ligia Andrade Zuniga.

| Save As | Clear Form |
|---------|-----------|

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
  See attached.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Aadika Singh    Date: 09/27/2023

Attorney's Printed Name: Aadika Singh

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☐ No ☑

Address: 490 43rd Street, Unit #115

Oakland, CA 94609

Phone Number: 907-331-7481    Fax Number:

E-Mail Address: aadika@publicrightsproject.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
ATTACHED SHEET**

Appellate Court No: <u>23-2366</u>

Short Caption: <u>K.C., et al. v. Individual Members of the Medical Licensing Board
of Indiana, et al.</u>

(1)     The full name of every party that the attorney represents in the case (if
the party is a corporation, you must provide the corporate disclosure
information required by Fed. R. App. P. 26.1 by completing item #3)

Attorney is serving as counsel for an amicus brief on behalf of Local
Governments and Local Government Officials. Several of the *amici*
are governmental entities. The government entities have additional
counsel listed on the brief and are not subject to the disclosure
requirement. They are as follows:

City of Ann Arbor, Michigan; City of Baltimore, Maryland; City of
Boston, Massachusetts; City of Chicago, Illinois; City of Cincinnati,
Ohio; City of Columbus, Ohio; City of Madison, Wisconsin; City of
Minneapolis, Minnesota; County of Monterey, California; City of
New York, New York; City of Oakland, California; City of Pittsburgh,
Pennsylvania; City of Portland, Oregon; City of Sacramento,
California; City of Saint Paul, Minnesota; Travis County, Texas; and
City of West Hollywood, California.

Attorney is serving as counsel for the following Local Government
Officials in connection with the amicus brief:

Ylenia Aguilar, Elizabeth Alcantar, Soli Alpert, Susan AnderBois,
Valarie Bachelor, Natalie Beyer, Buta Biberaj, Daniel Biss, Xouhoa
Bowen, Teri Castillo, Peter Ceglarek, Michael Chameides, John Clark,
Jerry L. Clayton, Paula Cole, Laura Conover, Kara Davis, Satana
Deberry, Jorge DeFendini, Rosalba Dominguez, John Donegan, Parisa

Dehghani-Tafti, Matthew Ellis, Scott Esserman, Carrie Evans, Ramin Fatehi, Vanessa Fuentes, George Gascon, Megan Green, Leanne Greenberg, Marion Greene, Sarah George, Deborah Gonzalez, Beau Harbin, Michele Hirsch, Andrea Jenkins, Jillian Johnson, Tarece Johnson-Morgan, Nick Komives, Larry Krasner, Jaguanana Lathan, Stephanie Loredo, Mary Lupien, Ryan Mello, Rachel Miller, Omar Narvaez, Marcelia Nicholson, Isabel Piedmont-Smith, Veronica Pillar, Delishia Porterfield, Kim Roney, Minita Sanghvi, Alana Sanders, Gabriela Santiago-Romero, Mike Schmidt, Karen Stegman, Kimberly Wilburn, Stephanie Willoughby, Robin Wilt, Cynthia Wirth, Nelsie Yang, Gregory Young, Estevan Zarate, and Ligia Andrade Zuniga.

| Save As | | Clear Form |

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   Washtenaw County Prosecuting Attorney's Office

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   N/A

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

      N/A

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature:  /s/ Eli Savit                    Date: 09/27/2023

Attorney's Printed Name:  Eli Savit

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]    No [✓]

Address:  P.O. Box 8645

   Ann Arbor, Michigan, 48107

Phone Number: (734) 222-6620                    Fax Number: _____

E-Mail Address: savite@washtenaw.org

rev. 12/19 AK

[ Save As ]    [ Clear Form ]

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Washtenaw County Prosecuting Attorney's Office

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    N/A

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Victoria Burton-Harris     Date: 09/27/2023

Attorney's Printed Name: Victoria Burton-Harris

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]   No [✓]

Address: P.O. Box 8645

    Ann Arbor, Michigan, 48107

Phone Number: (734) 222-6620     Fax Number:

E-Mail Address: burtonharrisv@washtenaw.org

rev. 12/19 AK

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF INTEREST ............................................................1

SUMMARY OF ARGUMENT ............................................................4

ARGUMENT ......................................................................................5

I.   S.E.A. 480 VIOLATES THE DUE PROCESS
     RIGHTS OF PLAINTIFFS ..........................................................5

     A.   The Purported Harms Articulated by the State Are
          Speculative and Unsupported................................................7

     B.   S.E.A. 480 Is Not Narrowly Tailored...................................9

II.  LOCAL GOVERNMENTS WILL BE FORCED
     TO SHOULDER THE HARMS THAT STEM
     FROM BANS ON GENDER-AFFIRMING CARE..................13

     A.   Categorial Denial of Gender-Affirming Care
          Will Lead to Adverse Mental-Health Outcomes ...............15

     B.   Local Government Bears the Burden of Adverse
          Mental-Health Outcomes  ..................................................17

          1.   Suicidal Ideation and Mental Health Response ..........17

          2.   Crimes and Victimization ...........................................19

          3.   Housing Insecurity and Homelessness........................21

          4.   Schools and Academic Achievement...........................24

CONCLUSION..................................................................................28

ADDITIONAL COUNSEL ...............................................................29

APPENDIX A – LIST OF *AMICI* ....................................................31

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Bernal v. Fainter*,
    467 U.S. 216 (1984) ............................................................8

*Brandt v. Rutledge*,
    551 F. Supp. 3d 882 (E.D. Ark. 2021) ......................................11, 15

*Brandt v. Rutledge,*
    47 F.4th 661 (8th Cir. 2022)..............................................11

*Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*,
    927 F.3d 396 (6th Cir. 2019).....................................6, 7, 10

*L.W. v. Skrmetti*,
    2023 WL 4232308 (M.D. Tenn. June 28, 2023) ....................9, 15, 16

*Meyer v. Nebraska*,
    262 U.S. 390 (1923) ....................................................6, 13

*Moore v. City of E. Cleveland, Ohio*,
    431 U.S. 494 (1977) .........................................................12

*Parham v. J. R.*,
    442 U.S. 584 (1979) ................................................ *passim*

*Pierce v. Society of Sisters*,
    268 U.S. 510 (1925) .........................................................6

*Prince v. Massachusetts,*
    321 U.S. 158 (1944) ....................................................7, 10

*Reno v. Flores*,
    507 U.S. 292 (1993) .........................................................7

*Troxel v. Granville*,
    530 U.S. 57 (2000) .....................................................7, 11

*Wallis v. Spencer*,
    202 F.3d 1126 (9th Cir. 2000).............................................6

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ..........................................................................7

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ...............................................................5, 6, 27

**STATUTES**

AR Code § 25-19-103 (2020) ...........................................................13

Ind. Code § 25-1-22 ......................................................................6, 9

Ind. Code § 25-1-22-13(b) ..................................................................6

MCL 722.27a ...................................................................................13

Ohio Rev. Code § 3109.401 .............................................................13

TX Fam Code § 153.001 ..................................................................13

Utah Code § 80-2a-201 ....................................................................14

**OTHER AUTHORITIES**

A.V. Stoep, et al., *What Proportion of Failure to Complete
   Secondary School in the U.S. Population is Attributable
   to Adolescent Psychiatric Disorder?* J. of Behavioral
   Health Servs. & Research, 30(1):119-24 (2003) .............................24

Alliance for Justice, *National Survey on Victims' View on
   Safety and Justice* (Sept. 2022),
   https://allianceforsafetyandjustice.
   org/wp-content/uploads/2022/09/Alliance-for-Safety-
   and-Justice-Crime-Survivors-Speak-September-2022.pdf.........20, 21

American Psychological Ass'n, *Poverty and High School
   Dropouts* (May 2013), http://rb.gy/exmi3l......................................26

Andres Gutierrez, *Detroit Police Offer Resources as Officers Deal with Record Number of Mental Health Calls*, CBS Detroit (July 18, 2023), https://www.cbsnews.com/detroit/news/detroit-police-offer-resources-as-officers-deal-with-record-number-of-mental-health-calls/ .........................................................................17

Andrew Flores, et al., *Hate crimes against LGBT people: National Crime Victimization Survey, 2017-2019*, PLOS ONE, (Dec. 21, 2022), https://doi.org/10.1371/journal.pone.0279363 .................................20

Anita Chabria, *Police Fear "Suicide By Cop" Cases. So They've Stopped Responding to Some Calls*, The Los Angeles Times (Aug. 10, 2019) https://www.latimes.com/california/story/2019-08-09/suicide-calls-california-cops-stopped-responding#:~:text=Some%20small%20and%20midsize%20law,if%20the%20situation%20turns%20violent .....................18

Arianna Prothero et al., *School Counselors and Psychologists Remain Scarce Even as Needs Rise, Education Week* (Mar. 1, 2022), https://www.edweek.org/leadership/school-counselors-and-psychologists-remain-scarce-even-as-needs-rise/2022/03 ..................................................24

Catherine Stoddard, *"He Is A Hero": South Carolina Officer Dies Saving Person Having Mental Health Crisis,* Fox 5 Tampa Bay (Aug. 3, 2023), https://www.fox13news.com/news/he-is-a-hero-south-carolina-officer-dies-saving-person-having-mental-health-crisis.......................................................................................18

Chapin Hall at the University of Chicago, *Missed Opportunities: LGBTQ Youth Homelessness in America,* https://www.chapinhall.org/wp-content/uploads/VoYC-LGBTQ-One-Pager-FINAL.pdf......................................................22

Christine Chung, *New 988 Mental Health Crisis Hotline
Sees Record Demand*, The New York Times (Jan. 19,
2023) https://www.nytimes.com/2023/01/19/us/suicide-
hotline-demand.html ..........................................................................18

Cindy Long, *Why School Nurses Are Leaving*, NEA Today
(June 23, 2023), https://www.nea.org/advocating-for-
change/new-from-nea/why-are-school-nurses-leaving ...................25

City of Ann Arbor, *Ann Arbor Human Rights Commission*,
https://www.a2gov.org/departments/city-clerk/pages/
humanrightscommission.aspx#lgbtq ....................................................2

Dan Rosenzweig-Ziff, *Denver Mayor Wants to Buy Hotel
as First Step to First Homelessness*, Washington Post
(July 31, 2023),
https://www.washingtonpost.com/nation/2023/07/31/den
ver-homelessness-mayor-johnston-hotel/ .........................................21

Detroit Police Department, Chief's Neighborhood
Program, (2021), https://detroitmi.gov/sites/
detroitmi.localhost/files/events/2021-
09/CNL%20Power%20Pointrfnlsubr2.pdf ..........................................3

Diana Tordoff, et al., *Mental Health Outcomes in
Transgender and Nonbinary Youths Receiving Gender-
Affirming Care*, JAMA Netw Open. 5(2) (2022),
https://jamanetwork.com/journals/jamanetworkopen/fulla
rticle/2789423 ....................................................................................15

District Attorney Crime Prevention Foundation, SARB
Program (2020), http://rb.gy/1bqgyt.................................................26

Evan Millward, *Cincinnati Police LGBTQ liaisons
changing perspectives in the community and department*,
WCPO Cincinnati, (Jun. 8, 2021),
https://www.wcpo.com/community/pride/cincinnati-
police-lgbtq-liaisons-changing-perspectives-in-the-
community-and-department ................................................................3

Fight Crime: Invest in Kids, *School or the Streets: Crime and America's Dropout Crisis* (2008), http://rb.gy/b28sgj ..............26

G. Slap et al., *Adoption as a Risk Factor for Attempted Suicide During Adolescence*, Pediatrics 108(2):E30 (Aug. 2001), http://www.doi.org. 10.1542/peds.108.2.e30 ...................................................................24

George Hunter, *Why Michigan Police are 'Overwhelmed' by Growing Mental Health Calls*, The Detroit News (Oct. 16, 2022), https://www.detroitnews.com/ story/news/local/michigan/2022/10/17/why-michigan-police-are-overwhelmed-by-growing-mental-health-calls/69543716007/...........................................................................17

H. Kim et al., *Housing Instability and Mental Health Among Renters in the Michigan Recession and Recovery Study*, Public Health 209:30 (Aug. 2022), https://www.sciencedirect.com/science/article/abs/pii/S0 033350622001421?via%3Dihub .......................................................23

Hollywood Homeless Youth Partnership, *No Way Home*, at 7 (Nov. 2010), http://www.hhyp.org/downloads/HHYP_TCE_Report_11 -17-10.pdf .........................................................................................23

Hugo Westerlund et al*., Parental Academic Involvement in Adolescence as Predictor of Mental Health Trajectories Over The Life Course,* 15 BMC Public Health 653 (2015), https://doi.org/10.1186/s12889-015-1977-x ........................14

Jack L. Turban, et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation,* 145(2) Pediatrics (Feb. 2020), https://www.ncbi.nlm.nih.gov/ pmc/articles/PMC7073269/.......................................................16, 17

James Copple, et al., *Gender, Sexuality, and 21st Century Policing: Protecting the Rights of the LGBTQ+ Community*, Community Oriented Policing Services U.S. Department of Justice, (2017), https://www.iadlest.org/Portals/0/cops% 20LGBTQ.pdf ......................................................................................3

Kaleidoscope Youth Center, *LGBTQ+ Youth Homelessness*, (2019), https://www. kycohio.org/uploads/1/3/3/7/13374330/lgbtqia_homeless ness_info_kyc.pdf.................................................................2

Linda A. Teplin et al., *Crime Victimization in Adults with Severe Mental Illness*, 62 Arch. Gen. Psychiatry 8, 911-921 (2005) ..........................................................20

Memorandum from Michigan State Superintendent Brian J. Whiston to State Board of Education at 2 (Feb. 23, 2016), https://www.michigan.gov/-/media/Project/Websites/mde/Year/2016/02/26/Item_B_SBE_Statement_and_Guidance_on_LGBTQ.pdf?rev=34 84b24fa9c14f6e85a39684a5c33d94..................................25

Monica Deza et al., *Local Access to Mental Healthcare and Crime, National Bureau of Economic Research*, J. of Urb. Econs. 103410 (May 2022) ......................................19

N. Ray, *Lesbian, gay, bisexual and transgender youth: An epidemic of homelessness*, National Gay and Lesbian Task Force Policy Institute and the National Coalition for the Homeless (2007), http://www.thetaskforce.org/reports_and_research/homeless_ youth........................................22

National Ass'n of School Psychologists, *The Relationship Between Mental Health and Academic Achievement* [Research Summary] (2020), https://tinyurl. com/2p8b755y .....................................................24

National Coalition for the Homeless, *Mental Illness and Homelessness* (July 2009), https://www.nationalhomeless.org/factsheets/Mental_Illn ess.pdf.................................................................21

National Network for Youth, *LGBTQ+ Youth Homelessness*, https://nn4youth. org/lgbtq-homeless-youth/..............................................23

Nermeen E. El Nokali et al., *Parent Involvement and Children's Academic and Social Development in Elementary School,* 81 Child. Dev. 988 (2010)................................14

New York City Police Department, *Celebrating Pride, NYPD and GOAL Highlight Progress for LGBTQIA+,* (Jun. 24, 2021), https://www.nyc.gov/site/ nypd/news/p0624a/celebrating-pride-nypd-goal- highlight-progress-lgbtqia-#:~:text =The%20Department%20is%20committed%20to,behavi or%20towards%20the%20LGBTQIA%2B%20communit y .............................................................................................................2

Nicole Hensley, *Man Killed, 2 Houston Cops Stabbed During Mental Health Call,* The Houston Chronicle (Feb. 18, 2023), https://www.houstonchronicle.com/news/houston- texas/crime/article/officers-stabbed-man-killed- 17792878.php ...................................................................................18

Preston Mitchum & Aisha Moodie-Mills, *Beyond Bullying: How Hostile School Climate Perpetuates the School-to-Prison Pipeline for LGBT Youth*, Center for American Progress at 2 (Feb. 2014), http://rb.gy/uq8rut..................26

Qiwei He & Scott Barkowski, *The Effect of Health Insurance on Crime: Evidence from the Affordable Care Act Medicaid Expansion*, 29 Health Econ. 261 (Jan. 2020).................................................................................................19

Robert C. Whitaker et al., *Family Connection and Flourishing Among Adolescents in 26 Countries*, Pediatrics 149 (2022), https://publications.aap.org/pediatrics/ article/149/6/e2021055263/188014/Family-Connection- and-Flourishing-Among ...................................................................14

Robert Klemko, *Police Agencies are Desperate to Hire. But They Say Few Want the Job*, The Washington Post (May 27, 2023) https://www.washingtonpost.com/national-security/2023/05/27/police-vacancies-hiring-recruiting-reform/ ........................................................................17

S.R. Bondurant et al., *Substance Abuse Treatment Centers and Local Crime*, 104 Journal of Urb. Economics 124-133 (2018) ........................................................................19

S.T. Russell et al., *Indicators of Victimization and Sexual Orientation Among Adolescents*, 104 J. Public Health 255- 261 (2014) ..........................................................25

Seattle Police Foundation, *Safe Place*, https://seattlepolicefoundation.org/safe-place/ ....................................2

Urban Institute, *Five Charts that Explain the Homelessness-Jail Cycle—and How to Break It* (Sept. 16, 2020), http://rb.gy/9n6kqa ..................................................22

## <u>STATEMENT OF INTEREST</u>

*Amici* are 81 local governments and local government officials representing 75 jurisdictions in 26 states.[1] *Amici* regularly interface with youth and parents on a variety of issues, from schooling to housing to health care to the juvenile justice system. We file this brief in strong support of Appellees and as a demonstration of our belief that parents are uniquely situated to make medical decisions for their children—because families, in all of their shapes, sizes, and formations, are foundational for our communities. As governmental entities and officials that work with families, we recognize that parents generally know their children better than government. Parents, doctors, and patients should thus retain the liberty to make medically indicated decisions for children, without unnecessary interference by the state.

We also submit this brief because state laws like Indiana's S.E.A. 480 will have deleterious effects on our communities. The denial of gender-affirming care is strongly associated with adverse mental-health outcomes—outcomes that local units of government will ultimately need to address. By precluding young people from

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund its preparation or submission. No person other than *amici* or *amici*'s counsel made a monetary contribution to the preparation or submission of this brief. A list of all *amici* is available at Appendix A.

accessing medically indicated care, laws like S.E.A. 480 will strain already stretched local government resources and impair *amici*'s efforts to include and serve all our constituents effectively.

Such laws will also undercut the work that many local units of government have done to serve an already-vulnerable community. Recognizing that transgender people suffer from discrimination, distrust of government, and other forms of marginalization, many *amici* have dedicated staff and resources to better serve them as part of their constituencies. For example, local governments provide housing support to their communities, including services that focus on assisting transgender people.[2] *Amici* jurisdictions also have implemented programs and policies to train law enforcement to identify and check personal biases about transgender people, and to encourage reporting and cooperation.[3] In addition, many *amici* have established LGBTQ+ community liaison programs. Liaison law-enforcement officers develop and nurture relationships with LGBTQ+ community organizations, endeavor to

---

[2] Kaleidoscope Youth Center, *LGBTQ+ Youth Homelessness*, (2019), https://www. kycohio.org/uploads/1/3/3/7/13374330/lgbtqia_homelessness_info_kyc.pdf.

[3] *See, e.g.*, New York City Police Department, *Celebrating Pride, NYPD and GOAL Highlight Progress for LGBTQIA+*, (Jun. 24, 2021), https://www.nyc.gov/site/ nypd/news/p0624a/celebrating-pride-nypd-goal-highlight-progress-lgbtqia-#:~:text =The%20Department%20is%20committed%20to,behavior%20towards%20the%2 0LGBTQIA%2B%20community; Seattle Police Foundation, *Safe Place*, https://seattlepolicefoundation.org/safe-place/; City of Ann Arbor, *Ann Arbor Human Rights Commission*, https://www.a2gov.org/departments/city-clerk/pages/ humanrightscommission.aspx#lgbtq.

foster trust, and coordinate multi-government agency responses to the needs articulated.[4] Through these and other programs, local governments foster connection so that transgender victims and witnesses of crime, as well as individuals in need of services, will feel comfortable coming forward.[5]

Laws like S.E.A. 480 undermine these established local government efforts and programs. They threaten to impose significant mental-health related harms— and thus, increased vulnerability—among members of an already-vulnerable community. They will make the work of law enforcement harder, strain local government resources, and cause harm to individuals and their families. For all of these reasons and for what is set out below, *amici* strongly support Appellees' challenge of S.E.A. 480 and urge affirmance of the district court's order granting a preliminary injunction against enforcement of the state law.

---

[4] *See, e.g.*, Evan Millward, *Cincinnati Police LGBTQ liaisons changing perspectives in the community and department*, WCPO Cincinnati, (Jun. 8, 2021), https://www.wcpo.com/community/pride/cincinnati-police-lgbtq-liaisons-changing-perspectives-in-the-community-and-department; Detroit Police Department, Chief's Neighborhood Program, (2021), https://detroitmi.gov/sites/detroitmi.localhost/files/events/2021-09/CNL%20Power%20Pointrfnlsubr2.pdf.

[5] James Copple, et al., *Gender, Sexuality, and 21st Century Policing: Protecting the Rights of the LGBTQ+ Community*, Community Oriented Policing Services U.S. Department of Justice, (2017), https://www.iadlest.org/Portals/0/cops%20LGBTQ.pdf.

## SUMMARY OF ARGUMENT

S.E.A. 480 violates the deeply rooted due process rights of parents to make medical decisions about their children. History, tradition, and common sense dictate that parents have superior knowledge to the state when it comes to their children's unique needs. Yet, through S.E.A. 480, the Indiana Legislature sidelines parents entirely from certain medical decisions pertaining to gender-affirming care.  The law replaces parental judgment, as well as the judgment of medical providers, in all circumstances. S.E.A. 480 cannot meet the strict scrutiny demanded when fundamental rights protected by the Due Process Clause of the Fourteenth Amendment are implicated. Any concern of harm is speculative at best and certainly not supported by the records before the Court. Moreover, the statute is not narrowly tailored, as S.E.A. 480 preclude consideration of any specific contexts or individual child's needs.

The harms associated with S.E.A. 480 will not be limited to children denied access to gender-affirming care and their parents. Local governments, which are situated closest to constituents and provide direct services and support to the most vulnerable, will be left to shoulder the load. The denial of care and subsequent harms laws like S.E.A. 480 impose have significant downstream impacts ranging from crisis response to victimization, housing security, and educational attainment. In each instance, an already-vulnerable population will be negatively impacted and

local government resources will be strained to support them with safety, housing, and schooling, among other governmental services.

## ARGUMENT

## I.     S.E.A. 480 VIOLATES THE DUE PROCESS RIGHTS OF PLAINTIFFS

Indiana's S.E.A. 480 violates parents' due process rights to make medical decisions for their minor children.[6] S.E.A. 480 provides that the Legislature—not parents, not doctors, and not minors themselves—know what is in the best interest of children. That "statist notion that governmental power should supersede parental authority in *all* cases . . . is repugnant to American tradition." *Parham v. J. R.*, 442 U.S. 584, 602 (1979) (emphasis in the original). By denying parents *any* authority to make certain individualized medical choices on the advice of doctors, S.E.A. 480 runs afoul of deeply rooted legal traditions and violates the Due Process Clause of the Fourteenth Amendment.

The "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). Over a century of Supreme Court precedent, undergirded by the traditional presumption that parents act in the best interests of their children,

---

[6] For the reasons given by Appellees and by the district court, the law at issue in this case violates the Equal Protection Clause of the Fourteenth Amendment. *See* Appellees' Br. 23-40; SA 18-27. *Amici*, however, focus this brief on the due process rights of the families our governments closely serve.

zealously safeguards parental decision-making. *See Meyer v. Nebraska*, 262 U.S. 390, 400 (1923); *Parham,* 442 U.S. at 604; *Yoder*, 406 U.S. at 213; *Pierce v. Society of Sisters*, 268 U.S. 510 (1925). Of particular relevance here, parents "retain plenary authority to seek . . . care for their children, subject to a physician's independent examination and medical judgment." *Parham*, 442 U.S. at 604. In the medical context, "[p]arents possess a fundamental right to make decisions concerning the medical care of their children" under the Due Process Clause. *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 418 (6th Cir. 2019); *see also Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (due process "includes the right of parents to make important medical decisions for their children").

S.E.A. 480 wrests that fundamental due process right from parents. The law categorically dictates that no healthcare providers in Indiana may "knowingly provide gender transition procedures to a minor." Ind. Code § 25-1-22. Nor may providers "aid or abet another physician or practitioner in the provision of gender transition procedures to a minor," *id.* § 25-1-22-13(b), which restricts referrals or sharing of information with other providers, including those who are out of state. *See* Appellees' Br. 44-47. S.E.A. 480 contains no exceptions that allow parents to make a contrary decision about the appropriateness of such medical care. No matter how pronounced a minor's need for gender-affirming care—and no matter how severe the mental, physical, or emotional trauma that might result from its denial—

parents are absolutely precluded under S.E.A. 480 from making certain medical decisions that are in their children's best interests.

To be sure, a parent's "fundamental right to make decisions concerning the medical care of their children," *Kanuszewski*, 927 F.3d at 418, is not absolute. The state also has "a wide range of power for limiting parental freedom and authority in things affecting a child's welfare." *Prince v. Massachusetts,* 321 U.S. 158, 167 (1944). Nevertheless, "[t]he liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). And the Fourteenth Amendment "forbids the government to infringe" on such "'fundamental' liberty interests *at all*," unless the State can demonstrate that "infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (citation omitted; emphasis in original); *see also Reno v. Flores*, 507 U.S. 292, 302 (1993). Indiana has failed to meet that burden here.

## A.    The Purported Harms Articulated by the State Are Speculative and Unsupported

The State contends that (1) "the prohibited treatments are unsafe and their effectiveness is unproven," so (2) "S.E.A. 480 is justified by the State's interests in protecting the wellbeing of minors and regulating the medical profession." SA 21. But an asserted state interest must be "real, as opposed to merely speculative."

*Bernal v. Fainter*, 467 U.S. 216, 227 (1984). And the State's asserted interests are speculative indeed.

To be sure, the State provided the district court some evidence that "the safety and effectiveness of puberty blockers and hormone therapy is uncertain and unsettled." SA 23. But purported concern about "uncertain and unsettled" medical risks are speculative *by their own terms.* The State has effectively conceded as much, telling the district court that "more research is needed to explore these risks." *Id.*

What is more, record evidence credited by the district court also indicates significant "risks to minors' health and wellbeing from gender dysphoria if those treatments can no longer be provided to minors." SA 24-25. Specifically, if young people are blocked from gender-affirming care, they are at heightened risk of "additional distress and health risks, such as depression, posttraumatic stress disorder, and suicidality." SA 25. The record evidence in this case—submitted at the preliminary-injunction phase—is thus conflicting at best. And the State's conjecture that the risks of gender-affirming care outweigh its significant benefits is definitionally speculative.

In any event, the scientific consensus is clear. "*[E]very* major medical organization to take a position on the issue . . . agrees that puberty blockers and cross-sex hormone therapy are appropriate and medically necessary treatments for adolescents when clinically indicated." *L.W. v. Skrmetti*, 2023 WL 4232308, at *29

(M.D. Tenn. June 28, 2023) (emphasis added). The State may legitimately have concerns that a procedure is "unproven." Ind. Br. at 31. But if fundamental parental rights are to be displaced, the State must provide more than speculation about the purported risks. That is particularly true where (as here) record evidence indicates that denial of parental rights may endanger a child's health or life. SA 23-25; *see also* Br. of Am. Academy of Pediatrics, et al. at 20 (Dkt. No. 55) ("[T]he available data indicate that the gender-affirming treatments prohibited by [S.E.A. 480] are effective for the treatment of gender dysphoria.").

## B.     S.E.A. 480 Is Not Narrowly Tailored

Even if the State's purported interest were non-speculative, S.E.A. 480 is not narrowly tailored to that interest. As the district court observed, Indiana's law is "broad," because it opts to "ban—rather than otherwise regulate—gender transition care for minors."  SA 22. S.E.A. 480 fully and categorically bars certain "gender transition procedures" for minors. Ind. Code § 25-1-22. There are no exceptions to these sweeping medical commands. Care cannot be provided even if a parent, minor, and doctor all agree on a course of action. It cannot be provided if a young person's life will be endangered without the care. Indeed, S.E.A. 480 flatly prohibits gender-affirming care even if two, three, or four independent medical professionals all agree that medical treatment sought by a parent and minor comports with the standard of care and is indicated. It also prohibits referrals and assistance to providers in other

9

states. SA 29. At bottom, S.E.A. 480 declares that the Legislature knows what appropriate medical care is in all individual cases—and that the Legislature's judgment must trump medical opinion and parental authority in all cases where care is sought.

That categorical displacement of parental rights is not "narrow tailoring"; it is no tailoring at all. Of course, states may legitimately seek to minimize risks associated with medical treatment. But "[s]imply because the decision of a parent . . . involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. After all, the Supreme Court has emphasized, there are risks inherent in any medical treatment or procedure, including common childhood procedures like a "tonsillectomy [or] appendectomy." *Id.* Parents, not the state, nevertheless retain primary responsibility for making "judgments concerning" their child's "need for medical care or treatment." *Id.* Accordingly, when a state seeks to undercut those parental rights, it must generally allow for case-specific determinations that give weight to parental input.[7] *See, e.g.*, *id.* at 584 (upholding a "medical factfinding

---

[7] This is not to say that a state can *never* categorically prohibit certain choices a parent might make. *See, e.g.*, *Prince*, 321 U.S. 158 (upholding uniform application of child labor laws). Even in the medical context, where "the life of the child is at stake . . . the state . . . may subordinate the interest of the child's parents to its own interest in keeping the child alive." *Kanuszewski*, 927 F.3d at 419. But where a state relies only on the possible "risks" of a medical procedures—risks that are inherent in *any* medical procedure, *Parham*, 442 U.S. at 603—it cannot simply displace all

processes" when parents sought to have their children committed to a mental health-care facility as "consistent with constitutional guarantees"); *accord Troxel*, 530 U.S. at 70 (where a "fit parent's decision" regarding visitation rights are "subject to judicial review, the court must accord at least some special weight to the parent's own determination").

The context here illustrates why categorically sidelining parents in the medical decision-making process is so strongly disfavored. Young people who suffer from gender dysphoria face significant "distress and health risks," including "depression, posttraumatic stress disorder, and suicidality." SA 25. And "[e]very major expert medical association" has concluded that "gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people." *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 891 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022). Given the established health benefits, parents (and doctors) are in a far better position than the Indiana Legislature to make individualized decisions for the best interests of individual children.

Parents, after all, are often in the best position to know if their child is depressed or dealing with suicidal ideation. Parents may observe their child engaged

---

parental input, at least not without demonstrating that the procedure in practice uniformly presents an unusually high risk of harm.

in self-harm, making suicidal statements, or exhibiting other troubling behaviors. Moreover, parents are able to know when their child's depressive (or suicidal) behaviors began—and for how long they have been occurring. They will know if behaviors are typical or atypical for their child. They will know, as well as anybody, the severity of a child's struggles. Parents are therefore uniquely situated to evaluate the need for treatment for their child. And they are thus generally in a superior position to make a determination, in consultation with medical professionals, as to whether treatment is needed, and what type.

*     *     *

"[T]he institution of the family is deeply rooted in this Nation's history and tradition." *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 503 (1977). But by eliminating even the possibility that parents can seek gender-affirming care for their minor children, S.E.A. 480 turns that history and tradition on its head. "The law's concept of the family rests on a presumption that *parents* possess . . . capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602 (emphasis added). "More importantly," the Supreme Court has emphasized, "historically [the law] has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Id.* (emphasis added) (citing 1 W. Blackstone, Commentaries; 2 J. Kent, Commentaries on American Law * 190). True, "some parents may at times be acting against the interests of their children."

*Id*. But that is "hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests." *Id*. at 602-603.

This Indiana law does just that. It takes certain medical procedures for minors off the table entirely. It eliminates even the possibility that a parent, doctor, and minor can together make a decision that runs contrary to the State's commands. S.E.A. 480's categorical dictate that every medical case be treated the same means that that law is not narrowly tailored. And by removing medically indicated care from the choices available to parents, the Indiana law "discard wholesale" a parent's authority to "act in the child's best interest." *Parham*, 442 U.S. at 602-603. The constitutional violation is thus clear and S.E.A. 480 should be invalidated.

## II.   LOCAL GOVERNMENTS WILL BE FORCED TO SHOULDER THE HARMS THAT STEM FROM BANS ON GENDER-AFFIRMING CARE

The "natural duty of the parent" to prepare an individual child for "their station in life," *Meyer*, 262 U.S. at 400, is not only deeply rooted in constitutional tradition, it is reflected in *amici*'s day-to-day work. Countless state laws provide that parental decision-making is fundamental, and that parents are presumed to safeguard "the best interests of a child."[8] *Amici* enforce and implement these laws in a diverse array of fields, such as child custody and juvenile justice.

---

[8] *See, e.g.*, MCL § 722.27a ("[I]t is presumed to be in the best interests of a child for the child to have a strong relationship with both his or her parents."); AR Code § 25-19-103 (2020) (it is "the declared public policy of this state . . . that absent evidence

Those laws are there for a reason. Parental involvement in a child's life is associated with "declines in problem behaviors and improvements in social skills."[9] Numerous studies have shown, moreover, that "childhood family connection is associated with flourishing in adulthood."[10] When parents are involved in a child or adolescent's life, that young person is statistically more likely to succeed academically, and statistically less likely to experience mental-health issues into adulthood.[11]

By categorically prohibiting parents from accessing medically indicated gender-affirming treatment for their children, S.E.A. 480 threatens to undermine young people's future life outcomes. The denial of gender-affirming care can lead

---

to the contrary, it is in a child's best interest . . . [t]o have substantial, frequent, meaningful and continuing parenting time with both parents [and] [t]o have both parents participate in decision-making about the child"); Ohio Rev. Code § 3109.401 ("the parent and child relationship is of fundamental importance to the welfare of a child"); TX Fam Code § 153.001 ("public policy of this state is to . . . assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child"); Utah Code § 80-2a-201 ("It is the public policy of this state that . . . a parent retains the fundamental right and duty to exercise primary control over the care, supervision, upbringing, and education of the parent's child").

[9] Nermeen E. El Nokali et al., *Parent Involvement and Children's Academic and Social Development in Elementary School,* 81 Child. Dev. 988 (2010).

[10] Robert C. Whitaker et al., *Family Connection and Flourishing Among Adolescents in 26 Countries*, Pediatrics 149 (2022), https://publications.aap.org/pediatrics/article/149/6/e2021055263/188014/Family-Connection-and-Flourishing-Among.

[11] Hugo Westerlund et al.*, Parental Academic Involvement in Adolescence as Predictor of Mental Health Trajectories Over The Life Course,* 15 BMC Public Health 653 (2015), https://doi.org/10.1186/s12889-015-1977-x.

to significant trauma and mental-health issues, and the resulting effects are those that *amici* will need to address. *Amici* represent the government units closest to our residents. Our schools, public safety components, and other services are on the front lines supporting and protecting all community members. From that vantage, we understand that S.E.A. 480's displacement of the judgment of parents and doctors will not only cause harm for individuals, it will have broader deleterious effects on our communities as well.

### A.     Categorial Denial of Gender-Affirming Care Will Lead to Adverse Mental-Health Outcomes

As multiple courts have noted, "*every* major medical organization to take a position on the issue . . . agrees that puberty blockers and cross-sex hormone therapy are appropriate and medically necessary treatments for adolescents when clinically indicated." *L.W.*, 2023 WL 4232308, at *29 (emphasis added); *see also, e.g., Brandt*, 551 F. Supp. 3d at 891; *Doe 1 v. Thornbury*, No. 3:23-CV-230-DJH, 2023 WL 4230481, at *2 (W.D. Ky. June 28, 2023). Young transgender people who seek (and receive) gender-affirming care—including puberty blockers and gender-affirming hormones—experience "60% lower odds of moderate or severe depression and 73% lower odds of suicidality" than those who were denied care.[12] And the

---

[12] Diana Tordoff, et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, JAMA Netw. Open 5(2) (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789423.

adverse mental-health outcomes associated with the denial of indicated gender-affirming care are long-lasting. A cross-sectional study of transgender adults concluded that those who had been denied gender-affirming care as adolescents were significantly likelier to suffer from severe psychological stress and suicidal ideation than those who had received care.[13]

For these reasons, the "the AAP, American Medical Association, American Psychiatric Association, American Psychological Association, and American Academy of Child Adolescent Psychiatry" all support the availability of gender-affirming care when medically indicated. *L.W.*, 2023 WL 4232308, at *29. "[A]ll major medical organizations oppose outright bans on gender-affirming medical care for adolescents." *Id.*; *see also* Amicus Br. of Am. Academy of Pediatrics, et al. (Dkt. No. 55) at 21 ("The medical treatments prohibited by [S.E.A. 480] can be a crucial part of treatment for adolescents with gender dysphoria and necessary to preserve their health."). Such categorical bans prevent parents and doctors from making a decision that is in the best interest of an individual child. But mental-health issues that can result from the denial of care do not end with the child or their family. Rather, they radiate outwards and require local-government response.

---

[13] Jack L. Turban, et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation,* 145(2) Pediatrics (Feb. 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7073269/.

### B.     Local Government Bears the Burden of Adverse Mental-Health Outcomes

Across nearly every sector, local units of government like *amici* will bear the burden of adverse mental-health outcomes associated with care-denying laws like S.E.A. 480.

### 1.     Suicidal Ideation and Mental Health Response

The most pronounced observed effect from the denial of gender-affirming care is an increase in suicidal ideation and "severe psychological stress."[14] Laws like S.E.A. 480 will invariably exacerbate those issues—straining local units of government and placing more people in harm's way.

Often, local units of government are asked to respond to mental-health crises, including crises involving a suicidal person. Frequently (and in record numbers)[15] those calls are routed to law enforcement, who report being "overwhelmed" by mental-health related incidents.[16] The barrage of mental-health calls has taxed local

---

[14] Turban et al., *supra* n.13.

[15] *See, e.g.*, Andres Gutierrez, *Detroit Police Offer Resources as Officers Deal with Record Number of Mental Health Calls*, CBS Detroit (July 18, 2023), https://www.cbsnews.com/detroit/news/detroit-police-offer-resources-as-officers-deal-with-record-number-of-mental-health-calls/.

[16] George Hunter, *Why Michigan Police are 'Overwhelmed' by Growing Mental Health Calls*, The Detroit News (Oct. 16, 2022), https://www.detroitnews.com/story/news/local/michigan/2022/10/17/why-michigan-police-are-overwhelmed-by-growing-mental-health-calls/69543716007/.

law enforcement at a time when police ranks are already stretched thin.[17] And though there is movement towards a non-law enforcement response to mental health crises, those entities, too, are overburdened and under resourced in most communities.[18]

Accordingly, even a modest increase in suicidal ideation or psychological stress will burden local government at a time when those resources are already scarce.  Any such increase, moreover, will endanger both public servants and the community alike. Mental-health related calls—particularly when a person has a weapon—are often tense, fraught, and dangerous.[19] And tragedies arising from mental-health related calls are all too common.[20]

---

[17] Robert Klemko, *Police Agencies are Desperate to Hire. But They Say Few Want the Job*, The Washington Post (May 27, 2023) https://www.washingtonpost.com/national-security/2023/05/27/police-vacancies-hiring-recruiting-reform/.

[18] Christine Chung, *New 988 Mental Health Crisis Hotline Sees Record Demand*, The New York Times (Jan. 19, 2023), https://www.nytimes.com/2023/01/19/us/suicide-hotline-demand.html.

[19] *See,* Anita Chabria, *Police Fear "Suicide By Cop" Cases. So They've Stopped Responding to Some Calls*, The Los Angeles Times (Aug. 10, 2019), https://www.latimes.com/california/story/2019-08-09/suicide-calls-california-cops-stopped-responding#:~:text=Some%20small%20and%20midsize%20law,if%20the%20situation%20turns%20violent.

[20] *See, e.g.*, Nicole Hensley, *Man Killed, 2 Houston Cops Stabbed During Mental Health Call,* The Houston Chronicle (Feb. 18, 2023), https://www.houstonchronicle.com/news/houston-texas/crime/article/officers-stabbed-man-killed-17792878.php; Catherine Stoddard, *"He Is A Hero": South Carolina Officer Dies Saving Person Having Mental Health Crisis,* Fox 5 Tampa Bay (Aug. 3, 2023), https://www.fox13news.com/news/he-is-a-hero-south-carolina-officer-dies-saving-person-having-mental-health-crisis.

By creating and exacerbating mental-health issues, categorical denial of gender-affirming care will lead to more suicides, more attempted suicides, and more mental health crises. Each such incident, standing on its own, is of tremendous concern. But these are also incidents that (like so many) will require government response, strain local resources, and place public servants in harm's way.

## 2.     Crimes and Victimization

Access to all forms of health care—particularly health care that is associated with mental-health issues—is associated with reductions in crime.[21] That data is in many ways unsurprising. After all, access to healthcare can help people address mental-health and substance-use issues that are often the root causes of criminal activity. Indeed, counties with greater access to substance-use and mental-health treatment regularly enjoy decreased crime rates.[22]

Access to care, moreover, not only makes a meaningful difference in terms of crime rates, it also reduces would-be victims' vulnerability. People who are

---

[21] Qiwei He & Scott Barkowski, *The Effect of Health Insurance on Crime: Evidence from the Affordable Care Act Medicaid Expansion*, 29 Health Econ. 261 (Jan. 2020); *see also id.* at 262 ("Medicaid expansion is associated with a 10.4% reduction in motor vehicle theft, an 8.13% reduction in homicides, and a 6.33% reduction in robbery.").

[22] S.R. Bondurant et al., *Substance Abuse Treatment Centers and Local Crime*, 104 Journal of Urb. Economics 124-133 (2018); Monica Deza et al., *Local Access to Mental Healthcare and Crime, National Bureau of Economic Research*, J. of Urb. Econs. 103410 (May 2022).

struggling with mental-health issues are significantly more likely to be victimized by crime. Annually, more than one quarter of persons with severe mental-health issues are the victims of violent crime, "a rate more than 11 times higher than the general population rates even after controlling for demographic differences."[23] Not only are people with mental-health issues more likely to be victimized by crime in the first instance, mental-health issues among victims can make it more difficult to investigate cases and prove those cases at trial. By denying care that could ameliorate mental-health issues, S.E.A. 480 will exacerbate the victimization of transgender people, placing greater strain on local law enforcement, prosecutors, and others who support victims of crime.

What is more, S.E.A. 480 impacts a group that is *already* particularly vulnerable to crime. Researchers who used data from the 2017-2018 National Crime Victimization Survey concluded that transgender people are more than four times as likely to be subjected to personal violence than cisgender people.[24] On top of that,

---

[23] Linda A. Teplin et al., *Crime Victimization in Adults with Severe Mental Illness*, 62 Arch. Gen. Psychiatry 8, 911-921 (2005).

[24] Andrew Flores, et al., *Hate crimes against LGBT people: National Crime Victimization Survey, 2017-2019*, PLOS ONE, (Dec. 21, 2022), https://doi.org/10.1371/journal.pone.0279363. A 2022 nationwide survey concluded that transgender people are 2.5 times more likely to experience violent victimization than people who are not transgender. Alliance for Justice, *National Survey on Victims' View on Safety and Justice* (Sept. 2022), https://allianceforsafetyandjustice. org/wp-content/uploads/2022/09/Alliance-for-Safety-and-Justice-Crime-Survivors-Speak-September-2022.pdf.

crimes against transgender individuals are generally underreported. Many of these crimes thus go unsolved or unaddressed, and these crimes can have long-term impacts on the economic and mental well-being of victims.[25] By *further* increasing the likelihood that transgender people will be victims of crime, S.E.A. 480 will thus undercut community safety.

### 3.      Housing Insecurity and Homelessness

Laws like S.E.A. 480 will also exacerbate homelessness, as those suffering from mental-health issues are particularly likely to be unhoused. Homeless individuals, and those facing housing insecurity, have a higher share of mental-health issues than the population overall.[26] And homelessness places extraordinary demands on local governments that provide essential services. Local governments fund emergency shelters, food assistance, healthcare, mental health services, and outreach programs. As the homeless population grows, the strain on existing human and financial resources can become overwhelming. For example, Saint Paul, Minnesota, monitors and restricts encampments to protect the health, safety, and security of encampment residents and the greater community. Many cities around

---

[25] Alliance for Justice, *supra* n.24.

[26] National Coalition for the Homeless, *Mental Illness and Homelessness* (July 2009), https://www.nationalhomeless.org/factsheets/Mental_Illness.pdf.

the country are similarly facing significant challenges around the unhoused.[27] Laws like S.E.A. 480 that cause (or exacerbate) mental-health issues will ineluctably increase housing vulnerability as well, furthering the existing strain on local governments.

And again: by increasing the likelihood that transgender people will become homeless, S.E.A. 480 increases vulnerability for an already-vulnerable population. In many locations, LGBTQ+ people are disproportionately likely to experience housing insecurity.[28] That vulnerability is particularly pronounced for LGBTQ+ youth, who are 2.2 times more likely to experience homelessness than their non-LGBTQ+ peers.[29]

Housing insecurity has broader impacts as well. Homelessness increases the risk that a person will be cited or jailed for low-level offenses like "camping, loitering, and public urination"—which "people wouldn't have to endure if they had

---

[27] *See, e.g.*, Dan Rosenzweig-Ziff, *Denver Mayor Wants to Buy Hotel as First Step to First Homelessness*, Washington Post (July 31, 2023), https://www.washingtonpost.com/nation/2023/07/31/denver-homelessness-mayor-johnston-hotel/.

[28] N. Ray, *Lesbian, gay, bisexual and transgender youth: An epidemic of homelessness*, National Gay and Lesbian Task Force Policy Institute and the National Coalition for the Homeless (2007), http://www.thetaskforce.org/reports_and_research/homeless_ youth.

[29] Chapin Hall at the University of Chicago, *Missed Opportunities: LGBTQ Youth Homelessness in America,* https://www.chapinhall.org/wp-content/uploads/VoYC-LGBTQ-One-Pager-FINAL.pdf.

a place to call home."[30] On average, people experiencing unsheltered homelessness have 21 contacts with the police every six months.[31] These effects are particularly pronounced among homeless youth. Sixty-nine percent of homeless youth have had "some involvement with the juvenile or criminal justice systems, including arrest, probation, and/or incarceration."[32]

For young people in particular, "[h]omelessness increases the risk of victimization."[33] According to one study, some 25% of homeless youth have been "robbed or threatened by a weapon while homeless and another thirteen percent "had been victims of sexual assault."[34] And just as mental-health issues can cause homelessness in the first place, housing insecurity contributes to worse mental health outcomes overall.[35] By categorically denying care that directly impacts an individual's mental health, laws like S.E.A. 480 will exacerbate that vicious

---

[30] Urban Institute, *Five Charts that Explain the Homelessness-Jail Cycle—and How to Break It* (Sept. 16, 2020), http://rb.gy/9n6kqa.

[31] *Id.*

[32] Hollywood Homeless Youth Partnership, *No Way Home*, at 7 (Nov. 2010), http://www.hhyp.org/downloads/HHYP_TCE_Report_11-17-10.pdf.

[33] *Id.* at 8.

[34] *See* National Network for Youth, *LGBTQ+ Youth Homelessness*, https://nn4youth.org/lgbtq-homeless-youth/.

[35] H. Kim et al., *Housing Instability and Mental Health Among Renters in the Michigan Recession and Recovery Study*, Public Health 209:30 (Aug. 2022), https://www.sciencedirect.com/science/article/abs/pii/S0033350622001421?via%3Dihub.

feedback loop—causing more homelessness, more mental-health issues, and more vulnerability that local governments will need to address.

### 4.    Schools and Academic Achievement

S.E.A. 480's denial of care also impacts the effectiveness of our schools, given the impacts of psychological distress on student participation and achievement. Multiple studies demonstrate a strong connection between mental health and academic achievement of students.[36] More than half of students who do not achieve a high school diploma have a diagnosable mental illness.[37] Unsurprisingly, high school students who show suicidal ideation achieve at lower levels and have less connection to their schools and peers.[38] Many school districts do not have psychologists or enough counselors to support students in distress.[39] As a result, students suffering from mental-health issues frequently fall behind and often drop

---

[36] National Ass'n of School Psychologists, *The Relationship Between Mental Health and Academic Achievement* [Research Summary] (2020), https://tinyurl.com/2p8b755y.

[37] A.V. Stoep, et al., *What Proportion of Failure to Complete Secondary School in the U.S. Population is Attributable to Adolescent Psychiatric Disorder?* J. of Behavioral Health Servs. & Research, 30(1):119-24 (2003).

[38] G. Slap et al., *Adoption as a Risk Factor for Attempted Suicide During Adolescence*, Pediatrics 108(2):E30 (Aug. 2001), http://www.doi.org.10.1542/peds.108.2.e30.

[39] Arianna Prothero et al., *School Counselors and Psychologists Remain Scarce Even as Needs Rise, Education Week* (Mar. 1, 2022), https://www.edweek.org/leadership/school-counselors-and-psychologists-remain-scarce-even-as-needs-rise/2022/03.

out of school. Due to an existing nationwide shortage in nurses, schools do not have the resources to meet most existing needs, let alone the increased mental-health demands laws like S.E.A. 480 will create.[40]

And yet again, the targeted impacts of S.E.A. 480 will exacerbate harm to a population that is already at risk. LGBTQ+ students already face significant barriers to academic achievement.  LGBTQ+ students "are targets of physical violence and experience a hostile school environment more frequently than non-LGBTQ peers" and as a result are more than two times as likely to skip school or have prolonged absences due to fears about physical safety.[41] These missed school days can disrupt a student's educational trajectory and put them at increased risk of dropping out. Students who face bullying or who feel unsafe often encounter harsh discipline at school when they act out or confront those who are threatening them. As a result of bullying, LGBTQ+ students are more likely to be involved in physical fights while at school.[42] Such students are also "more likely to experience harsh disciplinary

---

[40] Cindy Long, *Why School Nurses Are Leaving*, NEA Today (June 23, 2023), https://www.nea.org/advocating-for-change/new-from-nea/why-are-school-nurses-leaving.

[41] Memorandum from Michigan State Superintendent Brian J. Whiston to State Board of Education at 2 (Feb. 23, 2016), https://www.michigan.gov/-/media/Project/Websites/mde/Year/2016/02/26/Item_B_SBE_Statement_and_Guidance_on_LGBTQ.pdf?rev=3484b24fa9c14f6e85a39684a5c33d94.

[42] S.T. Russell et al., *Indicators of Victimization and Sexual Orientation Among Adolescents*, 104 J. Public Health 255- 261 (2014).

treatment," even though these punishments "do not correlate with higher rates of misbehavior."[43] In addition to disrupting a student's educational trajectory, these factors cycle LGBTQ+ students into the juvenile justice system all too frequently. Unfortunately, many of those students ultimately drop out of school, increasing the risk of homelessness, poverty, and future justice involvement.

The cascading effects do not end there. Young people who fail to complete high school are 3.5 times more likely than high school graduates to be arrested and more than eight times as likely to be incarcerated.[44] High school dropouts are also "far more likely to be victims of crime" than young people who graduate from high school.[45] And more broadly, high school dropouts "face extremely bleak economic and social prospects"[46] including a variety of adverse health outcomes.

By exacerbating mental-health issues among young people, S.E.A. 480 will further undercut students' academic success. Once again, in turn, that will create

---

[43] Preston Mitchum & Aisha Moodie-Mills, *Beyond Bullying: How Hostile School Climate Perpetuates the School-to-Prison Pipeline for LGBT Youth*, Center for American Progress at 2 (Feb. 2014), http://rb.gy/uq8rut.

[44] Fight Crime: Invest in Kids, *School or the Streets: Crime and America's Dropout Crisis* (2008), http://rb.gy/b28sgj.

[45] District Attorney Crime Prevention Foundation, SARB Program (2020), http://rb.gy/1bqgyt.

[46] American Psychological Ass'n, *Poverty and High School Dropouts* (May 2013), http://rb.gy/exmi3l.

long-term and widespread impacts affecting community safety, economic stability, and public health.

*    *    *

Few concepts are so deeply rooted in the American constitutional tradition as parental primacy over decisions that will impact their children's future trajectory. *See Parham*, 442 U.S. at 602; *Yoder*, 406 U.S. at 232. Individualized and nuanced medical decisions—like the decision whether to seek gender-affirming care—should be left to parents, doctors, and the minors themselves. By categorically displacing parental input, and prohibiting medically indicated care, S.E.A. 480 violates the U.S. Constitution.

While S.E.A. 480's constitutional violation strikes at the heart of "[t]he law's concept of the family," *Parham*, 442 U.S. at 602, its adverse effects do not end there. Denied the ability to make personal and individualized medical decisions with their parents' guidance, many who are deprived of care under S.E.A. 480 will suffer lasting mental-health consequences. The rippling effects of those consequences will create additional vulnerabilities that *amici* governments will need to address.

Strong families, at bottom, are the basis for strong communities. And by undercutting parental rights, S.E.A. 480 not only runs afoul of constitutional protections—it weakens the fabric of our communities.

## **CONCLUSION**

For all of the foregoing reasons and for all of the reasons stated by Appellees, the order of the district court should be affirmed.

Respectfully submitted,

Jonathan B. Miller
Aadika Singh
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
jon@publicrightsproject.org
646-831-6113

Eli Savit
Victoria M. Burton-Harris
Washtenaw County Prosecuting Attorney
P.O. Box 8645
Ann Arbor, Michigan, 48107

Dated: September 27, 2023

## ADDITIONAL COUNSEL

ATLEEN KAUR
City Attorney
Guy C. Larcom City Hall
301 East Huron, 3rd Floor
Ann Arbor, MI 48104
*Attorney for the City of Ann Arbor, Michigan*

EBONY M. THOMPSON
Acting City Solicitor
Baltimore City Department of
    Law
100 N. Holliday Street
Baltimore, MD 21202
*Attorney for the City of Baltimore, Maryland*

ADAM CEDERBAUM
Corporation Counsel
City Hall, Room 615
Boston, MA 02201
*Attorney for the City of Boston, Massachusetts*

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the
    City of Chicago
MYRIAM ZRECZNY KASPER
Deputy Corporation Counsel
SUZANNE M. LOOSE
Chief Assistant Corporation
    Counsel
121 N. LaSalle Street, Room
    600
Chicago, IL 60602
*Attorneys for the City of Chicago, Illinois*

EMILY SMART WOERNER
City Solicitor 801 Plum Street,
    Room 214
Cincinnati, OH 45202
*Attorney for the City of Cincinnati, Ohio*

ZACHARY M. KLEIN
Columbus City Attorney
77 North Front Street, 4th
    Floor
Columbus, OH 43215
*Attorney for the City of Columbus, Ohio*

MICHAEL HAAS
City Attorney
210 Martin Luther King Jr.
    Blvd., Room 401
Madison, WI 53703
*Attorney for the City of Madison, Wisconsin*

KRISTYN ANDERSON
City Attorney
City Hall, Room 210
350 South Fifth Street
Minneapolis, Minnesota
    55415
*Attorney for the City of Minneapolis, Minnesota*

LESLIE J. GIRARD
County Counsel
168 West Alisal Street, 3rd
   Floor
Salinas, CA 93901
*Attorney for the County of
Monterey, California*

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel
100 Church Street
New York, NY 10007
*Counsel for the City of New
York, New York*

BARBARA J. PARKER
City Attorney
One Frank H. Ogawa Plaza,
   6th Floor
Oakland, CA 94612
*Attorney for the City of
Oakland, California*

KRYSIA KUBIAK
City Solicitor and Chief Legal
   Officer
414 Grant Street
Pittsburgh, PA 15219
*Counsel for the City of
Pittsburgh, Pennsylvania*

ROBERT TAYLOR
City Attorney
1221 SW Fourth Avenue,
   Room 430
Portland, OR 97204
*Attorney for the City of
Portland, Oregon*

SUSANA ALCALA WOOD
City Attorney
915 I Street, Fourth Floor
Sacramento, CA 95814
*Attorney for City of
Sacramento, California*

LYNDSEY M. OLSON
City Attorney
400 City Hall & Court House
15 West Kellogg Blvd.
Saint Paul, MN 55102
*Attorney for the City of St.
Paul, Minnesota*

DELIA GARZA
Travis County Attorney
P.O. Box 1748
Austin, TX 78701
*Counsel for Travis County,
Texas*

LAUREN LANGER
City Attorney
Best Best & Krieger LLP
300 South Grand Ave., 25th
   Floor
 Los Angeles, CA 90071
*Attorney for City of West
Hollywood, California*

## <u>APPENDIX A – LIST OF AMICI</u>

### Local Governments & Offices

Washtenaw County Prosecuting Attorney's Office, Michigan

City of Ann Arbor, Michigan

City of Baltimore, Maryland

City of Boston, Massachusetts

City of Chicago, Illinois

City of Cincinnati, Ohio

City of Columbus, Ohio

City of Madison, Wisconsin

City of Minneapolis, Minnesota

County of Monterey, California

City of New York, New York

City of Oakland, California

City of Pittsburgh, Pennsylvania

City of Portland, Oregon

City of Sacramento, California

City of Saint Paul, Minnesota

Travis County, Texas

City of West Hollywood, California

## Local Government Officials

Ylenia Aguilar
*Central Arizona Water Conservation Board Member, Maricopa County, Arizona*

Elizabeth Alcantar
*Council Member, City of Cudahy, California*

Soli Alpert
*Rent Stabilization Board Member, City of Berkeley, California*

Susan AnderBois
*Councilor, City of Providence, Rhode Island*

Valarie Bachelor
*Unified School District Member, City of Oakland, California*

Natalie Beyer
*School Board Member, City of Durham, North Carolina*

Buta Biberaj
*Commonwealth's Attorney, Loudoun County, Virginia*

Daniel Biss
*Mayor, City of Evanston, Illinois*

Xouhoa Bowen
*Council Member, City of San Leandro, California*

Teri Castillo
*Councilwoman, City of San Antonio, Texas*

Peter Ceglarek
*School Board Trustee, City of Ferndale, Michigan*

Michael Chameides
*Supervisor, Columbia County, New York*

John Clark
*Mayor, Town of Ridgway, Colorado*

Jerry L. Clayton
*Sheriff, Washtenaw County, Michigan*

Paula Cole
*School Board Member and Director, City of Richfield, Minnesota*

Laura Conover
*County Attorney, Pima County, Arizona*

Kara Davis
*District Attorney, Gilliam County, Oregon*

Satana Deberry
*District Attorney, City of Durham, North Carolina*

Jorge DeFendini
*Alderperson, City of Ithaca, New York*

Rosalba Dominguez
*Council Member, Murray City, Utah*

John Donegan
*Councilperson, City of Cranston, Rhode Island*

Parisa Dehghani-Tafti
*Commonwealth's Attorney, Arlington County, Virginia*

Matthew Ellis
*District Attorney, Wasco County, Oregon*

Scott Esserman
*Public Schools Board of Education Treasurer, City of Denver, Colorado*

Carrie Evans
*Council Member, City of Minot, North Dakota*

Ramin Fatehi
*Commonwealth's Attorney, Norfolk, Virginia*

Vanessa Fuentes
*Councilwoman, City of Austin, Texas*

George Gascon
*District Attorney, Los Angeles, California*

Megan Green
*President of the Board of Aldermen, City of St. Louis, Missouri*

Leanne Greenberg
*Osborn Elementary School District Governing Board Member,
City of Phoenix, Arizona*

Marion Greene
*Commissioner, Hennepin County, Minnesota*

Sarah George
*State Attorney, Chittenden County, Vermont*

Deborah Gonzalez
*District Attorney, Athens-Clark County, Georgia*

Beau Harbin
*Legislator, Cortland County, New York*

Michele Hirsch
*Alderwoman, City of Kingston, New York*

Andrea Jenkins
*Council President, City of Minneapolis, Minnesota*

Jillian Johnson
*Council Member, City of Durham, North Carolina*

Tarece Johnson-Morgan
*Board of Education Chairperson, Gwinnett County, Georgia*

Nick Komives
*Council Member, City of Toledo, Ohio*

Larry Krasner
*District Attorney, Philadelphia County, Pennsylvania*

Jaguanana Lathan
*School Board Member, City of Antioch, California*

Stephanie Loredo
*Unified School District Governing Board Member, Culver City, California*

Mary Lupien
*Council Vice President, City of Rochester, New York*

Ryan Mello
*Council Member, Pierce County, Washington*

Rachel Miller
*Council President, City of Providence, Rhode Island*

Omar Narvaez
*Council Member, City of Dallas, Texas*

Marcelia Nicholson
*Chairwoman of County Board of Supervisors, Milwaukee County, Wisconsin*

Isabel Piedmont-Smith
*Council Member, City of Bloomington, Indiana*

Veronica Pillar
*Legislator, Tompkins County, New York*

Delishia Porterfield
*Council Member, Metropolitan Government of Nashville & Davidson County*

Kim Roney
*Council Member, City of Asheville, North Carolina*

Minita Sanghvi
*Commissioner of Finance, City of Saratoga Springs, New York*

Alana Sanders
*Commissioner, Newton County, Georgia*

Gabriela Santiago-Romero
*Council Member, City of Detroit, Michigan*

Mike Schmidt
*District Attorney, Multnomah County, Oregon*

Karen Stegman
*Mayor Pro Tem, Town of Chapel Hill, North Carolina*

Kimberly Wilburn
*Council Member, City of Minnetonka, Minnesota*

Stephanie Willoughby
*School Board Trustee, City of Vicksburg, Mississippi*

Robin Wilt
*Council Member, Town of Brighton, New York*

Cynthia Wirth
*School Board Member, City of Norristown, Pennsylvania*

Nelsie Yang
*Council Member, City of St. Paul, Minnesota*

Gregory Young
*Supervisor, Fulton County, New York*

Estevan Zarate
*Round Rock Independent School District Member, City of Austin, Texas*

Ligia Andrade Zuniga
*Vice President of School Board Trustees, City of San Mateo, California*

## <u>CERTIFICATE OF COMPLIANCE</u>
with type-volume limitation, typeface requirements,
and type-style requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

27(d)(2) because it contains 6,181 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses

Times New Roman 14-point type face throughout, and Times New Roman is a

proportionally spaced typeface.


Dated: September 27, 2023          */s/ Jonathan B. Miller*
                                   Jonathan B. Miller

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on September 27, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Seventh Circuit and served through CM/ECF upon all counsel of record in this case.

Dated: September 27, 2023          */s/ Jonathan B. Miller*
                                   Jonathan B. Miller