No. 23-2366

# In the
# United States Court of Appeals
## for the Seventh Circuit

K.C., et al.,

*Plaintiffs-Appellees,*

v.

INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING
BOARD OF INDIANA, et al.,

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division, No. 1:23-cv-00595-JPH-KMB.
The Honorable **James P. Hanlon**, Judge Presiding.

## BRIEF OF *AMICI CURIAE* BIOMEDICAL ETHICS AND PUBLIC HEALTH SCHOLARS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

KATHLEEN HARTNETT
JULIE VEROFF
ZOË HELSTROM
COOLEY LLP
3 Embarcadero Center
20th Floor
San Francisco, CA 94111-4004
(415) 693-2000

ELIZABETH F. REINHARDT
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
(202) 842-7800

KATELYN KANG
(*Counsel of Record*)
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2103
(212) 479-6000

*Attorneys for Amici Curiae*

 COUNSEL PRESS · (866) 703-9373

PRINTED ON RECYCLED PAPER 

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Aziza Ahmed, Khiara M. Bridges, David S. Cohen, I. Glenn Cohen, Lisa C. Ikemoto, Yvonne Lindgren, Maya Manian, Michelle Oberman, Rachel Rebouche, Nadia N. Sawicki, Michael R. Ulrich, *see* Addendum A for additional parties.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cooley LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: *Katelyn Kang*    Date: 9/25/2023

Attorney's Printed Name: Katelyn Kang

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ✔    No ☐

Address: 55 Hudson Yards New York, NY 10001-2103

Phone Number: (212) 479-6000    Fax Number: (212) 479-6275

E-Mail Address: kkang@cooley.com

rev. 12/19 AK

# ADDENDUM A

## List of *Amici Curiae*

*Amici* include the following individuals, whose affiliations are provided for identification purposes only:

**Aziza Ahmed**
Professor of Law
Boston University School of Law

**Khiara M. Bridges**
Professor of Law
University of California, Berkeley School of Law

**David S. Cohen**
Professor of Law
Drexel University, Thomas R. Kline School of Law

**I. Glenn Cohen**
Deputy Dean, James A. Attwood and Leslie Williams Professor of Law, and Faculty Director, Petrie-Flom Center for Health Law Policy, Biotechnology & Bioethics
Harvard Law School

**Dabney P. Evans**
Associate Professor of Public Health
Emory University

**Charlene Galarneau**
Senior Lecturer, Department of Global Health and Social Medicine
Faculty Member, Center for Bioethics
Harvard Medical School

Associate Professor Emerita
Women's and Gender Studies Department
Wellesley College

Affiliate Researcher, Center for Antiracist Research
Boston University

**Joanna Grossman**
Ellen K. Solender Endowed Chair in Women and the Law and Professor of Law
SMU Dedman School of Law

**Lisa C. Ikemoto**
Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Elizabeth Kukura**
Associate Professor of Law
Drexel University Thomas R. Kline School of Law

**Yvonne Lindgren**
Associate Professor of Law
University of Missouri – Kansas City School of Law

**Maya Manian**
Professor of Law
American University Washington College of Law

**Michelle Oberman**
Katharine and George Alexander Professor of Law
Santa Clara University School of Law

**Dara Purvis**
Professor of Law
Penn State Law

**Rachel Rebouché**
Dean and Peter J. Liacouras Professor of Law
Temple University Beasley School of Law

**Nadia N. Sawicki**
Georgia Reithal Professor of Law and Co-Director, Beazley Institute for Health Law & Policy
Loyola University Chicago School of Law

**Jessica Silbey**
Professor of Law
Boston University School of Law

**Michael R. Ulrich**
Assistant Professor
Boston University School of Public Health and School of Law

**Ruqaiijah Yearby**
Kara J. Trott Professor in Health Law
The Ohio State University, Moritz College of Law

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Aziza Ahmed, Khiara M. Bridges, David S. Cohen, I. Glenn Cohen, Lisa C. Ikemoto, Yvonne Lindgren, Maya Manian, Michelle Oberman, Rachel Rebouche, Nadia N. Sawicki, Michael R. Ulrich, *see* Addendum A for additional parties.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cooley LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: *Elizabeth Reinhardt*    Date: 9/25/2023

Attorney's Printed Name: Elizabeth Reinhardt

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 1299 Pennsylvania Avenue, NW Washington, DC 20004-2400

Phone Number: (202) 842-7800    Fax Number: (202) 842-7899

E-Mail Address: ereinhardt@cooley.com

rev. 12/19 AK

# ADDENDUM A

## List of *Amici Curiae*

*Amici* include the following individuals, whose affiliations are provided for identification purposes only:

**Aziza Ahmed**
Professor of Law
Boston University School of Law

**Khiara M. Bridges**
Professor of Law
University of California, Berkeley School of Law

**David S. Cohen**
Professor of Law
Drexel University, Thomas R. Kline School of Law

**I. Glenn Cohen**
Deputy Dean, James A. Attwood and Leslie Williams Professor of Law, and Faculty Director, Petrie-Flom Center for Health Law Policy, Biotechnology & Bioethics
Harvard Law School

**Dabney P. Evans**
Associate Professor of Public Health
Emory University

**Charlene Galarneau**
Senior Lecturer, Department of Global Health and Social Medicine
Faculty Member, Center for Bioethics
Harvard Medical School

Associate Professor Emerita
Women's and Gender Studies Department
Wellesley College

Affiliate Researcher, Center for Antiracist Research
Boston University

**Joanna Grossman**
Ellen K. Solender Endowed Chair in Women and the Law and Professor of Law
SMU Dedman School of Law

**Lisa C. Ikemoto**
Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Elizabeth Kukura**
Associate Professor of Law
Drexel University Thomas R. Kline School of Law

**Yvonne Lindgren**
Associate Professor of Law
University of Missouri – Kansas City School of Law

**Maya Manian**
Professor of Law
American University Washington College of Law

**Michelle Oberman**
Katharine and George Alexander Professor of Law
Santa Clara University School of Law

**Dara Purvis**
Professor of Law
Penn State Law

**Rachel Rebouché**
Dean and Peter J. Liacouras Professor of Law
Temple University Beasley School of Law

**Nadia N. Sawicki**
Georgia Reithal Professor of Law and Co-Director, Beazley Institute for Health Law &
Policy
Loyola University Chicago School of Law

**Jessica Silbey**
Professor of Law
Boston University School of Law

**Michael R. Ulrich**
Assistant Professor
Boston University School of Public Health and School of Law

**Ruqaiijah Yearby**
Kara J. Trott Professor in Health Law
The Ohio State University, Moritz College of Law

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 Aziza Ahmed, Khiara M. Bridges, David S. Cohen, I. Glenn Cohen, Lisa C. Ikemoto, Yvonne Lindgren, Maya Manian,

 Michelle Oberman, Rachel Rebouche, Nadia N. Sawicki, Michael R. Ulrich, see Addendum A for additional parties.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Cooley LLP

(3)     If the party, amicus or intervenor is a corporation:

  i)     Identify all its parent corporations, if any; and

         N/A

  ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  N/A

Attorney's Signature: *Julie Veroff*                                Date: 9/25/2023

Attorney's Printed Name: Julie Veroff

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ☑

Address: 3 Embarcadero Center, 20th Floor San Francisco, California 94111-4004

Phone Number: (415) 693-2000                    Fax Number: (415) 693-2222

E-Mail Address: jveroff@cooley.com

rev. 12/19 AK

# ADDENDUM A

## List of *Amici Curiae*

*Amici* include the following individuals, whose affiliations are provided for identification purposes only:

**Aziza Ahmed**
Professor of Law
Boston University School of Law

**Khiara M. Bridges**
Professor of Law
University of California, Berkeley School of Law

**David S. Cohen**
Professor of Law
Drexel University, Thomas R. Kline School of Law

**I. Glenn Cohen**
Deputy Dean, James A. Attwood and Leslie Williams Professor of Law, and Faculty
Director, Petrie-Flom Center for Health Law Policy, Biotechnology & Bioethics
Harvard Law School

**Dabney P. Evans**
Associate Professor of Public Health
Emory University

**Charlene Galarneau**
Senior Lecturer, Department of Global Health and Social Medicine
Faculty Member, Center for Bioethics
Harvard Medical School

Associate Professor Emerita
Women's and Gender Studies Department
Wellesley College

Affiliate Researcher, Center for Antiracist Research
Boston University

**Joanna Grossman**
Ellen K. Solender Endowed Chair in Women and the Law and Professor of Law
SMU Dedman School of Law

**Lisa C. Ikemoto**
Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Elizabeth Kukura**
Associate Professor of Law
Drexel University Thomas R. Kline School of Law

**Yvonne Lindgren**
Associate Professor of Law
University of Missouri – Kansas City School of Law

**Maya Manian**
Professor of Law
American University Washington College of Law

**Michelle Oberman**
Katharine and George Alexander Professor of Law
Santa Clara University School of Law

**Dara Purvis**
Professor of Law
Penn State Law

**Rachel Rebouché**
Dean and Peter J. Liacouras Professor of Law
Temple University Beasley School of Law

**Nadia N. Sawicki**
Georgia Reithal Professor of Law and Co-Director, Beazley Institute for Health Law &
Policy
Loyola University Chicago School of Law

**Jessica Silbey**
Professor of Law
Boston University School of Law

**Michael R. Ulrich**
Assistant Professor
Boston University School of Public Health and School of Law

**Ruqaiijah Yearby**
Kara J. Trott Professor in Health Law
The Ohio State University, Moritz College of Law

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Aziza Ahmed, Khiara M. Bridges, David S. Cohen, I. Glenn Cohen, Lisa C. Ikemoto, Yvonne Lindgren, Maya Manian, Michelle Oberman, Rachel Rebouche, Nadia N. Sawicki, Michael R. Ulrich, *see* Addendum A for additional parties.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cooley LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: *Kathleen Hartnett*      Date: 9/25/2023

Attorney's Printed Name: Kathleen Hartnett

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 3 Embarcadero Center, 20th Floor San Francisco, California 94111-4004

Phone Number: (415) 693-2000      Fax Number: (415) 693-2222

E-Mail Address: khartnett@cooley.com

rev. 12/19 AK

# ADDENDUM A

## List of *Amici Curiae*

*Amici* include the following individuals, whose affiliations are provided for

identification purposes only:

**Aziza Ahmed**
Professor of Law
Boston University School of Law

**Khiara M. Bridges**
Professor of Law
University of California, Berkeley School of Law

**David S. Cohen**
Professor of Law
Drexel University, Thomas R. Kline School of Law

**I. Glenn Cohen**
Deputy Dean, James A. Attwood and Leslie Williams Professor of Law, and Faculty
Director, Petrie-Flom Center for Health Law Policy, Biotechnology & Bioethics
Harvard Law School

**Dabney P. Evans**
Associate Professor of Public Health
Emory University

**Charlene Galarneau**
Senior Lecturer, Department of Global Health and Social Medicine
Faculty Member, Center for Bioethics
Harvard Medical School

Associate Professor Emerita
Women's and Gender Studies Department
Wellesley College

Affiliate Researcher, Center for Antiracist Research
Boston University

**Joanna Grossman**
Ellen K. Solender Endowed Chair in Women and the Law and Professor of Law
SMU Dedman School of Law

**Lisa C. Ikemoto**
Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Elizabeth Kukura**
Associate Professor of Law
Drexel University Thomas R. Kline School of Law

**Yvonne Lindgren**
Associate Professor of Law
University of Missouri – Kansas City School of Law

**Maya Manian**
Professor of Law
American University Washington College of Law

**Michelle Oberman**
Katharine and George Alexander Professor of Law
Santa Clara University School of Law

**Dara Purvis**
Professor of Law
Penn State Law

**Rachel Rebouché**
Dean and Peter J. Liacouras Professor of Law
Temple University Beasley School of Law

**Nadia N. Sawicki**
Georgia Reithal Professor of Law and Co-Director, Beazley Institute for Health Law & Policy
Loyola University Chicago School of Law

**Jessica Silbey**
Professor of Law
Boston University School of Law

**Michael R. Ulrich**
Assistant Professor
Boston University School of Public Health and School of Law

**Ruqaiijah Yearby**
Kara J. Trott Professor in Health Law
The Ohio State University, Moritz College of Law

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __23-2366__

Short Caption: __K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.__

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

|   | **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.** |
|---|---|

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   Aziza Ahmed, Khiara M. Bridges, David S. Cohen, I. Glenn Cohen, Lisa C. Ikemoto, Yvonne Lindgren, Maya Manian,

   Michelle Oberman, Rachel Rebouche, Nadia N. Sawicki, Michael R. Ulrich, *see* Addendum A for additional parties.

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Cooley LLP

(3)   If the party, amicus or intervenor is a corporation:

   i)     Identify all its parent corporations, if any; and

          N/A

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: __*Zoë Helstrom*__     Date: __9/25/2023__

Attorney's Printed Name: __Zoë Helstrom__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes [ ]     No [✔]

Address: __3 Embarcadero Center, 20th Floor San Francisco, California 94111-4004__

Phone Number: __(415) 693-2000__     Fax Number: __(415) 693-2222__

E-Mail Address: __zhelstrom@cooley.com__

rev. 12/19 AK

# ADDENDUM A

## List of *Amici Curiae*

*Amici* include the following individuals, whose affiliations are provided for identification purposes only:

**Aziza Ahmed**
Professor of Law
Boston University School of Law

**Khiara M. Bridges**
Professor of Law
University of California, Berkeley School of Law

**David S. Cohen**
Professor of Law
Drexel University, Thomas R. Kline School of Law

**I. Glenn Cohen**
Deputy Dean, James A. Attwood and Leslie Williams Professor of Law, and Faculty
Director, Petrie-Flom Center for Health Law Policy, Biotechnology & Bioethics
Harvard Law School

**Dabney P. Evans**
Associate Professor of Public Health
Emory University

**Charlene Galarneau**
Senior Lecturer, Department of Global Health and Social Medicine
Faculty Member, Center for Bioethics
Harvard Medical School

Associate Professor Emerita
Women's and Gender Studies Department
Wellesley College

Affiliate Researcher, Center for Antiracist Research
Boston University

**Joanna Grossman**
Ellen K. Solender Endowed Chair in Women and the Law and Professor of Law
SMU Dedman School of Law

**Lisa C. Ikemoto**
Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Elizabeth Kukura**
Associate Professor of Law
Drexel University Thomas R. Kline School of Law

**Yvonne Lindgren**
Associate Professor of Law
University of Missouri – Kansas City School of Law

**Maya Manian**
Professor of Law
American University Washington College of Law

**Michelle Oberman**
Katharine and George Alexander Professor of Law
Santa Clara University School of Law

**Dara Purvis**
Professor of Law
Penn State Law

**Rachel Rebouché**
Dean and Peter J. Liacouras Professor of Law
Temple University Beasley School of Law

**Nadia N. Sawicki**
Georgia Reithal Professor of Law and Co-Director, Beazley Institute for Health Law &
Policy
Loyola University Chicago School of Law

**Jessica Silbey**
Professor of Law
Boston University School of Law

**Michael R. Ulrich**
Assistant Professor
Boston University School of Public Health and School of Law

**Ruqaiijah Yearby**
Kara J. Trott Professor in Health Law
The Ohio State University, Moritz College of Law

**TABLE OF CONTENTS**

**Page**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES ............................................................................... ii

STATEMENT OF INTEREST .......................................................................... 1

INTRODUCTION ............................................................................................ 1

I.      THE HEALTH CARE BAN REFLECTS A FUNDAMENTAL
        MISUNDERSTANDING OF HOW SCIENTIFIC KNOWLEDGE AND
        MEDICAL STANDARDS ARE GENERATED. ......................................... 3

        A.      The Medical Care Targeted by the Health Care Ban Is Not
                "Experimental." .................................................................... 4

        B.      Medical Knowledge Is Credibly Generated Through Multiple
                Methods, Not Just Randomized Control Trials and "Long-Term"
                Studies. ............................................................................... 5

        C.      Off-Label Drug Use Is Legal, Common, and, When Medically
                Indicated, Safe and in Service of a Patient's Best Interest. .......................... 11

II.     THE HEALTH CARE BAN CONTRAVENES KEY TENETS OF
        BIOMEDICAL ETHICS. ............................................................. 16

        A.      The Health Care Ban Forces Providers to Disregard Patients'
                Autonomy. ........................................................................... 16

        B.      The Health Care Ban Forces Providers to Violate Their Duty of
                Beneficence. ........................................................................ 21

                1.      The Health Care Ban's Treatment Prohibition Forces
                        Providers to Violate Their Duty of Beneficence. .............................. 23

                2.      The Health Care Ban's Referrals Prohibition Forces
                        Providers to Violate Their Duty of Beneficence and
                        Undermines Public Health. .................................................. 24

        C.      The Health Care Ban Forces Providers to Violate Their Duty of
                Justice. ............................................................................... 27

CONCLUSION ............................................................................................... 29

-i-

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island,*
  517 U.S. 484 (1996) ............................................................................................26

*Brandt v. Rutledge,*
  47 F.4th 661 (8th Cir. 2022)................................................................................8

*Brandt v. Rutledge,*
  No. 21-2875 (8th Cir. Jan. 19, 2022) ...............................................................3, 23

*Buckman Co. v. Pls.' Legal Comm.,*
  531 U.S. 341 (2001)...........................................................................................12, 13

*Conant v. Walters,*
  309 F.3d 629 (9th Cir. 2002) .............................................................................25

*Matter of Lawrance,*
  579 N.E.2d 32 (Ind. 1991) .................................................................................16

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,*
  475 U.S. 1 (1986) ...............................................................................................26

*Planned Parenthood Cincinnati Region v. Taft,*
  444 F.3d 502 (6th Cir. 2006) .............................................................................11, 12

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011)............................................................................................24

*Wollschlaeger v. Governor, Fla.,*
  848 F.3d 1293 (11th Cir. 2017) .........................................................................25

**TABLE OF AUTHORITIES**

(continued)

Page(s)

**Statutes**

Ind. Code § 25-1-20-4(b)(3) ..........................................................................13

Ind. Code § 25-1-22-13(c) ............................................................................21

Ind. Code § 25-22.5-1-2.1 ............................................................................17

Ind. Code § 27-8-20-7 ..................................................................................13

Ind. Code § 34-18-12 ....................................................................................16

S.E.A. 480 § 13(b) ........................................................................................24

**Other Authorities**

Am. Cancer Soc'y, *Late Effects of Childhood Cancer Treatment* (Sept. 18, 2017) ...................20

Am. Cancer Soc'y, *Off-Label Drug Use* (Mar. 17, 2015)............................................12

Am. Med. Ass'n, *Code of Medical Ethics Opinion 1.1.1, Patient-Physician
    Relationships*..........................................................................................22

Am. Med. Ass'n, *Code of Medical Ethics Opinion 2.1.1, Informed Consent* ............................20

Am. Med. Ass'n, *Code of Medical Ethics Opinion 2.2.1, Pediatric Decision
    Making*..................................................................................................18

Am. Soc'y of Clinical Oncology, *Recent Developments in Medicare Coverage
    of Off-Label Cancer Therapies*, 5 J. Oncology Practice (2009) ...........................................13

Am. Soc'y of Clinical Oncology, *Reimbursement for cancer treatment:
    Coverage of off-label drug indications*, 24 J. Clinical Oncology (2006)................................13

Aníbal Torres Bernal & Deborah Coolhart, *Treatment and Ethical
    Considerations with Transgender Children and Youth in Family Therapy*, 23
    J. of Fam. Psychotherapy 296 (2012)...................................................................20

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Anthony J. Hatswell et al., *Regulatory approval of pharmaceuticals without a randomised controlled study: analysis of EMA and FDA approvals 1999-2014*, BMJ Open (June 30, 2016) ............................................................9

Benjamin Freedman, *Equipoise and the Ethics of Clinical Research*, 317 N. Engl. J. Med. 141 (1987) ...........................................................7

Beth A. Clark, *Ethics in Child & Youth Care Practice with Transgender Youth*, 8 Int'l J. of Child, Youth & Fam. Studies 74 (2017) .....................................18, 27

Beth A. Clark & Alice Virani, *This Wasn't a Split-Second Decision: An Empirical Ethical Analysis of Transgender Youth Capacity, Rights, and Authority to Consent to Hormone Therapy*, 18 J. Bioethical Inquiry 151 (2021)..............................................................................19

Br. of Am. Acad. of Pediatrics, et al. as *Amici Curiae* Supporting Plaintiffs, *Brandt v. Rutledge*, No. 21-2875 (8th Cir. Jan. 25, 2022) ................................................3, 23

Brendan J. Nolan et al., *Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial*, JAMA Network Open (2023) .................................................................7, 8

Carla Pelusi et al., *Effects of Three Different Testosterone Formulations in Female-to-Male Transsexual Persons*, 11 J. Sex Med. 3002 (2014)........................................6

Christopher M. Wittich et al., *Ten common questions (and their answers) about off-label drug use*, 87 Mayo Clinic Proc. 982 (2012) .................................................... *passim*

Cong. Rsch. Serv., *Off-Label Use of Prescription Drugs* 4 (Feb. 23, 2021) ...............................12

Denise Thomson et al., *Controlled Trials in Children: Quantity, methodological quality and descriptive characteristics of Pediatric Controlled Trials published 1948-2006*, 5 PLoS One (2010) ................................................6

Edward L. Hannan, *Randomized Clinical Trials and Observational Studies: Guidelines for Assessing Respective Strengths and Limitations*, 1(3) JACC: Cardiovascular Interventions 211 (2008) ..............................................6

**TABLE OF AUTHORITIES**

(continued)

Page(s)

Gert Helgesson, *Children, Longitudinal Studies, and Informed Consent*, 8
Med., Health Care & Philos. 307 (2005) ...............................................................8

*Good medical practice: Duties of a doctor registered with the General Medical
Council*, Gen. Med. Council (2001) .....................................................................22

H. Christine Allen et al., *Off-Label Medication Use in Children, More Common
Than We Think: A Systematic Review of the Literature*, 111 J. Okla State
Med. Assoc. 776 (2018) ........................................................................................14

Holger Schünemann et al. (eds.), *Grading of Recommend., Assess., Dev. &
Eval. Handbook* 14 (2013) .....................................................................................9

Howard Balshem et al., *GRADE guidelines: 3. Rating the quality of evidence*,
64(4) J. Clinical Epidemiol. 401 (2011) ...........................................................9, 10

Human Rights Watch, *"I Want to Be Like Nature Made Me"*: Medically
Unnecessary Surgeries on Intersex Children in the US (2017).............................21

J. R. Vevaina et al., *Issues in biomedical ethics*, 39 Disease-a-Month 869
(1993)......................................................................................................................1

Jack L. Turban et al., *Access to gender-affirming hormones during adolescence
and mental health outcomes among transgender adults*, 17(1) PLoS ONE 2
(2022)......................................................................................................................8

James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed
Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71
(1998)................................................................................................................14, 15

Jessica Kremen et al., *Addressing Legislation That Restrict Access to Care for
Transgender Youth*, 147 Pediatric Perspectives (2021)................................18, 19

John J. Smith, *Physician Modification of Legally Marketed Medical Devices:
Regulatory Implications Under the Federal Food, Drug, & Cosmetic Act*, 55
Food & Drug L.J. 251 (2000)................................................................................13

José A. Sacristán, *Clinical Research and Medical Care: Towards Effective and
Complete Integration*, 15 BMC Med. Res. Methodol. (2015)................................4

**TABLE OF AUTHORITIES**

(continued)

Page(s)

Katrien Oude Rengerink et al., *Pregnant women's concerns when invited to a randomized trial: A qualitative case control study*, 15 BMC Pregnancy and Childbirth 207 (2015) ..........................................................................................................6

Katherine L. Kraschel et al., *Legislation restricting gender-affirming care for transgender youth: Politics eclipse healthcare*, 3(8) Cell Reports Medicine 4 (2022)..........................................................................................................................8, 28

Kellan Baker, *The Future of Transgender Coverage*, 376 New Eng. J. Med. 19, 1801-04 (May 2017) ...................................................................................................3

Kristina R. Olson et al., *Mental health of transgender children who are supported in their identities*, Pediatric Collections: LGBTQ+: Support and Care (2016)......................................................................................................................23

Lois Snyder Sulmasy & Thomas A. Bledsoe, *American College of Physicians Ethics Manual 170*, Annals of Internal Medicine 86 (7th ed. 2019) ........................ *passim*

Luisa Kcomt et al., *Healthcare avoidance due to anticipated discrimination among transgender*, 11(100608) SSM - Population Health 1 (2020) .................................28

Meredithe McNamara et al., *A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria*, Yale Sch. of Med. 1 (2022) ....................................................................................................10

Nat'l Comm'n for the Protection of Hum. Subjects of Biomedical Rsch., *The Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research* (1978)........................................................................................4

Natalie S. Blencowe et al., *Interventions in randomized controlled trials in surgery: issues to consider during trial design*, 16 Trials (2015)............................................7

Norman P. Spack et al., *Children and adolescents with gender identity disorder referred to a pediatric medical center*, 129 Pediatrics (2012).................................23

Off-Label Prescription of Medications for Treatment and Prevention of COVID-19, Op. Ind. Att'y Gen. 2022-1 (Feb. 23, 2022)............................................ *passim*

Parth Shah et al., *Informed Consent* (2021) ..................................................................17

**TABLE OF AUTHORITIES**

(continued)

Page(s)

Phillip E. Wagner et al., 39.1 *Health (Trans)gressions: Identity and Stigma Management in Trans\* Healthcare Support Seeking* 51 (Oct. 2016) ...................................28

Rainer S. Beck et al., *Physician-Patient Communication in the Primary Care Office: A Systematic Review*, 15 J. Am. Bd. Fam. Pract. (2002) ........................................25

Richard E. Redding, *Children's Competence to Provide Informed Consent for Mental Health Treatment*, 50 Wash. & Lee L. Rev. 695 (1993)..........................................19

Robert J. Ligthelm et al., *Importance of observational studies in clinical practice*, 29(6) Clinical Therapeutics 1284 (2007) ................................................................10

Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech,* Univ. of Ill. L. Rev. 939 (2007) .............................................26

Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics* (8th ed. 2019) ........................................................................................................... *passim*

U.S. Food & Drug Admin., *Clinical Research Versus Medical Treatment* (Mar. 22, 2018) ......................................................................................................................4

U.S. Food & Drug Admin., *The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective* (Nov. 24, 2017)................................................................................11

William Janssen, *A Historical Perspective on Off-Label Medicine: From Regulation, Promotion, and the First Amendment to the Next Frontiers*, SSRN Elec. J. (2014) ...........................................................................................................15

World Medical Association, *Declaration of Geneva* (1948)......................................................22

## STATEMENT OF INTEREST[1]

*Amici curiae* listed in the Appendix are professors of law, medicine, and public health who teach and write about biomedical ethics and health-related rights and discrimination. Biomedical ethics, sometimes referred to as bioethics, is "the discipline of ethics dealing with moral problems arising in the practice of medicine and the pursuit of biomedical research." J. R. Vevaina et al., *Issues in biomedical ethics*, 39 Disease-a-Month 869 (1993), https://pubmed.ncbi.nlm.nih.gov/8243220. *Amici* have a strong interest in ensuring that principles of biomedical ethics are accurately described and properly applied. They submit this brief to explain how Indiana Senate Enrolled Act 480 is inconsistent with foundational principles of biomedical ethics.

## INTRODUCTION

Indiana Senate Enrolled Act 480 (the "Health Care Ban" or "Ban") is an extreme and unjustified intrusion into the medical profession. The law categorically prohibits health care professionals from providing gender-affirming care to their transgender minor patients with gender dysphoria, even when the patient, the patient's parent(s), and the patient's medical providers all agree that the care is medically appropriate and in the patient's best interest. Although allegedly promoting medical ethics, the Health Care Ban in fact contravenes fundamental and well-established principles of biomedical ethics and

---

[1] *Amici* certify that no person or entity, other than *amici curiae*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

reflects a misunderstanding of how medical knowledge is generated, creating serious, harmful consequences for individual patients and public health more generally.

Core principles of biomedical ethics include respect for autonomy, beneficence, and justice. The Health Care Ban eviscerates each of these principles. The Ban deprives minor patients of their ability to decide whether to receive medically necessary and appropriate treatment to which they and their parents have given informed consent (autonomy). The Ban forces providers to deny their patients care that is known to alleviate suffering, and thus to abandon their patients to serious physical and mental harm (beneficence). And the Ban compels providers to deny care that only patients who are transgender need, thereby exacerbating stigma and inequity and damaging trust in the medical profession (justice).

Indiana endeavors to rationalize these harms by suggesting that gender-affirming care is unsound or experimental, including by reference to arguments about randomized control trials and off-label use of prescription drugs. That position is unfounded and badly misunderstands how medical knowledge is credibly generated, particularly in the context of pediatric care. Randomized control trials are not, and have never been, requisite for medical care to be considered appropriate, and in fact are ill-suited for many types of treatment. And off-label use is legal, commonplace, and often necessary to serve a patient's best interest. Far from being "experimental," the gender-affirming care prohibited by the Health Care Ban is developed through rigorous and appropriate

methods and is recommended by every major medical association in the United States.

In sum, by singling out and banning gender-affirming care for transgender minors, the Health Care Ban undermines biomedical ethics, science, and public health, without any regard for the grave harm that will come from denying vulnerable patients critical health care. This Court should affirm the preliminary injunctions granted below.

## I.   THE HEALTH CARE BAN REFLECTS A FUNDAMENTAL MISUNDERSTANDING OF HOW SCIENTIFIC KNOWLEDGE AND MEDICAL STANDARDS ARE GENERATED.

The gender-affirming care prohibited by the Health Care Ban is developed through rigorous and appropriate methods and is recommended by every major medical association in the United States. Kellan Baker, *The Future of Transgender Coverage*, 376 New Eng. J. Med. 19, 1801-04 (May 2017); Br. of Am. Acad. of Pediatrics, et al. as *Amici Curiae* Supporting Plaintiffs at 8-22, *Brandt v. Rutledge*, No. 21-2875 (8th Cir. Jan. 25, 2022) ("AAP Br."). Nonetheless, Indiana often wrongly characterizes gender-affirming care as "experimental" and not evidence-based, pointing in support of that erroneous view to the lack of randomized control trials documenting the efficacy of the prohibited treatment and the fact that using puberty blockers and hormone therapy for gender-affirming care is not approved by the U.S. Food and Drug Administration. (Def.-Appellants' Opening Br. ("OB") 18, 20, 36, 51.) These arguments reflect a fundamental misunderstanding of medical practice and the ways medical knowledge and treatment guidelines are generated, particularly in the context of pediatric care. Medical providers are not and

have never been restricted to providing only those treatments that have been generated via randomized control trial and received FDA approval for the particular indication. Indeed, as explained herein, such restrictions would be impractical and unethical.

> **A.    The Medical Care Targeted by the Health Care Ban Is Not "Experimental."**

Although Indiana seeks to justify its ban on gender-affirming care for minors as preventing "experimental" treatment, Indiana wrongly conflates clinical care with clinical research and fails to engage with the ethical standards attendant to each.

Medical care delivered by a clinician to a patient and clinical research have distinct purposes and processes. *See, e.g.*, Nat'l Comm'n for the Protection of Hum. Subjects of Biomedical Rsch., *The Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research* (1978) (discussing the importance of distinguishing between research and clinical practice); U.S. Food & Drug Admin., *Clinical Research Versus Medical Treatment* (Mar. 22, 2018), https://www.fda.gov/patients/clinical-trials-what-patients-need-know/clinical-research-versus-medical-treatment (describing differences between clinical research and medical treatment in terms of intent, intended benefit, funding, timeframe, and other factors).  In the clinical care setting, the provider's aim is to improve a patient's health, and the provider is duty bound to act in that patient's best interest.  By contrast, the aim of a research study is to generate knowledge useful for *future* patients. *See* José A. Sacristán, *Clinical Research and Medical Care: Towards Effective and Complete Integration*, 15 BMC Med. Res. Methodol. (2015),

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4323129/.  A research study's protocols must be ethically designed and administered, but there is no obligation to do what is in each participant's best interest.  Importantly, receiving gender-affirming care does not automatically render a patient a subject of a research study (and certainly not an "experimental" one unmoored from ethical standards); gender-affirming care is known to advance the individual patient's best interest and is provided as clinical care for that purpose.

**B.     Medical Knowledge Is Credibly Generated Through Multiple Methods, Not Just Randomized Control Trials and "Long-Term" Studies.**

In addition to conflating research and treatment, opponents of gender-affirming care often misunderstand how medical knowledge is credibly and rigorously generated in suggesting that the lack of randomized control trials is dispositive.  There is no one method used to generate medical knowledge, and no one method is considered requisite to a treatment being deemed medically appropriate.  Rather, medical knowledge and practice are informed by a range of research and clinical inputs.

A randomized control trial—where some participants are randomly assigned to a treatment group and others are randomly assigned to a control group—is one of many types of credible research designs used to evaluate a medical intervention.  Medical interventions also can be and often are evaluated through observational studies, which include cross-sectional studies (based on data collected from a single point in time), and longitudinal studies (based on data collected from particular individuals over time).  *See,*

*e.g.*, Edward L. Hannan, *Randomized Clinical Trials and Observational Studies: Guidelines for Assessing Respective Strengths and Limitations*, 1(3) JACC: Cardiovascular Interventions 211–217 (2008), https://www.sciencedirect.com/science/article/pii/S1936879808001702. In addition, randomized *clinical* trials, which compare different established interventions to one another, may be used to inform medical treatment. For example, a randomized clinical trial has been used to evaluate sex hormone treatment for gender dysphoria, comparing different, established pharmacological treatments to one another. *See* Carla Pelusi et al., *Effects of Three Different Testosterone Formulations in Female-to-Male Transsexual Persons*, 11 J. Sex Med. 3002–3011 (2014), https://www.jsm.jsexmed.org/article/S1743-6095(15)30626-3/fulltext.

Study methods other than randomized control trials may be preferable in some circumstances, given that randomized control trials are not always feasible, appropriate, or the most reliable way to evaluate a medical intervention. For instance, randomized control trials are rarely used for interventions focused on children or pregnant people, or for surgical interventions. *See, e.g.*, Denise Thomson et al., *Controlled Trials in Children: Quantity, methodological quality and descriptive characteristics of Pediatric Controlled Trials published 1948–2006*, 5 PLoS One (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2948021/; Katrien Oude Rengerink et al., *Pregnant women's concerns when invited to a randomized trial: A qualitative case control study*, 15 BMC Pregnancy and Childbirth 207 (2015),

https://bmcpregnancychildbirth.biomedcentral.com/articles/10.1186/s12884-015-0641-x;

Natalie S. Blencowe et al., *Interventions in randomized controlled trials in surgery: issues to consider during trial design*, 16 Trials (2015), https://doi.org/10.1186/s13063-015-0918-4. Randomized control trials also are only ethical when there is clinical "equipoise," which means they are only appropriate when there is genuine uncertainty about whether the intervention will be more effective than the control. *See* Benjamin Freedman, *Equipoise and the Ethics of Clinical Research*, 317 N. Engl. J. Med. 141–145 (1987), https://www.nejm.org/doi/full/10.1056/NEJM198707163170304. That is because it is unethical to knowingly expose participants to an inferior intervention or control. For example, in acknowledging limitations to its analysis, a 2023 open-label randomized clinical trial assessing the effect of testosterone therapy compared with no treatment on gender dysphoria, depression, and suicidality explained that the trial was limited to three months in order to insure that "participants would not be disadvantaged by waiting longer than standard of care waiting times of 3 months for an initial consultation." Brendan J. Nolan et al., *Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial*, JAMA Network Open (2023), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2809058 ("Nolan").

This principle plainly applies to the banned treatments for gender dysphoria: performing randomized, placebo-controlled trials on the efficacy of that treatment would

be unethical, because the prevailing view among the medical community is that for patients who need it, hormone therapy is superior to a lack of pharmacological treatment. *See* Nolan.

Likewise, any critique of the lack of "long-term studies" on the safety and efficacy of gender-affirming care, particularly for minors, is misplaced, as there are many such studies.[2] And in any event, longitudinal studies need not last for some unspecified "long-term" period to be reliable, nor are such studies always the most ethically and legally appropriate. Often, other reliable and trustworthy methods are preferable. For example, before conducting longitudinal studies involving children, researchers must consider a child's privacy and autonomy all while maintaining data integrity—a sometimes difficult balancing act that can be avoided by using an alternative study design. *See, e.g.*, Gert Helgesson, *Children, Longitudinal Studies, and Informed Consent*, 8 Med., Health Care & Philos. 307 (2005), https://doi.org/10.1007/s11019-005-0978-4.

---

[2] *See, e.g.*, Jack L. Turban et al., *Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults*, 17(1) PLoS ONE 2 (2022), https://doi.org/10.1371/journal.pone.0261039 (collecting studies); Katherine L. Kraschel et al., *Legislation restricting gender-affirming care for transgender youth: Politics eclipse healthcare*, 3(8) Cell Reports Medicine 4 (2022) ("Kraschel") https://doi.org/10.1016/j.xcrm.2022.100719 ("Over a dozen studies have collectively linked [gender affirming care] to improvements in depression, anxiety, and suicidality."); *see also Brandt v. Rutledge*, 47 F.4th 661, 671 (8th Cir. 2022) ("According to surveys of the research on hormone treatment for adolescents done by the British National Institute for Health & Care Excellence, several studies have shown statistically significant positive effects of hormone treatment on the mental health, suicidality, and quality of life of adolescents with gender dysphoria. None has shown negative effects.").

Additionally, any argument that the Health Care Ban is justified because gender-affirming care for minors is supported only by "low-quality" evidence, is based on an erroneous understanding of what it means for evidence to be graded as "low-quality." Under the GRADE system, which is often used for presenting summaries of evidence and making clinical practice recommendations, the level of quality ascribed to evidence is based on the type of research methodology used— evidence generated via a randomized control trial is typically labeled "high quality" and evidence generated via an observational study is typically labeled "low quality." Howard Balshem et al., *GRADE guidelines: 3. Rating the quality of evidence*, 64(4) J. Clinical Epidemiol. 401 (2011) ("Balshem"); Holger Schünemann et al. (eds.), *Grading of Recommend., Assess., Dev. & Eval. Handbook* 14 (2013) ("GRADE Handbook"). Randomized trials with limitations such as inconsistent results or publication bias will go down in quality, and observational studies with a dose-response gradient (relationship between a stimulus and a response) or large magnitude of effect will go up in quality. GRADE Handbook at 13.

These "high quality" and "low quality" labels under GRADE thus are descriptive of the underlying method, but they do not necessarily reflect the reliability of the evidence generated.[3] As noted, observational evidence is sometimes favored for both

---

[3] Many treatments for other conditions, such as drugs for cancer and hematologic disorders, for example, are in widely accepted use without having been studied through randomized, controlled clinical trials. *See* Anthony J. Hatswell, *Regulatory approval of pharmaceuticals without a randomised controlled study: analysis of EMA and FDA approvals 1999-2014*, BMJ Open (June 30, 2016), https://pubmed.ncbi.nlm.nih.gov/27363818/.

ethical and practical reasons.  And with gender-affirming care, randomized control trials are not appropriate for the reasons described above.  Because randomized control trials are often inappropriate or infeasible, research that falls in the technical category of "low quality" can still be reliable and valuable when it comes to clinical practice.  *See* Meredithe McNamara et al., *A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria*, Yale Sch. of Med. 1, 15 (2022) ("McNamara").  Indeed, low-quality evidence may be sufficient to justify a strong recommendation for clinical care.  GRADE Handbook at 5; Balshem at 402-04 ("A particular level of quality does not imply a particular strength of recommendation.  Sometimes, low or very low quality evidence can lead to a strong recommendation.").  Were it otherwise, whole swaths of modern care for which randomized control trials are inappropriate for ethical and/or practical reasons would be called into question.  *See* Robert J. Ligthelm et al., *Importance of observational studies in clinical practice*, 29(6) Clinical Therapeutics 1284 (2007), https://pubmed.ncbi.nlm.nih.gov/18036390/ (noting that observational evidence is sometimes favored for both ethical and practical reasons).  For example, despite their "low quality" technical category, observational studies have been used in forming the Cholesterol Guidelines of the American College of Cardiology and the American Heart Association.  *See* McNamara at 16.  The same is true for a range of other treatments, from gall bladder surgery to the determination that aspirin is not appropriate to treat fevers in children.  *See id.* at 14, 16.

**C.    Off-Label Drug Use Is Legal, Common, and, When Medically Indicated, Safe and in Service of a Patient's Best Interest.**

Off-label use is legal, accepted, and, when medically indicated, safe and in service of a patient's best interest.  As Defendant-Appellant Attorney General of the State of Indiana has elsewhere explained, "[o]ff-label prescribing and use of medications is a common and widespread practice in health care and falls within the standard of competent care."  Off-Label Prescription of Medications for Treatment and Prevention of COVID-19, Op. Ind. Att'y Gen. 2022-1 at 10 (Feb. 23, 2022), https://content.govdelivery.com/attachments/INAG/2022/02/22/file_attachments/208329 2/Official%20Opinion%202022-1.pdf; *see also Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 505 (6th Cir. 2006) (observing that off-label use is "a widely employed practice").

An understanding of the FDA approval process makes clear why there is nothing unsafe or inappropriate about off-label use.  Garnering the FDA's approval of a drug requires showing that it is both safe—*i.e.*, the benefits outweigh the potential risks—and effective for its intended use.  *See* U.S. Food & Drug Admin., *The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective* (Nov. 24, 2017), https://www.fda.gov/drugs/information-consumers-and-patients-drugs/fdas-drug-review-process-ensuring-drugs-are-safe-and-effective.  It is well-established practice that once a drug has been approved by the FDA, health care providers may then prescribe it for other medically appropriate uses and in other dosages.  *See Taft*, 444 F.3d at 505; Op.

Ind. Att'y Gen. 2022-1 at 4 ("Per the FDA, once a drug is FDA-approved, [health care providers] may prescribe it for an unapproved use when they judge that it is medically appropriate for their patient."  (citation omitted)).  Such off-label use occurs because medical knowledge about how a drug might be beneficial in a different context or a different dosage continues to develop after FDA approval, but it is often too costly and impractical for drug makers to put each possible use of a drug through the FDA's "formal, lengthy, and expensive" approval process.  Am. Cancer Soc'y, *Off-Label Drug Use* (Mar. 17, 2015), https://www.cancer.org/treatment/treatments-and-side-effects/treatment-types/off-label-drug-use.html (noting that off-label drug use is "well-documented and very common in" oncology, "pediatrics and HIV/AIDS care").  In addition, providers often prefer that drug makers *not* seek approval for every off-label use, given that it could increase the cost of the drug and limit the scope of its clinical application, all of which would make it less available to their patients.  *See* Cong. Rsch. Serv., *Off-Label    Use    of    Prescription    Drugs*    4    (Feb.    23,    2021), https://sgp.fas.org/crs/misc/R45792.pdf.

Off-label use is common and "generally accepted."  *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 351 (2001); Christopher M. Wittich et al., *Ten common questions (and their answers) about off-label drug use*, 87 Mayo Clinic Proc. 982–990 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3538391/ (discussing off-label drug uses that have "become widely entrenched in clinical practice and become predominant

treatments for a given clinical condition" and citing studies showing that in a group of commonly used medications, 21% of prescriptions were for off-label use).  For example, about half of drugs used to treat cancer are prescribed off label.  *See* Am. Soc'y of Clinical Oncology, *Reimbursement for cancer treatment: Coverage of off-label drug indications*, 24 J. Clinical Oncology 3206–3208 (2006), https://ascopubs.org/doi/10.1200/JCO.2006.06.8940.

Off-label use is legal because FDA approval only limits how a drug can be marketed—*i.e.*, a drug cannot be marketed for a use different from its FDA-approved use—but not how a physician can prescribe it.  *See Buckman*, 531 U.S. at 351 & n.5; John J. Smith, *Physician Modification of Legally Marketed Medical Devices: Regulatory Implications Under the Federal Food, Drug, & Cosmetic Act*, 55 Food & Drug L.J. 251–252 (2000) (discussing off-label use and noting that "regulatory efforts are directed primarily at device marketing by manufacturers, not device use by physicians"); Op. Ind. Att'y Gen. 2022-1 at 4 ("Off-label use is not prohibited by the FDA or the [Food, Drug, and Cosmetic Act].").

In fact, multiple federal and state laws have been enacted in recent years to promote and protect off-label prescriptions, as has the federal government and Indiana. *See, e.g.*, Ind. Code § 27-8-20-7 (prohibiting insurers from excluding coverage of covered drugs on the grounds that they are not FDA approved for certain uses); Ind. Code § 25-1-20-4(b)(3) (protecting healthcare workers from liability for administering off-label prescriptions to treat COVID-19); Am. Soc'y of Clinical Oncology, *Recent Developments in*

*Medicare Coverage of Off-Label Cancer Therapies*, 5 J. Oncology Practice 18–20 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2790627/ (discussing 1993 legislation requiring Medicare to cover off-label uses of anti-cancer drugs and an expansion of Medicare's off-label coverage in 2008).

Off-label use is especially common and important in treating minors, as Defendant-Appellant the Attorney General of the State of Indiana has elsewhere acknowledged. *See* Op. Ind. Att'ys Gen. 2022-1 at 4 (noting the prevalence of off-label use in pediatric care). Minors are often excluded from clinical drug studies, including for ethical reasons. *See* Wittich (citing study finding that nearly 80% of children discharged from pediatric hospitals were taking at least one off-label medication and discussing range of widely practiced off-label drug uses in pediatric population); H. Christine Allen et al., *Off-Label Medication Use in Children, More Common Than We Think: A Systematic Review of the Literature*, 111 J. Okla State Med. Assoc. 776–783 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6677268 (surveying ten years of literature and finding that "[t]he use of off-label medications in children remains a common practice for pediatric providers").

Finally, and critically, off-label use is often essential for delivering the best care. James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71–104 (1998), https://pubmed.ncbi.nlm.nih.gov/11795338/ ("Off-label use is widespread in the medical

community and often is essential to giving patients optimal medical care, both of which medical ethics, FDA, and most courts recognize."); William Janssen, *A Historical Perspective on Off-Label Medicine: From Regulation, Promotion, and the First Amendment to the Next Frontiers*, SSRN Elec. J. (2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2519223 (explaining that in some circumstances, "a physician's failure to prescribe the medical product for such an unapproved use can constitute medical malpractice"); Op. Ind. Att'y Gen. 2022-1 at 4 (recognizing that "off-label use of a medication" is sometimes "*the* standard of care for the treatment of a condition or illness"). Accordingly, "the decision to prescribe a medication off-label is one that is best left to consultation between the patient and [health-care provider] in consideration of the medical circumstances of each situation." Op. Ind. Att'ys Gen. 2022-1 at 10 (professing that "the [Office of the Attorney General] does not wish to interfere with such issues confined to the patient-doctor relationship").

Thus, off-label use is legal, common, and often essential for delivering medically necessary care.

* * *

In sum, the Health Care Ban does not prohibit treatment that is "experimental" or non-evidence based. Any arguments to the contrary are based on a fundamental misunderstanding of both how scientific knowledge is generated and the FDA approval process. Treatment methods do not require a randomized control trial or on-label use to

be safe and effective.  Indiana's contradictory and contrary position, if accepted, would undermine a significant portion of modern medical practice, including almost all forms of pediatric health care and much of adult health care.

## II.     THE HEALTH CARE BAN CONTRAVENES KEY TENETS OF BIOMEDICAL ETHICS.

The Health Care Ban is directly at odds with key tenets of biomedical ethics: respect for autonomy, beneficence, and justice.  Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics*, 13 (8th ed. 2019).  These universal principles, which are the cornerstones of modern-day healthcare standards, guide providers' treatment decisions regardless of the type of medical care they are providing.

### A.     The Health Care Ban Forces Providers to Disregard Patients' Autonomy.

As a general matter, the Ban repeatedly acknowledges the importance of obtaining informed consent and respecting patient decision making, reflecting the core biomedical ethical principle of respect for autonomy.  That principle requires that patients have the ability to decide whether to receive appropriate medical care within the framework of informed consent.  Beauchamp & Childress at 105.  For example, Indiana has codified a definition of "informed consent" and has rendered the failure to adequately obtain informed consent tortious.  *See, e.g.*, Ind. Code § 34-18-12 (establishing informed consent); *Matter of Lawrance*, 579 N.E.2d 32, 38 (Ind. 1991) (citing *Revord v. Russell*, 401 N.E.2d 763, 766 (Ind. Ct. App. 1980) (outlining Indiana's common law doctrine of informed consent)).  Indiana has also enacted a "Right to Try" law, which allows a terminally ill patient to use

non-FDA approved drugs and medical products in order to treat their illness as long as they provide informed consent.  Ind. Code § 25-22.5-1-2.1 (2022).  In stark contrast to these laws reflecting the core principle of autonomy, the Health Care Ban attacks autonomy by preventing individuals from pursuing, and health care professionals from providing, beneficial medical treatment with due regard for a patient's interests.

Empowering a patient's autonomy is essential to the integrity of the provider-patient relationship, as well as the patient's individual liberty and ability to determine the course of their life.  In keeping with that bioethical principle, "the physician's professional role [is] to make recommendations on the basis of the best available medical evidence and to pursue options that comport with the patient's unique health needs, values, and preferences."  Lois Snyder Sulmasy & Thomas A. Bledsoe, *American College of Physicians* ("ACP") *Ethics Manual* 170, Annals of Internal Medicine 86 (7th ed. 2019), https://www.acpjournals.org/doi/10.7326/m18-2160; *see also* Beauchamp & Childress at 105 (respect for autonomy requires health care professionals "to disclose information, to probe for and ensure understanding and voluntariness, and to foster adequate decision making").  Informed consent is a crucial mechanism for ensuring respect for autonomy. In all non-emergency encounters, the provider is obligated to offer the patient material information and guidance, but the patient must be trusted and empowered to make the informed and voluntary decision that best advances their interests.  *See* Parth Shah et al., *Informed Consent* (2021), https://www.ncbi.nlm.nih.gov/books/NBK430827/.  After the

patient makes their decision, the provider's duty is to "protect and foster [the] patient's free, uncoerced choices." ACP *Ethics Manual* at 74.

Where, as here, the patients at issue are minors, the informed consent process usually involves the provider, the minor patient, and the minor's parents. When that is so, each actor has an important role to play: the provider offers medical instruction, the parents provide stewardship and consent, and the minor—assisted by that medical instruction and parental stewardship—provides assent. *See* Am. Med. Ass'n ("AMA"), *Code of Medical Ethics Opinion 2.2.1, Pediatric Decision Making*, https://www.ama-assn.org/delivering-care/ethics/pediatric-decision-making (discussing the importance of "[r]espect and shared decision making" between parents and minors "in the context of decisions for minors"); Beth A. Clark, *Ethics in Child & Youth Care Practice with Transgender Youth*, 8 Int'l J. of Child, Youth & Fam. Studies 74 (2017), http://dx.doi.org/10.18357/ijcyfs82201716754 (discussing relational ethics).

The process of informed consent (which, for minors, also frequently includes their parents) involves five core elements: 1) patient competence, 2) disclosure, 3) comprehension, 4) voluntariness, and 5) consent. Beauchamp & Childress at 122. As to the first element, parents generally have competence to participate in the informed consent process on behalf of their minor children, and many adolescent patients also have the competence to participate in the informed consent process, including in the context of gender-affirming care. *See* Jessica Kremen et al., *Addressing Legislation That Restrict*

18

*Access to Care for Transgender Youth*, 147 Pediatric Perspectives (2021), https://pubmed.ncbi.nlm.nih.gov/33883246/ (minor patients who are transgender "possess decisional capacity, and with guardian consent and the support of a multidisciplinary team, [] are able to contribute to decisions in their own best interests about [Gonadotropin Releasing Hormones] and gender-affirming hormones"); Beth A. Clark & Alice Virani, *This Wasn't a Split-Second Decision: An Empirical Ethical Analysis of Transgender Youth Capacity, Rights, and Authority to Consent to Hormone Therapy*, 18 J. Bioethical Inquiry 151–164 (2021), https://pubmed.ncbi.nlm.nih.gov/33502682/ (concluding, based on qualitative empirical analysis, that "trans[gender] youth demonstrated the understandings and abilities characteristic of the capacity to consent to hormone therapy and that they did consent to hormone therapy with positive outcomes"); Richard E. Redding, *Children's Competence to Provide Informed Consent for Mental Health Treatment*, 50 Wash. & Lee L. Rev. 695, 707 (1993), https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1759&context=wlulr ("Research . . . indicates that children often are capable of making important life decisions in a rational manner, including decisions about medical and psychological treatment.").

Once competence has been established, the elements of disclosure and comprehension require the provider to accurately and sensitively present relevant information about any diagnosis; the nature and purpose of recommended interventions; the burdens, risks, and expected benefits of all options, including forgoing treatment; and

any limitations to the medical community's knowledge regarding burdens, risks, and expected benefits. AMA, *Code of Medical Ethics Opinion 2.1.1, Informed Consent*, https://www.ama-assn.org/delivering-care/ethics/informed-consent; Aníbal Torres Bernal & Deborah Coolhart, *Treatment and Ethical Considerations with Transgender Children and Youth in Family Therapy*, 23 J. of Fam. Psychotherapy 296, 287–303 (2012), http://dx.doi.org/10.1080/08975353.2012.735594.

For the fourth element, voluntariness, the provider must then assess the patient's (and, if not a mature minor, the parents') ability to understand relevant medical information and the implications of treatment alternatives and to make an independent, voluntary decision. AMA *Informed Consent.* Fifth, and finally, the patient—and, where the patient is a minor, usually the parents as well—decides how to proceed.

From the perspective of biomedical ethics, a decision that is made jointly by a parent and child, aligns with a provider's recommendation, and is discerned through a process of informed consent should be fully respected. Indeed, medical professionals, parents, and adolescents are regularly entrusted to together decide the best course of treatment, including when the treatment has significant risks or permanent effects. Pediatric chemotherapy or radiation, for example, are subject to principles of informed consent, despite the potential lasting effects on growth development and reproductive capabilities. *See, e.g.*, Am. Cancer Soc'y, *Late Effects of Childhood Cancer Treatment* (Sept. 18, 2017), https://www.cancer.org/treatment/children-and-cancer/when-your-child-has-

cancer/late-effects-of-cancer-treatment.html.  Pediatric breast reduction performed to address excess breast tissue, back pain, or social anxiety; pediatric rhinoplasty; and orthopedic surgery on minors following sports injuries likewise can have enduring impacts.  There is nothing unique about gender-affirming care that demands a different scheme than allowing care when the provider, patient, and parents all agree about the best course of action.[4]

By prohibiting health care providers from offering medically necessary and appropriate treatment to adolescents with gender dysphoria and denying patients the ability to access such care when they and their parents have given informed consent, the Health Care Ban disrespects autonomy and undermines the provider-patient relationship.

### B.    The Health Care Ban Forces Providers to Violate Their Duty of Beneficence.

The duty to act in the best interest of the patient is called beneficence, and is best understood as "a group of norms pertaining to relieving, lessening, or preventing harm and providing benefits and balancing benefits against risks and costs."  Beauchamp &

---

[4] The Health Care Ban expressly allows surgical inventions to be performed on minors with intersex conditions or for conditions outside of gender-affirming care, including infants too young to participate in the decision-making process, even though such procedures have irreversible, long-term consequences and raise serious ethical concerns. *See* Ind. Code § 25-1-22-13(c); Human Rights Watch, *"I Want to Be Like Nature Made Me": Medically Unnecessary Surgeries on Intersex Children in the US* (2017), https://www.hrw.org/sites/default/files/report_pdf/lgbtintersex0717_web_0.pdf.

Childress at 13; *see also id.* at 217 ("[M]orality requires that we treat persons autonomously and refrain from harming them, but morality also requires that we contribute to their welfare.").[5]  Medical professionals all over the world take oaths and are held to duties that encompass beneficence.  For example, the World Medical Association's "Modern Hippocratic Oath" requires physicians to attest upon admission to the medical profession that the "health of [their] patient[s] will be [their] first consideration."  World Medical Association, *Declaration of Geneva* (1948).  Likewise, the United Kingdom's General Medical Council requires physicians to "make the care of your patient your first concern."  *Good medical practice: Duties of a doctor registered with the General Medical Council*, Gen. Med. Council 70–78 (2001), https://www.gmc-uk.org/ethical-guidance/ethical-guidance-for-doctors/good-medical-practice/duties-of-a-doctor.  And the AMA recognizes that "[t]he practice of medicine, and its embodiment in the clinical encounter between a patient and a physician, is fundamentally a moral activity that arises from the imperative to care for patients and to alleviate suffering."  AMA, *Code of Medical Ethics Opinion 1.1.1, Patient-Physician Relationships*, https://www.ama-assn.org/system/files/code-of-medical-ethics-chapter-1.pdf.

---

[5] A related principle, nonmaleficence, concerns avoiding the causation of harm.  Nonmaleficence thus prohibits action while beneficence requires it.  The Health Care Ban contravenes both principles.

1.    **The Health Care Ban's Treatment Prohibition Forces Providers to Violate Their Duty of Beneficence.**

Applying the principle of beneficence to the treatment of a patient with gender dysphoria is straightforward. When untreated, gender dysphoria has serious mental and physical consequences, including anxiety, depression, self-harm, and suicidality. *See, e.g.,* Norman P. Spack et al., *Children and adolescents with gender identity disorder referred to a pediatric medical center*, 129 Pediatrics (2012), https://pubmed.ncbi.nlm.nih.gov/22351896; Kristina R. Olson et al., *Mental health of transgender children who are supported in their identities*, Pediatric Collections: LGBTQ+: Support and Care (Part 3: Caring for Transgender                         Children)                       (2016) https://publications.aap.org/pediatrics/articleabstract/137/3/e20153223/81409/Mental-Health-of-Transgender-Children-Who-Are.  By contrast, evidence from both research and clinical experience makes clear that gender-affirming care improves patients' health and alleviates their suffering. *See* Dkt. 27, Plaintiff's Memorandum in Support of Motion for Preliminary Injunction at 8-10, 19, 25-26; AAP Br. at 19-21 (collecting evidence showing that gender-affirming care improves overall well-being; significantly lowers risk of depression, anxiety, and other negative mental health outcomes; and reduces rates of substance abuse and suicide attempts).  Withholding care for gender dysphoria as the Health Care Ban requires thus can result in serious harm to patients, contrary to the core principle of beneficence.

### 2.    The Health Care Ban's Referrals Prohibition Forces Providers to Violate Their Duty of Beneficence and Undermines Public Health.

In addition to prohibiting health care professionals from providing gender affirming care to adolescents with gender dysphoria, the Health Care Ban also prohibits them from making referrals for such care.  S.E.A. 480 § 13(b).  The Health Care Ban thus prevents patients and their parents from learning from trusted sources about where to access treatment for gender dysphoria, undermining their ability to receive that care.  Depriving patients of information from their health care providers about treatment options is dangerous for individual patient health and for public health more broadly.

The duty of beneficence encompasses a provider's obligation—if they cannot personally provide care—to refer the patient to someone who can.  *See ACP Ethics Manual* at 14 (explaining that a provider is not "obligated to recommend, perform or prescribe" a reproductive service, but, as in any other medical situation, "has a duty to inform the patient about care options and alternatives or refer the patient for such information, so that the patient's rights are not constrained").  The Health Care Ban forces providers to violate this duty by leaving their patients both without care and without referrals to get that care elsewhere.  By design, the Health Care Ban requires providers to stay silent in the face of their patients' actual medical needs.  *Cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("[T]he free flow of . . . speech" has "great relevance in the fields of medicine and public health, where information can save lives."  (quotation marks omitted)).

Stifling the flow of information between patients and their providers about accessing treatment undermines the integrity of the provider-patient relationship and individual patient health.  "An integral component of the practice of medicine is the communication between a doctor and a patient."  *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002); *see also Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1313 (11th Cir. 2017) (en banc) (similar).  Being able to engage in open dialogue with and access accurate and reliable information from one's provider about treatment options is critical to a patient's health in multiple respects, including promoting patient adherence to treatment plans. *See, e.g.*, Rainer S. Beck et al., *Physician-Patient Communication in the Primary Care Office: A Systematic Review*, 15 J. Am. Bd. Fam. Pract. (2002), https://pubmed.ncbi.nlm.nih.gov/11841136 ("When patients are informed and involved in decision making, they are more adherent to medical recommendations and carry out more health-related behavior change").  This is so even when—and perhaps especially when—there is societal debate about a proper course of treatment.  If patients are denied competent information from a reliable source—their health care provider—about where they can obtain medically competent care, they will be forced to obtain that information elsewhere.  "But word-of-mouth and the Internet are poor substitutes for a medical doctor; information obtained from chat rooms and tabloids cannot make up for the loss of individualized advice from a physician with many years of training and experience." *Conant*, 309 F.3d at 644 (Kozinski, J., concurring).  Preventing the flow of information from

providers about where to access treatment is harmful not only for individual health, but for society and public health more broadly. Society "regard[s] private, professional communication between doctors and patients as a significant source of expert, dependable information. . . . This knowledge, once received, is pertinent to much more than our personal decisions about receiving medical care. It is relevant to how we think about the provision of medical care generally." Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech,* Univ. of Ill. L. Rev. 939, 977–78 (2007). "[I]f the state could freely . . . manipulate the trustworthy information that we were able to receive from our physicians"—including referrals for treatment—it would raise serious concerns, for society depends on "knowledge that our doctors can uniquely provide, so that we can decide for ourselves what our medical care ought to be." *Id*. at 977–78; *see also Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (explaining that the First Amendment is concerned with government efforts to "limit[] the range of information and ideas to which the public is exposed").

In short, restricting speech about where to obtain treatment based on a particular viewpoint as the Health Care Ban requires will undermine public trust in health care providers, with the likely consequence of leading people to ignore the recommendations of their providers, or to avoid health care settings altogether. *See infra II.C* (describing distrust resulting from denial of care); *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) ("The First Amendment directs us to be especially skeptical of regulations

that seek to keep people in the dark for what the government perceives to be their own good.").

* * *

The principle of beneficence obligates providers to remove conditions that will cause harm to others.  Beauchamp & Childress at 219.  By mandating that providers deny care to their patients with gender dysphoria when the patient and their parents seek that care and the provider deems it medically indicated, and then abandon them with no referral for alternative sources for treatment, the Health Care Ban forces providers to cause harm to their patients and, thus, to violate their core duty of beneficence.

C.    **The Health Care Ban Forces Providers to Violate Their Duty of Justice.**

A third core principle of bioethics—justice—requires providers to acknowledge inequalities in the delivery of medical care and to work toward fair, equitable, and appropriate treatment for all.  Beauchamp & Childress at 267–68; Clark, *Ethics in Child & Youth Care Practice with Transgender Youth* at 79.  The Health Care Ban undermines this ethical duty of providers by creating a complete barrier to transgender adolescents receiving gender-affirming care.

The Health Care Ban denies care to minor patients based on their identity as transgender: care is banned only if it is for "gender transition procedures," which is care that only transgender individuals seek.  The Health Care Ban thus imposes medical strain on only those patients.  For example, the Ban, if allowed to go into effect, may force

families with minors who are transgender to consider moving out of state or to endure the negative health effects from stopping hormone therapy and to fear for their ability to survive without treatment.  (*See* Dkt. 1, Compl. ¶¶ 104, 124, 143, 144, 159; SA30; Plaintiff-Appellees' Br. 15-17.)  These potential costs are on top of the many socioeconomic and geographic barriers to gender-affirming care that transgender youth often already face.  *See* Phillip E. Wagner et al., 39.1 *Health (Trans)gressions: Identity and Stigma Management in Trans\* Healthcare Support Seeking* 51 (Oct. 2016) (noting "[t]he difficult decisions trans\* individuals make in regard to their healthcare have been well documented" and include "[f]inancial barriers, insurance issues, and access to services").  The Health Care Ban exacerbates and reinforces these already significant challenges by preventing transgender youth from accessing the gender-affirming healthcare they require.

Also, being denied coverage for gender-affirming care may lead transgender people to avoid seeking medical care altogether, or to choose between their health care, their food, their safety, or their housing.  *See* Kraschel at 5 (noting potential of legislative restrictions on gender-affirming care to disproportionally affect marginalized communities).  Avoiding or delaying care leads "to poorer physical and mental health outcomes."  Luisa Kcomt et al., *Healthcare avoidance due to anticipated discrimination among transgender*, 11(100608) SSM - Population Health 1 (2020), https://www.sciencedirect.com/science/article/pii/S2352827320302457.

As a matter of biomedical ethics and its core principle of justice, medical practitioners must not cause patients to fear seeking care, nor deny them care that, by definition, only people who are transgender need. The Health Care Ban forces health care providers to violate this principle by mandating discrimination against a vulnerable and stigmatized population.

* * *

The Health Care Ban is unsupported by biomedical ethics or any of its core principles. To the contrary, the Ban commands their violation, for no legitimate purpose, resulting in physical and emotional suffering.

### CONCLUSION

The Health Care Ban is an unwarranted restriction on the provision of health care: it contravenes multiple, fundamental principles of biomedical ethics and fails to rationally protect minors, instead mandating their harm. Permitting the Ban to take effect would open the door to unprecedented state intrusion into medicine and patient rights. This Court should reject such a result and affirm the preliminary injunctions granted below.

Dated: September 27, 2023

Kathleen Hartnett
Julie Veroff
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone: (415) 693-2000

Respectfully submitted,

/s/ *Katelyn Kang*

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2103
Telephone: (212) 479-6000

Elizabeth F. Reinhardt
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
Telephone: (202) 842-7800

*Attorneys for Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on September 27, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Seventh Circuit and served through CM/ECF upon all counsel of record in this case.


*/s/ Katelyn Kang*
Katelyn Kang

**CERTIFICATE OF COMPLIANCE**

The undersigned certifies that the foregoing Amicus Brief complies with Fed. R. App. P. 29(c) and the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,746 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This document complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses Palatino Linotype 12-point type face throughout, and Palatino Linotype is a proportional spaced typeface that includes serifs.

Dated: September 27, 2023

/s/ Katelyn Kang
Katelyn Kang
One of the Attorneys for Amicus