No. 23-2366

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

––––––––––––––––––

K.C., *et al.*,

Plaintiffs-Appellees

v.

INDIVIDUAL MEMBERS OF THE MEDICAL
LICENSING BOARD OF INDIANA, *et al.*,

Defendants-Appellants

––––––––––––––––––

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF INDIANA
Case No. 1:23-cv-00595
The Honorable Judge James P. Hanlon

––––––––––––––––––

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFFS-APPELLEES AND URGING AFFIRMANCE ON THE ISSUES
ADDRESSED HEREIN

––––––––––––––––––

KRISTEN CLARKE
 Assistant Attorney General

TOVAH R. CALDERON
JONATHAN L. BACKER
 Attorneys
 Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 532-3528

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES

INTEREST OF THE UNITED STATES ................................................................. 1

STATEMENT OF THE ISSUE................................................................. 2

STATEMENT OF THE CASE................................................................. 2

    *1.*    *SEA 480* ................................................................. 2

    *2.*    *Procedural History*................................................................. 4

SUMMARY OF THE ARGUMENT ................................................................. 6

ARGUMENT

    PLAINTIFFS ARE LIKELY TO SUCCEED ON
    THE MERITS OF THEIR EQUAL-PROTECTION CLAIM ....................... 8

        *A.*    *SEA 480 Is Subject To Heightened Scrutiny* .............................. 9

            *1.*    *SEA 480 Facially Discriminates Based On Sex* .............. 9

            *2.*    *SEA 480 Also Discriminates Based On Sex*
                  *By Targeting Transgender Minors* .................................11

            *3.*    *SEA 480 Also Triggers Heightened Scrutiny*
                  *Because Transgender Persons Constitute At*
                  *Least A Quasi-Suspect Class* ..........................................14

            *4.*    *Defendants' Arguments Against Application Of*
                  *Heightened Scrutiny Lack Merit* ....................................18

                  *a.*    *A Law Can Discriminate Based On Sex*
                        *Without Preferring One Sex Over Another* .........18

**TABLE OF CONTENTS (continued):**                              **PAGE**

           b.    Dobbs *And* Geduldig *Are Inapposite* ...................20

           c.    *Physiological Differences Between Sexes Are Irrelevant To Determining The Level Of Scrutiny* ...........................................................21

           c.    *Heightened Scrutiny Is Consistent With The Proper Role Of Courts Applying The Equal Protection Clause* ..................................................22

    B.   *The District Court Did Not Abuse Its Discretion In Finding That SEA 480 Is Unlikely To Survive Heightened Scrutiny* .................................................................23

       1.   *A Strong Medical Consensus Supports The Use Of Puberty Blockers And Hormone Therapies To Treat Gender Dysphoria* ........................................24

       2.   *SEA 480 Is Not Substantially Related To Achieving Indiana's Asserted Interests* ......................27

           a.    *SEA 480 Is Overinclusive* ....................................28

           b.    *SEA 480 Is Underinclusive* ..................................29

CONCLUSION ...................................................................................... 31

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:** **PAGE**

*A.C.* v. *Metropolitan Sch. Dist. of Martinsville*,
    75 F.4th 760 (7th Cir. 2023) ........................................................10-11, 19-20

*Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200 (1995) ....................................19

*Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731 (2020).......................................... *passim*

*Bowen* v. *Gilliard*, 483 U.S. 587 (1987) ..................................................................15

*Brandt* v. *Rutledge*, 47 F.4th 661 (8th Cir. 2022)...................................... 8-9, 15, 29

*Bray* v. *Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ........................12

*Brown* v. *Zavaras*, 63 F.3d 967 (10th Cir. 1995) ...................................................15

*Builders Ass'n of Greater Chi.* v. *County of Cook*,
    256 F.3d 642 (7th Cir. 2001) ..........................................................................28

*City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432 (1985) ........... 14-15, 23, 30

*Civil Rights Cases*, 109 U.S. 3 (1883) ....................................................................14

*Dobbs* v. *Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) .................... 20-21

*Doe 1* v. *Thornbury*, 75 F.4th 655 (6th Cir. 2023) ...................................................8

*Doe* v. *Ladapo*, No. 4:23cv114,
    2023 WL 3833848 (N.D. Fla. June 6, 2023)...................................................8

*Eknes-Tucker* v. *Governor of Ala.*, No. 22-11707,
    2023 WL 5344981 (11th Cir. Aug. 21, 2023),
    pet. for reh'g en banc pending (filed Sept. 11, 2023)............................ *passim*

*Frontiero* v. *Richardson*, 411 U.S. 677 (1973).......................................................17

*Geduldig* v. *Aiello*, 417 U.S. 484 (1974) .......................................................... 20-21

**CASES (continued):** PAGE

*Grimm* v. *Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020),
    cert. denied, 141 S. Ct. 2878 (2021) .......................................................... 15-17

*Hecox* v. *Little*, Nos. 20-35813, 20-35815,
    2023 WL 5283127 (9th Cir. Aug. 17, 2023) ........................................... 12, 15

*International Ass'n of Fire Fighters, Loc. 365* v. *City of East Chicago*,
    56 F.4th 437 (7th Cir. 2022) ............................................................................8

*J.E.B.* v. *Alabama*, 511 U.S. 127 (1994) .....................................................13

*Karnoski* v. *Trump*, 926 F.3d 1180 (9th Cir. 2019) ....................................15

*Koe* v. *Noggle*, No. 1:23-cv-2904,
    2023 WL 5339281 (N.D. Ga. Aug. 20, 2023) ...............................................8

*L.W.* v. *Skrmetti*, 73 F.4th 408 (6th Cir. 2023) .............................. 8, 22-23

*Lyng* v. *Castillo*, 477 U.S. 635 (1986) .................................................. 14-16

*M.A.B.* v. *Board of Educ. of Talbot Cnty.*,
    286 F. Supp. 3d 704 (D. Md. 2018) .............................................................17

*McWright* v. *Alexander*, 982 F.2d 222 (7th Cir. 1992) ...............................12

*Michael M.* v. *Superior Court of Sonoma Cnty.*, 450 U.S. 464 (1981) ...................22

*Miller* v. *Johnson*, 515 U.S. 900 (1995) ....................................................19

*Nguyen* v. *INS*, 533 U.S. 53 (2001) ...........................................................22

*San Antonio Indep. Sch. Dist.* v. *Rodriguez*, 411 U.S. 1 (1973)............................15

*Sessions* v. *Morales-Santana*, 582 U.S. 47 (2017) ...............................5, 28

*United States* v. *Virginia*, 518 U.S. 515 (1996)............................... *passim*

**CASES (continued):**                                                **PAGE**

*Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1037 (7th Cir. 2017),
    cert. dismissed, 138 S. Ct. 1260 (2018).................................. *passim*

**STATUTES:**

21 U.S.C. 355(a) ..........................................................................26

21 U.S.C. 355(d) ..........................................................................26

42 U.S.C. 2000h-2..........................................................................2

Indiana Senate Enrolled Act 480, Ind. Acts 94
    (codified at Ind. Code § 25-1-22-1 *et seq.*) (2023)
    Ind. Code § 25-1-22-1........................................................ 2-3
    Ind. Code § 25-1-22-3........................................................ 3, 10-11
    Ind. Code § 25-1-22-5........................................................21
    Ind. Code § 25-1-22-5(a).....................................................3
    Ind. Code § 25-1-22-5(a)(1) ...............................................9, 13
    Ind. Code § 25-1-22-5(a)(2) ............................................ 9-10, 13
    Ind. Code § 25-1-22-5(b)(1) ...............................................3, 29
    Ind. Code § 25-1-22-5(b)(2) .............................................3-4, 29
    Ind. Code § 25-1-22-5(b)(4) .................................................4
    Ind. Code § 25-1-22-5(b)(6) ...............................................3, 29
    Ind. Code § 25-1-22-12 .....................................................3, 10
    Ind. Code § 25-1-22-12(a)....................................................3
    Ind. Code § 25-1-22-13 .......................................................21
    Ind. Code § 25-1-22-13(a).................................................2, 9
    Ind. Code § 25-1-22-13(b)....................................................2
    Ind. Code § 25-1-22-13(c)(1) .............................................3, 29
    Ind. Code § 25-1-22-13(c)(2) .............................................3, 29
    Ind. Code § 25-1-22-13(c)(4) ...............................................4
    Ind. Code § 25-1-22-13(d)....................................................4
    Ind. Code § 25-1-22-15 .......................................................4
    Ind. Code § 25-1-22-17 .......................................................4

Ind. Code § 16-34-2-1 (2023) ......................................................20

**STATUTES (continued):**                                                                **PAGE**

Ind. Code § 25-1-9-4(a)(3) (2023) .............................................................................4

**REGULATIONS:**

21 C.F.R. Pt. 314 ...............................................................................................26

Exec. Order No. 13,988, § 1, 86 Fed. Reg. 7023 (Jan. 20, 2021).............................2

**RULE:**

Fed. R. App. P. 29(a) .........................................................................................2

**MISCELLANEOUS:**

*2023 Anti-Trans Bills Tracker*, TransLegislation.com
    (last visited Sept. 1, 2023), https://perma.cc/489J-X2G3.............................17

Christopher M. Wittich et al., *Ten Common Questions (and Their Answers)*
    *About Off-Label Drug Use*, 87 Mayo Clinic Proc. 982, 985 (2012),
    https://perma.cc/2YHU-LLLJ......................................................................27

Press Release, Am. Acad. Pediatrics, *AAP Reaffirms Gender-Affirming*
    *Care Policy, Authorizes Systematic Review of Evidence to Guide*
    *Update* (Aug. 4, 2023), https://perma.cc/C5TG-MEMG .............................25

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

––––––––––––––––

No. 23-2366

K.C., *et al.*,

Plaintiffs-Appellees

v.

INDIVIDUAL MEMBERS OF THE MEDICAL
LICENSING BOARD OF INDIANA, *et al.*,

Defendants-Appellants

––––––––––––––––

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF INDIANA
Case No. 1:23-cv-00595
The Honorable Judge James P. Hanlon

––––––––––––––––

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFFS-APPELLEES AND URGING AFFIRMANCE ON THE ISSUES
ADDRESSED HEREIN

––––––––––––––––

**INTEREST OF THE UNITED STATES**

This case challenges an Indiana statute that prohibits certain medical care for

transgender minors.  The United States has a strong interest in protecting the rights

of individuals who are lesbian, gay, bisexual, transgender, and intersex.  The

President issued an Executive Order that recognizes the right of all people to be

"treated with respect and dignity" and receive "equal treatment" regardless of

gender identity or sexual orientation.  Exec. Order No. 13,988, § 1, 86 Fed. Reg.

7023 (Jan. 20, 2021).  In addition, 42 U.S.C. 2000h-2 authorizes the Attorney

General to intervene to address sex-based denials of equal protection of the laws

under the Fourteenth Amendment.

The United States files this brief under Rule 29(a) of the Federal Rules of

Appellate Procedure.

## STATEMENT OF THE ISSUE

Whether Indiana Senate Enrolled Act 480 (SEA 480), which prohibits

certain kinds of medical care for transgender minors but not for other minors, is a

classification based on sex and transgender status that is subject to and fails

heightened equal-protection scrutiny.

## STATEMENT OF THE CASE

*1.     SEA 480*

Indiana enacted SEA 480 in April 2023, and it was scheduled to take effect

on July 1.  2023 Ind. Acts 94 (codified at Ind. Code § 25-1-22-1 *et seq.*).  SEA 480

would prohibit physicians and other medical practitioners from "knowingly

provid[ing]" or "aid[ing] or abet[ting]" the provision of "gender transition

procedures to a minor."  Ind. Code § 25-1-22-13(a)-(b) (2023).  The statute defines

"gender transition" as "the process in which an individual shifts from identifying

with and living as a gender that corresponds to his or her sex to identifying with

and living as a gender different from his or her sex." *Id.* § 25-1-22-3.  It defines

"sex" as "the biological state of being male or female, based on the individual's

sex organs, chromosomes, and endogenous hormone profiles." *Id.* § 25-1-22-12.

The statute defines "gender" as "the psychological, behavioral, social, and cultural

aspects of being male or female." *Id.* § 25-1-22-1.

SEA 480 defines the banned "gender transition procedures" as "any medical

or surgical service" that seeks to:

> (1) alter or remove physical or anatomical characteristics or features
> that are typical for the individual's sex; or

> (2) instill or create physiological or anatomical characteristics that
> resemble a sex different from the individual's sex, including medical
> services that provide puberty blocking drugs, gender transition
> hormone therapy, or genital gender reassignment surgery or
> nongenital gender reassignment surgery.

Ind. Code § 25-1-22-5(a) (2023).

At the same time, the statute expressly exempts medical treatment for

"disorder[s] of sex development" (also known as intersex conditions), *see* Ind.

Code §§ 25-1-22-5(b)(1) and (2), 25-1-22-13(c)(1) and (2) (2023); deviations from

"normal sex chromosome structure, sex steroid hormone production, or sex steroid

hormone action," *id.* §§ 25-1-22-5(b)(2), 25-1-22-13(c)(2); and "[s]ervices for a

disorder or condition of sexual development that is unrelated to a diagnosis of

gender dysphoria or gender identity disorder," *id.* § 25-1-22-5(b)(6).  The statute

also exempts "[a]ny medical or surgical service undertaken because the individual

suffers from a physical disorder, physical injury, or physical illness that would,"
without intervention, "place the individual in imminent danger of death or
impairment of major bodily function." *Id.* §§ 25-1-22-5(b)(4), 25-1-22-13(c)(4).
In addition, SEA 480 provides a continuing-care exception until December 31,
2023, for otherwise prohibited medical care that began before the law's effective
date. *Id.* § 25-1-22-13(d).

Physicians or medical practitioners who violate SEA 480 are subject to
discipline by their regulating licensing boards. Ind. Code §§ 25-1-9-4(a)(3),
25-1-22-15 (2023). The statute also authorizes private enforcement of its
provisions. *Id.* § 25-1-22-17.

## 2.   *Procedural History*

Four transgender minors who currently receive medical treatments banned
by SEA 480, their parents, and a doctor and her medical practice that provide the
banned treatments filed a class-action lawsuit against Indiana government officials,
including members of the Medical Licensing Board of Indiana and the Attorney
General of Indiana. SA6-SA8, SA33.[1]  Among other claims, the minor plaintiffs
allege that SEA 480 violates their rights and those of similarly situated minors
under the Fourteenth Amendment's Equal Protection Clause. SA8.

---

[1] "SA__" refers to appellants' Short Appendix by page number. "Doc. __,
at __" refers to the docket entry and page number of the district court filings
below. "Br. __" refers to pages of the appellants' opening brief.

Plaintiffs moved for a preliminary injunction barring enforcement of SEA 480 before its July 1, 2023, effective date.  Doc. 9.  In addition, plaintiffs moved for class certification (Doc. 10), but the district court stayed briefing of that motion pending resolution of plaintiffs' motion for a preliminary injunction (Doc. 43).

The district court granted in part plaintiffs' motion for a preliminary injunction.  As to the minor plaintiffs' equal-protection claim, the court held that SEA 480 must be reviewed under heightened scrutiny because "without sex-based classifications, it would be impossible for S.E.A. 480 to define whether a puberty-blocking or hormone treatment involved transition from one's sex (prohibited) or was in accordance with one's sex (permitted)."  SA19.  In light of that conclusion, the court did not address "what level of scrutiny a transgender-based classification alone might warrant."  SA21 n.3.

Applying heightened scrutiny, the district court found that although Indiana has "legitimate" interests in "protecting the wellbeing of minors and regulating the medical profession," SEA 480 lacks a "'close means-end fit.'"  SA21-SA22 (quoting *Sessions* v. *Morales-Santana*, 582 U.S. 47, 68 (2017)).  The court found that defendants "designated some evidence" that "provides support" for their view "that the safety and effectiveness of puberty blockers and hormone therapy is uncertain and unsettled."  SA23-SA24.  But the court also found that plaintiffs

"designated evidence of risks to minors' health and wellbeing from gender dysphoria if those treatments can no longer be provided to minors—prolonging of their dysphoria, and causing additional distress and health risks, such as depression, posttraumatic stress disorder, and suicidality." SA24-SA25. Thus, although defendants, in the court's preliminary view, "identified legitimate reasons for regulation" of gender-affirming care, they had not shown that a categorical ban of puberty blockers or hormone therapies to treat gender dysphoria "was closely tailored to uphold those interests." SA25.

The district court also found that the minor plaintiffs would suffer irreparable harm if they could not receive puberty blockers or hormone therapies to treat their gender dysphoria (SA30), and that the balance of the equities and the public interest favored a preliminary injunction (SA32). Accordingly, the court enjoined defendants from enforcing SEA 480's prohibitions except those related to gender-reassignment surgery. SA35-SA36.

Defendants timely appealed the district court's preliminary injunction order. Doc. 77.

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's holding that plaintiffs are likely to succeed on the merits of their equal-protection claim because SEA 480's ban on gender-affirming care is subject to, and cannot survive, intermediate scrutiny.

Intermediate scrutiny applies to SEA 480.  As the district court found, SEA 480 facially discriminates based on sex because sex-based classifications are determinative in the law's ban on gender-affirming care for transgender minors. Although the district court did not reach the issue, intermediate scrutiny also applies because SEA 480 targets transgender minors, which inherently involves sex discrimination as well as differential treatment of (at least) a quasi-suspect class.

SEA 480 cannot survive intermediate scrutiny.  Defendants claim that SEA 480's purpose is to protect children and to regulate the medical profession. No one disputes that those are important government interests in the abstract.  But the premise underlying defendants' assertion of those interests is that the treatments that SEA 480 bans are "unproven," unsafe, and not medically necessary.  Br. 42.  The record does not support defendants' view.  Moreover, as the district court found, the statute is overinclusive because it categorically bans necessary medical care to transgender minors when more narrowly tailored regulation could help ensure treatment in line with the prevailing standard of care. However, SEA 480 also is underinclusive because it expressly permits non-transgender minors to access the very same treatments that it denies to transgender minors.

**ARGUMENT**

**PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL-PROTECTION CLAIM**

In considering a preliminary injunction, a district court must consider, among other factors, whether the movant has shown "some likelihood of succeeding on the merits." *International Ass'n of Fire Fighters, Loc. 365* v. *City of East Chicago*, 56 F.4th 437, 446 (7th Cir. 2022) (citation omitted). This Court should join the Eighth Circuit in holding that gender-affirming-care bans like SEA 480 likely violate the Equal Protection Clause. See *Brandt* v. *Rutledge*, 47 F.4th 661, 670-671 (8th Cir. 2022).[2]

---

[2] The Eleventh Circuit recently held that rational-basis review applied to Alabama's similar ban and that the law survived that minimal level of scrutiny. See *Eknes-Tucker* v. *Governor of Ala.*, No. 22-11707, 2023 WL 5344981, at *15 (11th Cir. Aug. 21, 2023), pet. for reh'g en banc pending (filed Sept. 11, 2023). A Sixth Circuit motions panel provisionally reached the same conclusion in determining whether preliminary injunctions against similar Tennessee and Kentucky laws should be stayed pending appeal. See *Doe 1* v. *Thornbury*, 75 F.4th 655, 657 (6th Cir. 2023); *L.W.* v. *Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023). But the motions panel stressed that its conclusion, reached without full appellate briefing, was "initial" and "may be wrong." *L.W.*, 73 F.4th at 422. District courts have concluded that Georgia and Florida gender-affirming-care bans likely violate the Equal Protection Clause. See *Koe* v. *Noggle*, No. 1:23-cv-2904, 2023 WL 5339281, at *14 (N.D. Ga. Aug. 20, 2023); *Doe* v. *Ladapo*, No. 4:23cv114, 2023 WL 3833848, at *8 (N.D. Fla. June 6, 2023), appeal pending, No. 23-12159 (11th Cir. filed June 27, 2023). But *Eknes-Tucker* leaves those decisions in flux. For the reasons set forth below, neither *Eknes-Tucker* nor the stay opinions in *L.W.* or *Thornbury* are persuasive, and they cannot be reconciled with this Court's precedents.

A.    *SEA 480 Is Subject To Heightened Scrutiny*

The district court correctly concluded that heightened scrutiny applies to SEA 480 because it facially discriminates based on sex.  In addition, the statute discriminates based on transgender status, which both inherently entails sex discrimination and is an independent basis for application of heightened scrutiny because transgender persons are a quasi-suspect class.

1.    *SEA 480 Facially Discriminates Based On Sex*

Laws that discriminate based on sex are subject to intermediate scrutiny. See *United States* v. *Virginia*, 518 U.S. 515, 555 (1996).  The district court properly found that SEA 480 facially discriminates based on sex because "sex-based classifications are not just present in [its] prohibitions; they're determinative."  SA19.

Under SEA 480, a "minor's sex at birth determines whether or not the minor can receive certain types of medical care." *Brandt*, 47 F.4th at 669.  The statute prohibits medical providers from administering "gender transition procedures to a minor."  Ind. Code § 25-1-22-13(a) (2023).  SEA 480 defines the prohibited procedures as those that "instill or create physiological or anatomical characteristics that resemble a *sex different from the individual's sex*" assigned at birth or that "alter or remove physical or anatomical characteristics or features that are typical for the *individual's sex*" assigned at birth.  *Id.* § 25-1-22-5(a)(1) and (2)

(emphases added).  Thus, as the district court determined, the statute expressly

"allows physicians and other practitioners to 'instill or create' characteristics

'resembl[ing]' female anatomical characteristics for females but not for males, and

male anatomical characteristics for males but not for females."  SA18 (alteration in

original) (quoting Ind. Code § 25-1-22-5(a)(2) (2023)).  For example, under

SEA 480, a minor assigned female at birth cannot receive testosterone to live as a

male.  By contrast, a minor assigned male at birth can receive testosterone to live

as a male.

Because SEA 480 "cannot be stated without referencing sex," it is

"inherently based upon a sex-classification."  *Whitaker* v. *Kenosha Unified Sch.*

*Dist. No. 1 Bd. of Educ.*, 858 F.3d 1037, 1051 (7th Cir. 2017), cert. dismissed, 138

S. Ct. 1260 (2018); accord *A.C.* v. *Metropolitan Sch. Dist. of Martinsville*, 75 F.4th

760, 772 (7th Cir. 2023).  In crafting the statute, the legislature could not "writ[e]

out instructions" to identify the banned medical procedures "without using the

words man, woman, or sex (or some synonym)."  *Bostock* v. *Clayton Cnty.*, 140

S. Ct. 1731, 1746 (2020).  Indeed, as the district court observed, the statute

"defines 'sex,' defines 'gender transition' in sex-based terms, and then phrases its

prohibitions in terms that repeatedly rely on those definitions."  SA19 (quoting Ind.

Code §§ 25-1-22-3, 25-1-22-12 (2023)).

That "the medical procedures that [SEA 480] regulates—puberty blockers and cross-sex hormones as a treatment for gender dysphoria—are themselves sex-based" does not change the analysis. *Eknes-Tucker* v. *Governor of Ala.*, No. 22-11707, 2023 WL 5344981, at *15 (11th Cir. Aug. 21, 2023), pet. for reh'g en banc pending (filed Sept. 11, 2023). That framing analyzes the statute at the wrong level of abstraction and bakes into the equal-protection comparison the very classification being scrutinized. As this case demonstrates, puberty blockers, estrogen, and testosterone can be taken by any person, regardless of their sex assigned at birth or their gender identity. Accordingly, the Equal Protection Clause requires Indiana to justify under heightened scrutiny its denial of those treatments to certain individuals on the basis of sex assigned at birth.

2.    *SEA 480 Also Discriminates Based On Sex By Targeting Transgender Minors*

Heightened scrutiny also applies because SEA 480 facially differentiates based on transgender status, which this Court has recognized "is a form of sex discrimination." *A.C.*, 75 F.4th at 769. The very purpose of the prohibited gender-affirming care is to enable "an individual [to] shift[] from identifying with and living as a gender that corresponds to his or her sex [assigned at birth] to identifying with and living as a gender different from his or her sex" assigned at birth. Ind. Code § 25-1-22-3 (2023). By targeting gender-affirming care—medical care that only a transgender person would seek—SEA 480 discriminates by proxy

based on transgender status.  Cf. *Bray* v. *Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews" because such skullcaps are worn "exclusively or predominantly" by Jewish people.); *McWright* v. *Alexander*, 982 F.2d 222, 228 (7th Cir. 1992) (A defendant "cannot be permitted to use a technically neutral classification as a proxy to evade [a] prohibition of intentional discrimination."). "Proxy discrimination is a form of facial discrimination." *Hecox* v. *Little*, Nos. 20-35813, 20-35815, 2023 WL 5283127, at *26 (9th Cir. Aug. 17, 2023) (Christen, J., concurring in part and dissenting in part) (citation omitted). Defendants are therefore wrong that "S.E.A. 480 does not facially discriminate against transgender persons." Br. 40.

As the Supreme Court has recognized, "it is impossible to discriminate against a person for being  *  *  *  transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. By targeting transgender minors, SEA 480 "unavoidably discriminates against persons with one sex identified at birth" but who identify with a different sex "today." *Id.* at 1746. That inescapable feature of transgender discrimination inheres in SEA 480. "[A] medical provider can't know whether" a treatment involves "gender *transition*" prohibited by the statute "without knowing the patient's sex [assigned at birth] and the gender associated with the goal of the treatment." SA19.

Sex classification also is inherent in how SEA 480 treats transgender minors differently based on their gender nonconformance.  See *Eknes-Tucker*, 2023 WL 5344981, at *17 (acknowledging that Alabama's gender-affirming-care ban, like SEA 480, "restricts a specific course of medical treatment that, by the nature of things, only gender nonconforming individuals may receive").  The Supreme Court has recognized that differential treatment based on gender stereotypes is a form of sex classification subject to heightened scrutiny.  *J.E.B.* v. *Alabama*, 511 U.S. 127, 137-138 (1994).  And this Court has held that discrimination based on transgender status inherently entails that type of classification because, "[b]y definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth."  *Whitaker*, 858 F.3d at 1048.

Indeed, discrimination based on gender nonconformity appears in SEA 480's plain text.  The statute defines the prohibited medical treatments by reference to whether they "instill or create physiological or anatomical characteristics that *resemble* a sex different from the individual's sex" assigned at birth or "alter or remove physical or anatomical characteristics or features that are *typical* for the individual's sex" assigned at birth.  Ind. Code § 25-1-22-5(a)(1) and (2) (2023) (emphases added).  Thus, for example, the statute permits a non-transgender girl to take puberty blockers to maintain a physical appearance stereotypically associated with girls (*i.e.*, to treat precocious puberty).  But it

- 14 -

prohibits a transgender girl from doing the same (*i.e.*, to treat gender dysphoria). Heightened scrutiny therefore applies to SEA 480 because it "treats transgender [people], * * * who fail to conform to the sex-based stereotypes associated with their assigned sex at birth, differently" than non-transgender people, who do. *Whitaker*, 858 F.3d at 1051.[3]

> 3. *SEA 480 Also Triggers Heightened Scrutiny Because Transgender Persons Constitute At Least A Quasi-Suspect Class*

Heightened scrutiny also applies to SEA 480 because transgender persons constitute at least a quasi-suspect class. The Supreme Court has analyzed four factors to determine whether a group constitutes a "suspect" or "quasi-suspect" class: (1) whether the class historically has faced discrimination, see *Lyng* v. *Castillo*, 477 U.S. 635, 638 (1986); (2) whether the class has a defining characteristic that "frequently bears no relation to [the] ability to perform or contribute to society," *City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432,

---

[3] Defendants seek to turn *Whitaker*'s logic on its head by portraying SEA 480 as a measure to combat gender stereotyping by medical providers in diagnosing and treating gender dysphoria. See Br. 38 (stating that because "gender identity is both a response to one set of stereotypes and an embrace of other stereotypes" and because "[s]tereotypes permeate gender *dysphoria* as well," the statute "stops medical practitioners from foisting irreversible procedures on minors who do not conform to sex stereotypes"). Even if defendants' portrayal of how medical providers diagnose and treat gender dysphoria were accurate (and it is not), the difference, of course, is that SEA 480 is a state law that facially classifies based on sex stereotypes. By contrast, private medical providers do not engage in state action subject to equal-protection safeguards by diagnosing or treating gender dysphoria. See *Civil Rights Cases*, 109 U.S. 3, 11 (1883).

440-441 (1985) (citation omitted); (3) whether the class has "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638; and (4) whether the class lacks political power, see *Bowen* v. *Gilliard*, 483 U.S. 587, 602 (1987).  If these factors are satisfied, then the classification warrants heightened scrutiny.

This test sets a high bar to ensure that a class of people truly requires "extraordinary protection from the majoritarian political process." *San Antonio Indep. Sch. Dist.* v. *Rodriguez*, 411 U.S. 1, 28 (1973).  For precisely that reason, the Supreme Court has not recently considered whether to recognize another quasi-suspect class.  But several courts have found that transgender persons are the rare group that meets this high bar and concluded that they "constitute at least a quasi-suspect class."  *Grimm* v. *Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020) (collecting district court cases reaching same conclusion), cert. denied, 141 S. Ct. 2878 (2021); see also *Hecox*, 2023 WL 5283127, at *11 ("[H]eightened scrutiny applies to laws that discriminate on the basis of transgender status [because] gender identity is at least a 'quasi-suspect class.'" (quoting *Karnoski* v. *Trump*, 926 F.3d 1180, 1200-1201 (9th Cir. 2019))); *Brandt*, 47 F.4th at 670 n.4 (finding no "clear error in the district court's factual findings underlying" the legal conclusion that transgender persons are a quasi-suspect class but not relying on

that legal theory to affirm).[4]

First, "[t]here is no doubt" that transgender persons, as a class, "historically have been subjected to discrimination on the basis of their gender identity, including high rates of violence and discrimination in education, employment, housing, and healthcare access." *Grimm*, 972 F.3d at 611 (citation omitted); see also *Whitaker*, 858 F.3d at 1051 ("There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity.").

Second, whether a person is transgender bears no relation to their ability to contribute to society. As the Fourth Circuit has found, "[s]eventeen of our foremost medical, mental health, and public health organizations agree that being transgender 'implies no impairment in judgment, stability, reliability, or general social or vocational capabilities.'" *Grimm*, 972 F.3d at 612 (citation omitted).

Third, there is no reasonable dispute that transgender persons share "obvious, immutable, *or* distinguishing characteristics that define them as a discrete group." *Bowen*, 483 U.S. at 602 (emphasis added) (quoting *Lyng*, 477 U.S. at 638). Transgender persons are distinguishable as a group because their gender identities do not align with their sex assigned at birth. Courts have also

---

⁴ The Tenth Circuit in *Brown* v. *Zavaras*, 63 F.3d 967 (1995), held that a transgender plaintiff was "not a member of a protected class." *Id.* at 971. But that decision "reluctantly followed a since-overruled Ninth Circuit opinion." *Grimm*, 972 F.3d at 611.

held that transgender status is immutable because it "is not a choice" but is "as natural and immutable as being cisgender." *Grimm*, 972 F.3d at 612-613; see also, *e.g.*, *M.A.B.* v. *Board of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 720-721 (D. Md. 2018) (collecting district court cases). The testimony of plaintiffs' experts confirms this as well. See Doc. 26-1, at 7; Doc. 26-2, at 6-7.

Finally, transgender persons have not "yet been able to meaningfully vindicate their rights through the political process." *Grimm*, 972 F.3d at 613. "Even considering the low percentage of the population that is transgender," such persons are "underrepresented in every branch of government." *Ibid.* (citing relevant data). Furthermore, the proliferation of laws and governmental policies, like SEA 480, targeting transgender persons for discrimination, particularly transgender youth, is more evidence that transgender people lack the power necessary to protect themselves in the political process. See *2023 Anti-Trans Bills Tracker*, TransLegislation.com (last visited Sept. 1, 2023), https://perma.cc/489J-X2G3 (listing 83 anti-transgender laws enacted in 2023).

That the position of *some* transgender persons in society "has improved markedly in recent decades," *Frontiero* v. *Richardson*, 411 U.S. 677, 685-686 (1973), does not undermine finding that transgender persons as a class lack political power. The same was true about women when the Supreme Court began treating sex as a quasi-suspect classification. See *ibid.* Nor does the fact that the

United States has taken action in this case and elsewhere prove that transgender

persons now have political clout sufficient to defend themselves against

discriminatory laws (contra Br. 41-42); instead, it underscores how dire their

situation has become.

In sum, all four factors confirm that transgender persons constitute at least a

quasi-suspect class.  Consequently, heightened scrutiny applies for the additional

reason that SEA 480 discriminates against that class.

>    4.    *Defendants' Arguments Against Application Of Heightened Scrutiny*
>          *Lack Merit*

>         a.    *A Law Can Discriminate Based On Sex Without Preferring One*
>               *Sex Over Another*

Defendants contend that SEA 480 does not discriminate based on sex

because it applies equally to boys and girls and does not prefer one sex over

another sex.  Br. 32.  That is wrong.  The Supreme Court squarely rejected this

same argument in *Bostock*.  140 S. Ct. at 1741-1742.  A law like SEA 480 that

discriminates against *both* transgender girls and boys "*doubles* rather than

eliminates" liability for sex discrimination.  *Id.* at 1742 (emphasis added).  As is

true for Title VII of the Civil Rights Act of 1964, which "works to protect

individuals of both sexes from discrimination" even if an employer "treat[s] men

and women as groups more or less equally," *id.* at 1741, the right to equal

protection is a "personal right" that considers the treatment of *individuals* as

individuals and not only as part of a (favored or disfavored) group.  See *Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200, 227, 230 (1995) (stating that the Fourteenth Amendment "protect[s] persons, not groups"); *Miller* v. *Johnson*, 515 U.S. 900, 911 (1995) (similar).

This Court's decisions in *A.C.* and *Whitaker* also foreclose defendants' reasoning.  Those cases concerned sex-based bathroom policies that required both males and females to use bathrooms that accord with their sex assigned at birth. See *A.C.*, 75 F.4th at 764; *Whitaker*, 858 F.3d at 1039.  But this Court correctly applied heightened scrutiny to those policies.  *A.C.*, 75 F.4th at 772; *Whitaker*, 858 F.3d at 1051.  That makes sense because, under defendants' reasoning, even a law requiring racial segregation in schools—which would prohibit members of *all* races from attending racially integrated schools—would not be subject to heightened scrutiny.  Of course, that is not how equal protection works.

Defendants argue (Br. 37) that this Court "clarified" in *A.C.* that *Whitaker*'s reasoning does not extend to the medical context by "express[ing] no opinion on how  *  *  *  the Equal Protection Clause regulates other sex-segregated living facilities, educational programs, or sport teams."  75 F.4th at 773.  But this Court in *A.C.* itself rejected an argument that similar *holding*-limiting language in *Bostock* means that that case's *logic* does not extend to school-bathroom policies.

See *id.* at 769 (stating that a defendant's analogous argument "read[s] quite a bit into a statement that says, in essence, 'we aren't reaching this point'").

      *b.*    Dobbs *And* Geduldig *Are Inapposite*

Defendants cite *Dobbs* v. *Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), and *Geduldig* v. *Aiello*, 417 U.S. 484 (1974), to argue that SEA 480 does not discriminate based on sex. Br. 33-38. In *Dobbs*, the Supreme Court declined to apply heightened scrutiny to a state's regulation of abortion. 142 S. Ct. at 2245-2246. The law on its face did not discriminate based on sex, see *id.* at 2243, and the Court held that although abortion is a "medical procedure that only one sex can undergo," that fact alone was insufficient to "trigger heightened constitutional scrutiny," *id.* at 2245-2246. Likewise, in *Geduldig*, the Court declined to apply heightened scrutiny to a state law that excluded from disability-insurance coverage "certain disabilities resulting from pregnancy." 417 U.S. at 486. The law on its face did not discriminate based on sex, see *id.* at 489, and the Court held that "[w]hile it is true that only women can become pregnant," that fact alone did not trigger heightened scrutiny, *id.* at 486 n.20.[5]

---

[5] Some abortion laws, unlike the Mississippi law at issue in *Dobbs*, do use sex-based terminology to define their prohibitions. See, *e.g.*, Ind. Code § 16-34-2-1 (2023) (repeatedly using the term "woman"). But, as demonstrated by the existence of facially neutral abortion laws, such language is unnecessary to describe the conduct that those laws prohibit. There is no avoiding sex-based terminology in fashioning a ban on gender-affirming care.

Unlike the facially neutral laws at issue in *Dobbs* and *Geduldig*, SEA 480 facially discriminates based on sex.  Indeed, the legislature could not even describe the banned procedures without using the words "man, woman, or sex (or some synonym)."  *Bostock*, 140 S. Ct. at 1746.  When, as here, a law on its face discriminates based on sex, heightened scrutiny is warranted, and nothing in *Dobbs* or *Geduldig* suggests otherwise.

SEA 480 also is unlike laws regulating abortion or pregnancy because it regulates medical procedures that *all* individuals can undergo.  Medical providers cannot perform an abortion on a non-transgender man, but they *can* prescribe puberty blockers or hormones to any person regardless of their sex assigned at birth (or their gender identity).  Yet SEA 480 bars medical providers from prescribing testosterone to minors whose sex assigned at birth is female, while allowing them to prescribe the same testosterone to minors whose sex assigned at birth is male—and the same in reverse for estrogen.  See Ind. Code §§ 25-1-22-5, 22-1-22-13 (2023).  SEA 480 therefore fundamentally differs from the facially neutral laws at issue in *Dobbs* and *Geduldig*.

> c.    *Physiological Differences Between Sexes Are Irrelevant To Determining The Level Of Scrutiny*

That physiological differences exist between sexes does not mean that the rational-basis standard applies to sex-based classifications in the healthcare context.  See Br. 34, 37-38.  Indeed, the Supreme Court developed intermediate (as

opposed to strict) scrutiny precisely because "[p]hysical differences between men and women * * * are enduring." *Virginia*, 518 U.S. at 533. Accordingly, equal-protection analysis already accounts for physiological differences between sexes at the second step of the inquiry, which considers whether a State's justification for the law is "exceedingly persuasive." *Ibid.* (citation omitted). Thus, defendants' reliance on *Michael M.* v. *Superior Court of Sonoma County*, 450 U.S. 464 (1981), and *Nguyen* v. *INS*, 533 U.S. 53, 60 (2001), is misplaced. In those cases, the Court applied heightened scrutiny to sex-based classifications and then held the laws were *justified* because of the physiological differences between men and women. *Nguyen*, 533 U.S. at 60-61, 64; *Michael M.*, 450 U.S. at 469, 473. Because SEA 480 draws sex-based distinctions, heightened scrutiny likewise applies here.

        **d.**    *Heightened Scrutiny Is Consistent With The Proper Role Of Courts Applying The Equal Protection Clause*

Defendants also argue that SEA 480 reflects the "original fixed meaning" of the Equal Protection Clause and question whether "the people of this country ever agreed to remove decisions about" gender-affirming care from "the democratic process." Br. 30-31 (internal quotation marks omitted) (quoting *L.W.* v. *Skrmetti*, 73 F.4th 408, 415 (6th Cir. 2023)). A similar argument could have been made against applying heightened scrutiny to laws that "withhold from women opportunities accorded men." *Virginia*, 518 U.S. at 531. Such laws were commonplace when the Fourteenth Amendment was ratified and for more than a

century thereafter.  *Ibid.*  Yet it is now uncontroversial that the Equal Protection

Clause demands "an exceedingly persuasive justification" for any "gender-based

government action."  *Ibid.* (internal quotation marks and citation omitted).  The

lesson is that the "original fixed meaning" of the Equal Protection Clause is

defined not by the particular applications foreseen by its framers, but by the

principle of equal treatment embodied in its text.  Cf. *Bostock*, 140 S. Ct. at 1750-

1751 (rejecting a similar appeal to Title VII's "expected applications").

Nor is heightened scrutiny inconsistent with respect for the "democratic

process."  Br. 31 (quoting *L.W.*, 73 F.4th at 415).  In most contexts, the

Constitution presumes "that even improvident decisions will eventually be rectified

by the democratic process."  *Cleburne*, 473 U.S. at 440.  But the Equal Protection

Clause's premise is that courts must take a different approach to lines based on

race, gender, and other suspect classifications.  As our Nation's history makes all

too clear, such distinctions are both pernicious and "unlikely to be soon rectified

by legislative means."  *Ibid.*  Accordingly, when States draw distinctions based on

suspect classifications, the Constitution gives courts not just the power but the duty

to carefully scrutinize their proffered justifications.

B.    *The District Court Did Not Abuse Its Discretion In Finding That SEA 480 Is*
       *Unlikely To Survive Heightened Scrutiny*

To satisfy heightened scrutiny, defendants bear the "demanding" burden of

showing that "the [challenged] classification serves important governmental

objectives" and that it is "substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533 (citation omitted). This justification must be "exceedingly persuasive." *Id.* at 531 (citation omitted). Accordingly, the justification "must be genuine, not hypothesized or invented *post hoc* in response to litigation" and "must not rely on overbroad generalizations." *Id*. at 533.

Defendants contend that SEA 480 is necessary to "protect[] children from unproven, often irreversible medical interventions that can have long-term negative consequences for their health and well-being." Br. 42. The record does not support defendants' characterization of the treatments at issue—puberty blockers and hormone therapies. But, regardless, SEA 480 is not "substantially related" to defendants' asserted interests. *Virginia*, 518 U.S. at 533 (citation omitted).

1.    *A Strong Medical Consensus Supports The Use Of Puberty Blockers And Hormone Therapies To Treat Gender Dysphoria*

Defendants attempt to justify SEA 480 as necessary to "safeguard[] the physical and psychological well-being" of minors and to "regulat[e] the medical profession." Br. 42-43 (citations omitted). No one disputes that those are important government interests in the abstract. But the unsupported premise underlying defendants' assertion of those interests is that puberty blockers and hormone therapies are "unproven" treatments for gender dysphoria and are unsafe. Br. 42. That position cannot be squared with the medical consensus supporting those banned treatments.

The prevailing standard of care for treating gender dysphoria is set out in evidence-based guidelines published by well-established medical organizations, including the World Professional Association for Transgender Health (WPATH) and the Endocrine Society.  Doc. 26-1, at 9-10; see also Docs. 49-1, 49-3.  Those guidelines endorse the use of puberty blockers and hormone therapies to treat gender dysphoria only after the onset of puberty and subject to rigorous conditions. Doc. 49-1, at 3878; Doc. 49-3, at S256-S257.

Every major American medical organization, including the American Academy of Pediatrics (AAP) and the American Medical Association, agrees that treatment with puberty blockers and gender-affirming hormones is appropriate and medically necessary, when clinically indicated, and those organizations oppose gender-affirming-care bans like SEA 480.  Doc. 26-1, at 16; Doc. 26-2, at 11; Doc. 26-3, at 4.  Indeed, the AAP recently reaffirmed its support for gender-affirming care.  Press Release, Am. Acad. Pediatrics, *AAP Reaffirms Gender-Affirming Care Policy, Authorizes Systematic Review of Evidence to Guide Update* (Aug. 4, 2023), https://perma.cc/C5TG-MEMG.  In doing so, the AAP authorized a "systematic review of the evidence" supporting such medical interventions not because it lacked any "confiden[ce]" in its policy but because of the organization's "concerns about restrictions to access to health care" like SEA 480.  *Ibid.*

Defendants unpersuasively attempt to cast doubt on the medical consensus supporting gender-affirming care by criticizing the lack of randomized, placebo-controlled trials concerning the banned treatments. Br. 44-45. Relatedly, defendants try to justify SEA 480 by noting that the use of puberty blockers or hormone therapies to treat gender dysphoria is "off-label," meaning that the FDA has not approved those medications for that particular use. Br. 11, 13, 43. But as the United States has explained in other cases, pediatric treatments often are not supported by evidence from randomized trials and are "off label." U.S. Intervenor & Amicus Br. at 44-48, *L.W.* v. *Skrmetti*, Nos. 23-5600, 23-5609 (6th Cir. Aug. 10, 2023); U.S. Intervenor Br. at 41-42, *Eknes-Tucker*, 2023 WL 5344981 (11th Cir. Aug. 21, 2023) (No. 22-11707). And as plaintiffs' expert Dr. Turban points out, conducting randomized trials on minors with gender dysphoria would not be ethical. Doc. 58-4, at 3.

No adverse inference can be drawn from the absence of FDA approval for the use of puberty blockers or hormone therapies to treat gender dysphoria because FDA does not *sua sponte* engage in a review of all drugs for all potential uses. See 21 U.S.C. 355(a) and (d); 21 C.F.R. Pt. 314 (outlining the process by which a sponsor can request FDA approval for a particular use). A particular use may lack FDA approval for reasons entirely unrelated to a medication's safety and efficacy. For example, even where there is ample evidence supporting a drug's effectiveness

for a new use and no apparent safety concerns, a sponsor may elect not to file an application with the FDA to market the drug for that use because doing so is not economically viable.  Christopher M. Wittich *et al*., *Ten Common Questions (and Their Answers) About Off-Label Drug Use*, 87 Mayo Clinic Proc. 982, 985 (2012), https://perma.cc/2YHU-LLLJ.

Defendants also argue that gender-affirming care is unnecessary because, in their view, many minors with gender dysphoria will "desist" in experiencing that condition in adulthood.  Br. 47.  But the WPATH and Endocrine Society guidelines already address that concern by limiting medical intervention to after the onset of puberty when research shows gender dysphoria persists except in rare circumstances.  See U.S. Intervenor & Amicus Br. at 52-53, *L.W.*, *supra* (Nos. 23-5600, 23-5609); U.S. Intervenor Br. at 46-47, *Eknes-Tucker*, *supra* (No. 22-11707).

 2. *SEA 480 Is Not Substantially Related To Achieving Indiana's Asserted Interests*

Even if defendants had substantiated their safety concerns, SEA 480 is not "substantially related" to addressing those concerns.  *Virginia*, 518 U.S. at 533 (citation omitted).  The district court properly found SEA 480 overinclusive in categorically banning the use of puberty blockers and hormone therapies to treat gender dysphoria.  See SA24-SA27.  Yet, the statute is also underinclusive because

SEA 480 allows non-transgender minors to access the very same care that it denies to transgender minors.

> ### a.    SEA 480 Is Overinclusive

The district court found that SEA 480 lacks a "'close means-end fit'" because it categorically bans the use of puberty blockers and hormone therapies to treat gender dysphoria despite evidence that preventing transgender minors from accessing such treatments will "prolong[] * * * their [gender] dysphoria, and caus[e] additional distress and health risks, such as depression posttraumatic stress disorder, and suicidality."  SA24-SA27 (quoting *Sessions* v. *Morales-Santana*, 582 U.S. 47, 68 (2017)).  Put differently, the court found that SEA 480 is "overinclusive" in prohibiting the use of puberty blockers and hormone therapies in all instances.  *Builders Ass'n of Greater Chi.* v. *County of Cook*, 256 F.3d 642, 647 (7th Cir. 2001).  The district court properly found that Indiana could have addressed its concerns about puberty blockers and hormone therapies through more narrowly tailored regulation.

In attempting to justify SEA 480, defendants repeatedly point to developments in some European countries regarding gender-affirming care. Br. 20-24, 51.  But, as the district court found, "no European country that has conducted a systematic review" of "the risks and uncertainties" surrounding the use of puberty blockers and hormone therapies to treat gender dysphoria has

"responded with a ban on" those medical interventions.  SA26.  In fact, medical

bodies in several of the countries that defendants highlight have either required or

recommended safeguards that "closely mirror the standards of care laid out by

[WPATH] and the Endocrine Society."  *Brandt*, 47 F.4th at 671.  For example, as

the district court found, "Finland's health service has restricted puberty blockers

and cross-sex hormone therapies to when gender dysphoria is severe and other

psychiatric symptoms have ceased."  SA26-SA27.

A more narrowly tailored approach to address defendants' concerns about

gender-affirming care would be to codify the standard of care developed by

WPATH and the Endocrine Society or to place other reasonable limits on using

puberty blockers or hormone therapies to treat gender dysphoria.

> b.    *SEA 480 Is Underinclusive*

SEA 480 also is underinclusive in addressing its asserted concerns about

gender-affirming care.  Indeed, the statute expressly permits the banned procedures

for a range of conditions other than gender dysphoria.  Ind. Code §§ 25-1-22-

5(b)(1), (2) and (6), 25-1-22-13(c)(1) and (2) (2023).  Plaintiffs' expert Dr. Shumer

explains that puberty blockers are routinely used to treat precocious puberty and

other conditions.  Doc. 26-2, at 13, 15.  Defendants attempt to distinguish the use

of puberty blockers to treat precocious puberty as "ensur[ing] that puberty happens

at the normal age."  Br. 35.  But Dr. Shumer explains that adolescents enter

puberty at a range of ages and that the standard of care for treating gender dysphoria is not to "delay puberty beyond the typical age range." Doc. 58-3, at 5. Hormone therapies are used, sometimes on a lifelong basis, to treat many conditions other than gender dysphoria, including certain intersex conditions. Doc. 58-3, at 8. Not all patients with gender dysphoria undergo hormone therapy on a long-term basis. Doc. 58-3, at 9-10. For those who do, the "risks of ongoing hormone therapy can be well-managed and are not unlike risks associated with those present for other patients who undergo long-term sex hormone therapy for different conditions," including intersex conditions. Doc. 58-3, at 9-10.

Accordingly, if SEA 480's objective is to curb risks associated with puberty blockers and hormone therapies, it is a severely underinclusive response to that concern. Indeed, SEA 480 is so "arbitrary" in denying the treatments at issue only to transgender minors, that the statute would fail even rational-basis review. *Cleburne*, 473 U.S. at 446.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's determination that plaintiffs-appellees are likely to succeed on the merits of their claim that SEA 480 violates the Equal Protection Clause.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Jonathan L. Backer
TOVAH R. CALDERON
JONATHAN L. BACKER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 532-3528

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES AND URGING AFFIRMANCE ON THE ISSUES ADDRESSED HEREIN:

(1)  complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B), as modified by Circuit Rule 29, because it contains 6,666 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

(2)  complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared using Microsoft Word for Microsoft 365 in a proportionally spaced typeface (Times New Roman) in 14-point font.

s/ Jonathan L. Backer
Jonathan L. Backer
 Attorney

Date:  September 27, 2023