No. 23-2366

====

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

====

K.C., *et al.*,

*Plaintiffs-Appellees*,

*v.*

THE INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD OF INDIANA,
in their official capacities, *et al.*,

*Defendants-Appellants*,

UNITED STATES OF AMERICA *Intervenor-Appellee.*

————————

*On Appeal from the United States District Court
for the Southern District of Indiana,*
Case No. 1:23-cv-00595-KMB

————————

====

**BRIEF OF ELLIOT PAGE AND FIFTY-FIVE OTHER INDIVIDUALS
AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES**

====

Carmine D. Boccuzzi, Jr.
Howard S. Zelbo
JD Colavecchio
Adrian Gariboldi
Nathaniel Reynolds
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999
cboccuzzi@cgsh.com

Gabriel Arkles
Sydney Duncan
TRANSGENDER LEGAL DEFENSE &
EDUCATION FUND, INC.
520 8th Avenue, Suite 2204
New York, New York 10018
T: 646-993-1688
Garkles@transgenderlegal.org

*Attorneys for* Amici Curiae

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: No. 23-2366

Short Caption: K.C. v. Medical Licensing Board of Indiana

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Elliot Page and fifty-five other individuals. See attachment 1 for a complete list.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cleary Gottlieb Steen & Hamilton and Transgender Legal Defense and Education Fund

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

N/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/a

Attorney's Signature:    /s/ Carmine D. Boccuzzi, Jr.     Date:   09/27/23

Attorney's Printed Name: Carmine D. Boccuzzi, Jr.

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ✔   **No** ☐

Address: One Liberty Plaza New York, NY 10006

Phone Number: 212-225-2000     Fax Number: 212-225-3999

E-Mail Address: cboccuzzi@cgsh.com

rev. 12/19 AK

Attachment 1

1. Rye D. Blum
2. Jennifer Finney Boylan
3. Precious Brady-Davis
4. Wen Brovold
5. Alejandra Caraballo
6. Jennifer Michelle Chavez
7. Lena Chipman
8. Destiny Clark
9. Naomi Clark
10. Carla Combs
11. Ryan Combs
12. Gibran Cuevas
13. Zackary Drucker
14. Jack Einstein
15. Rhys Ernst
16. Jackson L. Gates
17. Cecilia Gentili
18. Nick Gorton
19. Jamison Green
20. Oliver Hall
21. Gwendolyn Herzig
22. Ray Holloman
23. Abigail Jensen
24. Harvey Katz
25. Harper B. Keenan
26. Anna H. Lange
27. Adrien Lawyer
28. Elena Long
29. Beck Witt Major
30. Miss Major
31. Rickke Mananzala
32. Dion Manley
33. Anya Marino
34. Sarah McBride
35. Jessie Lee Ann McGrath
36. Ei Meeker
37. Chris Mosier
38. Shain M. Neumeier
39. Rebecca Oppenheimer
40. Elliot Page
41. Torrey Peters
42. Jacob Reilly
43. Jeani Rice-Cranford
44. Marisa Richmond

45. La Sarmiento
46. Devon Shanley
47. Ames Simmons
48. Nick Romano
49. Avy Skolnik
50. Daniel Soltis
51. Trent Sutherlin,
52. Lilly Wachowski
53. Jillian Weiss
54. Fresh Lev White
55. Mallory Anna Wood
56. Gerda Zinner

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __No. 23-2366__

Short Caption: __K.C. v. Medical Licensing Board of Indiana__

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    __Elliot Page and fifty-five other individuals. See attachment 1 for a complete list.__

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    __Cleary Gottlieb Steen & Hamilton and Transgender Legal Defense and Education Fund__

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and
    __N/a__

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
    __N/a__

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
    __N/a__

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
    __N/a__

Attorney's Signature: __/s/ Howard S. Zelbo__    Date: __09/27/23__

Attorney's Printed Name: __Howard S. Zelbo__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes [ ]  No [X]

Address: __One Liberty Plaza New York, NY 10006__

Phone Number: __212-225-2000__    Fax Number: __212-225-3999__

E-Mail Address: __hzelbo@cgsh.com__

rev. 12/19 AK

Attachment 1

1. Rye D. Blum
2. Jennifer Finney Boylan
3. Precious Brady-Davis
4. Wen Brovold
5. Alejandra Caraballo
6. Jennifer Michelle Chavez
7. Lena Chipman
8. Destiny Clark
9. Naomi Clark
10. Carla Combs
11. Ryan Combs
12. Gibran Cuevas
13. Zackary Drucker
14. Jack Einstein
15. Rhys Ernst
16. Jackson L. Gates
17. Cecilia Gentili
18. Nick Gorton
19. Jamison Green
20. Oliver Hall
21. Gwendolyn Herzig
22. Ray Holloman
23. Abigail Jensen
24. Harvey Katz
25. Harper B. Keenan
26. Anna H. Lange
27. Adrien Lawyer
28. Elena Long
29. Beck Witt Major
30. Miss Major
31. Rickke Mananzala
32. Dion Manley
33. Anya Marino
34. Sarah McBride
35. Jessie Lee Ann McGrath
36. Ei Meeker
37. Chris Mosier
38. Shain M. Neumeier
39. Rebecca Oppenheimer
40. Elliot Page
41. Torrey Peters
42. Jacob Reilly
43. Jeani Rice-Cranford
44. Marisa Richmond

45. La Sarmiento
46. Devon Shanley
47. Ames Simmons
48. Nick Romano
49. Avy Skolnik
50. Daniel Soltis
51. Trent Sutherlin,
52. Lilly Wachowski
53. Jillian Weiss
54. Fresh Lev White
55. Mallory Anna Wood
56. Gerda Zinner

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>No. 23-2366</u>

Short Caption: <u>K.C. v. Medical Licensing Board of Indiana</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Elliot Page and fifty-five other individuals.  See attachment 1 for a complete list.</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Cleary Gottlieb Steen & Hamilton and Transgender Legal Defense and Education Fund</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    <u>N/a</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    <u>N/a</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/a</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/a</u>

Attorney's Signature: <u>/s/ JD Colavecchio</u>    Date: <u>09/27/23</u>

Attorney's Printed Name: <u>JD Colavecchio</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐  No ☒

Address: <u>One Liberty Plaza New York, NY 10006</u>

Phone Number: <u>212-225-2000</u>    Fax Number: <u>212-225-3999</u>

E-Mail Address: <u>jdcolavecchio@cgsh.com</u>

rev. 12/19 AK

Attachment 1

1.  Rye D. Blum
2.  Jennifer Finney Boylan
3.  Precious Brady-Davis
4.  Wen Brovold
5.  Alejandra Caraballo
6.  Jennifer Michelle Chavez
7.  Lena Chipman
8.  Destiny Clark
9.  Naomi Clark
10. Carla Combs
11. Ryan Combs
12. Gibran Cuevas
13. Zackary Drucker
14. Jack Einstein
15. Rhys Ernst
16. Jackson L. Gates
17. Cecilia Gentili
18. Nick Gorton
19. Jamison Green
20. Oliver Hall
21. Gwendolyn Herzig
22. Ray Holloman
23. Abigail Jensen
24. Harvey Katz
25. Harper B. Keenan
26. Anna H. Lange
27. Adrien Lawyer
28. Elena Long
29. Beck Witt Major
30. Miss Major
31. Rickke Mananzala
32. Dion Manley
33. Anya Marino
34. Sarah McBride
35. Jessie Lee Ann McGrath
36. Ei Meeker
37. Chris Mosier
38. Shain M. Neumeier
39. Rebecca Oppenheimer
40. Elliot Page
41. Torrey Peters
42. Jacob Reilly
43. Jeani Rice-Cranford
44. Marisa Richmond

45. La Sarmiento
46. Devon Shanley
47. Ames Simmons
48. Nick Romano
49. Avy Skolnik
50. Daniel Soltis
51. Trent Sutherlin,
52. Lilly Wachowski
53. Jillian Weiss
54. Fresh Lev White
55. Mallory Anna Wood
56. Gerda Zinner

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: No. 23-2366

Short Caption: K.C. v. Medical Licensing Board of Indiana

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Elliot Page and fifty-five other individuals.  See attachment 1 for a complete list.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cleary Gottlieb Steen & Hamilton and Transgender Legal Defense and Education Fund

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/a

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/a

Attorney's Signature: _/s/ Adrian Gariboldi_    Date: 09/27/23

Attorney's Printed Name: Adrian Gariboldi

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]  No [X]

Address: One Liberty Plaza New York, NY 10006

Phone Number: 212-225-2000    Fax Number: 212-225-3999

E-Mail Address: agariboldi@cgsh.com

rev. 12/19 AK

Attachment 1

1. Rye D. Blum
2. Jennifer Finney Boylan
3. Precious Brady-Davis
4. Wen Brovold
5. Alejandra Caraballo
6. Jennifer Michelle Chavez
7. Lena Chipman
8. Destiny Clark
9. Naomi Clark
10. Carla Combs
11. Ryan Combs
12. Gibran Cuevas
13. Zackary Drucker
14. Jack Einstein
15. Rhys Ernst
16. Jackson L. Gates
17. Cecilia Gentili
18. Nick Gorton
19. Jamison Green
20. Oliver Hall
21. Gwendolyn Herzig
22. Ray Holloman
23. Abigail Jensen
24. Harvey Katz
25. Harper B. Keenan
26. Anna H. Lange
27. Adrien Lawyer
28. Elena Long
29. Beck Witt Major
30. Miss Major
31. Rickke Mananzala
32. Dion Manley
33. Anya Marino
34. Sarah McBride
35. Jessie Lee Ann McGrath
36. Ei Meeker
37. Chris Mosier
38. Shain M. Neumeier
39. Rebecca Oppenheimer
40. Elliot Page
41. Torrey Peters
42. Jacob Reilly
43. Jeani Rice-Cranford
44. Marisa Richmond

45. La Sarmiento
46. Devon Shanley
47. Ames Simmons
48. Nick Romano
49. Avy Skolnik
50. Daniel Soltis
51. Trent Sutherlin,
52. Lilly Wachowski
53. Jillian Weiss
54. Fresh Lev White
55. Mallory Anna Wood
56. Gerda Zinner

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>No. 23-2366</u>

Short Caption: <u>K.C. v. Medical Licensing Board of Indiana</u>

 To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

 The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Elliot Page and fifty-five other individuals. See attachment 1 for a complete list.</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Cleary Gottlieb Steen & Hamilton and Transgender Legal Defense and Education Fund</u>

(3) If the party, amicus or intervenor is a corporation:

 i) Identify all its parent corporations, if any; and
<u>N/a</u>

 ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
<u>N/a</u>

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
<u>N/a</u>

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
<u>N/a</u>

Attorney's Signature:  <u>/s/ Nathaniel Reynolds</u> Date: <u>09/27/23</u>

Attorney's Printed Name: <u>Nathaniel Reynolds</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☐ No ☒

Address: <u>One Liberty Plaza New York, NY 10006</u>

Phone Number: <u>212-225-2000</u> Fax Number: <u>212-225-3999</u>

E-Mail Address: <u>nreynolds@cgsh.com</u>

rev. 12/19 AK

Attachment 1

1.  Rye D. Blum
2.  Jennifer Finney Boylan
3.  Precious Brady-Davis
4.  Wen Brovold
5.  Alejandra Caraballo
6.  Jennifer Michelle Chavez
7.  Lena Chipman
8.  Destiny Clark
9.  Naomi Clark
10. Carla Combs
11. Ryan Combs
12. Gibran Cuevas
13. Zackary Drucker
14. Jack Einstein
15. Rhys Ernst
16. Jackson L. Gates
17. Cecilia Gentili
18. Nick Gorton
19. Jamison Green
20. Oliver Hall
21. Gwendolyn Herzig
22. Ray Holloman
23. Abigail Jensen
24. Harvey Katz
25. Harper B. Keenan
26. Anna H. Lange
27. Adrien Lawyer
28. Elena Long
29. Beck Witt Major
30. Miss Major
31. Rickke Mananzala
32. Dion Manley
33. Anya Marino
34. Sarah McBride
35. Jessie Lee Ann McGrath
36. Ei Meeker
37. Chris Mosier
38. Shain M. Neumeier
39. Rebecca Oppenheimer
40. Elliot Page
41. Torrey Peters
42. Jacob Reilly
43. Jeani Rice-Cranford
44. Marisa Richmond

45. La Sarmiento
46. Devon Shanley
47. Ames Simmons
48. Nick Romano
49. Avy Skolnik
50. Daniel Soltis
51. Trent Sutherlin,
52. Lilly Wachowski
53. Jillian Weiss
54. Fresh Lev White
55. Mallory Anna Wood
56. Gerda Zinner

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: No. 23-2366

Short Caption: K.C. v. Medical Licensing Board of Indiana

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Elliot Page and fifty-five other individuals. See attachment 1 for a complete list.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cleary Gottlieb Steen & Hamilton and Transgender Legal Defense and Education Fund

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/a

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/a

Attorney's Signature: _____    Date: 09/26/2023

Attorney's Printed Name: Z Gabriel Arkles

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☐ No ☒

Address: 520 8th Ave. Ste 2204, New York, NY 10018

Phone Number: 212-225-2000    Fax Number: _____

E-Mail Address: garkles@transgenderlegal.org

rev. 12/19 AK

Attachment 1

1. Rye D. Blum
2. Jennifer Finney Boylan
3. Precious Brady-Davis
4. Wen Brovold
5. Alejandra Caraballo
6. Jennifer Michelle Chavez
7. Lena Chipman
8. Destiny Clark
9. Naomi Clark
10. Carla Combs
11. Ryan Combs
12. Gibran Cuevas
13. Zackary Drucker
14. Jack Einstein
15. Rhys Ernst
16. Jackson L. Gates
17. Cecilia Gentili
18. Nick Gorton
19. Jamison Green
20. Oliver Hall
21. Gwendolyn Herzig
22. Ray Holloman
23. Abigail Jensen
24. Harvey Katz
25. Harper B. Keenan
26. Anna H. Lange
27. Adrien Lawyer
28. Elena Long
29. Beck Witt Major
30. Miss Major
31. Rickke Mananzala
32. Dion Manley
33. Anya Marino
34. Sarah McBride
35. Jessie Lee Ann McGrath
36. Ei Meeker
37. Chris Mosier
38. Shain M. Neumeier
39. Rebecca Oppenheimer
40. Elliot Page
41. Torrey Peters
42. Jacob Reilly
43. Jeani Rice-Cranford
44. Marisa Richmond

45. La Sarmiento
46. Devon Shanley
47. Ames Simmons
48. Nick Romano
49. Avy Skolnik
50. Daniel Soltis
51. Trent Sutherlin,
52. Lilly Wachowski
53. Jillian Weiss
54. Fresh Lev White
55. Mallory Anna Wood
56. Gerda Zinner

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: No. 23-2366

Short Caption: K.C. v. Medical Licensing Board of Indiana

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

        Elliot Page and fifty-five other individuals.  See attachment 1 for a complete list.

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

        Cleary Gottlieb Steen & Hamilton and Transgender Legal Defense and Education Fund

(3)      If the party, amicus or intervenor is a corporation:

        i)        Identify all its parent corporations, if any; and

                N/a

        ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

                N/a

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

      N/a

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

      N/a

Attorney's Signature: _____    Date: 09/26/2023

Attorney's Printed Name: Sydney Duncan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☒

Address: 520 8th Ave. Ste 2204, New York, NY 10018

Phone Number: 212-225-2000        Fax Number: _____

E-Mail Address: sduncan@transgenderlegal.org

rev. 12/19 AK

Attachment 1

1. Rye D. Blum
2. Jennifer Finney Boylan
3. Precious Brady-Davis
4. Wen Brovold
5. Alejandra Caraballo
6. Jennifer Michelle Chavez
7. Lena Chipman
8. Destiny Clark
9. Naomi Clark
10. Carla Combs
11. Ryan Combs
12. Gibran Cuevas
13. Zackary Drucker
14. Jack Einstein
15. Rhys Ernst
16. Jackson L. Gates
17. Cecilia Gentili
18. Nick Gorton
19. Jamison Green
20. Oliver Hall
21. Gwendolyn Herzig
22. Ray Holloman
23. Abigail Jensen
24. Harvey Katz
25. Harper B. Keenan
26. Anna H. Lange
27. Adrien Lawyer
28. Elena Long
29. Beck Witt Major
30. Miss Major
31. Rickke Mananzala
32. Dion Manley
33. Anya Marino
34. Sarah McBride
35. Jessie Lee Ann McGrath
36. Ei Meeker
37. Chris Mosier
38. Shain M. Neumeier
39. Rebecca Oppenheimer
40. Elliot Page
41. Torrey Peters
42. Jacob Reilly
43. Jeani Rice-Cranford
44. Marisa Richmond

45. La Sarmiento
46. Devon Shanley
47. Ames Simmons
48. Nick Romano
49. Avy Skolnik
50. Daniel Soltis
51. Trent Sutherlin,
52. Lilly Wachowski
53. Jillian Weiss
54. Fresh Lev White
55. Mallory Anna Wood
56. Gerda Zinner

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...........................................................................iii

INTERESTS OF *AMICI CURIAE*.................................................................1

ARGUMENT..............................................................................................3

I. *Amici* Lead Productive and Fulfilling Lives ......................................3

    A.   *Amici* Have Meaningful Careers and Do Important
           Public Service ......................................................................3

    B.   *Amici* Find Joy in Family Life and Care for Others.........................6

II. *Amici* Benefitted from Gender-Affirming Healthcare ....................8

    A.   Care Relieved Gender Dysphoria and Often
           Saved Lives .........................................................................8

    B.   Transition Generated Confidence and Joy ....................................10

III. Transgender Youth Deserve the Chance To Seek and Obtain
     Gender-Affirming Care..............................................................13

    A.   Many *Amici* Knew Their Gender and Experienced
           Gender Dysphoria from a Young Age..........................................14

    B.   *Amici* Who Started Receiving Gender-Affirming
           Healthcare as Adolescents Benefitted
           from It Immensely. ...............................................................16

    C.   Many *Amici* Who Could Not Access Gender-
           Affirming Care When They Were Younger
           Believe that Earlier Care Would Have Prevented
           Needless Suffering................................................................17

    D.   Transgender People—with or without
           Disabilities—Can Make Healthcare Decisions and
           Benefit from Gender-Affirming Healthcare..................................19

i

E.    The Decision To Transition Is Deliberative, and Patients, and the Parents of Minor Children, Make Careful Healthcare Decisions with Their Doctors........................ 22

CONCLUSION................................................................................ 25

CERTIFICATE OF COMPLIANCE .............................................. 27

CERTIFICATE OF SERVICE ....................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Brandt v. Rutledge*,
    551 F. Supp. 3d 882 (E.D. Ark. 2021)................................................ 24

## Rules and Statutes

Ind. Code § 25-1-22-1 ............................................................... 2

## Other Authorities

Annie Pullen Sansfaçon et al., *The experiences of gender diverse and trans children and youth considering and initiating medical interventions in Canadian gender-affirming specialty clinics*, 20 Int'l J. of Transgender Health (Aug. 30, 2019), https://doi.org/10.1080/15532739.2019.1652129 ....................................... 22

Jack Turban *et al.*, *Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults,* PLOS ONE (Jan. 12, 2022), https://doi.org/10.1371/journal.pone.0261039 ..................... 20

## INTERESTS OF *AMICI CURIAE*[1]

*Amici* are 56 transgender adults who have received medically-necessary gender-affirming healthcare, including one or more of puberty-blockers, anti-androgens, hormones, or surgery.  Like the overwhelming majority of people who receive this care, *amici* benefitted from it immensely.  *Amici* began treatment for gender dysphoria from as little as one year ago to as long as over sixty years ago.  Some *amici* were fortunate enough to be able to begin receiving this care as minors.  For the majority, however, the barriers to accessing this care—due, fundamentally, to discrimination—were insurmountable until adulthood.  The *amici* who received gender-affirming healthcare as minors describe it as crucial to their wellbeing and even survival.  Many who started care after adolescence suffered as a result of the delay.

Transgender people reside in every region of our country, work in numerous professions, and come from all types of backgrounds.  Consistent with this, *amici* come from a variety of racial and ethnic backgrounds, including African-American, Black, Latinx, Puerto Rican, white, Filipinx, Japanese, biracial, and

---

[1] The parties have consented to the filing of this brief.  Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for *amici curiae* states that no counsel for a party authored this brief in whole or in part, and no person—other than the *amici* and their counsel—made a monetary contribution intended to fund the preparation or submission of this brief.  A complete list of *amici* is included as the Appendix.

mixed-race. They also have diverse religious affiliations and beliefs, including Christian, Catholic, Jewish, Buddhist, Unitarian, atheist, and agnostic. They live in nineteen states and Washington D.C. *Amici* are parents, children, spouses, partners, friends, aunts, uncles, mentors, and siblings. The youngest is twenty-five years old, and the oldest is over seventy-five. *Amici* include teachers, lawyers, scientists, actors, artists, athletes, filmmakers, public servants, doctors, nurses, software developers, and faith leaders.

The care that S.E.A. 480 prohibits is lifesaving.[2] The State's view that gender-affirming healthcare worsens distress or that it is unsuitable for adolescents is contradicted not only by the science but also by *amici*'s experiences. As *amici* attest, receiving care both alleviated suffering and generated new joy in their lives. Because S.E.A. 480 inhibits access to this critical medical care for transgender people, *amici* have an interest in asking this Court to consider their stories before rendering its decision.

---

[2] S.E.A. 480 is codified at Ind. Code § 25-1-22-1 *et seq*.

## ARGUMENT

*Amici* submit their stories as transgender adults who know the importance of the medical care they have received, and who understand the stakes for those that S.E.A. 480 harms.

### I.    *Amici* Lead Productive and Fulfilling Lives

*Amici* lead both ordinary and extraordinary lives, pursuing their passions and contributing to their communities.  Yet, the State wholly ignores the lived experiences of these individuals to support their view that transition ruins lives. *See, e.g.*, Defendants-Appellants Br. at 18-19 (speculating that gender-affirming medical care leads to "tragic" results, such as drug overdose or "regret").  This is distortion, not reality, as evidenced by the vibrant lives *amici* lead within their professions, families, communities, and faiths.

#### A.    *Amici* Have Meaningful Careers and Do Important Public Service

*Amici* make substantial contributions to society through many paths and in many fields.  Some *amici* have found fulfillment supporting the next generation as teachers and coaches.  Chris Mosier of Illinois, a professional triathlete, works as a coach and speaker because he is "deeply passionate about ensuring that young people like himself never need to live in a world where they don't see someone like themselves."  Dr. Marisa Richmond of Tennessee, a now-retired professor of History and Women's and Gender Studies at Middle

Tennessee State University, was proud to continue her family's multi-generational tradition of education. She "cares very strongly" about her role in preparing her students "for the next stage of life."

Included among the *amici* are doctors, nurses, social workers, and others providing critical healthcare services. Dr. Gwendolyn Herzig of Arkansas owns an independent pharmacy, which she operated "in the face of a pandemic" as a vital resource for her community. Mallory Wood of Maryland spends her time as a clinical social worker "caring for others experiencing acute psychiatric crisis such as suicidality, post-traumatic stress, and psychosis." She considers it a privilege to be "a source of care and grounding for people who are experiencing some of the hardest moments of their lives." Rye Blum of New York, a nurse practitioner at a community health center, explains that in spite of long hours and many stories of suffering, "being present with others" and "offering solutions to help in their journey is an incredible privilege and joy."

Several *amici* have worked and volunteered as faith leaders or public servants. Jeani Rice-Cranford of Tennessee, for example, is a pastor who says that every day they are "checking in on others" and supporting them through life's ups and downs. Fresh "Lev" White, a Buddhist teacher and diversity trainer in California, teaches "compassion for self and others." Jake Reilly, a community development director in Minnesota, advocates for "equitable schools, parks, and

housing choices for all people," in his capacity as a parent, volunteer, and public employee. Jessie Lee Ann McGrath of California has been a prosecutor for over thirty-five years, prosecuting serious felonies, internet-related crimes, and consumer fraud. Carla Combs of Tennessee volunteered as a firefighter and served in the United States Air Force during Operations Desert Shield and Desert Storm. And Gibran Cuevas of Tennessee spent thirty-six years in law enforcement, and, in his retirement, now volunteers as a child advocate in court.

Several *amici* have a record of remarkable achievements in arts and sciences. Dr. Rebecca Oppenheimer, an astrophysicist at the American Museum of Natural History and Columbia University, was the first scientist to study the atmospheric composition, chemistry, and physics of a sub-stellar object outside of our solar system. Her work "opened a whole new aspect of astronomy, our understanding of the universe, and our role in it." Naomi Clark, a professor at New York University, has built a career in the arts, focusing on game design. She has patented an invention for virtual building with digital blocks used by LEGO, written a textbook, won an award at a major international festival, had her work curated in museums around the world, started her own small business selling tens of thousands of copies of self-published board games, and mentored many in her field.

*Amici* who have achieved recognition for their accomplishments particularly value the ways they have been able to use their platforms to support others. For example, Lilly Wachowski of Illinois, a filmmaker who has written, produced, and directed over twenty acclaimed films, including films of the *Matrix* franchise, commented that her "films at their core, try to center love and connectivity," and that she is "proud to have lifted up" queer and transgender voices "in front of, as well as behind the camera." Elliot Page of New York, an accomplished actor and producer known for his roles in *The Umbrella Academy* and *Juno*, most values "moments when I connect with those who have been moved by my journey or work I have created that has positively impacted their lives."

### B.     *Amici* Find Joy in Family Life and Care for Others

Like most people, *amici* value their families, where they both give and receive love and support. Numerous *amici* shared sentiments like those conveyed by Precious Brady-Davis of Illinois, who says that simple things like "picking up my daughter at school brings me the most joy."[3] Dion Manley, a locally elected school board member in Ohio, is grateful that "people in my local community say they still see me as my same self and what matters to them is that I am a good dad."

---

[3] The State's purported concern about fertility is overblown. *See*, *e.g.*, Defendants-Appellants Br. at 44. Several *amici* became genetic and, sometimes, gestational parents after years of hormonal and other treatments.

Lena Chipman, a successful business executive in Tennessee, is also "a mother, raising a beautiful five-year-old girl and teaching her how to cook, how to ride a bike, and how to be honest and true." Ms. Chipman also helps out at the school and reads to the children. She is "passionate about solving problems and trying to make the world a better place for everyone—even those who don't understand the LGBTQ experience."

Beck Witt Major of Arkansas has been a caregiver for loved ones for over sixteen years: "It is a profound labor of love, and the pain and joy of it all has impacted my life probably more than anything else." He also had "a lifelong dream of birthing a baby and recently did that too," which he considers "an incredible blessing." Wen Brovold, who works in Minnesota at a nonprofit, has weathered the pandemic with their partner and twelve-year-old child, while also caring for their partner's father who cannot care for himself. Anna Lange of Georgia, a sergeant in the Houston County Sheriff's Office, noted that her "number one priority every day is being a parent to my only son. It is a job that I take seriously because like every parent, I want my child to grow up, have good morals, and treat people with dignity and respect."

Other *amici* also consider family the center of their lives. Dr. Herzig said, "My family is everything to me. My wife and children take priority over anything and everything else." Jennifer Boylan, who has been married for thirty-five years,

lives with her wife in their "little town in Maine" and has raised two children.  She said: "Having a transgender parent was never an issue in their lives.  If anything, I hope it provided a lesson in how to be open hearted, how to stand up for the underdog, and to understand the importance of being yourself in this world."  For many *amici*, transitioning has allowed them to be more comfortable with themselves and, in turn, to connect more deeply with their families and communities.

## II.     *Amici* Benefitted from Gender-Affirming Healthcare

Gender-affirming care has profoundly benefitted all *amici*.  Many had to suffer through adolescence and even much of adulthood before getting access to care.  *Amici* in no way regret receiving care.  If they are dissatisfied by anything, it is beginning the treatment that changed their lives later than they needed it.  *Amici* have made their own careful decisions about treatment and want other transgender people to have the information, support, access, and trust they need to do the same.

### A.     Care Relieved Gender Dysphoria and Often Saved Lives

The health benefits of gender-affirming care are immense.  One of the most common terms *amici* used to describe this care was "lifesaving."  This care has an immense, positive impact on people's lives because, in the words of Sgt. Lange, "gender dysphoria is a nightmare."  Jack Einstein, a twenty-five-year-old paralegal in New York, began receiving gender-affirming healthcare while young and

reflected that his distress from dysphoria was so debilitating that he questions whether he would have lived to adulthood if he had not had access to care. Destiny Clark echoes the experiences of many when she explains: "The gender-affirming care I received saved my life. Prior to getting the care I needed I was depressed and oftentimes suicidal."

In other words, gender-affirming care for transgender people works. Many *amici* noticed a marked difference in their performance, productivity, and ability to bring their full selves to their professional lives, as well as their family relationships and spiritual lives, once they had relief from dysphoria. Daniel Soltis of South Carolina commented that access to care has meant, "I've been able to have a life. I've been able to form meaningful relationships with friends and family and romantic partners. I've been able to feel present in my body. I've been able to build a career. I've been able to create artistic work. I've been able to travel, explore, continually learn who I am as a person and what I want from life."

Dr. Oppenheimer, already an accomplished scientist, found that treatment made it possible for her to achieve even more: "After I came out, my productivity, which was already quite high, went through the roof. My publication rate almost doubled, and my research and work with my students was vastly improved." Ms. McGrath likewise has "been able to increase her performance at work" and has received a promotion to supervise a group of nine lawyers, paralegals, and support

staff in her office since receiving care.

Mr. Blum found that masculinizing chest reconstruction surgery, or top surgery, made it easier for them to do their best work as a provider for their patients: "I could focus my attention and energy on what I was meant to focus my attention and energy on—the labor of healing and healthcare." The improvements for Mr. Blum were not limited to work; they also found that care improved their ability to practice their religion. "My religion and spiritual practices are a significant part of my life that are also impossible to explore and fully experience in an embodied way without being in the right body," he explained. His religious tradition includes observance that differs by gender, which "is inaccessible to anyone who doesn't know who they are and feel comfortable enough in their own skin to navigate community and participation."

Improvements also extend to family life. As Harvey Katz of New York shares, "I go to a job that I love. I own a home. I am loved by a truly incredible wife and I believe that I am valuable enough to receive that love. That ability to move forward with my life in a meaningful way is how gender-affirming medical care has benefited me."

### B.    Transition Generated Confidence and Joy

For some *amici*, gender-affirming healthcare has become an unremarkable part of life. Mr. Mosier reflects: "My daily life is much like the life of my

cisgender peers in sports: I get up, I train, I eat, I train again, I scroll through Instagram, I do some computer work. My 'transgender lifestyle' isn't much different than my peers who are not transgender." Free to appreciate other things about life, one of Rickke Mananzala's simple pleasures has been "taking my dog for walks early in the morning when the city is quiet." Naomi Clark enjoys being a mom: "To most people I pass or sit near as my daughter and I commute to preschool on the subway, I'm just another mom toting a toddler around along with my work bag."

Some *amici* experience happiness, satisfaction, and a sense of rightness related to gender since receiving care. Oliver Hall of Kentucky shares the profound effect that receiving gender-affirming care has had on their life: "I am able to live my life now. I feel invested in taking care of myself and my community and building meaningful relationships." As Dr. Jamison Green of Washington, an award-winning author, policy consultant, and retired corporate executive, says, "There is nothing like living comfortably in one's body." For Ms. McGrath, "just being able to live as myself has been one long period of euphoria. Being able to look in the mirror and being happy with the reflection I see has been magical. I no longer dislike the person looking back at me and that has made life worth living."

Many *amici* shared a similar sense of relief.  As Ms. Wachowski recalls, "When I started living as my true self, I would sometimes catch short sharp glimpses of my reflection in windows and cars as I'd walk along or ride my bike. It would make my heart skip a beat.  The silhouette of my shadow on the ground cast by the afternoon sun was exhilarating and life-affirming.  If no one else did, the Sun saw me as I am."  For Dr. Herzig, "every step" in her transition has brought her joy.  While, unfortunately, she will always live with the impact of not having received treatment earlier, the treatment that she eventually did receive has allowed her "a level of comfort I have never known before."  She "can finally enjoy life."

La Sarmiento of Maryland explained that top surgery allowed them "to come into alignment" with themselves.  *Amici* who have had this procedure at any age have had enormously positive outcomes.  Mr. Page describes his experience after top surgery in this way: "I couldn't believe the amount of energy I had, ideas, how my imagination flourished, because the constant discomfort and pain around that aspect of my body was gone."  Mr. Mosier recalled his first triathlon race after top surgery as a moment of gender euphoria: "The feeling of being able to run freely in a body that more closely matched the way I've always seen myself was overwhelming."

*Amici* also value the ability to make gender-affirming health care decisions for themselves, with the support of medical providers, family, and their communities. Mr. Witt Major explained that the ability to make medical choices supported by trusted experts improved his self-confidence. Making decisions about how they live in their own bodies is critical to many *amici*'s wellbeing.

*Amici*'s family and friends often noticed a positive difference after they received the care they wanted and needed. Alejandra Caraballo of Massachusetts, an attorney who teaches at Harvard Law School, observes: "One of the consistent things I've been told by friends and family is just how much happier and joyful I am after I came out." Similarly, Anya Marino's parents "frequently have remarked that I have an energy and joy I had lacked during the thirty-five years I did not have access to gender-affirming care." Mr. Blum says, "I still thank G-d literally every morning that I was made transgender and that I have gained access to medical care so that I can live as exactly who I am."

## III.    Transgender Youth Deserve the Chance To Seek and Obtain Gender-Affirming Care

Most *amici* had a strong sense of who they were and what they needed at a young age, and *amici* who began treatment while young universally described profound joy for having transitioned and no regret for having done so. Many *amici* who began receiving gender-affirming healthcare as adults wished they had begun transitioning earlier. They strongly believe that earlier care would have prevented

years of suffering and enhanced their well-being.  This stands in sharp contrast to the State's insistence that depriving minors of needed treatment somehow protects them.  *See* Defendants-Appellants Br. at 1-3.  Transgender adolescents and adults can and do make careful, informed decisions about treatment with the support of trusted professionals and loved ones, including parents, contrary to claims from the State.  *See* Defendants-Appellants Br. at 48.

### A.     Many *Amici* Knew Their Gender and Experienced Gender Dysphoria from a Young Age

*Amici* often had a clear sense of their gender at a very young age.  Mr. Page knew when he was four years old.  Recalling a visit to the YMCA in his memoir *Pageboy*, he writes, "Primarily, I understood that I wasn't a girl.  Not in a conscious sense but in a pure sense, uncontaminated.  That sensation is one of my earliest and clearest memories."  Rhys Ernst of North Carolina remembers, "One of my earliest conscious memories, in which I felt the most alive and like myself, was at age three, when I realized quite clearly that I was a boy.  I felt a strong jolt of purpose and belonging claiming that identity for myself."  Adrien Lawyer of New Mexico recalls, "I knew I was a boy when I was three years old.  Throughout my life I struggled with the feelings and experiences of dysphoria."  Growing up without transgender role models, some *amici* felt bewildered by what they were going through until later in life.  Abby Jensen of Arizona describes "being six or seven years old and praying every night to wake up as a girl, and being thoroughly

14

confused at why I wanted such a thing." Dr. Avy Skolnik of Massachusetts had a sense of his gender at three years old: "Throughout elementary school, I secretly hoped I would somehow become male at puberty."

Unfortunately, many *amici* were shamed for their perceived gender nonconformity as children. Despite the claims of the State that transgender adolescents are influenced by social media, their peers, or their doctors to claim a trans or non-binary identity, in fact there is intense pressure in the other direction. *See* Defendants-Appellants Br. at 8-9. Mr. Hall recalls, "Deep down I knew from high school on that I was trans but I saw how trans people were treated and how I was already being treated as a queer person and I didn't want more pain." It was only after gender-affirming treatment that Mr. Hall started to see a future for themself. Throughout elementary and middle school, Mx. Rice-Cranford dropped out of school activities—like choir, orchestra, and even their grade school graduation—because they were expected to wear a skirt or a dress.[4] Ms. Combs recalls being chased by kids in the neighborhood when she was eight years old and being beaten for wearing mascara. Her grandmother once discovered her in a dress and told her how disappointed her grandfather would be. "I couldn't escape the shame of knowing I was something that my family believed to be disgusting," she says.

---

[4] "Mx." is a gender-neutral honorific.

But some *amici* also recalled precious moments of validation and joy. For example, Dr. Skolnik remembers his first experience of gender euphoria at age nine when his mother allowed him to cut his hair short after "I had desperately wanted this for a long time."

Of course, regardless of whether they were supported as a child by the adults in their lives, *amici*'s gender identities endured. For Ray Holloman of Tennessee, receiving gender-affirming care has allowed him to live his "absolute best life" after struggling with depression and suicidality because "I didn't feel like I was in the right body." Transitioning "set everything right" and his life has "taken off like a rocket ship since then." For Dr. Green, "My parents thought I would just grow out of the 'tom-boy phase,' but that never happened." Finally, at age thirty-nine, "I was able to start medically-supervised hormone treatment, get reconstructive surgery, and live as a young man and," decades later, "grow old as the man I know I am and always knew I was supposed to be."

## B. *Amici* Who Started Receiving Gender-Affirming Healthcare as Adolescents Benefitted from It Immensely.

Several *amici* began receiving gender-affirming healthcare as adolescents, and not one of them regrets it.

Mr. Einstein, who is now twenty-five, began treatment at age thirteen, with testosterone at fifteen and top surgery at seventeen. For him, care was critical: "As someone who has benefited from gender-affirming healthcare during adolescence,

16

I can confirm that it saved my life and I have never once regretted the decision." Since top surgery, he has not experienced any depression or dysphoria.

Other *amici* began hormone treatment as minors several decades ago. Miss Major, an activist in Arkansas who is now over seventy-five, first began receiving trans healthcare in the form of hormones when she was sixteen years old. Her life has not been easy: "Despite the fact that I'm a proud transgender woman, I have run into walls at every turn in life. People telling me that I couldn't, that I shouldn't, that I can't." But she reflects that receiving hormone treatment as a teen "made life easier than it would have been."

Cecilia Gentili, a fifty-one-year-old small business owner in New York, first received self-managed gender-affirming healthcare at age seventeen. While she reflects that the hormone treatment she received would have been even more beneficial if she had been able to obtain it through a doctor, rather than on her own, it was still "great" and "changed her life." *Amici's* experiences mirror those of many trans people for whom access to healthcare while young immensely improved their lives.

### C. Many *Amici* Who Could Not Access Gender-Affirming Care When They Were Younger Believe that Earlier Care Would Have Prevented Needless Suffering

Most *amici* were not able to access gender-affirming healthcare until adulthood. For some, it is difficult even to imagine having sought or obtained

earlier care because they did not have the language to describe their experience as transgender people at the time, or because their own or others' gender nonconformity was harshly punished. Some keenly regret that they did not have the opportunity to receive care earlier and reflect on what it would have meant to them to start treatment during adolescence.

Naomi Clark regards the time when she went without gender-affirming healthcare as the "lost years" of her life. While she was able to "go through the motions," in many ways, she was "dead to the world, and unable to mature or make life plans." Jennifer Michelle Chavez of Georgia likewise shares that "had I been allowed to transition from an early age, I believe there would have been so much less turmoil and I would have a greater sense of fulfillment as a woman." For Ms. Chipman, "The suffering of gender dysphoria kills. Had I been able to transition as a youth, I would have had far less pain in my life."

For Gerda Zinner, an academic advisor and adjunct professor in Tennessee, accessing gender-affirming care when she was younger "would have greatly helped," as she was "distressed about the first signs of puberty." She was "terrified" by how her body was changing and masculinizing, as her voice deepened and body hair increased. Mr. Holloman said that "If I had people that I could have talked to back then or gone on puberty blockers back then, I could have had such a better experience in my life." Since transitioning, he has reconnected

with his former teachers, and they told him that he is "the person he was always meant to be."

As Mr. Soltis remarks: "Puberty is when irreversible changes start happening whether you want them or not, so it's not a situation where care can be delayed without harm." Some of the changes from going through puberty without gender-affirming healthcare cannot be undone, resulting in serious and continuing dysphoria. For Mr. Lawyer, accessing gender-affirming care when he was younger "would have helped me 100%. Going through male puberty in my thirties was so difficult. Going through one puberty, at the right time with my peers, is something I could only dream of." And, while some changes from puberty can be medically addressed later (for those who survive to adulthood), sometimes this can only be accomplished with expensive, invasive, and time-consuming treatments that would not otherwise have been needed, in addition to the needless suffering delayed care causes. Dr. Elena Long of New Hampshire speaks for many of the *amici* when she comments that starting treatment at the beginning of puberty "would have been life-changing."

### D. Transgender People—with or without Disabilities—Can Make Healthcare Decisions and Benefit from Gender-Affirming Healthcare

Transgender people—including those with disabilities—can and should be trusted to make healthcare decisions with the support of trusted professionals and

family.  The State, however, suggests that transgender people only believe they are transgender because they have "autism or other mental health issues" that need to be "resolved" before gender-affirming care is an appropriate course of treatment. *See* Defendants-Appellants Br. at 8, 14.  In reality, many *amici*, like many transgender youth and adults, do not have any disability or illness (apart from gender dysphoria).  Those *amici* who do have a disability or illness, like the vast majority of other people with disabilities or illnesses, can still make informed decisions about their healthcare.  As Shain Neumeier of Massachusetts, an autistic trial attorney with a craniofacial condition, points out, it is wrong to assume, just because someone is disabled, that they do not know who they are or that their choices are "invalid."

Moreover, in *amici*'s experience, while untreated depression or other conditions did not lead to gender dysphoria, untreated gender dysphoria did sometimes lead to or worsened depression or other conditions—that is, they could not effectively manage those conditions *without* hormones, surgery, or other accepted treatment for gender dysphoria.  Indeed, many *amici* remarked on improvements to both their physical and mental health as a result of receiving hormones, surgery, or other treatment.[5]  When Mr. Einstein had top surgery, it

---

[5] Studies indicate that treating adolescents leads to better mental health outcomes for transgender adults.  *See, e.g.,* Jack Turban *et al.*, *Access to gender-affirming*

alleviated not only dysphoria, but also Tietze syndrome (chronic inflation of the chest wall) and a broken rib he had gotten from tightly binding his chest. For Ms. McGrath, hormones resolved her depression entirely: "For many years I was sad, depressed, suicidal and I couldn't figure out what the issue was. Once I started hormone replacement therapy my depression and sadness began to lift, and I saw the world and my life in a whole new way." For Mx. Brovold, since they began hormones and had top surgery, "My depression and anxiety have decreased by 90%. I was able to cut my depression medication in half. Now I stand taller and laugh deeper." Today, they no longer take anti-depressants.

Of course, some transgender people, much like some cisgender people, still experience depression or other disabilities or illnesses, even after treatment for gender dysphoria. Regardless, access to gender-affirming care makes up a crucial element of a holistic approach to health for *amici*. Ms. Jensen experienced clinical depression for many years before she began hormones: "My first dose of estrogen at the beginning of my transition was instantly the best anti-depressant I have ever taken. Although I continue to need other anti-depressants, estrogen and living as my true self are critical parts of my mental health."

---

*hormones during adolescence and mental health outcomes among transgender adults*, PLOS ONE (Jan. 12, 2022), https://doi.org/10.1371/journal.pone.0261039.

Relief from dysphoria can also remove a drain on energy and attention, making it easier to navigate life with a chronic illness or disability.  For Mr. Hall, "Being able to be connected to my body helps me feel able and motivated to work to control my diabetes."  Similarly, receiving hormones from a doctor allowed Ms. Gentili to prioritize treatment for other conditions for the first time.  Ames Simmons of Washington, DC notes that "my life did not suddenly become free of anxiety and depression.  But I certainly feel better equipped to face those things because I have had gender-affirming medical care."

E.     **The Decision To Transition Is Deliberative, and Patients, and the Parents of Minor Children, Make Careful Healthcare Decisions with Their Doctors**

Receiving gender-affirming healthcare was not a decision that any of *amici* took lightly, nor was it the result of pressure by medical professionals or anyone else.  The idea that young people make hasty decisions to medically transition because they have trans peers or learn about trans people online is simply not the reality.  Defendants-Appellants Br. at 8-9.[6]  *Amici* unanimously describe the

---

[6] A 2019 study found that gender diverse and transgender youth "demonstrated their ability to identify and assert needs such as prompt access to services and medication."  Annie Pullen Sansfaçon *et al.*, *The experiences of gender diverse and trans children and youth considering and initiating medical interventions in Canadian gender-affirming specialty clinics,* 20 Int'l J. of Transgend Health at 383 (Aug. 30, 2019), https://doi.org/10.1080/15532739.2019.1652129.  Adolescents often do not even seek care until after years of reflection and waiting as they explored and came to accept their own gender and then worked up the courage to come out to their parents.  *Id*. at 376.

decision to transition as a deliberative process which reduced their suffering and enabled them to finally live self-actualized and fulfilling lives. "The decision to transition," as Ms. Chipman says, "is not an easy one. No one wants to join a marginalized, often attacked minority." She adds that "even the medical professionals who are supportive still take a very cautious approach."

Mr. Witt Major, who went to a youth gender clinic, noted the care the providers took in ensuring young people fully understood the risks and implications of their options. He also observed that the young people he met there did not all make the same treatment choices. Some of his peers in the gender-clinic have taken hormones, and some have not. Some have chosen to birth children, and some have no desire to do so. Mr. Witt Major notes that one of the reasons puberty-blockers are a good choice for transgender adolescents is that this treatment "gives you more time to see what feels best for you."

Dr. Herzig explains that gender-affirming healthcare for transgender youth is not a unilateral decision, but a "team decision that is made and guided by the parents, practitioners, therapists, and the child. It's a very personal and cautious decision that is made on a patient-by-patient basis by healthcare experts who are experienced with the patient population. It's an educated decision that is based on science and the guidance and support of multiple American healthcare institutions. It's a lifesaving decision that can help a child flourish, live their life to the fullest

and succeed by giving them the tools to be happy and fulfilled."[7]

As Mr. Blum remarks, "A person is never too young to tell you when their body is in pain. When a young person is able to communicate where their pain is coming from, and their healthcare provider or family finds a solution that will relieve that pain and offers it—that is a healthy, functioning life affirming system."

\*    \*    \*

While *amici*'s life experiences are varied, they are unanimous that gender-affirming healthcare has changed their lives for the better. For many, it has even saved their lives. Some *amici* who were able to receive care as minors may not have lived to adulthood without it, and many who were not able to receive care until later in life think of the time that they were not able to live authentically as lost years. The care banned by S.E.A. 480 has alleviated the suffering of countless transgender people and has paved the way for them to live more fulfilling and

---

[7] There is broad consensus among all of the major professional medical associations in support of gender-affirming care for minors, including: the American Medical Association, American Pediatric Society, American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Psychiatric Association, American Association of Physicians for Human Rights Inc., American College of Osteopathic Pediatricians, Association of Medical School Pediatric Department Chairs, Endocrine Society, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, and World Professional Association for Transgender Health. *See Brandt v. Rutledge*, 551 F. Supp. 3d 882, 890, 890 n.3 (E.D. Ark. 2021), *aff'd, Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022).

joyful lives.  *Amici* respectfully request that this Court take their lived experiences into account while deciding questions implicating young people's ability to access gender-affirming healthcare with the support of their parents and medical providers.  In the words of Ms. Gentili: "Transgender youth know who they are, and they know what they need.  Our job is to listen to them."

## CONCLUSION

For the foregoing reasons, the decision of the District Court for the Southern District of Indiana should be affirmed.

Dated:  September 27, 2023
        New York, New York

Respectfully submitted,

*/s/ Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.
Howard S. Zelbo
JD Colavecchio
Adrian Gariboldi
Nathaniel Reynolds
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999
cboccuzzi@cgsh.com
hzelbo@cgsh.com
jdcolavecchio@cgsh.com
agariboldi@cgsh.com
nreynolds@cgsh.com

*/s/ Gabriel Arkles*
Gabriel Arkles
Sydney Duncan
Transgender Legal Defense & Education
Fund, Inc.
520 8th Avenue, Suite 2204
New York, New York 10018
T: 646-993-1688
Garkles@transgenderlegal.org
Sduncan@transgenderlegal.org

*Attorneys for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 5,876 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

*/s/ Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.  The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.  I further certify that upon approval by the Clerk, I will serve paper copies of the foregoing document to Defendants-Appellants by mailing a true and correct copy thereof to their attorneys of record at the address on file with the Clerk.

*/s/ Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.

# Appendix

## List of 56 *Amici Curiae*[8]

**Mr. Rye D. Blum**
*Nurse Practitioner, Callen-Lorde Community Health Center, New York*

**Prof. Jennifer Finney Boylan**
*Professor of English, Barnard College of Columbia University, Maine*

**Mrs. Precious Brady-Davis**
*Associate Regional Communications Director, Sierra Club, Illinois*

**Mx. Wen Brovold**
*Communications Director, Groundswell Fund, Minnesota*

**Ms. Alejandra Caraballo**
*Clinical Instructor, Harvard Law School Cyberlaw Clinic, Massachusetts*

**Ms. Jennifer Michelle Chavez**
*Certified Master Auto Repair Technician, Georgia*

**Ms. Lena Chipman**
*Managing Director, Application Security and Solution Architecture, Concentrix, Tennessee*

**Ms. Destiny Clark**
*Community Health Worker, Birmingham AIDS Outreach, Alabama*

**Ms. Naomi Clark**
*Chair, Game Design Department, Tisch School of the Arts of New York University, New York*

**Ms. Carla Combs**
*Senior Software Engineer, AvidXchange, Tennessee*

**Dr. Ryan Combs**
*Associate Professor, School of Public Health and Information Sciences of the University of Louisville, Kentucky*

**Mr. Gibran Cuevas**
*Retired Sergeant, Miami Dade Police Department, Tennessee*

**Ms. Zackary Drucker**
*Director, Producer, Artist, California*

**Mr. Jack Einstein**
*Paralegal, Transgender Legal Defense and Education Fund, New York*

**Mr. Rhys Ernst**
*Filmmaker, Artist, California*

**Jackson L. Gates**
*Assistant Manager, Valentine Holdings, LLC, Arkansas*

**Ms. Cecilia Gentili**
*Founder, Trans Equity Consulting, New York*

**Dr. Nick Gorton**
*Physician, California*

**Dr. Jamison Green**
*Author, Educator, Policy Consultant, Washington*

---

[8]     *Amici* submit this brief only in their capacities as private citizens. To the extent an *amicus*'s employer is named, it is solely for descriptive purposes and does not constitute the employer's endorsement of the brief or any portion of its content.

**Mr. Oliver Hall**
*Trans Health Director, Kentucky Health Justice Network, Kentucky*

**Dr. Gwendolyn Herzig**
*Pharmacist, Dalton Herzig Inc. DBA Park West Pharmacy, Arkansas*

**Mr. Ray Holloman**
*Senior Program Manager, Enterprise Disaster Recovery, F5 Networks, Tennessee*

**Ms. Abigail Jensen**
*Retired Attorney, Arizona*

**Harvey Katz**
*Registered Nurse, New York*

**Dr. Harper B. Keenan**
*Assistant Professor of Education, University of British Columbia, British Columbia*

**Ms. Anna H. Lange**
*Criminal Investigator, Georgia*

**Mr. Adrien Lawyer**
*Director of Education, Transgender Resource Center of New Mexico, New Mexico*

**Dr. Elena Long**
*Associate Professor, University of New Hampshire, New Hampshire*

**Mr. Beck Witt Major**
*Construction/Maintenance Worker, UAMS Head Start, Arkansas*

**Miss Major**
*Founder of Transgender/Non-Binary Non-Profit Organization, House of GG, Arkansas*

**Mr. Rickke Mananzala**
*Executive Director, New York Foundation, New York*

**Mr. Dion Manley**
*Healthcare Worker and School Board Member, Ohio*

**Ms. Anya Marino**
*Director of LGBTQI Equality -National Women's Law Center, Washington D.C.*

**Sen. Sarah McBride**
*State Senator, Delaware*

**Ms. Jessie Lee Ann McGrath**
*Attorney, California*

**Mr. Ei Meeker**
*High School Educator, Health Education, New York*

**Mr. Chris Mosier**
*Triathlete, Illinois*

**Mx. Shain M. Neumeier**
*Trial Attorney, Committee for Public Counsel Services, Massachusetts*

**Dr. Rebecca Oppenheimer**
*Curator and Professor of Astrophysics, American Museum of Natural History and Columbia University, New York*

**Mr. Elliot Page**
*Actor, New York*

**Ms. Torrey Peters**
*Author, New York*

**Mr. Jacob Reilly**
*Community Development Director, Minnesota*

**Mx. Jeani Rice-Cranford**
*Lab Assistant, Nashville State Community College, Tennessee*

**Dr. Marisa Richmond**
*Professor of History and Women's and Gender Studies, Middle Tennessee State University, Tennessee*

**Mx. La Sarmiento**
*Mindfulness Teacher, Maryland*

**Mr. Devon Shanley**
*Teacher, New York*

**Ames Simmons**
*Policy Consultant, Washington, D.C.*

**Mx. Nick Romano**
*IT Professional, University of Tennessee, Tennessee*

**Dr. Avy Skolnik**
*Psychologist, UMass Amherst, Massachusetts*

**Mr. Daniel Soltis**
*Software Designer, South Carolina*

**Trent Sutherlin**
*Licensed Certified Social Worker, Registered Nurse, Arkansas*

**Ms. Lilly Wachowski**
*Filmmaker, Screenwriter & Producer, Illinois*

**Dr. Jillian Weiss**
*Attorney, New York*

**Mr. Fresh Lev White**
*Buddhist Teacher and Diversity Trainer, California*

**Ms. Mallory Anna Wood**
*Licensed Clinical Social Worker, Sheppard Pratt Health Systems, Maryland*

**Ms. Gerda Zinner**
*Academic Advisor and Adjunct Professor, University of Tennessee at Chattanooga, Tennessee*