No. 23-2366

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| K.C., et al., | ) | On Appeal from the United States |
| | ) | District Court for the Southern |
| *Plaintiffs-Appellees,* | ) | District of Indiana, Indianapolis |
| | ) | Division |
| v. | ) | |
| | ) | Case No. 1:23-cv-00595-JPH- |
| INDIVIDUAL MEMBERS OF THE | ) | KMB |
| MEDICAL LICENSING BOARD OF | ) | |
| INDIANA, et al., | ) | |
| | ) | Hon. James P. Hanlon, |
| *Defendants-Appellants.* | ) | District Court Judge |
| | ) | |
| | ) | |

## BRIEF OF *AMICI CURIAE* GLBTQ ADVOCATES & DEFENDERS, NATIONAL WOMEN'S LAW CENTER, AND FIVE ADDITIONAL ORGANIZATIONS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Chasel Lee
Jenner & Block LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
clee@jenner.com

Adam G. Unikowsky
  *Counsel of Record*
Jenner & Block LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

Jocelyn A. Sitton
Jenner & Block LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
jsitton@jenner.com

*Counsel for Amici Curiae*

<u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Appellate Court No. _____23-2366_____

Short Caption:___K.C., et al. v. Individual Members of the Medical Licensing Board, et al._____

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[X]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

GLBTQ Advocates & Defenders; National Center for Transgender Equality; The Trevor Project; Family Equality; Human Rights Campaign Foundation; Nat'l Center for Lesbian Rights; National Women's Law Center (new)

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP for *Amici Curiae*

(3)     If the party or amicus is a corporation:

i)      Identify all of its parent corporations, if any; and

None

ii)     list any publicly held company that owns 10% or more of the party's or amicus' stock:

None

4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature _/s/ Adam G. Unikowsky_____     Date: September 27, 2023 (new)_____

Attorney's Printed Name:_Adam G. Unikowsky_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes**     ___X___
                                                                                                              **No**     _____

Address:     1099 New York Avenue, Suite 900, Washington, DC, 20001

Phone Number: (202) 639-6041_____     Fax Number:  (202) 639-6066_____

E-Mail Address: aunikowsky@jenner.com_____

<u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Appellate Court No. _____ 23-2366 _____

Short Caption:____K.C., et al. v. Individual Members of the Medical Licensing Board, et al.____

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

GLBTQ Advocates & Defenders; National Center for Transgender Equality; The Trevor Project; Family Equality; Human Rights Campaign Foundation; National Center for Lesbian Rights; National Women's Law Center

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP for *Amici Curiae*

(3)    If the party or amicus is a corporation:

        i)        Identify all of its parent corporations, if any; and

                 None

        ii)       list any publicly held company that owns 10% or more of the party's or amicus' stock:

                 None

4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature  /s/ Jocelyn A. Sitton _____        Date:  September 27, 2023 _____

Attorney's Printed Name:  Jocelyn A. Sitton _____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).      **Yes** _____
                                                                                                                 **No**    __X__

Address:        353 North Clark Street, Chicago, IL 60654 _____

Phone Number:  (312) 840-7484 _____        Fax Number:  (312) 527-0484 _____

E-Mail Address:  jsitton@jenner.com _____

ii

<u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Appellate Court No. _____23-2366_____

Short Caption:___K.C., et al. v. Individual Members of the Medical Licensing Board, et al._____

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

GLBTQ Advocates & Defenders; National Center for Transgender Equality; The Trevor Project; Family Equality; Human Rights Campaign Foundation; National Center for Lesbian Rights; National Women's Law Center

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP for *Amici Curiae*

(3)     If the party or amicus is a corporation:

i)       Identify all of its parent corporations, if any; and

None

ii)      list any publicly held company that owns 10% or more of the party's or amicus' stock:

None

4)       Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature  _/s/ Chasel Lee_____     Date: _September 27, 2023_____

Attorney's Printed Name: _Chasel Lee_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** _____

**No** ____X____

Address:       455 Market Street, Suite 2100, San Francisco, CA 94105

Phone Number: (415) 293-5956_____     Fax Number: (628) 267-6859_____

E-Mail Address: clee@jenner.com_____

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .................................................................... v

INTEREST OF *AMICI CURIAE* ........................................................... 1

SUMMARY OF ARGUMENT ............................................................ 4

ARGUMENT ...................................................................................... 5

I.   The Act Is Subject To Heightened Scrutiny Because It
     Discriminates Based On Sex. ................................................. 5

     A.   All Sex-Based Classifications Are Subject To Heightened
          Scrutiny, Regardless Of The Ostensible Purpose Of The
          Classification. ............................................................. 6

     B.   Laws That Single Out Transgender People Constitute Sex
          Discrimination. ........................................................... 8

     C.   The Act Discriminates On The Basis Of Sex And Is Therefore
          Subject To Heightened Scrutiny. ................................. 11

II.  The Act Cannot Withstand Heightened Scrutiny ................... 17

CONCLUSION ............................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville,*
    75 F.4th 760 (7th Cir. 2023)............................................................ 4, 9, 10

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995) ................................................................................ 13

*Bostock v. Clayton Cnty.,*
    140 S. Ct. 1731 (2020) ................................................................. 4, 8, 9, 13

*Brandt ex rel. Brandt v. Rutledge,*
    47 F.4th 661 (8th Cir. 2022)............................................................. 11, 16

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Martinez,*
    561 U.S. 661 (2010) ................................................................................ 16

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ................................................................................ 18

*City of Richmond v. J.A. Croson Co.,*
    488 U.S. 469 (1989) ............................................................................ 6, 12

*Dobbs v. Jackson Women's Health Organization,*
    142 S. Ct. 2228 (2022) ...................................................................... 15, 16

*Doe v. Ladapo,*
    No. 23cv114, __F. Supp. 3d__, 2023 WL 3833848 (N.D. Fla.
    June 6, 2023)........................................................................................ 14

*Doe v. Snyder,*
    28 F.4th 103 (9th Cir. 2022)................................................................. 10

*Eknes-Tucker v. Marshall,*
    603 F. Supp. 3d 1131 (M.D. Ala. 2022), *vacated sub nom.*
    *Eknes-Tucker v. Governor of Ala.,* No. 22-11707, __F.4th__, 2023
    WL 5344981 (11th Cir. Aug. 21, 2023) ................................................. 11

*Geduldig v. Aiello,*
    417 U.S. 484 (1974) ................................................................................ 15

*Grimm v. Gloucester Cnty. Sch. Bd.,*
    972 F.3d 586 (4th Cir. 2020) ............................................................ 10, 14

*J.E.B. v. Alabama ex rel. T.B.,*
    511 U.S. 127 (1994) ............................................................................. 13

*Jackson Women's Health Org. v. Currier,*
    349 F. Supp. 3d 536 (S.D. Miss. 2018) ............................................... 15

*Lawrence v. Texas,*
    539 U.S. 558 (2003) ............................................................................. 16

*Loving v. Virginia,*
    388 U.S. 1 (1967) ................................................................................. 13

*Miller v. Johnson,*
    515 U.S. 900 (1995) ............................................................................... 6

*Mississippi Univ. for Women v. Hogan,*
    458 U.S. 718 (1982) ............................................................................... 7

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) ............................................................................. 13

*Peltier v. Charter Day Sch., Inc.,*
    37 F.4th 104 (4th Cir. 2022) ............................................................... 13

*Sch. of the Ozarks, Inc. v. Biden,*
    41 F.4th 992 (8th Cir. 2022), *cert denied,* 143 S. Ct. 2638
    (2023) .................................................................................................. 10

*Sessions v. Morales-Santana,*
    582 U.S. 47 (2017) ............................................................................ 7, 8

*Thompson v. Hebdon,*
    7 F.4th 811 (9th Cir. 2021)................................................................. 8-9

*Tuan Anh Nguyen v. INS,*
    533 U.S. 53 (2001) ................................................................................. 7

*United States v. Virginia,*
    518 U.S. 515 (1996) ..................................................................... 6, 7, 12

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of
    Ed.,*
    858 F.3d 1034 (7th Cir. 2017) ..................................................4, 9, 10, 17

vi

**Statutes and Rules**

Fed. R. App. P. 29 ................................................................................. 1

Ind. Code § 25-1-22-3 ......................................................................... 11

Ind. Code § 25-1-22-5(a) ...................................................................... 4

Ind. Code § 25-1-22-13(a) (eff. July 1, 2023)............................................. 4, 11

Ind. Code § 25-1-22-13(c)..................................................................... 18

**Other Authorities**

Antonin Scalia, *The Rule of Law As A Law of Rules,* 56 U. Chi. L.
    Rev. 1175 (1989) ........................................................................... 9

Reva B. Siegel et al., *Equal Protection in* Dobbs *and Beyond: How
    States Protect Life Inside and Outside of the Abortion Context,* 43
    Colum. J. Gender & L. 67 (2022) ............................................................ 15

*These New Indiana Laws Affect Transgender and Other LGBTQ
    Hoosiers*, Indianapolis Star (June 12, 2023, 12:25 PM) ........................... 12

U.S. Const. amend. XIV, § 1 ................................................................ 6

## INTEREST OF *AMICI CURIAE*[1]

*Amici* consist of GLBTQ Legal Advocates & Defenders, the National Women's Law Center, and the five additional organizations listed below. *Amici* are committed to ensuring that all people, including women and LGBTQ people, can live their lives free from discrimination, including with respect to access to the health care they need.

*Amicus* **GLBTQ Legal Advocates & Defenders ("GLAD")** works through litigation, public policy advocacy, and education to create a just society free from discrimination based on gender identity and expression, HIV status, and sexual orientation. GLAD has litigated widely in both state and federal courts in all areas of the law to protect and advance the rights of lesbians, gay men, bisexuals, transgender individuals, and people living with HIV and AIDS.

*Amicus* **The National Women's Law Center ("NWLC")** is a non-profit legal advocacy organization that fights for gender justice—in the courts, in public policy, and in our society—working across the issues that are central to the lives of women and girls—especially women of color, LGBTQ people, and low-income women and families. Since its founding in 1972, NWLC has worked to advance educational opportunities, workplace justice, health and reproductive rights, and income security. This work has included participating in numerous cases, including before Courts of Appeals and the U.S. Supreme Court, to ensure that

---

[1] All parties consent to the filing of this brief. No party's counsel authored this brief in whole or in part, and no money intended to fund preparing or submitting this brief was contributed by a party or party's counsel or anyone other than *amicus*, its members, or its counsel. *See* Fed. R. App. P. 29(a)(4).

rights and opportunities are not restricted based on sex. Additionally, NWLC has a particular interest in ensuring that discrimination against LGBTQ individuals is not perpetuated in the name of women's rights.

*Amicus* **Family Equality** (formerly Family Equality Council) is a national organization advancing lived and legal equality for LGBTQ+ families and those who wish to form them. For over forty years, Family Equality has worked to change attitudes, laws, and policies through advocacy and public education to ensure that all families, regardless of creation or composition, are respected, loved, and celebrated in all aspects of life. Given the profound and critical impact that transgender health care has on an individual and their family, Family Equality has an ongoing interest in ensuring that LGBTQ+ people, including youth, have access to gender-affirming health care services.

*Amicus* **Human Rights Campaign Foundation ("HRC Foundation")** is the educational arm of the Human Rights Campaign, America's largest civil rights organization working to achieve equality for LGBTQ+ people. Through its programs, the HRC Foundation seeks to make transformational change in the everyday lives of LGBTQ+ people, shedding light on inequity and deepening the public's understanding of LGBTQ+ issues, including advancing transgender and racial justice and the importance of reproductive health care.

*Amicus* **National Center for Transgender Equality ("NCTE")** works to improve the lives of the nearly two million transgender people in the United States and their families through sound public policy, public education, and groundbreaking research. NCTE has worked with countless health and human

2

service providers as well as local, state, and federal agencies on policies to ensure equal access to vital health and human services.  In 2015, NCTE conducted the U.S. Transgender Survey, the largest survey to date of transgender people, with nearly 28,000 respondents from all fifty states and the U.S. territories.

*Amicus* **The Trevor Project** is the nation's leading lesbian, gay, bisexual, transgender, queer, and questioning ("LGBTQ") youth crisis intervention and suicide prevention organization.  The Trevor Project offers the only nationwide accredited, free, and confidential phone, instant message, and text messaging crisis intervention services for LGBTQ youth.  These services are used by tens of thousands of youth each month.  Through analyzing and evaluating data obtained from these services and national surveys, The Trevor Project produces innovative research that brings new knowledge, with clinical implications, to issues affecting LGBTQ youth.

*Amicus* **National Center for Lesbian Rights ("NCLR")** is a national non-profit legal organization dedicated to protecting and advancing the civil rights of lesbian, gay, bisexual, and transgender people through litigation, public policy advocacy, and public education.  Through its Transgender Youth Project, NCLR seeks to promote greater understanding and support for transgender children and their families.

*Amici* seek to eliminate discriminatory barriers to health care for LGBTQ people, particularly transgender people, across the United States through impact litigation, education, and public policy work.  *Amici* therefore write to explain

why this Court should apply heightened scrutiny to laws, like Indiana's, that single out transgender people.

## SUMMARY OF ARGUMENT

Indiana Senate Enrolled Act 480 ("S.E.A. 480" or "the Act") forbids health care providers from providing medical treatment to transgender minors if—and only if—the purpose of that treatment is to allow those minors to live their lives consistent with their gender identity.  The Act prohibits health care providers from "knowingly provid[ing] gender transition procedures to a minor." Ind. Code § 25-1-22-13(a) (eff. July 1, 2023).  The Act's prohibitions on health care for minors are broad, encompassing puberty blockers, hormones, and surgery.  *Id.* § 25-1-22-5(a).  In enacting S.E.A. 480, Indiana has placed many transgender adolescents at grave risk of harm while also violating their constitutional rights.

The Southern District of Indiana correctly held that Plaintiffs are entitled to preliminary injunctive relief against the Act.  The Act facially discriminates on the basis of sex.  Each time the Act is applied, the minor's sex is outcome-determinative.  The Act targets transgender people, and as both the Supreme Court of the United States and this Court have held, laws and policies that target transgender people inherently discriminate on the basis of sex.  *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1753-54 (2020); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772 (7th Cir. 2023); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Ed.*, 858 F.3d 1034, 1051-52 (7th Cir. 2017).  Therefore, the Act should be subject to heightened scrutiny, rather than rational basis review.

Defendants argue that rational basis review is warranted because the Act regulates medical procedures.  App. Dkt. 19, Defs.' Opening Br. 33-36, *see also id.* 39.  That reasoning is incorrect.  Regardless of what the Act regulates, it discriminates on the basis of sex.  To be sure, the State has a legitimate interest in protecting minors from unsafe medical procedures—an interest that may be considered when evaluating whether the law *withstands* heightened scrutiny.  But that interest does not transform a sex-based law that targets transgender people into a generally applicable law warranting rational basis review.

The Act cannot withstand heightened scrutiny.  The Act categorically bars medical care for transgender minors, even when the minors, their parents, and their doctors all agree that the care is warranted.  These extreme restrictions reflect hostility to gender nonconformity, not a legitimate effort to protect children's health or safety.  This Court should affirm the grant of the preliminary injunction and preserve Indiana youths' access to medically appropriate health care.

## ARGUMENT

### I.  The Act Is Subject To Heightened Scrutiny Because It Discriminates Based On Sex.

Laws singling out transgender people, including the Act, discriminate on the basis of sex.  Like all other laws that discriminate on the basis of sex, it is subject to heightened scrutiny.

**A.    All Sex-Based Classifications Are Subject To Heightened Scrutiny, Regardless Of The Ostensible Purpose Of The Classification.**

The Equal Protection Clause bars a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  "At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class."  *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (internal quotation marks and citations omitted).

To implement that constitutional guarantee, the Supreme Court requires "all gender-based classifications" to be subjected to "heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (citations omitted).  "Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action."  *Id.* at 531 (citations omitted).  Heightened scrutiny serves to "smoke out" illegitimate motives by ensuring that the state can prove—not just assert—that the classification has a sufficiently persuasive justification.  *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989).  "[B]enign justifications" for such classifications "will not be accepted automatically"; a court will closely scrutinize whether the classification in fact advances the "alleged objective."  *Virginia*, 518 U.S. at 535-36 (internal quotation marks and citations omitted).

Heightened scrutiny applies even to those classifications ostensibly based on physical differences between men and women.  For example, laws

6

distinguishing between mothers and fathers are subject to heightened scrutiny. The typical rationale for such laws—mothers give birth to children, fathers do not—are relevant to whether the laws *pass* heightened scrutiny, not whether they are subject to heightened scrutiny in the first instance. *Compare Tuan Anh Nguyen v. INS*, 533 U.S. 53, 60-61 (2001) (applying heightened scrutiny to statute distinguishing between mothers and fathers, but upholding statute based on physical differences in means of proving parentage), *with Sessions v. Morales-Santana*, 582 U.S. 47, 57-58 (2017) (applying heightened scrutiny and invalidating statute distinguishing between mothers and fathers that relied on outdated gender stereotypes about each's relationship to nonmarital children).

Constitutional limitations on gender classifications apply with full force to laws that single out people who do not conform to sex stereotypes. Many of the Supreme Court's foundational sex-discrimination cases involve such litigants. Women stereotypically do not attend military school, yet "generalizations about 'the way women are,'" or "estimates of what is appropriate for *most women*," do not justify treating women who do seek to attend military school differently from men. *Virginia*, 518 U.S. at 550. Likewise, even in a world where "nearly 98[%] of all employed registered nurses were female," men and women applying to nursing school must be treated equally, and a legislature may not "perpetuate the stereotyped view of nursing as an exclusively woman's job." *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 729 (1982). As the Supreme Court recently reaffirmed, "[o]verbroad generalizations" concerning gender roles "have a constraining impact, descriptive though they may be of the way many people still

order their lives." *Morales-Santana*, 582 U.S. at 63. "Even if stereotypes frozen into legislation have 'statistical support,'" the Supreme Court's decisions "reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." *Id.* at 63 n.13 (citations omitted).

### B. Laws That Single Out Transgender People Constitute Sex Discrimination.

When laws target transgender people, they discriminate on the basis of sex. Therefore, these laws must be subject to heightened scrutiny.

*Bostock v. Clayton County* explains why policies discriminating against transgender people constitute sex discrimination. 140 S. Ct. 1731 (2020). "[T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 1741. And if the policy discriminates against both transgender men and transgender women, it "doubles rather than eliminates" the discrimination. *Id.* at 1742-43.

There is no principled distinction between the standard articulated in *Bostock* for Title VII and the Equal Protection Clause. Title VII and the Equal Protection Clause both bar sex discrimination. Why would a law that *is* sex discrimination under Title VII transform into a law that *is not* sex discrimination under the Constitution? Appellate decisions "must comport with the 'reasoning or theory,' not just the holding, of Supreme Court decisions." *Thompson v.*

*Hebdon*, 7 F.4th 811, 827 (9th Cir. 2021) (citation omitted).  Indeed, "when the Supreme Court … decides a case, not merely the *outcome* of that decision, but the *mode of analysis* that it applies will thereafter be followed by the lower courts[.]"  Antonin Scalia, *The Rule of Law As A Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989).

This Court has previously rejected the argument that *Bostock*'s reasoning was limited to Title VII cases.  *See A.C.*, 75 F.4th at 772.  *Bostock*'s reasoning applies beyond the context of Title VII and makes clear that the Act impermissibly classifies based on sex.

Moreover, as noted above, the Supreme Court has repeatedly underscored that laws premised on sex stereotyping constitute illicit sex discrimination under the Equal Protection Clause.  *Bostock*, meanwhile, explained that it is arbitrary to distinguish discrimination based on sex stereotyping from discrimination against transgender people:  If an employer who "fires men who do not behave in a sufficiently masculine way" engages in sex discrimination, why should courts "roll out a new and more rigorous standard" when "that same employer discriminates against … persons identified at birth as women who later identify as men"?  140 S. Ct. at 1749.  That arbitrariness does not go away when considering discrimination under the Equal Protection Clause as opposed to discrimination under Title VII.

This Court's decision in *Whitaker ex rel. Whitaker v. Kenosha Unified School District Number 1 Board of Education* similarly confirms that discrimination against transgender people constitutes sex discrimination under

the Equal Protection Clause. The *Whitaker* Court explained: "By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." 858 F.3d at 1048. The Court further reasoned policies such as the Act "cannot be stated without referencing sex," which renders them "inherently based upon a sex-classification" and requires heightened scrutiny. *Id.* at 1051. And the Court made clear its heightened scrutiny holding applied to the plaintiff's Equal Protection claim. *Id.* at 1051-54. In *A.C. ex rel. M.C. v. Metropolitan School District of Martinsville*, this Court recently reaffirmed this reasoning, noting that "[p]er *Whitaker*'s guidance, [a law that discriminates against transgender minors] relies on sex-based classifications and is therefore subject to heightened scrutiny." 75 F.4th at 772 (citation omitted). *Whitaker* and *A.C.* establish the principle that laws or policies singling out transgender people are a type of sex discrimination. That principle does not go away merely because the law at issue involves medical care rather than employment.

Finally, the Fourth, Eighth, and Ninth Circuits have all found that *Bostock*'s reasoning extends beyond Title VII. *See*, *e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) (Title IX); *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 1001 (8th Cir. 2022) (Fair Housing Act), *cert denied*, 143 S. Ct. 2638 (2023); *Doe v. Snyder*, 28 F.4th 103, 113-14 (9th Cir. 2022) (Title IX and Section 1557 of the ACA). This further strengthens the rationale for applying heightened scrutiny to the Act.

10

### C. The Act Discriminates On The Basis Of Sex And Is Therefore Subject To Heightened Scrutiny.

On its face, the Act discriminates on the basis of sex.  Under S.E.A. 480, a health care provider may not "knowingly provide gender transition procedures to a minor."  Ind. Code § 25-1-22-13(a).  The statute defines "gender transition" as "the process in which an individual shifts from identifying with and living as a gender that corresponds to his or her sex to identifying with and living as a gender different from his or her sex."  *Id.* § 25-1-22-3.

Sex is baked into the statutory text.  Not only does the word "sex" appear throughout the statute, but every single time the law will be enforced and applied, a court must ascertain the minor's sex assigned at birth.  Suppose a minor receives estrogen.  If the minor was assigned male at birth, S.E.A. 480 applies.  If the minor was assigned female at birth, S.E.A. 480 does not apply.  In each case, the minor's sex is outcome-determinative.  The Act on its face classifies based on sex.  Its application rests directly on discerning the sex of the minor.  Therefore, the Act discriminates based on sex.  A law that "prohibits transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity. . . . constitutes a sex-based classification for purposes of the Fourteenth Amendment."  *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1147 (M.D. Ala. 2022), *vacated sub nom. Eknes-Tucker v. Governor of Ala.*, No. 22-11707, __F.4th__, 2023 WL 5344981 (11th Cir. Aug. 21, 2023); *accord Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 669-70 (8th Cir. 2022).

Moreover, the rationale for applying heightened scrutiny applies with full force here. Heightened scrutiny exists to "smoke out" improper legislative rationales, such as hostility to gender nonconformity. *J.A. Croson Co.*, 488 U.S. at 493. Although the State contends that it is merely trying to protect minors from well-established medical treatments it perceives to be potentially harmful, there are strong reasons to be concerned that this justification is a pretext for a desire to discourage gender nonconformity. Indiana's law was enacted as part of a suite of new laws that, among other things, regulate the use of pronouns in school by transgender youth, ban local governments from restricting "conversion therapy" on transgender youth, and ban purportedly "harmful materials" from school libraries—a law widely understood to target books related to LGBTQ people.[2] It therefore makes perfect sense to conduct the heightened scrutiny analysis, which "smoke[s] out" illicit motives, *id.*, by requiring a "searching analysis" into the justifications for the challenged law, *Virginia*, 518 U.S. at 536 (citation omitted). That analysis allows the Court to determine whether the State's asserted motive—protection of children from dangerous medical treatments—*in fact* justifies the Act. *See Virginia*, 518 U.S. at 535-36 ("[A] tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded.").

---

[2] *See These New Indiana Laws Affect Transgender and Other LGBTQ Hoosiers*, Indianapolis Star (June 12, 2023, 12:25 PM), https://www.indystar.com/story/news/politics/2023/06/07/indiana-general-assembly-new-laws-on-transgender-lgbtq-issues/70294326007/.

Defendants' arguments for applying rational basis review instead of heightened scrutiny are irreconcilable with Supreme Court precedent. First, Defendants argue that the Act "does not prefer one sex to the other sex or in any way treat the two sexes differently." Defs.' Opening Br. 32. But applying a sex-based rule to both sexes does not immunize the classification. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 141-42, 142 n.14 (1994); *see also Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 124 (4th Cir. 2022). The "fact of equal application does not immunize the statute from the very heavy burden of justification" required by the Fourteenth Amendment. *Loving v. Virginia*, 388 U.S. 1, 9 (1967).

*Bostock* repudiated that exact reasoning. It rejected an interpretation of Title VII that "would require [the Court] to consider the employer's treatment of groups rather than individuals, to see how a policy affects one sex as a whole versus the other as a whole," instead explaining that "our focus should be on individuals, not groups." 140 S. Ct. at 1740. The same analysis applies to the Equal Protection Clause. It is hornbook law that the Equal Protection Clause embodies the exact same "basic principle" as Title VII: it "protect[s] *persons*, not *groups*." *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Thus, a law that treats groups equally in the aggregate—but *individually* classifies people based on a suspect characteristic—is subject to heightened scrutiny. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 743 (2007); *accord T.B.*, 511 U.S. at 152 (Kennedy, J., concurring in judgment) (explaining that the Equal Protection Clause bars gender

13

discrimination in jury selection because "[t]he neutral phrasing of the Equal Protection Clause, extending its guarantee to 'any person,' reveals its concern with rights of individuals, not groups").  If a transgender boy is classified based on sex, that discrimination does not disappear because a transgender girl is also classified based on sex.

Defendants also argue that the Act "mentions the word 'sex' only to distinguish gender-transition procedures" from the same medical procedures when the minor seeking the treatment is not seeking to transition.  Defendants claim that the Act "uses sex to identify a distinct type of procedure—not to determine its permissibility."  Defs.' Opening Br. 32.  Defendants are correct that any law targeting health care related to gender transition will necessarily refer to a person's sex.  But they draw the wrong inference from that observation.  Precisely *because* such laws necessarily refer to a person's sex, heightened scrutiny is warranted.  The Act is not a generally applicable law that happens to regulate transgender people.  It applies to transgender people only, and hence inherently classifies based on sex every time it is applied.  The fact that a law "needs" to refer to sex to regulate transgender health care is not a basis to ratchet the level of scrutiny down—it is the very reason the standard of scrutiny must be ratcheted up.  *See Grimm*, 972 F.3d at 608 (if a prohibition "cannot be stated without referencing sex," "heightened scrutiny should apply") (citations omitted); *Doe v. Ladapo*, No. 23cv114, __F. Supp. 3d__, 2023 WL 3833848, at *8 (N.D. Fla. June 6, 2023) ("If one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex.").

14

Defendants' reliance on *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), and *Geduldig v. Aiello*, 417 U.S. 484 (1974), is also misplaced. Those cases involved laws that restricted abortion (*Dobbs*) and barred coverage for certain pregnancy-related disabilities (*Geduldig*). Defendants cited those cases for the proposition that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" Defs.' Opening Br. 33 (quoting *Dobbs*, 142 S. Ct. at 2245-46, in turn quoting *Geduldig*, 417 U.S. at 496 n.20). *Amici* respectfully disagree with this proposition: the statement in *Dobbs* was dictum,[3] and there are strong arguments that *Geduldig*—which predates the Supreme Court's decision to apply heightened scrutiny to sex-based classifications—is inconsistent with subsequent case law, including *United States v. Virginia*.[4]

But even if *Dobbs* and *Geduldig* accurately characterize the law, both cases are inapplicable here. In *Dobbs* and in *Geduldig*, the Court reasoned (incorrectly) that laws regulating abortion and pregnancy did not facially discriminate

---

[3] Justice Alito discussed an *amicus* brief arguing that abortion rights are grounded in the Equal Protection Clause, *see Dobbs*, 142 S. Ct. at 2245-46, because there was no equal protection claim active in the case. Rather, the plaintiffs amended their complaint years prior to *Dobbs* to drop their equal protection challenge to Mississippi's statute. *See Jackson Women's Health Org. v. Currier*, 349 F. Supp. 3d 536, 538 (S.D. Miss. 2018).
[4] *See* Reva B. Siegel et al., *Equal Protection in* Dobbs *and Beyond: How States Protect Life Inside and Outside of the Abortion Context,* 43 Colum. J. Gender & L. 67, 68-69 (2022), https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=3954&context=faculty_scholarship.

because they targeted medical treatment or services and not women.  But even in that circumstance, the Court explained that heightened scrutiny would apply where the States' justifications were "mere pretext[s] designed to effect an invidious discrimination against members of one sex or the other."  *Dobbs*, 142 S. Ct. at 2245-46 (citation omitted).

Here, Plaintiffs present a facial challenge.  And there is no need to consider pretext because the words of the challenged laws manifest the invidiousness by identifying the targeted characteristic—sex—and describing the targeted group— a minor whose identity is different from their sex, in other words, a transgender minor.  The law here is *facially* discriminatory.

Moreover, in *Geduldig* and in *Dobbs*, under the policies at issue, it did not matter *why* an individual received the procedure.  In contrast here, "the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law."  *Brandt*, 47 F.4th at 669.  Thus, the more analogous cases are those holding that laws targeting same-sex relationships are sexual-orientation classifications.  *See, e.g.*, *Christian Legal Soc'y Chapter of Univ. of Cal. v. Martinez*, 561 U.S. 661, 689 (2010); *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring in judgment).

Defendants expressed concern that gender transition care involves medical treatments that could be dangerous for children.  Defs.' Opening Br. 29. There is no doubt that protecting children from dangerous medical treatments is a proper role of government.  But that analysis comes into play at Step 2 of the analysis—whether heightened scrutiny is satisfied—not Step 1—whether

16

heightened scrutiny applies.  This Court should closely scrutinize Indiana's actions and assess whether its blanket ban is justified, not rubber-stamp a statute that facially singles out transgender people merely because it is related to health care.

## II.  The Act Cannot Withstand Heightened Scrutiny.

No court has ever held that a complete ban on health care for transgender minors can withstand heightened scrutiny.  Indiana's S.E.A. 480 has banned *all* medical treatment for transgender minors seeking to live according to their gender identity.  Even if the minor, the minor's parents, and the minor's doctor are unanimous that the medical treatment would be safe and beneficial, the State has declared such care to be flatly illegal across the board.

There is no "exceedingly persuasive justification" for this law.  *Whitaker*, 858 F.3d at 1053.  As explained in the district court's detailed findings, as well as the submission of Plaintiffs, the State's asserted interests in safety do not justify the discriminatory Act.  In the district court's view, there was "designated evidence of risks to minors' health and wellbeing from gender dysphoria if [] treatments can no longer be provided to minors—prolonging of their dysphoria, and causing additional distress and health risks, such as depression, posttraumatic stress disorder, and suicidality. . . . So, while the State has identified legitimate reasons for regulation in this area, the designated evidence does not demonstrate, at least at this stage, that the extent of its regulation was closely tailored to uphold those interests."  Dkt. 67, Order at 24-25 (S.D. Ind. June 16, 2023).  Those findings are not clearly erroneous, and they necessarily

17

establish that the State cannot justify a targeted ban on health care treatment for transgender minors.

Defendants expressed concern that gender-transition treatment prohibited by the Act has not been approved by the FDA. Defs.' Opening Br. 11. If Indiana had chosen to ban *all* off-label uses of FDA-approved drugs, an equal protection challenge to such a ban would likely be subject to rational basis review, even if it had the incidental effect of restricting medical care for transgender people. Instead, however, the State allows physicians discretion to prescribe drugs for off-label uses *except* when they prescribe drugs to transgender minors. *See* Ind. Code § 25-1-22-13(c). That aspect of the Act should raise concern that the State's asserted justification is pretextual. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("[A] law cannot be regarded as protecting an interest . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.") (citations omitted). And that aspect of the State's law is what triggers the application of heightened scrutiny.

Concerns about the lack of FDA approval are not a basis to ban medical care for transgender youth. The fact that the FDA has not approved these drugs or procedures for the treatment of gender dysphoria does not indicate that the treatment is not safe or effective when used for that purpose. Off-label use of drugs or treatment is a commonplace practice across the medical profession. Defendants have not pointed to anything to indicate any circumstances that

implicate problems associated with the off-label nature of prescribing drugs for the treatment of gender dysphoria.

For the reasons stated by the district court, Plaintiffs, and *Amici*, the Act cannot survive under heightened scrutiny. Laws like the Act, which discriminate on the basis of sex without adequate justification, are unconstitutional.

## CONCLUSION

For the foregoing reasons and those articulated by Plaintiffs, *Amici* respectfully request that this Court affirm the district court's grant of a preliminary injunction of Indiana's S.E.A. 480 on the provision of gender transition medical care for transgender youth.

Dated: September 27, 2023

Chasel Lee
Jenner & Block LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
clee@jenner.com

Respectfully submitted,

/s/ Adam G. Unikowsky

Adam G. Unikowsky
   *Counsel of Record*
Jenner & Block LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

Jocelyn A. Sitton
Jenner & Block LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
jsitton@jenner.com

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this document complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 29 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 4,712 words. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 12 point Bookman Old Style font for text and 11 point Bookman Old Style font for footnotes.

Dated: September 27, 2023          /s/ Adam G. Unikowsky
                                   Adam G. Unikowsky

                                   *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I, Adam G. Unikowsky, an attorney, hereby certify that on September 27, 2023, I caused the **Brief Of *Amici Curiae* GLBTQ Advocates & Defenders, National Women's Law Center, And Five Additional Organizations In Support Of Plaintiffs-Appellees And Affirmance** to be electronically filed with the Clerk of the Court for the United States Court Of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to ECF procedure (h)(2) and Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause fifteen copies of the above cited brief to be transmitted to the Court via UPS overnight delivery, delivery fee prepaid within five days of that date.

Dated: September 27, 2023

/s/ Adam G. Unikowsky
Adam G. Unikowsky

*Counsel for Amici Curiae*