No. 23-2366

=====================================================

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

_____

K.C., ET AL.,

*Plaintiffs-Appellees*,

v.

INDIVIDUAL MEMBERS OF THE MEDICAL
LICENSING BOARD OF INDIANA, ET AL.,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court for the
Southern District of Indiana, No. 1:23-cv-00595-JPH-KMB,
The Honorable James P. Hanlon, Judge

_____

**REPLY FOR DEFENDANTS-APPELLANTS**

_____

Office of the Attorney General              THEODORE E. ROKITA
IGC South, Fifth Floor                      Attorney General of Indiana
302 W. Washington Street
Indianapolis, IN 46204                      JAMES A. BARTA
(317) 232-0709                              Deputy Solicitor General
James.Barta@atg.in.gov
                                            MELINDA R. HOLMES
                                            Deputy Attorney General


*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ................................................................................. 1

ARGUMENT ........................................................................................ 3

I.     The Fourteenth Amendment Permits Indiana To Protect Minors from Harmful and Unproven Gender-Transition Procedures .................................. 3

       A.     S.E.A. 480 classifies by age, procedure, and medical condition—not sex—rendering it subject to rational-basis review.................................. 3

             1.     References to sex-related concepts in a law that applies equally to both sexes do not trigger heightened scrutiny ........... 4

             2.     S.E.A. 480 does not traffic in cultural stereotypes...................... 8

             3.     *Whitaker* and *Bostock* do not require heightened scrutiny ......... 9

             4.     Other appellate rulings support reversal ................................... 13

       B.     Alleged disparate impacts on transgender persons do not trigger heightened scrutiny.................................................................. 14

       C.     Substantive due process does not provide an alternative ground for heightened scrutiny ......................................................... 14

       D.     S.E.A. 480's ban on subjecting minors to unproven, harmful procedures satisfies any level of scrutiny................................... 16

II.     Indiana May, Consistent with the First Amendment, Prohibit Medical Providers from Aiding or Abetting Unlawful Procedures .............................. 22

III.     Equitable Considerations Militate Against Injunctive Relief........................ 24

IV.     The District Court Erred in Enjoining Enforcement of S.E.A. 480 Against Everyone and in All Circumstances ................................................... 25

CONCLUSION.................................................................................... 26

## TABLE OF AUTHORITIES

**CASES**

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
   495 F.3d 695 (D.C. Cir. 2007) ............................................................. 15

*Bigelow v. Virginia*,
   421 U.S. 809 (1975) ................................................................. 23, 24

*Bostock v. Clayton Cnty.*,
   140 S. Ct. 1731 (2020) ............................................................. 10, 12

*Brandt ex rel. Brandt v. Rutledge*,
   47 F.4th 661 (8th Cir. 2022) ........................................................... 13

*Brown v. Entm't Mechs. Ass'n*,
   564 U.S. 786 (2011) ...................................................................... 17

*Califano v. Webster*,
   430 U.S. 313 (1977) ........................................................................ 8

*City of Chicago v. Barr*,
   961 F.3d 882 (7th Cir. 2020) ....................................................... 25, 26

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) ............................................................*passim*

*Doe v. City of Lafayette*,
   377 F.3d 757 (7th Cir. 2004) ........................................................... 15

*Doe ex rel. Doe v. Pub. Health Tr.*,
   696 F.2d 901 (11th 1983) .............................................................. 15

*Doe v. Rokita*,
   54 F.4th 518 (7th Cir. 2022) ........................................................... 25

*Eknes-Tucker v. Governor of Ala.*,
   80 F.4th 1205 (11th Cir. 2023) ..................................................*passim*

*Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*,
   848 F.3d 822 (7th Cir. 2017) ........................................................... 14

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ........................................................... 26

CASES [CONT'D]

*Geduldig v. Aiello,*
    417 U.S. 484 (1974) ................................................................. 5, 7, 11

*GEFT Outdoor, LLC v. City of Westfield,*
    39 F.4th 821 (7th Cir. 2022) .......................................................... 21

*Gonzales v. Carhart,*
    550 U.S. 124 (2007) ............................................................ 6, 16, 17

*Heller v. Doe,*
    509 U.S. 312 (1993) .................................................................... 14

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ....................................................................... 23

*L.W. by Williams v. Skrmetti,*
    --- F.4th ---, 2023 WL 6321688 (6th Cir. 2023) .............................*passim*

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville,*
    75 F.4th 760 (7th Cir. 2023) ................................................. 10, 11, 12

*New York v. Ferber,*
    458 U.S. 747 (1982) ............................................................... 16, 24

*Nguyen v. INS,*
    533 U.S. 53 (2001) ............................................................ 9, 17, 18, 22

*Parham v. J.R.,*
    442 U.S. 584 (1979) .................................................................... 15

*Pers. Adm'r v. Feeney,*
    442 U.S. 256 (1979) ..................................................................... 7

*Poe v. Drummond,*
    No. 23-CV-177-JFH-SH, 2023 WL 6516449 (N.D. Okla. Oct. 5, 2023) ............... 13

*Raich v. Gonzales,*
    500 F.3d 850 (9th Cir. 2007) .......................................................... 15

*Reed v. Reed,*
    404 U.S. 71 (1971) .................................................................. 4, 13

*Rostker v. Goldberg,*
    453 U.S. 57 (1981) ............................................................... 17, 21

## Cases [cont'd]

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006) ................................................................. 23

*Rutherford v. United States*,
  616 F.2d 455 (10th Cir. 1980) ............................................ 16

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) .......................................... 25

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard
  Coll.*,
  600 U.S. 181 (2023) ............................................................ 12

*The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*,
  76 F.4th 569 (7th Cir. 2023) .............................................. 23

*United States v. Crawley*,
  837 F.2d 291 (7th Cir. 1988) .............................................. 11

*United States v. Hansen*,
  599 U.S. 762 (2023) ............................................................ 23

*United States v. Morgano*,
  39 F.3d 1358 (7th Cir. 1994) .............................................. 11

*United States v. Virginia*,
  518 U.S. 515 (1996) .............................................................. 4

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ....................................................... 14, 15

*West v. Radtke*,
  48 F.4th 836 (7th Cir. 2022) .............................................. 12

*Whalen v. Roe*,
  429 U.S. 589 (1977) ............................................................ 15

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017) ....................................... 1, 10

**STATUTES**

18 U.S.C. § 116(a)(1) .................................................................................. 5

Ind. Code § 25-1-22-2 ............................................................................... 3

Ind. Code § 25-1-22-4 ............................................................................ 3, 9

Ind. Code § 25-1-22-5 ............................................................................... 3

Ind. Code § 25-1-22-6 ............................................................................... 9

Ind. Code § 25-1-22-8 ............................................................................... 9

## INTRODUCTION

Both the Sixth and Eleventh Circuits have now upheld laws similar to Indiana's. *See L.W. by Williams v. Skrmetti*, --- F.4th ---, 2023 WL 6321688 (6th Cir. 2023); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205 (11th Cir. 2023). Recognizing that laws banning gender-transition procedures for minors classify by age and procedure—not sex—the courts held that it is "eminently reasonable" to prohibit subjecting children to "unsettled," "experimental" procedures with "potentially irreversible" consequences. *L.W.*, 2023 WL 6321688, at *13, *20. Only the Eighth Circuit has gone a different way. But it did not even cite the Supreme Court's most relevant decisions governing medical regulations.

Plaintiffs argue that *Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017)—a school-bathroom case litigated under a Title IX sex-stereotyping theory—compels this Court to side with the Eighth Circuit. As this Court recently held, however, *Whitaker* does not resolve how courts should evaluate the constitutionality of many policies relating to sex even within the school environment. *A fortiori* it does not resolve how courts should evaluate regulations of pediatric medicine that balance the risks and benefits of experimental procedures based on the available scientific evidence.

In the intervening years, moreover, the Supreme Court has held "'[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245–46 (2022). That describes procedures to make a male look like a female,

or a female look like a male, to a tee. And while S.E.A. 480 may mention the word "sex" in distinguishing those sex-specific procedures from other procedures that use the same drugs, S.E.A. 480 does not classify by sex. No minor can access gender-transition procedures regardless of sex or gender identity.

In all events, S.E.A. 480 represents a necessary measure to protect still-developing children from experimental procedures with irreversible consequences. Plaintiffs act as if all who oppose unrestricted medical interventions for gender dysphoria in minors are simply prejudiced. But the district court did not agree: It recognized that "important" reasons underlie S.E.A. 480. SA1. New systematic reviews of the scientific literature conclude nothing is reliably known about gender-transition procedures for minors except that they adversely affect bone density. And countries that pioneered the procedures are now curtailing their use.

Inexplicably, the district court reasoned that Indiana must allow gender-transition procedures for minors because other countries permit "'limited'" experimentation. SA26. But neither the court nor plaintiffs explain why Indiana cannot make a different policy choice, especially when courts must give deference to legislative judgments regarding conflicting medical evidence. Plaintiffs instead seek to defend the injunction with endorsements from their experts and medical interest groups. A few physicians, however, do not control constitutional decisionmaking. And the voices plaintiffs cite nowhere confront systematic literature reviews concluding their "evidence" is unreliable. The preliminary injunction should be vacated.

## ARGUMENT

**I.     The Fourteenth Amendment Permits Indiana To Protect Minors from Harmful and Unproven Gender-Transition Procedures**

The Fourteenth Amendment permits Indiana to prohibit for minors new, risky, and potentially irreversible procedures unsupported by any reliable evidence. S.E.A. 480's prohibition on providing gender-transition procedures for minors restricts access based on age, condition, and procedure—not sex or transgender status—making it subject to rational-basis review. Substantive due process does not give parents a fundamental right to demand these procedures either. And regardless the district court's concession that there is conflicting evidence about gender-transition procedures' safety and efficacy requires reversal. Prohibiting unproven, or at the very least medically controversial, procedures is substantially related to Indiana's important interests in protecting minors and regulating medicine.

### A.     S.E.A. 480 classifies by age, procedure, and medical condition—not sex—rendering it subject to rational-basis review

In characterizing S.E.A. 480 as "draw[ing] lines solely based on . . . transgender status and sex," Resp. Br. 25, plaintiffs disregard the statute's actual language. The plain language of S.E.A. 480 prohibits gender-transition procedures for minors of both sexes and all gender identities, subject to exceptions for objectively verifiable "disorder[s] of sex development," "physical injury," and similar conditions. Ind. Code § 25-1-22-5(a)–(b); *see* Opening Br. 32. S.E.A. 480 mentions "sex" and sexual anatomy to identify a distinct use of GnRH analogues and hormones. Ind. Code §§ 25-1-22-2, 25-1-22-4, 25-1-22-5(a); *see* Opening Br. 32–33. But access to drugs for that purpose

depends on age and condition—not sex or transgender status. The district court itself observed that "S.E.A. 480 prohibits both male and female minors" from undergoing medicalized "gender transition[s]." SA20.

### 1. References to sex-related concepts in a law that applies equally to both sexes do not trigger heightened scrutiny

a. Plaintiffs argue that heightened scrutiny nonetheless applies because S.E.A. 480 "'referenc[es] sex.'" Resp. Br. 25; *see id.* at 30. But plaintiffs do not even try to reconcile their position with the Supreme Court's descriptions of sex classifications. *See* Opening Br. 31, 33. According to the Supreme Court, sex classifications that trigger heightened scrutiny "prefer one sex over the other," *Reed v. Reed*, 404 U.S. 71, 75–76 (1971), or "close[] a door . . . to women" but not men, *United States v. Virginia*, 518 U.S. 515, 532 (1996); *see L.W.*, 2023 WL 6321688, at *13 (collecting cases). Not every use of "sex-related language" constitutes a sex classification. *L.W.*, 2023 WL 6321688, at *15 (quoting *Eknes-Tucker*, 80 F.4th at 1233 (Brasher, J., concurring)); *see Eknes-Tucker*, 80 F.4th at 1228–29 (main op.).

Plaintiffs' complaint—that S.E.A. 480 prohibits GnRH analogues and hormones "for gender dysphoria in transgender youth" while allowing their use by minors "to treat precocious puberty" and "disorders of sexual development," Resp. Br. 25; *see id.* at 29—underscores there is no sex classification. Lines drawn based upon diagnosis ("gender dysphoria" versus "precocious puberty") and intended use are condition- and procedure-based lines. Simply put, distinguishing between "those who want to use these drugs to treat a discordance between their sex and gender identity

and those who want to use these drugs to treat other conditions" is a not a "sex *classification*." *Eknes-Tucker*, 80 F.4th at 1233 (Brasher, J., concurring).

b.    *Geduldig v. Aiello*, 417 U.S. 484 (1974), and *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), confirm that S.E.A. 480 does not classify based on sex. Under those decisions, "'[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny.'" *Dobbs*, 142 S. Ct. at 2245–46 (quoting *Geduldig*, 417 U.S. at 496 n.20). So mentioning "sex" in a regulation of "sex-based" procedures does not trigger enhanced review. *Eknes-Tucker*, 80 F.4th at 1228; *see L.W.*, 2023 WL 6321688, at *14. That makes sense: Otherwise no "medical condition, procedure, [or] drug having any relation to biological sex" could be regulated "without running the gauntlet of skeptical judicial review." *L.W.*, 2023 WL 6321688, at *15. Important laws prohibiting "genital mutilation for females," or funding testicular cancer screenings for males but ovarian cancer screenings for females would be at risk. *Id.* at *14 (quoting 18 U.S.C. § 116(a)(1)).

Plaintiffs deny that *Dobbs* and *Geduldig* apply, explaining that "[t]ransgender and cisgender youth can both have medical needs to receive the medications used for gender-affirming treatments." Resp. Br. 29. But the question is not whether both sexes (or all gender identities) have "medical needs." It is whether "only one sex can undergo" the "procedure" regulated. *Dobbs*, 142 S. Ct. at 2245–46 (quoting *Geduldig*, 417 U.S. at 496 n.20). And plaintiffs do not deny that the regulated procedures are sex-based. Gender-transition providers seek to instill male characteristics in females

and female characteristics in males, and use different hormones—testosterone for females, estrogen for males—depending on a minor's sex. *See* Opening Br. 34–35.

Plaintiffs' argument, moreover, assumes that every use of GnRH analogues and hormones constitutes an "identical" treatment and is "medically indicated." Resp. Br. 25; *see id.* at 29. But plaintiffs do not deny physicians who treat males for delayed puberty with testosterone address a different diagnosis, pursue a different goal, use a different dosage regimen, and seek to cause different effects than physicians who prescribe testosterone to females for gender dysphoria. *See* Opening Br. 11–13, 35–36. Nor do plaintiffs deny that the FDA has approved GnRH analogues, testosterone, and estrogen for some conditions but has not approved their use for gender dysphoria. *See id.* at 11; *L.W.*, 2023 WL 6321688, at *11. That belies the notion that the many different uses to which GnRH analogues and hormones can be put all constitute "one treatment" that must be regulated identically. *L.W.*, 2023 WL 6321688, at *13.

Assuming every use of GnRH analogues and hormones is "medically indicated" is problematic as well. Resp. Br. 25. To start, that assumption presumes that interested physicians have the final say about what procedures are "medically indicated." It ignores that federal and state officials may "regulat[e] the medical profession." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007); *see Dobbs*, 142 S. Ct. at 2267 (rejecting the notion that "the position of the American Medical Association" controls). And as discussed below, "medical and regulatory authorities are not of one mind" about whether gender-transition procedures are safe and efficacious. *L.W.*, 2023 WL

6321688, at *11; *see* Opening Br. 20–24; p.16–21, *infra*. Plaintiffs cannot simply assume that their views are correct.

     c.     *Geduldig*'s and *Dobbs*'s caveat about "mere pretexts designed to effect an invidious discrimination," *Geduldig*, 417 U.S. at 496 n.20, does not help plaintiffs either. *Contra* Resp. Br. 28. That language reflects that a facially neutrally law may offend equal protection if its "effects upon women" (or men) "are disproportionality adverse" and are a product of "purposeful discrimination." *Pers. Adm'r v. Feeney*, 442 U.S. 256, 274 (1979). Here, however, the district court did not find—and plaintiffs present no evidence—that S.E.A. 480 has disproportionate adverse "effects upon women" (or men) or that Indiana's legislative intent was to discriminate purposefully against that sex. It is undisputed that S.E.A. 480 applies to both sexes. SA20.

     Plaintiffs instead complain that S.E.A. 480 "targets only treatment related to gender transition." Resp. Br. 28. But *Geduldig* applied rational-basis review to a statute that excluded only a single condition—and one affecting "only women." 417 U.S. at 496 n.20. And *Dobbs* applied rational-basis review to a statute that banned only abortion, rejecting the argument that banning the procedure somehow "constitute[d] 'invidiously discriminatory animus' against women." 142 S. Ct. at 2245–46. As those decisions establish, one "cannot simply define, or create, a protected class *solely* by the nature of a denied medical benefit." *L.W.*, 2023 WL 6321688, at *15.

     d.     Plaintiffs also argue that applying rational-basis review to S.E.A. 480 ignores that the Equal Protection Clause protects "'person[s]'" and "not . . . groups." Resp. Br. 30. But S.E.A. 480 does "not disadvantage 'persons' based on their sex."

*L.W.*, 2023 WL 6321688, at *15. The "key" to the constitutional analysis here is that S.E.A. 480 conditions access to "testosterone, estrogen, and puberty blockers" based "on the age of the individual and the risk-reward assessment of treating this medical condition (as opposed to another) with these procedures." *Id.*

The nature of the injunction plaintiffs defend confirms as much. Plaintiffs do not defend an injunction that "make[s] a procedure given to one sex available to the other." *L.W.*, 2023 WL 6321688, at *15. "They want both sexes to receive the same gender-transitioning care." *Id.* The district court's injunction thus does "not equalize burdens or benefits between girls and boys" or require the state to "treat boys and girls the same." *Eknes-Tucker*, 80 F.4th at 1233 (Brasher, J., concurring). The injunction "merely force[s]" Indiana "to *either* ban puberty blockers and hormones for all purposes *or* allow them for all purposes." *Id.*

### 2.    S.E.A. 480 does not traffic in cultural stereotypes

Plaintiffs alternatively argue that S.E.A. 480 rests on "overbroad generalizations" and "'stereotypes'" about sex. Resp. Br. 27, 30. But S.E.A. 480 is not based on "archaic and overbroad generalizations" about how women or men should behave. *Califano v. Webster*, 430 U.S. 313, 317 (1977) (cleaned up).  Rather, S.E.A. 480 restricts relatively new, unproven medical interventions for minors with gender dysphoria out of concern that they carry undue risk compared to psychosocial care. *Eknes-Tucker*, 80 F.4th at 1229. "A concern about potentially irreversible medical procedures for a child is not a form of stereotyping." *L.W.*, 2023 WL 6321688, at *17.

8

Of course, S.E.A. 480's risk-benefit assessment reflects that males and females naturally have different healthy sex-hormone levels and genitalia. *See* Ind. Code §§ 25-1-22-4, 25-1-22-6, 25-1-22-8. But the Supreme Court has warned against deriding "basic biological differences" as "stereotypes." *Nguyen v. INS*, 533 U.S. 53, 73 (2001). "Recognizing and respecting biological sex differences does not amount to stereotyping—unless Justice Ginsburg's observation in *United States v. Virginia* that biological differences between men and women 'are enduring' amounts to stereotyping." *L.W.*, 2023 WL 6321688, at *18; *see Eknes-Tucker*, 80 F.4th at 1229.

Besides, if recognizing biological differences amounts to stereotyping, plaintiffs' experts are guilty of it too. They wish to administer cross-sex hormones—testosterone to females and estrogen to males—precisely because the sexes naturally produce different sex hormones. *See* Dkt. 48-4 at 23 (Weiss Decl. ¶¶ 107–08); Dkt. 26-1 at 11 (Karasic Decl. ¶ 43). And plaintiffs' experts take the additional step of applying socially structured gender roles to determine gender identity and diagnose gender dysphoria. Opening Br. 38. That does not reflect a "misunderstanding" of the "diagnosis." Resp. Br. 30 n.5. The diagnostic criteria that plaintiffs' experts use require physicians to ask (for example) whether a child prefers "games or activities stereotypically used or engaged in by the other gender." Dkt. 49-4 at 7 (DSM-5 TR3).

## 3.  *Whitaker* and *Bostock* do not require heightened scrutiny

Similarly misplaced is plaintiffs' position that "discrimination based on transgender status is sex discrimination." Resp. Br. 23. S.E.A. 480 nowhere mentions transgender status: It prohibits *all* minors from using GnRH analogues and

hormones for a particular purpose (subject to condition-based exceptions that cover all gender identities). Opening Br. 32, 40. Plaintiffs' argument presumes success on a disparate-impact theory they have abandoned, *see* Resp. Br. 32 n.6, and would effectively "create a new suspect class" without satisfying the "high" bar for creating one, *L.W.*, 2023 WL 6321688, at *16, *18. Plaintiffs overread *Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), and *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), as well.

a.     In *Whitaker*, the Court held that barring transgender students from using the bathroom of their choice violated Title IX and the Equal Protection Clause. 858 F.3d at 1039. But its conclusion that "discrimination against transgender students is a form of sex discrimination" was tied to Title IX's prohibition against "discrimination 'on the basis of sex,'" *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023)—language that reaches more broadly than the Constitution, *see L.W.*, 2023 WL 6321688, at *16; *Eknes-Tucker*, 80 F.4th at 1228–29. And *Whitaker*'s conclusion was also tied to its view that the school's bathroom policy provided "less favorable treatment" because of "sex stereotypes." *A.C.*, 75 F.4th at 769. A policy that bars a transgender student from walking through a bathroom door labeled "boys" operates differently from a policy that bars all minors—cisgender and transgender—from accessing powerful drugs for an unproven, dangerous use.

All of this is to say that *Whitaker*'s general statements about Title IX, stereotyping, and bathroom policies do not foreordain how the Equal Protection Clause applies to medical regulations that confront biological fundaments. That question was

10

"not presented" in *Whitaker*, subjected to "adversary presentation," or "necessary to the outcome." *United States v. Crawley*, 837 F.2d 291, 292–93 (7th Cir. 1988). In fact, this Court has clarified that *Whitaker* does not resolve questions about "how Title IX and the Equal Protection Clause regulate[]" other matters within the school environment, including "sex-segregated living facilities" and "sports teams"—a point plaintiffs ignore. *A.C.*, 75 F.4th at 773. Upholding S.E.A. 480 thus would not require "'jump[ing] from one side of [a] circuit split to another,'" Resp. Br. 32; this Court has taken no position on regulation of gender-transition procedures.

Plaintiffs, moreover, offer no plausible way to extend *Whitaker* to gender-transition procedures without departing from intervening Supreme Court precedent. Opening Br. 37–38. Since *Whitaker*, the Supreme Court has held that regulating a procedure that "only one sex can undergo does not trigger heightened constitutional scrutiny.'" *Dobbs*, 142 S. Ct. at 2245–46 (quoting *Geduldig*, 417 U.S. at 496 n.20). Plaintiffs effectively seek to "nullify *Dobbs*" by treating all "legislative references to biological differences" as a form of stereotyping that triggers "heightened review." *L.W.*, 2023 WL 6321688, at *18; *see Eknes-Tucker*, 80 F.4th at 1229. Whatever the validity of *Whitaker*'s logic for bathroom polices, there is no reason to "propagate" it to a new context despite contrary—and intervening—Supreme Court precedent. *United States v. Morgano*, 39 F.3d 1358, 1368 (7th Cir. 1994).

b.    *Bostock* does not counsel otherwise. In *Bostock*, the Supreme Court "only" held that "an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual

11

'because of such individual's sex'" in violation of Title VII. 140 S. Ct. at 1753. It did not address the Equal Protection Clause—or even whether every Title VII case involving alleged transgender discrimination violated the statute. *See id.*; *cf. West v. Radtke*, 48 F.4th 836, 849–51 (7th Cir. 2022) (finding no Title VII violation post-*Bostock*). And while this Court has extended "*Bostock*'s reasoning to *Title IX*," this Court has never extended it to constitutional claims. *A.C.*, 75 F.4th at 769 (emphasis added).

Extending *Bostock* now would be a mistake. "The Equal Protection Clause contains none of the text that the Court interpreted in *Bostock*." *Eknes-Tucker*, 80 F.4th at 1229; *see Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring) (deeming it "implausible on its face" that the Equal Protection Clause "should mean the same thing" as Title VI). Indeed, the Clause is narrower than Title VII. It excludes "disparate impact claims," *L.W.*, 2023 WL 6321688, at *16—no small matter in a case where plaintiffs attack S.E.A. 480 for placing a "special burden" on "[t]ransgender" minors, Resp. Br. 29.

There is "marked difference in application of the anti-discrimination principle" as well. *L.W.*, 2023 WL 6321688, at *17. "In *Bostock*, the employers fired adult employees because their behavior did not match stereotypes of how adult men or women dress or behave." *Id.*; *see Bostock*, 140 S. Ct. at 1753. Here, S.E.A. 480 bans the "same" unproven, and "potentially irreversible," procedures for "all" minors due to concerns about those procedures' risks while allowing the procedures after minors reach majority. *L.W.*, 2023 WL 6321688, at *17. Extending *Bostock*'s stereotyping reasoning to

12

biological differences would defy *Dobbs* as much as extending *Whitaker*'s would. *See L.W.*, 2023 WL 6321688, at *17–*18; *Eknes-Tucker*, 80 F.4th at 1229.

### 4.    Other appellate rulings support reversal

Although *Whitaker* and *Bostock* do not address the question on appeal, other decisions do. Both the Sixth and Eleventh Circuits have now upheld state statutes similar to S.E.A. 480, applying rational-basis review. *See L.W.*, 2023 WL 6321688, at *13; *Eknes-Tucker*, 80 F.4th at 1228; *see also Poe v. Drummond*, No. 23-CV-177-JFH-SH, 2023 WL 6516449, at *7 (N.D. Okla. Oct. 5, 2023) (similar).

Plaintiffs' only criticism of the Sixth and Eleventh Circuits is that neither "mentions *Whitaker*." Resp. Br. 32. Both courts, however, addressed "a similar stereotyping case." *L.W.*, 2023 WL 6321688, at *18; *see Eknes-Tucker*, 80 F.4th at 1229–30. They fully considered the very arguments that plaintiffs make here, explaining how embracing the arguments would require "nullify[ing] *Dobbs* and *Geduldig*." *L.W.*, 2023 WL 6321688, at *18; *see Eknes-Tucker*, 80 F.4th at 1229.

By contrast, the Eighth Circuit did "not explain how applying heightened scrutiny to a law that regulates sex-specific medical interventions" accords with the Supreme Court's decisions in *Dobbs* and *Geduldig. Eknes-Tucker*, 80 F.4th at 1232–33 (Brasher, J., concurring). Nor did it consider the Supreme Court's explanation that sex-based classifications "prefer" "members of either sex over members of the other." *Reed*, 404 U.S. at 75–76. *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022), supplies no persuasive reason to apply heightened scrutiny.

**B.  Alleged disparate impacts on transgender persons do not trigger heightened scrutiny**

Aside from sex, plaintiffs assert S.E.A. 480 classifies based on "transgender status." Resp. Br. 25. As plaintiffs conceded below, however, "S.E.A. 480 'does not specifically refer to transgender individuals.'" Dkt. 27 at 20. And plaintiffs do not address the standards for disparate-impact challenges on appeal or develop any argument that transgender status is a protected trait. *Compare* Opening Br. 40–42, *with* Resp. Br. 32 n.6 (saying there is "no need . . . to address" the issues). With plaintiffs having forfeited any argument that transgender status is protected, *see Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 848 F.3d 822, 829 (7th Cir. 2017), plaintiffs' complaints about "transgender status" discrimination provide no basis for applying heightened scrutiny, *see Heller v. Doe*, 509 U.S. 312, 319 (1993).

**C.  Substantive due process does not provide an alternative ground for heightened scrutiny**

Substantive due process does not provide an alternative path to heightened scrutiny. To determine whether the Fourteenth Amendment protects an unwritten right, a court must "careful[ly] descri[be]" it and ask whether "objective[]" evidence shows it to be so "deeply rooted in this Nation's history and tradition" such that "neither liberty nor justice would exist" without it. *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citation omitted). Plaintiffs offer no objective evidence that *anyone*—parents or children—has a deeply rooted right to obtain GnRH analogues and hormones to address gender dysphoria even where prohibited by law.

Plaintiffs assert a generic "'interest of parents in the care, custody, and control of their children.'" Resp. Br. 42. When describing a right, however, courts must

"avoid[] sweeping abstractions and generalities." *Doe v. City of Lafayette*, 377 F.3d 757, 769 (7th Cir. 2004) (en banc); *see Dobbs*, 142 S. Ct. at 2246–47; *Glucksberg*, 521 U.S. at 721. Decisions addressing parents' right to "send children to religious school" or teach them "German language" are too "far afield." *Dobbs*, 142 S. Ct. at 2267–68. Similarly, *Parham v. J.R.*, 442 U.S. 584, 604 (1979), a procedural due process case, does not establish that parents have "an affirmative right to receive medical care" state regulators have deemed too risky for any child. *L.W.*, 2023 WL 6321688, at *10; *see Eknes-Tucker,* 80 F.4th at 1223–24. It merely addressed the "kind of inquiry" required before parents could decide "to have a child institutionalized for mental health care," which was already legal in Georgia. *Parham*, 442 U.S. at 605–06.

At bottom, a parent's right "to make decisions for his daughter [is] no greater than his rights to make medical decisions for himself." *Doe ex rel. Doe v. Pub. Health Tr.*, 696 F.2d 901, 903 (11th 1983); *see Whalen v. Roe*, 429 U.S. 589, 604 (1977). Parents otherwise could demand for their children all sorts of "treatments" that they could not demand for themselves—unapproved vaccines, medical marijuana, abortions, etc. *See L.W.*, 2023 WL 6321688, at *9; *Eknes-Tucker,* 80 F.4th at 1224 n.18. But plaintiffs do not argue adults have a right to gender-transition procedures—a position that would face a wall of adverse precedent. *See, e.g., Dobbs,* 142 S. Ct. at 2242–43 (no right to abortion); *Glucksberg*, 521 U.S. at 722–36 (no right to physician assisted suicide); *Raich v. Gonzales*, 500 F.3d 850, 864–66 (9th Cir. 2007) (no right to medical marijuana); *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 711 (D.C. Cir. 2007) (en banc) (no "right to . . . experimental

drugs"); *Rutherford v. United States*, 616 F.2d 455, 456 (10th Cir. 1980) (no right for "terminally ill cancer patients" to "take whatever treatment they wished").

> ### D.    S.E.A. 480's ban on subjecting minors to unproven, harmful procedures satisfies any level of scrutiny

S.E.A. 480 survives heightened scrutiny regardless. Plaintiffs do not dispute state interests in "safeguarding the physical and psychological well-being of a minor," *New York v. Ferber*, 458 U.S. 747, 756–57 (1982), and "regulating the medical profession" are important, *Gonzales*, 550 U.S. at 157; *see* SA1. The dispute is whether S.E.A. 480 is "substantially related" to those interests. Resp. Br. 35.

1.    In arguing that S.E.A. 480 is not substantially related to state interests, plaintiffs seek to rewrite the district court's decision. Contrary to plaintiffs' suggestion, the district court did not reject defendants' experts and evidence. Resp. Br. 33–35. The court deemed those experts "reasonably well qualified," Dkt. 73 at 14:23–15:6, 16:16–25, and cited them repeatedly, SA22–SA23. Nor did the court have any trouble concluding there was "support for Defendants' view that the safety and effectiveness of puberty blockers and hormone therapy is uncertain and unsettled." SA23. It cited evidence that the drugs "carry risks" and that research on "delay[ing] puberty past a typical age is exceptionally limited." SA22–SA23. In fact, the court stated, there is a "consensus from all sides . . . that more research is needed." SA23.

Although the court acknowledged plaintiffs had presented evidence of near-term benefit for "some minors," SA30; *see* SA24–SA25, it did not resolve the debate. Instead, the court deemed S.E.A. 480 overbroad because Europeans allow "'formal research'" and "'monitored clinical trials.'" SA26–SA27. But neither the court nor

plaintiffs offer any explanation of why other countries' decision to allow "limited" research requires Indiana to make the same policy choice, much less permit *unlimited* use. *See* Opening Br. 45. Indeed, plaintiffs gloss over that other countries have allowed only "'limited'" and "'monitored'" trials, SA26–SA27; *see* Opening Br. 20–24, acting as if they allow procedures without limitation, Resp. Br. 40. That is because allowing only *limited* use demonstrates the procedures are not *generally* safe, which satisfies heightened scrutiny. *See Nguyen*, 533 U.S. at 70.

Nor do plaintiffs have an answer for binding precedent requiring judicial "defer[ence]" to legislative judgments in "'areas fraught with medical and scientific uncertainties.'" *Dobbs*, 142 S. Ct. 2268; *see* Opening Br. 45–46. Plaintiffs invoke the principle that legislative findings are not exempt from judicial review. Resp. Br. 39. But that principle proved no barrier in *Gonzales*—a case plaintiffs nowhere cite. It deemed sufficient that "both sides ha[d] medical support for their position." 550 U.S. at 161; *see* at 165–67. Thus, far from favoring plaintiffs, the "persist[ence]" of a "contested factual question" about safety and efficacy requires upholding S.E.A. 480. *Id.* at 161, 163–64; *see Brown v. Entm't Mechs. Ass'n*, 564 U.S. 786, 799–800 (2011) (legislature entitled to "make a predictive judgment" on heightened scrutiny). The "[d]istrict [c]ourt was quite wrong in undertaking an independent evaluation of the evidence" on heightened scrutiny. *Rostker v. Goldberg*, 453 U.S. 57, 82–83 (1981).

2.     Plaintiffs instead seek to defend the injunction by arguing there is no question about gender-transition procedures' safety and efficacy. Resp. Br. 33–37. Even setting aside the deference due legislative judgments, however, the evidence

shows that minors who want GnRH analogues and hormones for transitions are not "similarly situated" to minors who require the drugs for other purposes. *Nguyen*, 533 U.S. at 63. Start with use and effect. Plaintiffs do not deny that minors who use sex hormones for transitioning take larger doses for longer periods to treat a different condition than minors who use sex hormones for, say, delayed puberty. *See* Opening Br. 34–35. Nor do plaintiffs deny that hormones affect each sex differently. *See id.*

Next look at risks. No one disputes that gender-transition procedures carry risks or that hormones can cause "irreversible effect[s]." Dkt. 48-11 at 18 (Turban Dep. 61:6–15); *see* Opening Br. 43–45; Resp. Br. 9–10, 37. Citing only a declaration from their expert Daniel Shumer, plaintiffs argue that gender-transition procedures are not "uniquely risky." Resp. Br. 9–10, 35. Shumer, however, did not address— much less rebut—European systematic reviews finding no "reliable," long-term evidence of safety, Dkt. 49-5 at 41 (NICE GnRH Review 40); *see* Dkt. 49-6 at 15, 48 (NICE Hormone Review 14, 47); Dkt. 49-10 at 13 (Swedish Review 12), data indicating that cross-sex hormones exponentially increase cancer, heart-disease, and stroke risk, Dkt. 48-4 at 24–25 (Weiss Decl. ¶¶ 109–25), or the Endocrine Society's admission that extended pubertal suppression has "adverse effects on bone mineralization" and "unknown effects on brain development," Dkt. 49-1 at 15 (Hembree 3882).

Regarding fertility, plaintiffs do not deny that cross-sex hormones pose risks. *See* Opening Br. 44; Resp. Br. 10, 36. They observe that "*surgical*" procedures for other conditions "may have fertility consequences" as well. Resp. Br. 36 (emphasis added). By plaintiffs' account, however, the equal-protection question requires

18

comparison of different uses of "identical pharmacological" compounds—not drugs and scalpels. *Id.* at 25; *see Eknes-Tucker*, 80 F.4th at 1235 (Brasher, J., concurring). And whatever the fertility risk from pubertal suppression alone, "pubertal suppression" *plus* "hormones" can "compromise[] fertility." Dkt. 49-1 at 15 (Hembree 3882); *see* Dkt. 48-2 at 44 (Hruz Decl. ¶ 77). That so many gender-dysphoric minors treated with GnRH analogues quickly proceed to hormones justifies a different regulatory approach.

Consider the lack of supporting evidence too. Gender-transition procedures are relatively "novel[]," *L.W.*, 2023 WL 6321688, at *19—so much so that proponents admit data on long-term outcomes is "limited," Dkt. 49-3 at 15, 30 (WPATH SOC-8 at S65); *see* Dkt. 48-1 at 85 (Cantor Decl. ¶ 175) (collecting additional WPATH admissions), and systematic reviews judge that the procedures' long-term efficacy is "unknown," Opening Br. 16–17, 44–45 (quoting Dkt. 49-10 at 13 (Swedish Review 12)). Although plaintiffs counter that "studies" demonstrate the procedures' "effectiveness," Resp. Br. 35–36, they do not attempt to address those studies' severe "methodological weaknesses" or the multiple systematic reviews rejecting their findings as unreliable, Opening Br. 16–17, 44–45 (quoting Dkt. 49-10 at 9–10 (Swedish Review 10–11)). In fact, Shumer refused to pronounce the reviews' conclusions "unreasonable." Dkt. 48-10 at 67–69 (Shumer Dep. 259:11–18, 263:17–165:9). Whatever one thinks of the State's experts, discarding systematic reviews representing the apex of medical knowledge in favor of select studies, individual experience, or position

19

statements would contravene bedrock principles of evidence-based medicine. Opening Br. 46.

Asserting that gender-transition procedures are the "standard of care" endorsed by "major medical organizations," Resp. Br. 1, 35, 38, is no answer either. That begs the question who establishes the "standard of care"—the FDA? States? Other countries? The physicians themselves? Surely physicians' views are not dispositive. *See L.W.*, 2023 WL 6321688, at *11–*12. That would leave regulators powerless to address abuses facilitated by the medical establishment, such as the "opioid epidemic." *Eknes-Tucker*, 80 F.4th at 1225 n.19; *see* Dkt. 48-5 at 26, 27–30 (Kaliebe Decl. ¶¶ 71, 73–76, 79). Plaintiffs, moreover, overlook that U.S. organizations conducted no research and held no member votes before endorsing medicalized transitions. Opening Br. 18–19. And whatever U.S. organizations say, European pioneers of gender-transition procedures have since limited their use for minors. *See id.* at 20–24.

Plaintiffs accuse Indiana of setting a "uniquely high standard of efficacy." Resp. Br. 35. Their meaning is not clear—high compared to what? The bar should be higher the riskier or more irreversible the procedure. And compared to prescribing small doses of testosterone short term to treat delayed male puberty, prescribing females high doses of testosterone long-term to induce irreversible changes is high risk. *See* Opening Br. 42–45; pp.18–19, *supra*. Plaintiffs seek to downplay the difference by asserting detransition is "rare." Resp. 37. But no study examines long-term persistence for minors with adolescent-onset gender dysphoria. Dkt. 48-1 at 59, 66–67, 122 (Cantor Decl. ¶¶ 115, 135, 269); Dkt. 48-5 at 130–17 (Kaliebe Decl. ¶¶ 33–45).

And regardless using GnRH analogues and hormones for transitioning presents increases other adverse events. *See* pp.18–19, *supra*.

There is, moreover, the problem that no one knows *which* minors will persist. Opening Br. 47. Contrary to plaintiffs' assertion, a "lack of rigorous assessments for gender dysphoria" is not the only factor contributing to the problem. Resp. Br. 37 n.7. As plaintiffs' own witnesses admit, "gender identity change[s] over time." Dkt. 48-8 at 13 (Mosaic Dep. 44:13–15, 46:14–25); *see* Opening Br. 47. Thus, no one can "predict the psychosexual outcome for any specific child." Dkt. 49-1 at 9 (Hembree 3876).

3.     Plaintiffs also argue for the first time on appeal that "informed consent" is a "more tailored alternative." Resp. Br. 37, 40. That misconceives "how intermediate scrutiny works." *Eknes-Tucker*, 80 F.4th at 1235 (Brasher, J., concurring). "Intermediate scrutiny . . . does not require a perfect or least restrictive fit." *GEFT Outdoor, LLC v. City of Westfield*, 39 F.4th 821, 825 (7th Cir. 2022); *see, e.g.*, *Rostker*, 453 U.S. at 79–82. Informed consent, moreover, does not protect anyone from unsafe or ineffective procedures with irreversible consequences. And Indiana can be legitimately concerned that young teenagers "lack the capacity to consent to such a significant and potentially irreversible" procedure. *L.W.*, 2023 WL 6321688, at *19; *see* Dkt. 48-5 at 40 (Kaliebe Decl. ¶¶ 107–08) (brains develop through age 20). Young children cannot understand what it means to permanently give up fertility, breastfeeding, or normal sexual development. Dkt. 48-1 at 98-99, 108 (Cantor Decl. ¶¶ 206, 234).

Plaintiffs also assert that gender-transition procedures are helping "appellee-youth." Resp. Br. 34, 40. But their near-term experiences reveal nothing about long-

term outcomes. And regardless, heightened scrutiny does not require a law to "achiev[e] its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70. Moreover, contrary to plaintiffs' assertion, there are "alternative" treatments. Resp. Br. 40; *see* Opening Br. 50–51 As plaintiffs' own witnesses admit, social support and "psychotherapy" are "very valuable" treatments for "a lot of people." Dkt. 48-9 at 22 (Karasic Dep. 76:18–24); *see* Dkt. 48-11 at 59–60 (Turban Dep. 228:16–229:1); Dkt. 48-8 at 22, 25 (Mosaic Dep. 77:1–8, 90:7–14). Several European authorities "endorse psychotherapy as the treatment of choice for minors." Dkt. 48-1 at 14 (Cantor Decl. ¶ 16).

4.    As a final gambit, plaintiffs argue that S.E.A. 480 fails rational basis because Indiana's asserted interests are not its "true motivation." Resp. Br. 40–41. On rational-basis review, the question is about what lawmakers "could have thought"—not what they did. *Dobbs*, 142 S. Ct. at 2284; *see id.* at 2255. A lawmaker faced with gender-transition procedures' novelty, many known and unknown risks, no reliable evidence of benefit, lack of FDA approval, and growing international calls for caution could think it "eminently reasonable" to limit their use for minors. *L.W.*, 2023 WL 6321688, at *20; *see Eknes-Tucker*, 80 F.4th at 1230–31.

## II.    Indiana May, Consistent with the First Amendment, Prohibit Medical Providers from Aiding or Abetting Unlawful Procedures

Plaintiffs do not dispute that S.E.A. 480's aiding-and-abetting provision covers "*any action* that aids or abets" gender-transition procedures. Opening Br. 48; *see* Resp. Br. 44–45. They focus on narrow applications, saying S.E.A. 480 prevents providers "from referring patients" or "producing patient records." Resp. Br. 44–45. Those actions, however, are not "pure speech." *Id.* at 45. "Producing patient records"

is, at least in most instances, conduct and is not "inherently expressive." *The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*, 76 F.4th 569, 575 (7th Cir. 2023). And any impact on "referring patients" is merely "incidental" to "regulation of conduct." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006).

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), does not hold otherwise. *Contra* Resp. Br. 46. That case applied strict scrutiny to a statute prohibiting material support to foreign terrorist organizations through "expert advice or assistance" because the statute required examining speech's "content" to determine whether knowledge provided is "specialized" or not. 561 U.S. at 8, 14–15, 26–27. S.E.A. 480, by contrast, does not regulate speech on its face. Any provider who provides a referral violates it regardless of what referral contains.

No matter the scrutiny, S.E.A. 480's aiding-and-abetting ban survives. It has "'never'" violated the First Amendment to "'make a course of conduct illegal merely because'" words were involved. *United States v. Hansen*, 599 U.S. 762, 783 (2023). Plaintiffs object that gender-transition procedures are legal in some other States. Resp. Br. 46. That objection ignores that the injunction applies to *all* referrals and enumerated actions, including referrals *within Indiana* for gender-transition surgeries, which remain illegal. Opening Br. 49.

Nor does *Bigelow v. Virginia*, 421 U.S. 809 (1975), resolve whether Indiana may prohibit providers from providing its children with out-of-state referrals. In invalidating an advertising restriction, the Court stressed that the statute was "directed at the publishing of informative material" that implicated matters of "constitutional

interest[]"—not merely speech integral to conduct (*e.g.*, solicitations). *Id.* at 821–22, 827. *Bigelow* did not consider States' interest in protecting their children's "well-being" by prohibiting "'speech . . . used as an integral part of conduct.'" *Ferber*, 458 U.S. at 756–57, 761–62.

## III.     Equitable Considerations Militate Against Injunctive Relief

Equitable considerations "largely favor the State[]" as well. *L.W.*, 2023 WL 6321688, at *22. Plaintiffs do not deny the current injunction harms Indiana by preventing it from "enforc[ing] the will of [its] legislature[]." *Id.* And while they offhandedly dismiss the "risks" of gender-transition procedures, Resp. Br. 47, the district court recognized evidence showing that the "efficacy and safety" of the procedures is "uncertain and unsettled," SA23; *see* Opening Br. 42–48; p.16, *supra*. Thus, by the court's own account, the injunction risks harm to children's health.

Plaintiffs repeat the statement that "some minors" may benefit from gender-transition procedures. Resp. Br. 47 (quoting SA30). But they ignore the obvious mismatch between that qualified statement and an injunction that permits unrestricted access to gender-transition procedures for *all minors*. *See* Opening Br. 50. And as discussed above, any evidence of short-term benefit hardly establishes the absence of long-term consequences. *Contra* Resp. Br. 48. Even WPATH concedes there is "limited data" on "long-term physical, psychological, and neurodevelopmental outcomes," Dkt. 49-3 at 68 (WPATH SOC-8 at S65)—and other more rigorous reviews conclude the "long-term" effects are "unknown," Dkt. 49-10 at 13 (Swedish Review 12).

Irreparable harm from an equal-protection violation cannot be presumed either. *See Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000); *contra* Resp. Br. 48.

## IV. The District Court Erred in Enjoining Enforcement of S.E.A. 480 Against Everyone and in All Circumstances

The injunction's ban on enforcing S.E.A. 480 against "any provider" and "any minor" is overbroad regardless. Opening Br. 51–53 (quoting SA33). Whatever the general "authority" of courts "to provide injunctive relief that extends to non-parties," no one disputes that universal injunctions are "appropriate only in rare circumstances." *City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020). Plaintiffs agree that an "injunction 'should be no greater than necessary to protect the rights of the prevailing litigants.'" Resp. Br. 49 (quoting *Doe v. Rokita*, 54 F.4th 518, 519 (7th Cir. 2022)). Plaintiffs argue a "statewide injunction" is nonetheless "necessary to provide complete relief to the appellees." Resp. Br. 48. But plaintiffs nowhere explain how appellees would be harmed by a more tailored injunction that forbade S.E.A. 480's enforcement only as to *them* and providers furnishing *them* services.

Plaintiffs also do not defend the district court's view that nonparties constitute "prevailing litigants" before class certification. Instead, plaintiffs invoke S.E.A. 480's impact on "'similarly-situated nonparties'" and speculate about the potential for multiple lawsuits. Resp. Br. 49–50. That argument is foreclosed by *Doe v. Rokita*. *Doe* overturned a statewide injunction, explaining that an injunction "should be no greater than necessary to protect the rights of the prevailing litigants" absent a properly "certified" class. 54 F.4th at 519. *City of Chicago* does not counsel differently. Although it opined about "some circumstances" when a "universal injunction[]" might

25

be proper, the Court resolved the case on a "narrow[er]" ground to "avoid" that issue. 961 F.3d at 916, 920. The injunction cannot be reconciled with *Doe*.

Plaintiffs also fault the State for seeking to stay class-certification briefing without "disclos[ing]" that it intended to "oppose any preliminary injunctive relief extending beyond the named plaintiffs." Resp. Br. 50. If the absence of that representation troubled plaintiffs, they could have opposed a stay on that ground. But plaintiffs "withdr[e]w their opposition" to a stay while conceding the State had not "agree[d] . . . any injunction" would "apply . . . to all members of the putative classes" and that it was "not clear whether the defendants w[ould] argue . . . that facial relief is inappropriate." Dkt. 42 at 1–2; *see* Opening Br. 25–26 (providing additional context). Plaintiffs' strategic withdrawal cannot justify the overbroad injunction.

Regardless, enjoining enforcement of S.E.A. 480 in all circumstances was inappropriate given plaintiffs' concessions that gender-transition procedures are not always appropriate for gender-dysphoric minors and that States may ban procedures not furnished according to "WPATH's guidelines." Opening Br. 52–53 (quoting Dtk. 73 at 19:2–9). Plaintiffs' response—that in "a facial challenge," the "constitutional violation inheres" in "the statute"—confuses the standard for a facial challenge with whether it is met here. Resp. Br. 51 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011)). As *Ezell* explains, a "law is not facially unconstitutional unless it 'is unconstitutional in all of its applications.'" 651 F.3d at 698. And as plaintiffs' concessions establish, S.E.A. 480 has at least some constitutional applications.

## CONCLUSION

The preliminary injunction should be vacated.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana

<u>/s/ James A. Barta</u>
JAMES A. BARTA
Deputy Solicitor General

MELINDA R. HOLMES
Deputy Attorney General

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
James.Barta@atg.in.gov

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limitation of Circuit Rule 32(c) because this document contains 6,980 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This document complies with the typeface requirements of Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 12-point font.

October 18, 2023     /s/ James A. Barta
            JAMES A. BARTA
            Deputy Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ James A. Barta</u>
JAMES A. BARTA
Deputy Solicitor General

Office of the Indiana Attorney General
Indiana Government Center South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 232-0709
Facsimile: (317) 232-7979
James.Barta@atg.in.gov