**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

K.C., ET AL.,

*Plaintiffs-Appellees,*

v.

INDIVIDUAL MEMBERS OF THE MEDICAL
LICENSING BOARD OF INDIANA, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Southern District of Indiana, No. 1:23-cv-00595-JPH-KMB,
The Honorable James P. Hanlon, Judge

**RESPONSE TO PLAINTIFFS-APPELLEES' MOTION TO RECONSIDER
AND REQUEST FOR EN BANC CONSIDERATION**

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
James.Barta@atg.in.gov

THEODORE E. ROKITA
Attorney General of Indiana

JAMES A. BARTA
Solicitor General

MELINDA R. HOLMES
Deputy Attorney General

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION .......................................................................................... 1

BACKGROUND ........................................................................................... 2

I.    Factual Background ............................................................................ 2

II.    Procedural Background ...................................................................... 4

    A.    District court proceedings .......................................................... 4

    B.    Appellate proceedings ................................................................ 5

ARGUMENT ............................................................................................... 6

I.    The Traditional Standards for a Stay Are Satisfied ........................... 6

    A.    Plaintiffs-Appellees' request for reconsideration fails to address the most critical consideration—success on the merits ......................... 7

    B.    The stay is necessary to prevent irreparable harm to the State, third parties, and the public interest ...................................... 8

    C.    No alleged harms to Plaintiffs-Appellees undermine the stay ............. 11

    D.    Indiana Code § 25-1-22-13(d) does not support a blanket delay .......... 15

II.    The Stay Order Accords with This Court's Practices ...................... 16

III.    The Stay Does Not Warrant En Banc Consideration ...................... 18

CONCLUSION ............................................................................................ 19

# TABLE OF AUTHORITIES

**CASES**

*In re A & F Enters.*
742 F.3d 763 (7th Cir. 2014) ......................................................... 6, 7, 17

*Abbott v. Perez,*
585 U.S. 579 (2018) ................................................................... 8

*AM Gen. Corp. v. DaimlerChrysler Corp.,*
311 F.3d 796 (7th Cir. 2002) ...................................................... 7

*Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.,*
14 F.4th 624 (7th Cir. 2021) ....................................................... 8

*Cannon v. Armstrong Containers Inc.,*
92 F.4th 688 (7th Cir. 2024) ....................................................... 18

*Deering Milliken, Inc. v. FTC,*
647 F.2d 1124 (D.C. Cir. 1978) ................................................... 16

*Easley v. Reuss,*
532 F.3d 592 (7th Cir. 2008) ...................................................... 18, 19

*EEOC v. Ind. Bell Tel. Co.,*
256 F.3d 516 (7th Cir. 2001) ...................................................... 18

*Eknes-Tucker v. Governor of Ala.,*
80 F.4th 1205 (11th Cir. 2023) ................................................... 7, 11

*Eknes-Tucker v. Governor of Ala.,*
No. 22-11707 (11th Cir. Jan. 11, 2024) ...................................... 1, 8, 16

*Frank v. Walker,*
766 F.3d 755 (7th Cir. 2014) ...................................................... 16

*Frank v. Walker,*
769 F.3d 494 (7th Cir. 2014) ...................................................... 7, 8

*Gonzales v. Carhart,*
550 U.S. 124 (2007) .................................................................. 1, 13, 14

*HM Holdings, Inc. v. Rankin,*
72 F.3d 562 (7th Cir. 1995) ........................................................ 18

CASES [CONT'D]

*Ill. Republican Party v. Pritzker,*
    973 F.3d 760 (7th Cir. 2020) ................................................................. 7

*L.W. by Williams v. Skrmetti,*
    73 F.4th 408 (6th Cir. 2023) ............................................................... 11

*L.W. by Williams v. Skrmetti,*
    83 F.4th 460 (6th Cir. 2023) ............................. 1, 8, 9, 11, 12, 13

*Maryland v. King,*
    567 U.S. 1301 (2012) ............................................................................. 8

*Mitchell v. JCG Indus., Inc.,*
    753 F.3d 695 (7th Cir. 2014) ............................................................... 18

*Nat. Res. Def. Council, Inc. v. Winter,*
    518 F.3d 704 (9th Cir. 2008) ............................................................... 16

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977) ............................................................................. 8

*New York v. Ferber,*
    458 U.S. 747 (1982) ............................................................................... 8

*Nken v. Holder,*
    556 U.S. 418 (2009) ....................................................................... 17, 18

*Planned Parenthood of Blue Ridge v. Camblos,*
    116 F.3d 707 (4th Cir. 1997) ............................................................... 18

*In re StarNet, Inc.,*
    355 F.3d 634 (7th Cir. 2004) ............................................................... 16

*Stone v. Signode Indus. Grp. LLC,*
    777 F. App'x 170 (7th Cir. 2019) ....................................................... 16

*To-Am Equip. Co. v. Mitsubishi Caterpillar Forklift Am., Inc.,*
    152 F.3d 658 (7th Cir. 1998) ............................................................... 7

*United States v. Rosciano,*
    499 F.2d 173 (7th Cir. 1974) ............................................................... 18

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ............................................................................. 14

**STATUTES**

Ind. Code § 25-1-22-4 ....................................................................... 3

Ind. Code § 25-1-22-5(a) ........................................................... 2, 3, 16

Ind. Code § 25-1-22-5(a)(2) .............................................................. 13

Ind. Code § 25-1-22-5(b) ................................................................. 3, 4

Ind. Code § 25-1-22-5(b)(3) ........................................................ 14, 16

Ind. Code § 25-1-22-5(b)(4) .............................................................. 14

Ind. Code § 25-1-22-5(b)(5) .............................................................. 12

Ind. Code § 25-1-22-11 ...................................................................... 2

Ind. Code § 25-1-22-12 ...................................................................... 2

Ind. Code § 25-1-22-13(a) ......................................................... 2, 12, 15

Ind. Code § 25-1-22-13(b) ............................................................ 2, 15

Ind. Code § 25-1-22-13(c) ................................................................. 4

Ind. Code § 25-1-22-13(c)(3) ....................................................... 14, 16

Ind. Code § 25-1-22-13(d) ......................................................... 4, 6, 15

Ind. Code § 25-22.5-2-7 .................................................................. 14

**OTHER AUTHORITIES**

7th Cir. R. 32.1(b) ......................................................................... 18

844 Ind. Admin. Code 5-1-3 ............................................................ 14

Fed. R. App. P. 2(a) ....................................................................... 17

Fed. R. App. P. 8(a)(1)(C) ............................................................... 17

Fed. R. App. P. 8(a)(2) .................................................................... 17

*Gender Health Program*, Riley Children's Health, Indiana University
Health, https://www.rileychildrens.org/departments/gender-health-
program (last visited Mar. 5, 2024) ................................................. 12

# INTRODUCTION

After full briefing and oral argument, the panel stayed a preliminary injunction preventing enforcement of Indiana's S.E.A. 480. That stay—like the underlying statute—is critical to preserving the "safety and well-being of [Indiana] children." *Eknes-Tucker v. Gov. of Alabama*, 80 F.4th 1205, 1231 (11th Cir. 2023).

S.E.A. 480 represents a traditional exercise of state authority to regulate medicine where the science is "uncertain[]" and evolving. *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). It prohibits medical practitioners from providing gender-transition procedures—procedures to remove or replace endogenous sex characteristics through surgeries or medications—to minors 17 and younger. It, however, does not ban all treatments for gender dysphoria. S.E.A. 480 only restricts potentially irreversible interventions so new and untested that their "safety and effectiveness" remains "uncertain and unsettled." SA23; *see L.W. by Williams v. Skrmetti*, 83 F.4th 460, 488 (6th Cir. 2023) (procedures are "unsettled, developing, [and] in truth still experimental").

By permitting S.E.A. 480's enforcement, the stay represents an application of traditional practices and standards. This Court has previously stayed injunctions after argument where the merits and equities are clear. And the stay here simply reflects the majority's evident conclusion that S.E.A. 480 is a valid, democratically adopted statute that protects children from risky, unproven interventions while still permitting widely used methods of caring for children with gender dysphoria.

There is no merit to Plaintiffs-Appellees' suggestion that S.E.A. 480's (now expired) safe harbor requires further delay so that minors can continue receiving

gender-transition procedures. That safe harbor was designed to remove any doubt that physicians seeking to *end* those procedures could taper hormones to avoid potential complications—something physicians can still do today. It was never designed to allow harmful, unproven procedures to continue.

Reconsideration of the non-precedential stay order is unwarranted.

## BACKGROUND

### I.    Factual Background

Indiana S.E.A. 480 generally prohibits licensed medical practitioners from "knowingly provid[ing]," or aiding or abetting another practitioner in providing, "gender transition procedures to a minor." Ind. Code § 25-1-22-13(a), (b). "[G]ender transition procedures" are procedures that "seek[] to" "(1) alter or remove physical or anatomical characteristics or features that are typical for the individual's sex" or "(2) instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex." § 25-1-22-5(a). "Sex" refers to "the biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." § 25-1-22-12.

As defined, gender-transition procedures include using GnRH analogues, also called puberty blockers, to prevent minors from undergoing puberty at a normal age and developing endogenous sex characteristics (*e.g.*, facial hair in natal males and breasts in natal females). *See* Ind. Code §§ 25-1-22-5(a); 25-1-22-11; Dkt. 48-2 at 14–15, 33–34 (Hruz Decl. ¶¶ 25, 59); Dkt. 26-2 at 13–15 (Shumer Decl. ¶¶ 54, 57–58). GnRH analogues are drugs approved by the FDA for central precocious puberty, a

rare disorder in which children undergo puberty too early. Dkt. 48-2 at 20–22, 24 (Hruz Decl. ¶¶ 36–37, 39, 43). GnRH analogues are not FDA approved for gender dysphoria, Dkt. 48-4 at 18 (Weiss Decl. ¶ 86), a psychiatric condition marked by "clinically significant distress" with one's sex, Dkt. 49-4 at 7–8 (DSM-5 TR 3–4).

Gender-transition procedures also include the use of hormones to instill sex characteristics that a minor would not endogenously develop. *See* Ind. Code §§ 25-1-22-4, 25-1-22-5(a). Naturally, males produce testosterone as their principal sex hormone while females produce estrogen as their principal sex hormone. Dkt. 48-4 at 23 (Weiss Decl. ¶¶ 107–08); Dkt. 48-2 at 17 (Hruz Decl. ¶ 29). This difference contributes to males and females developing different anatomical and physical characteristics. Dkt. 48-2 at 16–20 (Hruz Decl. ¶¶ 27–34). When cross-sex hormones are prescribed for gender dysphoria, physicians give females doses of testosterone 20–40 times higher than their normal levels to induce typical male characteristics, such as lower voice and facial hair, and give males doses of estrogen about 5 times higher than their normal levels to induce typical female characteristics, such as breasts, female fat distribution, and softer skin. Dkt. 48-4 at 23 (Weiss Decl. ¶¶ 107–08); Dkt. 48-2 at 39–40, 42 (Hruz Decl. ¶¶ 68, 73). This use of hormones is not FDA approved either.

Notwithstanding S.E.A. 480's general prohibition on gender-transition procedures for minors, it permits (1) services for "a disorder or condition of sexual development," (2) services for a "physical disorder, physical injury, or physical illness," (3) services for "any infection, injury, disease, or disorder" attributable to gender-transition procedures, and (4) "[m]ental health or social services." Ind. Code §§ 25-1-

3

22-5(b), 25-1-22-13(c). S.E.A. 480 also permitted practitioners to "continue to pre-scribe to an individual, who was taking a gender transition hormone therapy on June 30, 2023, as part of a gender transition procedure, gender transition hormone therapy until December 31, 2023." § 25-1-22-13(d). S.E.A. 480, however, did not delay the ef-fective date of any other provision, including its aiding-and-abetting provision.

## II.    Procedural Background

In April 2023, plaintiffs—four transgender minors, their parents, a physician who provides gender-transition procedures, and her medical practice—challenged S.E.A. 480 and sought a preliminary injunction. Dkt. 1 at 3–4 (¶¶ 7–16); Dkt. 9. Plain-tiffs alleged that (among other things) S.E.A. 480 violates equal protection and the First Amendment. Dkt. 1 at 42–45 (¶¶ 212–23).

### A.    District court proceedings

The district court preliminarily enjoined enforcement of S.E.A. 480's prohibi-tions on providing puberty blockers and hormones to minors for gender transitions, concluding plaintiffs had "some likelihood of success" on their equal-protection claim. SA2. The court deemed S.E.A. 480's prohibition of gender-transition procedures to be overbroad, citing evidence that "some minors" benefit from the procedures and that some European authorities have permitted "limited" use of the procedures for minors in "'formal research'" and "'clinical trials.'" SA26–SA27, SA30. The court, however, admitted that S.E.A. 480 does not favor one sex over the other; it "prohibits both male and female minors from using puberty blockers and cross-sex hormone therapy for gender transitions." SA18–SA20. And the court admitted that "there are important

reasons underlying" S.E.A. 480, observing that gender-transition procedures for minors carry numerous risks, that "high-quality medical research" on the procedures is "exceptionally limited," and that the procedures' "long term effects" are "currently unknown." SA1–SA2, SA22–SA23 (cleaned up). "[T]he safety and effectiveness of puberty blockers and hormone therapy is uncertain and unsettled." SA23.

The district court also enjoined enforcement of S.E.A. 480's prohibition on aiding and abetting gender-transition procedures for minors to the extent it applies "to providing patients with information, making referrals to other medical providers, or providing medical records and other information to medical providers." SA35. It deemed plaintiffs to have shown "some likelihood" that applying the aiding-and-abetting provision to these actions would violate the First Amendment. SA29. The court rejected arguments that S.E.A. 480 prohibits only speech "incidental to separate, prohibited conduct," explaining that "Plaintiffs have some likelihood of success on challenges to other portions of S.E.A. 480 as well." SA28–SA29. The court concluded that the remaining factors relevant to injunctive relief favored plaintiffs for the same reasons it thought they had some likelihood of succeeding on the merits. SA30–SA32.

## B.   Appellate proceedings

This appeal of the preliminary injunction followed. During briefing, the parties addressed both the merits and the equitable considerations governing preliminary injunctions (irreparable harm, balance of equities, and public interest). Opening Br. at 3–4 (stating the issues on appeal); Response Br. at 2–3 (same).

After briefing and oral argument, the panel stayed the preliminary injunction on February 27, 2024. 7th Cir. Doc. 124 at 1–2. It indicated that an opinion and judgment would follow. *Id.* at 2. As later recorded in a separate order, Judge Jackson-Akiwumi dissented. 7th Cir. Doc. 127 at 2. Plaintiffs sought reconsideration of the stay and en banc consideration. 7th Cir. Doc. 125; *see* 7th Cir. Doc. 126 (ordering the filing to be treated as "a motion to reconsider and request for en banc consideration").[1]

On March 1, 2024, the panel requested a response that addressed (among other things) "(1) whether a 'grace period' similar to that referenced in Ind. Code § 25-1-22-13(d) should be built into this court's stay; and (2) whether another approach would accomplish the end of Ind. Code § 25-1-22-13(d)." 7th Cir. Doc. 127 at 1–2. Judge Jackson-Akiwumi "dissent[ed]" from that order on the ground that it did "not request full briefing from both parties on whether a stay should issue." *Id.* at 2.

## ARGUMENT

## I. The Traditional Standards for a Stay Are Satisfied

Plaintiffs-Appellees provide no persuasive reason to reconsider the stay order, much less review it en banc. "The standard for granting a stay pending appeal mirrors that for granting a preliminary injunction." *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). It requires consideration of "likelihood of success on the merits, the irreparable harm that will result to each side if the stay is either granted or

---

[1] In light of this Court's order that the filing be treated as "a motion," 7th Cir. Doc. 126, the State understands that the rules governing motions apply here.

denied in error, and whether the public interest favors one side or the other." *Id.* Each of these considerations is satisfied here.

### A.  Plaintiffs-Appellees' request for reconsideration fails to address the most critical consideration—success on the merits

The "first and most important question" in evaluating the stay—and for that matter, the underlying preliminary injunction—is the parties' relative chances on the merits. *Frank v. Walker*, 769 F.3d 494, 495–96 (7th Cir. 2014); *see Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020) (a preliminary injunction requires a "strong" showing of success). The stronger the State's chances of success, the less critical other factors are. *See A & F Enters.*, 742 F.3d at 766. A preliminary injunction cannot be maintained if the party that obtained it has "no likelihood of success." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 830 (7th Cir. 2002).

In a footnote, Plaintiffs-Appellees assert that the State is "unlikely to succeed on the merits" for the reasons stated their "brief." Mot. 11 n.4. But the panel considered that brief, and at least a majority was not persuaded by it. Plaintiffs-Appellees' footnote provides no reason to doubt that, at the very least, the State has "a strong prospect of success on appeal." *Frank*, 769 F.3d at 496; *see To-Am Equip. Co. v. Mitsubishi Caterpillar Forklift Am., Inc.*, 152 F.3d 658, 663 (7th Cir. 1998) (holding that an assertion "buried in footnote" did not preserve a claim of error).

This, moreover, is not a case in which a stay order was entered after limited briefing on a tight timeline that afforded scant opportunity for deliberation. The stay was entered only after the panel considered full merits briefing and heard oral argument from both sides. 7th Cir. Doc. 124 at 1. And the majority's assessment of the

merits is consistent with thorough opinions from the Sixth and Eleventh Circuits up-

holding statutes similar to S.E.A. 480. *See L.W. by Williams v. Skrmetti*, 83 F.4th 460

(6th Cir. 2023); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205 (11th Cir. 2023).

## B. The stay is necessary to prevent irreparable harm to the State, third parties, and the public interest

Plaintiffs-Appellees nonetheless accuse the panel of ignoring other stay fac-

tors, arguing that the "State presented no argument that it was harmed by the pre-

liminary injunction during . . . the appeal." Mot. 1–2, 11. That is incorrect: As the

State explained, the injunction irreparably harms the State, third parties, and the

public with every day that passes. Opening Br. at 49–51; Reply at 24–26.

Most obviously, the injunction "inflicts irreparable harm on the State" by pre-

venting "enforc[ement]" of a "duly enacted" statute. *Abbott v. Perez*, 585 U.S. 579, 602

n.17 (2018). As this Court has recognized, there is a strong "public interest in using

laws enacted through the democratic process." *Frank*, 769 F.3d at 496; *see Camelot

Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 14 F.4th 624, 634 (7th Cir. 2021).

"'[A]ny time a State is enjoined by a court from effectuating statutes enacted by rep-

resentatives of its people, it [thus] suffers a form of irreparable injury.'" *Maryland v.

King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). The stay mitigates that

harm.

No less important, a stay prevents irreparable harm to the State's—and the

public's—interest in "safeguarding the physical and psychological well-being" of "mi-

nor[s]." *New York v. Ferber*, 458 U.S. 747, 756–57 (1982). As the district court ob-

served, the "safety and effectiveness of puberty blockers and hormone therapy is

uncertain and unsettled." SA23. Children face real harm from these procedures—including risks of damaged bones, stroke, and infertility. SA22–SA23; *see* Dkt. 48-2 at 29–30, 35–38, 45–46 (Hruz Decl. ¶¶ 51–52, 54, 61–66, 79); Dkt. 48-4 at 20–21 (Weiss Decl. ¶¶ 87, 92, 96); Dkt. 49-5 at 14 (NICE GnRH Review 13); Dkt. 49-6 at 15 (NICE Hormones Review 14); Dkt. 49-9 at 7 (COHERE Review 6); Dkt. 49-10 at 13 (Swedish Review 12). Even proponents concede that the procedures carry risks for "bone mineralization," "compromised fertility," and "unknown effects on brain development." Dkt. 49-1 at 15 (Endocrine Society 3882); *see* Dkt. 49-3 at 60, 64, 68–69 (WPATH SOC-8 S57, S61, S65–S66). And the irreversibility of changes adds to the risk. All sides agree that cross-sex hormones cause a variety of "permanent" changes to minors' bodies. Dkt. 48-11 at 18 (Turban Dep. 61:6–15); *see* Dkt. 49-1 at 16, 20 (Endocrine Society 3883, 3887); Dkt. 49-3 at 121–22 (WPATH SOC-8 at S118–19).

Meanwhile, no controlled trials assess the safety of using GnRH analogues and hormones for gender transitions in minors—a relatively "novel" use. *L.W.*, 83 F.4th at 488, 491. As the district court summarized, "high-quality medical research" on using blockers to "delay puberty past a typical age is exceptionally limited." SA22–23; *see* Dkt. 49-5 at 13–15 (NICE GnRH Review 12–14); Dkt. 49-9 at 9 (COHERE Review 8); Dkt. 49-10 at 13 (Swedish Review 12). And the "'long term effect[s]'" of "cross-sex hormones for gender transitions are 'currently unknown.'" SA23; *see* Dkt. 49-6 at 14–15 (NICE Hormones Review 13–14); Dkt. 49-10 at 14 (Swedish Review 13). "Indeed, the consensus from all sides is that more research is needed to explore these risks." SA23; *see* Dkt. 49-1 at 14, 16 (Endocrine Society 3881, 3883) (rating research as "low"

or "very low" quality); Dkt. 49-3 at 68 (WPATH SOC-8 S65) (noting "limited data" on "long-term physical, psychological, and neurodevelopmental outcomes in youth").

There is no reliable evidence of benefit to minors either. Dkt. 48-1 at 28, 30 (Cantor Decl. ¶¶ 44, 52). As several independent reviews have observed, what little research exists is beset by severe "methodological weaknesses." Dkt. 49-10 at 10–11 (Swedish Review 9–10); *see* Dkt. 49-5 at 41–42, 45 (NICE GnRH Review 40–41, 44); Dkt. 49-6 at 15, 48, 51 (NICE Hormone Review 14, 47, 50). Multiple systematic reviews of the scientific literature have thus concluded that the "[l]ong-term effects" of gender-transition procedures on both physical and mental health are "unknown." Dkt. 49-10 at 13–14 (Swedish Review 12–13); *see* Dkt. 48-1 at 39 (Cantor Decl. ¶ 74) ("there is great uncertainty about the effects" (quoting Brignardello-Petersen & Wiercioch 2022)); Dkt. 48-1 at 44 (Cantor Decl. ¶ 83) ("We found insufficient evidence to determine the efficacy or safety" (quoting Haupt 2020)); Dkt. 48-1 at 21 (Cantor Decl. ¶ 30) (Norway's 2023 review deemed the interventions "experimental").

And even if one believes the anecdotal experiences cited by the district court suggest that "some minors" will benefit from gender-transition procedures, SA30, no one can know which minors those are. All studies of prepubertal children report that up to 88% will no longer identify with the opposite gender by adolescence. Dkt. 48-1 at 59 (Cantor Decl. ¶ 115). And while Plaintiffs-Appellees dispute whether these numbers hold true for older children, they concede that adolescents' gender identity can "change[] over time." Dkt. 48-8 at 13 (Bast Dep. 44:13–20); *see* Dkt. 26-2 at 6 (Shumer Decl. ¶ 28). The upshot is that it is impossible to determine which minors

will later come to regret these medical interventions even if they seek them now. For "[w]ith current knowledge, we cannot predict the psychosexual outcome for any specific child." Dkt. 49-1 at 9 (Endocrine Society 3876).

The stay thus not only prevents irreparable harm to the State's interest in enforcing its laws, but also to its interest in protecting developing minors from unproven, risky, and potentially irreversible interventions. *See L.W.*, 83 F.4th at 491 (staying injunction); *Eknes-Tucker*, 80 F.4th at 1231 (vacating injunction). True, the State may not have sought emergency relief from the injunction. *See* Mot. 13. (It did not dawdle either, seeking only a seven-day extension for its reply after losing lead counsel while facing multiple deadlines. 7th Cir. Doc. 58-1 at 2–3.) But that does not erase the harm the injunction inflicts on the State, Indiana children, or the public. The panel's stay is consistent with stays by other courts. *See L.W. by Williams v. Skrmetti*, 73 F.4th 408 (6th Cir. 2023) (staying preliminary injunction pending appeal); Order, *Eknes-Tucker v. Governor of Ala.*, No. 22-11707 (11th Cir. Jan. 11, 2024) (staying injunction after decision while rehearing petitions were pending).

## C. No alleged harms to Plaintiffs-Appellees undermine the stay

No other considerations cut against a stay. The stay is not causing harm to minors by preventing access to gender-transition procedures precisely because their "safety and effectiveness" is "unsettled and uncertain." SA23; *see* pp. 8–11, *supra*. Indeed, one study correlates cross-sex hormones with increased risk of suicide among gender-dysphoric youth. Dkt. 48-1 at 72–73 (Cantor Decl. ¶¶ 146–150).

Nor does the stay require minors with gender dysphoria to go "untreated." Mot. 6. "[N]o one doubts" that these minors should receive "psychological and related care." *L.W.*, 83 F.4th at 491. S.E.A. 480 authorizes social support and mental-health care for minors with gender dysphoria, *see* Ind. Code §§ 25-1-22-5(b)(5), 25-1-22-13(a), which Indiana providers have continued to offer since the stay issued, *see, e.g.*, *Gender Health Program*, Riley Children's Health, Indiana University Health, https://www.rileychildrens.org/departments/gender-health-program (last visited Mar. 5, 2024). The only interventions for gender dysphoria in minors that S.E.A. 480 bans are risky, irreversible interventions that lack reliable supporting evidence.

The non-invasive treatments for gender dysphoria that S.E.A. 480 expressly permits cannot be dismissed offhand. *Contra* Mot. 9, 10 n.3. Psychosocial support and psychotherapy have been used in treating gender-dysphoric minors for years, especially by the Dutch, with articles reporting beneficial results. *See* Dkt. 48-1 at 83–89 (Cantor Decl. ¶¶ 186–99) (describing six studies that confounded medical interventions with psychotherapy and two that specifically found no advantage of medical interventions over psychotherapy); Dkt. 49-10 at 5 (Swedish Review 4) (explaining that studies purporting to find benefits from medical interventions "do not allow separation of potential effects of psychological intervention"). Several European authorities now "endorse psychotherapy as the treatment of choice for minors." Dkt. 48-1at 14 (Cantor Decl. ¶ 16). And even Plaintiffs-Appellees' witnesses agree that "psychotherapy" is "very valuable for a lot of people" with gender dysphoria. Dkt. 48-9 at 22 (Karasic Dep. 76:18–24); *see* Dkt. 48-11 at 59–60 (Turban Dep. 228:16–229:1)

(admitting psychotherapy "helped" patients with co-morbidities); Dkt. 48-8 at 21 (Bast Dep. 75:9–10) (acknowledging Mosaic provides mental-health interventions).

Plaintiffs-Appellees still say mental-health interventions for gender dysphoria are not "evidence-based." Mot. 9, 10 n.3. Whatever is meant by that, gender-transition procedures cannot claim to be evidence-based either. Multiple systematic reviews— which represent the apex of medical knowledge—have concluded that the safety and purported effectiveness of using GnRH analogues and hormones for gender dysphoria in minors is "unknown." SA23; *see* pp. 9–10, *supra*. And so Indiana "may reasonably exercise caution," opting for less-invasive approaches over riskier approaches with "irreversible" consequences. *L.W.*, 83 F.4th at 477. The Constitution gives States "wide discretion" to make these cost-benefit calls in areas fraught with "medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007).

The stay does not prevent providers from taking steps needed to safely *end* gender-transition procedures either. As Plaintiffs-Appellees observe, hormone doses may need to be titrated down rather than immediately stopped. Mot. 5–6. S.E.A. 480 accommodates that need. It prohibits only procedures that "seek[] to" (1) "alter or remove physical or anatomical characteristics or features that are typical for the individual's sex" or (2) "instill or create physiological or anatomical characteristics that resemble a sex different from that individual's sex." Ind. Code § 25-1-22-5(a)(2). It does not prevent providers from titrating down hormones for the purpose of safely *ending* a gender-transition procedure. Indeed, for the avoidance of doubt, S.E.A. 480 expressly permits the "treatment of any infection, injury, disease, or disorder that

has been caused by or exacerbated by . . . gender transition procedures." *Id.* §§ 25-1-22-5(b)(3), 25-1-22-13(c)(3); *see id.* § 25-1-22-5(b)(4) (further clarifying that providers may provide "[a]ny medical" service needed to prevent "imminent danger of death or impairment of major bodily function"). The stay does not harm minors.

Plaintiffs-Appellees identify no distinct harms to parents or providers. All alleged harms to those groups wrongly presume that gender-transition procedures for minors are safe, that they are effective, and that no alternative exists. *See* Mot. 7–10. Neither parents nor providers can claim a cognizable injury from being unable to secure procedures for minors that cause them harm and have no proven long-term benefits. The lack of evidence undergirding gender-transition procedures for minors is a full answer to the parents' and providers' concerns about being unable to secure them.

The notion that the stay requires a violation of providers' "ethical duties," Mot. 9, is specious. That allegation presumes that providers have an ethical duty to violate federal and state regulations on medicine. As courts have long recognized, however, States have a "significant role" in "regulating the medical profession" and determining what its "ethics" should be. *Gonzales*, 550 U.S. at 157 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 713 (1997)). The Indiana regulations that Plaintiffs-Appellees cite reflect this reality. Far from permitting providers to violate Indiana laws based on their own subjective assessments of propriety, the regulations require providers to follow "standards of conduct and practice established by statute." 844 Ind. Admin. Code 5-1-3; *see* Ind. Code § 25-22.5-2-7. Those "statute[s]" include S.E.A. 480.

### D. Indiana Code § 25-1-22-13(d) does not support a blanket delay

The stay accords with Indiana Code § 25-1-22-13(d) as well. That provision permitted practitioners to "continue to prescribe to an individual, who was taking a gender transition hormone therapy on June 30, 2023, as part of a gender transition procedure, gender transition hormone therapy until December 31, 2023." § 25-1-22-13(d). That provision sought to avoid any doubts that physicians could safely end gender-transition procedures by titrating down hormones.

Contrary to Plaintiffs-Appellees' suggestion, however, § 25-1-22-13(d) was never designed to allow covered adolescents to arrange to receive gender-transition procedures elsewhere or to "permit doctors to refer patients" for those procedures. Mot. 5, 14. Even between June 30, 2023, and December 31, 2023, S.E.A. 480 prohibited medical professionals from aiding and abetting transitioning procedures, including by referrals. Ind. Code § 25-1-22-13(a)–(b). And S.E.A. 480 did not delay the implementation of its prohibition against prescribing GnRH analogues (puberty blockers) or surgeries. S.E.A. 480 cannot be read to endorse the continuation of cross-sex hormones for minors beyond what is necessary to end the procedure.

Plaintiffs-Appellees' request for a blanket delay of S.E.A. 480's effective date would thus give them far more than § 25-1-22-13(d) ever did. And Plaintiffs-Appellees nowhere disclaim that they would again ask for similar delays if S.E.A. 480 is later enjoined and the injunction is again lifted. Rather than pave the way for perpetual delay, the Court could simply clarify—to the extent any clarification is needed—that S.E.A. 480 already allows providers to titrate down hormones to end a gender-

transition procedure. That use of hormones does not "seek[] to" accomplish what S.E.A. 480 prohibits—altering physical characteristics to resemble another sex's— but instead "treats" an "injury, disease, or disorder . . . caused by . . . gender transition procedures." Ind. Code §§ 25-1-22-5(a), (b)(3), 25-1-22-13(c)(3).

## II. The Stay Order Accords with This Court's Practices

That leaves Plaintiffs-Appellees' procedural objection that it was improper to issue a "stay sua sponte in advance of an opinion on the merits." Mot. 12. But nothing in the Federal Rules of Appellate Procedure, this Court's rules and operating procedures, or this Court's practice bars a panel from issuing a sua sponte stay after oral argument but before an opinion. This Court and others have issued stays in similar circumstances before. *See, e.g.*, *Frank v. Walker*, 766 F.3d 755, 756 (7th Cir. 2014) (issuing stay after oral argument); *In re StarNet, Inc.*, 355 F.3d 634, 636 (7th Cir. 2004) (issuing stay sua sponte after oral argument despite denying a prior stay motion); *Eknes-Tucker v. Governor of Ala.*, No. 22-11707 (11th Cir. Jan. 11, 2024) (staying injunction after decision while rehearing petitions were pending); *Nat. Res. Def. Council, Inc. v. Winter*, 518 F.3d 704, 705 (9th Cir. 2008) (affirming injunction but partially and temporarily staying it sua sponte); *Deering Milliken, Inc. v. FTC*, 647 F.2d 1124, 1126, 1129 (D.C. Cir. 1978) (staying orders sua sponte); *cf. Stone v. Signode Indus. Grp. LLC*, 777 F. App'x 170 (7th Cir. 2019) (vacating stay of injunction sua sponte after oral argument). Plaintiffs-Appellees identify no contrary authority.

Instead, Plaintiffs-Appellees emphasize that the panel's stay afforded them less time to "prepare[] for the possibility that SEA 480" could take effect than would

a final judgment on the merits. Mot. 1, 12–13. That constitutes an objection to the concept of a stay. Stays are designed to "suspend[]" or "modify[]" an injunction "while an appeal is pending." Fed. R. App. P. 8(a)(1)(C); *see* Fed. R. App. P. 8(a)(2). This feature of stays allows the Court to "minimize the costs of error" from erroneously issued injunctions. *A & F Enters.*, 742 F.3d at 766. Prohibiting panels from issuing stays after argument would multiply the costs of error by prolonging an injunction even after it becomes transparent that the injunction should never have issued.

That the stay issued sua sponte does not change the analysis. The Federal Rules of Appellate Procedure expressly authorize a panel to act on its own motion to "expedite its decision or for other good cause." Fed. R. App. P. 2(a). So it was appropriate for the panel to issue a stay once it concluded that S.E.A. 480 was valid to minimize the injunction's harms to the State, Indiana children, and the public. Plaintiffs-Appellees, moreover, cannot contend that they lacked an opportunity to be heard on considerations relevant to a stay. The panel entered a stay only after considering briefs and oral argument addressing the same factors that this Court considers in granting a stay—the parties' chances of success on the merits, the harms to both sides, and the public interest. *See A & F Enters.*, 742 F.3d at 766.

Nor can delay of S.E.A. 480 be justified on the theory that the panel's stay constitutes a sudden interruption of the "status quo." Mot. 3, 11. The preliminary injunction Plaintiffs-Appellees received was only a preliminary form of relief, defeasible by a stay, reversal on appeal, or final judgment. And it did not establish a new baseline. Rather, the district court's injunction "'*alter[ed]* the legal status quo" while

the panel's stay prevents "'judicial alteration'" of it. *Nken v. Holder*, 556 U.S. 418, 429 (2009). "[T]he status quo is that which the People have wrought, not that which unaccountable federal judges impose upon them." *Planned Parenthood of Blue Ridge v. Camblos*, 116 F.3d 707, 721 (4th Cir. 1997).

### III.    The Stay Does Not Warrant En Banc Consideration

Regardless, the stay does not warrant en banc consideration. As reflected in Federal Rule of Appellate Procedure 35, the standards for en banc consideration are "'strict.'" *Cannon v. Armstrong Containers Inc.*, 92 F.4th 688, 714 n.12 (7th Cir. 2024) (quoting *HM Holdings, Inc. v. Rankin*, 72 F.3d 562, 562 (7th Cir. 1995)). The "'function of en banc hearings is not to review alleged errors,'" *HM Holdings*, 72 F.3d at 563 (quoting *United States v. Rosciano*, 499 F.2d 173, 174 (7th Cir. 1974)), "even in cases that particularly agitate judges," *EEOC v. Ind. Bell Tel. Co.*, 256 F.3d 516, 529 (7th Cir. 2001) (en banc) (Posner, J., concurring). "Otherwise every case in which the panel was divided could provoke" a request for en banc consideration, consuming the full Court's time and resources. *Mitchell v. JCG Indus., Inc.*, 753 F.3d 695, 699 (7th Cir. 2014) (Posner, J., concurring in denial of rehearing en banc). Instead, en banc proceedings "are designed to address issues that affect the integrity of the circuit's case law (intra-circuit conflicts) and the development of the law (questions of exceptional importance)." *Easley v. Reuss*, 532 F.3d 592, 594 (7th Cir. 2008).

The stay order does not meet these standards. That short, "nonprecedential" order does not announce any new principle of law or set any precedent. *See* 7th Cir. Doc. 124 at 1; Circuit R. 32.1(b). Nor does the order conflict with other decisions from

this Court or the Supreme Court. As discussed above, the order simply reflects that a majority concluded the traditional stay standards are met. *See* pp. 6–11, *supra*. The considerations of judicial economy underlying Appellate Rule 35 favor denying Plaintiffs-Appellees' request for en banc consideration as well. For the full Court to evaluate the stay, all members of the Court would have to familiarize themselves not only with this briefing on the stay order, but also with the merits briefing and the oral argument that the merits panel considered and that Plaintiffs-Appellees invoke. *See* 7th Cir. Doc. 124 at 1; Mot. 11 n.4. That would constitute a "'heavy burden,'" especially in the absence of a written explanation from the panel. *Easley*, 532 F.3d at 594. The Court would be better served by denying en banc consideration of the stay and awaiting any rehearing petition arising from the panel's forthcoming opinion.

## CONCLUSION

The request for reconsideration and en banc consideration should be denied.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana

/s/ James A. Barta
JAMES A. BARTA
Solicitor General

MELINDA R. HOLMES
Deputy Attorney General

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
James.Barta@atg.in.gov

**CERTIFICATE OF COMPLIANCE**

1.     This document complies with the type-volume limitations of Fed. R. App. P. 27(d)(2) because this document contains 5,068 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.     This document complies with the typeface requirements of Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 12-point font.

March 5, 2024                                    /s/ James A. Barta
                                                JAMES A. BARTA
                                                Solicitor General

**CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ James A. Barta
JAMES A. BARTA
Solicitor General

Office of the Indiana Attorney General
Indiana Government Center South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 232-0709
Facsimile: (317) 232-7979
James.Barta@atg.in.gov