IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

No. 23-2366

K.C., *et al.*,

Plaintiffs/Appellees,

v.

INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING
BOARD OR INDIANA, *et al.*

Defendants/Appellants

---

On Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:23-cv-00595-JPH-KMB,
The Honorable James P. Hanlon, Judge

---

**Supplemental Declaration of Catherine Bast, MD**

Catherine Bast, being duly sworn, declares that:

1.  I am a plaintiff in the above-captioned lawsuit and am a medical doctor at and a co-founder of Mosaic Health and Healing Arts, Inc., which is also a plaintiff.

2.  I currently treat approximately 70-80 transgender patients under the age of 18.

3.  Since the Court's order on Tuesday, February 27, 2024, I have been in the process of canceling appointments with patients who were scheduled to see me for treatment that is now prohibited under Indiana law. Beginning on Wednesday morning, my staff and I began to cancel about 30 appointments, beginning with those that were scheduled for last week.

4.  The calls I made to patients were some of the most difficult conversations I have ever had in my life. Every parent that I spoke with was in tears. They expressed to me that their children were distraught, experiencing anxiety, and some had not slept since the news of the Court's order. One mother conveyed to me that her son's anxiety medication stopped working and there was no way to calm his anxiety in light of the decision making his medical treatment in Indiana illegal.

5.  I felt that in every single phone call I was making, I was doing harm. As a doctor, I took an oath to do no harm but now I feel like I am abandoning my patients and taking them off their medication in ways that will lead to predictable harms and without any ability to provide them with continuity of care. Not only do I

believe that I am violating my ethical duties as a result of the Court's order, but I am certain that I am also violating federal law since the Affordable Care Act prohibits me from discriminating based on sex and requires that I at least refer patients to other providers when I myself cannot treat them.

6. In addition to the conversations that I had on the phone with families, I received about 8-10 messages through the online patient portal from other families. In these messages families asked specific questions about where they should go for care and asked about treating physicians in places like Michigan where gender-affirming medical treatment is not banned. These families were panicked but because of the "aid and abet" provision in the Indiana ban on treatment, all I could do was respond, "I am so sorry, but I cannot advise you about treatment."

7. Keeping critical medical information from patients goes against everything we learn as physicians. In medicine we work so hard to make information accessible and to ensure that there is continuity of care among providers.

8. In any other context, I would ensure that patients in this type of position would be connected with competent care out of state. For example, if I had a patient who was moving out of state and they had ongoing medical needs, I would work with them to identify and recommend providers out of state. I would explain the different options and help them figure out a plan that worked best for them. I would also ensure that they had a sufficient supply of medication to hold them over

during the period of time that care was being transferred. Once the patient had selected an out-of-state provider, I would then speak with that provider and send over the medical records. This type of exchange of information is critical for patient health.

9. I am terrified about what will happen to my dozens of adolescent patients with gender dysphoria who lost access to treatment overnight. No one should abruptly terminate hormone treatment and I fear that my patients will experience a range of mental health and physiological harms when they do not have access to their treatment. It is not safe to abruptly terminate, nor is there a protocol for abrupt termination of, hormone therapy. For each of my patients, I need to be able to either ensure that they have continuity of care elsewhere or advise them on how to titrate down on their current medication.

10. In addition to my patients receiving gender-affirming hormone therapy or puberty suppression by injection, I have about 15 patients with an implant for pubertal suppression. I need to ensure that these patients are able to connect with a provider out of state with the skill and experience to treat them. Because of the Court's order, I have not been able to do that.

11. I have close to 40 transgender adolescent patients who receive coverage for their medical treatment through Indiana Medicaid. These patients will not be able to receive care out of state through Medicaid as they are enrolled in Indiana's Medicaid program and not in the Medicaid program in any other state, and I am not aware of any out-of-state provider that accepts Indiana Medicaid. I

will therefore need to be able to advise these patients about titrating off of treatment and monitor their hormone levels during this period. Because of the Court's order, I cannot do that.

12. In addition to the very serious mental health harms that will result from cutting patients off from care, I am worried about the safety of many of my patients who have never lived or been known as any gender other than the one consistent with their gender identity. For these patients, the abrupt termination of treatment could lead to physical changes that not only will be extremely distressing but could also out them as transgender to the people in their lives who have no knowledge of their transgender status. This could lead to discrimination, harassment, and other threats to my patients' safety.

13. I am scared about the well-being of my patients. My heart breaks for them and for their parents. I am worried about what will happen if I cannot provide them with the appropriate advice, monitoring, and referrals. I have colleagues who have lost patients to suicide when this care has been cut off. I want to do everything in my power to treat the patients who I have cared for over many months and in some cases years.

14. In order to properly provide and oversee referrals for my patients or to titrate their medication down safely, I would need at least 90 days. I would work around the clock, filling in appointments wherever I could. I would do whatever it takes to protect the health and safety of transgender adolescents here in Indiana.

I swear under penalty of perjury that the foregoing is true and correct.

Date: 3/4/2024

_____
CATHERINE BAST, MD