In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 23-2366

K.C., et al.,

*Plaintiffs-Appellees,*

*v.*

INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD OF
INDIANA, et al.,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:23-cv-00595-JPH-KMB — **James P. Hanlon**, *Judge*.

———————————

ARGUED FEBRUARY 16, 2024 — DECIDED NOVEMBER 13, 2024

———————————

Before RIPPLE, BRENNAN, and JACKSON-AKIWUMI, *Circuit
Judges*.

BRENNAN, *Circuit Judge*. Indiana enacted a law prohibiting
its physicians from altering a child's sex characteristics
through medication or surgery as treatment for gender dys-
phoria. Some children who would receive the treatment if not
for the law argue that Indiana has deprived them of equal pro-
tection of the laws based on their sex or transgender status.

The parents argue it infringes a fundamental right to oversee their children's medical care because the law makes their consent legally irrelevant. And a physician argues Indiana's decision to extend enforcement to those who facilitate the banned treatment regulates her speech based on its content. The district court found that these arguments were likely to succeed and that a preliminary injunction was warranted. The state has appealed.

Courts have long permitted states to hold closely the power to regulate the practice of medicine. This power is strongest when the safety and effectiveness of the treatment is uncertain, as is true here. This appeal calls us to decide whether the Constitution says a regulation of the treatments for gender dysphoria is a step too far, withdrawing the question from the people forever.

## I.

### A. Clinical treatment of minors with puberty blockers and hormone therapy

At issue here are two medical treatments: puberty blockers, which delay the onset of puberty, and hormone therapy, which introduces one of the primary sex hormones into the body's endocrine system. For years, physicians working with children have used these treatments for disorders of sex development or puberty. More recently, physicians have begun using them to treat childhood gender dysphoria.

Used in their traditional setting, puberty blockers and hormone therapy correct a pubertal or hormonal abnormality. For example, puberty blockers are a common treatment for central precocious puberty, which occurs when puberty begins too early. *See* Kanthi Bangalore Krishna et al., *Use of*

*Gonadotropin-Releasing Hormone Analogs in Children: Update by an International Consortium*, 91 HORMONE RSCH. IN PÆDIATRICS 357, 357 (2019); Jadranka Popovic et al., *Gonadotropin-Releasing Hormone Analog Therapies for Children with Central Precocious Puberty in the United States*, 10 FRONTIERS IN PEDIATRICS, at 1, 2 (2022). Early onset of puberty can lead to serious physical consequences for the child, including shorter-than-expected height due to rapid acceleration of the skeleton, as well as behavioral difficulties. Popovic, *Gonadotropin-Releasing Hormone Analog Therapies*, at 2. By slowing puberty down, puberty blockers can allow a child to begin puberty at an appropriate age and avoid these problems. *Id.*

Another example is Klinefelter syndrome, which physicians sometimes treat with hormone therapy. This syndrome is a sex chromosome abnormality that affects boys. *See* Chang et al., *Morbidity in Klinefelter Syndrome and the Effect of Testosterone Treatment*, 184 AM. J. OF MED. GENETICS 344, 344 (2020). Although they enter puberty normally, these boys can experience an early cessation of puberty due to declining levels of testosterone. Anna Nordenström, *Puberty in Individuals with a Disorder of Sex Development*, 14 CURRENT OP. IN ENDOCRINE & METABOLIC RSCH. 42, 46 (2020). Klinefelter syndrome has been treated with testosterone supplementation since the 1960s, and hormone therapy has been proposed as a treatment since the 1940s, when Klinefelter was first described. Chang, *Morbidity in Klinefelter Syndrome*, at 344–45.

More recently, physicians have started using puberty blockers and hormone therapy for a new purpose: to treat gender dysphoria in minors approaching puberty. Gender dysphoria is the diagnostic term for the distress a person may feel in response to believing their gender identity does not

match their sex. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STA-
TISTICAL MANUAL OF MENTAL DISORDERS 511 (5th ed. text revi-
sion 2022).

There are psychological and medical treatments for gen-
der dysphoria. Social support and psychotherapy are widely
recognized approaches, Danyon Anderson et al., *Gender Dys-
phoria and Its Non-Surgical and Surgical Treatments*, 10 HEALTH
PSYCH. RSCH., at 4 (2022), including by both appellees and ap-
pellants. Medical organizations that broadly support inter-
ventions endorse psychosocial therapy for gender dysphoria.
*Id.* ("The WPATH recognizes that psychotherapy successfully
helps individuals with their gender identity without needing
hormone based medical therapy or gender affirmation sur-
gery.").

Physicians may also attempt to eliminate the distress asso-
ciated with gender dysphoria through three medical interven-
tions relevant here. In adolescents, this route typically begins
when a physician prescribes puberty blockers to prevent the
development of secondary sex characteristics. Then, physi-
cians can introduce the hormones biologically produced by
the opposite sex to induce those secondary sex characteristics.
And finally, a patient could undergo surgery to eliminate the
primary sex characteristics developed in utero and establish
the characteristics of the other sex through plastic surgery.

The efficacy and risks of the three medical interventions
are unclear. Some reports and studies provide reasons to be
cautious, emphasizing the medical interventions' usefulness
in effectuating a gender transition but not in treating the men-
tal health component. For example, one study found no "clin-
ically significant changes" in depression and anxiety among
minors prescribed hormone therapy within seven months of

their first visit. Annette L. Cantu et al., *Changes in Anxiety and Depression from Intake to First Follow-Up Among Transgender Youth in a Pediatric Endocrinology Clinic*, 5 TRANSGENDER HEALTH 196, 199 (2020). Other reports have noted the risks and side effects of interfering with puberty, one of the most critical developmental periods in a human being's life, when the gender dysphoria could be treated by other means. For example, a case study explored the devastating impacts on fertility and bone density in long-term use of puberty blockers. Ken C. Pang et al., *Long-term Puberty Suppression for a Nonbinary Teenager*, 145 PEDIATRICS, Feb. 2020, at 1, 2.

Other sources support medical interventions, saying they do treat the mental health symptoms effectively and that the side effects are comparable whether or not prescribed as treatment for gender dysphoria. One study, for example, found a statistical correlation between gender hormone therapy and lower suicidality. Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. ADOLESCENT HEALTH 643, 647 (2022). But the most influential voices in this group have been two professional organizations—the Endocrine Society and the World Professional Association for Transgender Health. They have promulgated treatment guidelines recommending that physicians use puberty blockers and hormone therapy to treat children with gender dysphoria at certain stages and after certain assessments. But these organizations have not evaded criticism. Some have expressed doubt about whether WPATH's guidelines actually reflect medical consensus as to treatments for gender dysphoria. *See Kosilek v. Spencer*, 774 F.3d 63, 87, 90 (1st Cir. 2014) (en banc) (holding a prison official did not act with deliberate indifference by failing to provide transgender

inmate with sex reassignment surgery, even where treating doctor did not follow WPATH standards of care because it was one of "two alternative courses of medical treatment"); *Gibson v. Collier*, 920 F.3d 212, 223 (5th Cir. 2019) ("[T]he WPATH Standards of Care do not reflect medical consensus," and "[t]here is no medical consensus that sex reassignment surgery is a necessary or even effective treatment for gender dysphoria.").

States have taken a variety of regulatory approaches in response to the debate over the medical treatments. These approaches group into three general camps. Some have decided the risks and efficacy are too unclear and have chosen to limit access to medical treatments to adults while protecting access to puberty blockers and hormone therapy when used to treat the disorders of sex development or puberty. *See, e.g.*, KY. REV. STAT. ANN. § 311.372(2) & (3). Others, believing the risk of harm to the patient to be greater than the risk of not treating gender dysphoria with medical interventions, have shielded from disclosure healthcare information related to the treatment. *See, e.g.*, CAL. CIV. CODE § 56.109. And others have chosen to wait.

**B.  Senate Enrolled Act 480**

In April 2023, Indiana stopped waiting and enacted Senate Enrolled Act 480. The law forbids medical practitioners from providing gender transition procedures to minors. IND. CODE § 25-1-22-13(a). Gender transition procedures are defined as medical interventions designed to "alter or remove" sex characteristics "typical for the individual's sex" or "instill or create" sex characteristics "that resemble a sex different from the individual's sex." *See id.* § 25-1-22-5(a).

SEA 480 concerns these procedures generally, but three interventions are at its core. *See id.* § 25-1-22-5(a)(2). First, puberty-blocking drugs. *Id.; id.* § 25-1-22-11. Second, hormone therapy. *Id.* §§ 25-1-22-5(a)(2); 25-1-22-4. Hormone therapy is defined as the provision of testosterone, estrogen, or progesterone in an amount greater than what a healthy person of that age and sex would naturally produce. *Id.* § 25-1-22-4. And third, gender reassignment surgery. *Id.* §§ 25-1-22-6; 25-1-22-8; 25-1-22-5(a)(2). The act prohibits both genital and non-genital surgical interventions.

SEA 480 also defines a gender transition procedure by what it is not. *See id.* § 25-1-22-5(b)(1)–(6). Those procedures necessary to correct a disorder of sex development or to treat an abnormality relating to sex, for example, are permitted. *Id.* § 25-1-22-5(b)(1), (2), (6). The law does not affect mental health or social services. *Id.* § 25-1-22-5(b)(5). And it does not limit a physician's ability to treat a minor injured by a gender transition procedure or to save the minor from imminent grievous harm. *Id.* § 25-1-22-5(b)(3), (4). SEA 480 also provides for secondary liability. One practitioner "may not aid or abet another" who is providing gender transition procedures to a minor. *Id.* § 25-1-22-13(b).

To illustrate: A male child with gender dysphoria could not receive puberty blockers, hormone therapy, or gender reassignment surgery as treatment for that diagnosis. But a male child with, for example, Klinefelter syndrome, could receive hormone therapy to supplement his natural development of testosterone.

### C. Appellees' challenge to SEA 480

On April 5, 2023, a group of transgender children, their parents, and a physician and her practice—Mosaic Health and Healing Arts, Inc.—sued the Indiana officials responsible for enforcing SEA 480.

They alleged SEA 480 violated the Equal Protection Clause, substantive due process, the First Amendment's Free Speech Clause, the Affordable Care Act, and the Medicaid statute. And they sought to represent three classes—minors who would be eligible for the treatment, parents of those minors, and Indiana physicians who would provide the banned treatment; and two subclasses—minors eligible for the treatment who receive Medicaid and physicians who provide the banned treatment who are Medicaid providers.

The next day the plaintiffs moved for a preliminary injunction. After briefing and a hearing, the district court granted the injunction in part on June 16, 2023. It considered three of the prohibitions within SEA 480: the non-surgical gender transition procedures, speech constituting aiding and abetting gender transition procedures, and gender reassignment surgery. Because no provider in Indiana performs gender reassignment surgery on minors, the district court found the plaintiffs lacked standing to challenge that prohibition and so declined to enjoin it. So, its injunction extended only to the first two.

Although the plaintiffs brought seven claims total, the district court discussed only two in its preliminary injunction order: the minor plaintiffs' Equal Protection Clause claim and the physicians' Free Speech Clause claim. The minor plaintiffs alleged that SEA 480 constituted a sex-based and transgender-

status-based classification. The district court concluded that they showed a likelihood of success on this claim because SEA 480 conditions the legality of a procedure on the patient's sex. On heightened review, it determined that SEA 480 serves an important interest but was far broader than necessary.

The physician plaintiffs alleged that SEA 480's secondary liability provision constituted a content-based regulation of protected speech; namely, medical-care communications. The court also concluded that these plaintiffs showed a likelihood of success on their Free Speech claim, as the aiding and abetting provision does not sweep in speech incidentally but targets it directly. Finally, the court decided that the balance of harms tilted in favor of entering the injunction.

On July 11, 2023, Indiana appealed from the district court's decision to enter the injunction. This court heard oral argument on February 16, 2024, and on February 27, stayed the district court's order and injunction. Indiana's law would have gone into effect had the district court not entered its injunction, so the stay allowed the state to enforce SEA 480 while this appeal proceeded. The factors this court weighed when evaluating the merits of the stay are the same as the factors for a preliminary injunction. *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 14 F.4th 624, 628 (7th Cir. 2021). So, our analysis below supports both our February 27 stay and our decision on Indiana's appeal.

## II.

Indiana challenges the district court's preliminary injunction. To earn the "extraordinary remedy" of a preliminary injunction, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), the party seeking the injunction must establish:

> [T]hat he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Id.* at 20. Legislative enactments touching on health and welfare receive a "strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993) (upholding laws providing for procedures governing commitment of mentally disabled persons). And "in areas where there is medical and scientific uncertainty," the courts give legislatures "wide discretion" in crafting a response. *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007).

When evaluating a preliminary injunction, "we review the district court's findings of fact for clear error, its legal conclusions de novo, and its balancing of the factors for a preliminary injunction for abuse of discretion." *Doe v. Univ. of So. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (brackets and quotation omitted). "An error of law can cause an abuse of discretion." *Id.*; *Common Cause Ind. v. Lawson*, 978 F.3d 1036, 1039 (7th Cir. 2020); *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (also errors of fact); *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437 (7th Cir. 1986) (same).

### III.

A party seeking a preliminary injunction "must make a strong showing that [it] is likely to succeed on the merits." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *cf. Nken v. Holder*, 556 U.S. 418, 434 (2009). This factor is a "significant burden," but it ought not "spill … into the ultimate merits," as a preliminary injunction is "designed to protect both

the parties and the process while the case is pending." *Ill. Republican Party*, 973 F.3d at 763.

Proof of a likelihood of success by a preponderance of evidence is not necessary. *Id.* We instead ask the party to demonstrate "how [it] proposes to prove the key elements of its case," *id.*, and evaluate its chance of success based on this proffer. This "step 'is often decisive.'" *Doe v. Univ. of S. Ind.*, 43 F.4th at 791 (quoting *Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022)).

Appellees say SEA 480 violates the Constitution in three ways: the Equal Protection Clause by classifying the minor plaintiffs based on their sex and their status as transgender persons; substantive due process by not allowing the parents to override the law if they consent to the banned treatment; and the Free Speech Clause by forbidding the physicians to aid and abet other physicians who provide the banned treatment. Although appellees initially raised seven claims, the parties focus on these three in their briefs. Though the district court discussed only the first and third claims, we will discuss all three to determine whether they are likely grounds of success on the merits for appellees.[1]

---

[1] Our dissenting colleague fails to engage with whether SEA 480 raises any equal protection or substantive due process problems. Instead, our colleague cites the dissents from other judges who have opined on various state laws concerning gender transition procedures for minors.

This approach does not grapple with the similarities and the differences between and among each state's law. *See* Appendix. To us, Indiana's law warrants independent review on each of these constitutional questions.

### A.  Equal Protection Clause

First, appellees claim SEA 480 classifies on the basis of transgender status and sex, cannot meet heightened scrutiny, and therefore violates the Fourteenth Amendment's Equal Protection Clause. The Fourteenth Amendment forbids a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

The Supreme Court has characterized the Equal Protection Clause as a Constitutional anti-discrimination rule. *Goesaert v. Cleary*, 335 U.S. 464, 466 (1948) ("The Constitution in enjoining the equal protection of the laws upon States precludes irrational discrimination as between persons or groups of persons in the incidence of a law."); *Frontiero v. Richardson*, 411 U.S. 677, 679 (1973) (evaluating whether a "difference in treatment constitutes an unconstitutional discrimination"); *Craig v. Boren*, 429 U.S. 190, 207–08 (1976). Under the Clause, discrimination means unequal treatment on the basis of a characteristic likely to be regulated for suspect purposes. *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012) ("[The Equal Protection Clause is] a guard against state and local government discrimination on the basis of race, national origin, sex, and other class-based distinctions.").

The Equal Protection Clause works by subjecting state action to a particular level of judicial review depending on which class is being treated differently. The most burdensome for the state—strict scrutiny—is reserved for unequal treatment on the basis of race and national origin, *see, e.g., Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273–74 (1986), and (generally) alienage, *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 602 (1976). Laws that discriminate based on sex, *United States v. Virginia*, 518 U.S. 515, 532–

33 (1996), and the marital status of a person's parents at the time of his birth, *Clark v. Jeter*, 486 U.S. 456, 461 (1988), receive intermediate scrutiny. If a state has not treated one of these classes unequally, "courts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws" and will review the law for a rational basis. *Vance v. Bradley*, 440 U.S. 93, 97 (1979); *Pennell v. City of San Jose*, 485 U.S. 1, 14 (1988).

The "underlying rationale" for these classifications "is that, where legislation affects discrete and insular minorities, the presumption of constitutionality fades because traditional political processes may have broken down." *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974) (quoting *Robison v. Johnson*, 352 F. Supp. 848, 855 (D. Mass. 1973)). So, not every instance of unequal treatment implicates the Equal Protection Clause's two more burdensome tiers of scrutiny. For one, "laws that apply evenhandedly to all 'unquestionably comply' with the Equal Protection Clause." *Vacco v. Quill*, 521 U.S. 793, 800 (1997) (quoting *N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 587 (1979)). Further, even laws that affect different groups unevenly raise no equal protection problems per se. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271–72 (1979) ("Most laws classify, and many affect certain groups unevenly … ."); *see Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 314 (1976) ("[T]he drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one."). Because "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," courts need to assure themselves that uneven treatment exists and is based on the protected characteristic. *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

Therefore, courts must start by identifying the particular "differential treatment" or "official action that closes a door or denies opportunity to" a person. *Virginia*, 518 U.S. at 532–33. Then, unless that differential treatment or door-closing is on the basis of the person's race, national origin, alienage, sex, or parents' marital status at the time of his birth, the Constitution compels the court to uphold the law if it has a rational basis.

The key issue in this appeal is whether SEA 480 classifies based on a protected class, and that issue requires us to answer two questions. First, does SEA 480 classify based on sex? If yes, we must determine whether it serves an important governmental objective and the means employed are substantially related to achieving that objective. *Virginia*, 518 U.S. at 533. Indiana's justification for SEA 480 would have to be "exceedingly persuasive." *Id.* Second, is transgender status a quasi-protected class warranting a level of scrutiny higher than rational basis? If yes, we must determine and apply that level of scrutiny.

SEA 480's classifications based on age and medical diagnosis do not merit higher scrutiny. *Murgia*, 427 U.S. at 312–13 (age); *cf. City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 442 (1985) (disability). So, if we answer no to both questions—if we determine Indiana's law does not classify based on sex and transgender status is not a quasi-protected class—we will review SEA 480 for a rational basis.

### 1. Differential treatment based on sex

Where the Supreme Court has held that a law entails "differential treatment" between the sexes or "closes a door or denies opportunity to" one sex, *Virginia*, 518 U.S. at 532–33, the

state placed a benefit within reach of one sex and out of reach of the other or burdened one sex in a way it had not burdened the other. For example, the Court has found differential treatment in a law giving a man preference over a woman when both are otherwise equally qualified to administer an intestate estate, *Reed v. Reed*, 404 U.S. 71, 71–75, 77 (1971); a law requiring servicewomen—but not servicemen—to prove their spouses are dependent on them in order to qualify for increased benefits, *Frontiero*, 411 U.S. at 678–79, 688; a law allowing widows—but not widowers—to receive social security benefits upon the death of their spouse, *Weinberger v. Wiesenfeld*, 420 U.S. 636, 639–41, 645 (1975); a law allowing women to purchase near beer at age 18 but men at age 21, *Craig*, 429 U.S. at 210, 197; a law placing an obligation on husbands—but not wives—to pay alimony, *Orr v. Orr*, 440 U.S. 268, 270–71, 273 (1979); a law allowing unwed mothers—but not unwed fathers—to object to their children's adoption, *Caban v. Mohammed*, 441 U.S. 380, 387–88 (1979); a state nursing school's policy of barring men—but not women—from admission, *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 730–31 (1982); a state military institution's policy of barring women—but not men—from admission, *Virginia*, 518 U.S. at 533–34; and a law allowing an unwed mother—but not a father—to transfer her U.S. citizenship to her child born abroad, *Sessions v. Morales-Santana*, 582 U.S. 47, 51–52 (2017).

Following the Supreme Court's guidance, this court has found differential treatment in a city ordinance banning women—but not men—from bearing their breasts in public, *Tagami v. City of Chicago*, 875 F.3d 375, 377, 380 (7th Cir. 2017); a rule requiring boys—but not girls—to cut their hair short to play interscholastic basketball, *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 572, 582 (7th Cir. 2014);

and an ordinance requiring a county to award a certain quota of contracts to women-owned—but not male-owned—enterprises, *Builders Ass'n of Greater Chicago v. County of Cook*, 256 F.3d 642, 643, 645 (7th Cir. 2001).

SEA 480 is unlike the rules in any of these cases. It bars gender transition procedures regardless of whether the patient is a boy or a girl: Nobody may receive the treatment the state has chosen to regulate. So, sex does not indicate on what basis treatment is prohibited. The law does not create a class of one sex and a class of another and deny treatment to just one of those classes.

Appellees point past this Supreme Court and Seventh Circuit precedent to *Whitaker ex rel. Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017). In their view, *Whitaker* shifted how this court reads and applies the Equal Protection Clause: Any law that "cannot be stated without referencing sex" creates a sex-based classification demanding heightened scrutiny. *Id.* at 1051. They argue SEA 480 entails a sex-based classification under *Whitaker* because the law "prohibit[s] medical treatment only when that treatment is deemed inconsistent with a minor's birth sex." Because SEA 480 requires physicians to consider a patient's sex before prescribing gender transition procedures, appellees say, *Whitaker* confirms that SEA 480 classifies on the basis of sex.

Not so. *Whitaker* did not hold that a state draws a sex-based classification each time it must reference sex to enforce the law. Such a statement would directly contradict the Supreme Court. Both before and after *Whitaker*, the Court has applied rational-basis review to laws classifying based on sex where the distinction drawn is based on a medical procedure

or condition exclusive to one sex. *See Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236–37 (2022). Enforcing the laws in those cases depended on an essential reference to sex, too. In *Geduldig*, California did not allow pregnant women to receive disability payments on account of their pregnancy, but the court applied rational-basis review. *Geduldig*, 417 U.S. at 488–89, 496. In *Dobbs*, Mississippi did not allow pregnant women to have abortions after the child's gestational age passed 15 weeks, but the court applied rational-basis review. *Dobbs*, 597 U.S. at 232, 300. If *Whitaker* means what appellees say, the Court in *Geduldig* and *Dobbs* should have applied heightened scrutiny.

If *Whitaker*'s pronouncement modified the Equal Protection Clause analysis, we would expect this court to have treated it as having done so in subsequent cases. But since *Whitaker*, this court has not once cited the language appellees point to, despite referencing the case in three Equal Protection Clause cases. *See A.C. ex rel. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772 (7th Cir. 2023); *West v. Radtke*, 48 F.4th 836, 852 (7th Cir. 2022); *Carson v. Lake Cnty.*, 865 F.3d 526, 536 (7th Cir. 2017).

Further, *Whitaker* itself did not require this purported gloss: the school district's classification was sex-based because assigning a bathroom based on a child's sex unquestionably separates the sexes into two groups. This is an unremarkable conclusion. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1311–12 (11th Cir. 2020) (W. Pryor, J., dissenting) (disagreeing that similar bathroom rule violated Equal Protection Clause but recognizing that rule classified based on sex) (subsequent history omitted).

The court's "referencing sex" language referred to "the student's birth certificate," which is how the school district determined which bathroom each student could use. *Whitaker*, 858 F.3d at 1051; *see id.* at 1041 (explaining that school district required "legal or medical documentation" from student to change student's gender in school records). "Referencing sex" was *how* the school district classified by sex, not *why* its classification was sex-based.

Appellees have another *Whitaker* problem. Even if the case means what appellees and the district court think it does, medical practitioners can comply with SEA 480 "without referencing sex." Although the physician would have to determine the patient's sex to decide *which* hormone to prescribe, the physician does not need to reference sex to determine whether the patient has gender dysphoria. Once the patient is diagnosed, the physician knows that SEA 480 restricts his treatment options. So, even under appellees' reading of *Whitaker*, heightened scrutiny need not be applied.

Consider a hypothetical demonstrating why SEA 480 does not require a reference to sex. Assume a physician did not know a patient's sex and could only establish it by asking the patient questions. The physician asks the patient, as the DSM-5-TR commands, if the patient has "[a] strong desire *to be of* … []some alternative gender different from one's assigned gender[][.]" Gender Dysphoria, *Gender Dysphoria in Adolescents and Adults*, F64.0(A)(4) DSM-5-TR, at 513 (emphasis added). The patient says, "yes." The physician asks the patient if the patient has "[a] strong desire *to be treated as* … []some alternative gender different from one's assigned gender[][.]" *Id.* at F64.0(A)(5) (emphasis added). The patient says, "yes." If the patient has been feeling that way for at least six months, *id.* at

F64.0(A), and experienced "clinically significant distress" in the patient's social life, *id.* at F64.0(B), the physician knows—while still ignorant to the patient's sex—that SEA 480 prohibits two treatment options.[2]

The only way SEA 480 implicates sex at all is that the medical treatment at issue is sex specific—it denies each sex access to the other's hormones. A physician could, if not for SEA 480, prescribe two medical treatments: one exclusively to girls with gender dysphoria—testosterone; and one exclusively to boys with gender dysphoria—estrogen.

The Supreme Court has dealt with laws like this before, in which the classification is only sex-based because it regulates a "medical procedure that only one sex can undergo." *Dobbs*, 597 U.S. at 236. In *Geduldig*, for example, California had declined to compensate workers for lost time working if the reason was a disability attributable to pregnancy. 417 U.S. at 488–89. The Court found no sex-based classification, explaining that "[t]here is no risk from which men are protected and women are not" and "there is no risk from which women are protected and men are not." *Id.* at 496–97. It did not raise a constitutional problem that pregnant women were being

---

[2] We recognize that *Whitaker* addressed the role transgender status played in the school district's bathroom policy. The school district, *Whitaker* explained, "treats transgender students … who fail to conform to the sex-based stereotypes associated with their assigned sex at birth[] differently." 858 F.3d at 1051. Appellees place significant emphasis on that quote, citing it three times in their brief. But for two reasons, sex-based stereotyping is not at issue here. First, a physician in Indiana could not provide gender transition procedures no matter how the patient acted or dressed. Second, if transgender status enters the debate about SEA 480 at all, it would be through a diagnosis of gender dysphoria, not the patient's external manifestation of gender.

treated differently than men under the disability plan, the Court continued, for two reasons: Pregnancy is an "objectively identifiable physical condition with unique characteristics" and there was no indication that the regulation of pregnancy was pretextual, hiding some secret discriminatory motive. *Id.* at 496 n.20. Illustrating this "lack of identity between the excluded disability and gender," the Court pointed out how "[t]he program divides potential recipients into two groups—pregnant women and nonpregnant persons." *Id.; see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993).

In *Dobbs*, the Court summarized the rule applicable in these cases: When a state regulates a "medical procedure that only one sex can undergo," the courts apply rational-basis review "unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" 597 U.S. at 236 (quoting *Geduldig*, 417 U.S. at 496, n.20).

As mentioned, Indiana has regulated two procedures—the male and female hormone therapies—which, because of the polarity of the sexes, only one sex can undergo. Like in *Geduldig*, SEA 480 bans estrogen therapy for a class of, for example, boys with gender dysphoria, but preserves access for all girls and boys with disorders of sex development. There is thus a "lack of identity" between hormone therapy and gender. *Geduldig*, 417 U.S. at 496, n.20.

And, also like the disability program in *Geduldig*, there is no evidence that SEA 480 is a pretext designed to discriminate against either sex. The law blocks access to the treatment to boys and girls equally. If Indiana intended SEA 480 to disfavor girls, for example, it would not have burdened them in

the exact same way it burdened the boys. It could have permitted access to testosterone therapy as a gender dysphoria treatment but banned estrogen therapy. Appellees say SEA 480 is pretextual because it "targets only treatment related to gender transition." But this law is markedly less pretextual than, say, an abortion regulation, which has no male counterpart yet still receives rational-basis review. Appellees offer no meaningful response to this. So, we will review it for a rational basis.

Appellees urge that *Bostock v. Clayton County*, 590 U.S. 644 (2020), compels us to adopt their view of the Equal Protection Clause. There, the Supreme Court interpreted the meaning of the word "sex" in Title VII of the Civil Rights Act to include adverse action by an employer where that decision was "based in part on sex." *Id.* at 659. Appellees recognize *Bostock*'s statutory roots but contend that its reasoning should branch out to antidiscrimination provisions in the Constitution.

It does not. *Bostock* turns on the text of Title VII. The words in the statute—"because of," in particular—were dispositive for the Court's holding and occupied much of its discussion. *See id.* at 656–67. And for its understanding of how the Civil Rights Act uses "sex," the Court relied on sources dating to the time of the Act's enactment to decide what "discriminate" means. *Id.* at 657. This court has recognized that *Bostock* provides "useful guidance" in Title IX cases because both Title VII and Title IX "involve sex stereotypes and less favorable treatment because of the disfavored person's sex." *A.C.*, 75 F.4th at 769. But *Bostock* is of no use when interpreting the Equal Protection Clause. That clause does not use the word "sex." And the Fourteenth Amendment was ratified nearly a

century before the Civil Rights Act, meaning *Bostock*'s sources have little to say about constitutional meaning.

*Bostock* does not apply to every use of the word "sex" in American statutory and constitutional law. The case decided an interpretive question about Title VII's reach. Title VII does not apply here, so neither does *Bostock*.

### 2. Transgender status as a quasi-suspect class

Because sex does not provide a reason to heighten our scrutiny of SEA 480, we consider appellees' alternative argument: the law classifies based on transgender status, such a classification is quasi-suspect, and therefore SEA 480 is subject to heightened scrutiny.

This argument, too, is unsuccessful. SEA 480 regulates gender transition procedures, which means it may incidentally burden transgender people without burdening nontransgender people. But even if transgender status were a quasi-suspect class, any differential treatment on that basis in SEA 480 is tethered to those procedures. There is thus a "lack of identity between" the regulated activity and the difference in treatment. *Geduldig*, 417 U.S. at 496 n.20; *see Dobbs*, 597 U.S. at 236. It is true that *Dobbs* and *Geduldig* are about sex, but their logic applies equally to a case about transgender status. *See Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1229–30 (11th Cir. 2023). Further, as with sex, there is no evidence that SEA 480 is a pretext designed to discriminate against transgender people. The law allows mental health care, does not limit an adult's access to gender transition treatment, and does not prohibit treatment focused on non-medical affirmation of the individual's gender identity. It is focused on the medically induced part of a gender transition, which is the

part of the transitioning process Indiana believes is too dangerous and novel to be left unregulated.[3]

---

[3] The Supreme Court has been extremely hesitant to add new suspect classes, having not done so in more than 40 years. *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023), *cert. granted*, 144 S. Ct. 2679 (2024). Transgender status is neither "an immutable characteristic determined solely by the accident of birth," *Segovia v. United States*, 880 F.3d 384, 390 (7th Cir. 2018) (cleaned up), nor has the status been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973); *see also Segovia*, 880 F.3d at 390.

Immutability is one of the factors most consistently present in Equal Protection cases. Almost all the suspect classes the Supreme Court has recognized share an immutable characteristic, unlike many of those it has rejected. *See, e.g.*, *Murgia*, 427 U.S. at 312–14 (age); *Rodriguez*, 411 U.S. at 25 (poverty); *Harris v. McRae*, 448 U.S. 297, 322–23 (1980) (indigent women seeking abortions); *N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 592–94 (1979) (methadone users); *Johnson v. Robinson*, 415 U.S. 361, 375 n.14 (1974) (conscientious objectors); *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 488–89 (1955) (opticians). This court, too, recognizes the central role of immutability when analyzing Equal Protection cases. *Baskin v. Bogan*, 766 F.3d 648, 657 (7th Cir. 2014); *Segovia*, 880 F.3d at 390; *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 638 (7th Cir. 2007); *Hamilton v. Caterpillar Inc.*, 966 F.2d 1226, 1227 (7th Cir. 1992).

The incongruence between sex and gender identity, essential to transgender status, is fundamentally different than an immutable characteristic determined at birth. Indeed, some transgender adolescents realize in adulthood that their gender identity and sex are actually congruent. One of appellees' experts, for example, described a study finding that multiple adolescents realized that their sex and gender matched and stopped treatment before even proceeding to hormone therapy. The characteristic that indicates they are transgender—the incongruence between sex and gender—can thus change. *See Segovia*, 880 F.3d at 390. One could argue that the adolescents' gender identities did not change—they simply realized later that they were incorrect about their identities. Yet this argument

SEA 480 does not receive heightened scrutiny because of the way it treats transgender people. So, we consider whether Indiana had a rational basis for enacting SEA 480.

### 3. Rational basis

"When applying rational basis review to an equal protection claim, we are highly deferential to the government." *Hope v. Comm'r of Ind. Dep't of Corr.*, 66 F.4th 647, 650 (7th Cir. 2023).

---

misunderstands what it means for a trait to be immutable. Consider an analogy: a person learns that he has Gallic ancestry. But after completing a DNA test, the person discovers that he descends exclusively from the Britons. The consequences of this discovery change nothing about the legality of discriminatory acts against him. It is unconstitutional to discriminate based on his ancestry, whatever it may be. If transgender status were a suspect class, it would operate in a different way. A transgender adolescent who realizes in adulthood that his gender identity matches his sex would lose constitutional protection entirely. That realization would nullify the trait that qualified the adolescent for constitutional protection in the first place.

In addition, transgender people have not been relegated "to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Rodriguez*, 411 U.S. at 28. They have never been denied the right to "hold office, serve on juries, or bring suit in their own names," nor have they been denied the right to vote because they are transgender. *Frontiero*, 411 U.S. at 685. And the "legislative response" to transgender issues "negates any claim that [transgender people] … have no ability to attract the attention of the lawmakers." *City of Cleburne*, 473 U.S. at 445. Most states cover gender transitions in their Medicaid policies, *Medicaid Coverage of Transgender-Related Health Care*, MOVEMENT ADVANCEMENT PROJECT, https://www.lgbtmap.org/equality-maps/medicaid, and twenty-four states plus D.C. bar private health insurers from excluding transgender people from coverage, *Healthcare Laws and Policies*, MOVEMENT ADVANCEMENT PROJECT, https://www.lgbtmap.org/equality-maps/healthcare_laws_and_policies.

If "any reasonably conceivable state of facts … could provide a rational basis for the classification," the challenged law is constitutional. *Beach Commc'ns, Inc.*, 508 U.S. at 313.

First, we must "identify a legitimate end … ." *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1011 (7th Cir. 2019). Second, we must "ask whether the means—the classification—bears a rational relationship to the end." *Id.* Protecting minor children from being subjected to a new and heavily challenged medical treatment is a legitimate end. The two classifications—age and medical diagnosis—are rationally related to this end. The law applies to minors only. And because the state believes puberty blockers are dangerous when prescribed to stop puberty's natural course and hormone therapy is dangerous when prescribed cross-sex, limiting access for those purposes is reasonable.

We hold that appellees have not shown a likelihood of success on the merits of their Equal Protection Clause claim.

### 4. Treatment by other circuits

Three of our fellow circuits have heard challenges to laws regulating the medical procedures available for gender dysphoria treatment. The Sixth and Eleventh Circuits reached the same conclusion as we do on the Equal Protection Clause claim. The Eighth Circuit disagreed on equal protection and did not discuss substantive due process or whether transgender status is a quasi-suspect class. None of the three circuits discussed the First Amendment. In the Appendix is a chart comparing the statutes in these cases to the statute at issue here. A few words on the three cases.

In *Brandt ex rel. Brandt v. Rutledge*, the Eighth Circuit held that Arkansas' similar law drew a sex-based classification,

was subject to heightened scrutiny, and violated the Equal Protection Clause. 47 F.4th 661, 669–71 (8th Cir. 2022). *Brandt*'s analysis was brief. As we do with the Indiana law, the *Brandt* court recognized that the Arkansas law deprives women— but not men—access to testosterone, and vice versa. *Id.* at 669. As Indiana does, Arkansas argued that the sex-based classifi- cation only arises incidentally through the medical procedure at issue. *Id.* at 669–70. The *Brandt* court dismissed this argu- ment by noting that the state "conflat[ed] the classifications drawn by the law with the state's justification for it." *Id.* at 670. Because "[t]he biological sex of the minor patient is the basis on which the law distinguishes between those who may receive certain types of medical care and those who may not," the court applied heightened scrutiny. *Id.*

Parties do sometimes confuse their justification for a clas- sification with the classification question. *See Tagami*, 875 F.3d at 380. But that is not the case here. Ignore for a moment why Indiana has denied men access to estrogen and women access to testosterone and consider the classes: SEA 480 separates gender dysphoric girls, for example, from non-gender dys- phoric girls and all boys. We do not need to consider Indiana's justifications to understand why the rule in *Dobbs* and *Geduldig* applies.

But *Brandt* did not discuss or even cite *Dobbs* and *Geduldig*. Indeed, *Brandt* cited only four cases in deciding which level of scrutiny to apply. *See id.* at 669–70. Nothing in the Eighth Circuit's analysis warrants reevaluating our conclusion.

By contrast, in *L.W. ex rel. Williams v. Skrmetti*, the Sixth Circuit held that Tennessee and Kentucky's similar laws did not violate substantive due process or the Equal Protection Clause. 83 F.4th at 491. And in *Eknes-Tucker v. Governor of*

*Alabama*, the Eleventh Circuit held the same of Alabama's law. 80 F.4th at 1224–25, 1227.

*Skrmetti* and *Eknes-Tucker* engaged in much deeper and more thorough analyses of the Equal Protection Clause. In *Skrmetti*, for example, the Sixth Circuit evaluated nearly a dozen Supreme Court cases to determine whether the statutes fit the traditional mold of unequal treatment. 83 F.4th at 480–81. It also examined the medical treatment for gender dysphoria in detail. *Id*. at 483. The Eleventh Circuit reached the same conclusion, explaining that the Alabama law "targets specific medical interventions for minors" and therefore does not classify on the basis of any suspect characteristic. *Eknes-Tucker*, 80 F.4th at 1227. Both courts also discussed the *Geduldig* incidental classification cases at length. The Sixth Circuit recognized how many other statutes would be problematic under the Equal Protection Clause "[i]f any reference to sex in a statute dictated heightened review." *Skrmetti*, 83 F.4th at 482; *see also Eknes-Tucker*, 80 F.4th at 1228 (same). And the Eleventh Circuit explained why the *Geduldig* reasoning would apply to insulate the Arkansas law from heightened scrutiny even if transgender people made up a quasi-suspect class. *Eknes-Tucker*, 80 F.4th at 1229–30.

The Sixth and Eleventh Circuit's analyses are more persuasive because they comprehensively apply Equal Protection law and better respond to more counterarguments.

## B. Substantive due process

Next, appellees claim that because SEA 480 does not include a provision allowing the banned treatment if a parent consents, the law infringes the parent plaintiffs' authority to make medical decisions for their children. They say this

authority is a fundamental right, and that SEA 480 thus denies them substantive due process.

Under the Fourteenth Amendment, "[n]o State shall … deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. IV, § 1. The Supreme Court has instructed that this clause requires heightened judicial scrutiny of laws that infringe a fundamental right. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). To determine whether a state prevents a person from exercising such a right, the court must ask whether the subject matter of the deprivation is fundamental in the first place—whether it is "deeply rooted in [our] history and tradition" and "essential to our Nation's scheme of ordered liberty." *Dobbs*, 597 U.S. at 237 (quotations omitted).

This substantive view of due process "has sometimes led the Court to usurp authority that the Constitution entrusts to the people's elected representatives." *Dobbs*, 597 U.S. at 239–40; *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225–26 (1985). The Supreme Court has urged courts to "exercise the utmost care whenever [they] are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the [federal judiciary]." *Glucksberg*, 521 U.S. at 720 (citation and quotations omitted); *see also Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992); *Dep't of State v. Muñoz*, 144 S. Ct. 1812, 1821–22 (2024) (explaining that "[i]dentifying unenumerated rights carries a serious risk of judicial overreach").

First, we must decide what right is at issue. Then, we can evaluate whether it is fundamental. If so, we apply strict scrutiny; if not, rational basis.

### 1. Defining the right at issue

The level of generality with which we define the right at issue matters. "[W]e have a tradition of carefully formulating the interest at stake in substantive-due-process cases." *Glucksberg*, 521 U.S. at 722; *see, e.g.*, *Reno v. Flores*, 507 U.S. 292, 302 (1993); *Collins*, 503 U.S. at 125.

The Supreme Court has always defined the right at issue narrowly, hewing as closely as possible to the statute, *Glucksberg*, 521 U.S. at 723, or the complaint, *Collins*, 503 U.S. at 125. In *Reno*, the right at issue was not what the respondents identified—"freedom from physical restraint"—but something far more specific:

> [T]he alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution.

507 U.S. at 302.

In *Collins*, the right at issue was not what petitioner identified—"to be free from unreasonable risks of harm to his body, mind and emotions and … to be protected from the city['s] … custom and policy of deliberate indifference toward the safety of its employees"—but, specifically, "a safe working environment." 503 U.S. at 117, 126.

In *Glucksberg*, the Court navigated nearly a half dozen formulations of the right at issue—proposed by the respondents and the court below—including the amorphous "liberty to shape death" and the searching "right to control of one's final

days." 521 U.S. at 722 (quotations omitted). Rejecting those, the court used the language found in the Washington statute at issue, settling on "whether the 'liberty' specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so." *Id.* at 723.

And in *Dobbs*, the Court warned against the risks of defining a right too broadly. *See* 597 U.S. at 257. The right to abortion was at issue, but a prior case had defined it as an "intimate and personal choice[] … central to personal dignity and autonomy" and "[t]he right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992); *see Dobbs*, 597 U.S. at 255. A definition that broad, the Court explained, would lead to problems. *See Dobbs*, 597 U.S. at 257. It might, for example, "license fundamental rights to illicit drug use, prostitution, and the like." *Id.*

This court has heeded the Supreme Court's warning. In *Khan v. Gallitano*, we rejected the plaintiff's "right to contract" language as "far too general to guide our analysis of the specific conduct about which [she] complain[ed]." 180 F.3d 829, 833–34 (7th Cir. 1999). And in *Lukaszczyk v. Cook County*, we held that the specific law at issue—a vaccine mandate—did not violate substantive due process, leaving intact other rights against the invasion of bodily autonomy. 47 F.4th 587, 602 (7th Cir. 2022).

Appellees here offer two ways to evaluate the right at issue. They invoke "the fundamental right of parents, rather than the State, to make medical decisions for their children" and "the ability of the parent to consent to medical care for their child … ." Both are broad.

As *Dobbs* explained, defining a right this broadly can lead to problems. Appellees' view may give parents immunity from child neglect claims if they decline to take their child to the hospital after a serious injury and the child's injuries leave him permanently disabled. Or, it may allow parents to request and receive a prescription for a drug widely agreed to be dangerous because the parent believes it would benefit the child. Further, SEA 480 does not prevent a parent from consenting to a course of medical treatment on his child's behalf; it makes that consent legally irrelevant.

Properly tailored, the question here is whether the Due Process Clause gives parents the right to access gender transition procedures for their children. SEA 480 is specifically limited to "gender transition procedures," so any right encompassing all medical treatment is too broad. *See* IND. CODE § 25-1-22-13(a) (forbidding medical practitioners to "knowingly provide gender transition procedures to a minor"). And appellees' complaint takes aim at SEA 480's lack of an exemption for parents who have consented to the treatment on their minors' behalf.

Although appellees argue we should not evaluate the right at issue as narrowly as the "specific medical procedure," that is precisely what the Court did in *Dobbs*. It did not have to uproot cases speaking generally of the "sacred … right of every individual to the possession and control of his own person." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891). Rather, the Court recognized that access to a specific medical procedure—abortion—is not a fundamental right. *Dobbs*, 597 U.S. at 240.

*2. Whether the right is deeply rooted*

Knowing the right at issue, we ask whether that right is "deeply rooted in [our] history and tradition" and "essential to our Nation's scheme of ordered liberty." *Dobbs*, 597 U.S. at 237 (quotations omitted). "The mere novelty of … a claim is reason enough to doubt that 'substantive due process' sustains it; the alleged right certainly cannot be considered '"so rooted in the traditions and conscience of our people as to be ranked as fundamental."'" *Reno*, 507 U.S. at 303 (quoting *United States v. Salerno*, 481 U.S. 739, 751 (1987) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934))); *see Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 72 (2009) (novelty of DNA testing evidence precludes constitutional right to access and submit such evidence at trial).

*Cruzan ex rel. Cruzan v. Director, Missouri Department of Health* is one example of when the Supreme Court has found a right so rooted. 497 U.S. 261 (1990). In *Cruzan*, the Court held that a state may require clear and convincing evidence of the wishes of an incompetent person before ending life-sustaining treatment. *Id.* at 281. The principle of informed consent, the Court explained, "ha[d] become firmly entrenched in American tort law," *id.* at 269, having been "carefully guarded[] by the common law," *id.* (quotations omitted). This common law right applied just as well when the person was a patient—patients too "generally possess[ed] the right not to consent, that is, to refuse treatment." *Id.* at 270.

To the contrary, the gender transition procedures at the heart of appellees' claimed right have no such long history. The first report of a minor transgender patient treated with puberty blockers was in the Netherlands in 1998. P.T. Cohen-Kettenis & S.H.M. van Goozen, *Pubertal Delay as an Aid in*

*Diagnosis and Treatment of a Transsexual Adolescent*, 7 EUR. CHILD & ADOLESCENT PSYCHIATRY 246 (1998); Natalie J. Nokoff, *Medical Interventions for Transgender Youth*, *in* ENDOTEXT [INTERNET] (Kenneth R. Feingold et al. eds., 2000) (describing this as the first). The first treatment guidelines for adolescents diagnosed with gender dysphoria by the Endocrine Society came out in 2009. *See Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline*, 94 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3132 (Wylie C. Hembree et al. eds., 2009). In 1998, WPATH approved its first treatment guidelines for children and made its first recommendation that adolescents be considered candidates for hormone therapy. STEPHEN B. LEVINE ET AL., HARRY BENJAMIN INT'L GENDER DYSPHORIA ASS'N, THE STANDARDS OF CARE FOR GENDER IDENTITY DISORDERS 18–19 (5th version 1999). The 1990 version of the Standards even recommended that doctors should consider "how well the patient fits the diagnostic criteria for transsexualism as listed in the DSM-III-R," which requires that "[t]he person has reached puberty." PAUL A. WALKER ET AL., HARRY BENJAMIN INT'L GENDER DYSPHORIA ASS'N, STANDARDS OF CARE: THE HORMONAL AND SURGICAL SEX REASSIGNMENT OF GENDER DYSPHORIC PERSONS 3 (4th version 1990) (4.3.1 Principle 8).

The states are not watching silently on this issue. Rather, as in *Glucksberg*, "[they] are currently engaged in serious, thoughtful examinations" of the questions that attend these novel procedures. 521 U.S. at 719. Nationally, the picture is complicated. Arizona has chosen to ban surgical care alone. ARIZ. REV. STAT. ANN. § 32-3230(A). North Carolina has banned all medical treatment, like Indiana. N.C. GEN. STAT. § 90-21.151. Georgia has banned surgery and hormone therapy, but not puberty blockers. GA. CODE ANN. § 43-34-15(a).

Some states have chosen to make providing any banned medical transition treatment a crime. *See, e.g.*, ALA. CODE § 26-26-4(c); N.D. CENT. CODE § 12.1-36.1-02(2). Some have passed laws protecting those who receive the treatment in the state from enforcement actions elsewhere. *See, e.g.*, CAL. CIV. CODE § 56.109(a), N.Y. EXEC. LAW § 837-x*2. And still others have not acted.

This circuit is a microcosm of the complexity of the national picture: Indiana has banned the treatment, Illinois has a shield law, *see, e.g.*, 20 ILL. COMP. STAT. 2630/3.2(b), (c)(2), and Wisconsin has not acted either way. "To suddenly constitutionalize this area would short-circuit what looks to be a prompt and considered legislative response." *Osborne*, 557 U.S. at 73.

Appellees raise an alternative argument. They urge that the Supreme Court has already established a broader fundamental right which would necessarily include the lesser one we have identified: the fundamental right of parents to make medical decisions on their children's behalf.

The Supreme Court and this court have supported parents in family–relations substantive due process cases before. *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (including "to marry, establish a home and bring up children" in statement of "the liberty thus guaranteed" by the Fourteenth Amendment); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal … that the custody, care, and nurture of the child reside first in the parents … ."); *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1018 (7th Cir. 2000) ("[T]he right of a man and woman to marry, and to bear and raise their children is the most fundamental of all rights—the foundation of not just this country, but of all civilization.").

Appellees say that *Parham v. J.R.*, which addresses parental authority in the substantive due process context, further establishes parents' "plenary authority to seek … care for their children." 442 U.S. 584, 604 (1979). In *Parham*, the Court upheld a Georgia law allowing parents to admit their children to psychiatric hospitals voluntarily, so long as a neutral fact-finder confirmed institutionalization was medically appropriate. *Id.* at 618–19. *Parham* is about the limits of parental discretion. It does not establish "a constitutional requirement that the State recognize [family] decisionmaking." *Cruzan*, 497 U.S. at 286 (distinguishing *Parham*).

*Parham* could not reach as far as appellees claim without overruling other lines of caselaw or being undermined by Seventh Circuit cases. This court has not purported to contradict *Parham* when stating that "the constitutional right to familial integrity is not absolute." *Brokaw*, 235 F.3d at 1019; *Doe v. Heck*, 327 F.3d 492, 520 (7th Cir. 2003). In *Heck*, even though this court held that the parents' "right to familial relations" was violated when their son was interviewed without their notice or consent, it cautioned that it was not "suggesting that the right of parents to discipline their children is absolute or that parents are immune from being investigated for child abuse." *Heck*, 327 F.3d at 524, 523. Quite to the contrary, "[t]he liberty interest in familial privacy and integrity is 'limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents.'" *Id.* at 520 (quoting *Brokaw*, 235 F.3d at 1019 (cleaned up)).

Nor did this court contradict *Parham* when it explained that "a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a

particular provider if the government has reasonably prohib-
ited that type of treatment … ." *Mitchell v. Clayton*, 995 F.2d
772, 775 (7th Cir. 1993). A parent's right to demand care for
his child could not be stronger than the child's right to access
it. *Cf. Whalen v. Roe*, 429 U.S. 589, 604 n.33 (1977) (declining to
hold that "a doctor's right to administer medical care has any
greater strength than his patient's right to receive such care").

And *Parham* did not overrule older Supreme Court cases
endorsing limits on the parental right over his child's general
"custody, care, and nurture." *Prince*, 321 U.S. at 166; *id.*
("[N]either rights of religion nor rights of parenthood are
beyond limitation."). In *Prince*, the Court upheld an aunt–cus-
todian's conviction under a state child-labor law—her nine-
year-old daughter had been distributing religious pamphlets.
321 U.S. at 159, 162. Even though a parent can make decisions
about her child's care for the most part, the Court explained,
"the state as parens patriae may restrict the parent's control
… in many other ways." *Id.* at 166.

Appellees' broad formulation of *Parham* contradicts yet
another line of Supreme Court cases, holding that a state can
ban dangerous and habit-forming narcotics. *Minnesota ex rel.
Whipple v. Martinson*, 256 U.S. 41, 45 (1921); *Robinson v. Califor-
nia*, 370 U.S. 660, 664 (1962) (recognizing *Whipple*). If *Parham*
somehow tunneled through *Whipple* without shaking its foun-
dation, giving parents a path to demand for their children ac-
cess to a narcotic for a well-meaning medical purpose despite
a state's "firmly established" power to ban it, appellees pro-
vide no evidence of it. *Whipple*, 256 U.S. at 45.

Because SEA 480 does not infringe a fundamental right,
we again review it for a rational basis. *Lukaszczyk*, 47 F.4th at
600.

### 3. Rational basis

The rational-basis analysis is essentially the same whether under the Equal Protection Clause or substantive due process. *Hayden*, 743 F.3d at 576 (listing cases) ("This rational-basis variant of substantive due process differs little, if at all, from the most deferential form of equal protection review."); *see also Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013) (same).

SEA 480 is supported by a rational basis. As discussed above, protecting minor children from being subjected to a novel and uncertain medical treatment is a legitimate end. And if Indiana had included a parental-consent provision, the exception would swallow the rule: all but a small number of minors cannot consent to their own health care anyway. *See* IND. CODE § 16-36-1-3(a), (a)(2).

The Supreme Court's direction is straightforward: We must "exercise the utmost care" in this new land, *Glucksberg*, 521 U.S. at 720 (quotations omitted), lest we "cast [this] statute[] into constitutional doubt," *Osborne*, 557 U.S. at 73, withdraw the question from the people of Indiana, "and be forced to take over the issue … ourselves." *Id.* We oblige. Appellees have not shown a likelihood of success on their substantive due process claim.

### C. Free Speech Clause

Appellees' last claim challenges SEA 480's secondary liability provision as a violation of the First Amendment's Free Speech Clause. *See* IND. CODE § 25-1-22-13(b).

This provision forbids anyone to aid and abet a principal violator. It provides that "a physician or other practitioner may not aid or abet another physician or practitioner in the

provision of gender transition procedures to a minor." IND. CODE § 25-1-22-13(b). Appellees contend that, as applied to the class of medical practitioners challenging the law, this provision violates the First Amendment. They focus on two specific First Amendment activities they say the law prohibits: referring patients to other physicians, and discussing where and to what extent gender transition procedures are available.

It is not clear that the law prohibits anything other than speech used "as an integral part of" unlawful conduct. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). Such speech "is historically recognized as unprotected." *See United States v. Price*, 775 F.3d 828, 838 (7th Cir. 2014). Aiding and abetting laws, such as the provision at issue in SEA 480, fall within this category of unprotected speech. *United States v. Hansen*, 599 U.S. 762, 781 (2023).

The Supreme Court's recent analysis in *Hansen* supports our view of Indiana's law. In *Hansen*, the Court held that 8 U.S.C. § 1324(a)(1)(A)(iv)'s prohibition on "encourag[ing] or induc[ing]" a violation of the immigration laws was not an overbroad restriction on free speech. *Id.* at 780. The respondent, Helaman Hansen, ran an immigration scam promising a painless citizenship process through "adult adoption." *Id.* at 766–67. Hansen would connect an alien with an American citizen, who would adopt the alien. Then, the new parent would pass citizenship to the alien. Hansen was convicted under the encouragement/inducement law. *Id.* at 767. He argued it was a facially overbroad regulation of protected speech, but the district court disagreed. On appeal, the Ninth Circuit reversed and agreed with Hansen, explaining that the law would include, for example, "encouraging an undocumented

immigrant to take shelter during a natural disaster … ." *Id.* at 768 (quotations omitted). The Supreme Court reversed, viewing the law much more narrowly. *Id.* at 781.

As relevant here, the Court explained that the word "induce" refers to the concept of facilitation, which in turn is another term for aiding and abetting. The Ninth Circuit's error was thinking Congress used "induce" for its ordinary meaning. *Id.* at 773. This would of course be overbroad, as it would apply to substantially more protected speech than unprotected speech. *Id.* at 774. Instead, as an aiding and abetting law, *id.*, the only speech the statute reached was "speech integral to unlawful conduct," *id.* at 783.

So too here. SEA 480's secondary liability clause applies to speech by physicians that aids or abets another physician's provision of gender transition procedures to a minor. If Indiana applied the law to speech that did not aid or abet a principal violation of SEA 480, the defendant's first course of action would not be a federal constitutional challenge—it would be to move for dismissal of the lawsuit. In other words, because SEA 480's secondary liability provision "stretches no further than … [s]peech intended to bring about a particular unlawful act," the plaintiff doctor and her practice could only ever be sued for unprotected speech. *Id.*

Appellees offer several counterarguments. First, they say SEA 480's secondary liability provision prohibits pure speech based on its content. But the first question in any First Amendment case is whether the speech at issue is protected. If the answer is no, the fact that a law regulates pure speech is no longer relevant. *See Counterman v. Colorado*, 600 U.S. 66, 73 (2023) ("From 1791 to the present, the First Amendment has permitted restrictions upon the content of speech in a few

limited areas." (quotations omitted)). *Giboney* and *Hansen* say speech integral to criminal or unlawful conduct is unprotected. *Giboney*, 336 U.S. at 498; *Hansen*, 599 U.S. at 783. Thus, assuming appellees are correct that SEA 480 prohibits pure speech (a contention with which even the district court did not agree), that speech is unprotected.

Second, appellees urge that, even if SEA 480 is directed at conduct as the state argues, it nonetheless directly burdens their speech as applied. But, again, to the extent SEA 480 regulates speech, it only regulates speech integral to unlawful conduct. The First Amendment's protection does not reach that far. *Hansen*, 599 U.S. at 783 ("Speech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected.").

Assuming for a moment that SEA 480 does more than regulate speech integral to unlawful conduct, courts must still ask whether a law's burden on speech is "incidental" to its regulation of the speakers' conduct or is in fact the targeted evil, such that it is "based on the content of [their] speech" "on its face [or] in its practical operation." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). SEA 480's secondary liability provision burdens speech incidentally because it targets conduct: facilitating the provision of gender transition procedures.

In *Sorrell*, the Court held that a Vermont law prohibiting the sale, disclosure, and use of prescriber-identifying information was a content-based speech regulation. 564 U.S. at 563–64. The law was "directed at certain content" and "aimed at particular speakers." *Id.* at 567. It conditioned liability on the content of the information and how the user incorporated that information into its speech. *Id.* at 564. For example,

marketing to providers was a prohibited use but educational communication was not. *Id.*

In *Expressions Hair Design v. Schneiderman*, too, the Court held that a New York law regulated speech—not conduct—because it mandated how a store owner could communicate its prices, not simply what prices he may charge. 581 U.S. 37, 47–48 (2017). The law forbade store owners to charge credit card users an amount higher than that reflected by the sticker price. *Id.* at 41, 47. Thus, it regulated speech—"the communication of prices"—not conduct—"prices themselves." *Id.* at 48. It would be permitted, the Court explained, for New York to require delis to charge $10 for sandwiches. *Id.* at 47. Such a law would regulate the content of speech "incidental[ly]" because the store owners would have to display the $10, but under the law, it would not matter how. *Id.*

SEA 480's aiding and abetting provision differs from the statutes in these cases. Its language does not address speech at all, so it is not like the statute discussed in *Sorrell*. And it is more like the hypothetical statute in *Schneiderman*, as it says physicians must avoid some *action*, not that they must avoid some *language*.

Although the district court correctly recognized that an incidental burden on speech "flow[s] indirectly from the core purpose of the regulation," it concluded that the speech targeted by SEA 480 is "itself" aiding and abetting and therefore could not be "incidental to separate, prohibited conduct." That is not correct.

Simply because speech is picked up during enforcement of a law does not mean the law targets speech. If this were true, the First Amendment would frown on laws forbidding,

for example, an accountant to assist a client with filing a false tax return. *See United States v. Knapp*, 25 F.3d 451, 457 (7th Cir. 1994); *United States v. Kaun*, 827 F.2d 1144, 1152 (7th Cir. 1987). Any speech involved would flow indirectly from the law's purpose in targeting tax fraud, but it would also be "itself" the targeted act.

Ordinarily, the "incidental" question is necessary to prevent states from attaching penalties to restrictions of protected speech. But secondary liability statutes depend on their mate for legal power. So, if a plainly unconstitutional primary liability statute fell, it would take the secondary liability statute with it. The practical concern baked into the "incidental" question would never arise.[4]

That brings us to appellees' third argument: *Hansen* and *Giboney* do not govern, they say, because an out-of-state referral to a state permitting gender transition procedures would not be "integral to unlawful conduct." First, this argument ignores that the district court's preliminary injunction extends to in-state referrals. There, of course, the underlying wrongful conduct is the principal violation of Indiana's statute by the practitioner providing the treatment. The physicians Indiana regulates have authority to connect patients to treatment through their professional connections and medical training.

---

[4] To reiterate, we hold that appellees have not shown a strong likelihood of success on the merits of their First Amendment claim because, to the extent SEA 480 regulates speech, it regulates speech integral to unlawful conduct. Accordingly, we decline to apply the intermediate scrutiny test outlined in *United States v. O'Brien*, 391 U.S. 367, 377 (1968), and discussed in the dissenting opinion. The parties did not engage with *O'Brien*, so, without the benefit of full briefing, we leave those arguments to litigation on remand.

When the state and its physicians agree, these physicians can use their authority to provide a valuable service that the state cannot provide on its own. But when the physicians and the state do not see eye-to-eye on treatment—and when the state validly regulates that treatment—the state must be able to preclude its physicians from using their authority to help the state's citizens access the treatment. Otherwise, the physicians would hold a veto over the state's power to protect its citizens. SEA 480's secondary liability provision covers unprotected speech, and it reasonably relates to its primary liability provision, which itself is a reasonable regulation.

Second, SEA 480 can prohibit providing assistance to physicians in states where gender-transition procedures are illegal. The provision at issue prohibits aiding and abetting. IND. CODE § 25-1-22-15. That phrase is a term of art that covers those "who facilitated any part" of an unlawful venture. *Rosemond v. United States*, 572 U.S. 65, 72 (2014); *see also Hansen*, 599 U.S. at 771 (the abettor must provide "assistance to a wrongdoer"). The amount of assistance is immaterial, as "a contribution to some part of a crime aids the whole." *Rosemond*, 572 U.S. at 73. Even under appellees' reading, then, the statute permissibly reaches assisting out-of-state providers.

The dissenting opinion focuses entirely on an issue that neither party raised in the district court nor on appeal. The dissent reads SEA 480 as only barring Indiana physicians and practitioners from aiding and abetting other Indiana physicians and practitioners in the provision of gender transition treatment to minors. So, our dissenting colleague says, we need not reach the First Amendment question because appellees may make referrals to, and discuss former patients with, out-of-state providers without violating SEA 480. The parties

disagree. Appellants and appellees read SEA 480 to also pro-
hibit Indiana providers from aiding and abetting out-of-state
providers. That explains why the district court evaluated SEA
480 under the First Amendment, *K.C. v. Indiv. Members of Med.
Licensing Bd. of Ind.*, 677 F. Supp. 3d 802, 818–19 (S.D. Ind.
2023), and why the parties have asked this court to do the
same.

Courts should avoid resolving cases on constitutional
grounds when they can be fairly resolved on statutory
grounds. *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348
(1936) (Brandeis, J., concurring). But avoiding the First
Amendment question in this case would be a mistake. The
dissenting opinion incorrectly characterizes appellees' as-ap-
plied First Amendment claim. They do not limit their
challenge, as the dissent says, to SEA 480's bar on aiding and
abetting out-of-state providers. Rather, in their complaint, ap-
pellees broadly allege that SEA 480 "prohibits [them] from en-
gaging in communications that are designed to allow another
physician or practitioner to provide 'gender transition proce-
dures' as described in the statute." DE 1, Complaint at 44.
Even under the dissent's reading of SEA 480, we must reach
the First Amendment issue to determine whether Indiana
could prohibit, for example, a South Bend physician from aid-
ing and abetting an Indianapolis physician's provision of gen-
der transition treatment to a minor.

Further, licensure can be in multiple states. So, even under
a narrow reading of SEA 480, secondary liability could attach
when an Indiana physician aids and abets a physician li-
censed in both Indiana and Illinois providing gender transi-
tion services in Illinois. Given these scenarios, the First
Amendment question—argued and considered by the district

court, raised on appeal, and briefed by the parties—deserves our review. What is more, our task at this interlocutory stage is to determine appellees' likelihood of success on the merits, not to rule definitively on the First Amendment question. Other issues this litigation might present, including the scope of the statute and any constitutional questions that might flow from it, are left for another day. Indeed, any such issues should first be briefed by the parties and considered in the district court on remand. And the district court may deem it appropriate to certify a statutory question to the Indiana Supreme Court. IND. R. APP. P. 64(A). We leave these matters to the district court's discretion as this litigation proceeds.

*   *   *

These constitutional arguments threaten significant consequences. Appellees ask us to constitutionalize and thus take from Indiana the power to regulate a new and heavily debated medical treatment with unknown risks. If we hasten to set one side of the debate into constitutional stone, we will prevent Indiana from responding to tomorrow's insights. Our Constitution is not so quick to act. By design, it provides a solution to just a few difficult questions and leaves the rest to the people.

So will we. Appellees have not shown a likelihood of success on any of their claims. This factor cuts against an injunction.

## IV.

A party seeking a preliminary injunction must also "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted); *DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022). "[I]f legal

remedies available to the movant … are seriously deficient as compared to the harm suffered" then the harm is irreparable. *DM Trans, LLC*, 38 F.4th at 618. The district court's determination is a factual finding, so this court reviews it for clear error. *Whitaker*, 858 F.3d at 1045.

The district court decided that this factor favored the plaintiffs. *K.C.*, 677 F. Supp. 3d at 819–20. Citing evidence that puberty blockers and cross-sex hormone therapy can help treat gender dysphoria, the court concluded the minor plaintiffs would suffer if they lost access to that treatment once the law went into effect. *Id.* at 820. And because the court held that the physician plaintiffs were likely to succeed on the merits of their First Amendment claim, it also found this constitutional violation to constitute irreparable harm. *Id.*

The district court clearly erred. While it was correct to recognize the record evidence supporting the effectiveness of medical interventions to treat gender dysphoria, the court failed to even discuss other record evidence establishing that psychotherapy and psychosocial support are also effective treatment options. *See id.* It might be different if Indiana barred all treatment for gender dysphoria, but SEA 480 does no such thing.

The district court incorrectly concluded that the physician plaintiffs would suffer irreparable harm if Indiana enforced the aiding and abetting provision. Again, the district court did not misstate the law—"violations of First Amendment rights are presumed to constitute irreparable injuries … ." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006). But plaintiffs are not likely to succeed on the merits of their First Amendment claim. *See infra* III.C.; *see also Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (affirming decision that preliminary

injunctive relief was warranted where First Amendment violation "was both threatened and occurring at the time of respondents' motion and … respondents sufficiently demonstrated a probability of success on the merits" of that claim).

The second factor cuts against entering an injunction.

## V.

The third factor weighs "the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted." *DM Trans, LLC*, 38 F.4th at 622 (quoting *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015)).

This is a sliding scale—"'the more likely [the moving party] is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor.'" *Id.* (quoting *Turnell*, 796 F.3d at 662) (alteration in original); *Mays*, 974 F.3d at 818; *cf. Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020) ("If the plaintiff is likely to win on the merits, the balance of harms need not weigh as heavily in his favor."). Part of the balancing process includes evaluating the public interest, which refers to "the effects the preliminary injunction—and its denial—would have on non-parties." *Speech First, Inc.*, 968 F.3d at 637.

We do not defer to the district court's erroneous decision on this factor. *See DM Trans, LLC*, 38 F.4th at 622; *id.* ("Unless the district court's legal conclusions were incorrect or its findings of fact were clearly erroneous, we afford the court's ultimate decision 'great deference.'") (cleaned up); *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021); *Speech First, Inc.*, 968 F.3d at 638. The court conditioned its decision that

the balance of harms favored the plaintiffs on its likelihood of success and irreparable harm determinations. *K.C.*, 677 F. Supp. 3d at 820.

As we discussed above, the district court erroneously evaluated these issues. It misapplied the *Geduldig* incidental sex-based classification line of caselaw, which instructs courts to double check whether the groups created by a law are divided by sex or for some other purpose. It also neglected to consider the state's evidence of psychosocial support and psychotherapy, which led to its view that the plaintiffs would have no treatment options without the law. We did not discuss the court's heightened scrutiny discussion, but this blind spot affected its view there too. And although it was still in error, the district court is not to blame for its contrary conclusion on the Free Speech Clause claim, for it did not have the benefit of *Hansen* before reaching its decision.

An injunction causes significant harm to Indiana and the public interest. SEA 480 is a duly enacted law. Indiana's voters have decided, through their representatives, legislative and executive, that medical interventions are too risky and novel to be safe treatments for children with gender dysphoria. The people of Indiana have a substantial interest in the effectiveness of that decision. Because appellees have not shown a likelihood of success, and because their harms are not irreparable, we conclude that the balance of harms favors Indiana.

The district court erred by entering the preliminary injunction.

## VI.

"That the wisdom of a legislative act is not subject to judicial scrutiny requires no citation." *EEOC v. City of Janesville*, 630 F.2d 1254, 1259 (7th Cir. 1980); *Beach Commc'ns, Inc.*, 508 U.S. at 314 ("'[J]udicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.'" (quoting *Vance*, 440 U.S. at 97 (footnote omitted))); *Heller*, 509 U.S. at 319; *see also Dandridge v. Williams*, 397 U.S. 471, 487 (1970). As the Supreme Court has explicitly warned lower courts, when legislatures "act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation, even assuming, arguendo, that judges with more direct exposure to the problem might make wiser choices." *Marshall v. United States*, 414 U.S. 417, 427 (1974); *Gonzales*, 550 U.S. at 163 ("[Legislatures have] wide discretion to pass legislation in areas where there is medical and scientific uncertainty.").

And yet, throughout their briefs, appellees and their amici herald statements from medical authorities on their side of the debate as evidence that the Indiana legislature acted imprudently. But the federal courts do not mediate medical debates. The Constitution vests the people and their chosen representatives with that responsibility. This is why "[w]e have consistently deferred to legislative judgment in cases involving the regulation of licensed professions." *DeSalle v. Wright*, 969 F.2d 273, 275 (7th Cir. 1992); *Sutker v. Ill. State Dental Soc'y*, 808 F.2d 632, 635 (7th Cir. 1986). It is also why "health and welfare laws" like SEA 480 are "entitled to a 'strong presumption of validity.'" *Dobbs*, 597 U.S. at 221 (quoting *Heller*, 509 U.S. at 319). *See Marshall*, 414 U.S. at 427; *Williamson*, 348 U.S. at 487–

88; *Maguire v. Thompson*, 957 F.2d 374, 378–79 (7th Cir. 1992). Appellees must take their grievance to the people of Indiana—not the courts.

For the reasons above, we REVERSE the district court's order and VACATE its injunction. We REMAND for further proceedings consistent with this opinion.

**APPENDIX**

| | ALABAMA | ARKANSAS | INDIANA | KENTUCKY | TENNESSEE |
|---|---|---|---|---|---|
| **Prohibited Conduct Generally** | Ala. Code § 26-26-4(a) (a) Except as provided in subsection (b), no person shall engage in or cause any of the following practices to be performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this chapter: | Ark. Code Ann. § 20-9-1502 (a) A physician or other healthcare professional shall not provide <u>gender transition procedures</u> to any individual under eighteen (18) years of age. (b) A physician or other healthcare professional shall not refer any individual under eighteen (18) years of age to any healthcare professional for gender transition procedures. | Ind. Code Ann. § 25-1-22-13 Sec. 13. (a) Except as provided in subsections (c) and (d), a physician or other practitioner may not knowingly provide <u>gender transition procedures</u> to a minor. (b) Except as provided in subsection (c), a physician or other practitioner may not aid or abet another physician or practitioner in the provision of gender transition procedures to a minor. | Ky. Rev. Stat. Ann. § 311.372 (2) Except as provided in subsection (3) of this section, a health care provider shall not, for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex, knowingly: | Tenn. Code Ann. § 68-33-103(a)(1) (a)(1) A healthcare provider shall not knowingly perform or offer to perform on a minor, or administer or offer to administer to a minor, a medical procedure if the performance or administration of the procedure is for the purpose of: (A) Enabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or (B) Treating purported discomfort or distress from a discordance between the |

| | | | | | minor's sex and asserted identity. |
|---|---|---|---|---|---|
| *Puberty-blocking medication* | **Ala. Code § 26-26-4(a)(1)** (1) Prescribing or administering puberty blocking medication to stop or delay normal puberty. | **Ark. Code Ann. § 20-9-1501(6)(A)** "Gender transition procedures" means any medical or surgical service, including without limitation physician's services, inpatient and outpatient hospital services, or prescribed drugs related to gender transition that seeks to: … (ii) Instill or create physiological or anatomical characteristics that resemble a sex different from the individual's biological sex, including without limitation medical services that provide puberty-blocking drugs … | **Ind. Code Ann. § 25-1-22-5** Sec. 5. (a) As used in this chapter, "gender transition procedures" means any medical or surgical service, including physician's services, practitioner's services, inpatient and outpatient hospital services, or prescribed drugs related to gender transition, that seeks to: … (2) instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex, including medical services that provide puberty blocking drugs … | **Ky. Rev. Stat. Ann. § 311.372(2)(a)** (a) Prescribe or administer any drug to delay or stop normal puberty; | **Tenn. Code Ann. § 68-33-104** A person shall not knowingly provide a hormone or puberty blocker by any means to a minor if the provision of the hormone or puberty blocker is not in compliance with this chapter. |
| *Hormones* | **Ala. Code § 26-26-4(a)** | **Ark. Code Ann. § 20-9-** | **Ind. Code Ann. § 25-1-22-** | **Ky. Rev. Stat. Ann. §** | |

|  | (2) Prescribing or administering supraphysiologic doses of testosterone or other androgens to females. (3) Prescribing or administering supraphysiologic doses of estrogen to males. | **1501(6)(A)** "Gender transition procedures" means any medical or surgical service, including without limitation physician's services, inpatient and outpatient hospital services, or prescribed drugs related to gender transition that seeks to: . . . (ii) Instill or create physiological or anatomical characteristics that resemble a sex different from the individual's biological sex, including without limitation . . . cross-sex hormones . . . | **5** Sec. 5. (a) As used in this chapter, "gender transition procedures" means any medical or surgical service, including physician's services, practitioner's services, inpatient and outpatient hospital services, or prescribed drugs related to gender transition, that seeks to: . . . (2) instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex, including medical services that provide . . . gender transition hormone therapy . . . | **311.372(2)(b)** (b) Prescribe or administer testosterone, estrogen, or progesterone, in amounts greater than would normally be produced endogenously in a healthy person of the same age and sex; |  |
| *Surgery* | **Ala. Code § 26-26-4(a)(4)** (4) Performing surgeries that sterilize, | **Ark. Code Ann. § 20-9-1501(6)(A)** "Gender transition | **Ind. Code Ann. § 25-1-22-5** Sec. 5. (a) As used in this | **Ky. Rev. Stat. Ann. § 311.372(2)(c)** (c) Perform any |  |

| | | | |
|---|---|---|---|
| including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.<br><br>**Ala. Code § 26-26-4(a)(5)** (5) Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's sex, including metoidioplasty, phalloplasty, and vaginoplasty.<br><br>**Ala. Code § 26-26-4(a)(6)** (6) Removing any healthy or non-diseased body part or tissue, except for a male circumcision. | procedures" means any medical or surgical service, including without limitation physician's services, inpatient and outpatient hospital services, or prescribed drugs related to gender transition that seeks to: . . . (ii) Instill or create physiological or anatomical characteristics that resemble a sex different from the individual's biological sex, including genital or nongenital gender reassignment surgery …<br><br>**Ark. Code Ann. § 20-9-1501(7)(A)** "Genital gender reassignment surgery" means a medical procedure performed for the purpose of | chapter, "gender transition procedures" means any medical or surgical service, including physician's services, practitioner's services, inpatient and outpatient hospital services, or prescribed drugs related to gender transition, that seeks to: … (2) instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex, including genital gender reassignment surgery or nongenital gender reassignment surgery knowingly performed for the purpose of assisting an individual with a gender transition. | sterilizing surgery, including castration, hysterectomy, oophorectomy, orchiectomy, penectomy, and vasectomy;<br><br>**Ky. Rev. Stat. Ann. § 311.372(2)(d)** (d) Perform any surgery that artificially constructs tissue having the appearance of genitalia differing from the minor's sex, including metoidioplasty, phalloplasty, and vaginoplasty;<br><br>**Ky. Rev. Stat. Ann. § 311.372(2)(e)** (e) Remove any healthy or non-diseased body part or tissue. |

| | | assisting an individual with a gender transition, including without limitation: (A) Surgical procedures such as penectomy, orchiectomy, vaginoplasty, clitoroplasty, or vulvoplasty for biologically male patients or hysterectomy or ovariectomy for biologically female patients;

**Ark. Code Ann. § 20-9-1501(7)(B)** "Genital gender reassignment surgery" means a medical procedure performed for the purpose of assisting an individual with a gender transition, including without limitation: (C) Phalloplasty, vaginectomy, scrotoplasty, or | **Ind. Code Ann. § 25-1-22-6** Sec. 6. As used in this chapter, "genital gender reassignment surgery" means a medical procedure knowingly performed for the purpose of assisting an individual with a gender transition, including the following: (1) Surgical procedures, including a penectomy, orchiectomy, vaginoplasty, clitoroplasty, or vulvoplasty for a male sex patient or hysterectomy or ovariectomy for a female sex patient. (3) Phalloplasty, vaginectomy, scrotoplasty, or implantation of erection or testicular prostheses for a female sex patient. | | |

| | | implantation of erection or testicular prostheses for biologically female patients; | | | |
|---|---|---|---|---|---|
| **_Exceptions Generally_** | **Ala. Code § 26-26-4(b)** (b) Subsection (a) does not apply to a procedure undertaken to treat a minor born with a medically verifiable disorder of sex development, including either of the following: | **Ark. Code Ann. § 20-9-1502(c)** (c) A physician or other healthcare professional is not prohibited from providing any of the following procedures which are not gender transition procedures to an individual under eighteen (18) years of age: | **Ind. Code Ann. § 25-1-22-13(c)** (c) This section does not prohibit a physician or other practitioner from providing any of the following to a minor: | **Ky. Rev. Stat. Ann. § 311.372(3)** (3) The prohibitions of subsection (2) this section shall not limit or restrict the provision of services to: | **Tenn. Code Ann. § 68-33-103(b)(1)** (b)(1) It is not a violation of subsection (a) if a healthcare provider knowingly performs, or offers to perform, a medical procedure on or administers, or offers to administer, a medical procedure to a minor if: |
| _Born with ambiguous sex characteristics_ | **Ala. Code § 26-26-4(b)(1)** (1) An individual born with external biological sex characteristics that are irresolvably ambiguous, including an individual born with 46 XX chromosomes with | **Ark. Code Ann. § 20-9-1502(c)(1)** (1) Services to persons born with a medically verifiable disorder of sex development, including a person with external biological sex characteristics that are irresolvably | **Ind. Code Ann. § 25-1-22-13(c)(1)** (1) Services to individuals born with a medically verifiable disorder of sex development, including an individual with external biological sex characteristics that are irresolvably | **Ky. Rev. Stat. Ann. § 311.372(3)(a)** (a) A minor born with a medically verifiable disorder of sex development, including external biological sex characteristics that are irresolvably ambiguous; | **Tenn. Code Ann. § 68-33-103(b)(1)(A)** (A) The performance or administration of the medical procedure is to treat a minor's congenital defect . . . |

| | | | | | |
|---|---|---|---|---|---|
| | virilization, 46 XY chromosomes with under virilization, or having both ovarian and testicular tissue. | ambiguous, such as those born with 46 XX chromosomes with virilization, 46 XY chromosomes with undervirilization, or having both ovarian and testicular tissue; | ambiguous, including individuals born with forty-six (46) XX chromosomes with virilization, born with forty-six (46) XY chromosomes with undervirilization, or having both ovarian and testicular tissue. | | |
| *Disorder of sexual development* | **Ala. Code § 26-26-4(b)(2)** (2) An individual whom a physician has otherwise diagnosed with a disorder of sexual development, in which the physician has determined through genetic or biochemical testing that the person does not have normal sex chromosome structure, sex steroid hormone production, or sex steroid | **Ark. Code Ann. § 20-9-1502(c)(2)** (2) Services provided when a physician or practitioner has otherwise diagnosed a disorder of sexual development that the physician has determined through genetic or biochemical testing that the person does not have normal sex chromosome structure, sex steroid hormone production, or sex steroid | **Ind. Code Ann. § 25-1-22-13(c)(2)** (2) Services provided when a physician or practitioner has diagnosed a disorder of sexual development that the physician or practitioner has determined through genetic or biochemical testing that the individual does not have normal sex chromosome structure, sex steroid hormone | **Ky. Rev. Stat. Ann. § 311.372(3)(b)** (b) A minor diagnosed with a disorder of sexual development, if a health care provider has determined, through genetic or biochemical testing, that the minor does not have a sex chromosome structure, sex steroid hormone production, or sex steroid hormone action, that is | **Tenn. Code Ann. § 68-33-103(b)(1)(A)** (A) The performance or administration of the medical procedure is to treat a minor's congenital defect . . . |

| | hormone action for a male or female. | hormone action; | production, or sex steroid hormone action. | normal for a biological male or biological female; | |
|---|---|---|---|---|---|
| *Disease/disorder/injury* | | **Ark. Code Ann. § 20-9-1502(c)** (3) The treatment of any infection, injury, disease, or disorder that has been caused by or exacerbated by the performance of gender transition procedures, whether or not the gender transition procedure was performed in accordance with state and federal law or whether or not funding for the gender transition procedure is permissible under this subchapter; or (4) Any procedure undertaken because the individual suffers from a physical disorder, physical injury, or | **Ind. Code Ann. § 25-1-22-13(c)** (3) The treatment of any infection, injury, disease, or disorder that has been caused by or exacerbated by the performance of gender transition procedures. (4) Any medical or surgical service undertaken because the individual suffers from a physical disorder, physical injury, or physical illness that would, as certified by a physician or practitioner, place the individual in imminent danger of death or impairment of major bodily function unless the medical or | **Ky. Rev. Stat. Ann. § 311.372(3)(c)** (c) A minor needing treatment for an infection, injury, disease, or disorder that has been caused or exacerbated by any action or procedure prohibited by subsection (2) of this section. | **Tenn. Code Ann. § 68-33-103(b)(1)(A)** (b)(1) It is not a violation of subsection (a) if a healthcare provider knowingly performs, or offers to perform, a medical procedure on or administers, or offers to administer, a medical procedure to a minor if: (A) The performance or administration of the medical procedure is to treat a minor's . . . disease, or physical injury; | |

| | | physical illness that would, as certified by a physician, place the individual in imminent danger of death or impairment of major bodily function unless surgery is performed. | surgical service is performed. | | |
|---|---|---|---|---|---|

JACKSON-AKIWUMI, *Circuit Judge,* dissenting. The majority opinion vacates the district court's preliminary injunction on the grounds that Indiana's Senate Enrolled Act 480 does not likely violate Provider-Plaintiffs' free speech rights, Parent-Plaintiffs' due process rights, or Minor-Plaintiffs' equal protection rights. I disagree on all fronts. On the critically important due process and equal protection questions before us, I dissent for largely the same compelling reasons explained by dissenting judges around the country.[1]

I limit this dissenting opinion to the question no court of appeals has addressed to date: whether a state law *construed* to prohibit medical providers from aiding and abetting out-of-state providers in the provision of gender transition treatment to minors violates the First Amendment. The issue is this: Provider-Plaintiffs, fearing exposure to liability under SEA 480 for providing patients information about out-of-state providers, referring patients to out-of-state providers, and discussing former patients with out-of-state providers, say they must remain silent, in violation of their right to free speech.

---

[1] *See L.W. by & through Williams v. Skrmetti,* 83 F.4th 460, 492–513 (6th Cir.) (White, J., dissenting), *cert. dismissed in part sub nom. Doe v. Kentucky,* 144 S. Ct. 389 (2023), *and cert. granted sub nom. United States v. Skrmetti,* 144 S. Ct. 2679 (2024); *Eknes-Tucker v. Governor of Alabama,* 114 F.4th 1241, 1275–77 (Wilson, J., dissenting), 1277–89 (Jordan, J., dissenting), 1289–1319 (Rosenbaum, J., dissenting) (11th Cir. 2024)*; see also Brandt v. Rutledge,* 677 F. Supp. 3d 877, 917–23 (E.D. Ark. 2023), *appeal filed,* No. 23-2681 (8th Cir. July 21, 2023). As the majority opinion notes, the statutes in these cases from around the country presented the same core substantive due process and equal protection issues relevant here. *See ante* at 25–27.

Provider-Plaintiffs make clear throughout their complaint and brief on appeal that the focus of their challenge is their ability to communicate about and to out-of-state providers. Here are examples, with all emphasis added:

- Complaint ¶ 175: "If S.E.A. 480 becomes law, [Provider-Plaintiff Dr. Catherine Bast] *will want to provide advice to her minor patients to assist them in receiving gender-affirming care in other states* and will, at her patients' requests, want to cooperate with the health providers *in that state* in terms of sharing information concerning her minor patients. This is also part of her duty as a physician to not abandon patients when she is unable to continue their care."

- Complaint ¶ 178: "However, S.E.A. 480 prohibits her from doing anything that aids or abets another physician or practitioner in providing gender transition procedures for a minor *and she will therefore not even be able to discuss with her patients the availability of these services in another state.*"

- Appellees' Brief at 22: "The district court also properly held that appellees were likely to succeed in demonstrating that S.E.A. 480's 'aiding or abetting' provision, Ind. Code § 25-1-22 13(b), violates the First Amendment. It prohibits practitioners from referring patients for care or discussing that care with other practitioners. This is pure speech, not conduct, and as the district court noted, *a state cannot prohibit the dissemination of truthful information about lawful out-of-state alternatives* without running afoul of the First Amendment. *See, e.g.*, *Bigelow v. Virginia*, 421 U.S. 809, 829 (1975)."

- Appellees' Brief at 46–47: "A *transgender minor who receives gender-affirming care in Illinois or Michigan is violating no law, and so Mosaic's referral to a provider in one of these states, while certainly integral to the minor's health and well-being, is not 'integral to unlawful conduct.'* The State ignores this distinction. It is not clear why the State believes that the district court's First Amendment holding depends on its conclusion that Indiana cannot prohibit gender-affirming care. (Appellants Br. 49). It does not: as the Supreme Court made clear in *Bigelow*, 421 U.S. at 827-29, *the right to share information about legal options for obtaining medical care does not rise and fall on whether a state can prohibit that care within its borders.* The State has no answer for this case."

The initial, and largest, fault I find in the majority opinion's analysis is its unexplained silence on a threshold statutory interpretation issue: an analysis of SEA 480 reveals the law bars *Indiana providers* from giving gender transition treatment to minors, and it bars *Indiana providers* from aiding and abetting *other Indiana providers* in doing the same. As I explain below, the law cabins its reach to the conduct of "physicians" licensed to practice in Indiana and "practitioners" regulated by an Indiana board. The law does not reach the conduct of out-of-state physicians or practitioners who provide gender transition treatment. It therefore does not violate SEA 480 for an Indiana physician or practitioner to provide their patients information about and referrals to out-of-state physicians and practitioners, or to discuss former patients with out-of-state physicians and practitioners. This understanding changes everything in the analysis that should follow.

The lacuna in the majority opinion's analysis gives way to a second fundamental error: placing Provider-Plaintiffs' proposed speech into two categories of unprotected speech. Contrary to the majority opinion's holding, Provider-Plaintiffs' proposed speech does not fall within *Giboney*'s speech-integral-to-unlawful-conduct exception because provision of treatment by an out-of-state provider is not a violation of SEA 480, meaning Provider-Plaintiffs' proposed speech is integral to *lawful* conduct. And because there is no unlawful conduct to begin with, aiding and abetting liability cannot attach.

Nor is Provider-Plaintiffs' proposed speech incidental to regulated conduct because, again, SEA 480 does not regulate conduct by out-of-state providers. This means Provider-Plaintiffs' proposed speech (again, providing patients information about and referrals to out-of-state providers, and discussing former patients with out-of-state providers) is incidental to *un*regulated conduct. Provider-Plaintiffs are free to discuss out-of-state treatment options and make referrals to out-of-state providers, full stop.

We therefore need not reach the constitutional question. But the majority opinion does. Even if we did have to reach that question, the aiding and abetting provision of SEA 480 is unconstitutional. For these reasons, I dissent.

**I**

I begin with a brief procedural history, followed by an overview of the standard governing this appeal. Provider-Plaintiffs are a physician, Dr. Catherine Bast, and her family medicine practice, Mosaic Health and Healing Arts, Inc., in Goshen, Indiana. Dr. Bast and Mosaic sought to preliminarily enjoin SEA 480's aiding and abetting provision from going

into effect. They argued that the law violated their First Amendment rights as applied to the following proposed activities: discussing lawful out-of-state treatment options with patients and making referrals to out-of-state providers, which includes discussing former patients with out-of-state providers. Separately, Minor-Plaintiffs and Parent-Plaintiffs respectively alleged the equal protection and due process violations that I referenced at the beginning of this dissent. The district court agreed with all the plaintiffs and issued a preliminary injunction. Indiana appealed.

Eleven days after we heard oral argument, the panel majority issued a sua sponte order staying the preliminary injunction. *See K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, No. 23-2366, 2024 WL 811523 (7th Cir. Feb. 27, 2024). In a highly unusual move, the panel majority decided on its own that SEA 480 should go into effect immediately. This forced hundreds of transgender minors in Indiana to wake up the next day without access to their existing care for gender dysphoria and chilled Provider-Plaintiffs' speech about care available out-of-state—all before we decided anything on the merits. I dissented. *See* Dkt. 127 (Jackson-Akiwumi, J., dissenting from the February 27, 2024, order staying the preliminary injunction). The panel majority subsequently denied Plaintiff-Appellees' motion to reconsider, also over my dissent. *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, No. 23-2366, 2024 WL 1212700 (7th Cir. Mar. 21, 2024). And then came the order denying Plaintiff-Appellees' motion requesting en banc reconsideration—again, over my dissent. *See* Dkt. 140.

Today, we reach a merits decision on whether to uphold or vacate the district court's preliminary injunction.

## II

We must remember, for purposes of this interlocutory appeal under 28 U.S.C. § 1292(a)(1), our role is to review the district court's decision for abuse of discretion only, evaluating its legal conclusions de novo and its factual findings for clear error. *See United States v. NCR Corp.*, 688 F.3d 833, 837 (7th Cir. 2012); *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018).

In deciding whether to issue an injunction, a district court considers four factors: (1) whether the movant is likely to succeed on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction. *See NCR Corp.*, 688 F.3d at 837. The two most important factors are likelihood of success on the merits and irreparable harm. *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024).

I focus this dissent on Provider-Plaintiffs' likelihood of succeeding on the merits of their First Amendment challenge, as "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). I discussed the remaining factors in a prior dissent. *K.C.*, 2024 WL 1212700, at *3–4 (Jackson-Akiwumi, J., dissenting).

### III

The first step in any First Amendment analysis is to construe the statute's meaning, bearing in mind that, "[w]hen legislation and the Constitution brush up against each other, our task is to seek harmony, not to manufacture conflict." *United States v. Hansen*, 599 U.S. 762, 781 (2023). If the relevant conduct falls outside the statute's scope, our work is done. *Ind. Right to Life Victory Fund v. Morales*, 66 F.4th 625, 632 (7th Cir. 2023), *certified question answered*, 217 N.E.3d 517 (Ind. 2023) (explaining that, "when we are faced with *both* statutory *and* constitutional questions, we must prioritize resolving the statutory issues if doing so would prevent us from engaging in unnecessary constitutional analysis," particularly "when the statute at issue is a state statute" (citation omitted)); *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (explaining that, "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter"). If the statute reaches the relevant conduct, though, we decide the constitutional question.

Applying this guidance, I address the unavoidable meaning of SEA 480's text and conclude that the text should end our consideration of Provider-Plaintiffs' free speech claim. Though the majority opinion skips over our statutory interpretation starting point and dives into the constitutional question, even then, I explain, the majority opinion cannot save SEA 480 from falling short of what the First Amendment requires.

A

I start, as we must, with the statutory text. I conclude that our First Amendment analysis should end where it begins because Provider-Plaintiffs' proposed speech falls outside SEA 480's purview.

SEA 480 prohibits "a physician or other practitioner [from] … knowingly provid[ing] gender transition procedures to a minor." IND. CODE § 25-1-22-13(a). SEA 480 also prohibits "a physician or other practitioner … aid[ing] or abet[ting] another physician or practitioner in the provision of gender transition procedures to a minor." § 25-1-22-13(b).

SEA 480 gives the terms "physician" and "practitioner" specific meaning. SEA 480 defines "physician" as "an individual who is licensed under IC 25-22.5," § 25-1-22-9, and Section 25-22.5 defines "physician" as "any person who holds the degree of doctor of medicine … and who holds a valid unlimited license to practice medicine … *in Indiana*," § 25-22.5-1-1.1(g) (emphasis added). The statute defines "practitioner" as "an individual who provides health services and holds … an unlimited license … issued by a board regulating the profession in question." § 25-1-22-10. The relevant statutory chapter does not define "board," but it does note that "[a] physician or practitioner" who violates SEA 480 "violates the standards of practice under IC 25-1-9." § 25-1-22-15. Section 25-1-9-1 states that "'board' means any of the entities described in IC 25-0.5-11," *see* § 25-1-9-1, and Section 25-0.5-11, in turn, lists over one dozen boards, including the Medical Licensing Board of Indiana (which regulates physicians licensed by the state of Indiana and whose individual members are defendants in this case), *see* § 25-0.5-11-5, the Indiana Board of Pharmacy, *see* §

25-0.5-11-8, and the State Psychology Board, *see* § 25-0.5-11-11.

So, SEA 480 bars *physicians licensed in Indiana* from providing gender transition treatment to minors. *See Estate of Moreland v. Dieter*, 576 F.3d 691, 698 (7th Cir. 2009) (noting, with citation to Indiana law, that courts must respect a statute's plain language). SEA 480 also bars *practitioners licensed in Indiana* from doing the same. *See Law v. Siegel*, 571 U.S. 415, 422 (2014) ("[T]he 'normal rule of statutory construction' [is] that words repeated in different parts of the same statute generally have the same meaning." (citation omitted)); *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning."); *Dep't of Treasury of Ind. v. Muessel*, 218 Ind. 250, 258 (1941) ("[W]e have a rule of construction that the same word used in the same manner in different places in the same statute is presumed to be used with the same meaning.").

What does this mean for the "aid and abet" part of SEA 480? Taken together, the provision above establishes that SEA 480's prohibition on "a physician or other practitioner … aid[ing] or abet[ing] another physician or practitioner in the provision of gender transition procedures to a minor" means one *Indiana* provider's secondary liability depends on another *Indiana* provider's primary violation, which is providing gender transition procedures. This accords with our centuries-old aiding and abetting jurisprudence, which establishes that a primary violation of law is the only thing to which a secondary violation of that law (also called "aiding and abetting" liability) may attach. *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 488 (2023).

Keep in mind that "aiding and abetting is merely a theory of *liability*, not a substantive offense," *United States v. Schuh*, 289 F.3d 968, 976 (7th Cir. 2002) (emphasis added), and "not [] a separate crime," *United States v. Ruiz*, 932 F.2d 1174, 1180 (7th Cir. 1991). It is a tool to hold a party liable for helping others break the law. "[L]iability for aiding and abetting," therefore, "*requires that a wrongful act be carried out*." *Hansen*, 599 U.S. at 771 (emphasis added); *United States v. Worthen*, 60 F.4th 1066, 1069 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 91 (2023) ("It is 'hornbook law' that convicting an aider and abettor first requires showing that *the underlying crime … 'was actually committed*.'" (cleaned and emphasis added) (citation omitted)); *United States v. Freed*, 921 F.3d 716, 721 (7th Cir. 2019) ("[I]t is axiomatic that one cannot aid and abet a crime *unless a crime was actually committed*." (emphasis added)); *Damato v. Hermanson*, 153 F.3d 464, 470 (7th Cir. 1998) ("[Under] the traditional understanding of aiding and abetting liability… an aider and abettor knowingly contributes to *the principal's violation*, rather than committing an independent violation of its own." (emphasis added)).

Applying this well-established aiding and abetting jurisprudence to Provider-Plaintiffs' First Amendment challenge to SEA 480 is straight forward. Starting at the top, a primary violation of SEA 480 occurs when an Indiana provider provides gender transition treatment to a minor. A secondary violation of SEA 480 occurs when an Indiana provider helps the principal Indiana provider treat the minor. Provider-Plaintiffs wish to provide their minor patients information about out-of-state treatment and referrals to out-of-state providers but cannot do so for fear of liability under SEA 480's aiding and abetting provision. Yet, if Provider-Plaintiffs do as they propose, an out-of-state provider—not an Indiana one—would

treat the minor, and that is not a primary violation of SEA 480. Because Provider-Plaintiffs would not be assisting with a primary violation of SEA 480, SEA 480's secondary liability does not attach. Ergo, Provider-Plaintiffs' proposed activities do not violate SEA 480's aiding and abetting provision. This is the end of the statutory analysis and, thus, the First Amendment challenge—or so I thought.

The majority opinion skips the requisite statutory interpretation analysis, and instead begins and ends with the constitutional question.[2] The majority opinion does not discuss SEA 480's clear text, much less acknowledge that SEA 480 governs Indiana physicians and practitioners only. Because SEA 480 simply does not reach the conduct of out-of-state providers and Provider-Plaintiffs do not challenge the First Amendment implications of SEA 480's ban on aiding and abetting Indiana providers,[3] we have no opportunity to

---

[2] My colleagues explain their approach by stating that the parties agree on SEA 480's scope, so my colleagues will defer to that understanding. *See ante* at 43–44. First, courts are not bound by the parties' interpretation of a statute. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 56 (2006) ("Nor must we accept an interpretation of a statute simply because it is agreed to by the parties."). Second, "[i]t is a well-established principle … that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) (citing *Escambia County v. McMillan*, 466 U.S. 48, 51, (1984) (per curiam)).

[3] *See ante* at 61–62 (summarizing Plaintiff-Providers' First Amendment challenge as focused on communications about out-of-state treatment alternatives). The majority opinion posits that Plaintiff-Providers are complaining about speech related to Indiana treatment options *and* speech related to out-of-state treatment options. Even if so—and while there may be no constitutional violation for the first type of speech as it may be speech incidental to conduct now regulated by SEA 480—the separate

decide whether SEA 480's aiding and abetting provision violates the First Amendment.[4]

---

constitutional question about the second type of speech, concerning out-of-state providers, must be answered with an analysis the majority opinion does not provide, as I discuss later in this dissent. *See post* at 81–82.

[4] A brief word on standing. We have recognized that, in the pre-enforcement context, "when an ambiguous statute arguably prohibits certain protected speech, a reasonable fear of prosecution can provide [Article III injury-in-fact] for a First Amendment challenge," which can be redressed with injunctive relief. *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010). Ordinarily, no substantial, credible threat of enforcement exists if the statute "clearly fails to cover" a plaintiff's conduct. *Lawson v. Hill*, 368 F.3d 955, 957 (7th Cir. 2004) (quoting *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)). SEA 480's aiding and abetting provision, we now know, cannot be fairly read to prohibit Provider-Plaintiffs from giving information about and referrals for out-of-state treatment; yet, Indiana has confirmed that liability remains on the table, declaring in its briefing that "S.E.A. 480 prohibits *any action* that aids or abets a gender-transition procedure" and refusing to disavow that the aiding and abetting provision applies to Provider-Plaintiffs' proposed speech. Dkt. 19 at 55; *see also* Dkt. 105 at 29–30 (Indiana arguing that it is unresolved "whether Indiana may prohibit providers from providing its children with out-of-state referrals"). *Cf. Lawson*, 368 F.3d at 959 (citing *Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1468 (3d Cir. 1994)) (concluding that plaintiffs lacked standing because the prosecutor neutralized any threat of enforcement by disavowing prosecution under the statute); *Florio*, 40 F.3d at 1468 (concluding that "the state demonstrat[ing] its willingness to prosecute …. added immediacy to [the plaintiff's] claim that he faced prosecution if he engaged in [the] proscribed expressive activity"). So, the substantial and credible threat of enforcement and, thus, Article III injury-in-fact, live on.

B

We need not reach the constitutional question for the reason I have just explained, but the majority opinion does. Even under the majority opinion's approach, SEA 480's aiding and abetting provision is unconstitutional.

To understand why, we must first frame the First Amendment inquiry. In deciding whether a law imposes an unconstitutional restriction on speech, we ask four questions.

First, does the statute regulate speech or conduct? *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). In analyzing the First Amendment issue (even though doing so is not necessary, as I have explained), I conclude that SEA 480 regulates speech. The majority opinion assumes the same. *See ante* at 40.

Second, is the regulated speech or regulated conduct protected? *Id.* We ask this because the First Amendment guarantees that "Congress shall make no law … abridging the freedom of speech," U.S. Const. amend. I, and the Fourteenth Amendment makes this constitutional protection applicable to the states, *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). This means the First Amendment protects against government restriction—based on message, ideas, subject matter, or content—of "pure speech" or "expressive conduct." *303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023). The First Amendment does not protect "nonexpressive conduct"; nor does it prohibit restrictions on speech incidental to regulated conduct, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011), or speech integral to unlawful conduct, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949).

The majority opinion holds that, insofar as the aiding and abetting provision regulates speech, it reaches only unprotected speech—either speech integral to unlawful conduct or speech incidental to regulated conduct. Our law, however, defies both conclusions. I explain why below, before returning to the third and fourth questions, which are determining the applicable level of scrutiny and applying that scrutiny to the facts, respectively.

1.

I begin with the speech-integral-to-unlawful conduct exception.

The exception for speech integral to unlawful conduct found life in *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949). There, the Supreme Court observed "that the constitutional freedom for speech … [does not] extend[] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Id*. at 498. "[W]here speech becomes an integral part of the crime, a First Amendment defense is foreclosed even if the prosecution rests on words alone." *United States v. Kaun*, 827 F.2d 1144, 1152 (7th Cir. 1987) (citation omitted). Aiding and abetting liability generally, my colleagues and I agree, falls within *Giboney*'s speech-integral-to-unlawful-conduct exception. But our agreement on *Giboney* ends there.

As a preliminary matter, SEA 480's aiding and abetting provision regulates speech integral to civil conduct. Physicians and practitioners who provide or threaten to provide gender transition treatment face civil claims brought by minors or their parents. § 25-1-22-16. Providers who aid and abet

treatment face the same, as well as discipline by the board regulating the provider. § 25-1-22-15.

Though courts use the phrases "speech integral to criminal conduct" and "speech integral to unlawful conduct" interchangeably, *see, e.g.*, *Giboney*, 336 U.S. at 498 (discussing speech "integral" to "conduct otherwise unlawful" and "speech or writing used as an integral part of conduct in violation of a valid criminal statute"), courts have historically applied the *Giboney* exception only to crimes, not civil infractions, *see, e.g.*, *Giboney*, 336 U.S. at 498; *United States v. Stevens*, 559 U.S. 460, 471 (2010) (noting the First Amendment does not protect speech integral to criminal conduct). The majority opinion does not address this distinction in *Giboney*'s application.

Even if the *Giboney* exception applies to civil laws like SEA 480, we do not have a speech-integral-to-unlawful-conduct problem here. Remember, to have a speech-integral-to-unlawful conduct situation, we need aiding and abetting liability. For aiding and abetting liability to attach, we need a primary violation. But there is none here as far as Provider-Plaintiffs are concerned. By providing information about and referrals for *out-of-state* treatment, Provider-Plaintiffs do not aid and abet other *Indiana* providers in treating minors—the conduct that constitutes a primary violation of SEA 480.

Put more simply, there is no unlawful conduct here—and there can be no "speech integral to unlawful conduct" without unlawful conduct.[5] Furthermore, the caselaw on speech

---

[5] The majority opinion cites the Supreme Court's decision in *Hansen*, *see ante* at 38–43, as a modern example of the speech-integral-to-unlawful-conduct exception. 599 U.S. at 762. But *Hansen* and this case are cut from

integral to unlawful conduct requires a strong connection between the speech and the unlawful conduct. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (describing the unprotected speech as "intrinsically related" to depictions of animal cruelty, which a federal statute criminalizes); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 249–250 (2002) (holding that distribution and sale of child pornography "were intrinsically related to the sexual abuse of children" giving the speech at issue "a proximate link to the crime from which it came").

The cases on speech integral to unlawful conduct are no different from the other rare exceptions to First Amendment protection: incitement, defamation, obscenity, and "true threats" of violence. *See Counterman v. Colorado*, 600 U.S. 66, 73–74 (2023) (listing these four as the "few limited areas" where restrictions on speech are permitted); *Stevens*, 559 U.S. 468–69 (adding speech integral to conduct to the above list, with a cite to *Giboney*). The cases in these areas focus on the specificity and imminence of the threat at issue, which is another way of asking "how connected is the speech to the unlawful conduct?" But here, again, we have no unlawful conduct. Just speech.

two different cloths. *Hansen* was a case about unlawful conduct, and there is none here. Moreover, *Hansen* concerned a federal immigration law, 8 U.S.C. § 1324(a)(1)(A)(iv), which, according to every circuit court that has ruled on the issue, applies extraterritorially. *See United States v. Beliard*, 618 F.2d 886, 887 (1st Cir. 1980); *United States v. Villanueva*, 408 F.3d 193, 196 (5th Cir. 2005); *United States v. Lopez*, 484 F.3d 1186, 1194–95 (9th Cir. 2007) (en banc); *United States v. Rolle*, 65 F.4th 1273, 1279 (11th Cir. 2023); *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004). This case concerns state law, and no one asserts that SEA 480 applies extraterritorially. So, the majority opinion's attempt to graft *Hansen* onto this case fails.

Another issue I see: The majority opinion suggests that the aiding and abetting provision does not stir up a constitutional problem because, the majority opinion rationalizes, Provider-Plaintiffs can always ask the trial court to dismiss a lawsuit against them if Indiana applies the law in an unconstitutional way. "If Indiana applied the law to speech that did not aid or abet a principal violation of SEA 480," the majority opinion says, "the defendant's first course of action would not be a federal constitutional challenge—it would be to move for dismissal of the lawsuit." *Ante*, at 39. "In other words," the majority opinion concludes, "because SEA 480's secondary liability provision 'stretches no further than … [s]peech intended to bring about a particular unlawful act,' the plaintiff doctor and her practice could only ever be sued for unprotected speech." *Ante*, at 39.

This reasoning unravels because our jurisprudence permits pre-enforcement, as-applied First Amendment challenges. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 14–16 (2010). Why? To prevent the chilling effect associated with expansive proscriptions on speech. *See Majors*, 317 F.3d at 721. Otherwise, plaintiffs face an unattractive set of options: refrain from activity they believe the First Amendment protects, or risk liability for violating the challenged law. *Id.*

My colleagues appear moved by the good intentions that Indiana contends underpin SEA 480's aiding and abetting provision. But it is axiomatic that a state cannot ensnare free speech just because it means well. The majority opinion says: "[T]he underlying wrongful conduct is the principal violation of Indiana's statute by the practitioner providing the treatment." *Ante*, at 42. Perhaps, by "principal violation," the majority opinion means *principle* violation, as in the Provider-

Plaintiffs' conduct (or the out-of-state provider's conduct) violates the spirit of SEA 480, rather than its letter, satisfying aiding and abetting liability's underlying wrongful conduct requirement. This interpretation tracks other reasoning found in the majority opinion. At one point, for example, the majority opinion asserts: "But when the physicians and the state do not see eye-to-eye on treatment—and when the state validly regulates that treatment—the state must be able to preclude its physicians from using their authority to help the state's citizens access the treatment. Otherwise, the physicians would hold a veto over the state's power to protect its citizens." *Ante*, at 43.

To the extent that the majority opinion contends that violating the spirit of SEA 480 satisfies the primary violation requirement, this rationale cannot sustain SEA 480's aiding and abetting provision. To provide tractable limits to the *Giboney* exception, the speech at issue must bear a causal link to an independently unlawful course of conduct, not a relationship to the mere *purpose* of a law. Without a primary violation, the only "unlawful conduct" that could be the basis of applying *Giboney*'s speech-integral-to-unlawful-conduct exception would be the speech itself—speech that Indiana regards as politically unpopular and morally disfavored.

The First Amendment does not tolerate that result, as the freedom of speech is meant to prevent the government from "suppress[ing] unpopular ideas or information." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). The Supreme Court, in *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, found fears that patients who received price advertising from pharmacists would "choose the low-cost, low-quality service," "destroy the pharmacist-customer

relationship," and "drive the 'professional' pharmacist out of business" insufficient to justify restricting the pharmacists' speech, explaining:

> There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them…. But the choice among these alternative approaches is not ours to make or the Virginia General Assembly's. It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us. Virginia is free to require whatever professional standards it wishes of its pharmacists …. But it may not do so by keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering…. [A] State may [not] completely suppress the dissemination of concededly truthful information about entirely lawful activity, fearful of that information's effect upon its disseminators and its recipients.

425 U.S. 748, 769–70, 773 (1976); *see also Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002) (rejecting the conclusion that the government can regulate physicians' speech about controlled substances because it may result in patients making bad decisions if given truthful information); *Sorrell*, 564

U.S. at 567, 572, 577 (finding unconstitutional a state law, enacted in part because lawmakers believed brand-name drugs were less safe than generic alternatives, permitting pharmacies to share prescriber-identifying information with anyone for any reason except marketing, and explaining that "[t]hose who seek to censor or burden free expression often assert that disfavored speech has adverse effects" but a regulation cannot "achieve [a State's] policy objectives through the indirect means of restraining certain speech by certain speakers").

For this reason, a state could not pass a law prohibiting ministers from informing their teenage parishioners that they can marry in another state, even if the state legislature thinks that it is against teenagers' best interests to marry without parental consent. As another example, Indiana could not prohibit Indiana physicians from informing patients that medical marijuana is legal in another state, even if the Indiana state legislature believes that its residents will make bad decisions if given truthful information. *See Thompson*, 535 U.S. at 374–75.

So, Indiana can realize its objectives by enacting a law and punishing those who violate it; it cannot accomplish its objectives by punishing speech that somehow *relates* to the *purpose* of a state law, yet amounts to no criminal or civil primary violation. *See Kingsley Int'l Pictures Corp. v. Regents of Univ. of N.Y.*, 360 U.S. 684, 689 (1959) (explaining that, "[a]mong free men, the deterrents ordinarily to be applied to prevent crime" and other unlawful conduct "are education and punishment for violations of the law, not abridgment of the rights of free speech" (citation omitted)). Put differently, for us to be assured that a state law targets something other than disfavored speech, it is not enough that the state label the speech itself as "illegal conduct" (i.e., "breach of the peace," "sedition," or, in

this case, aiding and abetting). *See* Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981, 1011 (2016). Instead, the speech "must help cause or threaten *other illegal* conduct . . ., which may make restricting the speech a justifiable means of preventing that *other* [*illegal*] conduct." *Id.* (emphasis added).

In short, Indiana cannot prohibit speech that aids and abets disfavored, yet legal, conduct. For all these reasons, *Giboney*'s speech-integral-to-unlawful-conduct exception does not apply.

2.

Now, consider the exception to First Amendment protection for speech incidental to conduct. The majority opinion cites *Sorrell* and *Expressions Hair Design v. Schneiderman*, 581 U.S. 37 (2017), to support its position that "SEA 480's secondary liability provision burdens speech incidentally because it targets conduct: facilitating the provision of gender transition procedures." *Ante*, at 40.

It is "true that the First Amendment does not prevent restrictions directed at … conduct from imposing incidental burdens on speech," *Sorrell*, 564 U.S. at 567, but—before we get to the incidental speech analysis—the state must *regulate* the relevant conduct by way of a law, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 292 n.4 (1984) (describing the issue whether proposed activities fall within the definitions found in the regulations as "a threshold matter" when considering the application of the speech-incidental-to-conduct exception). And, again, as a matter of statutory interpretation, SEA 480 does not regulate (or, said differently, reach) the conduct of out-of-state providers.

The majority opinion's view that the aiding and abetting provision permissibly regulates only speech incidental to conduct is wrong for three reasons.

The first reason is that even if SEA 480 incidentally burdens speech, SEA 480's aiding and abetting provision fails the *O'Brien* test, a test the majority opinion says it need not apply. Courts use the *O'Brien* factors to assess whether a regulation is constitutionally valid even if it incidentally affects speech. *See United States v. O'Brien*, 391 U.S. 367, 376–77 (1968). *O'Brien* requires that (1) the regulation be within the government's constitutional power; (2) the regulation further an important or substantial governmental interest; (3) the governmental interest be unrelated to the suppression of free expression; and (4) the restriction on free expression be no greater than is essential to further the governmental interest. *Id.*

SEA 480's aiding and abetting provision fails this test. A look at the first *O'Brien* factor demonstrates this: no portion of the majority opinion explains how regulating the aiding and abetting out-of-state conduct falls within Indiana's constitutional power. "[S]tate law enforcement agencies generally have no authority to operate outside a state's borders," erecting considerable hurdles to Indiana's authority to regulate the conduct of out-of-state providers. Darryl K. Brown, *Extraterritorial State Criminal Law, Post-Dobbs*, 113 J. Crim. L. & Criminology 853, 859 (2024); *see also* Ruth Mason & Michael S. Knoll, *Bounded Extraterritoriality*, 122 Mich. L. Rev. (forthcoming 2024) (manuscript at 8–17) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4375149) (explaining that the Dormant Commerce Clause doctrine substantially constrains states' power to regulate extraterritorially, predominantly through civil law); Paul Schiff Berman, Roey

Goldstein & Sophie Leff, *Conflicts of Law and the Abortion War Between the States*, 172 U. Pa. L. Rev. 399, 440–55 (2024).

On the second *O'Brien* factor, Indiana cannot have a substantial interest in regulating the aiding and abetting of legal conduct that occurs outside of the state. On the third factor, for reasons already discussed, I conclude that Indiana's interest in regulating the aiding and abetting of conduct is directly related to the suppression of speech itself. And on the fourth factor, SEA 480's restriction on free expression is greater than necessary to achieve any governmental interest because, again, Indiana lacks an interest in regulating the aiding and abetting of out-of-state treatment, which is legal under SEA 480.

The majority opinion sidesteps *O'Brien* entirely. My colleagues tell us that Plaintiff-Providers' proposed speech includes sharing information with Indiana providers *and* sharing information with out-of-state providers. If true, that would not let us off the hook when it comes to examining the constitutionality of both types of proposed speech. Yet the majority opinion does not offer a word on *O'Brien* regarding communications with Indiana providers (and I do not because, again, I do not think these communications are at issue in this appeal), much less a word on *O'Brien* regarding communications with out-of-state providers.

The majority opinion's two reasons for concluding the aiding and abetting provision regulates only speech incidental to conduct similarly fail to persuade.

In the majority opinion's view, "[s]imply because speech is picked up during enforcement of a law does not mean the law targets speech." *Ante*, at 41. I agree. But the majority

opinion fails to account for a fact that renders its analysis un-workable: for the reasons I have explained, SEA 480 does not and cannot reach the provision of gender transition treatment outside of Indiana. *See, e.g., ante* at 43. And the majority opinion is right that the First Amendment does not frown on laws forbidding an accountant to assist a client with filing a false tax return. *See ante* at 41–42. But in *United States v. Knapp*, 25 F.3d 451 (7th Cir. 1994), and *United States v. Kaun*, 827 F.2d 1144 (7th Cir. 1987), the two cases the majority opinion cites to support this argument, the challenged *federal* income tax law did purport to reach the underlying conduct—that is, the filing of a false federal tax return in *any* state. The First Amendment *does* frown on a law—not so different from the scenario Provider-Plaintiffs fear here—forbidding an Indiana accountant or lawyer from advising a client, "you can incorporate in Delaware, where you would not have to pay certain state taxes," even if the failure to pay those same taxes in Indiana would be unlawful.

Two, the majority opinion relies on *United States v. Hansen*, 599 U.S. 762 (2023), to conclude:

> Ordinarily, the "incidental" question is necessary to prevent states from attaching criminal penalties to restrictions of protected speech. But secondary liability statutes depend on their mate for legal power. So, if a plainly unconstitutional primary liability statute fell, it would take the secondary liability statute with it. The practical concern baked into the "incidental" question would never arise.

*Ante*, at 42.

*Hansen* does not do what the majority opinion suggests. I agree that aiding and abetting liability can attach only when a primary violation occurs. And I agree that a plainly unconstitutional primary liability statute takes its secondary liability provision down with it. But I do not agree that this means that "[t]he practical concern baked into the 'incidental' question would never arise." *Id*. This is because Provider-Plaintiffs have not lodged a *facial* challenge to SEA 480. They bring an *as-applied* challenge. So, we are without occasion to decide whether SEA 480 is a "plainly unconstitutional primary liability statute," as the majority opinion describes the hypothetical inquiry. *Id*. And "the practical concern baked into the 'incidental' question," *id.*, persists in as-applied challenges, as evidenced by the majority opinion's robust analysis of whether the speech-incidental-to-conduct exception removes First Amendment protection from Provider-Plaintiffs' as-applied speech.

For these reasons, I cannot conclude that SEA 480's aiding and abetting provision as applied to Provider-Plaintiffs regulates speech incidental to conduct.

The speech in this case does not fall into the traditional unprotected speech categories of speech integral to unlawful conduct or speech incidental to regulated conduct. Nor is the majority opinion entitled to create a new "First Amendment Free Zone" that leaves speech integral to *lawful* conduct and speech incidental to *un*regulated conduct unprotected. *Stevens*, 559 U.S. at 469 (citation omitted).

3.

With *Giboney*'s speech-integral-to-unlawful-conduct and the speech-incidental-to-conduct exceptions to First Amendment protection excised from our consideration, only pure speech remains; so, we return to the framework for deciding whether a law imposes an unconstitutional restriction on speech, *see ante* at 72–73, and ask the third question: What level of scrutiny applies? *See Cornelius*, 473 U.S. at 797.

No party disputes that the aiding and abetting provision regulates speech based on its content, since it prohibits only speech related to gender transition treatment for minors. As such, it is subject to strict scrutiny as a content-based restriction on pure speech. *Sorrell*, 564 U.S. at 567.

Now to the fourth and final question: Has Indiana made the requisite showing when we apply strict scrutiny to SEA 480's aiding and abetting provision? To survive strict scrutiny, Indiana must show that the aiding and abetting provision's singling out of speech relating to gender transition treatment for minors is necessary to "further[] a compelling interest and is narrowly tailored to that end." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015).

Trying to shoulder this burden, Indiana argues—and the majority opinion accepts—that the aiding and abetting provision furthers Indiana's compelling interests in preventing harm to the physical and psychological well-being of minors, regulating the providers it licenses, and enforcing democratically enacted statutes.

Even assuming these amount to compelling interests, Indiana fails to demonstrate that prohibiting Plaintiff-Providers from providing information about and referrals for out-of-

state treatment is narrowly tailored to further these interests. This is because the provision of gender transition treatment by out-of-state providers does not violate SEA 480, rendering a provision that targets secondary conduct (like the aiding and abetting provision) overbroad and not "reasonably necessary to achieve" Indiana's interests. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395–96 (1992) (concluding that a law that leaves gaps that, if filled, would directly target the conduct the state purportedly seeks to regulate, while nonetheless regulating the secondary conduct of speech, fails strict scrutiny). In the end, it is plain to me that SEA 480's aiding and abetting provision, even if aimed at Indiana's legitimate interests, has such a tendency to inhibit constitutionally protected expression that it cannot stand.

## IV

I would affirm the district court's preliminary injunction and conclude that we need not reach the constitutional issue because Provider-Plaintiffs' proposed speech falls outside SEA 480's bounds. Indeed, SEA 480 bars Indiana physicians and practitioners from providing gender transition treatment to minors and it bars Indiana providers from aiding and abetting other Indiana providers in the provision of the same. If I reached the constitutional question, I would hold that SEA 480's aiding and abetting provision violates the First Amendment because it does not regulate speech integral to unlawful conduct; it does not regulate speech incidental to regulated conduct; and it does not regulate Provider-Plaintiffs' pure speech in a manner that survives strict scrutiny.

I respectfully dissent.